# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

OLIVIA Y., et al.,

                                    Plaintiffs,

    v.

TATE REEVES, as Governor of the State of
Mississippi, et al.

                                    Defendants.

CIVIL ACTION NO.
3:04-CV-251-DCB-FKB

---

**PLAINTIFFS' PROPOSED SECOND AMENDED MOTION FOR RELIEF PURSUANT
TO REMEDY PHASE OF PLAINTIFFS' RENEWED MOTION FOR CONTEMPT AND
FOR THE APPOINTMENT OF A RECEIVER**

---

Plaintiffs respectfully move this Court for the entry of an Order finding Defendants in

contempt of this Court's orders and for the appointment of a general receiver with full authority

to administer Mississippi's child welfare system to bring it into compliance with the orders of

this Court. In support of their motion, Plaintiffs state the following:

1. This Second Amended Renewed Motion[1] is brought pursuant to Federal Rule of Civil

    Procedure 70(e), the Stipulated Third Remedial Order [Dkt. 713]("STRO"), and the 2nd

    Modified Mississippi Settlement Agreement and Reform Plan [Dkt. 712]("2nd MSA"). This

---

[1] Plaintiffs' position and the supporting evidence are laid out fully in their previous filings, which are all incorporated by reference herein as if fully set forth herein. *See* Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt, for an Evidentiary Hearing and for the Appointment of a Receiver [Dkt. 739], accompanying Memorandum of Law in Support [Dkt. 740], Reply in Support [Dkt. 767], Amended Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt [Dkt. 849] ("Amended Renewed Motion"), accompanying Memorandum of Law in Support [Dkt. 850], Reply Memorandum of Law in Further Support [Dkt. 864], Motion for Leave to Supplement Pending Amended Motion for Relief [Dkt. 876], and accompanying Proposed Supplemental Memorandum of Law in Support of Amended Motion for Relief [Dkt. 876-2].

Second Amended Renewed Motion is supported by the accompanying Amended Memorandum of Law in Support of the Second Amended Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt and for the Appointment of a Receiver, which is filed contemporaneously and is incorporated by reference into this motion.

2. As explained more fully in Plaintiffs' accompanying memorandum of law, and confirmed by the evidence and arguments submitted in support of this Second Amended Renewed Motion, an order finding Defendants in contempt and appointing a receiver is necessary to prevent further harm to the entire class of *Olivia Y.* foster children whose safety and well-being remain at risk as a direct result of Defendants' consistent disregard for their Court-ordered obligations.

3. Specifically, Plaintiffs submit the following exhibits in support of this Amended Renewed Motion.

- **Exhibit A**: Progress of the Mississippi Department of Child Protection Services: Monitoring Report for *Olivia Y., et al. v. Bryant, et al.* covering January to December 2018 [Dkt. 845] (the "Monitor's 2018 Report")

- **Exhibit B**: Progress of the Mississippi Department of Child Protection Services: Interim Monitoring Report for *Olivia Y., et al. v. Bryant, et al.* covering January to June 2019 [Dkt. 875] (the "Interim Report")

- **Exhibit C**: Progress of the Mississippi Department of Child Protection Services: Monitoring Report for *Olivia Y., et al. v. Bryant, et al.* covering January to December 2019 [Dkt. 897] (the "Monitor's 2019 Report")

- **Exhibit D**: Report to the Mississippi Legislature: A Review of the Mississippi Department of Child Protection Services for Fiscal Year 2019 (the "2019 PEER Report")

4. For the reasons stated in this Second Amended Renewed Motion, as well as the reasons and authorities provided in the accompanying memorandum brief, Plaintiffs request that the Court grant their motion, find that Defendants are in noncompliance with the 2nd MSA, and hence in contempt of court; and issue an order appointing a Receiver.

5. Plaintiffs also request that this Court grant such other and further relief as this Court deems necessary and proper.

RESPECTFULLY SUBMITTED, this the _____day of July 2020.

/s/ Marcia Robinson Lowry
Marcia Robinson Lowry (pro hac vice)
Anastasia Benedetto (pro hac vice)
A Better Childhood, Inc.
355 Lexington Avenue, Floor 16
New York, New York 10017
Telephone (646) 808-7344
Email: mlowry@abetterchildhood.org
        abenedetto@abetterchildhood.org

Wayne Drinkwater, Jr. (MBN 6193)
Michael J. Bentley (MBN 102631)
BRADLEY ARANT BOULT CUMMINGS LLP
One Jackson Place, Suite 400
188 East Capitol Street
Jackson, Mississippi 39201
Telephone: (601) 948-8000
Facsimile: (601) 948-3000
Email: wdrinkwater@bradley.com
        mbentley@bradley.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on _____, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will deliver copies to all counsels or record.

<u>*/s/ Marcia Robinson Lowry*</u>
Marcia Robinson Lowry (*pro hac vice*)

# EXHIBIT A

RECEIVED

JUN 10 2019

TOM S. LEE
U.S. DISTRICT JUDGE



# Progress of the Mississippi Department of Child Protection Services

Monitoring Report for *Olivia Y., et al. v. Bryant, et al.*
2ND MODIFIED MISSISSIPPI SETTLEMENT AGREEMENT
AND REFORM PLAN

**REPORT 6**

**JANUARY TO DECEMBER 2018**

**ISSUED JUNE 11, 2019**



**PUBLIC CATALYST**

# CONTENTS

Introduction ........................................................................................................................... 3

    Summary of Progress and Challenges ..................................................................................... 4

    2018 Summary of Commitments .......................................................................................... 7

    Methodology ....................................................................................................................... 19

    Demographics ..................................................................................................................... 19

    Creation of the Mississippi Department of Child Protection Services ...................................... 22

    Operational Budget ............................................................................................................. 23

1. Systemic Infrastructure Standards ...................................................................................... 23

    Department Leadership ....................................................................................................... 23

    Staff Qualifications and Training .......................................................................................... 24

    Caseloads and Supervision .................................................................................................. 27

    Continuous Quality Improvement ........................................................................................ 29

    Management Information Systems & Data Reporting ............................................................. 30

    Performance Based Contracting .......................................................................................... 35

    Foster Care Maintenance Payments .................................................................................... 36

2. Child Safety and Maltreatment in Care ............................................................................... 37

    Screening Reports of Abuse and Neglect .............................................................................. 38

    Investigating Maltreatment in Care ..................................................................................... 40

3. Family-Based Placements .................................................................................................. 48

4. Placement Standards ......................................................................................................... 54

5. Visitation ......................................................................................................................... 60

    Worker Contact and Monitoring .......................................................................................... 60

    Developing and Maintaining Connections ............................................................................. 64

6. Child and Youth Permanency .............................................................................................. 64

    Comprehensive Family Service Plans .................................................................................... 64

    Concurrent Permanency Planning ........................................................................................ 66

    Permanency Case Goals ...................................................................................................... 67

    Permanency Reviews .......................................................................................................... 71

i

Permanency Performance Indicators..........................................................................................73

7. Transition to Independent Living............................................................................................74

8. Child Well-Being......................................................................................................................78

   Physical and Mental Health Care .............................................................................................78

   Educational Services.................................................................................................................80

## FIGURES

Figure 1. Age of Children in Custody on December 31, 2018 ......................................................20

Figure 2. Placement Types of Children in Custody on December 31, 2018.................................21

Figure 3. Length of Stay in Care of Children in Custody on December 31, 2018 ........................21

Figure 4. Percent of Workers Meeting the Caseload Standard, 2018 .........................................28

Figure 5. Percent of Caseworker Supervisors Meeting the Supervision Ratio Standard, 2018.................28

Figure 6. Worker-Child Visitation, 2018.....................................................................................61

Figure 7. Worker-Foster Parent Visitation, 2018 .......................................................................63

## TABLES

Table 1. Race of Children in Custody on December 31, 2018......................................................20

Table 2. Exits from Care by Exit Type, January 1, 2018 to December 31, 2018..........................22

Table 3. Federal Goals for Children in Custody as of December 31, 2018...................................22

Table 4. 2nd MSA Caseload Standards by Case Type ..................................................................27

Table 5. Current Resource Board Payment Schedule .................................................................37

Table 6. ANE Reports by Intake Action, 2018 ............................................................................38

Table 7. Licensure Status of Homes, 2018 .................................................................................50

Table 8. Non-relative Foster Homes Licensed, 2018 ..................................................................53

Table 9. Special Needs Board Rates............................................................................................55

Table 10. Successive Emergency Shelter Placements, 2018........................................................60

Table 11. Worker-Child Visitation Narrative Review, 2018 ........................................................61

Table 12. Worker-Parent Visitation Narrative Review, 2018......................................................63

Table 13. Permanency Outcome Performance Standards...........................................................73

Table 14. Youth Receiving Independent Living Skills, 2018 ........................................................76

## Introduction

This document serves as the sixth report to the Honorable Tom S. Lee of the United States District Court for the Southern District of Mississippi, Northern Division in the matter of *Olivia Y. v. Bryant*. On December 19, 2016, the State of Mississippi, the Mississippi Department of Child Protection Services (MDCPS) and A Better Childhood, counsel for the plaintiffs, jointly submitted to the court a 2nd Modified Mississippi Settlement Agreement and Reform Plan (the "2nd MSA") that provides a path for improvement of Mississippi's child welfare system. Judge Lee had previously entered as orders of the court the Mississippi Settlement Agreement and Reform Plan on January 4, 2008 (the "Initial Settlement Agreement") and the Modified Mississippi Settlement Agreement and Reform Plan on July 6, 2012. MDCPS is the statewide child welfare agency that provides child protection, abuse prevention and placement services on behalf of the State of Mississippi. A Better Childhood is a national advocacy organization with experience in class action litigation on behalf of children in child welfare systems. Judge Lee entered an order directing implementation of the 2nd MSA following its submission by the parties.

In sum, the 2nd MSA, which became effective on January 1, 2018, sets forth the child welfare infrastructure, standards and outcomes that Mississippi must meet within specific timeframes statewide. Specifically, the 2nd MSA:

- Provides the plaintiff class relief by committing MDCPS to specific improvements in the state's care for vulnerable children, with respect to their safety, permanency, and well-being;

- Requires the implementation of a comprehensive child welfare data and tracking system, with the goal of improving MDCPS' ability to account for and manage its work with vulnerable children;

- Establishes benchmarks and performance standards in order to prevent harm to children in the class; and

- Provides a clear path for MDCPS to exit court supervision after the successful achievement and maintenance of performance standards.

Pursuant to the 2nd MSA, the Court appointed Public Catalyst as the monitor, charged with reporting on MDCPS' progress implementing its commitments. The monitor is responsible for assessing the state's performance under the 2nd MSA. The parties agreed the monitor shall take into account timeliness, appropriateness and quality in reporting on MDCPS' performance. The monitor is required to verify data reports and statistics provided by MDCPS and shall periodically conduct case record and qualitative reviews to monitor, evaluate and validate the state's

performance with respect to the commitments in the 2nd MSA. In evaluating MDCPS' performance, the monitor is not required to draw a conclusion as to whether the Department has achieved or maintained substantial compliance in accordance with Sections 11.2 and 11.3 of the 2nd MSA and has not done so.

The monitor is required to provide a written report to the Court and the parties no less frequently than annually. This is the monitor's first report to the Court under the 2nd MSA and reflects the status of Mississippi's performance as of December 31, 2018. This report includes MDCPS' progress for the entirety of calendar year 2018.

## Summary of Progress and Challenges

Of 113 commitments due in 2018 in the 2nd MSA, the monitor confirmed that MDCPS met required performance standards 37 times and did not do so in at least 35 other areas. The Department did not provide data for an additional 18 commitments, and the monitoring team could not validate quantitative data submitted by MDCPS for another 23 commitments. The 41 commitments for which MDCPS either did not provide data or provided inaccurate data that cannot be validated are listed in the Summary of Commitments and the relevant sections of this report. MDCPS' substantial and ongoing data problems include the manner in which the Department documents and identifies certain data fields, coding errors and performance calculations that are inconsistent with the established rules. These deficits create blind spots that impair MDCPS management's ability to lead the Department and ensure the safety, well-being and permanency of children consistent with the 2nd MSA.

Among the areas where MDCPS showed progress in 2018 are:

- *Staff Qualifications:* MDCPS reported that caseworkers hired in 2018 possessed an approved degree. MDCPS also reported caseworker supervisors appointed during 2018 possessed an approved degree and the requisite years of experience.

- *Training:* During 2018, the MDCPS Office of Professional Development administered staff training and professional development to the workforce. MDCPS reported that the newly hired workers requiring training completed pre-service training during the period and workers hired into their positions late in the period were enrolled in training that ended in the first quarter of 2019. Additionally, all caseworkers and investigators received the required 20 or more in-service training hours and all supervisors received the required 12 or more in-service training hours during 2018. Finally, MDCPS provided information indicating that caseworker supervisors appointed in 2018 met the 90-day requirement for training completion.

- *New Non-relative Homes*: MDCPS licensed 431 new non-relative foster homes in 2018, exceeding the annual target of 400 homes established by the monitor after consultation with the Department.

- *Post-Adoption Services:* MDCPS established a system of statewide post-adoptive services to stabilize and maintain adoptive placements. Adoptive families eligible for adoption subsidies have access to these services which include counseling, crisis intervention, family preservation and stabilization services and peer support.

Among the areas where MDCPS did not meet the identified performance standard are several critical to child safety, including:

- *Caseloads:* The parties agreed MDCPS would build capacity in 2017 to achieve reasonable workload standards by the start of 2018 for at least 90 percent of its caseworkers. The parties negotiated and agreed upon the standards for caseworkers in 2016, but MDCPS did not meet the standard for its staff at any time in 2018. Performance varied between a high of 60 percent in the first quarter of 2018 to a low of 47 percent in the third quarter.

- *Screening Child Maltreatment in Care (MIC)*: MDCPS agreed to ensure that it maintains a statewide system to appropriately receive, screen and investigate reports of child maltreatment, but many features of the system lack adequate quality controls. For example, MDCPS screened out 656 maltreatment reports involving children in custody during 2018. MDCPS reported that the Department's Safety Review Unit (SRU) conducted reviews of 409 of the 656 screened-out MIC reports (62.3 percent) in 2018, although it is required to review them all. SRU determined only one report was inappropriately screened-out and returned it for investigation, but the referral was not subsequently investigated.

- *Investigating Maltreatment in Care*: The monitoring team conducted a qualitative review of all MIC investigations completed by the Special Investigations Unit (SIU) during the first quarter of 2018 where the alleged perpetrator was a non-relative foster parent, relative foster parent, or residential facility staff member. This included 82 investigations involving 153 children. The monitoring team concluded the evidence supported MDCPS' findings in 58 of 82 investigations (70.7 percent). The monitoring team concluded in 14 investigations (17.1 percent) more information was needed in order to draw a proper conclusion. There were ten investigations (12.2 percent) where some or all the allegations were found to be unsubstantiated by MDCPS, but the monitoring team concluded that information presented during the course of the investigation was sufficient to substantiate.

5

- *Reviewing Maltreatment In Care Investigations*: Within 30 calendar days of the completion of any investigation of maltreatment of a child in custody, SRU must review the maltreatment investigation to identify any case practice deficiencies in the investigation and any remedial actions necessary to ensure the safety of the child who is the subject of the investigation, as well as any other children in the home or placement. The monitoring team determined that SRU conducted reviews of only 325 (65.9 percent) of 493 investigations in 2018. The monitoring team reviewed SRU reports for 82 MIC investigations from the first quarter of 2018 and observed that SRU noted case practice deficiencies in 14 of the SRU reports. Specific remedial actions and timeframes to address these deficiencies were not identified in the SRU reports.

- *Maltreatment in Care:* Data provided by MDCPS and verified by the monitoring team indicate that 95 children in MDCPS' custody were victims of abuse or neglect by their caregivers, a rate of child maltreatment that is more than three times the standard agreed upon in the 2nd MSA. MDCPS should have protected at least 68 more children from abuse or neglect in their placements in 2018 in order to meet the agreed upon safety standard.

## 2018 Summary of Commitments

| Section | Commitment | Achieved | Report Page |
|---------|------------|----------|-------------|
| STRO 2.a | Complete the creation and implementation of a fully functional child welfare agency, MDCPS, which is independent of, although housed within, the Mississippi Department of Human Services (MDHS), not later than July 1, 2018. | Yes | 22 |
| 2nd MSA Introduction | Defendants shall request state funds and any federal/special fund authorization sufficient to effect the provisions and outcome measures set forth in the 2nd MSA. | Yes | 23 |
| SYSTEMIC INFRASTRUCTURE STANDARDS | | | |
| 1 | MDCPS shall maintain a Commissioner of Child Protection Services having responsibility for the oversight and management of the MDCPS. | Yes | 23 |
| 1.1.a | MDCPS shall hire caseworkers who have, at minimum, a bachelor's degree in social work or a related human services degree. The monitor shall review and determine which degrees qualify as related human services degrees. | Yes | 24 |
| 1.1.b | MDCPS shall hire or promote to the position of caseworker supervisor only persons who have a master's degree in social work or a related human services degree and two years of experience working with children and families, preferably in foster care; or a bachelor's degree in social work or a related human services degree with three years of experience working with children and families, preferably in foster care. | Yes | 24 |
| 1.2.a | MDCPS shall maintain a Training Unit headed by a qualified director of training (see 2nd MSA for full requirements of the Training Unit). | Yes | 25 |
| 1.2.b | MDCPS caseworkers shall receive a minimum of 270 hours of pre-service training, which includes instructional training and supervised field training, and may include E-Learning. Any E-Learning training is subject to the approval of the monitor (see 2nd MSA for more info). | Yes | 25 |
| 1.2.c | MDCPS caseworker trainees, as part of pre-service training, may be assigned specific tasks or activities in connection with a case that is the primary responsibility of an experienced caseworker and may, under appropriate supervision, be assigned responsibility for a "training caseload" with progressively responsible caseload assignment. | Not Applicable | 26 |
| 1.2.d | MDCPS caseworkers shall receive a minimum of 20 hours of in-service training, and all supervisors shall receive a minimum of 12 hours of in-service training. | Yes | 26 |
| 1.2.e | MDCPS caseworker supervisors, within 90 days of hire or promotion, shall receive a minimum of 40 hours of training, directed specifically at the supervision of child welfare caseworkers. | Yes | 26 |
| 1.3.a | 90% of MDCPS caseworkers will have caseloads which do not exceed the caseload standards set forth in the 2nd MSA (pg. 3-4). Individual MDCPS caseworkers with generic caseloads shall not carry a mixed caseload that exceeds 100% capacity as calculated by weights per case type set forth in the 2nd MSA (pg. 3-4). | No | 27 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| 1.3.b | 85% of MDCPS supervisors shall be responsible for no more than five caseworkers. | No | 28 |
| 1.4.a | By December 1st of each year, MDCPS shall develop an annual Continuous Quality Improvement Plan, which shall be subject to the approval of the monitor after consultation with the parties. | Yes | 29 |
| 1.5.a | MDCPS shall maintain comprehensive information systems that permit: (1) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding required actions in a child's case and whether they have taken place. | No | 30 |
| 1.6.a | MDCPS shall provide to all county agency staff with child welfare responsibilities access to computer services, word processing, and electronic mail and access to the current management information systems and access to CCWIS, once implemented. | Yes | 33 |
| 1.6.b | Data related to compliance with the 2nd MSA's Foster Care Service Standards will be collected, analyzed and made available, at least quarterly, to MDCPS regional and county staff. | Yes | 33 |
| 1.6.c | MDCPS county staff shall have access to an electronic statewide database of available placement resources. | Yes | 34 |
| 1.7.a | Defendants shall establish, maintain and assess the effectiveness of a performance-based contracting system to evaluate annually contract agency compliance with the terms of the 2nd MSA. Defendants shall take all reasonable steps to ensure contract agency remediation of any identified deficiencies within three months. | Yes | 35 |
| 1.7.b | Prior to MDCPS contracting for case management services for children in custody, MDCPS shall submit for review and approval to the monitor a detailed plan to ensure accountability and provide supervision and oversight of such agencies. | Not Applicable | 35 |
| 1.8.a | Defendants shall ensure that all licensed foster families (regardless of whether they are supervised directly by MDCPS or by private providers, and whether they are kinship or unrelated foster families) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the 2nd MSA. | Yes | 36 |
| 1.8.b | Defendants shall pay to all licensed foster families at least the basic monthly foster care maintenance payments. Every two years thereafter, Defendants shall provide increases in the foster care maintenance payments, based upon the previous year's rate of inflation. | Yes | 36 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| 1.8.c | Defendants shall deliver to the monitor a written report regarding the adequacy of a proposed schedule of foster care maintenance payments made to foster care providers serving children and the actual cost in the state of Mississippi to provide such care (see 2nd MSA for specific report requirements). Following review of the Defendants' report, the monitor shall establish the rates that Defendants shall then implement. | Yes | 36 |
| **FOSTER CARE SERVICE STANDARDS** | | | |
| 2.1 | MDCPS shall ensure that it maintains a statewide system to appropriately receive, screen and investigate reports of child maltreatment (see 2nd MSA for system requirements). Any extensions of the timeframes set forth in MDCPS policy for the completion of investigations are subject to the review and approval of the monitor. | No | 38, 44 |
| 2.2 | MDCPS shall continue to maintain a special investigations unit whose responsibility is to investigate reports of maltreatment of children in custody. | Yes | 40 |
| 2.2 | The initiation of a special investigation shall not extend beyond 24 hours. | No (97.3%, very close) | 40 |
| 2.3 | MDCPS will develop and implement policies and procedures, subject to the review and approval of the monitor, for the Agency to review all maltreatment in care reports that were screened-out and assess the appropriateness within 24 hours of all screen-out determinations. If the decision to screen-out the report is determined to be inappropriate, MDCPS shall ensure the report is referred for investigation immediately. | No | 39 |
| 2.4 | Upon receipt of a substantiated report of child maltreatment in a contract agency group home or emergency shelter, MDCPS shall, within 30 calendar days, initiate a licensure investigation, that is in addition to and independent of the child protection investigation (see 2nd MSA for investigation requirements). | No | 43 |
| 2.5 | Upon receipt of a report of child maltreatment in a private child placing agency foster home, MDCPS staff will notify the child placing agency, who shall, within 30 calendar days, initiate a licensure investigation that is in addition to and independent of, any child protection investigation (see 2nd MSA for investigation requirements). | No | 43 |
| 2.6 | All allegations of maltreatment of a child in custody shall be investigated by a worker who has received training on intake and investigations processes, policies, and investigation techniques and has no ongoing connection to the foster care case. | No | 40 |
| 2.7 | Within 30 days of the completion of any investigation of maltreatment of a child in custody, as required in Section 2.1, MDCPS shall review the maltreatment investigation (see 2nd MSA for review requirements). | No | 43 |
| 2.8 | MDCPS shall assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment of children in MDCPS custody. | No | 39 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 2.8.a.1 | By July 1, 2018, at least 90% of maltreatment-in-care investigations will be initiated and completed within 30 days. | Yes | 40 |
| 2.8.b | Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker according to the following schedule: 1) Once per week for the first month and twice per month for three months if the investigation is found to be substantiated; or 2) Twice per month in accordance with MDCPS policy if the investigation is found to be unsubstantiated. | No | 42 |
| 2.8.c | When a maltreatment investigation involves a foster or adoptive home, MDCPS shall file a copy of the approved final investigative report, and any recommendations and/or corrective actions MDCPS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and with the Bureau Director for Licensure. MDCPS shall also provide those records to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor. | MDCPS did not report | 41 |
| 2.8.d | When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by MDCPS, a copy of the final investigative report shall be filed in the child's case record, with the Director of Congregate Care Licensure, and sent to the licensed provider facility. MDCPS shall provide the report to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor. | MDCPS did not report | 41 |
| 2.9 | The rate of child abuse and neglect among children in foster care shall not exceed 0.33% per year effective for the period beginning 1/1/18 (see 2nd MSA for full definition of this metric). | No | 47 |
| 3.1 | All foster homes and facilities with children placed who are in the custody of MDCPS shall be timely licensed. | Cannot validate | 48 |
| 3.1 | All foster homes and facilities with children placed who are in the custody of MDCPS shall be subject to the licensure process approved by Public Catalyst on December 31, 2016. | Yes | 48 |
| 3.2.a | No child shall remain in a foster home or facility determined to be unable to meet MDCPS licensing standards, absent an order by a state court with jurisdiction over child custody directing the placement of the child into a specific unlicensed placement. | No | 51 |
| 3.2.b | Safety Issues: If it is determined that an unlicensed foster home or facility is unable to meet MDCPS licensing standards due to a safety issue, Defendants shall take all reasonable efforts to immediately ensure the child's safety and to remove the child, including, if required by the court, seeking an emergency court order. If the child is not in imminent danger, MDCPS shall implement a safety plan and within five calendar days, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only. | Cannot validate | 51 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| 3.2.c | Non-safety Issues: If MDCPS determines an unlicensed foster home to be unable to meet MDCPS licensing standards due to a non-safety issue, Defendants shall, within 30 calendar days of that determination, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only. | Cannot validate | 51 |
| 3.3.a | MDCPS, in conjunction with the monitor, shall establish annual statewide and county performance requirements and time periods for new foster home licensure. The monitor will report to the parties MDCPS progress on achieving the performance requirements. The Defendants shall meet the performance requirements, including time periods. | Yes | 53 |
| 3.3.b | MDCPS shall begin to implement the annual plan to recruit and retain additional licensed foster home placements and shall maintain the additional number of total placements, as necessary during the applicability of the 2nd MSA. | No | 53 |
| 4.1/ 4.13.a | By July 1, 2018, 70% of foster homes shall provide care for no more than five children (including foster, biological, and adoptive children) at any given time (see 2nd MSA for allowable exceptions). | Yes | 54 |
| 4.2/ 4.14.a | By July 1, 2018, 60% of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs. | MDCPS did not report | 54 |
| 4.3/ 4.15 | At least 95% of children in MDCPS custody shall be placed in the least restrictive setting that meets their individual needs as determined by a review of all intake, screening, assessment and prior placement information regarding the child available at the time of placement. | Yes | 55 |
| 4.4/ 4.18 | 90% of children who enter MDCPS custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless the child entered custody in Regions II-East, II-West, or V-West or one of the exceptions provided in this 2nd MSA is documented as applying. | Yes | 56 |
| 4.5 | Each child who enters placement from Regions II-East, II-West, and V-West shall be placed within his/her own county or within 75 miles of the home from which he/she was removed (see 2nd MSA for list of approved exceptions). This provision shall be evaluated by the monitor in December 2018 to determine whether the 75-mile exception is still necessary. | Yes | 56 |
| 4.6/ 4.16.a | By July 1, 2018, 60% of siblings entering MDCPS custody at or near the same time shall be placed together (see 2nd MSA for allowable exceptions). If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file. | Cannot validate | 57 |
| 4.7/ 4.17.a | By July 1, 2018, 60% of children in MDCPS custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability consistent with 2nd MSA requirements. | MDCPS did not report | 57 |

11

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| 4.8 | No child shall remain overnight in an MDCPS office or other nonresidential facility that provides intake functions. | Yes | 58 |
| 4.9 | No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless: a) The child has exceptional needs that cannot be met in a licensed foster home; or b) In order to keep a sibling group together for a temporary period, not to exceed 15 days and the RD has granted documented approval for the congregate care placement; or c) To enable a mother and baby to be placed together and there is not an available foster home for both of them. | No | 58 |
| 4.10/ 4.12 | By July 1, 2018, 70% of children will remain in his/her existing placement and not be moved to another placement unless MDCPS specifically documents in the child's case record justifications for that move and the move is approved by a MDCPS supervisor. | No | 59 |
| 4.11 | No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others with documented approval from the RD. | No | 59 |
| 5.1.a.1 | By July 1, 2018, at least 75% of foster children shall have an MDCPS caseworker meet with the child at least two times per month (see 2nd MSA requirements for visits). | No | 60 |
| 5.1.a.1 | By July 1, 2018, at least 75% of foster children shall have at least one visit per month by the caseworker, which takes place in the child's placement. | Cannot validate | 60 |
| 5.1.b.1 | By July 1, 2018, at least 75% of foster children receiving a 90-day trial home visit period shall have an MDCPS caseworker meet with the child in the home at least two times per month. | Cannot validate | 62 |
| 5.1.c.1 | By July 1, 2018, for a least 75% of foster children with a goal of reunification, MDCPS shall meet with the child's parents at least monthly unless the child's parent(s) reside out-of-state or are incarcerated. | Cannot validate | 62 |
| 5.1.d.1 | By July 1, 2018 at least 75% of foster parents with at least one foster child in the home shall have MDCPS visit the home monthly. | No | 63 |
| 5.2.a | MDCPS shall arrange contact for the child with his/her parents and with any siblings not in the same placement within 72 hours of foster care placement unless there are documented reasons why contact should not occur. If a visit cannot be arranged within 72 hours, a telephone call to parents, siblings, or extended family members shall be provided to the child. | No | 64 |
| 5.2.c | MDCPS and its contracting agencies shall implement a policy that prohibits cancellation of visits as a form of discipline against children. | Yes | 64 |
| 6.1.a.1 | By July 1, 2018 at least 75% of Family Service Plans shall be submitted by the caseworker consistent with 2nd MSA requirements, within 30 calendar days of a child's entry into custody. The supervisor shall review the Plan for approval within 15 calendar days. The Family Service Plan shall be considered complete upon documented supervisory review and approval. | No | 64 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| 6.1.b | In instances in which it is impossible to meet with one or both parents, the service planning process will proceed, notwithstanding the parent's absence. | Yes | 65 |
| 6.1.c.1 | By July 1, 2018, in at least 75% of placement cases in which the whereabouts of one or both parents is unknown, MDCPS shall, within 30 days, institute a diligent search for the parent(s), which shall be documented in the child's case record. | MDCPS did not report | 65 |
| 6.1.d.1 | By July 1, 2018, for at least 75% of foster children who enter custody, permanency plans shall be submitted within 30 calendar days of the child's entry into custody by the caseworker consistent with 2nd MSA requirements. The supervisor shall review the plan for approval within 15 calendar days. The permanency plan shall be considered complete upon documented supervisory review and approval. | No | 65 |
| 6.2.a.1 | At least 95% of children in custody with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements. | No | 66 |
| 6.3.a.1.a | By July 1, 2018, at least 75% of foster children with a permanency goal of reunification shall have service plans for their parents that identify those services MDCPS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that MDCPS made those identified services available directly or through referral. | No | 67 |
| 6.3.a.2 | For a child with a permanency goal of reunification, the child's MDCPS caseworker shall meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances. | Cannot validate | 67 |
| 6.3.a.3 | For children with a permanency goal of reunification, the case record shall document opportunities provided to parents in support of reunification. | No | 67 |
| 6.3.a.4 | When a recommendation to reunify a child with his/her family has been made, MDCPS shall develop an after-care plan with the family that identifies the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured. MDCPS shall take reasonable steps to provide or facilitate access to services necessary to support the child during the trial home visit. | No (97.0%, very close) | 68 |
| 6.3.a.5.a | By July 1, 2018, at least 75% of foster children who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During the trial home visit period, MDCPS shall provide or facilitate access to the services identified in the child's after-care plan, consistent with the 2nd MSA requirements. | Cannot validate | 68 |

13

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 6.3.a.6 | Before the end of any trial home visit period, MDCPS shall convene a meeting with the child's parents and the child to determine the appropriateness of a final discharge. If final discharge is determined to be appropriate, MDCPS shall make the appropriate application to the Youth Court to be relieved of custody. | No | 68 |
| 6.3.b.1.a | By July 1, 2018, at least 70% of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child specific activities that MDCPS will undertake to achieve adoption. | Yes | 69 |
| 6.3.b.2.a | By July 1, 2018, a termination of parental rights referral shall be made on behalf of at least 70% of children who have spent more than 17 of the last 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception pursuant to the federal Adoption and Safe Families Act ("ASFA") has been documented by MDCPS in the child's case record. | Cannot validate | 69 |
| 6.3.b.3 | MDCPS shall provide to the monitor a report of all TPR referrals made during the monitoring period, the date those TPR referrals were made, and the date the TPR petition was filed with the court. | Yes | 69 |
| 6.3.c | Defendants shall establish and maintain a system of post-adoptive services to stabilize and maintain adoptive placements. Adoptive families eligible for adoption subsidies shall have access to these services, which may include services such as counseling, mental health treatment and crisis intervention, family preservation and stabilization services, and peer support. | Yes | 70 |
| 6.3.d.1 | The permanency goals of durable legal custody and guardianship may be assigned when there are documented efforts in the child's case record to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. | Cannot validate | 71 |
| 6.3.d.2 | When the permanency goals of durable legal custody and guardianship are assigned to a child under the age of 14 years old or living with a non-relative, MDCPS shall provide to the monitor at the end of each monitoring period, information from the child's case record documenting efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. | Cannot validate | 71 |
| 6.3.e | If MDCPS concludes, after considering reunification, adoption, durable legal custody and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, MDCPS may assign a permanency goal of APPLA for the child (see 2nd MSA for APPLA requirements). | MDCPS did not report | 71 |
| 6.4.a.1 | By July 1, 2018, at least 80% of foster children who have been in custody for at least six months shall have a timely court or administrative case review consistent with 2nd MSA requirements. | No | 71 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| 6.4.b.1 | By July 1, 2018, for at least 80% of foster children who have been in custody for at least 12 months, MDCPS shall make reasonable efforts to have a timely annual court review scheduled consistent with 2nd MSA requirements. | MDCPS did not report | 72 |
| 6.4.c | MDCPS shall review documented exceptions pursuant to ASFA for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review. | MDCPS did not report | 73 |
| 6.5.a.1 | By July 1, 2018, the monitor will establish the performance standard for the following indicator: Of all children who enter foster care in a 12-month period, what percent discharged to permanency within 12 months of entering foster care? The initial entry cohort for this indicator will be children who entered care between October 1, 2014 and September 30, 2015. | Yes | 73 |
| 6.5.a.2 | By July 1, 2018, the monitor will establish the performance standard for the following indicator: Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care between 12 and 23 months, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. The numerator is the number of children in the denominator who discharged from foster care to permanency within 12 months of the first day of the 12-month period. The initial cohort for this indicator will be children in care on the first day of October 1, 2015, who had been in care for 12-23 months as of that day. | Yes | 73 |
| 6.5.a.3 | By July 1, 2018, the monitor will establish the performance standard for the following indicator: Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care for 24 months or more, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. The numerator is the number of children in the denominator who discharged from foster care to permanency within 12 months of the first day of the 12-month period. The initial cohort for this indicator will be children in care on the first day of October 1, 2015, who had been in care for 24 months or more as of that day. | Yes | 73 |
| 6.5.c/ 6.5.d | By March 15, 2018, the monitor will establish the performance standards for the following indicator: for all children in the custody of MDCPS who were adopted in FFY2017, the monitor shall validate the average and median lengths of time to adoption finalization for each child from the date on which the child's adoption goal was established. | Yes | 74 |
| 7.1 | MDCPS shall provide each youth transitioning to independence with at least six months' advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition. | No | 74 |
| 7.2 | Each foster youth age 14 years and older, regardless of his/her permanency plan, shall be provided with an opportunity to participate in the creation of an appropriate Independent Living service plan for a successful transition to adulthood. | MDCPS did not report | 75 |

| Section | Commitment | Achieved | Report Page |
|---------|------------|----------|-------------|
| 7.3 | Each foster youth age 14 years and older shall have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood. MDCPS shall maintain sufficient resources to deliver Independent Living services to all youth described herein. | No | 75 |
| 7.4 | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid coverage so that their coverage continues without interruption at the time of emancipation. | MDCPS did not report | 76 |
| 7.5 | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond receive a start-up stipend of at least $1,000.00 at the time of emancipation, or as soon as practicable thereafter. | No | 76 |
| 7.6 | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond have access to a housing resource specialist responsible for assisting the youth obtain an adequate living arrangement. | MDCPS did not report | 77 |
| 7.7 | MDCPS shall continue to implement policies and processes which ensure that youth emancipating from the foster care system at age 18 or beyond receive services and support under the State Educational Training and Vocational (ETV) Program for which they are eligible. | MDCPS did not report | 77 |
| 7.8.a | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate. | Cannot validate | 78 |
| 7.8.b | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A social security or social insurance number. | Cannot validate | 78 |
| 7.8.c | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A resume, when work experience can be described. | Cannot validate | 78 |
| 7.8.d | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A driver's license, when the ability to drive is a goal; if not a driver's license, then a state-issued, photo identification. | Cannot validate | 78 |
| 7.8.e | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: An original or certified copy of the youth's birth certificate. | Cannot validate | 78 |
| 7.8.f | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Previous placement information. | Cannot validate | 78 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| 7.8.g | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Documentation of immigration, citizenship, or naturalization, when applicable. | Cannot validate | 78 |
| 7.8.h | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Documentation of tribal eligibility or membership. | Cannot validate | 78 |
| 7.8.i | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Death certificates when parents are deceased. | Cannot validate | 78 |
| 7.8.j | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A life book or a compilation of personal history and photographs, as appropriate. | Cannot validate | 78 |
| 7.8.k | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties. | Cannot validate | 78 |
| 8.1.a.1 | By July 1, 2018, 70% of children shall have an initial medical screening within 7 days of the child's entry into foster care. | No | 78 |
| 8.1.b.1 | By July 1, 2018, 70% of children shall have an initial EPDST or other comprehensive medical examination within 60 days of the child's entry into foster care. | No | 79 |
| 8.1.c.1 | By July 1, 2018, the monitors in collaboration with MDCPS will establish the performance baseline for periodic and ongoing medical examinations. | Yes | 79 |
| 8.1.c.2 | By July 31, 2018, the monitor will establish performance standards for MDCPS to meet by July 1, 2019. | Yes | 79 |
| 8.1.d.2 | By July 1, 2018, 60% of children shall be provided with practitioner recommended follow-up treatment. | MDCPS did not report | 79 |
| 8.1.e.1 | By July 1, 2018, 60% of children shall have a dental examination within 90 days of the child's entry into foster care. | No | 79 |
| 8.1.f.1 | By July 1, 2018, 75% of children shall have information provided to foster parents or facility staff within 15 days of placement. | MDCPS did not report | 80 |
| 8.1.g | By July 1, 2018, 85% of children shall have their Medicaid information provided to foster parents or facility staff at the time of placement. | MDCPS did not report | 80 |
| 8.2.a | MDCPS shall review the educational record of each child who enters custody for the purpose of identifying the child's general and, if applicable, special educational needs and shall document the child's educational needs within 30 calendar days of his/her entry into foster care. | MDCPS did not report | 80 |
| 8.2.b | MDCPS shall take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within seven calendar days of initial placement or any placement change, including while placed in shelters or other temporary placements. | MDCPS did not report | 80 |

| Section | Commitment | Achieved | Report Page |
|---------|------------|----------|-------------|
| 8.2.c.1 | At least 90% of school-age foster children who enter custody shall have their educational records reviewed and their educational needs documented by MDCPS within 30 calendar days of their entry into foster care. | MDCPS did not report | 80 |

## Methodology

To prepare this report, the monitoring team conducted a series of verification activities to evaluate MDCPS' progress implementing its commitments in the 2nd MSA. The monitoring team conducted extensive reviews of thousands of records and other data and information, reviewed and analyzed a wide range of aggregate and detail data produced by MDCPS, and reviewed policies, memos, and other internal information relevant to MDCPS' work during the period. The monitoring team held meetings with the parties pursuant to Section 9.4 of the 2nd MSA; regular meetings with MDCPS leadership and program staff; meetings with management and staff at MDCPS regional and county offices; and meetings with numerous public and private stakeholders. The monitoring team interviewed staff and supervisors across the state and discussed the pace, progress and challenges of the system improvement work. To verify information produced by MDCPS, the monitoring team conducted extensive field-based interviews, cross-data validation and qualitative case record reviews.[1]

## Demographics

MDCPS produced demographic data for the period from January 1, 2018 to December 31, 2018. MDCPS data indicate there were 5,577 children in custody on January 1, 2018 and 4,811 children in custody as of December 31, 2018. During the monitoring period, 2,790 youth were placed in foster care and 3,549 children exited care.[2] MDCPS served 8,287 children during the monitoring period. Young children aged zero to six years made up the largest portion (2,148 or 45 percent). Twenty-six percent of youth (1,252) were 12 to 17 years of age, 25 percent of children (1,229) were seven to 11 years of age and four percent of youth (182) were 18 years and over, as detailed in Figure 1.

---

[1] The monitoring team conducted extensive qualitative reviews of more than 2,000 children's cases, and the findings are included in the relevant sections of this report. In most instances, the sample sizes for the monitoring team's case record reviews were based on a statistically significant sample of cases and methodology based on a 90 percent confidence level.

[2] The monitoring team identified 31 children who appear twice in MDCPS' entry cohort data. Each of these children entered foster care more than once during the monitoring period. The monitoring team also identified 25 children who appeared twice in the exit cohort. Each of these children exited foster care two times during the monitoring period.

**Figure 1. Age of Children in Custody on December 31, 2018**

*n=4,811*



The population of children in care on December 31, 2018 was approximately evenly split by gender, with 51 percent of children in care male and 49 percent female. Regarding race, the population of children was 54 percent White, 37 percent African American, 0.1 percent Asian, 0.1 percent Native Hawaiian or Pacific Islander, and 0.1 percent Native American. Additionally, three percent of children reported being of mixed race. Two percent of children were identified with Hispanic ethnicity and can be of any race. The race of five percent of children was undetermined.[3]

**Table 1. Race of Children in Custody on December 31, 2018**

| Race | Count | Percent |
|------|-------|---------|
| White | 2,620 | 54% |
| African American | 1,778 | 37% |
| Unable to Determine | 246 | 5% |
| Mixed Race | 152 | 3% |
| Asian | 6 | 0.1% |
| Native Hawaiian, Pacific Islander | 5 | 0.1% |
| Native American | 4 | 0.1% |
| Total | 4,811 | 100% |
| Hispanic ethnicity and of any race | 92 | 2% |

Note: Percentages may not add up to 100 due to rounding.

---

[3] Children whose race was explicitly marked as 'Unable to Determine' and whose race was not found are combined into the entry for 'Unable to Determine'.

As the following figure demonstrates, 90 percent of children in MDCPS' custody on December 31, 2018 lived in family settings, including foster families (47 percent), with relatives (33 percent), with their own parents (8 percent), in homes that intend to adopt (1 percent), and in homes of unrelated caregivers (0.2 percent). Of children in custody, 425 (9 percent) lived in institutional settings, including residential treatment and other congregate care facilities. Another 13 (0.3 percent) youth resided in Supervised Independent Living placements, which serve youth who are preparing to transition out of care.

**Figure 2. Placement Types of Children in Custody on December 31, 2018**
*n=4,811*

| Placement Type | Count |
|---|---|
| Family Based | 4309 |
| Institutional | 425 |
| Missing Placement Type | 43 |
| Runaway | 21 |
| Independent | 13 |

Of the children in care on December 31, 2018, 40 percent were in care less than one year, while 18 percent were in care for more than three years.

**Figure 3. Length of Stay in Care of Children in Custody on December 31, 2018**
*n=4,811*



- 3-6 years: 357, 7%
- 6+ years: 535, 11%
- Less than a year: 1901, 40%
- 1-2 years: 1231, 26%
- 2-3 years: 787, 16%

21

**Table 2. Exits from Care by Exit Type, January 1, 2018 to December 31, 2018**

| Exit Type | Count | Percent |
|---|---|---|
| Reunification | 1,968 | 55% |
| Adoption | 617 | 17% |
| Living with other relatives | 453 | 13% |
| Guardianship | 350 | 10% |
| Emancipation | 87 | 2% |
| County of Service Placement Change | 26 | 0.7% |
| Runaway | 26 | 0.7% |
| Transfer to another agency | 13 | 0.4% |
| Death of a child | 9 | 0.3% |
| Total | 3,549 | 100% |

Note: Percentages may not add up to 100 due to rounding.

As the table below demonstrates, of the children in custody on December 31, 2018, half had reunification as a federal goal. For the remaining children, 1,861 (39 percent) had a goal of adoption, 231 (5 percent) had a goal of APPLA, 63 (1 percent) had a goal of durable legal custody or guardianship, and 135 (3 percent) had placement with a relative as a federal goal. There were 139 children (3 percent) with missing federal goal codes.

**Table 3. Federal Goals for Children in Custody as of December 31, 2018**

| Federal Goal | Count | Percent |
|---|---|---|
| Reunification | 2,382 | 50% |
| Adoption | 1,861 | 39% |
| APPLA | 231 | 5% |
| Custody with a relative | 135 | 3% |
| No plan documented (less than 45 days in custody) | 109 | 2% |
| Durable legal custody / guardianship | 63 | 1% |
| No plan documented (no current approved FSP) | 30 | 0.6% |
| Total | 4,811 | 100% |

Note: Percentages may not add up to 100 due to rounding.

## Creation of the Mississippi Department of Child Protection Services

The parties agreed in the Stipulated Third Remedial Order (STRO), approved by the Court on December 19, 2016, that Mississippi would complete the creation and implementation of a fully functional child welfare agency, which is independent of, although housed within, the Mississippi Department of Human Services (MDHS), not later than July 1, 2018. This provision of the STRO remained in effect when the 2nd MSA began on January 1, 2018. On May 13, 2016, Governor Phil Bryant signed legislation (Senate Bill 2179) that created MDCPS, an independent cabinet-level

department, headed by a commissioner, to serve as the state's lead child welfare agency. By creating this new department, the responsibility of child protection was removed from MDHS. The enabling legislation provided for the Commissioner of MDCPS and the Executive Director of MDHS to develop and implement a plan for the orderly transition of MDCPS from the MDHS Office of Family and Children's Services, including the transfer of equipment, records, resources and dedicated child welfare funds and the allocation of shared services. MDCPS determined that the complete separation from MDHS would prevent the two departments from using state-appointed funds as matching funds to draw down certain federal dollars. As such, MDCPS and MDHS requested that the legislature amend Senate Bill 2179 to maintain MDCPS as a sub-agency of MDHS with the Commissioner of MDCPS retaining full operational control of MDCPS. This legislation was passed and on April 13, 2018 Governor Bryant signed the legislation (Senate Bill 2675). Beginning in 2016, the two departments have maintained a series of memoranda of understanding between them with respect to the identification of blended responsibilities and the establishment of guidelines for shared functions, cost reduction, and access to federal funds.

## Operational Budget

The 2nd MSA requires MDCPS to request state funds and any federal/special fund authorization sufficient to effect the provisions and outcome measures set forth in this 2nd MSA. For state fiscal year (SFY) 2018 (July 1, 2017 to June 30, 2018), MDCPS was appropriated $97,969,323 and later requested and received from the Mississippi Legislature an additional $12,000,000 deficit appropriation. During the 2018 Mississippi legislative session, MDCPS requested a state fund appropriation of $133,626,889.78 for SFY2019 (July 1, 2018 to June 30, 2019). This request sought an increase of $23,657,566 from the prior fiscal year's state funding. MDCPS' request for increased funding centered on its desire to hire additional staff to achieve compliance with the caseload requirement in the 2nd MSA, and its need to develop a Comprehensive Child Welfare Information System (CCWIS) data system as required by the 2nd MSA. However, the Mississippi Legislature only appropriated MDCPS $97,994,298 in state general funds and $12,000,000 in state special funds, for a total state funding of $109,994,298, which fell short of MDCPS' request by $23,632,591. MDCPS also received $88,504,053 in federal funds in fiscal year 2018 and estimated receiving $97,371,706 in federal funds in fiscal year 2019.

# 1. Systemic Infrastructure Standards

## Department Leadership

MDCPS committed in the 2nd MSA to maintain a Commissioner of Child Protection Services having responsibility for the oversight and management of the Department. The Commissioner must possess at least a bachelor's degree from an accredited institution of higher learning and ten

years' experience in management, public administration, finance, or accounting or a master's or doctoral degree from an accredited institution of higher learning and five years' experience in management, public administration, finance, law, or accounting.

Prior to his appointment, the monitoring team had an opportunity to meet with Commissioner Jess H. Dickinson and review his qualifications for the position. Commissioner Dickinson possesses a Juris Doctorate degree from the University of Mississippi School of Law and had more than 35 years of experience in law, serving both as an attorney and a justice in the Mississippi legal and judiciary systems, respectively. Commissioner Dickinson possesses the requisite qualifications to serve as commissioner of MDCPS.

## Staff Qualifications and Training

MDCPS committed to ensure that staff serving Mississippi's at-risk children and families have appropriate qualifications and receive adequate training.

### Caseworker Qualifications (1.1.a.)

MDCPS reported 197 caseworkers were hired in 2018. All caseworkers are required to have, at minimum, a bachelor's degree in social work or a related human services field that is approved as a qualifying degree by the monitor.[4] Comparing the reported degrees for all the caseworkers hired in 2018 to the list of qualifying degrees, all the caseworkers possessed an approved degree. The monitoring team also reviewed the paper degrees or official transcripts for a randomly-selected sample of 55 caseworkers hired in 2018 and confirmed that all the caseworkers' degrees in the sample were accurately reported.

### Supervisory Qualifications (1.1.b.)

In the 2nd MSA, MDCPS agreed that new caseworker supervisors must possess either a master's degree in social work or an approved qualifying human services degree and two years of experience working with children and families or a bachelor's degree in social work or an approved qualifying human services degree with three years of experience working with children and families. MDCPS reported 44 caseworker supervisors were appointed during 2018. The monitoring team compared the reported degrees for all the caseworker supervisors appointed in 2018 to the list of qualifying degrees and reviewed the paper degrees or official transcripts and

---

[4] MDCPS submitted and the monitor approved the following degrees as related human services degrees: Child and Family Studies, Child Development, Counseling, Criminal Justice, Disciplinary Studies, Early Childhood and Family, Education, Education and Human Science, Elementary Education, Family Studies, General Studies, Guidance Education, Interdisciplinary Studies, Marriage and Family Therapy, Nursing, Political Science, Psychology, and Sociology.

job applications for the caseworker supervisors and determined that all the supervisors possessed an approved degree and the requisite years of experience.

*Training Unit (1.2.a.)*

MDCPS committed to maintain a Training Unit headed by a qualified director of training with adequate staffing, funding and resources to assure that comprehensive child welfare training is provided to caseworkers, supervisors and other child welfare employees. The child welfare training should enable staff to comply with the relevant mandates of the 2nd MSA, MDCPS policy, and reasonable professional standards. During 2018, the MDCPS Office of Professional Development (OPD) administered training and professional development in order to prepare MDCPS employees to assume their job responsibilities and enhance their knowledge, skills and abilities. Specifically, OPD delivered pre-service, supervisory and in-service training to Department staff during the period. OPD was led by a senior manager with an advanced degree and nine years of experience as a director of workforce development and a director of professional development in Mississippi's child welfare agency. Unit staff included approximately 35 training coordinators and practice model coaches, along with five supervisors, funded by both state and federal dollars.

*Pre-Service Training (1.2.b.)*

All new MDCPS caseworkers must complete a total of 270 hours of pre-service training, which includes classroom instruction, field instruction, and E-Learning. The pre-service training program offered by MDCPS' OPD exceeds 270 hours of training with a combination of eight alternating weeks of classroom instruction and on-the-job training. During on-the-job training weeks, certain material is delivered through online learning.

MDCPS reported that 132 of the 197 new workers hired in 2018 completed pre-service training during the period. Twenty-six caseworkers previously employed and trained by MDCPS were rehired by the Department and exempt from pre-service training.[5] Ten workers left the Department either before starting or before completing training. One worker hired in November 2018 has been unable to attend training, reportedly due to medical complications and will complete training once medically cleared. The remaining 28 workers were hired into their positions late in the period and were enrolled in training that ended in the first quarter of 2019.

The monitoring team reviewed the four competency exams administered during pre-service training for a randomly-selected sample of 55 caseworkers hired in 2018 and confirmed that 47 caseworkers in the sample achieved a passing score of 70 or higher on each of the four exams

---

[5] Caseworkers and supervisors who have successfully completed MDCPS' current pre-service training are not required to attend training again.

and one caseworker left training before completing any of the competency exams. The remaining seven caseworkers in the sample were rehired, had been previously employed and trained by MDCPS and did not need to again complete pre-service training.

*Training Caseloads (1.2.c.)*

The 2nd MSA allows a trainee to be assigned responsibility for a "training caseload," under appropriate supervision, that gradually increases as the trainee successfully completes pertinent competence-based examinations. MDCPS has elected not to implement training caseloads at this time. MDCPS will notify the monitor before instituting training caseloads so the required competency exams and standards for passing the exams can first be reviewed and approved by the monitor.

*In-Service Training (1.2.d.)*

MDCPS agreed that all caseworkers must complete a minimum of 20 in-service training hours in 2018 and all supervisors must complete a minimum of 12 in-service training hours in 2018. MDCPS provided data to the monitoring team indicating that all 855 caseworkers and investigators received 20 or more in-service training hours and all 258 supervisors received 12 or more in-service training hours during 2018, as required. In-service training covered a wide range of topics such as Comprehensive Addiction and Recovery Act policy, Interstate Compact on the Placement of Children, educational services, human trafficking, staff safety, termination of parental rights, and youth transition support services.

*Supervisor Training (1.2.e.)*

MDCPS committed in the 2nd MSA that caseworker supervisors must complete a minimum of 40 hours of training directed specifically at the supervision of child welfare caseworkers within 90 days of assuming a supervisory position. OPD offers a clinical supervisory training program consisting of 40 hours of classroom training based on identified competencies.

MDCPS provided information indicating that of the 44 caseworker supervisors appointed in the period, 41 supervisors met the 90-day requirement for training completion. One supervisor appointed late in 2018 was pending training at the end of the period; one supervisor left the Department prior to completing training; and one supervisor who had been previously employed and trained by MDCPS, was rehired as a supervisor and exempt from supervisory training. The monitoring team reviewed the competency exam administered at the end of supervisory training for the 41 supervisors who completed training in 2018 and confirmed that all had achieved a passing score of 70 or higher on the competency exam.

## Caseloads and Supervision

*Caseworker Caseloads (1.3.a.)*

The 2nd MSA sets forth caseload standards for staff and supervisors performing critical child welfare functions. The 2nd MSA states that 90 percent of MDCPS caseworkers must have caseloads that do not exceed the caseload standards for each type of case. Individual MDCPS caseworkers who carry a mixed caseload are held to a weighted, pro-rated standard. The table below details the caseload standards for each type of case.

### Table 4. 2nd MSA Caseload Standards by Case Type

| Type of Case | Included Categories | Standards | Weight Per Case – 100% Capacity |
|---|---|---|---|
| Child Protection | Investigations Level 2<br>Investigations Level 3 | 14 Investigations | 0.0714 |
| Ongoing Foster Care | Placement Responsibility & Service | 14 Children | 0.0714 |
| Ongoing Foster Care | Placement County of Responsibility<br>Placement County of Service | | 0.0357 |
| In-Home | Protection Responsibility & Service<br>Prevention Responsibility & Service | 17 Families | 0.0588 |
| In-Home | Protection or Prevention County of Responsibility<br>Protection or Prevention County of Service | | 0.0294 |
| Adoption | Adoption County of Service | 15 Children | 0.0667 |
| New Application Licensing | Resource Inquiry<br>ICPC Application<br>Foster Home Study | 15 Homes | 0.0667 |
| Renewal Licensing | Foster Home Supervision<br>Foster Home Renewal | 36 Homes | 0.0278 |

The parties agreed in the STRO that MDCPS would build capacity in 2017 to meet these standards by the start of 2018. However, as the following chart demonstrates, MDCPS did not meet the 90 percent caseload standard for its staff in any quarter during 2018.

**Figure 4. Percent of Workers Meeting the Caseload Standard, 2018**



*\*Data as of the middle of March, June, September and December*     **Source: MDCPS Data**

*Supervisor Staffing Ratios (1.3.b.)*

In order to ensure appropriate attention and oversight of its staff's work with children and families, MDCPS agreed that 85 percent of supervisors would be responsible for overseeing no more than five caseworkers each.

**Figure 5. Percent of Caseworker Supervisors Meeting the Supervision Ratio Standard, 2018**

*\*Data as of the end of March, June, September and December*     **Source: MDCPS Data**

28

As the chart above indicates, MDCPS did not meet the caseworker supervisors' workload standard of 85 percent in any quarter during 2018.[6]

*Caseload Verification*

The monitoring team undertook an in-depth review of caseload reporting for the period. From August to November 2018, the monitoring team interviewed casework staff about their workloads in six MDCPS county and regional offices. Interviews included both supervisory and caseload-carrying staff randomly selected by the monitoring team, working in Harrison, Hancock, Hinds, Lee, Lowndes and Jackson counties. Staff members were directed to bring printouts of their caseloads, typically from the previous workday, with them to interviews. The monitoring team reviewed the caseload assignments with the workers and/or their supervisors and inquired whether the printouts represented all their caseload assignments as of that day, which coincided with the date of an official MDCPS caseload count. The monitoring team then compared the workload printouts of these hundreds of cases identified across all the interviews, with MDCPS' official caseload submissions to determine if they aligned.

Based on interviews with 160 caseworkers, 33 supervisors, three deputy directors, and four regional directors in MDCPS, and data analysis involving thousands of cases statewide, the monitoring team concludes the caseload data and information provided by the Department accurately reflects MDCPS' caseload performance.

## Continuous Quality Improvement

*Continuous Quality Improvement Plan (1.4.a.)*

Pursuant to the 2nd MSA, MDCPS is required to develop an annual Continuous Quality Improvement (CQI) Plan by December 1st of each year, which shall be subject to the approval of the monitor after consultation with the parties.

The monitoring team reviewed the initial draft CQI plan for 2019, which was submitted timely by MDCPS on November 15, 2018, and had extensive discussions with MDCPS regarding the planned CQI activities and processes. Based on feedback from the monitoring team, MDCPS submitted updates to both the plan and supporting CQI tools. The monitoring team also shared the CQI plan with plaintiffs' counsel, who provided their feedback.

The monitoring team approved the 2019 CQI Plan for implementation in April 2019, after MDCPS submitted final edits to the Plan. There are several commitments discussed in this report for which MDCPS did not submit evidence of performance. MDCPS indicates the agency intends to

---

[6] At any given time during 2018, between 15 and 20 supervisors also carried caseloads ranging from one to 31 cases.

report its 2019 performance for many of these commitments through implementation of the 2019 CQI plan approved by the monitors.

## Management Information Systems & Data Reporting

*Comprehensive Information Systems and Reporting (1.5.a.)*

The 2nd MSA requires MDCPS to maintain comprehensive information systems that permit: (1) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding required actions in a child's case and whether they have taken place.

MDCPS' primary information system is the Mississippi Automated Child Welfare Information System (MACWIS). MDCPS also has ancillary information systems or tracking tools that are not directly connected to MACWIS but may leverage data from it, such as Excel sheets used to track resource homes involved in expedited pending relative placements,[7] to track and report on newly licensed and closed homes, and to facilitate and document the results of manual reviews of substantiated reports of maltreatment.

MDCPS reported employees are granted the appropriate level of access to MACWIS as part of the new hire process for caseworkers, supervisors, and identified State Office staff with positions and job responsibilities that require access to the system. A unique MACWIS ID is assigned to new caseworkers typically during the first week of pre-service classroom training. MDCPS reports quarterly to the monitor the MACWIS ID of new caseworkers granted access to the system.

The monitoring team generally has been able to identify children across multiple MACWIS data files to create a timeline of their placement settings and services while in MDCPS custody. MDCPS, however, has been unable to consistently and reliably report from MACWIS current and historical data of children in custody for numerous 2nd MSA commitments as noted below and in the pertinent sections of this report.

MACWIS contains a financial module the monitoring team used to verify that MDCPS was issuing foster care board payments to foster parents consistent with the child's age and placement type. The monitoring team requested and received from MDCPS data from MACWIS relating to the

---

[7] MDCPS refers to unlicensed relative home placements as expedited pending relative placements.

board rates foster parents were receiving for children on December 31, 2018.[8] See Section 1.8.a., below, for details of the monitoring team's review of foster care board rates.

The monitoring team confirmed that MDCPS' responses to various 2nd MSA commitments included many of the required data elements for the National Child Abuse and Neglect Data System (NCANDS) and the Adoption and Foster Care Analysis and Reporting System (AFCARS). MDCPS also provided correspondence from the Administration for Children and Families within the United States Department of Health and Human Services accepting MDCPS' FFY2018 NCANDS Child File and Agency File and its National Youth in Transition submissions derived from MDCPS data systems. MDCPS reports that MACWIS users have view-only access of TANF and child support data systems.

The monitoring team received from MDCPS a MACWIS Tickler Types Report listing alert notifications available to staff for actions taken and actions needed.

MDCPS produced data from MACWIS to demonstrate performance on some but not all commitments for the 2nd MSA and to document baseline populations and samples for qualitative reviews. MDCPS also submitted "cohort" data, which identifies children's entries and exits from foster care during the period, the population of children served during the period, and the population of children in care at the beginning and end of the period. The monitoring team analyzed the information to verify the data quality, assessed the methodology used to compute performance for each metric, and attempted to replicate the performance calculations made by MDCPS. In these efforts, both MDCPS and the monitoring team relied on business rules jointly developed between the monitoring team and MDCPS and insights obtained from prior validation efforts.[9]

As noted above, MDCPS is required to capture, track and report applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements. MDCPS did not report data on 18 commitments and the monitoring team cannot validate quantitative data submitted by MDCPS for another 23 commitments. These 41 commitments are delineated in the Summary of Commitments and the relevant sections of this report. Data problems include the manner in which MDCPS documents and identifies certain data fields, coding errors, MDCPS performance calculations that are inconsistent with the established business rules, and data files provided by MDCPS that the monitoring team was unable to replicate using the established business rules.

---

[8] The monitoring team conducted a qualitative review of board rates in MACWIS under commitment 1.8.

[9] Since personnel changes occurred in the MDCPS data unit in March 2018, MDCPS has had more difficulty responding timely and adeptly to inquiries related to data business rules, file creation and performance calculations.

The monitoring team found three significant and recurring data quality problems during the period: measuring maltreatment in care; tracking foster homes; and workers documenting resource identification numbers in MACWIS.

- <u>Measuring maltreatment in care</u>. In validating Section 2.9 (MIC rate, where the perpetrator must be a foster parent or a residential facility staff member), the monitoring team determined and MDCPS confirmed that the perpetrator relationship was incorrect for many reports of maltreatment, and may indicate a foster care provider or a non-foster care provider erroneously. The monitoring team also noted the incident date was not a reliable indicator of when the maltreatment occurred[10] because the incident date was often missing or identical to the report date. To address these issues, MDCPS and the monitoring team conducted a manual review of hundreds of substantiated reports of maltreatment in CY2018 to confirm whether the alleged maltreatment involved a custodial child in care at the time of the maltreatment and whether the perpetrator was a foster care provider. This manual review identified 18 perpetrator relationships needing correction and 24 allegations that clearly involved a custodial child but, according to MACWIS, did not indicate a custodial child was involved and/or were not investigated by the Special Investigations Unit.

- <u>Tracking foster homes</u>. The monitoring team identified numerous data quality problems related to the manual process MDCPS uses for collecting data for Section 3.1. Specifically, there were errors and inconsistencies in the Expedited Placements Master List,[11] such as homes that were "Closed – added in error"; homes where the Resource ID was actually a date; missing Resource IDs; duplicate homes/Resource IDs in a file designed to be unique; Excel formulas that reference the incorrect column or value; and the manner in which "Action Taken" reasons are recorded. Likewise, the structure of MDCPS's monthly files related to Section 3.3.b often varied from month to month in terms of format and compilation.

- <u>Workers documenting Resource IDs in MACWIS</u>. In validating Section 4.1 (Foster home licensure limits), the monitoring team discovered that MDCPS excluded on average 137 homes per quarter, mostly therapeutic foster homes, because the Resource ID that identifies the child's placement was for an umbrella child placing agency (CPA) (i.e., not the actual home in which the child is placed ("sub-resource") but instead the CPA that oversees that home). In these instances, the specific household members in the child's

---

[10] An accurate incident date could help determine if the alleged maltreatment occurred during the child's custody episode.

[11] This list includes homes for all unlicensed, expedited relative placements that have been tracked by the Continuous Quality Improvement (CQI)'s Evaluation and Monitoring Unit (EMU) since July 24, 2017, when EMU revised the tracking sheet and process.

placement are not documented in MACWIS. When a child is placed in a setting that is part of an umbrella agency, MACWIS:

  a. requires workers to select the umbrella agency but does not require them to select the subordinate resource;

  b. does not capture all household members for sub-resources because they do not go through MDCPS' inquiry process where such information is usually collected. The umbrella agency, not MDCPS, licenses its own sub-resources.

In Section 4.1, the monitoring team could not validate performance for placements that did not indicate in MACWIS a Resource ID for the sub-resource home. The Resource ID issue also affected the monitoring team's ability to validate Section 5.1.d.1 related to visits with foster parents, since validation relies on identifying the foster parent associated with the Resource ID which is not possible when the Resource ID represents an umbrella agency.

*Staff Resources (1.6.a.)*

Pursuant to the 2nd MSA, MDCPS committed to provide to all its county staff with child welfare responsibilities access to computer services, word processing and electronic mail; access to the current management information systems; and access to a revised modular information system, CCWIS, once implemented.[12] MDCPS produced a list with 1,177 caseworker and supervisor names, and their respective email addresses, network IDs, MACWIS IDs and job titles. Additionally, MDCPS produced quarterly the names, email addresses, network IDs, MACWIS IDs and job titles for newly hired workers. The monitor verified this information during in-person interviews with 160 randomly-selected MDCPS staff across Mississippi.

*Staff Access to Data (1.6.b.)*

MDCPS committed to collect, analyze and make available, at least quarterly, to MDCPS regional and county staff, data related to compliance with the 2nd MSA's Foster Care Service Standards. MDCPS produces Focus on Data reports that are available to all staff and are scheduled to be updated daily. The reports graph county performance and can be downloaded in Excel and PDF formats. The monitoring team confirmed there are 37 separate reports, covering 23 individual commitments[13] that can be accessed by staff at any time.

---

[12] CCWIS is not required to be implemented until June 30, 2021.
[13] Some 2nd MSA commitments have multiple reports that cover different aspects of the commitment.

33

*Electronic Placement Database (1.6.c.)*

The 2nd MSA requires that MDCPS county staff have access to an electronic statewide database of available placement resources. MDCPS reports that the Department released a Placement Matching Tool available to all staff on March 21, 2018, which is a component of CCWIS that MDCPS committed to implement by June 30, 2021. The matching tool is designed for use by both frontline workers and licensure staff. A step-by-step training video and instructions are available to staff through MDCPS' SharePoint intranet platform.

The Placement Matching Tool allows workers to search for a suitable placement for a child in custody, pulling basic demographic and address information from MACWIS. A search can be conducted using the child's name or the address of removal. The default search identifies homes within a 50-mile radius of the child's address of removal that have availability for a child of the specified age and gender. There are advanced search options that allow the worker to change the radius distance, search by special needs, and search for resource homes that provide specific types of services. The search results provide contact information for the home and licensure specialist, along with basic information about other children in the home. MDCPS structured the tool to include information as to whether there has been prior abuse and neglect referrals regarding the home, the date of the referrals, and final dispositions. Substantiated referral information is prominently displayed in red. Prior screened-out referrals are also included in the search results for a home.

The monitoring team reviewed the Placement Matching Tool video and instructions, sampled usage of the tool and found it to be a potentially important, viable resource for finding best placements for children. MDCPS indicates there will be future enhancements to the tool, and the monitoring team will undertake additional verification of its functionality in 2019.

## Performance Based Contracting

*Performance Based Contracting (1.7)*

MDCPS committed to establish, maintain and assess the effectiveness of a performance-based contracting system to evaluate annually contract agency compliance with the terms of the 2nd MSA (1.7.a). MDCPS further agreed to take all reasonable steps to ensure contract agency remediation of identified deficiencies within three months. An agency's failure to participate in remediation efforts is grounds for contract termination.

MDCPS reports that for this monitoring period the Department began to implement the new system by transitioning 14 therapeutic foster care, group home and shelter programs to performance-based contracts. Each of these contracts include performance-based outcome standards. Included in the contract's scope of services is the following language that requires agencies to comply with 2nd MSA commitments:

> "Independent contractor will perform and complete in a timely manner and satisfactory manner the services described in the 'Scope of Services' attached hereto as Exhibit A, and the 'Second Modified Mississippi Settlement Agreement Reform Plan,' attached hereto as Exhibit B, and incorporated herein by reference."

During the monitoring period, MDCPS conducted performance evaluations for six of the contracts against the new performance-based standards. MDCPS represents the remaining eight contracts will be evaluated in the next monitoring period. The monitoring team reviewed the 14 contracts and found that performance-based standards are embedded in the contracts relative to service delivery, quality of services delivered and licensing evaluations. The performance-based evaluation process includes case record reviews conducted by MDCPS' performance-based contract unit (PBC) of the following practice areas:

- Initial Strengths and Needs Assessment
- Preserving Connections
- Teaming and Permanency Planning
- Service Provision
- Preparing Youth for Adulthood
- Placement Stability and Discharge Planning
- Caseworker Contact with the Child
- Child Safety

PBC and agency staff meet prior to the case record reviews for an entrance conference, complete a tool that ranks the frequency and quality of services provided, complete the review with a description of findings and conduct an exit conference. For any area that is found deficient, MDCPS requires a corrective action plan within three months. During the monitoring period, one agency, evaluated in December 2018, was required to submit a corrective action plan regarding two non-safety issues. This plan was submitted by the contracted agency and accepted by the Department in March 2019.

The 2nd MSA requires that prior to MDCPS contracting for case management services for children in custody, the Department must submit for the monitors' review and approval a detailed plan that ensures accountability, supervision and oversight of such agencies (1.7.b). MDCPS did not contract for case management of children in custody during the monitoring period.

## Foster Care Maintenance Payments

### Licensed Foster Families' Reimbursement Rates (1.8.a.)

MDCPS is required to ensure that all licensed foster families (regardless of whether they are supervised directly by MDCPS or by private providers, and whether they are kinship or unrelated foster families) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the 2nd MSA. The monitoring team reviewed reimbursements for the care of a randomly selected sample of 100 children in licensed regular foster homes and determined that all the homes were paid the proper reimbursement rate for the age of the children in their care in December 2018.

### Foster Care Maintenance Payments (1.8.b.)

As of January 1, 2018, the effective date of the 2nd MSA, MDCPS agreed to pay to all licensed foster families at least the basic monthly foster care maintenance payments. Table 5 contains the current approved basic monthly rates for licensed foster homes. As mentioned above, the monitoring team reviewed a sample of 100 licensed regular foster homes and determined that all the homes were paid the proper reimbursement rate for the age of the children in their care in December 2018.

MDCPS committed to provide increases in the foster care board rate in SFY2020 based on the previous year's rate of inflation, as required by the 2nd MSA.

### Analysis of Rates (1.8.c.)

MDCPS was required to provide to the monitor within a year of court approval of the 2nd MSA (approved December 19, 2016) a written report setting forth (1) findings regarding the adequacy of a proposed schedule of foster care maintenance payments made to foster care providers

serving children, including children with specialized needs, and facilities providing congregate care in relation to the requirements of 42 U.S.C. § 675(4)(A) and the actual cost in the state of Mississippi to provide such care; and (2) the methodology utilized to determine the actual costs in the state of Mississippi to provide such care. Following review of the state's report, the monitor was required to establish the rates that MDCPS must implement. The monitoring team received the required reports timely on September 14, 2017 and reviewed and discussed the contents with MDCPS. The table below displays the current foster care maintenance rates approved by the monitor.

**Table 5. Current Resource Board Payment Schedule**

| Age/Status | Board | Clothing | Allowance | Payment | Daily Per Diem |
|---|---|---|---|---|---|
| 0-8 | $ 586.90 | $ 80 | $ 30 | $ 696.60 | $ 23.23 |
| 9-15 | $ 672.20 | $ 80 | $ 50 | $ 802.20 | $ 26.74 |
| 16-21 | $ 736.60 | $ 80 | $ 60 | $ 876.60 | $ 29.22 |
| Special Needs I | $ 838.60 | $ 80 | ** | $ 918.60 | $ 30.62 |
| Special Needs II | $ 901.30 | $ 80 | ** | $ 981.30 | $ 32.71 |
| Foster Teen Parent | $ 1,323.50 | $ 160 | $ 90 | $ 1,573.50 | $ 52.45 |
| Emergency Shelters | $ 4,412.10 | - | - | $ 4,412.10 | $ 147.07 |
| Regular Group Homes | $ 1,096.60 | $ 80 | ** | $ 1,176.60 | $ 39.22 (all ages) |
| Therapeutic Resource Homes | $ 2,823.10 | $ 80 | ** | $ 2,903.10 | $ 96.77 |
| Therapeutic Group Homes | $ 5,170.00 | $ 80 | ** | $ 5,250.00 | $ 175.00 |
| Related Therapeutic Placement | $ 1,293.70 | $ 80 | ** | $ 1,373.70 | $ 45.79 |

** Personal Allowance is based on the age of the child and is included in the total board payment.

## 2. Child Safety and Maltreatment in Care

In the 2nd MSA, MDCPS committed to maintain a statewide system to appropriately receive, screen and investigate reports of child maltreatment. MDCPS must ensure its system is adequately staffed and that investigations of all reports are commenced as required by state law and conducted and completed pursuant to policy and regulation. The 2nd MSA states that the monitor shall periodically review the statewide system for appropriately receiving, screening and investigating reports of child maltreatment.

## Screening Reports of Abuse and Neglect

*Responding to Reports of Abuse and Neglect (2.1)*

Mississippi Centralized Intake (MCI), established by MDCPS in 2009, is charged with receiving, prioritizing and dispatching reports of child maltreatment. Reports to MCI alleging child abuse, neglect, exploitation or risk are forwarded to local MDCPS offices for additional screening and investigation. If a report alleges maltreatment of a child in the state's custody, the information is required to be referred to the centralized Special Investigations Unit (SIU) for handling. MCI received 36,568 alleged abuse, neglect or exploitation (ANE) reports during 2018. Of the ANE reports received, 7,343 reports (20.1 percent) were screened out; 29,223 reports (79.9 percent) were assigned for investigation; and two reports remained in screening at the end of the period.

**Table 6. ANE Reports by Intake Action, 2018**

| Action | Q1 | Q2 | Q3 | Q4 | Year |
|---|---|---|---|---|---|
| Assigned for Investigation | 7,506 | 7,055 | 7,539 | 7,123 | 29,223 |
| Screened Out | 1,683 | 1,880 | 1,931 | 1,849 | 7,343 |
| In Screening | 0 | 0 | 1 | 1 | 2 |
| Total Referrals Received | 9,189 | 8,935 | 9,471 | 8,973 | 36,568 |

The monitoring team conducted a qualitative review of Mississippi's screening process in 2018. The review consisted of 100 randomly selected, screened-out abuse and neglect referrals involving children in MDCPS custody, all from 2018. The monitoring team determined that MDCPS made appropriate screening decisions in 91 of 100 instances. Nine of the referrals met criteria for maltreatment and should have been assigned for CPS investigation pursuant to MDCPS policy. In some instances, the screened-out referrals were forwarded to licensing or the ongoing worker as policy violations. In two instances, MDCPS had classified the reports as "duplicate" reports. To classify a report as a "duplicate" report, it must be determined that the new report involves the same alleged perpetrator(s), the same victim(s), the same types of maltreatment and the same incident as a prior referral. The two reports classified as "duplicate" by MDCPS did not meet these criteria.

Examples of referrals the monitoring team concluded should have been investigated for child abuse and neglect include:

- A referral was made by a nurse practitioner expressing concern that a child's foster family was not making sure she was taking her medications, including Benztropine Mesylate, Abilify and Vyvanse, regularly. The medications were stopped for unknown reasons.

- A 13-year-old foster child alleged that two years ago, in a previous foster home, she was sexually assaulted by her foster mother's teenage son. The foster mother was home at

the time, but she was in the kitchen and the children were in a separate room. The child did not tell anyone about the assault at the time, but afterwards she disclosed the assault during a visit to the doctor. The child also reported that the foster mother would whoop her across the back with a wide extension cord and it made her bleed. MDCPS screened this referral out as a "duplicate report" stating that the allegations were disclosed by the foster child during an open investigation. However, that investigation referenced a different perpetrator and did not document that any of the allegations in this referral were investigated by MDCPS.

*Maltreatment-in-Care Screen-Out Reviews (2.3)*

MDCPS committed to develop and implement policies and procedures, subject to the review and approval of the monitor, for the Department to review all maltreatment in care (MIC) reports that were screened-out and assess the appropriateness within 24 hours of all screen-out determinations. If the decision to screen-out the report is determined to be inappropriate, MDCPS shall ensure the report is referred for investigation timely.

Data provided by MDCPS indicate that 656 MIC reports were screened-out for investigation during 2018. MDCPS reported that the Department's Continuous Quality Improvement's (CQI) Safety Review Unit (SRU) conducted reviews of only 409 of the 656 screened-out MIC reports (62.3 percent) in 2018, though it is required to review all such screen-outs. SRU determined that only one report was inappropriately screened-out and returned it to MCI for investigation. The referral was not subsequently investigated by MDCPS.

*Standardized Decision-Making (2.8)*

The 2nd MSA requires MDCPS to assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment of children in MDCPS custody. However, MDCPS has not yet implemented a system to ensure standardized decision-making. When MCI identifies that a foster child is the subject of the maltreatment referral, the unit is required to send it to the SIU. If the SIU supervisor decides to screen-out the referral, the supervisor is required to advise the Director of Field Support Programs who, upon approving the screen-out determination, must notify the SRU of the screen-out. The SIU's screen-out judgments are routinely final. Of the hundreds of screen-outs the SRU reviewed in 2018, data and information from MDCPS indicates there was only one instance where a reversal was recommended by SRU, but as reported earlier, the case was never investigated, and it apparently remained a screen-out.

In those instances where MCI is unaware that the child described in a referral is in foster care, the maltreatment referrals are sent to the 82 counties and the referrals are then subject to review by the Regional Director or his/her designee. The Regional Directors, and their designees,

have the unilateral power in their counties to change the disposition and screen-out the referral. There is no evidence to suggest those judgments, made by different county-based individuals across the state, are subject to rigorous scrutiny by State Office staff or further discussion with MCI staff to establish standardization. In almost every instance, the screen-out judgments of the county staff are final. This broad distribution of responsibility and prerogative to screen out referrals across the state into the counties, and designated down to proxies by certain Regional Directors, undermines standardized decision-making.

## Investigating Maltreatment in Care

*Special Investigations Unit and MIC Investigation Initiation Timeliness (2.2)*

Pursuant to the 2nd MSA, MDCPS is required to continue to maintain a special investigations unit whose responsibility is to investigate reports of maltreatment of children in custody. The initiation of that investigation shall not extend beyond 24 hours.

MDCPS continued to maintain SIU, charged with investigating reports of maltreatment of children in custody throughout 2018. Data provided by MDCPS indicate that of the 527 investigations conducted by SIU that were due for approval in 2018, 513 (97.3 percent) were initiated timely.

*MIC Worker Training (2.6)*

Pursuant to the 2nd MSA, all allegations of maltreatment of a child in custody are to be investigated by a worker who has received training on intake and investigations processes, policies, and investigation techniques and has no ongoing connection to the foster care case.

MDCPS provided investigative training dates for all current SIU staff, who are responsible for conducting MIC investigations. However, both MDCPS and the monitoring team identified investigations of MIC that were not completed by SIU. SIU workers receive training on intake policy, investigations into maltreatment in care and facility investigations, in addition to the pre-service training that all workers receive. Ongoing foster care workers do not receive the same level of training. The monitoring team reviewed all 129 investigations with a custodial child victim that were conducted by non-SIU workers to determine if the investigator had an ongoing connection to the foster care case. The team identified four instances where an investigation of maltreatment of a child in custody was conducted by a worker with an ongoing connection to the foster care case of one of the alleged victims.

*MIC Investigation Completion Timeliness (2.8.a.)*

MDCPS committed that by July 1, 2018, at least 90 percent of MIC investigations will be initiated and completed within 30 days. Data provided by MDCPS indicate that of the 527 MIC

investigations due for completion in 2018, 518 (98.3 percent) were completed timely. The monitoring team's case record review of 82 MIC investigations confirmed that MDCPS met the performance standard for this commitment during 2018.

*Filing of MIC Investigations (2.8.c., 2.8.d.)*

Pursuant to the 2nd MSA, when a MIC investigation involves a foster or adoptive home, MDCPS must file a copy of the approved final investigation report, and any recommendations and/or corrective actions MDCPS has deemed necessary, in the case record of the foster child. The Department must also file a copy of the approved final investigation report, and any recommendations and/or corrective actions MDCPS has deemed necessary in the file of the foster or adoptive parents, along with a copy of the letter of notification to the foster or adoptive parents, and with the Bureau Director for Licensure. MDCPS must also provide those records to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor (2.8.c).

Additionally, when a MIC investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by MDCPS, a copy of the final investigative report must be filed in the child's case record, with the Director of Congregate Care Licensure, and sent to the licensed provider facility. MDCPS must also provide the report to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor (2.8.d).

MDCPS did not provide information on its performance for these commitments in 2018.

*Worker Contacts with Custody Children after a MIC Substantiation (2.8.b.)*

The 2nd MSA requires that any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker according to the following schedule:

- Once per week for the first month and twice per month for three months if the investigation is found to be substantiated, or
- Twice per month in accordance with MDCPS policy if the investigation is found to be unsubstantiated.

The monitoring team was unable to validate the data MDCPS provided for this commitment. The monitoring team was unable to replicate MDCPS' calculations used to create the files and calculate performance. During this process, MDCPS determined that it was incorrectly counting the number of weekly and monthly visits due to what appeared to be a coding error that assigned visits to the subsequent week or month in which they occurred.

During the fourth quarter of 2018, MDCPS reported there were nine foster children who remained in the same out-of-home placement following a substantiated report that he or she

41

was maltreated in that placement. The monitoring team conducted a qualitative review of case notes for these nine children to determine if they had been visited in the placement by an MDCPS caseworker according to the agreed upon schedule. The review indicated that for four of the nine foster children who were reported to have been maltreated and remained in the same placement, the substantiations of maltreatment were for incidents that occurred prior to the child's placement in the foster home and were included in the data by MDCPS erroneously. The substantiated perpetrator was not the foster parent. For the five foster children where the investigation of maltreatment was found to be substantiated in the foster home where they remained, only one foster child received the required visits by a caseworker.

For the five foster children reviewed, there were 23 visits required in the three-month period, based on the date of the substantiation. Sixteen of the 23 visits took place as required and seven visits did not.

*Licensure Investigations of Emergency Shelters and Group Homes (2.4)*

MDCPS committed to initiate a licensure investigation of contract agency group homes and emergency shelters within 30 calendar days following a substantiated report of child maltreatment. The licensure investigations are required to occur in addition to and independent of child protection investigations and must include an on-site inspection by MDCPS of the group home or emergency shelter to determine the contract provider's compliance with MDCPS licensure standards. A provider has 10 calendar days to submit a corrective action plan (CAP) with timeframes to rectify any identified violation of licensure standards and comply with the approved CAP timeframes. If the provider does not comply with the licensure standards based on the approved CAP and timeframes, MDCPS shall revoke the license.

MDCPS reports there were two substantiated reports of child maltreatment in 2018 relevant to this commitment, one in a group home and one in a shelter. In one investigation, MDCPS found no licensure violations; therefore, no CAP was necessary. In the other investigation, a CAP was submitted and approved.

The monitoring team reviewed the two licensure investigations and one CAP. In one investigation, there was an on-site inspection of the facility, but in the other review, the monitoring team was unable to determine whether such an inspection took place, as required. In that same investigation, MDCPS listed the date that licensure staff completed the investigation as being earlier than the date licensure staff even initiated the investigation. The CAP included timeframes and dates to rectify the violations, but the monitoring team was unable to determine whether the facility complied with the licensure standards based on the approved CAP and timeframes. Actions taken by the facility included the termination of multiple staff members, in-service trainings and policy updates.

42

*Licensure Investigations by Child Placing Agencies (2.5)*

The 2nd MSA requires that upon receipt of a report of child maltreatment in a private child placing agency (CPA) foster home, MDCPS must notify the CPA, which shall within 30 calendar days initiate an independent licensure investigation, including an on-site inspection of the foster home, to determine the provider's compliance with licensure standards. If the foster home provider is found to be in violation of licensure standards, the provider shall have ten calendar days to submit a CAP with timeframes to rectify the violation and comply with the approved plan. MDCPS shall recommend that the foster home license be revoked if the provider does not comply based on the approved CAP and timeframes.

MDCPS identified 21 reports of maltreatment involving CPA foster homes. The monitoring team reviewed the cases to assess whether an independent licensure investigation was initiated consistent with the 2nd MSA requirements. The monitoring team noted several issues during the review, including:

- MDCPS' notification to the CPAs of a report of maltreatment in a CPA foster home was inconsistent, ranging from 0 to 143 days, with a median of 40 days, after the report of maltreatment was made to MCI.

- CPAs did not always complete the required licensure investigation, opting instead, in some instances, to close the home or remove the child without completing the investigation as required.

- On-site inspections were conducted, as required, in connection with just eight of the 15 licensure investigations that were initiated.

- Licensure violations were indicated in eight of the licensure investigations conducted, but only two CAPs were developed in connection with those eight investigations.

*MIC Investigation Reviews (2.7)*

Within 30 calendar days of the completion of any investigation of maltreatment of a child in custody, as required in Section 2.1, MDCPS must review the maltreatment investigation. This review will:

- Identify any case practice deficiencies in the investigation and any remedial actions necessary to ensure the safety of the child who is the subject of the investigation, as well as any other children in the home or placement;

- Identify a timeframe in which any recommended remedial action must take place; and

- Monitor the initiation and completion of the remedial actions regarding individual child safety and case practice.

When any remedial actions have not been initiated or completed timely, MDCPS must notify the supervisor, Regional Director and Director of Field Operations.

Reviews of MIC investigations are completed by the MDCPS Safety Review Unit (SRU). MDCPS sent monthly spreadsheets to the monitor detailing the investigations that the SRU reviewed. The monitoring team determined that there should have been 493 investigations reviewed by the SRU during 2018, however SRU conducted reviews of only 325 (65.9 percent) of the investigations.[14]

The monitoring team reviewed SRU reports for the 82 MIC investigations from the first quarter of 2018, evaluated under commitment 2.1. SRU identified case practice deficiencies in 14 reports. These include the alleged victim children not being seen within 24 hours of intake, safety/risk assessments not being completed timely and CAPs not being documented in instances where one was recommended by the investigator. Specific remedial actions and timeframes to address these deficiencies were not identified in the SRU reports.

*Investigating Reports of Abuse and Neglect (2.1)*

The monitoring team conducted a qualitative review of all MIC investigations where the alleged perpetrator was a non-relative foster parent, relative foster parent or residential facility staff member, completed by SIU during the first quarter of 2018. This included 82 investigations involving 153 children. Nine of the 82 investigations, involving 19 children, were substantiated for abuse and/or neglect. The monitoring team's review involved reading Investigation Reports supplemented with information from MACWIS.

The monitoring team found that SIU workers consistently contacted and interviewed alleged victims within 24 hours of the report date and time. The alleged perpetrator and collateral contacts were typically interviewed during the course of the investigation. However, in five instances, MDCPS rendered a finding before forensic interview or drug testing results requested by MDCPS were received. The entire investigation was completed and approved within 30 calendar days of the initial intake report date and time in 80 of the 82 investigations. It appears that some investigations require additional time to complete a thorough assessment of the information gathered before making a finding, but an extension was not requested. The monitoring team also found instances where homes with prior child abuse or neglect substantiations were closed and then re-opened.

---

[14] MDCPS reported that prior to November 8, 2018, the tracking report sent to SRU excluded intakes that did not have an incident date. As a result, SRU did not review at least 161 investigations that the unit was required to assess. MDCPS reports it has implemented a correction so that referrals without incident dates are sent to SRU for review.

The monitoring team concluded the evidence supported MDCPS' findings in 58 of 82 investigations (70.7 percent). The monitoring team concluded in 14 investigations (17.1 percent) more information was needed in order to draw a proper conclusion. There were ten investigations (12.2 percent) where some or all the allegations were found to be unsubstantiated by MDCPS, but the monitoring team concluded that information presented during the course of the investigation was sufficient to substantiate.[15] A few examples include:

- MDCPS unsubstantiated allegations of abuse and neglect after a foster child reported the foster mother had slapped her in the face and pulled her hair. The foster mother made multiple assertions to the investigator that the alleged victim foster child had "put a spell on her without using words," and that the child was "evil," a "devil worshipper" and was "trying to kill her." The foster mother also admitted to pulling the child's hair, hitting her and "cussing" at her. She stated that she was going to "mail the worms in [her] body" to the foster child. Despite such statements from the foster mother, MDCPS left the alleged victim's two younger brothers in the placement and noted no concerns for the children in the home. Further, during the investigation, it became apparent that the foster mother was not ensuring that one of the foster children in the home was taking a prescribed medication. Five months later, the foster mother allegedly choked another foster child in the home, leaving him with a scratch on his neck and bruise on his shoulder. MDCPS found the allegation of physical abuse to be substantiated and the home was subsequently closed to new placements. The first investigation should have been substantiated, and the home should have been closed earlier.

- MDCPS unsubstantiated allegations of child maltreatment after a five-year-old child disclosed that his previous foster mother had put socks in his throat when he was crying and made him squat against the wall as punishment. He alleged that sometimes he was made to do the "wall sits" while in his underwear or naked, and that on at least one occasion, he was made to squat against the wall in a closet. The foster mother admitted to making him squat against the wall but denied ever putting a sock in his throat. The alleged child victim had been removed from the home prior to the investigation at the request of the foster mother, but two other foster children were left in the home. The SIU worker noted in her investigative findings that one of the foster children left in the placement was a similar age to the alleged victim child and that she "may be at risk for similar treatment now that [the alleged victim] is no longer there." The licensing worker met with the foster parents and recommended that a CAP be completed; the home remained open.

---

[15] This includes one investigation where the allegations were found to be substantiated for two foster children but unsubstantiated for another two foster children and one adoptive child in the same home. The monitoring team determined maltreatment should have been substantiated for all five children.

- Allegations of physical neglect were unsubstantiated after a 16-year-old foster child was arrested for breaking into cars and stealing handguns while the foster mother worked the night shift. The foster child allegedly brought the stolen guns and marijuana into the foster home, around the other youth in the home. There was photo evidence of the foster children having access to the guns and marijuana. The foster mother had allowed her 18-year-old son to watch the three foster children (ages 16, 14 and 14) during this time. Prior to this incident, there were supervision concerns regarding the foster mother that resulted in a corrective action plan. A police officer stated to the investigating worker that there is "no way these boys were being properly supervised." The foster home was subsequently closed, and the children were removed based on a lack of supervision, the exposure of the foster child to drugs and guns and admission by the arrested youth that he was sneaking out of the home on a recurring basis.

MDCPS utilizes third-party, contracted agencies to license therapeutic foster homes.[16] There were multiple unsubstantiated investigations that involved these contracted therapeutic foster homes. Examples include:

- In one case where the monitoring team concluded that more information was needed, there were allegations of insufficient food in the home and that the foster mother was waking the children up at 2:00 or 3:00 AM to complete chores. Similar allegations were made against the same foster mother in 2012 by another foster child. It is unclear if the SIU worker noticed this connection before finding the case to be unsubstantiated. The investigation was also completed prior to receiving the results of the forensic interviews MDCPS requested during the investigation. A CAP was completed at the recommendation of the licensing agency, the children were removed, and the home remains open.

- In another case, the foster mother allegedly made a 10-year-old child iron his own clothes, even after he had burned himself on one occasion. The foster mother also admitted to referring to "time out" as "jail," and stated that she would put the children in "jail" for 60 to 90 minutes at a time. The principal of the 10-year-old's school referred to the foster mother as being "not very nurturing." The foster child's younger sister, age 7, also alleged while being interviewed that she had fallen and injured her chin on concrete recently and that it hurt so bad that she did not eat, yet the foster mother allegedly did not take her to the doctor. The therapeutic foster care agency reportedly planned to provide extra support to the foster parent. MDCPS recommended no further intervention.

- In another therapeutic foster home case, an eight-year-old in the home stated that every time he gets in trouble, he gets a "whipping" and that he is afraid of the foster father. A

---

[16] A therapeutic foster home is a resource home licensed and certified to care for children with severe behavioral, emotional and psychological impairment. *MDCPS Section D: Foster Care Policy, Section V.G.3.*

two-year-old in the home slept in the foster parent's bed since he was days old, and the foster father refused to allow anyone to see his bedroom. The foster father also allegedly kissed an 18-year-old foster child in the home on her chest and neck for doing a good job raking leaves. MDCPS found the allegations to be unsubstantiated. The children were removed, and the home was closed.

### Maltreatment of Children in Care (2.9)

Pursuant to the 2nd MSA, MDCPS agreed that the rate of child abuse and neglect among children in foster care shall not exceed 0.33 percent per year. A child is counted as having been maltreated in foster care if the perpetrator of the maltreatment was identified as a foster parent or a residential facility staff member. This was a federal outcome standard (based on the federal Child and Family Services Review, Round Two) focused on keeping children in foster care safe from abuse and neglect by their caregivers.

Data provided by MDCPS and verified by the monitoring team indicate that 95 children (1.15 percent) in MDCPS' custody were victims of abuse or neglect by their caregivers. MDCPS should have protected at least 68 more children from abuse or neglect in their placements in 2018 in order to meet the agreed upon safety standard. Examples of substantiated abuse and neglect during 2018 include:

- A six-year-old foster child placed in a licensed relative home was alleged to have marks and bruises all over her body. The investigation confirmed that the child was beaten and whipped by her foster mother with a belt, causing significant bruising all over her body. In addition, the child, who was diagnosed with sickle cell, had not been given her medication. The foster mother possessed only an expired medication for the child that was unopened. Physical neglect and physical abuse were substantiated, the child was removed, and the home was closed.

- A nine-year-old in residential care had bruising on his chest and two scratches. He stated that a staff member had punched him in his chest, and another had grabbed him by his shirt and scratched him. Physical abuse was substantiated for the staff person who grabbed the child; she was previously substantiated – twice – for harming children in residential care. The child remained placed at the facility and MDCPS recommended that the staff person no longer have contact with children in CPS custody as this was the employee's third substantiated report.

- A grandmother, recently granted custody of her three-year-old granddaughter, allowed her to spend a few days with her previous foster parents. When she returned from the visit, she was red in the vaginal area, and didn't want to be washed between her legs. When the grandmother spoke with the foster mother about this, she said it was eczema

and to just put cream on it. However, when the grandmother tried to apply the cream, the child would scream. When interviewed, the child gestured to indicate the foster father who she called "daddy" had touched her in her vaginal area. Sexual abuse by her former foster father was substantiated and the home was closed.

- A five-year-old was coming to school for weeks in the same dirty clothes and smelling of urine. He was also hungry and stole food from the teacher's desk. He had scratches on his face and a wound with scabs on the back of his neck. When interviewed, he said that he cried when the other children tell him that he stinks. He said he got the scratches from rough housing with his eight-year-old brother, and the foster father did not put anything on the neck wound to help it to heal. He said he did not brush his teeth because he did not have a brush or paste. The foster father left his 16-year-old daughter to care for the foster children when he worked 12-hour shifts, and sometimes overnight. Physical neglect by the foster father was substantiated, the children were removed, and the home was closed.

- A nine-year-old child with developmental disabilities that caused him to have encopresis and enuresis was residing in a therapeutic foster home. He told his counselor that he was "whooped" by his foster mother with a belt. The older brother, age 11, could hear his brother being hit. There were bruises with a belt buckle pattern on his thighs, according to an examining physician. The foster mother admitted to hitting him for "peeing and pooping," but stated that she only used her hand, not a belt. Physical abuse was substantiated, the child was removed, and the home was closed.

## 3. Family-Based Placements

*Foster Home Licensure (3.1)*

In order to ensure that children who are removed from their families due to abuse and neglect are placed in the most appropriate and least restrictive setting, MDCPS agreed to develop a safe array of family-based placement resources. The 2nd MSA requires MDCPS to both recruit and license a target number of non-relative foster families and to ensure that when MDCPS places children with relatives, those homes are timely licensed. MDCPS agreed to utilize the licensure process approved by the monitor when assessing prospective relative and non-relative homes.

The licensure process requires MDCPS to: provide pre-service training for applicants; conduct home visits with the prospective applicants and family members; assess the physical and mental health of applicants; conduct home environment safety checks; obtain references regarding the applicants and complete full background checks that include state and federal fingerprints for all adults in the home. MDCPS is also required to complete a foster home study that synthesizes

information obtained during the home study process and documents the agency's licensure decision. The monitoring team reviewed a randomly selected sample of 20 non-relative foster homes licensed during the monitoring period and found that MDCPS licensed non-relative homes consistent with both the requirements of the approved licensure process and agency licensure standards.

MDCPS agreed to license non-relative homes within 120 days of the prospective foster parent's inquiry regarding foster parenting. For 2018, MDCPS was unable to submit accurate data regarding the timeliness of the licensure process for non-relative foster homes due to inconsistent practice during the period that impacted how timeliness was calculated. In addition, staff inconsistently entered into MACWIS the date of the prospective foster parent's inquiry, making it impossible to validate timeliness in many instances. MDCPS reports it is working to correct these issues.

Consistent with the requirements of the 2nd MSA, MDCPS developed an annual plan to recruit and retain additional licensed foster home placements for calendar year 2018. The monitoring team reviewed the plans utilized by the Department to assist in meeting the statewide 2018 targets and found them to be appropriate for this purpose.

When a child in the custody of MDCPS needs an out-of-home placement, potential relatives are always considered as the first placement resource. MDCPS policy states that "first priority for placement shall be given to a relative when it is suitable and appropriate to do so" and the Department committed to license all unlicensed relative homes with limited exceptions, as described below.

The assessment of a relative's home for potential placement begins when the child's caseworker initiates MDCPS' emergency placement process that includes a pre-placement safety assessment. The child's worker is responsible for walking through the entire home, both inside and outside, to ensure that safety issues do not exist or when safety issues are identified, they are remediated prior to a child's placement. MDCPS must also complete and assess the results of criminal, law enforcement and child abuse registry background checks prior to approving the placement. After the initial safety process is completed and supervisory staff approve the child's placement, casework staff must make a referral to the regional licensure unit for continuation of the 90-day licensure process.

MDCPS data shows that 1,318 child placements were made during the monitoring period into 798 unique unlicensed relative homes. The outcomes for licensure of the 798 homes are as follows.

**Table 7. Licensure Status of Homes, 2018**

| Licensure Status | Homes | Percent |
|---|---|---|
| Licensed | 493[17] | 62% |
| Unlicensed | 305 | 38% |
| Total | 798 | 100% |

The monitoring team conducted three separate quality reviews of 106 expedited pending relative placements made during 2018. The monitoring team was able to confirm that MDCPS implemented the licensure process approved by the monitor for relative homes. However, during the reviews, the monitoring team identified lapses by MDCPS in carrying out the initial pre-placement safety assessment process conducted by the child's caseworker. Specifically, the monitoring team found:

- Of the 106 cases reviewed, documentation of the initial home walk-through was missing for three placements and indicated the walk-through was completed late for 21 placements.

- Home study files lacked documentation of some criminal and central registry background checks for adults in 21 homes.

- Inappropriate sleeping arrangements were found in nine homes including: a foster child sleeping in the same bed as the foster parent; a young child sleeping in an unapproved crib; a child sleeping on an air mattress in the living room and a child sleeping on a couch due to a lack of space in the home. In most cases, there was documentation that these issues were resolved at some point during the licensing process.

- The review also surfaced various other safety issues, including relative homes without carbon monoxide detectors, homes with exposed wiring and homes in very poor repair.

MDCPS acknowledged that during the monitoring period, as the new relative home study process was implemented, caseworkers and supervisors were still working to hone their skills in order to fully implement the pre-placement safety process. MDCPS has plans for additional training to ensure that staff consistently comply with and document pre-placement relative home safety requirements. However, for this period MDCPS acknowledged lapses existed in both documentation and timely completion of required initial safety checks as well as timely referrals to licensure staff for the initiation of the relative home study process.

---

[17] Of the 493 licensed homes, 459 (93 percent) were licensed within 90 days of placement.

*Unlicensed Relative Homes (3.2.a.)*

MDCPS committed that no child will remain in a foster home or facility determined to be unable to meet licensure standards absent an order by a state court with jurisdiction over the child's custody directing the placement of the child into a specific unlicensed placement. MDCPS is not held accountable for a state court's order as long as MDCPS documents that it presented information to the court that the foster home has not met licensing standards, the reasons why the foster home has not and cannot meet licensing standards, and an explanation that a licensed foster home or facility is available, or one time only, to an appropriate expedited relative placement.

MDCPS data shows that during the monitoring period 453 children were placed in court-ordered unlicensed homes and facilities. One hundred fifty of those were placements of children in unlicensed shelters.[18] Three hundred three children were placed in court-ordered unlicensed family-based placements during the period. MDCPS produced to the monitoring team court orders for 49 children in expedited pending relative placements that were made during the period but did not produce court orders for the remainder of the court-ordered unlicensed placements.

Further, during the monitoring period MDCPS acknowledged it had not yet implemented consistent protocols to document information MDCPS provided to the court as it agreed to do in the 2nd MSA. Specifically, MDCPS did not produce evidence that it consistently advised the court whether or not it would be safe for a child to remain in the relative home when it could not be licensed, the reasons why the home could not be licensed and an explanation that a licensed placement was available.

*Safety and Non-Safety Issues (3.2.b., 3.2.c.)*

When MDCPS determines that an unlicensed foster home or facility is unable to meet MDCPS licensing standards due to a safety issue, MDCPS must take all reasonable efforts to immediately ensure the child's safety, including, when necessary, seeking an emergency court order to remove a child. If the child is not in imminent danger, MDCPS must implement a safety plan and within five calendar days, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only.

When MDCPS determines an unlicensed foster home cannot meet licensing standards due to a non-safety issue, the Department must, within 30 calendar days of that determination, either

---

[18] One hundred forty-four of the 150 shelter placements were ordered by the Harrison County Court as an alternative to initial non-relative foster home placement.

cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only.

MDCPS designated the Department's Continuous Quality Improvement Evaluation and Monitoring Unit (EMU) as the responsible entity to track and monitor its performance regarding the 2nd MSA's unlicensed relative home commitments.[19] Each week MDCPS' Data Reporting Unit provided a report to the EMU, which showed children who were placed in unlicensed relative homes. New unlicensed relative homes were assigned to EMU staff who were responsible to: review MACWIS to determine the unlicensed relative's home status; communicate with licensure staff regarding the timelines of the licensure process; follow up with licensure staff regarding any identified safety or non-safety related issue and monitor efforts to ensure timely and appropriate action is taken by licensure and field staff to address those issues. EMU staff utilized the Footprints tracking system to monitor the family's progress to licensure until a determination was made.

MDCPS submitted to the monitoring team beginning in April 2018 two types of reports monthly: A Safety Issues Report and a Non-Safety Issues Report, both regarding expedited pending relative homes. During the course of tracking the licensure process on an expedited pending relative resource placement, the EMU notes in a Footprints tracking system ticket if there is a safety issue or a non-safety issue that is preventing or may prevent the home from being licensed. The Safety Issues Report submitted to the monitoring team had no more than six entries per month. The Non-Safety Issues Report had no more than three entries per month. For instance, both June 2018 reports included six resource homes with safety issues and two with a non-safety issue. Identified safety issues included a hole in the floor of a child's bedroom, children having inappropriate bedding, and a home not having a fire extinguisher or carbon monoxide detector. Both items on the Non-Safety Issues report were duplicate entries, one from a year earlier, June 2017, and the other from the previous month's report that had been previously documented as resolved. The December 2018 report included only two relative homes with safety issues and one with a non-safety issue. MDCPS reported issues that included the lack of a fire extinguisher, inappropriate sleeping arrangements, and beer cans on the ground outside of a home.

The Safety Issues and Non-Safety Issues Reports do not include dates when MDCPS resolved each issue, which prevents the monitoring team from verifying that the licensing deficiencies were resolved within five days or 30 days as required by the 2nd MSA.

---

[19] In late 2018 MDCPS modified the tracking process by designating licensure staff responsible to ensure safety and non-safety issues are addressed.

*Foster Home Development (3.3)*

The 2nd MSA provides that MDCPS, in conjunction with the monitor, shall establish annual statewide and county performance requirements and time periods for new foster home licensure (3.3.a). In order for the first annual performance targets to be set for calendar year 2018, the monitoring team recommended that MDCPS conduct a foster home needs assessment to identify the number of available licensed foster homes and determine the number of licensed foster homes needed. The assessment was designed to inform MDCPS' efforts to build the capacity over time to make safe and appropriate placement matches, and ensure children are placed with their siblings in close proximity to their family and community. Utilizing segments of MDCPS' assessment analysis, as well as child custody data, caseload data, licensure data, and foster home development and closure data, the monitor established the 2018 new foster home licensure target at 400 homes. The time periods for new home licensure were set at:

- 150 new foster homes licensed by June 30, 2018

- 300 new foster homes licensed by September 30, 2018

- 400 new foster homes licensed by December 31, 2018

During the monitoring period, MDCPS provided to the monitoring team monthly new foster home licensure data. Through ongoing data verification and a sample review of new foster home records, the monitoring team confirmed that MDCPS licensed 431 new foster homes during 2018, exceeding the target of 400 new homes. MDCPS exceeded the interim target of 150 new homes developed by June 30, 2018 and slightly missed the September 30, 2018 interim target of 300 new homes.

**Table 8. Non-relative Foster Homes Licensed, 2018**

| Date | Goal for New Unrelated Foster Homes | Total # of New Unrelated Foster Homes Licensed |
|---|---|---|
| June 30, 2018 | 150 | 173 |
| September 30, 2018 | 300 | 285 |
| December 31, 2018 | 400 | 431 |

In order to expand the pool of foster homes available for placement, MDCPS committed to recruit and retain additional licensed foster home placements and maintain the additional number of total placements, as necessary during the applicability of the 2nd MSA (3.3.b). Taking into consideration the new home target and historical foster home closure data, the monitoring team established a net gain target of 275 additional foster homes for 2018.

MDCPS licensed 431 new homes and the monitoring team verified that 271 homes closed during the monitoring period, resulting in a net gain of 160 foster homes. While MDCPS expanded its

53

pool of foster homes in 2018, the Department did not meet the net gain target of 275 additional foster homes.

## 4. Placement Standards

*Foster Home Licensure Limits (4.1, 4.13)*

MDCPS agreed that no foster home shall provide care for more than five children (including foster, birth, and adoptive children) at any given time, in accordance with the following:

- Foster homes may provide care for more than three foster children, up to a total of five, only with the documented approval of MDCPS Office of Licensure determining that the foster children can be safely maintained in the foster home.

- No more than two children in the foster home may be under the age of two or have therapeutic needs, including the biological and/or adoptive children.

- Notwithstanding the above, a sibling group may be placed together in the same foster home in excess of these limits, but only if they are the only children in the home, and only upon written approval by the MDCPS Licensure Director determining that the foster children can be safely maintained in the home.

The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 70 percent for this commitment. Data provided by MDCPS indicate that as of December 31, 2018, there were 2,056 foster homes in Mississippi with at least one child in placement. Of these 2,056 homes, 1,921 (93.4 percent) met the terms of this commitment. Eighteen homes (0.9 percent) did not meet the requirements of the commitment, and MDCPS was unable to report on 117 homes[20] (5.7 percent).

*Children with Special Needs Placed with Resources Meeting Those Needs (4.2, 4.14)*

The 2nd MSA states that children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs. MDCPS is to ensure that each county office has access to resource workers within its region who have the ability to ascertain the placement resources available and their suitability for each child who needs placement.

Mississippi Code 43-27-101(f) defines a special needs child as:

> "A child with a variety of handicapping conditions or disabilities, including emotional or severely emotional disorders. These conditions or disabilities

---

[20] MDCPS was unable to report on resource homes identified as an umbrella agency or a subordinate resource to an umbrella agency.

54

present the need for special medical attention, supervision and therapy on a regimented basis."

Children with special needs qualify for increased board rates, divided into the levels Special Needs I, Special Needs II and Therapeutic, depending on the severity of the child's needs.

**Table 9. Special Needs Board Rates**

| Level | Definition | Current Board Rate |
|-------|-----------|--------------------|
| Special Needs I | A foster child qualifies for the Special Needs I board payment rate if the child has a mental health or medical diagnosis and applied for SSI and the application is pending or has been denied. | $838.60 |
| Special Needs II | A foster child qualifies for the Special Needs II board payment rate if the child receives SSI. A copy of the SSI letter that states the child is approved must be submitted to Eligibility. | $901.30 |
| Therapeutic | A foster child qualifies for a Therapeutic board payment rate if the child has a DSM-IV Axis I diagnosis. | $1,293.70 - $5,170.00[21] |

MDCPS reported that at the end of 2018, there were caregivers for 27 children receiving Special Needs I board payments, caregivers for 69 children receiving Special Needs II board payments, and caregivers for 308 children receiving Therapeutic board payments. Children are matched with placements that meet their needs through the Therapeutic Placement Unit, which reviews referrals for children requiring therapeutic placement and matches them to providers with the specific service(s) being requested. The parties agreed that by July 1, 2018, 60 percent of children with special needs would be matched with placement resources that can meet their therapeutic and medical needs. MDCPS did not provide data or an analysis of performance for this commitment for 2018.

*Children Placed in Least Restrictive Setting (4.3, 4.15)*

In the 2nd MSA, MDCPS committed that each foster child shall be placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment and prior placement information available at the time of placement. In order of consideration this means: placement with relatives; foster home care within reasonable proximity to the child's home community; foster home care outside of the child's home community; group home care or institutional care. The parties agreed to a 95 percent performance standard for this commitment.

---

[21] Rate varies depending on whether the placement setting is a related therapeutic placement, a therapeutic resource home or a therapeutic group home.

MDCPS reported that as of December 31, 2018, 4,309 of the 4,811 children in custody were placed in family-based settings, the least restrictive placement type. The monitoring team reviewed all the data submitted by MDCPS in support of its performance and undertook validation of a randomly selected sample of case notes and residential services applications for 25 children placed in congregate care programs which are more restrictive placement settings. The monitoring team determined those placements were made appropriately in order to meet the individual child's identified needs.

*Children Placed Within Proximity to Home (4.4, 4.18)*

MDCPS is required to ensure that each child who enters placement (from regions other than II-East, II-West, and V-West) shall be placed within his/her own county or within 50 miles from the home from which he/she was removed, unless:

- The child's needs are so exceptional that they cannot be met by a family or facility within his/her own county or within 50 miles of the home from which he/she was removed;

- The child is placed through the Interstate Compact on the Placement of Children (ICPC) consistent with its terms;

- The child is appropriately placed with relatives;

- The child, age 14 years or older, is pursuing educational or vocational opportunities;

- The child is ordered to be placed in a child-specific foster care setting by a court; or

- The child is placed in an adoptive home.

The parties agreed to a 90 percent performance standard for this commitment. Data provided by MDCPS indicate that, excluding children removed from regions II-E, II-W and V-W, there were 9,888 placements made in 2018. Of these, 9,647 (97.6 percent) met the proximity terms of the 2nd MSA. This includes placements made within 50 miles from the child's home of removal (8,056) and placements that exceeded 50 miles but had an approved exception consistent with the commitment (1,591).

*Children Placed Within Proximity to Home (4.5, 4.19)*

For children who enter placement from Regions II-East, II-West, and V-West, MDCPS committed that no less than 90 percent will be placed within his/her own county or within 75 miles of the home from which he/she was removed. The same exceptions apply, as in Sections 4.4 and 4.18 above, except for the radius distance.

MDCPS is not currently tracking whether placements for children from regions II-E, II-W and V-W are within 75 miles of the home of removal, instead reporting on whether the placements are

within 50 miles or have a valid exception. Data provided by MDCPS indicate that there were 1,690 placements of children from regions II-E, II-W and V-W in 2018. Of these, 1,588 (94.0 percent) were placed within 50 miles of the home of removal (1,112) or had an approved exception consistent with the terms of the commitment (476).

The 2nd MSA also calls for the monitor to evaluate this commitment in December 2018 to determine whether the 75-mile exception for these three regions is still necessary. Given that MDCPS does not currently track whether placements are within 75 miles from the home of removal and the Department is exceeding the standard while evaluating these three regions against the 50-mile rule, the monitor determines that the 75-mile exception for regions II-E, II-W and V-W is not necessary.

*Placing Siblings Together (4.6, 4.16)*

The 2nd MSA requires MDCPS to place siblings together when they enter placement at or near the same time. Exceptions can be made if placing the siblings together would be harmful to one or more of the siblings, one of the siblings has exceptional needs that can only be met in a specialized program or facility or the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts must be documented and maintained in the case file. The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 60 percent for this commitment.

The monitoring team is unable to validate the data MDCPS produced for this commitment. During validation, the monitoring team was unable to replicate the detail files MDCPS produced and observed many instances in which MDCPS identified siblings placed together despite the siblings' placement histories showing they were never in the same placement. The monitoring team requested feedback from MDCPS regarding the method used to identify sibling groups but MDCPS was unable to interpret its code (written by a former MDCPS employee) used to identify sibling groups and calculate performance for this commitment.

*Placement Disruptions (4.7, 4.17)*

MDCPS committed to take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. If there is a documented indication that a placement may disrupt, the caseworker shall immediately take steps to determine the following:

- The cause of the potential disruption;
- Whether the placement is appropriate for the child;

57

- Whether additional services are necessary to support the placement;
- Whether the child needs another placement; and
- If another placement is necessary, what that placement should be.

These efforts are to be documented in the child's case record. The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 60 percent for this commitment.

MDCPS did not provide a report identifying those children who were moved as a result of a disrupted placement including the cause of the disruption.

*Overnight Stays in an Office or Other Nonresidential Facility (4.8)*

The 2nd MSA requires that no child shall remain overnight in an MDCPS office or other nonresidential facility that provides intake functions. MDCPS reported that this did not occur during calendar year 2018. The monitoring team reviewed thousands of case records in preparation of this report and did not learn of any instance of this occurring in 2018.

*Young Children Placed in Congregate Care Facilities (4.9)*

MDCPS committed that no child under 10 years of age shall be placed in a congregate care setting, including group homes and shelters. Exceptions can be made if:

- the child has exceptional needs that cannot be met in a licensed foster home;
- in order to keep a sibling group together for a temporary period, not to exceed 15 days, and the Regional Director has granted documented approval for the congregate care placement;
- or to enable a mother and baby to be placed together and there is not an available foster home for both of them.

MDCPS reported there were 155 children under the age of ten placed in congregate care settings during 2018. The Department was unable to track and report how many of the 82 children who were placed between January 1, 2018 and July 16, 2018 had an allowable exception approved. Of the 73 children who were placed between July 17, 2018 and December 31, 2018, MDCPS reported that 54 (74.0 percent) had an allowable exception approved.[22]

---

[22] MDCPS implemented corrective action to fix the error in the database which lost required data on Regional Director approvals, allowing the Department to report on performance for July 17, 2018 to December 31, 2018.

*Placement Moves (4.10, 4.12)*

No child is to be moved from his/her existing placement to another placement unless MDCPS specifically documents in the child's case record justifications for that move and an MDCPS supervisor approves the move. The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 70 percent for this commitment.

MDCPS provided data indicating that there were 2,990 placement moves in the third quarter of 2018, which began on July 1, 2018, and 2,793 placement moves in the fourth quarter of 2018. The monitoring team reviewed a randomly selected sample of case notes and approvals for 67 placement moves that occurred in the second half of 2018. Every case the team reviewed listed a reason for the placement change and was approved by a supervisor. However, supervisory approval frequently occurred after the child's placement move. In 27 cases (40.3 percent), approval by the supervisor occurred more than a week after the placement change. Additionally, placement change reasons were often coded as "other" when another reason, such as "placement with a relative" or "trial home placement," would have been more applicable.

*Multiple Emergency Placements (4.11)*

MDCPS agreed to ensure that no child is placed in more than one emergency or temporary facility within one episode of foster care. Exceptions can be made if an immediate placement move is necessary to protect the safety of the child or of others with documented approval from the Regional Director. Data provided by MDCPS indicate that 52 children experienced 66 successive stays in shelter care during 2018. Successive stays were counted as meeting the requirements if there was an exception approved by the Regional Director indicating that the

placement was necessary to protect the safety of the child or of others. MDCPS' performance during each quarter of 2018 is charted below.

**Table 10. Successive Emergency Shelter Placements, 2018**

| Quarter | Number of Successive Stays | Number of Approved Successive Stays[23] | Percent of Approved Successive Stays |
|---|---|---|---|
| 1 | 8 | 1 | 12.5% |
| 2 | 13 | 0 | 0.0% |
| 3 | 26 | 25 | 96.0% |
| 4 | 19 | 19 | 100.0% |
| Full Year | 66 | 45 | 68.2% |

The monitoring team reviewed all the 45 cases with exceptions in MACWIS. Of the 45, only 13 (28.9 percent) contained information supporting the determination that the placement was needed to ensure the safety of the child or of others.

## 5. Visitation

## Worker Contact and Monitoring

*Caseworker Contact with Foster Children (5.1.a.)*

The 2nd MSA requires that by July 1, 2018, no less than 75 percent of foster children shall have an MDCPS caseworker meet with them at least two times per month. At least one visit per month shall occur in the child's placement.

MDCPS provided data on this commitment for 2018 but did not exclude children on trial home visits (THVs). Children on THVs should be excluded from this commitment because visit requirements for children on THVs, which is measured in 5.1.b, are different from visit requirements for children in out-of-home placements. While all children are required to be visited by a caseworker twice a month, both visits must occur in the home for children on THVs and only one visit must occur in the child's placement for children in out-of-home placements. The monitoring team is able to report for this commitment only the number and percentage of children with at least two visits in each month of 2018. MDCPS was not able to distinguish the children on THVs, making it impossible for the monitoring team to analyze whether the required number of visits occurred in the child's placement.

---

[23] MDCPS reported there were problems with capturing data on exceptions in the first half of 2018, which resulted in low performance in Q1 and Q2.

Regarding children receiving two caseworker visits each month, the Department's performance during every month of 2018 is reflected in the following chart.

**Figure 6. Worker-Child Visitation, 2018**



Source: MDCPS Data

The monitoring team conducted a qualitative review of visitation case notes for 70 randomly selected children who were in the custody of MDCPS during the fourth quarter of the year (October to December 2018) and subject to this commitment. The visitation narratives were reviewed to determine if the 2nd MSA requirements to assess safety, well-being, services, permanency and other service goals were documented. There were 339 contacts required, of which 294 were held. The chart below reflects any documented assessments during those contacts.

**Table 11. Worker-Child Visitation Narrative Review, 2018**

| Visitation Type | # Of contacts held | # Safety Assessed | # Well-being Assessed | # Services Assessed | # Permanency Assessed | # Other service goals Assessed |
|---|---|---|---|---|---|---|
| Worker-Child | 294 | 228 | 282 | 57 | 91 | 17 |

Overall, the monitoring team found that many of the files lacked detail about visitation, and at times, any information at all. For example, in one case, the visitation narratives each month contained the exact same information with the date changed. In another case there were no narratives from July to December 2018, although a supervisory note indicated the caseworker had seen the child each month, but it had not been documented.

*Caseworker Contact with Children on Trial Home Visits (5.1.b.)*

MDCPS committed that by July 1, 2018, at least 75 percent of foster children on a 90-day THV would be visited by an MDCPS caseworker in the home at least two times per month.

The monitoring team cannot validate the data MDCPS provided for this commitment. For this commitment and another commitment that involves THVs (6.3.a.5 – Children with a goal of reunification who reunified should have a 90-day THV), the monitoring team identified several problems with how MDCPS documented THVs and the methods it used to identify them.

*Caseworker Contact with Parents (5.1.c.)*

MDCPS committed, by July 1, 2018, to meet at least monthly with the parents of no less than 75 percent of foster children with a goal of reunification to discuss progress on the family service plan and the child's well-being. Exceptions include if the child's parent(s) reside out-of-state or are incarcerated.

The monitoring team cannot validate the data MDCPS provided for this commitment. The monitoring team identified several problems and raised questions regarding the files and calculations provided by MDCPS. For example, the file from which the final performance was generated appeared to be missing contact information for many parents, for multiple months. The monitoring team requested feedback from MDCPS regarding the method it used to create this file but MDCPS, as of April 2019, was still trying to understand the business rules and code (written by a former MDCPS employee) used to produce the file and calculate performance for this commitment. MDCPS also indicated that its code used to calculate performance was often not selecting the correct permanency plan needed to indicate whether the goal was reunification.

The monitoring team conducted a qualitative review of visitation case notes for a randomly selected sample of 70 children who were in the custody of MDCPS during the fourth quarter of the year (October to December 2018) and subject to this commitment. The monitoring team evaluated if the 2nd MSA requirements for MDCPS to assess progress on the family service plan and the child's well-being were documented. There were 170 worker-parent contacts required, of which 103 were documented. The chart below reflects any documented assessments during those contacts.

Table 12. Worker-Parent Visitation Narrative Review, 2018

| Visitation Type | # Of contacts held | # Well-being Assessed | # Family Service Plan Assessed |
|---|---|---|---|
| Worker-Parent | 103 | 47 | 29 |

As with the worker-child contacts discussed above, the monitoring team found that many of the worker-parent visitation narratives lacked detail.

*Caseworker Contact with Foster Parents (5.1.d.)*

MDCPS committed that, by July 1, 2018, at least 75 percent of foster parents with at least one foster child in the home must be visited by MDCPS monthly in the home.

MDCPS provided data for this commitment for 2018, which was analyzed by the monitoring team. The monitoring team calculated slightly lower performance than MDCPS reported. [24] The Department's performance during each month of 2018, as calculated by both MDCPS and the monitoring team, is charted below:

Figure 7. Worker-Foster Parent Visitation, 2018



---

[24] The monitoring team identified on average 143 homes per month (with a range of 126 to 177) that had a foster child placed in the home for the entire month for which MDCPS did not provide visitation data. The monitoring team included these foster parents in the performance calculations as non-compliant.

63

## Developing and Maintaining Connections

### Child-Parent Contacts within 72 Hours of Placement (5.2.a.)

The 2nd MSA requires MDCPS to arrange contact for the foster child with his/her parents and with any siblings not in the same placement within 72 hours of foster care placement unless there are documented reasons why contact should not occur. If MDCPS cannot arrange a visit within 72 hours, a telephone call to parents, siblings, or extended family members must be provided to the child.

The monitoring team reviewed visitation case notes for 70 children, as detailed in Section 5.1.a. Thirty-two of these children were removed from their parent(s) in the last quarter of 2018 and are subject to this commitment. The team reviewed the case narratives and found four children had a visit with their parent and six children had a visit with their sibling(s) within 72 hours of their removal. In another child's case, a no contact order with the parent was documented. There were no case narratives found documenting a telephone call between the child and parent(s) or sibling(s).

### Cancellation of Visits (5.2.c.)

The 2nd MSA requires MDCPS and its contracting agencies to implement a policy that prohibits cancellation of visits as a form of discipline against children. MDCPS reported that a policy update was issued in November 2017 prohibiting the cancellation of visits as a form of discipline for children in custody. MDCPS provided the monitor with a copy of the policy bulletin to all MDCPS staff and the email sharing the policy update with contracting agencies.

## 6. Child and Youth Permanency

## Comprehensive Family Service Plans

### Comprehensive Family Service Plans (6.1.a.)

The 2nd MSA requires that a comprehensive family service plan (FSP) that addresses the strengths, needs and services required for both the child and their parent(s) shall be completed within 45 days of a child's entry into foster care. In developing the FSP, the MDCPS caseworker must consult with the child, the child's parents and the foster care provider. MDCPS committed that by July 1, 2018 at least 75 percent of FSPs will be submitted by the caseworker consistent with 2nd MSA requirements, within 30 calendar days of a child's entry into custody and approved by the supervisor within 15 calendar days. The FSP shall be considered complete upon documented supervisory review and approval.

Data provided by MDCPS indicate there were 1,072 children who entered custody between July 1, 2018 and December 31, 2018 whose 45th day in custody fell during the year. Of the 1,072 FSPs due during the period, 799 (74.5 percent) were completed within 30 days of a child's entry into foster care and 1,022 (95.3 percent) were approved within 15 days. A total of 929 (86.7 percent) of the 1,072 FSPs due during the period were submitted and approved within 45 days.

The monitoring team reviewed a randomly selected sample of 66 initial FSPs completed during the period to assess whether the plans were developed in accordance with 2nd MSA requirements. The monitoring team found that only 16 (24.2 percent) of the FSPs in the sample indicated the plan was developed in consultation with the child's parents or the foster care provider. None of the plans reflected consultation with an age-appropriate child during development of the initial FSP. As such, strengths, needs and services for parents and children could not be evaluated.

*Parents' Inclusion in Service Planning (6.1.b.)*

The 2nd MSA provides that in instances in which it is impossible to meet with one or both parents, the service planning process will proceed as described above, notwithstanding the parent's absence.

The monitoring team reviewed a randomly selected sample of 66 initial FSPs completed during the period to assess whether the plans were developed in accordance with the 2nd MSA requirements. The monitoring team determined that only three (4.5 percent) of the FSPs in the sample indicated a child's parent could not be found, but service planning proceeded in the parent's absence as required.

*Diligent Search for Parents (6.1.c.)*

MDCPS committed that in those cases in which the whereabouts of one or both parents are unknown, MDCPS shall, within 30 days, institute a diligent search for the parent(s) and document the search in the child's case record. MDCPS committed to an interim performance standard of 75 percent by July 1, 2018.

MDCPS was unable to produce data related to diligent searches for parents for the first three quarters of 2018. The Department began tracking preliminary diligent search data in October 2018, as a pilot.

*Permanency Plans (6.1.d.)*

The 2nd MSA requires that within 45 days of a child's initial placement into foster care, MDCPS shall complete a permanency plan that specifies the child's permanency goal, a timeframe for achieving permanency and activities that support permanency. MDCPS committed that by July 1,

2018 for at least 75 percent of children who enter custody, permanency plans will be submitted within 30 calendar days of a child's entry into custody by the caseworker consistent with 2nd MSA requirements and approved by the supervisor within 15 calendar days. The permanency plan shall be considered complete upon documented supervisory review and approval.

The monitor validated there were 1,072 children who entered custody between July 1, 2018 and December 31, 2018 whose 45th day in custody fell during the period. Of the 1,072 permanency plans due during the period, 773 (72.1 percent) were completed within 30 days of a child's entry into foster care and 1,056 (98.5 percent) were approved within 15 days. A total of 928 (86.6 percent) of the 1,072 permanency plans due during the period were submitted and approved within 45 days.

The monitoring team reviewed a randomly selected sample of 66 initial FSPs completed during the period to assess whether the FSPs were developed in accordance with the 2nd MSA requirements, inclusive of a permanency plan. The monitoring team found that 42 (63.6 percent) of the FSPs in the sample contained a permanency plan that stated the child's permanency goal, as required. Of the 42 FSPs containing a permanency plan with a stated goal, only six (9.1 percent) plans included a timeframe for achieving permanency. Of the 66 FSPs reviewed, 31 (47.0 percent) indicated activities that support permanency.

## Concurrent Permanency Planning

### Concurrent Permanency Planning (6.2.a.)

MDCPS agreed to begin, within the first six months of a child's entry into care, to engage in concurrent permanency planning. MDCPS committed that at least 95 percent of children in custody with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements.

MDCPS provided data and summary files for this commitment, but MDCPS' analysis of the data in its summary file was inaccurate. The monitor independently analyzed the data MDCPS provided and determined there were 2,082 children subject to this commitment during the period. Of these 2,082 children with a permanency plan of reunification, all had a concurrent plan assigned at six months.

The monitoring team reviewed FSPs completed during the period for a randomly selected sample of 66 children with a goal of reunification to assess whether the plans included any documentation of a concurrent permanency goal or active concurrent permanency planning. The monitoring team found that all 66 (100.0 percent) of the FSPs in the sample included documentation of a concurrent permanency planning goal, of which only eight (12.1 percent) contained evidence of active concurrent permanency planning.

## Permanency Case Goals

### *Reunification (6.3.a.1.)*

The 2nd MSA requires when a child's permanency goal is reunification that MDCPS identify in the FSP and make available, directly or through referral, those services MDCPS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child. Caseworkers must monitor the provision of services through visits and updating of service plans. MDCPS committed to an interim performance standard of 75 percent by July 1, 2018.

The monitoring team reviewed FSPs completed during the period for a randomly selected sample of 66 children with a permanency goal of reunification to assess whether the FSPs were developed in accordance with the 2nd MSA requirements, inclusive of the identification and provision of necessary services. The monitoring team found that 58 (87.9 percent) of the FSPs in the sample identified services MDCPS deemed necessary to address the behaviors or conditions resulting in the child's placement into foster care. Of the FSPs containing identified services, 47 (71.2 percent) of the FSPs included documentation that MDCPS made some or all those identified services available directly or through referral.

### *Caseworker Contact with Parents (6.3.a.2.)*

MDCPS committed that for a child with a permanency goal of reunification, the child's MDCPS caseworker will meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances.

The monitoring team cannot validate the data MDCPS provided for this commitment. The monitoring team identified several problems with the data provided by MDCPS, which are described under Section 5.1.c.

### *Reunification Supports for Parents (6.3.a.3.)*

MDCPS committed in the 2nd MSA to document in the case record of children with a permanency goal of reunification, opportunities provided to their parents in support of reunification.

The monitoring team reviewed FSPs completed during the period for a randomly selected sample of 66 children with a permanency goal of reunification to determine whether the FSPs contained documentation of opportunities provided to parents in support of reunification. The monitoring team found that 58 (87.9 percent) of the FSPs in the sample identified services MDCPS deemed necessary to address the behaviors or conditions resulting in the child's placement into foster care. Of the FSPs containing identified services, 47 (71.2 percent) of the FSPs included

documentation that MDCPS made some or all those identified services available directly or through referral.

*After-Care Plans (6.3.a.4.)*

The 2nd MSA requires that when a recommendation is made to reunify a child with his or her family, MDCPS must develop an after-care plan that identifies services necessary to ensure that the conditions leading to the child's placement have been addressed, and that the child's safety and stability can be assured. It also requires MDCPS to take reasonable steps to provide or facilitate access to services necessary to support the child during the trial home visits.

The monitoring team reviewed the case records of 66 children where parent(s) had full custody restored during the last quarter of 2018 to determine if the children had after-care plans consistent with the 2nd MSA. Sixty-four of the children (97.0 percent) had an after-care plan, while two children (3.0 percent) did not have an appropriate after-care plan as required by the commitment.

*Trial-Home Visits (6.3.a.5.)*

The 2nd MSA provides that for each child who has a permanency goal of reunification and who is in fact returned home for the purpose of reunification, MDCPS will provide that child with a 90-day THV if the child has been in custody for at least 90 days, subject to the approval of the Youth Court.

MDCPS committed that by July 1, 2018, at least 75 percent of foster children who are reunified and who were in custody longer than 90 days would receive a 90-day THV period or have case record documentation reflecting the Youth Court's objection to such a THV. During the THV, MDCPS must provide or facilitate access to the services in the child's after-care plan, consistent with the 2nd MSA requirements.

The monitoring team cannot validate the data provided by MDCPS for this commitment. MDCPS' count of children with a THV was not limited to children who had a goal of reunification and was not limited to THVs that lasted 90 days or more. Likewise, MDCPS' count of children with a THV with Youth Court approval was not limited to children with a goal of reunification and a THV that lasted 90 days or longer.

*Final Discharge Meeting (6.3.a.6.)*

The 2nd MSA requires that before the end of any THV period, MDCPS will meet with the child's parents and the child to determine the appropriateness of final discharge. If final discharge is

determined to be appropriate, MDCPS shall make the appropriate application to the Youth Court to be relieved of custody.

The monitoring team reviewed the same sample of case records of 66 children where parents had full custody restored during the last quarter of 2018 (see 6.3.a.4, above). Fifty-five children's case records (83.3 percent) had documentation of a final parental discharge meeting, while 11 children's case records (16.7 percent) lacked documentation that MDCPS had a final discharge meeting with the parents. Fifty-eight children's records (87.9 percent) had documentation of a discharge meeting with age appropriate children, or documentation that children who were too young for discussion were seen prior to discharge. Eight children's case records (12.1 percent) lacked documentation that a discharge meeting was held with age appropriate children. Fifty-eight children's records (87.9 percent) had documentation that the appropriate application was made to the Youth Court for relief of custody. In one case MDCPS recommended continued custody because the THV was four days short of 90 days, but the judge denied that recommendation and discharged the children from custody. There were eight children's files (12.1 percent) where documentation was lacking that the appropriate Youth Court relief of custody application was made by MDCPS.

*Adoption (6.3.b.1.)*

The 2nd MSA requires that by July 1, 2018 at least 70 percent of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child specific activities that MDCPS will undertake to achieve adoption.

Relative to the adoption specialist, data provided by MDCPS indicate that of the 2,724 children with a goal of adoption during 2018, 2,672 (98.1 percent) had an adoption worker assigned.

MDCPS did not provide information on the number of children with adoption plans. However, the monitoring team reviewed a randomly selected sample of 66 children who had a goal of adoption. All but one (98.5 percent) of the children's case records documented evidence of adoption planning with identified activities undertaken to achieve adoption. In 47 (72.3 percent) of the cases, activities were documented within 60 days of the goal of adoption being assigned. In the remaining 18 cases, activities were documented more than 60 days after the adoption goal was assigned.

*Termination of Parental Rights (6.3.b.2., 6.3.b.3.)*

MDCPS must make a termination of parental rights (TPR) referral before a child has spent more than 17 of the last 22 months in foster care unless an available exception pursuant to the federal Adoption and Safe Families Act ("ASFA") has been documented by MDCPS in the child's case record. Subsequent to the initial ASFA exception, MDCPS may continue the exception for only

one additional six-month period unless continued invocation of the exception is reviewed, approved and documented semi-annually by the Regional Director assigned to the county of responsibility for the child. MDCPS committed to meet an interim standard of 70 percent for this commitment by July 1, 2018 (6.3.b.2).

The monitoring team was unable to validate the data provided by MDCPS for this commitment. MDCPS identified children as being in care for 17 of the past 22 months but whose custody history does not support this. Conversely, MDCPS' file omits hundreds of children who, according to the custody cohort file, were in care for at least 17 of the last 22 months.

The monitoring team reviewed case records for a randomly selected sample of 70 children subject to this commitment and found 43 (61.4 percent) cases met the terms of the 2nd MSA. With respect to these children, MDCPS either made the TPR referral (22), documented an ASFA exception in the electronic record (14) or placed the children in a THV by the last day of a child's seventeenth month in care (7).

MDCPS is required to provide the monitor a report of all TPR referrals made during the monitoring period, the date those TPR referrals were made and the date the petition was filed with the court (6.3.b.3). MDCPS provided this data for 2018.

*Post-Adoption Services (6.3.c.)*

MDCPS committed to establish and maintain a system of post-adoptive services to stabilize and support adoptive placements. MDCPS agreed that adoptive families eligible for adoption subsidies must have access to these services, which may include counseling, mental health treatment and crisis intervention, family preservation and stabilization services and peer support.

MDCPS reported that in SFY2018, the Department expended $1,552,672 for adoption subsidy payments on behalf of 3,327 eligible children. Consistent with its 2nd MSA commitment, MDCPS established a statewide post-adoptive service contract with a child and family service agency to ensure that eligible families have access to a range of post-adoptive services throughout Mississippi. The contract became effective in October 2017 and the provision of post-adoptive services continued throughout the entire monitoring period.[25] The monitoring team reviewed the contract and found the scope of services includes the provision of supportive counseling, mental health treatment and referrals, crisis intervention, family preservation and stabilization services, peer support and respite services consistent with 2nd MSA requirements. During calendar year 2018, MDCPS reported that 1,021 adoptive families throughout Mississippi accessed the aforementioned range of post-adoptive services.

---

[25] MDCPS reported that the contract value during the monitoring period for statewide provision of post-adoption services was $751,000.

*Durable Legal Custody and Guardianship (6.3.d.)*

The parties agreed that the permanency goals of durable legal custody and guardianship may be assigned when there are documented efforts in the child's case record to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. Further, when the permanency goals of durable legal custody and guardianship are assigned to a child under the age of 14 years old or living with a non-relative, MDCPS agreed to provide to the monitoring team information from the child's case record documenting efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption.

MDCPS provided to the monitoring team a data file identifying 63 children who were assigned the permanency goal of durable legal custody or guardianship at the conclusion of the monitoring period. However, the age of the children was not included in the file nor was information provided regarding whether the child was living with a non-relative. Further, MDCPS did not provide case record information to the monitoring team for children under the age of 14 who were assigned the permanency goals of durable legal custody and guardianship or living with a non-relative for the period. Therefore, the monitoring team cannot verify if MDCPS documented efforts to move a child to adoption and of a reasonable basis why it was in a child's best interests not to be considered for adoption.

*Another Planned Permanent Living Arrangement (APPLA) (6.3.e.)*

If MDCPS concludes, after considering reunification, adoption, durable legal custody, and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, MDCPS may assign a permanency goal of APPLA for the child. In such circumstances, MDCPS agreed that, (1) the child must be at least 16 years old and (2) MDCPS must document a compelling reason why this permanency goal is in the best interest of the child.

MDCPS provided a list of all children with a permanency goal of APPLA in 2018, including the age of each child. MDCPS did not provide information on whether there was a documented compelling reason why this permanency goal was in the best interest of each child. Therefore, the monitoring team cannot validate MDCPS' performance for this commitment.

## Permanency Reviews

*Permanency Plan Reviews (6.4.a.)*

The 2nd MSA requires that a child's permanency plan be reviewed in a court or administrative case review, which may be a foster care review, at least every six months. MDCPS agreed to take all reasonable steps, including written notice, to ensure the participation of the child, parents,

caregivers and relevant professionals in court or administrative reviews. MDCPS committed that by July 1, 2018, at least 80 percent of foster children who have been in custody for at least six months shall have a timely court or administrative case review consistent with 2nd MSA requirements.

During validation of the data MDCPS provided for this commitment, the monitoring team discovered that MDCPS did not use the date the permanency plan review was completed to determine when the next review was due and whether the review was administered timely. Instead, MDCPS used the date the review was scheduled in order to determine timeliness of the reviews. The monitoring team requested and MDCPS provided a new data file that included the review completion date for validation. MDCPS' original analysis indicated that 7,983 children were due for a permanency plan review during the period, of which 7,690 children (96.3 percent) received a timely review. The monitoring team's analysis concluded that 7,756 children were due for a permanency plan review during the period, of which 4,546 children (58.6 percent) received a timely review.

The monitoring team reviewed a randomly selected sample of 66 Youth Court Hearing and Review Summary reports completed by MDCPS during the period for children in custody for at least six months to assess the timeliness and participants of the permanency reviews. The monitoring team found evidence in the sample of Youth Court Hearing and Review Summary reports that the foster care reviewer (quality assurance coordinator), social worker (caseworker), social work supervisor (casework supervisor) and the foster child were listed as being invited to the permanency review in each of the reports. Parents were listed as invited in 45 (68.2 percent) of the reports. Guardians ad litem were invited in 34 (51.5 percent) of the reports and other individuals with an unspecified relationship to the child were listed as being invited in 37 (56.1 percent) of the reports. Caregivers and relatives were rarely listed as being invited in the sample.

The summary reports also indicated that quality assurance coordinators participated in each review and a caseworker attended 69.6 percent of the permanency reviews. Occasionally, caregivers (28.7 percent), caseworker supervisors (27.2 percent), the foster child (18.1 percent) and parents (18.1 percent) attended the permanency reviews. Relatives, guardians ad litem and other professionals rarely attended the reviews (less than 10 percent).

*Court Reviews (6.4.b.)*

The 2nd MSA also requires MDCPS to take all reasonable steps to ensure that a court review is held for each child in foster care custody within 12 months of the child's initial placement, and annually thereafter. MDCPS committed that by July 1, 2018, it would make reasonable efforts to have a timely annual court review scheduled consistent with 2nd MSA requirements for at least 80 percent of foster children who have been in custody for at least 12 months.

MDCPS did not provide information relative to the reasonable steps taken to ensure that timely court reviews occurred for each child in foster care custody. In the alternative, MDCPS reported that timely annual court reviews occurred for between 5 and 11 percent of foster children who had been in custody for at least 12 months during the period.

*Review of Adoption and Safe Families Act (ASFA) Exceptions (6.4.c.)*

MDCPS committed to review documented exceptions pursuant to ASFA for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review. MDCPS did not provide an analysis of its review conducted consistent with this commitment for 2018.

## Permanency Performance Indicators

*Permanency Outcomes (6.5.a.)*

The 2nd MSA requires that by July 1, 2018 the monitor establish performance standards for three permanency[26] indicators, informed by MDCPS' certified baseline performance established during the Stipulated Third Remedial Order (STRO). The standards must represent a substantial improvement above the certified baseline performance. The parties agreed that the standards take effect during Federal Fiscal Year (FFY) 2019 beginning on October 1, 2018.

The monitor analyzed MDCPS' permanency data, took into consideration the certified baseline performance established during the STRO and considered federal Child and Family Service Reviews (CFSR) Round 3 Permanency Standards in establishing the performance standards. As a result, the monitor established interim standards for MDCPS to achieve during FFY2019 and FFY2020. The final performance standard takes effect during FFY2021.

**Table 13. Permanency Outcome Performance Standards**

| 2nd MSA Section | Indicator | STRO Certified Baseline | CFSR Round 3 Performance Targets | FFY2019 Performance Standard | FFY2020 Performance Standard | FFY2021 Performance Standard (Final) |
|---|---|---|---|---|---|---|
| 6.5.a.1. | Permanency for children entering care in a 12-month period (Baseline: October 1, 2014-September 30,2015) | 43.5% | 40.4% | 43.9% | 45.7% | 45.7% |
| 6.5.a.2. | Permanency for children in care for 12-23 months on the first day of a 12-month period (Baseline: October 1, 2015-September 30, 2016) | 33.3% | 41.0% | 34.9% | 38.3% | 41.0% |
| 6.5.a.3. | Permanency for children in care for 24 months or more on the first day of a 12-month period (Baseline: October 1, 2015-September 30, 2016) | 31.1% | 30.3% | 31.4% | 32.7% | 32.7% |

---

[26] Permanency is defined as discharges from foster care to reunification with the child's parents or primary caregivers, durable legal custody, guardianship or adoption.

*Adoption Outcomes (6.5.c., 6.5.d.)*

The 2nd MSA requires that by March 15, 2018 the monitor establish adoption performance standards informed by the certified baseline performance established during the Stipulated Third Remedial Order (STRO). The parties agreed that for all children in the custody of MDCPS who were adopted in FFY2017 the monitor would validate the average and median lengths of time to adoption finalization for each child from the date on which the child's adoption goal was established. The parties agreed that adoption performance standards must represent a substantial improvement above the certified baseline performance established and the performance standards would take effect October 1, 2018.

The monitor certified the baseline performance as an average of 14.8 months and a median of 9.0 months from the date on which a child's adoption goal was established to adoption finalization and established the following performance standards, which, if achieved, demonstrate substantial improvement above the certified baseline:

- In FFY2019, the average length of time from the date on which a child's adoption goal was established to adoption finalization shall be 13.6 months and the median shall be 9.0 months.

- Beginning in FFY2020, the average length of time from the date on which a child's adoption goal was established to adoption finalization shall be 11.8 months and the median shall be 8.8 months.

With the agreement of the parties, the permanency and adoption performance standards took effect during FFY2019, which began on October 1, 2018 and concludes on September 30, 2019. As such, the monitor will report MDCPS' performance relative to the permanency and adoption standards in the next annual 2nd MSA report.

## 7. Transition to Independent Living

*Notification of Cessation of Benefits (7.1)*

MDCPS is required to provide each youth transitioning to independence with at least six months' advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition. MDCPS reported that 139 youth transitioned to independence during 2018. Of those young adults, 33 youth (23.7 percent) were given advance notice of the cessation of health benefits, 52 youth (37.4 percent) were given advance notice of the cessation of financial benefits and 45 youth (32.4 percent) were given advance notice of the cessation of other benefits.

*Independent Living Service Plans (7.2)*

MDCPS is required to provide to each foster youth age 14 years or older, regardless of his/her permanency plan, an opportunity to participate in the creation of an appropriate Independent Living service plan for a successful transition to adulthood. The monitoring team requested and received information indicating that during the first half of 2018, January 1st to June 30th, there were 1,780 children age 14 and older in custody. Of those youth, 1,290 (72.5 percent) had a documented Independent Living service plan in MACWIS and 547 youth (30.7 percent) participated in creating the plan. During the second half of 2018, July 1st to December 31st, there were 1,012 children age 14 and older in custody. Of those youth, 828 (81.8 percent) had a documented Independent Living service plan in MACWIS and 141 youth (13.9 percent) participated in creating the plan. However, MDCPS did not submit information indicating whether each foster youth age 14 years or older was provided an opportunity to participate in the creation of an Independent Living service plan.

*Independent Living Services (7.3)*

The 2nd MSA provides that each foster youth age 14 years and older will have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood. This includes Independent Living services eligible for federal reimbursement under the Chaffee program, which in part promotes employment or removes barriers to employment. MDCPS must maintain sufficient resources to deliver these services.

The monitoring team requested and MDCPS submitted data on services provided during the period to youth age 14 and older, including employment, community resources, transportation, communication skills, social development, youth law, money management, self-care, decision making, housing, relationships, daily living skills as well as the number of youth with no skill modules documented. However, MDCPS did not submit information indicating whether each foster youth age 14 years or older had access to these services. MDCPS' performance during each half of 2018 is charted below.

## Table 14. Youth Receiving Independent Living Skills, 2018

| Skill | January 1, 2018 – June 30, 2018 Youth participants receiving skill modules (N=1781) | | July 1, 2018 – December 31, 2018 Youth participants receiving skill modules (N=1012) | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| Employment | 286 | 16.0% | 240 | 23.7% |
| Community Resources | 232 | 13.0% | 212 | 20.9% |
| Transportation | 216 | 12.1% | 194 | ·19.1% |
| Communication Skills | 286 | 16.0% | 248 | 24.5% |
| Social Development | 258 | 14.4% | 217 | 21.4% |
| Youth Law | 179 | 10.0% | 144 | 14.2% |
| Money Management | 324 | 18.1% | 259 | 25.5% |
| Self-Care | 294 | 16.5% | 264 | 26.0% |
| Decision Making | 346 | 19.4% | 319 | 31.5% |
| Housing | 216 | 12.1% | 198 | 19.5% |
| Relationships | 260 | 14.5% | 263 | 25.9% |
| Daily Living Skills | 252 | 14.1% | 256 | 25.2% |
| No modules documented | 729 | 40.9% | 477 | 47.1% |

*Medical Coverage (7.4)*

The 2nd MSA requires MDCPS to implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid coverage so that their coverage continues without interruption at the time of emancipation. MDCPS reported that all youth who emancipated from care during 2018 had Medicaid numbers and were eligible to receive extended Medicaid. Youth are responsible for completing the Extended Medicaid documents to recertify their coverage. MDCPS reported that 83 youth age 18 and over emancipated from foster care in 2018[27] but could not report how many youth were enrolled for Medicaid coverage so that the youth's coverage continued without interruption at the time of emancipation.

*Start-Up Stipends (7.5)*

MDCPS must implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond receive a start-up stipend of at least $1,000.00 at the time of emancipation, or as soon as practicable thereafter.[28] Of the 83 youth identified by MDCPS as being age 18 and over who emancipated from foster care in 2018, 50 (60.2 percent) received a start-up stipend at the time of emancipation or shortly thereafter.

---

[27] The monitoring team identified in the cohort data 87 youth age 18 and over who emancipated from foster care in 2018 as reflected in Table 2.

[28] MDCPS reported that start-up stipends provided during 2018 were $1,500 each.

76

MDCPS also provided the policy on start-up stipends, which explains, in part, that not every youth who emancipates from care is entitled to a start-up stipend. The policy provides that a start-up stipend is available to youth who leave care after turning age 16 and have participated in Independent Living Program activities. The youth must have been in care for a minimum of six months. Acceptable purchases include any items associated with the establishment of a home such as dishes, cooking utensils, furniture, appliances and other home products. In addition, a youth released from custody at age 17 who has a job may use a portion of the stipend to purchase or repair a car if the vehicle is needed in the youth's job and the youth already has the basic items needed to live independently.

*Housing Resource Specialists (7.6)*

MDCPS is required to implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond have access to a housing resource specialist responsible for assisting the youth to obtain an adequate living arrangement.

MDCPS stated that a housing specialist was available to all youth during 2018. For January through May 2018, Independent Living services were provided through a sub-grant with a private social service agency. Through those services, all youth reportedly had access to a Transition Care Coach who worked with the MDCPS workers to identify any youth who could benefit from Aftercare Services, including apartment placements and/or other appropriate living arrangements. As of June 1, 2018, MDCPS assumed responsibility for administering Independent Living services and all youth had access to both their foster care worker and Transitional Navigators who could assist with obtaining adequate living arrangements through referrals to and coordination with other agencies.

MDCPS did not produce information indicating the number of youth emancipating from care requiring a housing specialist. However, MDCPS reported that of the 83 youth the agency identified who emancipated from care in 2018, 21 (25.3 percent) accessed a housing resource specialist.

*State Educational Training and Vocational (ETV) Program (7.7)*

MDCPS must continue to implement policies and processes which ensure that youth emancipating from the foster care system at age 18 or beyond receive services and support under the State Educational Training and Vocational (ETV) Program for which they are eligible. MDCPS did not submit information on the number of youth eligible for ETV services. However, MDCPS reported that during FFY2018, 98 youth received ETV funds.

*Identification and Essential Documentation (7.8)*

MDCPS committed to assist youth in obtaining or compiling the following documents and such efforts shall be documented in the child's case record:

- Educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate;
- A social security or social insurance number;
- A resume, when work experience can be described;
- A driver's license, when the ability to drive is a goal; if not a driver's license, then a state-issued, photo identification;
- An original or certified copy of the youth's birth certificate;
- Previous placement information;
- Documentation of immigration, citizenship, or naturalization, when applicable;
- Documentation of tribal eligibility or membership;
- Death certificates when parents are deceased;
- A life book or a compilation of personal history and photographs, as appropriate; and
- A list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties.

The monitoring team cannot validate the data provided by MDCPS for this commitment. Data was provided containing demographic information for 404 youth who were 17 years old and had a plan of APPLA during the first half of the year. However, most of the information regarding these standards for those youth was blank. For the 7.8 measures, MDCPS reported on 76 youth who emancipated from care between January 1, 2018 and June 30, 2018. For measures 7.5 and 7.6, MDCPS reported on only 38 youth who emancipated from care during the first half of 2018.

# 8. Child Well-Being

## Physical and Mental Health Care

### Initial Medical Screenings (8.1.a.)

MDCPS agreed that by July 1, 2018 at least 70 percent of children shall have an initial medical screening within seven days of the child's entry into foster care. Data provided by MDCPS indicate the Department met the standard for a timely initial medical exam in 2018 for only 59.2 percent

of children.[29] The monitoring team reviewed case and medical appointment notes in MACWIS for 71 children identified by MDCPS as having an initial health screening completed within seven days of the child's entry into foster care. All the cases featured notes supporting that an initial medical screening was completed timely.

*Comprehensive Medical Exams (8.1.b.)*

MDCPS agreed that by July 1, 2018, at least 70 percent of children shall have an initial EPSDT or other comprehensive medical examination within 60 days of the child's entry into foster care. MDCPS provided data from MACWIS, which indicate that 69.5 percent of youth received a timely first comprehensive medical exam in 2018. The monitoring team reviewed case and medical appointment notes in MACWIS for 100 children identified by MDCPS as having a comprehensive medical exam completed within 60 days of the child's entry into foster care. In only 51 percent of the cases reviewed, the monitoring team found documentation supporting that a full EPSDT or other comprehensive medical exam, including a mental health screening, was completed timely.

*Periodic and Ongoing Medical Exams (8.1.c.)*

The 2nd MSA requires that following an initial EPSDT or other comprehensive medical examination, children shall receive periodic and on-going medical examinations according to the periodicity schedule set forth by the EPSDT program. The Agreement calls for the monitor to set a performance standard for MDCPS to meet by July 1, 2019. The monitor established a performance standard of 45 percent and will report on MDCPS' performance relative to this commitment in the next annual report.

*Follow-up Treatment (8.1.d.)*

MDCPS agreed that by July 1, 2018, at least 60 percent of children shall receive recommended follow-up treatment throughout the time they are in foster care. MDCPS did not provide data for this commitment for 2018.

*Dental Exams (8.1.e.)*

MDCPS agreed that by July 1, 2018, at least 60 percent of children shall have a dental examination within 90 days of the child's entry into foster care.[30] Data provided by MDCPS indicate that 47.6 percent of youth received a timely initial dental examination in 2018. The monitoring team

---

[29] Data provided by MDCPS excluded all entries except the first for each child in the year from data and calculations for 8.1.a, 8.1.b and 8.1.e.

[30] Exceptions include if the child has had an examination within six months prior to placement or if they are under the age of four. Foster children who reach the age of four while in foster care shall receive a dental examination within 90 calendar days of his/her fourth birthday.

reviewed case and medical appointment notes in MACWIS for 100 children identified by MDCPS, as having a dental exam completed within 90 days of the child's entry into foster care. In 82 percent of the cases reviewed, there were notes supporting that an initial dental exam was completed timely.

*Medical Records (8.1.f.)*

Per the 2nd MSA, MDCPS committed to provide foster parents or facility staff with the completed foster child information form or other electronic record containing available medical, dental, educational and psychological information about the child within 15 days of placement. The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 75 percent for this commitment. MDCPS did not provide data for this commitment for 2018.

*Medicaid Information (8.1.g.)*

MDCPS agreed that by July 1, 2018, 85 percent of children shall have their Medicaid information provided to foster parents or facility staff at the time of placement. MDCPS did not provide data for this commitment for 2018.

## Educational Services

The 2nd MSA requires that MDCPS ensure children receive educational services. Specifically, MDCPS is required to:

- Review the educational record of each child who enters custody for the purpose of identifying the child's general and, if applicable, special educational needs and shall document the child's educational needs within 30 calendar days of his/her entry into foster care (8.2.a.).

- Take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within seven calendar days of initial placement or any placement change, including while placed in shelters or other temporary placements (8.2.b.).

- Make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences (8.2.c.).

MDCPS did not provide data for any of the above referenced educational service commitments for 2018.

# EXHIBIT B



Progress of the

# Mississippi Department of Child Protection Services

Interim Monitoring Report for *Olivia Y., et al. v. Bryant, et al.*
2ND MODIFIED MISSISSIPPI SETTLEMENT AGREEMENT
AND REFORM PLAN

**ISSUED DECEMBER 23, 2019**

INTERIM REPORT
JANUARY TO JUNE 2019



PUBLIC
CATALYST

# Introduction

This document serves as an interim report to the Honorable Tom S. Lee of the United States District Court for the Southern District of Mississippi, Northern Division in the matter of *Olivia Y. v. Bryant*. On December 19, 2016, the State of Mississippi, the Mississippi Department of Child Protection Services (MDCPS) and A Better Childhood, counsel for the plaintiffs, jointly submitted to the court a 2nd Modified Mississippi Settlement Agreement and Reform Plan (the "2nd MSA") that provides a path for improvement of Mississippi's child welfare system. Judge Lee entered an order directing implementation of the 2nd MSA following its submission by the parties.

In sum, the 2nd MSA, which became effective on January 1, 2018, sets forth the child welfare infrastructure, standards and outcomes that Mississippi must meet within specific timeframes statewide. Pursuant to the 2nd MSA, the Court appointed Public Catalyst as the monitor, charged with reporting on MDCPS' progress implementing its commitments. The monitor is required to provide a written report to the Court and the parties no less frequently than annually. In accordance with section 9.5, upon request of either party, the monitor may issue a report to the Court more frequently than annually evaluating the state's performance with respect to any commitment in the 2nd MSA. On or about September 12, 2019, A Better Childhood requested the monitor issue an interim report for the first half of 2019.

This interim status report covers MDCPS' progress for the first half of calendar year 2019, divided into Quarter One (Q1), from January 1 to March 31, 2019 and Quarter Two (Q2), from April 1 to June 30, 2019. The information is presented in a matrix that, for each commitment, includes: the monitoring methodology; the 2nd MSA performance standard; MDCPS' reported performance; and the monitor's validated performance, where it has been completed. The monitor utilized several methodologies to validate MDCPS' performance, which are abbreviated in the matrix and detailed in the key below. The monitor plans to subsequently issue an annual report covering MDCPS' progress implementing its commitments for the entirety of calendar year 2019.

### Table 1. Monitoring Methodology Key

| Methodology | Description |
|---|---|
| Data (D) | Performance was validated through analysis of data files provided by MDCPS[1] |
| Qualitative (Q) | Performance was validated through qualitative review of electronic and paper case records and files[2] |
| Information (I) | Performance was validated through review of information and memos provided by MDCPS |
| Data and Qualitative (D & Q) | Performance was validated through a combination of data file analysis and qualitative case record reviews |

---

[1] On July 24-25, 2019, the monitoring team met with MDCPS leadership to discuss reporting for commitments for which the monitoring team has been unable to validate MDCPS' data. MDCPS advised the monitoring team of their intention to re-code the data reports in order to improve accuracy. MDCPS anticipates that this process will be completed by December 31, 2019.
[2] In most instances, the sample sizes for the monitoring team's case record reviews were based on a statistically significant sample of cases and methodology based on a 90 percent confidence level.

## 2019 Interim Performance (January 1 – June 30, 2019)

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| | **SYSTEMIC INFRASTRUCTURE STANDARDS** | | | | | | | | |
| | MDCPS shall maintain a Commissioner of Child Protection Services having responsibility for the oversight and management of MDCPS. | I | -- | -- | -- | Yes | -- | -- | Yes |
| 1.1.a | MDCPS shall hire caseworkers who have, at minimum, a bachelor's degree in social work or a related human services degree. The monitor shall review and determine which degrees qualify as related human services degrees. | Q | 100% | 100% | 100% | Yes | 100% | 100% | Yes |
| 1.1.b | MDCPS shall hire or promote to the position of caseworker supervisor only persons who have a master's degree in social work or a related human services degree and two years of experience working with children and families, preferably in foster care; or a bachelor's degree in social work or a related human services degree with three years of experience working with children and families, preferably in foster care. | Q | 100% | 100% | 100% | Yes | 100% | 100% | Yes |
| 1.2.a | MDCPS shall maintain a Training Unit headed by a qualified director of training (see 2nd MSA for full requirements of the Training Unit). | I | -- | -- | -- | Yes | -- | -- | Yes |
| 1.2.b | MDCPS caseworkers shall receive a minimum of 270 hours of pre-service training, which includes instructional training and supervised field training, and may include E-Learning. Any E-Learning training is subject to the approval of the monitor (see 2nd MSA for more info). | Q | 100% | 100% | 100% | Yes | 100% | 100% | Yes |

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 1.2.c | MDCPS caseworker trainees, as part of pre-service training, may be assigned specific tasks or activities in connection with a case that is the primary responsibility of an experienced caseworker and may, under appropriate supervision, be assigned responsibility for a "training caseload" with progressively responsible caseload assignment. | -- | 100% | -- | -- | Not in effect | -- | -- | Not in effect |
| 1.2.d | MDCPS caseworkers shall receive a minimum of 40 hours of in-service training, and all supervisors shall receive a minimum of 24 hours of in-service training. | -- | 100% | -- | -- | Annual Reporting | -- | -- | Annual Reporting |
| 1.2.e | MDCPS caseworker supervisors, within 90 days of hire or promotion, shall receive a minimum of 40 hours of training, directed specifically at the supervision of child welfare caseworkers. | Q | 100% | 100% | 100% | Yes | 100% | 100% | Yes |
| 1.3.a | 90% of MDCPS caseworkers will have caseloads which do not exceed the caseload standards set forth in the 2nd MSA (pg. 3-4). Individual MDCPS caseworkers with generic caseloads shall not carry a mixed caseload that exceeds 100% capacity as calculated by weights per case type set forth in the 2nd MSA (pg. 3-4). | D | 90% | 54% | 54% | No | 57% | 57% | No |
| 1.3.b | 85% of MDCPS supervisors shall be responsible for no more than five caseworkers. | D | 85% | 78% | 78% | No | 82% | 82% | No |
| 1.4.a | By December 1st of each year, MDCPS shall develop an annual Continuous Quality Improvement Plan, which shall be subject to the approval of the monitor after consultation with the parties. | -- | -- | -- | -- | Annual Reporting | -- | -- | Annual Reporting |

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 1.4.b | Upon approval, MDCPS will implement the CQI Plan and will do so with sufficient staff and resources to assess compliance with those provisions in the 2nd MSA that were identified for review in the plan. | I | -- | -- | -- | Yes | -- | -- | Yes |
| 1.5.a | MDCPS shall maintain comprehensive information systems that permit: (1) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding required actions in a child's case and whether they have taken place. | -- | -- | -- | -- | Annual Reporting | -- | -- | Annual Reporting |
| 1.5.b | MDCPS shall have a Comprehensive Child Welfare Information System (CCWIS) appropriate to its size and complexity that shall meet federal requirements by June 30, 2021. | -- | -- | -- | -- | Annual Reporting | -- | -- | Annual Reporting |
| 1.6.a | MDCPS shall provide to all county agency staff with child welfare responsibilities access to computer services, word processing, and electronic mail and access to the current management information systems and access to CCWIS, once implemented. | I | 100% | 100% | 100% | Yes | 100% | 100% | Yes |

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 1.6.b | Data related to compliance with the 2nd MSA's Foster Care Service Standards will be collected, analyzed and made available, at least quarterly, to MDCPS regional and county staff. | I | -- | -- | -- | Yes | -- | -- | No[3] |
| 1.6.c | MDCPS county staff shall have access to an electronic statewide database of available placement resources. | I | -- | -- | -- | Yes | -- | -- | Yes |
| 1.7.a | Defendants shall establish, maintain and assess the effectiveness of a performance-based contracting system to evaluate annually contract agency compliance with the terms of the 2nd MSA. Defendants shall take all reasonable steps to ensure contract agency remediation of any identified deficiencies within three months. | Q | -- | -- | -- | Yes | -- | -- | Yes |
| 1.7.b | Prior to MDCPS contracting for case management services for children in custody, MDCPS shall submit for review and approval to the monitor a detailed plan to ensure accountability and provide supervision and oversight of such agencies. | -- | -- | -- | -- | Not in effect | -- | -- | Not in effect |
| 1.8.a | Defendants shall ensure that all licensed foster families (regardless of whether they are supervised directly by MDCPS or by private providers, and whether they are kinship or unrelated foster families) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the 2nd MSA. | Q | -- | -- | -- | Yes | -- | -- | Yes |

---

[3] MDCPS provides all county and regional staff with access to a data dashboard that graphs state and county performance relative to the 2nd MSA's Foster Care Service Standards. The dashboard was not providing updated data in the time period between March 13, 2019 and July 25, 2019.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 1.8.b | Defendants shall pay to all licensed foster families at least the basic monthly foster care maintenance payments. Every two years thereafter, Defendants shall provide increases in the foster care maintenance payments, based upon the previous year's rate of inflation. | Q | -- | -- | -- | Yes | -- | -- | Yes |
| | **FOSTER CARE SERVICE STANDARDS** | | | | | | | | |
| 2.1 | MDCPS shall ensure that it maintains a statewide system to appropriately receive, screen and investigate reports of child maltreatment (see 2nd MSA for system requirements). Any extensions of the timeframes set forth in MDCPS policy for the completion of investigations are subject to the review and approval of the monitor. | Q | -- | -- | -- | No[4] | -- | -- | No[4] |
| 2.2 | MDCPS shall continue to maintain a special investigations unit whose responsibility is to investigate reports of maltreatment of children in custody. | I | -- | -- | -- | Yes | -- | -- | Yes |
| 2.2 | The initiation of a special investigation shall not extend beyond 24 hours. | D | 100% | 99% | 99% | No, but very close | 96% | 90% | No |
| 2.3 | MDCPS will develop and implement policies and procedures, subject to the review and approval of the monitor, for the Agency to review all maltreatment in care reports that were screened-out and assess the appropriateness within 24 hours of all screen-out determinations. If the decision to screen-out the report is determined to be inappropriate, MDCPS shall ensure the report is referred for investigation immediately. | D & Q | 100% | Timely review – 92%[5] Appropriate screening – 100% | Timely Review – 70% Appropriate screening – 84% | No | Timely review – 93%[5] Appropriate screening – 100% | Timely review – 79% Appropriate screening – 86% | No |

---

[4] See the monitoring team's validated performance for commitments 2.3, 2.7 and 2.8, which concern appropriately receiving, screening and investigating reports of child maltreatment.
[5] MDCPS' calculation of reviews completed timely allows for reviews of screen-outs made after-hours, on weekends, and/or holidays to be completed the following workday, outside of the 24-hour timeframe indicated in the 2nd MSA.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---------|-----------|------------------------|----------------------|-------------------------------|----------------------------------|-----------------------------------|-------------------------------|----------------------------------|-----------------------------------|
| 2.4 | Upon receipt of a substantiated report of child maltreatment in a contract agency group home or emergency shelter, MDCPS shall, within 30 calendar days, initiate a licensure investigation, that is in addition to and independent of the child protection investigation (see 2nd MSA for investigation requirements). | D & Q | -- | -- | -- | Yes | -- | -- | Yes |
| 2.5 | Upon receipt of a report of child maltreatment in a private child placing agency foster home, MDCPS staff will notify the child placing agency, who shall, within 30 calendar days, initiate a licensure investigation that is in addition to and independent of, any child protection investigation (see 2nd MSA for investigation requirements). | D & Q | -- | -- | -- | No[6] | -- | -- | No[6] |
| 2.6 | All allegations of maltreatment of a child in custody shall be investigated by a worker who has received training on intake and investigations processes, policies, and investigation techniques and has no ongoing connection to the foster care case. | Q | 100% | -- | 98% | No, but very close | -- | 99% | No, but very close |
| 2.7 | Within 30 days of the completion of any investigation of maltreatment of a child in custody, as required in Section 2.1, MDCPS shall review the maltreatment investigation (see 2nd MSA for review requirements). | D & Q | 100% | Timely review – 99% Quality investigation – 100% | Timely review – 99% Quality investigation – 86% | No | Timely review – 96% Quality investigation – 99% | Timely review – 94% Quality investigation – 72% | No |

---

[6] Data validation is in progress to determine whether licensing investigations were conducted for all reports of child maltreatment in private agency foster homes. The monitoring team conducted a qualitative review of available licensing reports provided by MDCPS and determined that child placing agencies were not consistently conducting licensing investigations independent of the child protection investigation, as required by this commitment.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 2.8 | MDCPS shall assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment of children in MDCPS custody. | Q | -- | -- | -- | No[7] | -- | -- | No[7] |
| 2.8.a.1 | By July 1, 2018, at least 90% of maltreatment-in-care investigations will be initiated and completed within 30 days. | D | 90% | 99% | 99% | Yes | 96% | 93% | Yes |
| 2.8.b | Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker according to the following schedule: 1) Once per week for the first month and twice per month for three months if the investigation is found to be substantiated; or 2) Twice per month in accordance with MDCPS policy if the investigation is found to be unsubstantiated. | D & Q | 100% | -- | -- | Cannot validate MDCPS' data | -- | -- | Cannot validate MDCPS' data |

---

[7] MDCPS's broad distribution of responsibility and prerogative to screen out referrals across the state into the counties, and designated down to proxies by certain regional directors, undermines standardized decision-making.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 2.8.c | When a maltreatment investigation involves a foster or adoptive home, MDCPS shall file a copy of the approved final investigative report, and any recommendations and/or corrective actions MDCPS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and with the Bureau Director for Licensure. MDCPS shall also provide those records to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor. | D & Q | 100% | -- | -- | MDCPS did not report | -- | -- | Validation pending |
| 2.8.d | When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by MDCPS, a copy of the final investigative report shall be filed in the child's case record, with the Director of Congregate Care Licensure, and sent to the licensed provider facility. MDCPS shall provide the report to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor. | -- | 100% | -- | -- | MDCPS did not report | -- | -- | MDCPS did not report |
| 2.9 | The rate of child abuse and neglect among children in foster care shall not exceed 0.33% per year effective for the period beginning 1/1/18 (see 2nd MSA for full definition of this metric). | -- | ≤0.33% | -- | -- | Annual reporting | -- | -- | Annual reporting |
| 3.1 | All foster homes and facilities with children placed who are in the custody of MDCPS shall be timely licensed. | D | 100% | Relatives – 79% Nonrelatives – did not report | Relatives – 77% Nonrelatives – 69% | No | Relatives – 86% Nonrelatives – did not report | Relatives – 89% Nonrelatives – 75% | No |

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 3.1 | All foster homes and facilities with children placed who are in the custody of MDCPS shall be subject to the licensure process approved by Public Catalyst on December 31, 2016. | Q | 100% | Relatives – 89% | Relatives – 62% | No | Relatives – 95% | Relatives – 52% | No |
| 3.2.a | No child shall remain in a foster home or facility determined to be unable to meet MDCPS licensing standards, absent an order by a state court with jurisdiction over child custody directing the placement of the child into a specific unlicensed placement. | D & Q | 100% | -- | -- | Cannot validate MDCPS' data & information | -- | -- | Cannot validate MDCPS' data & information |
| 3.2.b | Safety Issues: If it is determined that an unlicensed foster home or facility is unable to meet MDCPS licensing standards due to a safety issue, Defendants shall take all reasonable efforts to immediately ensure the child's safety and to remove the child, including, if required by the court, seeking an emergency court order. If the child is not in imminent danger, MDCPS shall implement a safety plan and within five calendar days, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only. | Q | 100% | MDCPS did not report | -- | No[8] | MDCPS did not report | -- | No[8] |

[8] The monitoring team reviewed 100 relative foster homes during the first half of 2019 during which the team identified both safety and non-safety issues that were not flagged by MDCPS in its monthly report submissions. Further, when safety and non-safety issues were flagged and included in MDCPS' monthly report, some issues did not appear to have been resolved, or resolved timely, based on the department's submissions.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 3.2.c | Non-safety Issues: If MDCPS determines an unlicensed foster home to be unable to meet MDCPS licensing standards due to a non-safety issue, Defendants shall, within 30 calendar days of that determination, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only. | Q | 100% | MDCPS did not report | -- | No[8] | MDCPS did not report | -- | No[8] |
| 3.3.a | MDCPS, in conjunction with the monitor, shall establish annual statewide and county performance requirements and time periods for new foster home licensure. The monitor will report to the parties MDCPS progress on achieving the performance requirements. The Defendants shall meet the performance requirements, including time periods. | D | 400 homes for the year  160 homes by 6/30/19 | -- | -- | Not yet due | 208 homes | 206 homes | Yes |
| 3.3.b | MDCPS shall begin to implement the annual plan to recruit and retain additional licensed foster home placements and shall maintain the additional number of total placements, as necessary during the applicability of the 2nd MSA. | -- | 100 homes for the year | -- | -- | Annual reporting | -- | -- | Annual reporting |
| 4.1/ 4.13.a | By July 1, 2018, 70% of foster homes shall provide care for no more than five children (including foster, biological, and adoptive children) at any given time (see 2nd MSA for allowable exceptions). | D | 70% | -- | -- | Validation pending | -- | -- | Validation pending |
| 4.2/ 4.14.a | By July 1, 2018, 60% of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs. | Q | 60% | 96%[9] | 96%[10] | Yes | 97%[9] | 97%[10] | Yes |

[9] MDCPS calculated performance through a qualitative review of all children due for Foster Care Reviews during the period, regardless of whether the child had classified special needs.
[10] The monitoring team calculated performance through a qualitative review of a sample of children receiving special needs board rates during the period.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 4.3/ 4.15 | At least 95% of children in MDCPS custody shall be placed in the least restrictive setting that meets their individual needs as determined by a review of all intake, screening, assessment and prior placement information regarding the child available at the time of placement. | D & Q | 95% | 98% | 99% | Yes | 99% | 99% | Yes |
| 4.4/ 4.18 | 90% of children who enter MDCPS custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless one of the exceptions provided in this 2nd MSA is documented as applying.[11] | D | 90% | 100% | 97% | Yes | 100% | 96% | Yes |
| 4.6/ 4.16.a | By July 1, 2018, 60% of siblings entering MDCPS custody at or near the same time shall be placed together (see 2nd MSA for allowable exceptions). If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file. | D | 60% | -- | -- | Cannot validate MDCPS' data | -- | -- | Cannot validate MDCPS' data |
| 4.7/ 4.17.a | By July 1, 2018, 60% of children in MDCPS custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability consistent with 2nd MSA requirements. | Q | 60% | -- | -- | Cannot validate MDCPS' data and information | -- | -- | Cannot validate MDCPS' data and information |

[11] This commitment previously excluded children who entered placement from regions II-E, II-W, and V-W. Children from these three regions were instead subject to commitment 4.5, which required placement within 75 miles from the home of removal. In 2018, the monitoring team determined that the 75-mile exception for regions II-E, II-W, and V-W was no longer necessary, and all children were to be evaluated against the 50-mile standard, under commitment 4.4.

12 of 27

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 4.8 | No child shall remain overnight in an MDCPS office or other nonresidential facility that provides intake functions. | I | -- | -- | -- | Yes | -- | -- | Yes |
| 4.9 | No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless: a) The child has exceptional needs that cannot be met in a licensed foster home; or b) In order to keep a sibling group together for a temporary period, not to exceed 15 days and the RD has granted documented approval for the congregate care placement; or c) To enable a mother and baby to be placed together and there is not an available foster home for both of them. | D & Q | 100% | 94%[12] | 59%[13] | No | 83%[12] | 81%[13] | No |
| 4.10/ 4.12 | By July 1, 2018, 70% of children will remain in his/her existing placement and not be moved to another placement unless MDCPS specifically documents in the child's case record justifications for that move and the move is approved by an MDCPS supervisor. | Q | 70% | 91%[14] | 63%[15] | No | 88% | -- | Validation pending |
| 4.11 | No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others with documented approval from the RD. | -- | 100% | -- | -- | Annual Reporting | -- | -- | Annual Reporting |

[12] The monitoring team was unable to validate the performance reported by MDCPS. MDCPS excluded children placed in residential treatment facilities and medical treatment group homes from the data analysis. Additionally, the department did not account for whether children placed in order to keep a sibling group together exceeded 15 days in the placement and had documented approval by the RD.

[13] The monitoring team analyzed the data provided by MDCPS and determined performance of 35% in Q1 and 53% in Q2 for this commitment. The monitoring team also conducted qualitative reviews in MACWIS and found additional information increasing performance for this commitment.

[14] MDCPS' unit of analysis for this commitment was the child, meaning all moves the child experienced during the period were evaluated to determine compliance.

[15] The monitoring team's unit of analysis for this commitment was the placement move, meaning individual placement moves were evaluated to determine compliance.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 5.1.a.2 | By January 1, 2019, at least 90% of foster children shall have an MDCPS caseworker meet with the child at least two times per month (see 2nd MSA requirements for visits). | D & Q | 90% | -- | -- | Cannot validate MDCPS' data[16] | -- | -- | Cannot validate MDCPS' data[16] |
| 5.1.a.2 | By January 1, 2019, at least 90% of foster children shall have at least one visit per month by the caseworker, which takes place in the child's placement. | D & Q | 90% | -- | -- | Cannot validate MDCPS' data | -- | -- | Cannot validate MDCPS' data |
| 5.1.b.2 | By January 1, 2019, at least 90% of foster children receiving a 90-day trial home visit period shall have an MDCPS caseworker meet with the child in the home at least two times per month. | D & Q | 90% | -- | -- | Cannot validate MDCPS' data | -- | -- | Cannot validate MDCPS' data |
| 5.1.c.2 | By January 1, 2019, for a least 90% of foster children with a goal of reunification, MDCPS shall meet with the child's parents at least monthly unless the child's parent(s) reside out-of-state or are incarcerated. | D & Q | 90% | -- | -- | Cannot validate MDCPS' data[17] | -- | -- | Cannot validate MDCPS' data[17] |
| 5.1.d.2 | By January 1, 2019, at least 90% of foster parents with at least one foster child in the home shall have MDCPS visit the home monthly. | D & Q | 90% | -- | -- | Cannot validate MDCPS' data[18] | -- | -- | Cannot validate MDCPS' data[18] |

---

[16] The monitoring team was unable to validate the data provided by MDCPS for this commitment, which detailed the percentage of children who had the required number of visits each month. MDCPS also conducted a qualitative review for this commitment, reporting that 85% of caseworker visits with children met 2nd MSA quality standards in Q1 and 76% met quality standards in Q2.

[17] The monitoring team was unable to validate the data provided by MDCPS for this commitment, which detailed the percentage of parents who had the required number of visits each month. MDCPS also conducted a qualitative review for this commitment, reporting that 47% of caseworker visits with mothers and 32% of caseworker visits with fathers met 2nd MSA quality standards in Q1, and 41% of caseworker visits with parents met quality standards in Q2.

[18] The monitoring team was unable to validate the data provided by MDCPS for this commitment, which detailed the percentage of foster parents who had the required number of visits each month. MDCPS also conducted a qualitative review for this commitment, reporting that 66% of caseworker visits with foster parents met 2nd MSA quality standards in Q1 and 64% met quality standards in Q2.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 5.2.a | MDCPS shall arrange contact for the child with his/her parents and with any siblings not in the same placement within 72 hours of foster care placement unless there are documented reasons why contact should not occur. If a visit cannot be arranged within 72 hours, a telephone call to parents, siblings, or extended family members shall be provided to the child. | Q | 100% | 32%[19] | --[19] | -- | 49%[19] | --[19] | -- |
| 5.2.b | For children entering foster care, a visitation plan for the child and his/her family shall be developed as part of the Family Service Plan. The visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child. | Q | 100% | 53% | 54% | No | 37% | 53% | No |
| 5.2.b.1 | If parental visitation is appropriate, this visitation plan shall include a minimum of two visits per month with the parents, unless the court order in the child's case limits such visits or unless it is documented that a parent failed to make himself or herself available. | Q | 100% | 72% | -- | Validation pending | 67% | -- | Validation pending |
| 5.2.b.1.a | By January 1, 2019, 90% of children shall be provided with contacts with their parents consistent with 2nd MSA requirements. | -- | 90% | -- | -- | MDCPS did not report | -- | -- | MDCPS did not report |
| 5.2.b.2 | The child's visitation plan, regardless of permanency goal, shall include at least monthly visits with any siblings not in the same placement. | Q | 100% | -- | -- | MDCPS did not report[20] | 30% | -- | Validation pending |

[19] MDCPS calculated performance for this commitment through a qualitative review of children due for Foster Care Reviews (FCRs) during the period. As a child is first due for an FCR after six months in custody, MDCPS' performance for Q1 and Q2 is largely based on children who entered custody and were due for a 72-hour contact in 2018. The monitoring team will verify qualitative performance for this commitment for Q3 and Q4, as MDCPS' review for these quarters will include children who entered custody and were due for 72-hour contacts in 2019.

[20] MDCPS measured performance for this commitment through the FCR. For Q1, MDCPS only utilized single-child cases as part of the FCR; therefore, the department did not report on children with siblings, who would have been subject to this commitment, during Q1.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 5.2.b.2.a /5.2.b.3/ 5.2.b.4 | By January 1, 2019, 80% of children shall be provided with contacts with any siblings in custody not in the same placement consistent with 2nd MSA requirements. | -- | 80% | -- | -- | MDCPS did not report | -- | -- | MDCPS did not report |
| 5.2.c | MDCPS and its contracting agencies shall implement a policy that prohibits cancellation of visits as a form of discipline against children. | I | -- | -- | -- | Yes | -- | -- | Yes |
| 6.1.a.2 | By January 1, 2019 at least 90% of Family Service Plans shall be submitted by the caseworker consistent with 2nd MSA requirements, within 30 calendar days of a child's entry into custody. The supervisor shall review the Plan for approval within 15 calendar days. The Family Service Plan shall be considered complete upon documented supervisory review and approval. | D & Q | 90% | Completed timely – 76% Quality – 50%[21] | Completed timely – 76% Quality - --[21] | No | Completed timely – 81% Quality – 36%[21] | Completed timely – 81% Quality - --[21] | No |
| 6.1.b | In instances in which it is impossible to meet with one or both parents, the service planning process will proceed, notwithstanding the parent's absence. | -- | 100% | -- | -- | MDCPS did not report | -- | -- | MDCPS did not report |
| 6.1.c.2 | By January 1, 2019, in at least 90% of placement cases in which the whereabouts of one or both parents is unknown, MDCPS shall, within 30 days, institute a diligent search for the parent(s), which shall be documented in the child's case record. | Q | 90% | 22% | 36% | No | 18% | 8% | No |

---

[21] MDCPS reported on the quality of Family Services Plans (FSPs) for Q1 and Q2 based on a qualitative review of children due for Foster Care Reviews (FCRs) during the period. As a child is first due for an FCR after six months in custody, MDCPS' qualitative performance for Q1 and Q2 is largely based on children who entered custody and were due for initial FSPs in 2018. The monitoring team will verify qualitative performance for this commitment for Q3 and Q4, as MDCPS' review for these quarters will include children who entered custody and were due for initial FSPs in 2019.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 6.1.d.2 | By January 1, 2019, for at least 90% of foster children who enter custody, permanency plans shall be submitted within 30 calendar days of the child's entry into custody by the caseworker consistent with 2nd MSA requirements. The supervisor shall review the plan for approval within 15 calendar days. The permanency plan shall be considered complete upon documented supervisory review and approval. | D & Q | 90% | Completed timely – 76% Quality – 71%[22] | Completed timely – 76% Quality - --[22] | No | Completed timely – 81% Quality – 73%[22] | Completed timely – 81% Quality - --[22] | No |
| 6.2.a.1 | At least 95% of children in custody with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements. | Q | 95% | 50% | 63% | No | 51% | -- | Validation pending |
| 6.3.a.1.b | By January 1, 2019, at least 90% of foster children with a permanency goal of reunification shall have service plans for their parents that identify those services MDCPS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that MDCPS made those identified services available directly or through referral. | -- | 90% | -- | -- | MDCPS did not report | -- | -- | MDCPS did not report |

---

[22] MDCPS reported on the quality of Permanency Plans for Q1 and Q2 based on a qualitative review of children due for Foster Care Reviews (FCRs) during the period. As a child is first due for an FCR after six months in custody, MDCPS' qualitative performance for Q1 and Q2 is largely based on children who entered custody and were due for initial permanency plans in 2018. The monitoring team will verify qualitative performance for this commitment for Q3 and Q4, as MDCPS' review for these quarters will include children who entered custody and were due for initial permanency plans in 2019.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 6.3.a.2 | For a child with a permanency goal of reunification, the child's MDCPS caseworker shall meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances. | D & Q | 90% (see 5.1.c.2) | -- | -- | Cannot validate MDCPS' data[23] | -- | -- | Cannot validate MDCPS' data[23] |
| 6.3.a.3 | For children with a permanency goal of reunification, the case record shall document opportunities provided to parents in support of reunification. | -- | 100% | -- | -- | MDCPS did not report | -- | -- | MDCPS did not report |
| 6.3.a.4 | When a recommendation to reunify a child with his/her family has been made, MDCPS shall develop an after-care plan with the family that identifies the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured. MDCPS shall take reasonable steps to provide or facilitate access to services necessary to support the child during the trial home visit. | Q | 100% | 45% | -- | Validation pending | 50% | -- | Validation pending |

---

[23] The monitoring team was unable to validate the data provided by MDCPS for this commitment, which detailed the percentage of parents who had the required number of visits each month. MDCPS also conducted a qualitative review for this commitment, reporting that 47% of caseworker visits with mothers and 32% of caseworker visits with fathers met 2nd MSA quality standards in Q1, and 41% of caseworker visits with parents met quality standards in Q2.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 6.3.a.5.b | By January 1, 2019, at least 90% of foster children who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During the trial home visit period, MDCPS shall provide or facilitate access to the services identified in the child's after-care plan, consistent with the 2nd MSA requirements. | D | 90% | -- | -- | Cannot validate MDCPS' data | -- | -- | Cannot validate MDCPS' data |
| 6.3.a.6 | Before the end of any trial home visit period, MDCPS shall convene a meeting with the child's parents and the child to determine the appropriateness of a final discharge. If final discharge is determined to be appropriate, MDCPS shall make the appropriate application to the Youth Court to be relieved of custody. | -- | 100% | -- | -- | Cannot validate MDCPS' data | -- | -- | MDCPS did not report |
| 6.3.b.1.b | By January 1, 2019, at least 90% of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child specific activities that MDCPS will undertake to achieve adoption. | D & Q | 90% | Adoption worker assigned – 99% Adoption plan – 73% | Adoption worker assigned – 93% Adoption plan – 76% | No | Adoption worker assigned – 99% Adoption plan – 97% | Adoption worker assigned – 96% Adoption plan – 84% | No |
| 6.3.b.2.b | By January 1, 2019, a termination of parental rights referral shall be made on behalf of at least 80% of children who have spent more than 17 of the last 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception pursuant to the federal Adoption and Safe Families Act ("ASFA") has been documented by MDCPS in the child's case record. | -- | 80% | -- | -- | Annual reporting | -- | -- | Annual reporting |

19 of 27

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 6.3.b.3 | MDCPS shall provide to the monitor a report of all TPR referrals made during the monitoring period, the date those TPR referrals were made, and the date the TPR petition was filed with the court. | -- | -- | -- | -- | Annual reporting | -- | -- | Annual reporting |
| 6.3.c | Defendants shall establish and maintain a system of post-adoptive services to stabilize and maintain adoptive placements. Adoptive families eligible for adoption subsidies shall have access to these services, which may include services such as counseling, mental health treatment and crisis intervention, family preservation and stabilization services, and peer support. | -- | -- | -- | -- | Annual reporting | -- | -- | Annual reporting |
| 6.3.d.1 | The permanency goals of durable legal custody and guardianship may be assigned when there are documented efforts in the child's case record to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. | -- | 100% | -- | -- | MDCPS did not report[24] | -- | -- | MDCPS did not report[24] |
| 6.3.d.2 | When the permanency goals of durable legal custody and guardianship are assigned to a child under the age of 14 years old or living with a non-relative, MDCPS shall provide to the monitor at the end of each monitoring period, information from the child's case record documenting efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. | -- | 100% | -- | -- | MDCPS did not report[24] | -- | -- | MDCPS did not report[24] |

[24] MDCPS conducted a qualitative review for this commitment but did not limit the population to children with a permanency goal of durable legal custody or guardianship, nor report performance specific to children with a permanency goal of durable legal custody or guardianship. MDCPS has corrected this methodology for Q3.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---------|-----------|------------------------|---------------------|------------------------------|----------------------------------|-----------------------------------|-------------------------------|----------------------------------|-----------------------------------|
| 6.3.e | If MDCPS concludes, after considering reunification, adoption, durable legal custody and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, MDCPS may assign a permanency goal of APPLA for the child (see 2nd MSA for APPLA requirements). | -- | 100% | -- | -- | MDCPS did not report[25] | -- | -- | MDCPS did not report[25] |
| 6.4.a.2 | By January 1, 2019, at least 90% of foster children who have been in custody for at least six months shall have a timely court or administrative case review consistent with 2nd MSA requirements. | D & Q | 90% | Timely – 96% Quality – 53% | Timely – 96% Quality – 49% | No | Timely – 90% Quality – 40% | Timely – 91% Quality – Review pending | -- |
| 6.4.b.2 | By January 1, 2019, for at least 90% of foster children who have been in custody for at least 12 months, MDCPS shall make reasonable efforts to have a timely annual court review scheduled consistent with 2nd MSA requirements. | Q | 90% | 87% | 81% | No | 89% | -- | Validation pending |
| 6.4.c | MDCPS shall review documented exceptions pursuant to ASFA for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review. | -- | -- | -- | -- | Annual Reporting | -- | -- | Annual Reporting |
| 6.5.a.1 | Of all children who enter foster care in a 12-month period, the percent of children discharged to permanency within 12 months of entering foster care. The numerator is the number of the child in the denominator who discharged from foster care to permanency within 12 months. | -- | 43.9% | -- | -- | Annual reporting | -- | -- | Annual Reporting |

[25] MDCPS conducted a qualitative review for this commitment but did not limit the population to children with a permanency goal of APPLA, nor report performance specific to children with a permanency goal of APPLA. MDCPS has corrected this methodology for Q3.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 6.5.a.2 | Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care between 12 and 23 months, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. The numerator is the number of children in the denominator who discharged from foster care to permanency within 12 months of the first day of the 12-month period. | -- | 34.9% | -- | -- | Annual Reporting | -- | -- | Annual Reporting |
| 6.5.a.3 | Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care for 24 months or more, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. The numerator is the number of children in the denominator who discharged from foster care to permanency within 12 months of the first day of the 12-month period. | -- | 31.4% | -- | -- | Annual reporting | -- | -- | Annual reporting |
| 6.5.c/ 6.5.d | For all children in the custody of MDCPS who were adopted in the federal fiscal year, the monitor shall validate the average and median lengths of time to adoption finalization for each child from the date on which the child's adoption goal was established. | -- | 13.6 months average; 9 months median | -- | -- | Annual Reporting | -- | -- | Annual Reporting |

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 7.1 | MDCPS shall provide each youth transitioning to independence with at least six months' advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition. | Q | 100% | -- | -- | Cannot validate MDCPS' data[26] | -- | -- | Cannot validate MDCPS' data[26] |
| 7.2 | Each foster youth age 14 years and older, regardless of his/her permanency plan, shall be provided with an opportunity to participate in the creation of an appropriate Independent Living service plan for a successful transition to adulthood. | Q | 100% | -- | -- | Cannot validate MDCPS' data[26] | -- | -- | Cannot validate MDCPS' data[26] |
| 7.3 | Each foster youth age 14 years and older shall have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood. MDCPS shall maintain sufficient resources to deliver Independent Living services to all youth described herein. | Q | 100% | -- | -- | Cannot validate MDCPS' data[26] | -- | -- | Cannot validate MDCPS' data[26] |
| 7.4 | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid coverage so that their coverage continues without interruption at the time of emancipation. | -- | 100% | -- | -- | MDCPS did not report | -- | -- | MDCPS did not report |

[26] The monitoring team was unable to validate the Q1 and Q2 data and information provided by MDCPS for commitments under Section 7 of the 2nd MSA. In September 2019, the monitoring team met with MDCPS leadership and developed a plan for reporting which was implemented for Q3.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---------|-----------|----------------------|--------------------|----------------------------|-------------------------------|---------------------------------|----------------------------|-------------------------------|----------------------------------|
| 7.5 | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond receive a start-up stipend of at least $1,000.00 at the time of emancipation, or as soon as practicable thereafter. | Q | 100% | -- | -- | Cannot validate MDCPS' data[27] | -- | -- | Cannot validate MDCPS' data[27] |
| 7.6 | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond have access to a housing resource specialist responsible for assisting the youth obtain an adequate living arrangement. | Q | 100% | -- | -- | Cannot validate MDCPS' data[26] | -- | -- | Cannot validate MDCPS' data[26] |
| 7.7 | MDCPS shall continue to implement policies and processes which ensure that youth emancipating from the foster care system at age 18 or beyond receive services and support under the State Educational Training and Vocational (ETV) Program for which they are eligible. | -- | -- | -- | -- | Cannot validate MDCPS' data[27] | -- | -- | Cannot validate MDCPS' data[27] |
| 7.8.a | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate. | Q | 100% | -- | -- | Cannot validate MDCPS' data[26] | -- | -- | Cannot validate MDCPS' data[26] |
| 7.8.b | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A social security or social insurance number. | Q | 100% | -- | -- | Cannot validate MDCPS' data[26] | -- | -- | Cannot validate MDCPS' data[26] |

---

[27] The monitoring team was unable to validate the Q1 and Q2 data and information provided by MDCPS for commitments under Section 7 of the 2nd MSA. In September 2019, the monitoring team met with MDCPS leadership and developed a plan for annual reporting of this commitment.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---------|-----------|----------------------|---------------------|------------------------------|----------------------------------|-----------------------------------|-------------------------------|----------------------------------|-----------------------------------|
| 7.8.c | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A resume, when work experience can be described. | Q | 100% | -- | -- | Cannot validate MDCPS' data[26] | -- | -- | Cannot validate MDCPS' data[26] |
| 7.8.d | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A driver's license, when the ability to drive is a goal; if not a driver's license, then a state-issued, photo identification. | Q | 100% | -- | -- | Cannot validate MDCPS' data[26] | -- | -- | Cannot validate MDCPS' data[26] |
| 7.8.e | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: An original or certified copy of the youth's birth certificate. | Q | 100% | -- | -- | Cannot validate MDCPS' data[26] | -- | -- | Cannot validate MDCPS' data[26] |
| 7.8.f | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Previous placement information. | Q | 100% | -- | -- | Cannot validate MDCPS' data[26] | -- | -- | Cannot validate MDCPS' data[26] |
| 7.8.g | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Documentation of immigration, citizenship, or naturalization, when applicable. | Q | 100% | -- | -- | Cannot validate MDCPS' data[26] | -- | -- | Cannot validate MDCPS' data[26] |
| 7.8.h | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Documentation of tribal eligibility or membership. | Q | 100% | -- | -- | Cannot validate MDCPS' data[26] | -- | -- | Cannot validate MDCPS' data[26] |

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 7.8.i | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Death certificates when parents are deceased. | Q | 100% | -- | -- | Cannot validate MDCPS' data[26] | -- | -- | Cannot validate MDCPS' data[26] |
| 7.8.j | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A life book or a compilation of personal history and photographs, as appropriate. | Q | 100% | -- | -- | Cannot validate MDCPS' data[26] | -- | -- | Cannot validate MDCPS' data[26] |
| 7.8.k | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties. | Q | 100% | -- | -- | Cannot validate MDCPS' data[26] | -- | -- | Cannot validate MDCPS' data[26] |
| 8.1.a.1 | By July 1, 2018, 70% of children shall have an initial medical screening within 7 days of the child's entry into foster care. | D & Q[28] | 70% | 71% | -- | Validation pending | 73% | -- | Validation pending |
| 8.1.b.1 | By July 1, 2018, 70% of children shall have an initial EPDST or other comprehensive medical examination within 60 days of the child's entry into foster care. | D & Q[28] | 70% | 71% | -- | Validation pending | 72% | -- | Validation pending |
| 8.1.d.2 | By July 1, 2018, 60% of children shall be provided with practitioner recommended follow-up treatment. | -- | 60% | -- | -- | MDCPS did not report | -- | -- | MDCPS did not report |
| 8.1.e.1 | By July 1, 2018, 60% of children shall have a dental examination within 90 days of the child's entry into foster care. | D & Q[28] | 60% | 47% | -- | Validation pending | 48% | -- | Validation pending |

[28] In addition to producing data files, MDCPS also conducted qualitative reviews for commitments 8.1.a.1, 8.1.b.1, and 8.1.e.1 in Q1 and Q2. However, as the reviews were based on children who entered custody in each quarter as opposed to the agreed upon population of children who were due for exams in each quarter, MDCPS' reported qualitative performance is not included in this report. MDCPS will correct this methodology moving forward.

| Section | Commitment | Monitoring Methodology | Performance Standard | Q1 MDCPS Reported Performance | Q1 Monitor Validated Performance | Q1 Achieved Performance Standard? | Q2 MDCPS Reported Performance | Q2 Monitor Validated Performance | Q2 Achieved Performance Standard? |
|---|---|---|---|---|---|---|---|---|---|
| 8.1.f.1 | By July 1, 2018, 75% of children shall have information provided to foster parents or facility staff within 15 days of placement. | Q | 75% | 39% | -- | Validation pending | 38% | -- | Validation pending |
| 8.1.g | By July 1, 2018, 85% of children shall have their Medicaid information provided to foster parents or facility staff at the time of placement. | -- | 85% | -- | -- | MDCPS did not report | -- | -- | MDCPS did not report |
| 8.2.a/ 8.2.c.1 | At least 90% of school-age foster children who enter custody shall have their educational records reviewed and their educational needs documented by MDCPS within 30 calendar days of their entry into foster care. | Q | 90% | -- | -- | Cannot validate MDCPS' data | -- | -- | Cannot validate MDCPS' data |
| 8.2.b | MDCPS shall take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within seven calendar days of initial placement or any placement change, including while placed in shelters or other temporary placements. | -- | 100% | -- | -- | MDCPS did not report | -- | -- | MDCPS did not report |
| 8.2.c | MDCPS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences. | -- | 100% | -- | -- | MDCPS did not report | -- | -- | MDCPS did not report |

27 of 27

# EXHIBIT C

# Progress of the Mississippi Department of Child Protection Services

Monitoring Report for *Olivia Y., et al. v. Bryant, et al.*

2ND MODIFIED MISSISSIPPI SETTLEMENT AGREEMENT AND REFORM PLAN

**ISSUED JUNE 29, 2020**

REPORT 7

JANUARY TO DECEMBER 2019



PUBLIC CATALYST

# CONTENTS

Introduction ................................................................................................................. 3

    Summary of Progress and Challenges ................................................................. 4

    2019 Summary of Commitments ......................................................................... 8

    Methodology ........................................................................................................ 21

    Demographics ...................................................................................................... 22

    Operational Budget ............................................................................................. 26

1. Systemic Infrastructure Standards ................................................................... 26

    Department Leadership ...................................................................................... 26

    Staff Qualifications and Training ....................................................................... 27

    Caseloads and Supervision ................................................................................ 30

    Continuous Quality Improvement ..................................................................... 33

    Management Information Systems & Data Reporting ....................................... 33

    Performance Based Contracting ........................................................................ 38

    Foster Care Maintenance Payments .................................................................. 40

2. Child Safety and Maltreatment in Care ........................................................... 41

    Screening Reports of Abuse and Neglect .......................................................... 41

    Investigating Maltreatment in Care ................................................................... 44

3. Family-Based Placements ................................................................................ 53

4. Placement Standards ....................................................................................... 58

5. Visitation .......................................................................................................... 65

    Worker Contact and Monitoring ....................................................................... 65

    Developing and Maintaining Connections ........................................................ 67

6. Child and Youth Permanency ........................................................................... 69

    Comprehensive Family Service Plans ................................................................ 69

    Concurrent Permanency Planning ..................................................................... 72

    Reunification and Trial Home Visitation ........................................................... 72

    Other Permanency Case Goals .......................................................................... 77

    Permanency Reviews .......................................................................................... 80

Permanency Performance Indicators......................................................................... 81

7. Transition to Independent Living.......................................................................... 83

8. Child Well-Being................................................................................................. 89

Physical and Mental Health Care ........................................................................... 89

Educational Services............................................................................................... 93

## FIGURES

Figure 1. Age of Children in Custody on December 31, 2019 ...................................................... 23

Figure 2. Placement Types of Children in Custody on December 31, 2019................................. 24

Figure 3. Length of Stay in Care of Children in Custody on December 31, 2019 ....................... 25

Figure 4. Percent of Workers Meeting the Caseload Standard, 2019 ........................................ 31

Figure 5. Percent of Caseworker Supervisors Meeting the Supervision Ratio Standard, 2019................. 32

## TABLES

Table 1. Race of Children in Custody on December 31, 2019....................................................... 23

Table 2. Exits from Care by Exit Type, January 1, 2019 to December 31, 2019.......................... 25

Table 3. Federal Goals for Children in Custody as of December 31, 2019................................... 26

Table 4. 2nd MSA Caseload Standards by Case Type ................................................................. 31

Table 5. Current Resource Board Payment Schedule ................................................................ 41

Table 6. ANE Reports by Intake Action, 2019 ........................................................................... 42

Table 7. Background Checks for Relative Home Studies, 2019.................................................... 56

Table 8. Number of Foster Homes Meeting Licensure Limits, 2019........................................... 59

Table 9. Special Needs Board Rates .......................................................................................... 60

Table 10. Permanency Outcome Performance, FFY2019 ........................................................... 82

Table 11. Youth Receiving Independent Living Skills, 2019 ........................................................ 85

Table 12. Youth Receiving Identification and Essential Documentation, 2019 ........................... 89

## Introduction

This document serves as the seventh annual report[1] to the United States District Court for the Southern District of Mississippi, Northern Division in the matter of *Olivia Y. v. Bryant* and the first report to the Honorable David C. Bramlette, III, recently reassigned to this case. On December 19, 2016, the State of Mississippi, the Mississippi Department of Child Protection Services (MDCPS) and A Better Childhood, counsel for the plaintiffs, jointly submitted to the Court a 2nd Modified Mississippi Settlement Agreement and Reform Plan (the "2nd MSA") that provides a path for improvement of Mississippi's child welfare system. The Court had previously entered as orders of the Court the Mississippi Settlement Agreement and Reform Plan on January 4, 2008 (the "Initial Settlement Agreement") and the Modified Mississippi Settlement Agreement and Reform Plan on July 6, 2012. MDCPS is the statewide child welfare agency that provides child protection, abuse prevention, and placement services on behalf of the State of Mississippi. A Better Childhood is a national advocacy organization with experience in class action litigation on behalf of children in child welfare systems. The Court entered an order directing implementation of the 2nd MSA following its submission by the parties.

In sum, the 2nd MSA, which became effective on January 1, 2018, sets forth the child welfare infrastructure, standards, and outcomes that Mississippi must meet within specific timeframes statewide. Specifically, the 2nd MSA:

- provides the plaintiff class relief by committing MDCPS to specific improvements in the state's care for vulnerable children, with respect to their safety, permanency, and well-being;

- requires the implementation of a comprehensive child welfare data and tracking system, with the goal of improving MDCPS' ability to account for and manage its work with vulnerable children;

- establishes benchmarks and performance standards in order to prevent harm to children in the class; and

- provides a clear path for MDCPS to exit court supervision after the successful achievement and maintenance of performance standards.

Pursuant to the 2nd MSA, the Court appointed Public Catalyst as the monitor, charged with reporting on MDCPS' progress implementing its commitments. The monitor is responsible for assessing the state's performance under the 2nd MSA. The parties agreed the monitor shall

---

[1] The monitoring team filed an *Interim Monitoring Report for Olivia Y., et al. v. Bryant, et al.* with the Court on December 26, 2019 for the period January 1 through June 30, 2019.

consider timeliness, appropriateness, and quality in reporting on MDCPS' performance. The monitor is required to verify data reports and statistics provided by MDCPS and shall periodically conduct case record and qualitative reviews to monitor, evaluate, and validate the state's performance with respect to the commitments in the 2nd MSA. Pursuant to Section 10.1. of the 2nd MSA, performance during the period makes certain commitments eligible to move to the "To Be Maintained" designation, pending agreement of the parties. In evaluating MDCPS' performance, the monitor draws no conclusion of whether the Department has achieved or maintained substantial compliance in accordance with Section 11.3. of this 2nd MSA. The monitor is required to provide a written report to the Court and the parties no less frequently than annually, verifying if MDCPS has or has not met the performance standards and commitments due during the reporting period.

This is the monitor's second annual report to the Court under the 2nd MSA and reflects the status of Mississippi's reform efforts as of December 31, 2019. This report includes MDCPS' progress for the entirety of calendar year 2019.

## Summary of Progress and Challenges

Of 126 commitments due in 2019 in the 2nd MSA, the monitor confirmed that MDCPS met required performance standards 39 times and did not do so in 54 other areas. The monitoring team was unable to determine the performance standard for one commitment.[2] The Department did not provide data for an additional 12 commitments, and the monitoring team cannot validate data and information submitted by MDCPS for another 20 commitments.[3] The 32 commitments for which MDCPS either did not provide data or provided inaccurate data that cannot be validated are listed in the Summary of Commitments and the relevant sections of this report. MDCPS' substantial and ongoing data problems include the manner in which the Department documents and identifies certain data fields, coding errors, and performance calculations that are inconsistent with the established rules. These deficits create blind spots that impair MDCPS management's ability to lead the Department and ensure the safety, well-being, and permanency of children consistent with the 2nd MSA. While MDCPS did not report data for several commitments during the period or the monitoring team was unable to validate data

---

[2] For commitment 6.5.d, the monitoring team determined during 2019 data validation that the data file MDCPS provided during the Stipulated Third Remedial Order period to establish baseline performance did not accurately capture the average and median times from the date on which a child's adoption goal was established to adoption finalization. As baseline performance was used to establish the performance standards for this commitment, the standards need to be revisited before performance can be accurately measured.

[3] There were an additional four commitments for which the monitoring team cannot validate the quantitative data provided by MDCPS. However, due to qualitative reporting, the monitoring team was able to assess MDCPS' performance for these commitments.

MDCPS provided, the Department began producing for some of these same commitments new data for 2020 which the monitoring team is attempting to validate.

Among the areas where MDCPS showed progress in 2019 are:

- *To Be Maintained:* Pursuant to Section 10.1. of the 2nd MSA, when MDCPS performance, as validated by the Monitor, has attained the highest designated performance standard or standards for one 12-month reporting period, as to any eligible section, the applicable commitment can be designated as "To Be Maintained", pending agreement of the parties. Upon designation as "To Be Maintained", the section will not be actively monitored. MDCPS attained the highest designated performance standard for the 2019 reporting period with respect to 13 eligible 2nd MSA sections, including:

  - maintaining a qualified Commissioner of Child Protection Services (1.);

  - hiring caseworkers and supervisors with appropriate degrees and experience (1.1.a., 1.1.b.);

  - maintaining a Training Unit headed by a qualified director (1.2.a.);

  - delivering pre-service, in-service, and supervisory training to staff (1.2.b., 1.2.d., 1.2.e.);

  - providing staff with access to computer services, electronic mail, and the MDCPS management information system, access to data related to compliance with Foster Care Service Standards, and access to a statewide electronic placement resources database (1.6.a., 1.6.b., 1.6.c.);

  - implementing a performance-based contracting system (1.7.a.);

  - providing reimbursement rates to licensed foster families (1.8.a.); and

  - implementing a policy prohibiting cancellation of visits as a form of discipline against children (5.2.c.).

- *New Non-relative Homes*: MDCPS licensed 472 new non-relative foster homes in 2019, exceeding the annual target of 400 homes established by the monitor after consultation with the Department.

- *Post-Adoption Services:* MDCPS administered a system of statewide post-adoptive services to stabilize and maintain adoptive placements. Adoptive families eligible for adoption subsidies have access to these services which include counseling, mental health treatment and crisis intervention, family preservation and stabilization services, and peer support.

- *Federal Permanency Outcomes:* The monitor established interim performance standards for MDCPS to meet for FFY2019 regarding permanency for children entering care in a 12-month period, permanency for children in care for 12-23 months, and permanency for children in care for 24 months or more. The Department achieved the interim performance standard for each of the permanency outcomes during the reporting period.

Among the areas where MDCPS did not meet the identified performance standard are several critical to child safety, including:

- *Caseloads:* The parties negotiated and agreed MDCPS would achieve workload standards for at least 90 percent of its caseworkers. MDCPS did not meet the standard for its staff at any time in 2019. Performance varied between a high of 59 percent in the fourth quarter of 2019 to a low of 48 percent in the third quarter.

- *Screening Child Maltreatment in Care (MIC)*: MDCPS agreed to ensure that it maintains a statewide system to appropriately receive, screen, and investigate reports of child maltreatment, but many features of the system lack adequate quality controls. For example, MDCPS screened out 771 maltreatment reports involving children in custody during 2019. The monitoring team conducted a qualitative review of 200 of these screened out reports and concluded that MDCPS made appropriate screening decisions in 84.5 percent of the referrals. Seven percent of the screened-out reports met MDCPS' criteria for maltreatment and should have been assigned for investigation and 8.5 percent of the referrals did not include enough information to make a screening decision and required additional information prior to making the decision to screen out or accept the report for investigation.

- *Investigating Maltreatment in Care*: The monitoring team conducted a qualitative review of MIC investigations completed by the Special Investigations Unit during 2019. The monitoring team concluded the evidence supported MDCPS' findings 78.5 percent of the time. However, for another 9.5 percent of the investigations where some or all the allegations were found to be unsubstantiated by MDCPS, the monitoring team concluded, based on MDCPS' criteria for maltreatment, that information presented during the course of the investigation was sufficient to render a substantiation.

- *Maltreatment in Care:* Data provided by MDCPS and verified by the monitoring team indicate that 87 children (1.20 percent) in MDCPS' custody were victims of abuse or neglect by their caregivers. This is more than three and a half times the agreed upon rate of maltreatment and MDCPS should have protected at least 63 more children from abuse or neglect in their placement in 2019 in order to meet the agreed upon safety standard.

6

- *Child Safety during Trial Home Visits:* The monitoring team determined that MDCPS conducted 66 investigations into allegations of abuse or neglect of children during their trial home visits. Sixteen of these investigations, involving 32 child victims, were substantiated for abuse, neglect, or exploitation by the parent or caregiver. The maltreatment of these 32 children during a trial home visit are in addition to the 87 children who were determined to be maltreated in care under the agreed upon safety standard.

- *Transition to Independent Living:* MDCPS agreed to provide youth age 14 years and older with, among other things, an opportunity to create an appropriate Independent Living service plan, access to a range of supportive skills and services for a successful transition to adulthood, and assistance in obtaining and compiling documents they will need after emancipating from foster care. MDCPS conducted qualitative reviews for these commitments and reported 45 percent of youth participated in the creation of an Independent Living service plan, no more than one third of eligible youth received services related to any one Independent Living skill and most services were provided to less than 20 percent of eligible youth, and between zero and 47.6 percent of youth who emancipated from care received relevant documents, as agreed.

# 2019 Summary of Commitments

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| **2nd MSA Introduction** | Defendants shall request state funds and any federal/special fund authorization sufficient to affect the provisions and outcome measures set forth in the 2nd MSA. | Yes | 26 |
| **SYSTEMIC INFRASTRUCTURE STANDARDS** | | | |
| **1.** | MDCPS shall maintain a Commissioner of Child Protection Services having responsibility for the oversight and management of the MDCPS. | Yes | 26 |
| **1.1.a.** | MDCPS shall hire caseworkers who have, at minimum, a bachelor's degree in social work or a related human services degree. The monitor shall review and determine which degrees qualify as related human services degrees. | Yes | 27 |
| **1.1.b.** | MDCPS shall hire or promote to the position of caseworker supervisor only persons who have a master's degree in social work or a related human services degree and two years of experience working with children and families, preferably in foster care; or a bachelor's degree in social work or a related human services degree with three years of experience working with children and families, preferably in foster care. | Yes | 27 |
| **1.2.a.** | MDCPS shall maintain a Training Unit headed by a qualified director of training (see 2nd MSA for full requirements of the Training Unit). | Yes | 28 |
| **1.2.b.** | MDCPS caseworkers shall receive a minimum of 270 hours of pre-service training, which includes instructional training and supervised field training, and may include E-Learning. Any E-Learning training is subject to the approval of the monitor (see 2nd MSA for more info). | Yes | 28 |
| **1.2.c.** | MDCPS caseworker trainees, as part of pre-service training, may be assigned specific tasks or activities in connection with a case that is the primary responsibility of an experienced caseworker and may, under appropriate supervision, be assigned responsibility for a "training caseload" with progressively responsible caseload assignment. | Not applicable | 29 |
| **1.2.d.** | MDCPS caseworkers shall receive a minimum of 40 hours of in-service training, and all supervisors shall receive a minimum of 24 hours of in-service training. | Yes | 29 |
| **1.2.e.** | MDCPS caseworker supervisors, within 90 days of hire or promotion, shall receive a minimum of 40 hours of training, directed specifically at the supervision of child welfare caseworkers. | Yes | 29 |
| **1.3.a.** | 90% of MDCPS caseworkers will have caseloads which do not exceed the caseload standards set forth in the 2nd MSA (pg. 3-4). Individual MDCPS caseworkers with generic caseloads shall not carry a mixed caseload that exceeds 100% capacity as calculated by weights per case type set forth in the 2nd MSA (pg. 3-4). | No | 30 |
| **1.3.b.** | 85% of MDCPS supervisors shall be responsible for no more than five caseworkers. | No | 32 |
| **1.4.a.** | By December 1st of each year, MDCPS shall develop an annual Continuous Quality Improvement Plan, which shall be subject to the approval of the monitor after consultation with the parties. | Yes | 33 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **1.4.b.** | Upon approval, MDCPS will implement the CQI Plan and will do so with sufficient staff and resources to assess compliance with those provisions of the 2nd MSA that were identified for review in the Plan. The reviews will assess case practice, analyze outcomes, and produce analysis that will be shared with managers and stakeholders to achieve performance improvement. | Yes | 33 |
| **1.5.a.** | MDCPS shall maintain comprehensive information systems that permit: (1) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding required actions in a child's case and whether they have taken place. | No | 33 |
| **1.6.a.** | MDCPS shall provide to all county agency staff with child welfare responsibilities access to computer services, word processing, and electronic mail and access to the current management information systems and access to CCWIS, once implemented. | Yes | 33 |
| **1.6.b.** | Data related to compliance with the 2nd MSA's Foster Care Service Standards will be collected, analyzed, and made available, at least quarterly, to MDCPS regional and county staff. | Yes | 37 |
| **1.6.c.** | MDCPS county staff shall have access to an electronic statewide database of available placement resources. | Yes | 37 |
| **1.7.a.** | Defendants shall establish, maintain, and assess the effectiveness of a performance-based contracting system to evaluate annually contract agency compliance with the terms of the 2nd MSA. Defendants shall take all reasonable steps to ensure contract agency remediation of any identified deficiencies within three months. | Yes | 38 |
| **1.7.b.** | Prior to MDCPS contracting for case management services for children in custody, MDCPS shall submit for review and approval to the monitor a detailed plan to ensure accountability and provide supervision and oversight of such agencies. | Not applicable | 40 |
| **1.8.a.** | Defendants shall ensure that all licensed foster families (regardless of whether they are supervised directly by MDCPS or by private providers, and whether they are kinship or unrelated foster families) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the 2nd MSA. | Yes | 40 |
| **1.8.b.** | Defendants shall pay to all licensed foster families at least the basic monthly foster care maintenance payments. Every two years thereafter, Defendants shall provide increases in the foster care maintenance payments, based upon the previous year's rate of inflation. | Yes | 41 |

9

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| **1.8.c.** | Defendants shall deliver to the monitor a written report regarding the adequacy of a proposed schedule of foster care maintenance payments made to foster care providers serving children and the actual cost in the state of Mississippi to provide such care (see 2nd MSA for specific report requirements). Following review of the Defendants' report, the monitor shall establish the rates that Defendants shall then implement. | Achieved in 2018 | -- |
| | **CHILD SAFETY AND MALTREATMENT IN CARE** | | |
| **2.1.** | MDCPS shall ensure that it maintains a statewide system to appropriately receive, screen and investigate reports of child maltreatment (see 2nd MSA for system requirements). Any extensions of the timeframes set forth in MDCPS policy for the completion of investigations are subject to the review and approval of the monitor. | No | 41, 49 |
| **2.2.** | MDCPS shall continue to maintain a special investigations unit whose responsibility is to investigate reports of maltreatment of children in custody. | Yes | 44 |
| **2.2.** | The initiation of a special investigation shall not extend beyond 24 hours. | No | 44 |
| **2.3.** | MDCPS will develop and implement policies and procedures, subject to the review and approval of the monitor, for the Agency to review all maltreatment in care reports that were screened-out and assess the appropriateness within 24 hours of all screen-out determinations. If the decision to screen out the report is determined to be inappropriate, MDCPS shall ensure the report is referred for investigation immediately. | No | 43 |
| **2.4.** | Upon receipt of a substantiated report of child maltreatment in a contract agency group home or emergency shelter, MDCPS shall, within 30 calendar days, initiate a licensure investigation, that is in addition to and independent of the child protection investigation (see 2nd MSA for investigation requirements). | No | 45 |
| **2.5.** | Upon receipt of a report of child maltreatment in a private child placing agency foster home, MDCPS staff will notify the child placing agency, who shall, within 30 calendar days, initiate a licensure investigation that is in addition to and independent of, any child protection investigation (see 2nd MSA for investigation requirements). | No | 46 |
| **2.6.** | All allegations of maltreatment of a child in custody shall be investigated by a worker who has received training on intake and investigations processes, policies, and investigation techniques and has no ongoing connection to the foster care case. | Yes | 45 |
| **2.7.** | Within 30 days of the completion of any investigation of maltreatment of a child in custody, as required in Section 2.1, MDCPS shall review the maltreatment investigation (see 2nd MSA for review requirements). | No | 47 |
| **2.8.** | MDCPS shall assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment of children in MDCPS' custody. | No | 44 |
| **2.8.a.1.** | By July 1, 2018, at least 90% of maltreatment-in-care investigations will be initiated and completed within 30 days. | Yes | 45 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **2.8.b.** | Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker according to the following schedule: 1) Once per week for the first month and twice per month for three months if the investigation is found to be substantiated; or 2) Twice per month in accordance with MDCPS policy if the investigation is found to be unsubstantiated. | Cannot validate | 47 |
| **2.8.c.** | When a maltreatment investigation involves a foster or adoptive home, MDCPS shall file a copy of the approved final investigative report, and any recommendations and/or corrective actions MDCPS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and with the Bureau Director for Licensure. MDCPS shall also provide those records to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor. | No | 48 |
| **2.8.d.** | When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by MDCPS, a copy of the final investigative report shall be filed in the child's case record, with the Director of Congregate Care Licensure, and sent to the licensed provider facility. MDCPS shall provide the report to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor. | No | 48 |
| **2.9.** | The rate of child abuse and neglect among children in foster care shall not exceed 0.33% per year effective for the period beginning 1/1/18 (see 2nd MSA for full definition of this metric). | No | 52 |
| | **FAMILY-BASED PLACEMENTS** | | |
| **3.1.** | Nonrelative Foster Homes: All foster homes and facilities with children placed who are in the custody of MDCPS shall be timely licensed. | No | 53 |
| **3.1.** | Relative Foster Homes: All foster homes and facilities with children placed who are in the custody of MDCPS shall be timely licensed. | Cannot validate | 53 |
| **3.1.** | All foster homes and facilities with children placed who are in the custody of MDCPS shall be subject to the licensure process approved by Public Catalyst on December 31, 2016. | Yes | 53 |
| **3.2.a.** | No child shall remain in a foster home or facility determined to be unable to meet MDCPS licensing standards, absent an order by a state court with jurisdiction over child custody directing the placement of the child into a specific unlicensed placement. | No | 53 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| **3.2.b.** | Safety Issues: If it is determined that an unlicensed foster home or facility is unable to meet MDCPS licensing standards due to a safety issue, Defendants shall take all reasonable efforts to immediately ensure the child's safety and to remove the child, including, if required by the court, seeking an emergency court order. If the child is not in imminent danger, MDCPS shall implement a safety plan and within five calendar days, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only. | No | 54 |
| **3.2.c.** | Non-safety Issues: If MDCPS determines an unlicensed foster home to be unable to meet MDCPS licensing standards due to a non-safety issue, Defendants shall, within 30 calendar days of that determination, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only. | No | 54 |
| **3.3.a.** | MDCPS, in conjunction with the monitor, shall establish annual statewide and county performance requirements and time periods for new foster home licensure. The monitor will report to the parties MDCPS progress on achieving the performance requirements. The Defendants shall meet the performance requirements, including time periods. | Yes | 57 |
| **3.3.b.** | MDCPS shall begin to implement the annual plan to recruit and retain additional licensed foster home placements and shall maintain the additional number of total placements, as necessary during the applicability of the 2nd MSA. | Yes | 57 |
| | **PLACEMENT STANDARDS** | | |
| **4.1./ 4.13.a.** | By July 1, 2018, 70% of foster homes shall provide care for no more than five children (including foster, biological, and adoptive children) at any given time (see 2nd MSA for allowable exceptions). | Yes | 58 |
| **4.1./4.13.b.** | By July 1, 2019, 80% of foster homes shall provide care for no more than five children (including foster, biological, and adoptive children) at any given time (see 2nd MSA for allowable exceptions). | Yes | 58 |
| **4.2./4.14.a.** | By July 1, 2018, 60% of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs. | Yes | 58 |
| **4.2./4.14.b.** | By July 1, 2019, 75% of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs. | Yes | 58 |
| **4.3./4.15.** | At least 95% of children in MDCPS' custody shall be placed in the least restrictive setting that meets their individual needs as determined by a review of all intake, screening, assessment and prior placement information regarding the child available at the time of placement. | Yes | 60 |
| **4.4./4.18.** | 90% of children who enter MDCPS' custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless one of the exceptions provided in this 2nd MSA is documented as applying. | Yes | 61 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| **4.5./4.19.** | 90% of children who enter MDCPS' custody in Regions II-East, II-West, and V-West shall be placed within his/her own county or within 75 miles of the home from which he/she was removed unless one of the exceptions provided in this 2nd MSA is documented as applying. | No longer required | -- |
| **4.6./4.16.a.** | By July 1, 2018, 60% of siblings entering MDCPS' custody at or near the same time shall be placed together (see 2nd MSA for allowable exceptions). If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file. | Cannot validate | 62 |
| **4.6./4.16.b.** | By July 1, 2019, 75% of siblings entering MDCPS' custody at or near the same time shall be placed together (see 2nd MSA for allowable exceptions). If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file. | Cannot validate | 62 |
| **4.7./4.17.a.** | By July 1, 2018, 60% of children in MDCPS' custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability consistent with 2nd MSA requirements. | Cannot validate | 62 |
| **4.7./4.17.b.** | By July 1, 2019, 75% of children in MDCPS' custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability consistent with 2nd MSA requirements. | Cannot validate | 62 |
| **4.8.** | No child shall remain overnight in an MDCPS office or other nonresidential facility that provides intake functions. | Yes | 62 |
| **4.9.** | No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless: a) The child has exceptional needs that cannot be met in a licensed foster home; or b) In order to keep a sibling group together for a temporary period, not to exceed 15 days and the RD has granted documented approval for the congregate care placement; or c) To enable a mother and baby to be placed together and there is not an available foster home for both of them. | No | 63 |
| **4.10./4.12.a.** | By July 1, 2018, 70% of children will remain in his/her existing placement and not be moved to another placement unless MDCPS specifically documents in the child's case record justifications for that move and the move is approved by a MDCPS supervisor. | No | 64 |
| **4.10./4.12.b.** | By July 1, 2019, 80% of children will remain in his/her existing placement and not be moved to another placement unless MDCPS specifically documents in the child's case record justifications for that move and the move is approved by a MDCPS supervisor. | No | 64 |

13

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **4.11.** | No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others with documented approval from the RD. | No | 64 |
| | **VISITATION** | | |
| **5.1.a.2.** | By January 1, 2019, at least 90% of foster children shall have an MDCPS caseworker meet with the child at least two times per month (see 2nd MSA requirements for visits). | No | 65 |
| **5.1.a.2.** | By January 1, 2019, at least 90% of foster children shall have at least one visit per month by the caseworker, which takes place in the child's placement. | No | 65 |
| **5.1.b.2.** | By January 1, 2019, at least 90% of foster children receiving a 90-day trial home visit period shall have an MDCPS caseworker meet with the child in the home at least two times per month. | Cannot validate | 66 |
| **5.1.c.2.** | By January 1, 2019, for a least 90% of foster children with a goal of reunification, MDCPS shall meet with the child's parents at least monthly unless the child's parent(s) reside out-of-state or are incarcerated. | No | 66 |
| **5.1.d.2.** | By January 1, 2019 at least 90% of foster parents with at least one foster child in the home shall have MDCPS visit the home monthly. | No | 66 |
| **5.2.a.** | MDCPS shall arrange contact for the child with his/her parents and with any siblings not in the same placement within 72 hours of foster care placement unless there are documented reasons why contact should not occur. If a visit cannot be arranged within 72 hours, a telephone call to parents, siblings, or extended family members shall be provided to the child. | No | 67 |
| **5.2.b.** | For children entering foster care, a visitation plan for the child and his/her family shall be developed as part of the Family Service Plan. The visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child. | No | 68 |
| **5.2.b.1.** | If parental visitation is appropriate, this visitation plan shall include a minimum of two visits per month with the parents, unless the court order in the child's case limits such visits or unless it is documented that a parent failed to make himself or herself available. | No | 68 |
| **5.2.b.1.a.** | By January 1, 2019, 90% of children shall be provided with contacts with their parents consistent with the 2nd MSA requirements. | Did not report | 68 |
| **5.2.b.2.** | The child's visitation plan, regardless of permanency goal, shall include at least monthly visits with any siblings not in the same placement. | No | 68 |
| **5.2.b.2.a./ 5.2.b.3./ 5.2.b.4.** | By January 1, 2019, 80% of children shall be provided with contacts with any siblings in custody not in the same placement consistent with 2nd MSA requirements. | Did not report | 69 |
| **5.2.c.** | MDCPS and its contracting agencies shall implement a policy that prohibits cancellation of visits as a form of discipline against children. | Yes | 69 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| | **CHILD AND YOUTH PERMANENCY** | | |
| **6.1.a.2.** | By January 1, 2019 at least 90% of Family Service Plans shall be submitted by the caseworker consistent with 2nd MSA requirements, within 30 calendar days of a child's entry into custody. The supervisor shall review the Plan for approval within 15 calendar days. The Family Service Plan shall be considered complete upon documented supervisory review and approval. | No | 69 |
| **6.1.b.** | In instances which it is impossible to meet with one or both parents, the service planning process will proceed, notwithstanding the parent's absence. | Did not report | 70 |
| **6.1.c.2.** | By January 1, 2019, in at least 90% of placement cases in which the whereabouts of one or both parents is unknown, MDCPS shall, within 30 days, institute a diligent search for the parent(s), which shall be documented in the child's case record. | Cannot validate | 70 |
| **6.1.d.2.** | By January 1, 2019, for at least 90% of foster children who enter custody, permanency plans shall be submitted within 30 calendar days of the child's entry into custody by the caseworker consistent with 2nd MSA requirements. The supervisor shall review the plan for approval within 15 calendar days. The permanency plan shall be considered complete upon documented supervisory review and approval. | No | 71 |
| **6.2.a.1.** | At least 95% of children in custody with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements. | No | 72 |
| **6.3.a.1.b.** | By January 1, 2019, at least 90% of foster children with a permanency goal of reunification shall have service plans for their parents that identify those services MDCPS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that MDCPS made those identified services available directly or through referral. | Did not report | 72 |
| **6.3.a.2.** | For a child with a permanency goal of reunification, the child's MDCPS caseworker shall meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances. | No | 73 |
| **6.3.a.3.** | For children with a permanency goal of reunification, the case record shall document opportunities provided to parents in support of reunification. | Did not report | 73 |
| **6.3.a.4.** | When a recommendation to reunify a child with his/her family has been made, MDCPS shall develop an after-care plan with the family that identifies the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured. MDCPS shall take reasonable steps to provide or facilitate access to services necessary to support the child during the trial home visit. | No | 73 |

15

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **6.3.a.5.b.** | By January 1, 2019, at least 90% of foster children who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During the trial home visit period, MDCPS shall provide or facilitate access to the services identified in the child's after-care plan, consistent with the 2nd MSA requirements. | Cannot validate | 73 |
| **6.3.a.6.** | Before the end of any trial home visit period, MDCPS shall convene a meeting with the child's parents and the child to determine the appropriateness of a final discharge. If final discharge is determined to be appropriate, MDCPS shall make the appropriate application to the Youth Court to be relieved of custody. | Did not report | 77 |
| **6.3.b.1.b.** | By January 1, 2019, at least 90% of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child specific activities that MDCPS will undertake to achieve adoption. | No | 77 |
| **6.3.b.2.b.** | By January 1, 2019, a termination of parental rights referral shall be made on behalf of at least 80% of children who have spent more than 17 of the last 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception pursuant to the federal Adoption and Safe Families Act ("ASFA") has been documented by MDCPS in the child's case record. | No | 77 |
| **6.3.b.3.** | MDCPS shall provide to the monitor a report of all TPR referrals made during the monitoring period, the date those TPR referrals were made, and the date the TPR petition was filed with the court. | Yes | 77 |
| **6.3.c.** | Defendants shall establish and maintain a system of post-adoptive services to stabilize and maintain adoptive placements. Adoptive families eligible for adoption subsidies shall have access to these services, which may include services such as counseling, mental health treatment and crisis intervention, family preservation and stabilization services, and peer support. | Yes | 78 |
| **6.3.d.1.** | The permanency goals of durable legal custody and guardianship may be assigned when there are documented efforts in the child's case record to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. | Yes | 79 |
| **6.3.d.2.** | When the permanency goals of durable legal custody and guardianship are assigned to a child under the age of 14 years old or living with a non-relative, MDCPS shall provide to the monitor at the end of each monitoring period, information from the child's case record documenting efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. | Did not report | 79 |

| Section | Commitment | Achieved | Report Page |
|---------|------------|----------|-------------|
| **6.3.e.** | If MDCPS concludes, after considering reunification, adoption, durable legal custody and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, MDCPS may assign a permanency goal of APPLA for the child (see 2nd MSA for APPLA requirements). | No | 79 |
| **6.4.a.2.** | By January 1, 2019, at least 90% of foster children who have been in custody for at least six months shall have a timely court or administrative case review consistent with 2nd MSA requirements. | No | 80 |
| **6.4.b.2.** | By January 1, 2019, for at least 90% of foster children who have been in custody for at least 12 months, MDCPS shall make reasonable efforts to have a timely annual court review scheduled consistent with 2nd MSA requirements. | Yes | 80 |
| **6.4.c.** | MDCPS shall review documented exceptions pursuant to ASFA for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review. | Yes | 80 |
| **6.5.a.1.** | Of all children who enter foster care in a 12-month period, the percent who discharged to permanency within 12 months of entering foster care. | Yes | 81 |
| **6.5.a.2.** | Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care between 12 and 23 months, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. | Yes | 81 |
| **6.5.a.3.** | Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care for 24 months or more, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. | Yes | 81 |
| **6.5.d.** | For all children in the custody of MDCPS who were adopted in FFY2019, the monitor shall validate the average and median lengths of time to adoption finalization for each child from the date on which the child's adoption goal was established. | Unable to determine | 82 |
| TRANSITION TO INDEPENDENT LIVING | | | |
| **7.1.** | MDCPS shall provide each youth transitioning to independence with at least six months' advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition. | Cannot validate | 83 |
| **7.2.** | Each foster youth age 14 years and older, regardless of his/her permanency plan, shall be provided with an opportunity to participate in the creation of an appropriate Independent Living service plan for a successful transition to adulthood. | Cannot validate | 83 |
| **7.3.** | Each foster youth age 14 years and older shall have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood. MDCPS shall maintain sufficient resources to deliver Independent Living services to all youth described herein. | Cannot validate | 84 |

17

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| **7.4.** | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid coverage so that their coverage continues without interruption at the time of emancipation. | Cannot validate | 85 |
| **7.5.** | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond receive a start-up stipend of at least $1,000.00 at the time of emancipation, or as soon as practicable thereafter. | No | 86 |
| **7.6.** | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond have access to a housing resource specialist responsible for assisting the youth obtain an adequate living arrangement. | No | 86 |
| **7.7.** | MDCPS shall continue to implement policies and processes which ensure that youth emancipating from the foster care system at age 18 or beyond receive services and support under the State Educational Training and Vocational (ETV) Program for which they are eligible. | Yes | 88 |
| **7.8.a.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate. | No | 88 |
| **7.8.b.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A social security or social insurance number. | No | 88 |
| **7.8.c.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A resume, when work experience can be described. | No | 88 |
| **7.8.d.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A driver's license, when the ability to drive is a goal; if not a driver's license, then a state-issued, photo identification. | No | 88 |
| **7.8.e.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: An original or certified copy of the youth's birth certificate. | No | 88 |
| **7.8.f.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Previous placement information. | No | 88 |
| **7.8.g.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Documentation of immigration, citizenship, or naturalization, when applicable. | No | 88 |
| **7.8.h.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Documentation of tribal eligibility or membership. | No | 88 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| **7.8.i.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Death certificates when parents are deceased. | No | 88 |
| **7.8.j.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A life book or a compilation of personal history and photographs, as appropriate. | No | 88 |
| **7.8.k.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties. | No | 88 |
| **CHILD WELL-BEING** | | | |
| **8.1.a.1.** | By July 1, 2018, 70% of children shall have an initial medical screening within 7 days of the child's entry into foster care. | Cannot validate | 89 |
| **8.1.a.2.** | By July 1, 2019, 80% of children shall have an initial medical screening within 7 days of the child's entry into foster care. | Cannot validate | 89 |
| **8.1.b.1.** | By July 1, 2018, 70% of children shall have an initial EPDST or other comprehensive medical examination within 60 days of the child's entry into foster care. | Cannot validate | 90 |
| **8.1.b.2.** | By July 1, 2019, 80% of children shall have an initial EPDST or other comprehensive medical examination within 60 days of the child's entry into foster care. | Cannot validate | 90 |
| **8.1.c.2.** | By July 1, 2019, 45% of children shall be provided with periodic and on-going medical examinations. | Did not report | 91 |
| **8.1.d.2.** | By July 1, 2018, 60% of children shall be provided with practitioner recommended follow-up treatment. | Did not report | 92 |
| **8.1.d.3.** | By July 1, 2019, 90% of children shall be provided with practitioner recommended follow-up treatment. | Did not report | 92 |
| **8.1.e.1.** | By July 1, 2018, 60% of children shall have a dental examination within 90 days of the child's entry into foster care. | Cannot validate | 92 |
| **8.1.e.2.** | By July 1, 2019, 80% of children shall have a dental examination within 90 days of the child's entry into foster care. | Cannot validate | 92 |
| **8.1.f.1.** | By July 1, 2018, 75% of children shall have the completed foster child information form or other electronic record containing available medical, dental, educational, and psychological information about the child provided to foster parents or facility staff within 15 days of placement. | No | 93 |
| **8.1.f.2.** | By July 1, 2019, 90% of children shall have the completed foster child information form or other electronic record containing available medical, dental, educational, and psychological information about the child provided to foster parents or facility staff within 15 days of placement. | No | 93 |
| **8.1.g.** | By July 1, 2018, 85% of children shall have their Medicaid information provided to foster parents or facility staff at the time of placement. | Did not report | 93 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **8.2.a./8.2.c.1.** | At least 90% of school-age foster children who enter custody shall have their educational records reviewed and their educational needs documented by MDCPS within 30 calendar days of their entry into foster care. | No | 93 |
| **8.2.b.** | MDCPS shall take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within seven calendar days of initial placement or any placement change, including while placed in shelters or other temporary placements. | Did not report | 94 |
| **8.2.c.** | MDCPS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences. | Cannot validate | 94 |

## Methodology

To prepare this report, the monitoring team conducted a series of verification activities to evaluate MDCPS' progress implementing its commitments in the 2nd MSA. In accordance with Section 9.3., the monitoring team independently verified and analyzed a wide range of aggregate and detail data reports and statistics produced by MDCPS[4], including data related to caseloads and workloads, maltreatment in care, foster home licensure, and federal permanency outcomes. MDCPS also submitted "cohort" data, which identifies children's entries and exits from foster care during the period, the population of children served during the period, and the population of children in care at the beginning and end of the period.

Multiple verifications and data quality checks were performed against the data MDCPS provided. These checks focused on examining problems (e.g., missing data, internal consistency, duplicate records) with any variables used to identify children eligible for the indicator, to calculate derived variables, or measure the outcome. The monitoring team analyzed the information to verify the data quality, assessed the methodology used to compute performance for each metric, and attempted to replicate the performance calculations made by MDCPS. In these efforts, both MDCPS and the monitoring team relied on business rules jointly developed between the monitoring team and MDCPS and insights obtained from prior validation efforts. Problems related to data quality, if discovered, are noted. When possible, the monitoring team shared with MDCPS information about specific records that caused discrepancies or were flagged as a potential data quality issue.

Numerous interviews were conducted and meetings convened with key MDCPS personnel as needed relative to the data provided. When possible, multiple iterations of analyses were conducted and resubmitted by MDCPS based on the monitoring team's preliminary findings. The final data submitted were then analyzed and the results were compared to those provided by MDCPS.

MDCPS also produced the results of qualitative reviews it conducted of thousands of children's records using MDCPS' Foster Care Review and other qualitative review processes using a statistically significant review sample based on at least a 95 percent confidence level. To verify the information produced by MDCPS, the monitoring team conducted extensive field-based interviews, cross-data validation, and extensive qualitative case record reviews of more than 2,000 children's cases, including many of the same case records MDCPS reviewed to determine performance with a specific commitment, and the findings are included in the relevant sections

---

[4] MDCPS' primary information system is the Mississippi Automated Child Welfare Information System (MACWIS). MDCPS also has ancillary information systems or tracking tools that are not directly connected to MACWIS but may leverage data from it, such as Excel sheets used to track and report on newly licensed and closed homes and resource homes involved in expedited pending relative placements.

of this report. In most instances, the sample sizes for the monitoring team's case record verification reviews were based on a statistically significant sample of cases and methodology based on a 90 percent confidence level.

The monitoring team examined thousands of MDCPS administrative records including organizational charts, employee hiring and training records, financial and budgetary information, performance-based contracts, agency assessment reports and strategic improvement plans, court documents and pleadings associated with this litigation, hundreds of child-level court orders related to placement and permanency of children in MDCPS custody, relevant statutes and regulations, and MDCPS policies and bulletins issued to staff.

The monitoring team held quarterly meetings with the parties pursuant to Section 9.4. of the 2nd MSA, regular meetings with MDCPS leadership and program staff, meetings with management and staff at MDCPS regional and county offices and attended conferences with the Court.

## Demographics

MDCPS produced demographic data for the period from January 1, 2019 to December 31, 2019. MDCPS data indicate there were 4,786 children in custody on January 1, 2019 and 4,235 children in custody as of December 31, 2019. During the monitoring period, 2,501 youth were placed in foster care and 3,055 children exited care.[5] MDCPS served 7,285 children during the monitoring period. Young children aged zero to six years made up the largest portion (1,846 or 44 percent). Twenty-eight percent of youth (1,193) were 12 to 17 years of age, 24 percent of children (1,020) were seven to 11 years of age and four percent of youth (176) were 18 years and over, as detailed in Figure 1.

---

[5] The monitoring team identified 19 children who appear twice in MDCPS' entry cohort data. Each of these children entered foster care more than once during the monitoring period. The monitoring team also identified nine children who appeared twice in the exit cohort. Each of these children exited foster care two times during the monitoring period.

**Figure 1. Age of Children in Custody on December 31, 2019**

*n=4,235*



The population of children in care on December 31, 2019 was approximately evenly split by gender, with 51 percent of children in care male and 49 percent female. Regarding race, the population of children was 56 percent White, 38 percent African American, 0.2 percent Asian, 0.1 percent Native Hawaiian or Pacific Islander, and 0.1 percent Native American. Additionally, three percent of children reported being of mixed race. Three percent of children were identified with Hispanic ethnicity and can be of any race. The race of three percent of children was undetermined.[6]

**Table 1. Race of Children in Custody on December 31, 2019**

| Race | Count | Percent |
|------|-------|---------|
| White | 2,355 | 56% |
| African American | 1,599 | 38% |
| Unable to Determine | 143 | 3% |
| Mixed Race | 121 | 3% |
| Asian | 8 | 0.2% |
| Native Hawaiian, Pacific Islander | 6 | 0.1% |
| Native American | 3 | 0.1% |
| **Total** | **4,235** | **100%** |
| Hispanic ethnicity and of any race | 126 | 3% |

Note: Percentages may not add up to 100 due to rounding.

[6] Children whose race was explicitly marked as 'Unable to Determine' and whose race was not found are combined into the entry for 'Unable to Determine'.

As the following figure demonstrates, 88 percent of children in MDCPS' custody on December 31, 2019 lived in family settings, including foster families (50 percent), with relatives (28 percent), with their own parents (9 percent), in homes that intend to adopt (0.9 percent), and in homes of unrelated caregivers (0.2 percent). Of children in custody, 420 (10 percent) lived in institutional settings, including residential treatment and other congregate care facilities. Another 13 (0.3 percent) youth resided in Supervised Independent Living placements, which serve youth who are preparing to transition out of care.

**Figure 2. Placement Types of Children in Custody on December 31, 2019**
*n=4,235*



Of the children in care on December 31, 2019, 42 percent were in care less than one year, while 20 percent were in care for more than three years.

24

**Figure 3. Length of Stay in Care of Children in Custody on December 31, 2019**

*n=4,235*



**Table 2. Exits from Care by Exit Type, January 1, 2019 to December 31, 2019**

| Exit Type | Count | Percent |
|---|---|---|
| Reunification | 1,484 | 49% |
| Adoption | 755 | 25% |
| Living with other relatives | 370 | 12% |
| Guardianship | 306 | 10% |
| Emancipation | 72 | 2% |
| County of Service Placement Change | 41 | 1% |
| Runaway | 15 | 0.5% |
| Transfer to another agency | 7 | 0.2% |
| Death of a child | 5 | 0.2% |
| **Total** | **3,055** | **100%** |

Note: Percentages may not add up to 100 due to rounding.

As Table 3 demonstrates, of the children in custody on December 31, 2019, almost half had reunification as a federal goal. For the remaining children, 1,616 (38 percent) had a goal of adoption, 236 (6 percent) had a goal of APPLA, 36 (0.9 percent) had a goal of durable legal custody or guardianship, and 124 (3 percent) had placement with a relative as a federal goal. There were 159 children (4 percent) with missing federal goal codes.

**Table 3. Federal Goals for Children in Custody as of December 31, 2019**

| Federal Goal | Count | Percent |
|---|---|---|
| Reunification | 2,064 | 49% |
| Adoption | 1,616 | 38% |
| APPLA | 236 | 6% |
| Custody with a relative | 124 | 3% |
| No plan documented (less than 45 days in custody) | 113 | 3% |
| No plan documented (no current approved FSP) | 46 | 1% |
| Durable legal custody / guardianship | 36 | 0.9% |
| **Total** | **4,235** | **100%** |

Note: Percentages may not add up to 100 due to rounding.

## Operational Budget

The 2nd MSA requires MDCPS to request state funds and any federal/special fund authorization sufficient to affect the provisions and outcome measures set forth in this 2nd MSA. For state fiscal year (SFY) 2019 (July 1, 2018 to June 30, 2019), MDCPS was appropriated $97,994,298 in general funds and $12,000,000 in state special funds. MDCPS later requested and received from the Mississippi Legislature an additional $7,500,000 appropriation in state special funds. During the 2019 Mississippi legislative session, MDCPS requested a state fund appropriation of $135,744,859 for SFY2020 (July 1, 2019 to June 30, 2020). This request sought an increase of $18,250,561 from the prior fiscal year's state funding.[7] MDCPS' request for increased funding centered on its desire to hire additional staff to achieve compliance with the caseload requirement in the 2nd MSA, and its need to develop a Comprehensive Child Welfare Information System (CCWIS) data system as required by the 2nd MSA. However, the Mississippi Legislature appropriated MDCPS $110,548,860 in state general funds and $15,157,835 in state special funds, for a total state funding of $125,706,695, which fell short of MDCPS' request by $10,038,164. MDCPS also received $78,018,276 in federal funds in fiscal year 2019 and estimated receiving $118,263,549 in federal funds in fiscal year 2020.

## 1. Systemic Infrastructure Standards

## Department Leadership

MDCPS committed in the 2nd MSA to maintain a Commissioner of Child Protection Services having responsibility for the oversight and management of the Department. The Commissioner must

---

[7] During the 2019 session, HB 980 changed the state fiscal year closeout requirement causing MDCPS to incur 13 months of expenses in SFY2019 and requiring the additional appropriation of $7,500,000. Accordingly, $18,250,561 understates MDCPS' request for increased funding in SFY2020 because this request was for 12 months.

possess at least a bachelor's degree from an accredited institution of higher learning and ten years' experience in management, public administration, finance, or accounting or a master's or doctoral degree from an accredited institution of higher learning and five years' experience in management, public administration, finance, law, or accounting.

As previously reported, Commissioner Dickinson possessed the requisite qualifications to serve as commissioner of MDCPS during the period. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

## Staff Qualifications and Training

MDCPS committed to ensure that staff serving Mississippi's at-risk children and families have appropriate qualifications and receive adequate training.

*Caseworker Qualifications (1.1.a.)*

MDCPS reported 232 caseworkers were hired in 2019. All caseworkers are required to have, at minimum, a bachelor's degree in social work or a related human services field that is approved as a qualifying degree by the monitor.[8] Comparing the reported degrees for all the caseworkers hired in 2019 to the list of qualifying degrees, all the caseworkers possessed an approved degree. The monitoring team also reviewed the paper degrees or official transcripts for all caseworkers hired in 2019 and confirmed that the caseworkers' degrees were accurately reported. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Supervisory Qualifications (1.1.b.)*

In the 2nd MSA, MDCPS agreed that new caseworker supervisors must possess either a master's degree in social work or an approved qualifying human services degree and two years of experience working with children and families or a bachelor's degree in social work or an approved qualifying human services degree with three years of experience working with children and families. MDCPS reported 35 caseworker supervisors were appointed during 2019. The monitoring team compared the reported degrees for all the caseworker supervisors appointed in 2019 to the list of qualifying degrees. The team also reviewed the paper degrees or official transcripts and job applications for the caseworker supervisors and determined that all the supervisors possessed an approved degree and the requisite years of experience. *Pursuant to*

---

[8] In addition to the previously approved related human services degrees (Child and Family Studies, Child Development, Counseling, Criminal Justice, Disciplinary Studies, Early Childhood and Family, Education, Education and Human Science, Elementary Education, Family Studies, General Studies, Guidance Education, Interdisciplinary Studies, Marriage and Family Therapy, Nursing, Political Science, Psychology, and Sociology), the monitoring team reviewed and approved two additional degrees in 2019: Social Services and Educational Psychology.

*commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Training Unit (1.2.a.)*

MDCPS committed to maintain a Training Unit headed by a qualified director of training with adequate staffing, funding, and resources to assure that comprehensive child welfare training is provided to caseworkers, supervisors, and other child welfare employees. The child welfare training should enable staff to comply with the relevant mandates of the 2nd MSA, MDCPS policy, and reasonable professional standards. During 2019, the MDCPS Office of Professional Development (OPD) administered training and professional development in order to prepare MDCPS employees to assume their job responsibilities and enhance their knowledge, skills, and abilities. Specifically, OPD delivered pre-service, supervisory, and in-service training to Department staff during the period. OPD was led by a senior manager with an advanced degree and ten years of experience as a director of workforce development and a director of professional development in Mississippi's child welfare agency. Unit staff included approximately 34 training coordinators and practice model coaches, along with five supervisors. Estimated expenses for the unit for FY2020 (July 1, 2019 to June 30, 2020) are approximately $5,000,000. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Pre-Service Training (1.2.b.)*

All new MDCPS caseworkers must complete a total of 270 hours of pre-service training, which includes classroom instruction, field instruction, and E-Learning. The pre-service training program offered by MDCPS' OPD exceeds 270 hours of training with a combination of eight alternating weeks of classroom instruction and on-the-job training. During on-the-job training weeks, certain material is delivered through online learning.

MDCPS reported that 28 workers who were hired in late 2018 completed pre-service training in the first quarter of 2019. Of the 232 new workers hired in 2019, 156 completed pre-service training during the period. Twenty caseworkers previously employed and trained by MDCPS were rehired by the Department and exempt from pre-service training.[9] Thirteen workers left the Department either before starting or before completing training. The remaining 43 workers were hired into their positions late in the period and were enrolled in training that ended in the first quarter of 2020.

---

[9] Caseworkers and supervisors who have successfully completed MDCPS' current pre-service training are not required to attend training again.

The monitoring team reviewed the four competency exams administered during pre-service training for the 28 caseworkers hired in late 2018 and the 156 caseworkers hired in 2019 who completed training during the period and confirmed that 183 caseworkers achieved a passing score of 70 or higher on each of the four exams and one caseworker did not achieve a passing score on the week eight exam and is no longer employed with the agency. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Training Caseloads (1.2.c.)*

The 2nd MSA allows a trainee to be assigned responsibility for a "training caseload," under appropriate supervision, that gradually increases as the trainee successfully completes pertinent competence-based examinations. MDCPS has elected not to implement training caseloads at this time. MDCPS will notify the monitor before instituting training caseloads so the required competency exams and standards for passing the exams can first be reviewed and approved by the monitor.

*In-Service Training (1.2.d.)*

MDCPS agreed that all caseworkers must complete a minimum of 40 in-service training hours in 2019 and all supervisors must complete a minimum of 24 in-service training hours in 2019. MDCPS provided data to the monitoring team indicating that 807 caseworkers [10] and investigators received 40 or more in-service training hours and 240 supervisors received 24 or more in-service training hours during 2019, as required. The monitoring team verified for each worker that in-service training covered a wide range of topics such as active listening in the social services field, adoption competency, cultural competence, engaging incarcerated parents, ethics and accountability in child welfare, independent living: youth assessment/appraisal, and youth transition support services education processes. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Supervisor Training (1.2.e.)*

MDCPS committed in the 2nd MSA that caseworker supervisors must complete a minimum of 40 hours of training directed specifically at the supervision of child welfare caseworkers within 90 days of assuming a supervisory position. OPD offers a clinical supervisory training program consisting of 40 hours of classroom training based on identified competencies.

---

[10] On December 31, 2019, there were 828 caseworkers at MDCPS.

MDCPS provided information indicating that one caseworker supervisor hired late in 2018 completed supervisory training in the first quarter of 2019. Of the 35 caseworker supervisors appointed in the period, 21 supervisors met the 90-day requirement for training completion. Two supervisors appointed late in 2019 were pending training at the end of the period; nine supervisors were promoted in the period, but had completed supervisory training in a prior period and were exempt from completing it again; and three supervisors who had been previously employed and trained by MDCPS, were rehired as a supervisor and exempt from supervisory training. The monitoring team reviewed the competency exam scores for the exam administered at the end of supervisory training for the 22 supervisors who completed training in 2019 and confirmed that all had achieved a passing score of 70 or higher. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

## Caseloads and Supervision

*Caseworker Caseloads (1.3.a.)*

The 2nd MSA sets forth caseload standards for caseworkers and supervisors performing child welfare functions. The 2nd MSA states that 90 percent of MDCPS caseworkers must have caseloads that do not exceed the caseload standards for each type of case. Individual MDCPS caseworkers who carry a mixed caseload are held to a weighted, pro-rated standard. Table 4 details the caseload standards for each type of case.

**Table 4. 2nd MSA Caseload Standards by Case Type**

| Type of Case | Included Categories | Standards | Weight Per Case – 100% Capacity |
|---|---|---|---|
| Child Protection | Investigations Level 2<br>Investigations Level 3 | 14 Investigations | 0.0714 |
| Ongoing Foster Care | Placement Responsibility & Service | 14 Children | 0.0714 |
| Ongoing Foster Care | Placement County of Responsibility<br>Placement County of Service | | 0.0357 |
| In-Home | Protection Responsibility & Service<br>Prevention Responsibility & Service | 17 Families | 0.0588 |
| In-Home | Protection or Prevention County of Responsibility<br>Protection or Prevention County of Service | | 0.0294 |
| Adoption | Adoption County of Service | 15 Children | 0.0667 |
| New Application Licensing | Resource Inquiry<br>ICPC Application<br>Foster Home Study | 15 Homes | 0.0667 |
| Renewal Licensing | Foster Home Supervision<br>Foster Home Renewal | 36 Homes | 0.0278 |

As detailed in Figure 4, MDCPS did not meet the 90 percent caseload standard for its staff in any quarter during 2019.

**Figure 4. Percent of Workers Meeting the Caseload Standard, 2019**



*Data as of the end of March, June, September, and December          **Source: MDCPS Data**

*Supervisor Staffing Ratios (1.3.b.)*

MDCPS agreed that 85 percent of supervisors would be responsible for overseeing no more than five caseworkers each. As the chart below indicates, MDCPS came close to but did not meet the caseworker supervisors' workload standard of 85 percent in any quarter during 2019.

**Figure 5. Percent of Caseworker Supervisors Meeting the Supervision Ratio Standard, 2019**



*Data as of the end of March, June, September, and December*      **Source: MDCPS Data**

*Caseload Verification*

The monitoring team conducted a thorough review of caseload reporting for the period. From September to November 2019, the monitoring team interviewed casework staff about their workloads in six MDCPS county and regional offices. Interviews included both supervisory and caseload-carrying staff randomly selected by the monitoring team, working in Alcorn, DeSoto, Harrison, Jackson, Marshall, and Tippah counties. Staff members were directed to bring printouts of their caseloads, typically from the previous workday, with them to interviews. The monitoring team reviewed the caseload assignments with the workers and/or their supervisors and inquired whether the printouts represented all their caseload assignments as of that day, which coincided with the date of an official MDCPS caseload count. The monitoring team then compared the workload printouts of these thousands of cases identified across all the interviews, with MDCPS' official caseload submission to determine if they aligned.

Based on interviews with 135 caseworkers, 28 supervisors, and data analysis involving thousands of cases statewide, the monitoring team concluded the caseload data and information provided by the Department accurately reflected MDCPS' caseload performance during the period.

# Continuous Quality Improvement

*Continuous Quality Improvement Plan (1.4.a.)*

Pursuant to the 2nd MSA, MDCPS is required to develop an annual Continuous Quality Improvement (CQI) Plan by December 1st of each year, which shall be subject to the approval of the monitor after consultation with the parties.

The monitoring team reviewed the initial draft CQI Plan for 2020, which was submitted timely by MDCPS on November 5, 2019, and had extensive discussions with MDCPS regarding the planned CQI activities and processes. Based on feedback from the monitoring team, MDCPS submitted updates to the Plan, with an accompanying grid, and supporting CQI review and tracking tools. The monitoring team also shared the CQI Plan with plaintiffs' counsel, who provided their feedback. The monitoring team approved the 2020 CQI Plan for implementation on March 27, 2020.

*Continuous Quality Improvement Plan Implementation (1.4.b.)*

MDCPS was required by the 2nd MSA to implement the 2019 CQI Plan, upon approval by the monitors, with sufficient staff and resources to assess compliance with those provisions of the 2nd MSA that were identified for review in the Plan. The reviews must assess case practice, analyze outcomes, and produce analysis that will be shared with managers and stakeholders to achieve performance improvement.

The monitor previously reported, in the 2018 monitoring report, that MDCPS timely submitted its CQI Plan for 2019 and the monitor approved the Plan. MDCPS began implementing the approved 2019 CQI Plan in April 2019. The results of MDCPS' qualitative reviews with respect to 2nd MSA commitments included in the Plan are delineated in the relevant sections of this report.

# Management Information Systems & Data Reporting

*Comprehensive Information Systems and Reporting (1.5.a.)*

The 2nd MSA requires MDCPS to maintain comprehensive information systems that permit: (1) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding required actions in a child's case and whether they have taken place.

MDCPS' primary information system is the Mississippi Automated Child Welfare Information System (MACWIS). MDCPS also has ancillary information systems or tracking tools that are not directly connected to MACWIS but may leverage data from it, such as Excel sheets used to track resource homes involved in expedited pending relative placements,[11] to track and report on newly licensed and closed homes, and to facilitate and document the results of manual reviews of substantiated reports of maltreatment.

MDCPS reported employees are granted the appropriate level of access to MACWIS as part of the new hire process for caseworkers, supervisors, and identified State Office staff with positions and job responsibilities that require access to the system. A unique MACWIS ID is assigned to new caseworkers typically during the first week of pre-service classroom training. MDCPS reports quarterly to the monitor the MACWIS ID of new caseworkers granted access to the system.

The monitoring team generally has been able to identify children across multiple MACWIS data files to create a timeline of their placement settings and services while in MDCPS custody. MDCPS, however, has been unable to report consistently and reliably from MACWIS current and historical data of children in custody for numerous 2nd MSA commitments as noted below and in the pertinent sections of this report.

MACWIS contains a financial module the monitoring team used to verify that MDCPS was issuing foster care board payments to foster parents consistent with the child's age and placement type. The monitoring team requested and received from MDCPS quarterly data from MACWIS relating to the board rates foster parents were receiving for children during 2019. See Section 1.8.a., below, for details of the monitoring team's review of foster care board rates.

The monitoring team confirmed that MDCPS' responses to various 2nd MSA commitments included many of the required data elements for the National Child Abuse and Neglect Data System (NCANDS) and the Adoption and Foster Care Analysis and Reporting System (AFCARS). MDCPS also provided correspondence from the Administration for Children and Families within the United States Department of Health and Human Services accepting MDCPS' FFY2019 NCANDS Child File and Agency File and its National Youth in Transition Database submissions derived from MDCPS data systems. MDCPS reported that MACWIS users have view-only access of TANF and child support data systems.

The monitoring team received from MDCPS a MACWIS Tickler Types Report listing alert notifications available to staff for actions taken and actions needed.

---

[11] MDCPS refers to unlicensed relative home placements awaiting licensure as expedited pending relative placements.

MDCPS produced data from MACWIS to demonstrate performance on some but not all commitments for the 2nd MSA and to document baseline populations and samples for qualitative reviews. MDCPS also submitted "cohort" data, which identifies children's entries and exits from foster care during the period, the population of children served during the period, and the population of children in care at the beginning and end of the period. The monitoring team analyzed the information to verify the data quality, assessed the methodology used to compute performance for each metric, and attempted to replicate the performance calculations made by MDCPS. In these efforts, both MDCPS and the monitoring team relied on business rules jointly developed between the monitoring team and MDCPS and insights obtained from prior validation efforts.

As noted above, MDCPS is required to capture, track, and report applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements. MDCPS did not report data on 12 commitments and the monitoring team cannot validate data and information submitted by MDCPS for another 20 commitments.[12] These 32 commitments are delineated in the Summary of Commitments and the relevant sections of this report. Data problems include files missing a substantial number of records for individuals or events applicable to a commitment, files missing a significant amount of data for one or more fields needed to calculate performance, and files provided by MDCPS that the monitoring team was unable to replicate using the established business rules. While MDCPS did not report data for several commitments during the period or the monitoring team was unable to validate data MDCPS provided, the Department began producing new data for 2020 which the monitoring team is attempting to validate.

The monitoring team found significant and recurring data quality problems during the period, including tracking worker visits, measuring trial home visits, and reporting independent living services for youth.

- Tracking worker visits.  The monitoring team identified numerous data quality problems that made it impossible to validate certain visitation commitments in the 2nd MSA: Sections 2.8.b. (worker contacts with custody children after a maltreatment substantiation), 5.1.a. (worker contacts with foster children), 5.1.c. and 6.3.a.2. (worker contacts with parents), and 5.1.d. (worker contacts with foster parents).  The visits file MDCPS provided was missing job codes for thousands of visits. Only visits from certain types of workers are applicable for these commitments and job codes are needed to identify those workers. The visits file was also missing narrative locations for thousands

---

[12] There were an additional four commitments for which the monitoring team cannot validate the quantitative data provided by MDCPS. However, due to qualitative reporting, the monitoring team was able to assess MDCPS' performance for these commitments.

of visits. The narrative location is needed to identify whether at least one visit per month occurred in the child's placement, as required. MDCPS indicated that the location field is a required field, so the extent of the missing data suggests an error was made by MDCPS when extracting the data and creating the file. The monitoring team also determined the files submitted by MDCPS do not provide a reliable way to identify the parents with whom a child is to be reunified due to the manner in which the data were tracked. The significant number of missing job codes prevented the monitoring team from verifying that the extracted data report showing completed visits was no longer omitting visits for thousands of individuals, a data problem in 2018 that MDCPS attempted to resolve during the period.

- Measuring trial home visits. The monitoring team is unable to validate Sections 5.1.b. (worker contacts with children on trial home visits) and 6.3.a.5.b. (trial home visits). The monitoring team determined the files submitted by MDCPS do not provide a reliable way to identify trial home visits.[13] As with the other visitation commitments referenced above, the thousands of missing job codes in the visits file MDCPS provided also impacted these commitments. Only visits from certain types of workers are applicable for these commitments and the job code is needed to identify those workers. Likewise, the thousands of missing narrative locations in the visits file MDCPS produced made validation impossible. The narrative location is needed to identify whether at least two visits per month occurred in the child's home, as required. MDCPS indicated that the location field is a required field, so the extent of the missing data suggests an error was made by MDCPS when extracting the data and creating the file.

- Reporting independent living services for youth. The monitoring team identified problems with the consistency and quality of MDCPS' data reporting for several of the Independent Living (IL) services commitments. Due to a lack of complete, accurate, or consistent data and documentation during the period, the monitoring team was unable to validate data for four IL commitments in 2019.

*Staff Resources (1.6.a.)*

Pursuant to the 2nd MSA, MDCPS committed to provide to all its county staff with child welfare responsibilities access to computer services, word processing and electronic mail, access to the current management information systems, and access to a revised modular information system,

---

[13] The monitoring team identified several problems in the data, including the manner in which MDCPS defined the population of children who were placed in trial home visits as well as incorrect identification of the prior placement change reason in some cases. MDCPS' count of children with a trial home visit was not limited to children who had a goal of reunification and was not limited to trial home visits that lasted 90 days or more.

CCWIS, once implemented.[14] MDCPS produced quarterly the names, email addresses, network IDs, MACWIS IDs, and job titles for newly hired workers. Additionally, the monitoring team verified this information during in-person interviews with 163 randomly selected MDCPS staff across Mississippi. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Staff Access to Data (1.6.b.)*

MDCPS committed to collect, analyze, and make available, at least quarterly, to MDCPS regional and county staff, data related to compliance with the 2nd MSA's Foster Care Service Standards. MDCPS produces Focus on Data reports that are available to all staff and are scheduled to be updated daily. The reports graph county performance and can be downloaded in Excel and PDF formats. The monitoring team confirmed that the Focus on Data reports were generally accessible to staff throughout 2019 but were inaccessible to certain MDCPS staff during the period between March 13, 2019 and July 25, 2019.[15] *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Electronic Placement Database (1.6.c.)*

MDCPS agreed to provide county staff with access to an electronic statewide database of available placement resources. For most of 2019, the Department continued to utilize a Placement Matching Tool that was released to all staff on March 21, 2018 and is a component of CCWIS. The matching tool is designed for use by both frontline workers and licensure staff. A step-by-step training video and instructions are available to staff through MDCPS' SharePoint intranet platform.

In early September 2019, MDCPS staff gave the monitoring team an in-person demonstration of the Placement Matching Tool. The monitoring team was informed that county staff can utilize the tool to search by children who are currently in custody or who are entering care. The default search option is to search by address, and this populates a list of homes within a 50-mile radius of the child's removal address or current placement, as well as number of available beds, and the number of children in the home. There are advanced search options that allow the worker to change the radius distance, search by special needs, and search for resource homes that provide specific types of services. The monitoring team verified during in-person interviews with 163

---

[14] CCWIS is not required to be implemented until June 30, 2021.

[15] The monitoring team brought this to the attention of MDCPS on July 24, 2019. MDCPS looked into the issue and reported that the server was not updated and load-balancing was not working properly. MDCPS staff worked to update software drivers and the Focus on Data reports were again accessible on July 25, 2019.

randomly selected MDCPS staff across Mississippi that all had access to the Placement Matching Tool.[16]

MDCPS subsequently reported that from September 26, 2019 through the end of the calendar year, the Placement Matching Tool was unusable due to a coding issue. All staff were directed to utilize the Resource Directory within MACWIS, which contains a listing of available placement resources. The Directory includes filters that allow staff to search for resource homes located within a specific county, within a specific region, within the entire state, and for placements located outside the state. After conducting a search, the results list includes the applicable resources and displays the name of the head of household, the region, the county where the resource worker assigned to the home is located, the number of available slots by gender, the total number of available slots, the current status of the foster home license, and the date the license is set to expire. Staff can then click on a specific home and see the address, contact information for the resource parent(s), any prior maltreatment allegations in the home, the name of the licensure worker, a list of foster children currently placed in the home, and a list of all foster children who have ever been placed in the home. The monitoring team reviewed the MACWIS Resource Directory and determined it to be a suitable alternative in the absence of the CCWIS Placement Matching Tool. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

## Performance Based Contracting

*Performance Based Contracting (1.7.)*

MDCPS committed to establish, maintain, and assess the effectiveness of a performance-based contracting system to evaluate annually contract agency compliance with the terms of the 2nd MSA (1.7.a.). MDCPS further agreed to take all reasonable steps to ensure contract agency remediation of identified deficiencies within three months. An agency's failure to participate in remediation efforts is grounds for contract termination.

MDCPS reports that for this monitoring period there were 14 therapeutic foster care, group home, and shelter programs subject to performance-based contracts. Each of these contracts includes performance-based outcome standards. Included in the contract's scope of services is the following language that requires agencies to comply with 2nd MSA commitments:

---

[16] There were a small number of staff during November 2019 interviews who reported not having access to the Placement Matching Tool; however, the monitoring team subsequently determined these staff were either not responsible for the placement of children or were referring to the tool not working at that specific moment in time. All staff had access to the Resource Directory in MACWIS in the absence of the Placement Matching Tool.

> "Independent contractor will perform and complete in a timely manner and satisfactory manner the services described in the 'Scope of Services' attached hereto as Exhibit A, and the 'Second Modified Mississippi Settlement Agreement Reform Plan,' attached hereto as Exhibit B, and incorporated herein by reference."

During the monitoring period, MDCPS conducted performance evaluations of 14 contracts against the performance-based standards. The monitoring team reviewed all 14 contracts and found that performance-based standards are embedded in the contracts relative to service delivery, quality of services delivered, and licensing evaluations. The performance-based evaluation process includes case record reviews conducted by MDCPS' performance-based contract unit (PBC) of the following practice areas:

- initial strengths and needs assessment,
- preserving connections,
- teaming and permanency planning,
- service provision,
- preparing youth for adulthood,
- placement stability and discharge planning,
- caseworker contact with the child, and
- child safety.

PBC and agency staff meet prior to the case record reviews for an entrance conference, complete a tool that ranks the frequency and quality of services provided, complete the review with a description of findings, and conduct an exit conference. For any area that is found deficient, MDCPS requires a corrective action plan be implemented and the deficiencies remediated within three months. During the monitoring period, two agencies were required to submit a corrective action plan (CAP). One agency needed to address concerns regarding four of the eight practice areas:

- initial strengths and needs assessment,
- preserving connections,
- teaming and permanency planning, and
- placement stability and discharge planning.

The agency responded in a CAP to each area of concern, including timeframes for undertaking the actions to improve quality of services to the children placed with their agency.

The second agency needed to address concerns regarding five of the eight practice areas:

- initial strengths and needs assessment,
- teaming and permanency planning,
- preparing youth for adulthood,
- placement stability and discharge planning, and
- child safety.

The agency responded in a CAP to each area of concern, including timeframes for undertaking the actions to improve quality of services to the children placed with their agency.

*Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

The 2nd MSA requires that prior to MDCPS contracting for case management services for children in custody, the Department must submit for the monitors' review and approval a detailed plan that ensures accountability, supervision, and oversight of such agencies (1.7.b.). MDCPS did not contract for case management of children in custody during the monitoring period.

## Foster Care Maintenance Payments

*Licensed Foster Families' Reimbursement Rates (1.8.a.)*

MDCPS is required to ensure that all licensed foster families (regardless of whether they are supervised directly by MDCPS or by private providers, and whether they are kinship or unrelated foster families) receive at least the minimum reimbursement rate[17] for a given level of service as established pursuant to the 2nd MSA. The monitoring team reviewed reimbursements for the care of a randomly selected sample of 68 children in March 2019, 68 children in June 2019, and 68 children in September 2019 in licensed regular foster homes and determined that all the homes were paid the proper reimbursement rate for the age of the children in their care for those months. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

---

[17] The terms reimbursement rates, foster care maintenance payments, and resource board payments are used interchangeably in the 2nd MSA.

*Foster Care Maintenance Payments (1.8.b.)*

As of January 1, 2018, the effective date of the 2nd MSA, MDCPS agreed to pay to all licensed foster families at least the basic monthly foster care maintenance payments. The table below contains the current approved basic monthly rates for licensed foster homes. MDCPS committed to provide increases in the foster care board rate effective January 1, 2020 based on the previous year's rate of inflation, as required by the 2nd MSA.

**Table 5. Current Resource Board Payment Schedule**

| Age/Status | Board | Clothing | Allowance | Payment | Daily Per Diem |
|---|---|---|---|---|---|
| 0-8 | $ 586.90 | $ 80 | $ 30 | $ 696.60 | $ 23.23 |
| 9-15 | $ 672.20 | $ 80 | $ 50 | $ 802.20 | $ 26.74 |
| 16-21 | $ 736.60 | $ 80 | $ 60 | $ 876.60 | $ 29.22 |
| Special Needs I | $ 838.60 | $ 80 | ** | $ 918.60 | $ 30.62 |
| Special Needs II | $ 901.30 | $ 80 | ** | $ 981.30 | $ 32.71 |
| Foster Teen Parent | $ 1,323.50 | $ 160 | $ 90 | $ 1,573.50 | $ 52.45 |
| Emergency Shelters | $ 4,412.10 | - | - | $ 4,412.10 | $ 147.07 |
| Regular Group Homes | $ 1,096.60 | $ 80 | ** | $ 1,176.60 | $ 39.22 (all ages) |
| Therapeutic Resource Homes | $ 2,823.10 | $ 80 | ** | $ 2,903.10 | $ 96.77 |
| Therapeutic Group Homes | $ 5,170.00 | $ 80 | ** | $ 5,250.00 | $ 175.00 |
| Related Therapeutic Placement | $ 1,293.70 | $ 80 | ** | $ 1,373.70 | $ 45.79 |

** Personal Allowance is based on the age of the child and is included in the total board payment.

# 2. Child Safety and Maltreatment in Care

## Screening Reports of Abuse and Neglect

*Responding to Reports of Abuse and Neglect (2.1.)*

Mississippi Centralized Intake (MCI), established by MDCPS in 2009, is charged with receiving, prioritizing, and dispatching reports of child maltreatment. Reports to MCI alleging child abuse, neglect, exploitation, or risk are forwarded to local MDCPS offices for additional screening and investigation. If a report alleges maltreatment of a child in the state's custody, the information is required to be referred to the centralized Special Investigations Unit (SIU) for handling. MCI received 36,606 alleged abuse, neglect, or exploitation (ANE) reports during 2019. Of the ANE reports received, 8,661 reports (23.7 percent) were screened out, 27,939 (76.3 percent) were assigned for investigation, and zero to three reports remained in screening at the end of each respective quarter, for a total of six reports.

**Table 6. ANE Reports by Intake Action, 2019**

| Action | Q1 | Q2 | Q3 | Q4 | Year |
|---|---|---|---|---|---|
| Assigned for Investigation | 7,069 | 6,950 | 7,152 | 6,768 | 27,939 |
| Screened Out | 2,026 | 2,168 | 2,314 | 2,153 | 8,661 |
| In Screening | 2 | 0 | 3 | 1 | 6 |
| **Total Referrals Received** | **9,097** | **9,118** | **9,469** | **8,922** | **36,606** |

The monitoring team conducted a review of Mississippi's screening process in 2019. The review consisted of 200 randomly selected, screened-out abuse and neglect referrals involving children in MDCPS' custody, all from 2019. The monitoring team determined that MDCPS made appropriate screening decisions in 169 (84.5 percent) of 200 instances. Fourteen of the screened-out reports met MDCPS' criteria for maltreatment [18] and should have been assigned for investigation. Seventeen of the referrals did not include enough information to make a screening decision and required additional information prior to making the decision to screen out or accept the report for investigation. The monitoring team noted that many reports originated from MDCPS staff working directly with families, including caseworkers and licensing workers. These workers would likely have detailed information available about the families they are serving. In some of those instances, screening staff did not obtain additional information from these well-informed sources to make better-informed screening decisions.

Examples of screened-out reports that should have been accepted for investigation include:

- A residential facility staff person reported to MCI that a peer told a 17-year-old youth's therapist that the 17-year-old had attempted suicide through both an overdose and hanging himself. The youth had allegedly taken a peer's medication. He had multiple mental health diagnoses.

- A 12-year-old child in foster care reported that his foster mother's biological son, also 12, touched him inappropriately and attempted to initiate further sexual contact. The foster mother did not believe the allegations and stated that the child was making it up so that he could return home.[19]

- A report was received alleging that a foster child, age eight, who resided at a residential school for the blind during the week was seen by a staff member being dragged down the hall by teachers. The child was reportedly screaming and hollering. The child had been

---

[18] In accordance with Section 43-21-105 of the Mississippi Code of 1972 and MDCPS' Intake/Assessment Policy Effective November 11, 2016.

[19] Six months after this report was screened out for investigation, a similar allegation involving another foster child in the home and the 12-year-old biological child was referred and investigated. While unsubstantiated, this investigation resulted in the closure of the foster home.

running into things at school which was unusual. The child had previously suffered a traumatic brain injury, but normally the child could navigate without hitting things. Additionally, it was reported that the foster parent noticed a mark on the child's head; the child stated she hit her head on a pole. The bruise was blue and swollen but the swelling had gone down. The school had not contacted the foster parent. The child told her foster parent a girl at school was mean to her and tortured her. Another girl pushed the child and pulled her hair. The reporter and the foster mother were concerned about the child's safety and supervision at the school.

Examples of reports that required additional information to make a screening decision include:

- Two foster children, ages 12 and seven, were placed in an unrelated foster home. The children were being cared for by the maternal grandmother during a holiday visit. The grandmother admitted she made the children get on their knees on rocks and "popped" the children in the mouth. The grandmother disclosed that the 12-year-old child was "talking back" and the seven-year-old child had cursed at her.

- A child in MDCPS' custody, age three, reported being "whooped" with a belt while on a visit with his father. The child said he was hit hard. The child and his sister were preparing to begin a trial home visit with their father. The reporter did not observe marks or bruises and the child could not say if this occurred more than once.

- Two foster children were recently placed in a congregate care setting. One youth reported that another youth kept asking her to remove her clothing. She complied because she felt pressured and engaged in sexual activity with the other youth. The two residents were subsequently separated.

*Maltreatment-in-Care Screen-Out Reviews (2.3.)*

MDCPS committed to develop and implement policies and procedures, subject to the review and approval of the monitor, for the Department to review all maltreatment in care (MIC) reports that were screened-out and assess the appropriateness within 24 hours of all screen-out determinations. If the decision to screen out the report is determined to be inappropriate, MDCPS shall ensure the report is referred for timely investigation.

The Department's CQI Safety Review Unit (SRU) is charged with reviewing all screened-out MIC reports. Data provided by MDCPS indicate that 771 MIC referrals were screened out for investigation during 2019. Of the 771 screened-out MIC reports, 715 (92.7 percent) were reviewed timely by SRU. Fifty-one referrals were reviewed untimely and five referrals were not reviewed. SRU determined that all 766 referrals reviewed were appropriately screened out. As detailed under 2.1 above, the monitoring team reviewed 200 screened-out referrals alleging

maltreatment of children in MDCPS' custody that were reviewed by SRU. The monitoring team found that 31 (15.5 percent) of the 200 referrals were inappropriately screened out.

*Standardized Decision-Making (2.8.)*

The 2nd MSA requires MDCPS to assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment of children in MDCPS' custody. However, MDCPS has not yet implemented a system to ensure standardized decision-making. When MCI identifies that a foster child is the subject of the maltreatment referral, the unit is required to send it to the SIU. If the SIU supervisor decides to screen out the referral, the supervisor is required to advise the Director of Field Support Programs who, upon approving the screen-out determination, must notify the SRU of the screen-out. The SIU's screen-out judgments are routinely final. Of the hundreds of screen-outs the SRU reviewed in 2019, data and information from MDCPS indicates there were no instances where a reversal was recommended by SRU.

In those instances where MCI is unaware that the child described in a referral is in foster care, the maltreatment referrals are sent to the 82 counties and the referrals are then subject to review by the Regional Director or her/his designee. The Regional Directors, and their designees, have the unilateral power in their counties to change the disposition and screen out the referral. There is no evidence to suggest those judgments, made by different county-based individuals across the state, are subject to rigorous scrutiny by State Office staff or further discussion with MCI staff to establish standardization.[20] In almost every instance, the screen-out judgments of the county staff are final. This broad distribution of responsibility and prerogative across the state into the counties, and designated down to proxies by certain Regional Directors, undermines standardized decision-making.

## Investigating Maltreatment in Care

*Special Investigations Unit and MIC Investigation Initiation Timeliness (2.2.)*

Pursuant to the 2nd MSA, MDCPS is required to continue to maintain a special investigations unit whose responsibility is to investigate reports of maltreatment of children in custody. The initiation of that investigation shall not extend beyond 24 hours.

MDCPS continued to maintain SIU, charged with investigating reports of maltreatment of children in custody throughout 2019. Data provided by MDCPS indicate that of the 610

---

[20] In three counties that the monitoring team visited in November 2019, staff indicated that all screen-outs also had to be approved by the Deputy Director of Field Operations overseeing the region. This information was not included in MDCPS' memo regarding the Department's screening process submitted to the monitoring team on July 31, 2019, and it is not clear if this process is being followed statewide.

investigations conducted by SIU that were due for approval in 2019, 550 (90.2 percent) were initiated timely.

*MIC Worker Training (2.6.)*

Pursuant to the 2ⁿᵈ MSA, all allegations of maltreatment of a child in custody are to be investigated by a worker who has received training on intake and investigations processes, policies, investigation techniques, and has no ongoing connection to the foster care case. SIU workers receive training on intake policy, investigations into maltreatment in care and facility investigations, in addition to the pre-service training that all workers are required to receive. Ongoing foster care workers do not receive the same level of training.

MDCPS provided investigative training dates for all current SIU staff, who are responsible for conducting MIC investigations. SIU initiated 541 MIC investigations during 2019. Additionally, both MDCPS and the monitoring team identified investigations of MIC that were not completed by SIU. The monitoring team reviewed all 71 investigations with a custodial child victim that were conducted by non-SIU workers to determine if the investigator had an ongoing connection to the foster care case. The monitoring team identified only six instances where an investigation of maltreatment of a child in custody was conducted by a worker with an ongoing connection to the foster care case of one of the alleged victims. MDCPS performance exceeded 99 percent for this commitment.

*MIC Investigation Completion Timeliness (2.8.a.)*

MDCPS committed that at least 90 percent of MIC investigations will be initiated and completed within 30 days. Data provided by MDCPS indicate that of the 610 MIC investigations due for completion in 2019, 552 (90.5 percent) were completed timely. The monitoring team's case record review of 200 MIC investigations confirmed that MDCPS met the performance standard for this commitment during 2019.

*Licensure Investigations of Emergency Shelters and Group Homes (2.4.)*

MDCPS committed to initiate a licensure investigation of contract agency group homes and emergency shelters within 30 calendar days following a substantiated report of child maltreatment. The licensure investigations are required to occur in addition to and independent of child protection investigations and must include an on-site inspection by MDCPS of the group home or emergency shelter to determine the contract provider's compliance with MDCPS' licensure standards. A provider has ten calendar days to submit a corrective action plan (CAP) with timeframes to rectify any identified violation of licensure standards and comply with the approved CAP timeframes. If the provider does not comply with the licensure standards based on the approved CAP and timeframes, MDCPS shall revoke the license.

MDCPS reported there were six substantiated reports of child maltreatment in 2019 relevant to this commitment, all occurring in group homes. The monitoring team reviewed the licensing investigations and supporting documentation provided by MDCPS for these six incidents. Licensing violations were found by MDCPS in all six investigations. The monitoring team verified that on-site inspections were conducted in all investigations and that when MDCPS requested CAPs, they were submitted timely and included timeframes to rectify the violations.

Four of the investigations involved one facility, three of which resulted in citations for staff supervision. In the first case a CAP was implemented to address the identified concerns. With the following two investigations, MDCPS did not request new CAPs or revoke the facility's license as required by the 2nd MSA. However, the timeframe for monitoring the facility's compliance with the original CAP was extended by six months. In the fourth investigation, a staff person was terminated for physical abuse of a resident and again MDCPS did not request a CAP be implemented, as required by the 2nd MSA.

The remaining two investigations involved one other facility. In one instance a CAP was required to address the use of corporal punishment by staff and the failure to report alleged child maltreatment. In the other instance, staff were terminated for maltreatment of residents and the facility was cited for failing to report the incident, but no CAP was requested by MDCPS, as required by the 2nd MSA.

*Licensure Investigations by Child Placing Agencies (2.5.)*

The 2nd MSA requires that upon receipt of a report of child maltreatment in a private child placing agency (CPA) foster home, MDCPS must notify the CPA, which shall within 30 calendar days initiate an independent licensure investigation, including an on-site inspection of the foster home, to determine the provider's compliance with licensure standards. If the foster home provider is found to be in violation of licensure standards, the provider shall have ten calendar days to submit a CAP with timeframes to rectify the violation and comply with the approved plan. MDCPS shall recommend that the foster home license be revoked if the provider does not comply based on the approved CAP and timeframes.

Data and information provided by MDCPS indicate there were 20 reports of maltreatment involving CPA foster homes in 2019. The monitoring team conducted a qualitative review of licensing reports provided by MDCPS for these 20 cases and determined that CPAs were not consistently conducting licensing investigations independent of the child protection investigation, as required by this commitment. Rather, documentation provided to the monitoring team indicated that the licensing investigations were mainly conducted by MDCPS, with supplemental information detailing corrective actions provided by the CPAs when required.

The monitoring team found documentation in only one instance that the CPA conducted a complete licensing investigation independent of MDCPS and the CPS investigation.

Overall, there was documentation in five (25.0 percent) of the 20 licensing investigations that an on-site inspection of the foster home was completed. MDCPS established licensing violations in eight of the investigations. CAPs were required and completed in five instances[21] and the foster home was closed in three instances.

*Worker Contacts with Custody Children after a MIC Substantiation (2.8.b.)*

The 2nd MSA requires that any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker according to the following schedule:

- Once per week for the first month and twice per month for three months if the investigation is found to be substantiated, or

- twice per month in accordance with MDCPS policy if the investigation is found to be unsubstantiated.

The monitoring team was unable to validate the data for this commitment for the reasons noted in Section 1.5.a.

*MIC Investigation Reviews (2.7.)*

Within 30 calendar days of the completion of any investigation of maltreatment of a child in custody, as required in Section 2.1, MDCPS must review the maltreatment investigation. This review will:

- identify any case practice deficiencies in the investigation and any remedial actions necessary to ensure the safety of the child who is the subject of the investigation, as well as any other children in the home or placement;

- identify a timeframe in which any recommended remedial action must take place; and

- monitor the initiation and completion of the remedial actions regarding individual child safety and case practice.

When any remedial actions have not been initiated or completed timely, MDCPS must notify the supervisor, Regional Director, and Director of Field Operations.

---

[21] In one instance where a CAP was required the documentation provided by MDCPS indicated that a CAP was implemented, but no information was provided on the specific corrective actions required.

Reviews of MIC investigations are completed by the MDCPS Safety Review Unit (SRU). Data provided by MDCPS indicate that 562 investigations were due for review by SRU during 2019. Of these 562 investigations, 547 (97.3 percent) were reviewed timely by SRU. Thirteen investigations were reviewed more than 30 days after the completion of the investigation, and two investigations were not reviewed.

The monitoring team reviewed SRU reports for 174[22] of the 200 MIC investigations evaluated under commitment 2.1. SRU identified case practice deficiencies in nine of the investigations. These included the alleged victim(s) not being seen within 24 hours of intake, alleged perpetrator(s) not being interviewed, safety/risk assessments not being completed adequately, and in two instances SRU indicated they did not agree with the investigation findings. Specific remedial actions and timeframes to address these deficiencies were not identified in the SRU reports. The monitoring team identified case practice deficiencies in 40 investigations. These included alleged victims(s) not being interviewed timely, alleged perpetrator(s) not being interviewed, necessary collateral contacts and information not being obtained before rendering a finding, and in 17 instances the monitoring team, applying MDCPS' criteria for maltreatment, did not agree with the investigation findings.

*Filing of MIC Investigations (2.8.c., 2.8.d.)*

Pursuant to the 2nd MSA, when a MIC investigation involves a foster or adoptive home, MDCPS must file a copy of the approved final investigation report, and any recommendations and/or corrective actions MDCPS has deemed necessary, in the case record of the foster child. The Department must also file a copy of the approved final investigation report, and any recommendations and/or corrective actions MDCPS has deemed necessary in the file of the foster or adoptive parents, along with a copy of the letter of notification to the foster or adoptive parents, and with the Bureau Director for Licensure. MDCPS must also provide those records to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor (2.8.c.).

Additionally, when a MIC investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by MDCPS, a copy of the final investigative report must be filed in the child's case record, with the Director of Congregate Care Licensure, and sent to the licensed provider facility. MDCPS must also provide the report to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor (2.8.d.).

MDCPS stores investigation reports in MACWIS, which are linked to the child(ren) and provider(s) involved in the report. As of April 19, 2019, upon completion of a MIC investigation, the special

---

[22] Twenty-four of the MIC investigations reviewed by the monitoring team were not due for review by the SRU until 2020. Additionally, there were two MIC investigations the monitoring team reviewed for which the SRU review was due in 2019 but not completed.

investigator mails a copy of the finalized investigation packet to the youth court judge(s) with jurisdiction over the child(ren) involved in the report. MDCPS did not report performance for these commitments until the third quarter of 2019, as part of the MIC investigation review completed by the SRU. The Department reported that 249 (95.0 percent) of the 262 MIC investigations reviewed by SRU in the second half of 2019 documented a date the investigation findings were mailed to the youth court. The monitoring team reviewed a sample of 90 of these cases and confirmed MDCPS' performance for the second half of the year.

*Investigating Reports of Abuse and Neglect (2.1.)*

The monitoring team conducted a qualitative review of a sample of MIC investigations conducted during 2019, alleging ANE of a child in MDCPS' custody. The review included 200 investigations involving 393 alleged child victims. Fifty of the 200 investigations, involving 97 children, were substantiated for abuse and/or neglect. The monitoring team's review involved reading investigation reports supplemented with information documented in MACWIS.

The monitoring team found that SIU workers made face-to-face contact or attempted to make face-to-face contact with child victims within 24 hours of the report date and time in 191 (95.5 percent) of the 200 investigations. The alleged perpetrator and collateral contacts were typically interviewed during the course of the investigation, although in 14 investigations (7.0 percent) at least one of alleged perpetrators was not interviewed and should have been per MDCPS policy. The entire investigation was completed and approved within 30 calendar days of the initial intake report date and time in 183 of the 200 (91.5 percent) investigations. However, the monitoring team found that in cases where investigations were completed timely, additional time was sometimes needed to gather information and complete a thorough assessment. In eight instances, MDCPS rendered a finding before forensic interviews, medical/psychological exams, drug testing results, or information from law enforcement, as requested by MDCPS, were received. Even though MDCPS policy allows for investigators to request extensions when more time is needed to complete an investigation, extensions were not requested in these eight cases.

The monitoring team concluded the evidence supported MDCPS' findings in 163 of 200 investigations (81.5 percent). The monitoring team concluded in 20 investigations (10.0 percent) more information was needed in order to draw a proper conclusion. There were 17 investigations (8.5 percent) where some or all of the allegations were found to be unsubstantiated by MDCPS, but the monitoring team concluded, based on MDCPS' criteria for maltreatment, that

information presented during the course of the investigation was sufficient to render a substantiation.[23] A few examples where allegations should have been substantiated include:

- A foster child, age ten, and adoptive child, age 11, were left home to care for a foster child, age one. He was not changed regularly and had diaper rash. The older children changed his diaper, gave him a bath, and cleaned him with baby wipes because he was always filthy. MDCPS substantiated physical neglect of the one-year-old, but neglect was unsubstantiated for the other two children, who were caregivers for him. In interviews, the children also alleged that the foster mother called them names, cursed at them, "whooped" them with belts, shoes, and other objects, and smoked around them in the home and the car. As a result of this investigation, the 10-year-old was removed from the home. However, the one-year-old remained in the home for two months, and the 11-year-old adopted child and an older adopted youth still remain in the home.

- Physical neglect was unsubstantiated for four children, ages two, five, nine, and ten, who were placed with maternal relatives. They were found to have hair that had not been combed for some time and the home had the following hazardous and unsafe conditions: a gas fireplace without a screen with soot evident; a vase found in the tub in the girls' bathroom that had mold and fungi growing on it; a bathroom sink filled with rocks, toys, and other items, making it unusable; exposed electrical cords in the play area; electrical outlets with no covers; dishes that were unwashed for some time; grass which was quite tall and the worker "did not feel safe walking through"; and items on the porch and ground near the front steps which caused the foster parent to fall recently. There was also a concern about the children's health and whether they were receiving necessary medical care, but no verifying collateral contact with medical professionals was documented. The children remained in this relative home.

- A referral was received indicating that an argument took place between a foster youth, age 18, and his uncle and resource parent. The foster father told the youth to get out of his house, drew his pistol, and said he would shoot him if he came back on his property. The foster mother concurred with his having to leave. This forced the youth to depart on foot late at night and to stay with unknown friends. Several days later he contacted his worker and was placed with another relative prior to his leaving for college. Another concern that was disclosed during the investigation was that several months prior the 18-year-old was admitted to the Intensive Care Unit for an overdose of aspirin. After hospital discharge, he did not receive the recommended mental health or psychotropic medication follow-up, and described being anxious, having night terrors, and difficulty

---

[23] This includes one investigation where the allegations were found to be substantiated for one foster child, but unsubstantiated for another foster child and adoptive child in the home. The monitoring team determined maltreatment should have been substantiated for all three children.

sleeping. His 17-year-old brother, also in custody, disclosed that he had frequent headaches and feared he had a tumor, but was not taken for medical treatment. Abuse or neglect was unsubstantiated and the caregivers were granted durable legal custody of the 17-year-old.

The following are examples of investigations where more information was needed in order to make a proper investigative finding:

- It was alleged that a therapeutic foster mother's boyfriend, alleged to be a convicted felon, resided in the home unbeknownst to the supervising agency. Reportedly, he was abusive and when he became upset with the foster mother, he would not feed the foster child, age two, who had brain damage and required a feeding tube. The foster child was reported by the daycare center to have weight fluctuations, diarrhea, and vomiting. The child's physician was not contacted to determine whether he was receiving adequate care and nourishment via his feeding tube and to rule out neglect. Despite the allegation being unsubstantiated, the agency supervising the home removed the two-year-old six days after the referral was made and closed the home because the foster mother had never disclosed that her boyfriend was residing in the home nor did he have the required background checks.

- A youth, age 17, placed in a group home used a piece of glass to make superficial cuts to her wrist and both thighs and she was admitted to the hospital. She reported that she did so not to harm herself, but so she could escape the facility for a few days. The investigation contained no documentation regarding how and when the child obtained the glass or if a lack of supervision occurred by facility staff on duty at the time the child cut herself. No direct care staff or other residents were interviewed. Maltreatment in care was unsubstantiated.

- Four youth, ages 14, 15, 16, and 16, ran away from the group home where they resided and became involved in sex trafficking. One of the girls reported they were not really being supervised when they ran away. When she was located, she was returned to the group home, only to run away again. The investigator indicated that recent elopements from this facility resulted in "28 or more" investigations. Several of the girls in this referral had a history of sexual abuse, and were exposed to sexually transmitted diseases, HIV, and potential pregnancy during the time they were away from the facility. They also were on multiple medications and then given what they described as laced "weed" by the men who used them for sex. The investigator did not consider or interview facility staff regarding the possible lack of supervision potentially resulting in the girls' elopements. One girl was still missing at the investigation's conclusion.

*Maltreatment of Children in Care (2.9.)*

Pursuant to the 2nd MSA, MDCPS agreed that the rate of child abuse and neglect among children in foster care shall not exceed 0.33 percent per year. A child is counted as having been maltreated in foster care if the perpetrator of the maltreatment was identified as a foster parent or a residential facility staff member. This was a federal outcomes standard (based on the federal Child and Family Services Review, Round Two) focused on keeping children in foster care safe from abuse and neglect by their caregivers.

Data provided by MDCPS and verified by the monitoring team indicate that 87 children (1.20 percent) in MDCPS' custody were victims of abuse or neglect by their caregivers in 2019. This is more than three and a half times the agreed upon rate of maltreatment and MDCPS should have protected at least 63 more children from abuse or neglect in their placement in 2019 in order to meet the agreed upon safety standard. Examples of substantiated abuse and neglect during 2019 include:

- A six-year-old foster child was brought to the school nurse by her teacher due to numerous bruises covering her body and the child having difficulty walking. The investigation confirmed that the bruises were caused by the child's foster parent, who hit her with a paddle and wooden spoon. Physical abuse was substantiated, the foster parent was arrested, and the foster home was closed.

- A 12-year-old residing in residential placement was allegedly punched in the face with a closed fist by a staff member after a verbal altercation. Interviews with witnesses and video surveillance confirmed that the staff member was physically attacking the child and had to be restrained by other staff. Physical abuse was substantiated and the staff member was terminated.

- A two-year-old foster child was admitted to the hospital having seizures. He was placed in the ICU on a breathing machine. Hospital records documented a subdural hematoma on the child's brain that required emergency surgery, a few retinal hemorrhages, a spinal fracture, leaking spinal fluid, and unusual bruising covering his legs, arms, and back. The doctor classified the injuries as nonaccidental and determined they occurred within eight hours of the child's arrival at the hospital. The foster parents gave an insufficient explanation for his injuries. Another foster child in the home stated the children were whipped by the foster father when they got in trouble. Physical abuse and physical neglect were substantiated, all children were removed from the home, and SIU recommended closure of the foster home.

## 3. Family-Based Placements

*Foster Home Licensure (3.1.)*

In order to ensure that children who are removed from their families due to abuse and neglect are placed in the most appropriate and least restrictive setting, MDCPS agreed to develop a safe array of family-based placement resources. The 2nd MSA requires MDCPS to both recruit and license a target number of non-relative foster families and to ensure that when MDCPS places children with relatives, those homes are timely licensed. MDCPS agreed to utilize the licensure process approved by the monitor when assessing prospective relative and non-relative homes.

The licensure process requires MDCPS to: provide pre-service training for applicants; conduct home visits with the prospective applicants and family members; assess the physical and mental health of applicants; conduct home environment safety checks; obtain references regarding the applicants; and complete full background checks that include state and federal fingerprints for all adults in the home. MDCPS is also required to complete a foster home study that synthesizes information obtained during the home study process and documents the agency's licensure decision.

MDCPS agreed to license non-relative homes within 120 days of the prospective foster parent's inquiry regarding foster parenting. For 2019, data provided by MDCPS indicate that 373 (79.0 percent) of 472 homes were licensed timely. The monitoring team reviewed a randomly selected sample of 60 non-relative foster homes licensed during the monitoring period and found that MDCPS licensed non-relative homes consistent with both the requirements of the approved licensure process and agency licensure standards.

The Department agreed to license relative homes within 90 days of a child being placed in a home. The monitoring team was unable to validate the data MDCPS provided on the timeliness of licensing relative homes for 2019, as MDCPS did not include a necessary data file in the Department's fourth quarter submission.

*Unlicensed Placements (3.2.a.)*

MDCPS committed that no child will remain in a foster home or facility determined to be unable to meet licensure standards absent an order by a state court with jurisdiction over the child's custody directing the placement of the child into a specific unlicensed placement. MDCPS is not held accountable for a state court's order as long as MDCPS documents that it presented information to the court that the foster home has not met licensing standards, the reasons why the foster home has not and cannot meet licensing standards, and an explanation that a licensed foster home or facility is available, or one time only, an appropriate expedited relative placement.

MDCPS data shows that during the monitoring period 539 children were placed in court-ordered unlicensed homes and facilities. Sixty-four of those were placements of children in unlicensed shelters and 255 of those were placements of children in unlicensed detention/training schools. Two hundred and twenty children were placed in court-ordered unlicensed family-based placements during the period. MDCPS produced to the monitoring team court orders for 118 (53.6 percent) of the 220 children placed into unlicensed family-based placements during 2019. MDCPS did not consistently produce evidence that the court was advised whether or not it would be safe for a child to remain in a relative home when that home could not be licensed, including the reasons why the home could not be licensed and an explanation that a licensed placement was available.

Additionally, the monitoring team discovered five instances[24] where children were placed overnight in motels or hotels, which are unlicensed nonresidential facilities. The following examples were documented in case records:

- MDCPS placed a 17-year-old youth in a motel for a month and a half and utilized a rotating group of sitters from a sitter service to watch the youth. The Department conducted two separate maltreatment investigations regarding the child's stay at the motel, one while the child was still in the motel, and one subsequent to her removal. In the first investigation, it was alleged that the child had taken a beer from a man staying at the motel, that she had "found" $400 and split it with one of the sitters, and that she was sending inappropriate pictures of herself through social media. The Department removed the child's electronic device from her possession and found allegations of physical neglect to be unsubstantiated. While the investigation was ongoing, the Department removed the child from the motel and placed her in congregate care.

  In the second investigation, the child disclosed that while she was in the motel, she was taken to one of the sitter's homes at night whenever that sitter was on shift. The child reported that while in that home, she had sexual relations with the sitter's 47-year-old uncle "three to four times weekly" and that it was consensual. The Department substantiated allegations of physical neglect and sexual abuse, and the investigating worker noted that this report was forwarded to the local police department, but that law enforcement could not bring charges because 16 years is the age of consent in Mississippi. However, the investigating worker also noted that if an exchange occurred for sex, the age of consent is then 18 years of age. It appears the Department did not follow up on this.

---

[24] Of the five hotel stays, placement lines in MACWIS were labeled: "Own Home – Other Caretaker" (2); "Own Home – Other" (1); "Runaway" (1) ; and one placement line named the actual hotel.

- MDCPS conducted a maltreatment investigation regarding a sitter who was alleged to have left an 18-year-old youth alone while staying at a hotel. The youth invited several minors to her hotel room with whom she had sexual relations. The Department substantiated the allegations.

- The Department removed a 14-year-old youth from an emergency shelter after he was involved in a fight with another resident. The child was arrested and sent to a juvenile detention center for four days. Subsequently, the Department placed the child in a hotel due to "no placements being available." The youth's case record did not note whether a sitter was present during the child's six day stay at the hotel.

*Safety and Non-Safety Issues (3.2.b., 3.2.c.)*

When a child in the custody of MDCPS needs an out-of-home placement, potential relatives are always considered as the first placement resource. MDCPS policy states that "first priority for placement shall be given to a relative when it is suitable and appropriate to do so" and the Department committed to license all unlicensed relative homes with limited exceptions, as described below.

The assessment of a relative's home for potential placement begins when the child's caseworker initiates MDCPS' emergency placement process that includes a pre-placement safety assessment. The child's worker is responsible for walking through the entire home, both inside and outside, to ensure that safety issues do not exist or when safety issues are identified, they are remediated prior to a child's placement. MDCPS must also complete and assess the results of criminal, law enforcement, and child abuse registry background checks prior to approving the placement. After the initial safety process is completed and supervisory staff approve the child's placement, casework staff must make a referral to the regional licensure unit for continuation of the 90-day licensure process.

When MDCPS determines that an unlicensed foster home or facility is unable to meet MDCPS licensing standards due to a safety issue, MDCPS must take all reasonable efforts to immediately ensure the child's safety, including, when necessary, seeking an emergency court order to remove a child. If the child is not in imminent danger, MDCPS must implement a safety plan and within five calendar days, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only.

When MDCPS determines an unlicensed foster home cannot meet licensing standards due to a non-safety issue, the Department must, within 30 calendar days of that determination, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only.

The monitoring team conducted quality reviews of 200 expedited pending relative placements made during 2019. The monitoring team confirmed that MDCPS continued to utilize the licensure process approved by the monitor for relative homes. However, during the reviews, the monitoring team identified lapses by MDCPS in completing the initial background checks prior to the start of a child's placement. Specifically, the monitoring team found that a substantial number of background checks for the primary applicant were being completed after a child was placed in the home. The table below illustrates, of the 200 cases reviewed, the number and percentage of timely background checks.

**Table 7. Background Checks for Relative Home Studies, 2019**

| Background checks for Applicant #1 | Completed Prior to Placement | |
|---|---|---|
| | Count | Percent |
| MACWIS | 107 | 53.5% |
| Internet/Social Media | 105 | 52.5% |
| Local Police Department[25] | 58 | 29.0% |
| Sheriff[25] | 74 | 37.0% |
| Central Registry | 75 | 37.5% |
| Sex Offender | 98 | 49.0% |

Additionally, of the 200 cases reviewed, documentation of the initial home walk-through was missing for 12 placements (6.0 percent) and indicated the walk-through was completed late for 36 placements (18.0 percent).

For 2019, MDCPS submitted to the monitoring team two types of reports monthly: A Safety Issues Report and a Non-Safety Issues Report, both meant to document issues identified during the expedited pending relative initial safety check and home study process. However, the monitoring team found that MDCPS did not consistently utilize these reports to track and monitor resolution of safety and non-safety issues.

Rather, the monitoring team found that MDCPS documents safety and non-safety issues identified during the initial home walk-through and home study process and the resolution of those issues in the final home environment checklist and/or the written foster home study. Examples of safety issues identified by MDCPS are lack of fire extinguishers and carbon monoxide detectors. However, because MDCPS did not consistently utilize the Safety and Non-Safety report tracking system, the monitoring team is unable to evaluate if all those issues were remediated within the timeframes agreed to in the 2nd MSA.

---

[25] The licensing process approved by the monitor requires that either a local police department or sheriff check be completed prior to placement.

The monitoring team, in its expedited pending relative reviews, found additional safety concerns not identified by MDCPS regarding lack of appropriate sleeping arrangements, including safe sleep for young children; agency follow up with prescribing physicians for applicants taking medications for anxiety, depression, and pain; and relatives with lack of minimal household finances that calls into question their ability to care for a child in their home. Examples are:

- MDCPS staff appropriately had a relative applicant sign a Safe Sleep Education Acknowledgment. However, there was a picture in the home study packet of a newborn child sleeping in a crib with a blanket, something under his head, and bumpers. There was no documentation that this sleeping arrangement was discussed with the applicant and remediated.

- A relative applicant was prescribed 11 medications, including anti-anxiety and antidepressant medications according to the signed medical report. However, the written home study only listed five medications prescribed to the applicant. The licensed medical practitioner who completed the medical form wrote, "patient states she is stressed but controlled without complications." There was no further follow up documented in the home study.

- A relative's financial statement indicated that there was a $333.80 financial deficit each month. The applicant was disabled, unemployed, and received Social Security and Supplemental Security Income. The applicant's disability and financial situation were not discussed in the home study.

*Foster Home Development (3.3.)*

The 2nd MSA provides that MDCPS, in conjunction with the monitor, shall establish annual statewide and county performance targets for developing new foster homes. These targets are to be met during specific time periods as outlined below. For calendar year 2019, the Department conducted a foster home needs assessment to identify the number of available licensed foster homes and determine the number of licensed foster homes needed. The assessment was designed to inform MDCPS' efforts to build capacity over time so that safe and appropriate placement matches could be made. This includes ensuring that children are placed with siblings and in close proximity to their community. Utilizing segments of MDCPS' assessment analysis, as well as child custody data, licensure data, and foster home development and closure data, the monitor established the 2019 new foster home licensure target at 400 homes. The time periods for new home licensure were set at:

- 160 new homes licensed by June 30, 2019

- 285 new homes licensed by September 30, 2019

- 400 new homes by December 31, 2019

During the monitoring period, MDCPS provided to the monitoring team monthly new foster home licensure data. Through ongoing data verification and a sample review of new foster home records, the monitoring team confirmed that MDCPS licensed 472 new foster homes during 2019, exceeding the target of 400 new homes. MDCPS also met both of the interim targets, licensing 206 homes by June 30, 2019 and 331 homes by September 30, 2019.

In order to expand the pool of foster homes available for placement, MDCPS committed to recruit and retain additional licensed foster home placements and maintain the additional number of placements, as necessary during the applicability of the 2nd MSA (3.3.b.). Taking into consideration the new home target and historical foster home closure data, the monitoring team established a net gain target of 100 additional foster homes for 2019.

MDCPS licensed 472 new homes and the monitoring team verified that 310 homes closed during the monitoring period, resulting in a net gain of 162 foster homes. MDCPS surpassed the 2019 net gain target of 100 additional homes.

## 4. Placement Standards

*Foster Home Licensure Limits (4.1., 4.13.)*

MDCPS agreed that no foster home shall provide care for more than five children (including foster, birth, and adoptive children) at any given time, in accordance with the following:

- foster homes may provide care for more than three foster children, up to a total of five, only with the documented approval of MDCPS Office of Licensure determining that the foster children can be safely maintained in the foster home;

- no more than two children in the foster home may be under the age of two or have therapeutic needs, including the biological and/or adoptive children; and

- notwithstanding the above, a sibling group may be placed together in the same foster home in excess of these limits, but only if they are the only children in the home, and only upon written approval by the MDCPS Licensure Director determining that the foster children can be safely maintained in the home.

The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 70 percent for this commitment (4.13.a.), and by July 1, 2019, MDCPS agreed to meet an interim performance standard of 80 percent (4.13.b.). MDCPS provided data for this commitment, which was validated by the monitoring team. MDCPS' performance as of the last day of each month of 2019 is charted below.

**Table 8. Number of Foster Homes Meeting Licensure Limits, 2019[26]**

| Month | Number of foster homes with a child placed | Number of foster homes meeting licensure limits | Percent of foster homes meeting licensure limits |
|---|---|---|---|
| January | 2,068 | 1,927 | 93.2% |
| February | 2,063 | 1,927 | 93.4% |
| March | 2,034 | 1,903 | 93.6% |
| April | 2,031 | 1,897 | 93.4% |
| May | 1,984 | 1,849 | 93.2% |
| June | 1,936 | 1,808 | 93.4% |
| July | 1,908 | 1,776 | 93.1% |
| August | 1,889 | 1,769 | 93.6% |
| September | 1,874 | 1,755 | 93.6% |
| October | 1,882 | 1,758 | 93.4% |
| November | 1,854 | 1,735 | 93.6% |
| December | 1,828 | 1,705 | 93.3% |

The monitoring team conducted a qualitative review of this commitment, through in-person interviews in Mississippi, with a randomly selected group of licensure specialists and discussed a total of 77 homes for which the workers were responsible. All 77 homes met the terms of this commitment.

*Children with Special Needs Placed with Resources Meeting Those Needs (4.2., 4.14.)*

The 2nd MSA states that children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs. MDCPS is to ensure that each county office has access to resource workers within its region who have the ability to ascertain the placement resources available and their suitability for each child who needs placement.

Mississippi Code 43-27-101(f) defines a special needs child as:

> "A child with a variety of handicapping conditions or disabilities, including emotional or severely emotional disorders. These conditions or disabilities present the need for special medical attention, supervision and therapy on a regimented basis."

---

[26] Homes listed in the data as "sub-resources" were included in this calculation but counted as noncompliant as MDCPS cannot report on the number of biological and adoptive children in these homes. The number of these homes at the end of each month ranged from 95 to 116. Additionally, there were a small number of children listed as being placed in "umbrella agencies" or "residential facilities" for whom MDCPS could not report on the specific home they were placed in. These children were excluded from the calculations. The number of these children at the end of each month ranged from 38 to 45.

Children with special needs qualify for three levels of increased foster care board rates determined by the child's needs.

**Table 9. Special Needs Board Rates**

| Level | Definition | Current Board Rate |
|---|---|---|
| Special Needs I | A foster child qualifies for the Special Needs I board payment rate if the child has a mental health or medical diagnosis and applied for SSI and the application is pending or has been denied. | $838.60 |
| Special Needs II | A foster child qualifies for the Special Needs II board payment rate if the child receives SSI. A copy of the SSI letter that states the child is approved must be submitted to Eligibility. | $901.30 |
| Therapeutic | A foster child qualifies for a Therapeutic board payment rate if the child has a DSM-IV Axis I diagnosis. | $1,293.70 - $5,170.00[27] |

The parties agreed by July 1, 2018, 60 percent of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs (4.14.a.). MDCPS evaluated performance for this commitment through the FCR. The Department reviewed a total of 2,979 cases and reported 2,872 (96.4 percent) met the terms of this commitment during the first half of 2019. The monitoring team reviewed a randomly selected sample of placements for 136 children with an identified Special Needs I, Special Needs II, or Therapeutic board rate during the period to assess whether children with special needs were matched with placement resources that met their therapeutic and medical needs. The monitoring team found that 132 (97.1 percent) of the placements met the child's individual, special, therapeutic, and medical needs.

The parties agreed by July 1, 2019, 75 percent of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs (4.14.b.). During the second half of 2019, MDCPS reviewed a total of 4,475 cases through the FCR and reported 4,390 (98.1 percent) met the terms of this commitment. The monitoring team reviewed a randomly selected sample of placements for 71 children with an identified Special Needs I, Special Needs II, or Therapeutic board rate during the period to assess whether children with special needs were matched with placement resources that met their therapeutic and medical needs. The monitoring team found that 69 (97.1 percent) of the placements met the child's individual, special, therapeutic, and medical needs.

---

[27] Rate varies depending on whether the placement setting is a related therapeutic placement, a therapeutic resource home, or a therapeutic group home.

*Children Placed in Least Restrictive Setting (4.3., 4.15.)*

MDCPS committed that each foster child shall be placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment, and prior placement information available at the time of placement. In order of consideration this means placement with relatives, foster home care within reasonable proximity to the child's home community, foster home care outside of the child's home community, group home care, or institutional care. The parties agreed to a 95 percent performance standard for this commitment.

MDCPS evaluated this commitment through the FCR. The Department reviewed a total of 7,454 cases in 2019 and determined that 7,366 (98.8 percent) of cases reviewed met the terms of this commitment. Additionally, data provided by MDCPS indicate that as of December 31, 2019, 3,746 of the 4,235 children in custody were placed in family-based settings, the least restrictive placement type. The monitoring team undertook validation of a randomly selected sample of case narratives and residential services applications for 100 children placed in congregate care programs which are more restrictive placement settings. The monitoring team determined 96 (96.0 percent) of those placements were made appropriately in order to meet the individual child's identified needs.

*Children Placed Within Proximity to Home (4.4., 4.18.)*

MDCPS agreed to ensure that each child who enters placement shall be placed within his/her own county or within 50 miles of the home from which he/she was removed, unless:

- the child's needs are so exceptional that they cannot be met by a family or facility within his/her own county or within 50 miles of the home from which he/she was removed;

- the child is placed through the Interstate Compact on the Placement of Children (ICPC) consistent with its terms;

- the child is appropriately placed with relatives;

- the child, age 14 years or older, is pursuing educational or vocational opportunities;

- the child is ordered to be placed in a child-specific foster care setting by a court; or

- the child is placed in an adoptive home.

The parties agreed to a 90 percent performance standard for this commitment. The monitoring team confirmed that there were 10,495 placements made in 2019. Of these placements, data provided by MDCPS indicate that 10,087 (96.1 percent) met the proximity terms of the 2nd MSA. This includes placements made within 50 miles from the child's home of removal (7,968) and placements that exceeded 50 miles but had an approved exception consistent with the commitment (2,119). The monitoring team reviewed a sample of 204 exceptions MDCPS

reported were consistent with the terms of this commitment and found that 193 (94.6 percent) contained sufficient documentation to support the exception decision.

*Placing Siblings Together (4.6., 4.16.)*

The 2nd MSA requires MDCPS to place siblings together when they enter placement at or near the same time. Exceptions can be made if placing the siblings together would be harmful to one or more of the siblings, one of the siblings has exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts must be documented and maintained in the case file. The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 60 percent for this commitment (4.16.a.), and by July 1, 2019, would meet an interim performance standard of 75 percent (4.16.b.).

The monitoring team is unable to validate the data MDCPS produced for this commitment. The sibling-related files MDCPS provided for each quarter appear to have been created using the same method used in 2018, which the monitoring team identified then as problematic. For example, the monitoring team identified many instances in which MDCPS identified siblings placed together despite the siblings' placement histories showing they were never in the same placement.

*Placement Disruptions (4.7., 4.17.)*

MDCPS committed to take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. If there is a documented indication that a placement may disrupt, the caseworker shall immediately take steps to determine the following:

- the cause of the potential disruption;

- whether the placement is appropriate for the child;

- whether additional services are necessary to support the placement;

- whether the child needs another placement; and

- if another placement is necessary, what that placement should be.

The efforts made by MDCPS to avoid disruption and to ensure placement stability are required to be documented in the child's case record. The parties agreed that by July 1, 2018, 60 percent of children in MDCPS' custody with a documented indication that they were subject to a potential

or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability consistent with 2nd MSA requirements (4.17.a.). MDCPS reported 317 (63.5 percent) of 499 cases met the terms of this commitment during the period based on children reviewed through the FCR. MDCPS committed to an interim performance standard of 75 percent by July 1, 2019 (4.17.b.). MDCPS reported 584 (71.8 percent) of 813 cases met the terms of this commitment during the period based on children reviewed through the FCR.

The Department identified FCR reviewer errors that included counting placement moves that were not disruptions as disruptions and found instances where the reviewer answered a relevant FCR question incorrectly. MDCPS indicated the agency will work to develop staff performance in order to accurately report the Department's performance moving forward. As such, the monitoring team was unable to validate MDCPS' performance for 2019.

*Overnight Stays in an Office or Other Nonresidential Facility (4.8.)*

MDCPS agreed to ensure that no child shall remain overnight in an MDCPS office or other nonresidential facility that provides intake functions. MDCPS reported that there were no instances in which this occurred during calendar year 2019. The monitoring team interviewed 71 randomly selected caseworkers and supervisors, and all reported that they had not seen or been made aware of any child sleeping overnight in an MDCPS office during 2019. After reviewing thousands of cases throughout the year, the monitoring team did not discover an instance of a child staying overnight in an MDCPS office.

*Young Children Placed in Congregate Care Facilities (4.9.)*

MDCPS committed that no child under 10 years of age shall be placed in a congregate care setting, including group homes and shelters. Exceptions can be made if:

- the child has exceptional needs that cannot be met in a licensed foster home;

- in order to keep a sibling group together for a temporary period, not to exceed 15 days, and the Regional Director has granted documented approval for the congregate care placement; or

- to enable a mother and baby to be placed together and there is not an available foster home for both of them.

MDCPS reported 145 placements of children under age 10 into a congregate care setting during calendar year 2019. The monitoring team determined there were 155 placements[28] involving 118

---

[28] MDCPS included 13 placements (11 children) in hospitals that were not subject to this commitment. In addition, for the first half of 2019, the Department excluded residential treatment placements.

children under age 10 in a congregate care setting during the year. Of the 155 placements between January 1, 2019 and December 31, 2019, the monitoring team found that 107 (69.0 percent) had adequate approval[29] and an allowable exception documented.

*Placement Moves (4.10., 4.12.)*

No child is to be moved from his/her existing placement to another placement unless MDCPS specifically documents in the child's case record justifications for that move and an MDCPS supervisor approves the move. The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 70 percent for this commitment (4.12.a.). MDCPS evaluated performance for this commitment through the FCR. MDCPS reviewed a total of 781 cases and reported 691 (88.5 percent) met the terms of this commitment during the first half of 2019. The monitoring team reviewed a randomly selected sample of case narratives and approvals for 140 children who experienced at least one placement move during the period. The team found that 85 (60.7 percent) of the cases had a documented placement change reason and were approved by a supervisor.[30]

By July 1, 2019, the parties agreed that MDCPS would meet an interim performance standard of 80 percent for this commitment (4.12.b.). MDCPS reviewed a total of 1,446 cases through the FCR and reported 1,292 (89.3 percent) met the terms of this commitment during the second half of 2019. The monitoring team reviewed a randomly selected sample of case narratives and approvals for 114 children who experienced at least one placement move during the period. The team found that 73 (64.0 percent) of the cases had a documented placement change reason and were approved by a supervisor.[30] Additionally, placement change reasons were often coded as "other" when another reason, such as "placement with a relative" or "trial home placement," would have been more applicable.

*Multiple Emergency Placements (4.11.)*

MDCPS agreed to ensure that no child is placed in more than one emergency or temporary facility within one episode of foster care. Exceptions can be made if an immediate placement move is necessary to protect the safety of the child or of others with documented approval from the Regional Director.

Data provided by MDCPS indicate that 56 children experienced multiple stays in shelter care during 2019. MDCPS reported that 35 of the 56 (62.5 percent) children who experienced multiple

---

[29] If the documented reason is for a sibling group, then the placement must be for 15 or fewer days and be approved by an RD. For monitoring purposes, the RD approval must be documented within ten days of placement in order to be considered properly approved.

[30] For monitoring purposes, the supervisory approval must be documented within seven days of placement in order to be considered properly approved.

emergency shelter placements during 2019 met the terms of this commitment. Cases were counted as meeting the requirements if there was an exception approved by the Regional Director indicating that each successive shelter placement was necessary to protect the safety of the child or of others.[31]

The monitoring team reviewed case records for all 56 children placed in an emergency shelter multiple times during the reporting period. Case records for only eight (14.2 percent) of the children contained information supporting the determination that each successive placement was necessary to protect the safety of the child or of others.

## 5. Visitation

### Worker Contact and Monitoring

*Caseworker Contact with Foster Children (5.1.a.)*

The 2nd MSA requires that MDCPS shall meet with the child in person at least twice monthly to assess the child's safety and well-being, service delivery, and achievement of permanency and other service goals. At least one visit per month shall take place in the child's placement. The parties agreed that by January 1, 2019, MDCPS would meet a performance standard of 90 percent for this commitment.

MDCPS reported on this commitment through the FCR and determined that 5,982 (80.3 percent) of 7,454 cases reviewed met the 2nd MSA standards. The monitoring team conducted a qualitative review of visitation case narratives for 136 randomly selected children who were in the custody of MDCPS during the second half of the year and subject to this commitment. The visitation narratives were reviewed to determine if the 2nd MSA requirements to assess safety, well-being, services, permanency, and other service goals were documented. There were 816 worker-child contacts required, of which 474 (58.0 percent) occurred during the period under review. Three hundred and sixty (44.1 percent) of the contacts met the quality standards of the 2nd MSA.

Overall, the monitoring team found that narratives lacked detail about visitation, and at times, any information at all. There were cases where the caseworker documented that the "worker didn't observe marks or bruises on the child" and caseworkers made observations without engaging with the age-appropriate child. There were other cases where the caseworker transported the child to an appointment but did not engage the child, so there was no evidence

---

[31] Emergency placements should be approved by an RD. For monitoring purposes, the RD approval must be documented within ten days of placement in order to be considered adequately approved.

of safety assessment or active planning. Caseworkers listed the child's permanency goal in the case narrative without discussing what MDCPS was doing to achieve the child's permanency goal.

*Caseworker Contact with Children on Trial Home Visits (5.1.b.)*

MDCPS committed that by January 1, 2019, at least 90 percent of foster children on a 90-day THV would be visited by an MDCPS caseworker in the home at least two times each month.

The monitoring team cannot validate the data MDCPS provided for this commitment. For this commitment and another commitment that involves THVs (6.3.a.5.), the monitoring team identified several problems in the data, including the manner in which MDCPS defined the population of children who were placed in THVs and incorrect identification of the prior placement change reason in some cases.

*Caseworker Contact with Parents (5.1.c.)*

MDCPS committed, by January 1, 2019, to meet at least monthly with the parents of no less than 90 percent of foster children with a goal of reunification to discuss progress on the Family Service Plan and the child's well-being. Exceptions include if the child's parent(s) reside out-of-state or are incarcerated.

MDCPS reported on this commitment through the FCR and determined that 2,476 (51.3 percent) of 4,827 cases reviewed met the terms of this commitment. The monitoring team conducted a qualitative review of visitation case narratives for a randomly selected sample of 101 children who were in the custody of MDCPS during the second half of 2019 and subject to this commitment. The monitoring team evaluated if the 2nd MSA requirements for MDCPS to assess progress on the Family Service Plan and the child's well-being were documented. There were 303 worker-parent contacts required, of which 96 (31.7 percent) occurred during the period under review. Seventy-five (24.7 percent) of the contacts met the quality standards of the 2nd MSA. There were narratives that lacked detail and did not address the Family Service Plan or the child's well-being.

*Caseworker Contact with Foster Parents (5.1.d.)*

MDCPS committed that, by January 1, 2019, at least 90 percent of foster parents with at least one foster child in the home must be visited by MDCPS monthly in the home.

MDCPS reported on this commitment through the FCR and determined that 5,246 (71.0 percent) of 7,387 cases reviewed were compliant. The monitoring team conducted a qualitative review of visitation case narratives for 117 randomly selected foster parents with at least one foster child in the home during the second half of the year. The visitation narratives were reviewed to assess the child's safety and well-being in the placement and ensure appropriate services are provided.

There were 351 worker-foster parent contacts required, of which 222 (63.2 percent) occurred during the period under review. One hundred and eighty-nine (53.8 percent) of the contacts met the quality standards of the 2nd MSA.

Overall, the monitoring team found that narratives lacked detail about visitation, and at times, any information at all. There were cases where the caseworker never discussed the child's or foster parent's needs. In one case, a foster parent voiced concerns about the foster child's behavior; however, there was no evidence MDCPS conducted a safety assessment or active planning to address the concern.

## Developing and Maintaining Connections

*Child-Parent Contacts within 72 Hours of Placement (5.2.a.)*

The 2nd MSA requires MDCPS to arrange contact for the foster child with his/her parents and with any siblings not in the same placement within 72 hours of foster care placement unless there are documented reasons why contact should not occur. If MDCPS cannot arrange a visit within 72 hours, a telephone call to parents, siblings, or extended family members must be provided to the child.

MDCPS completed a review of children relevant to this commitment in 2019 as part of the FCR. The Department reviewed 1,444 cases and reported 820 (56.8 percent) met the terms of this commitment. In some instances, the Department reviewers recorded inaccurate dates, answered questions incorrectly, and asserted compliance due to "maintaining family connections" when the child was placed with a relative instead of visiting with parents as is required by this commitment.

The monitoring team reviewed the case narratives for 270 children who entered custody in 2019. The team found 21 (7.7 percent) children had a documented reason why a visit should not occur. Of the remaining 249 children reviewed, the team found 57 (22.9 percent) children had a visit with their parent within 72 hours of their removal. In the absence of a 72-hour visit there was no documentation of phone calls between parents and children found in case narratives for the remainder of the 192 children.

The monitoring team reviewed 81 children who had at least one sibling in a separate placement and 15 (18.5 percent) had a visit with their sibling(s) within 72 hours of their removal. In the absence of a 72-hour visit there was no documentation of telephone contact between siblings found in case narratives for the remaining 66 children.

*Family Visitation Plan and Parent Contacts (5.2.b., 5.2.b.1., 5.2.b.1.a.)*

For children entering foster care, a visitation plan for the child and his/her family shall be developed as part of the Family Service Plan. The visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child (5.2.b.).

MDCPS reported on this commitment through the FCR and determined that 2,909 (54.6 percent) of 5,331 cases reviewed met the terms of this commitment. The monitoring team reviewed visitation plans for 272 children who were removed from their parent(s) in the first half of 2019 and were subject to this commitment. There was a visitation plan for the child and his/her family developed as part of the Family Service Plan for 258 (94.9 percent) of the children. The plan was developed in collaboration with the parents in 180 (66.2 percent) of the cases. The foster parents were part of the development in 70 (25.7 percent) of the cases. The plan was developed with both the parents and the foster parents in 68 (25.0 percent) of the cases. In 76 (27.9 percent) of the cases, there was no indication that any person, other than MDCPS staff, was involved in the development of the visitation plan.

If parental visitation is appropriate, this visitation plan shall include a minimum of two visits each month with the parents, unless the court order in the child's case limits such visits or unless it is documented that a parent failed to make himself or herself available for visits (5.2.b.1.).

MDCPS reported on this commitment through the FCR and determined that 2,687 (77.1 percent) of 3,486 cases reviewed met the terms of this commitment. The monitoring team reviewed visitation plans for 136 children and found 101 (74.3 percent) included a minimum of two visits each month with the parents. The Family Service Plan or court order limited such visits in four cases (2.9 percent).

The 2nd MSA requires that by January 1, 2019, 90 percent of children shall be provided with contacts with their parents (5.2.b.1.a.). MDCPS did not submit quantitative data or conduct a qualitative review of parent-child visitation during 2019. Therefore, the monitoring team is unable to assess MDCPS' performance.

*Sibling Contacts (5.2.b.2., 5.2.b.2.a., 5.2.b.3., 5.2.b.4.)*

MDCPS committed that a child's visitation plan, regardless of permanency goal, shall include at least monthly visits with any siblings not in the same placement (5.2.b.2.).

MDCPS reported on this commitment through the FCR and determined that of 2,366 cases reviewed, 925 (39.1 percent) met the terms of this commitment. The monitoring team reviewed visitation plans for 132 children who were in the custody of MDCPS during the second half of 2019 and subject to this commitment. There were visitation plans for the child and his/her siblings developed as part of the Family Service Plan for 89 (67.4 percent) of the children.

MDCPS committed, by January 1, 2019, 80 percent of children shall be provided with contact with any siblings in custody not in the same placement consistent with 2nd MSA requirements (5.2.b.2.a.). Requirements include that all reasonable efforts shall be made to facilitate twice monthly in-person visits for children six years of age and younger, while all other children shall have at least monthly visits among separated siblings. Additionally, siblings shall have interim contact by alternative means such as email, texts, telephone calls, Facetime, and/or Skype (5.2.b.3.). Exceptions to the sibling visitation requirement are:

- the child or sibling is placed out-of-state pursuant to ICPC;

- the visit may be harmful to one or more of the siblings as determined by the court or documented in the record why the visit would be harmful to one or more of the children; or

- one of the siblings is above the age of 14 and refuses such visits and the reason for such refusal is documented in the case record (5.2.b.4.).

MDCPS did not submit quantitative data or conduct a qualitative review of sibling visitation during 2019. Therefore, the monitoring team is unable to assess MDCPS' performance.

*Cancellation of Visits (5.2.c.)*

The 2nd MSA requires MDCPS and its contracting agencies to implement a policy that prohibits cancellation of visits as a form of discipline against children. MDCPS reported that the agency continues to abide by a policy established in November 2017 that prohibits the cancellation of visits as a form of discipline for children in custody. MDCPS also includes this requirement in the scope of services for provider contracts. MDCPS reported that there were no instances of the policy being violated in calendar year 2019. In addition, the monitoring team reviewed thousands of case records in preparation of this report and did not learn through the reviews of any instance of cancellation of visits as a form of punishment occurring in 2019. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

# 6. Child and Youth Permanency

## Comprehensive Family Service Plans

*Comprehensive Family Service Plans (6.1.a.)*

The 2nd MSA requires that a comprehensive Family Service Plan (FSP) that addresses the strengths, needs, and services required for both the child and their parent(s) shall be completed within 45 days of a child's entry into foster care. In developing the FSP, the MDCPS caseworker

must consult with the child, the child's parents, and the foster care provider. MDCPS committed that by January 1, 2019 at least 90 percent of FSPs will be submitted by the caseworker consistent with 2nd MSA requirements, within 30 calendar days of a child's entry into custody and approved by the supervisor within 15 calendar days. The FSP shall be considered complete upon documented supervisory review and approval.

Data provided by MDCPS indicate there were 2,223 children who entered custody between January 1, 2019 and December 31, 2019 whose 45th day in custody fell during the year. Of the 2,223 FSPs due during the period, 1,313 (59.1 percent) were completed within 30 days of a child's entry into foster care and 2,090 (94.0 percent) were approved within 15 days. A total of 1,676 (75.4 percent) of the 2,223 FSPs due during the period were submitted and approved within 45 days.

MDCPS also reported qualitatively on this commitment through the FCR. The Department reviewed 1,460 cases and reported 643 (44.0 percent) met the terms of this commitment. The monitoring team reviewed a randomly selected sample of 134 initial FSPs completed during the period to assess whether the plans were developed in accordance with 2nd MSA requirements. The monitoring team found that 65 (48.5 percent) of the FSPs in the sample were  developed in consultation with the child's parents or the foster care provider. Only 11 of the plans reflected consultation with an age-appropriate child during development of the initial FSP. There is no indication any person was involved, other than MDCPS staff, in the development of 66 (49.3 percent) of the plans. As such, strengths, needs, and services for parents and children could not be evaluated in these instances.

*Parents' Inclusion in Service Planning (6.1.b.)*

The 2nd MSA provides that in instances in which it is impossible to meet with one or both parents, the service planning process will proceed as described above, notwithstanding the parent's absence.

MDCPS did not submit quantitative data or conduct a qualitative review of this commitment during 2019. Therefore, the monitoring team is unable to assess MDCPS' performance.

*Diligent Search for Parents (6.1.c.)*

MDCPS committed that in those cases in which the whereabouts of one or both parents are unknown, MDCPS shall, within 30 days, institute a diligent search for the parent(s) and document the search in the child's case record. MDCPS committed to a performance standard of 90 percent by January 1, 2019.

MDCPS reported on this commitment through the FCR and determined that 324 (21.1 percent) of 1,535 cases reviewed met the terms of this commitment. The FCR findings provided by the Department included multiple cases where MDCPS subsequently indicated "no diligent searches were completed" because the whereabouts of the parent(s) was (were) known despite the initial reviewer noting that the whereabouts of the parent(s) was (were) unknown. MDCPS indicated the agency will work to develop staff performance in order to accurately report the Department's performance moving forward. As such, the monitoring team was unable to validate MDCPS' performance for 2019.

*Permanency Plans (6.1.d.)*

The 2nd MSA requires that within 45 days of a child's initial placement into foster care, MDCPS shall complete a permanency plan that specifies the child's permanency goal, a timeframe for achieving permanency, and activities that support permanency. MDCPS committed that by January 1, 2019 for at least 90 percent of children who enter custody, permanency plans will be submitted within 30 calendar days of a child's entry into custody by the caseworker consistent with 2nd MSA requirements and approved by the supervisor within 15 calendar days. The permanency plan shall be considered complete upon documented supervisory review and approval.

The monitoring team validated there were 2,223 children who entered custody between January 1, 2019 and December 31, 2019 whose 45th day in custody fell during the period. Of the 2,223 permanency plans due during the period, 1,249 (56.2 percent) were completed within 30 days of a child's entry into foster care and 2,107 (94.8 percent) were approved within 15 days. A total of 1,670 (75.1 percent) of the 2,223 permanency plans due during the period were submitted and approved within 45 days.

MDCPS also reported qualitatively on this commitment through the FCR. The Department reviewed 1,460 cases and reported 1,146 (78.5 percent) met the terms of this commitment. The monitoring team reviewed a randomly selected sample of 134 initial FSPs completed during the period to assess whether the FSPs were developed in accordance with the 2nd MSA requirements, inclusive of a permanency plan. The monitoring team found that 130 (97.0 percent) of the FSPs in the sample contained a permanency plan that stated the child's permanency goal, as required. Of the 130 FSPs containing a permanency plan with a stated goal, 128 (98.5 percent) plans included a timeframe for achieving permanency. Of the 134 FSPs reviewed, 89 (66.4 percent) indicated activities that support permanency. A total of 87 (64.9 percent) of the initial FSPs contained a permanency plan that stated the child's permanency goal, a timeframe for achieving permanency, and activities that support permanency.

## Concurrent Permanency Planning

*Concurrent Permanency Planning (6.2.a.)*

MDCPS agreed within the first six months of a child's entry into care, to begin to engage in concurrent permanency planning. MDCPS committed that at least 95 percent of children in custody with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements.

The monitoring team analyzed data provided by MDCPS and determined there were 1,753 children subject to this commitment during the period. Of these 1,753 children with a permanency plan of reunification, 1,752 (99.9 percent) had a concurrent plan assigned at six months. MDCPS reported on the qualitative component of this commitment through the FCR and determined that 2,083 (56.3 percent) of 3,702 cases reviewed had case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements.

The monitoring team reviewed FSPs completed during the period for a randomly selected sample of 173 children with a goal of reunification to assess whether the plans included any documentation of a concurrent permanency goal or active concurrent permanency planning. The monitoring team found that all 173 (100.0 percent) of the FSPs in the sample included documentation of a concurrent permanency planning goal, of which 136 (78.6 percent) contained evidence of active concurrent permanency planning.

## Reunification and Trial Home Visitation

*Reunification (6.3.a.1.)*

The 2nd MSA requires when a child's permanency goal is reunification that MDCPS identify in the FSP and make available, directly or through referral, those services MDCPS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child. Caseworkers must monitor the provision of services through visits and updating of service plans. MDCPS committed to a performance standard of 90 percent by January 1, 2019.

MDCPS combined data reporting for 6.3.a.1., 6.3.a.2., and 6.3.a.3. in the FCR; however, the FCR question only pertained to 6.3.a.2. MDCPS did not report performance specific to the requirements of 6.3.a.1 for 2019. Therefore, the monitoring team is unable to assess MDCPS' performance. MDCPS has enhanced reporting for the 2020 CQI plan to include a question to assess this commitment.

*Caseworker Contact with Parents (6.3.a.2.)*

For a child with a permanency goal of reunification, MDCPS committed to have the child's caseworker meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances. See Section 5.1.c. for this analysis.

*Reunification Supports for Parents (6.3.a.3.)*

MDCPS committed in the 2nd MSA to document in the case record of children with a permanency goal of reunification, opportunities provided to their parents in support of reunification.

MDCPS combined data reporting for 6.3.a.1., 6.3.a.2., and 6.3.a.3. in the FCR; however, the FCR question only pertained to 6.3.a.3. MDCPS did not report performance specific to the requirements of 6.3.a.1 for 2019. Therefore, the monitoring team is unable to assess MDCPS' performance. MDCPS has enhanced reporting for the 2020 CQI plan to include a question to assess this commitment.

*After-Care Plans (6.3.a.4.)*

The 2nd MSA requires that when a recommendation is made to reunify a child with his or her family, MDCPS must develop an after-care plan that identifies services necessary to ensure that the conditions leading to the child's placement have been addressed, and that the child's safety and stability can be assured. MDCPS is also required to take reasonable steps to provide or facilitate access to services necessary to support the child during the trial home visit (THV).

MDCPS reported on this commitment through the FCR and determined that 375 (52.3 percent) of 717 cases reviewed met the terms of this commitment. The monitoring team reviewed the case records of 62 children whose parent(s) had full custody restored in 2019 to determine if the children had after-care plans consistent with the 2nd MSA. Thirty-three of the children (53.2 percent) had an after-care plan developed with the family. Twenty (32.3 percent) of the after-care plans identified and documented reasonable efforts to provide or facilitate access to services necessary to ensure the child's safety and stability during the THV, and that the conditions leading to the child's placement had been addressed.

*Trial Home Visits (6.3.a.5.)*

The 2nd MSA provides that for each child who has a permanency goal of reunification and who is in fact returned home for the purpose of reunification, MDCPS will provide that child with a 90-day THV if the child has been in custody for at least 90 days, subject to the approval of the Youth Court.

73

MDCPS committed that by January 1, 2019, at least 90 percent of foster children who are reunified and who were in custody longer than 90 days would receive a 90-day THV period or have case record documentation reflecting the Youth Court's objection to such a THV. During the THV, MDCPS must provide or facilitate access to the services in the child's after-care plan, consistent with the 2nd MSA requirements.

MDCPS' count of children with a THV was not limited to children who had a goal of reunification and was not limited to THVs that lasted 90 days or more. Likewise, MDCPS' count of children with a THV with Youth Court approval was not limited to children with a goal of reunification who had a THV that lasted 90 days or longer.

Although MDCPS' data for this commitment cannot be validated, the monitoring team conducted a review of child safety and stability on THVs, which is detailed below.

*Monitoring Team Review of Child Safety and Stability on Trial Home Visits (5.1.b., 6.3.a.4., 6.3.a.6.)*

In order to assess that the child's safety and stability was assured during the THV, as required under Sections 5.1.b. and 6.3.a.4., the monitoring team reviewed caseworker visitation and maltreatment investigations during THVs in 2019.

The monitoring team reviewed the case records of 62 children who had a THV and were reunified with their parents in 2019 to determine if the children had monthly visits with a worker while on a THV, consistent with the 2nd MSA. Thirty (48.4 percent) of the case records had documentation of two visits with a worker in the home each month during which the child's safety and well-being, service delivery, and achievement of permanency and other service goals were assessed.

The monitoring team also reviewed ANE investigations into alleged maltreatment of children during their THVs. MDCPS conducted 66 investigations into allegations of abuse or neglect of children during their THVs. Sixteen of these investigations, involving 32 child victims, were substantiated for abuse, neglect, or exploitation by the parent or caregiver. The maltreatment of these 32 children during a THV is in addition to the 87 children who were determined to be maltreated in care under the CFSR Round 2 definition discussed in Section 2.9. Examples of substantiated and unsubstantiated MIC investigations conducted during children's placements in THVs include:

- A six-year-old child was on a THV with his primary caregiver for seven months. There were two other children, ages two and three, in the home who were not in MDCPS' custody. Allegations were made that the caregiver was using drugs, and that she was unable to meet the basic needs of the children. During the investigation, the children reported sleeping in various homes with unknown adults. School records confirmed that the 6-

year-old was frequently absent or tardy. Interviews with the landlord, school, and daycare staff indicated that the children were frequently dirty, did not have adequate clothing, and they were left in the care of various individuals, who often appeared to be under the influence. The caregiver tested positive for methamphetamines. Physical neglect was substantiated and the 6-year-old was placed back into a relative foster home. The CPS investigator noted concerns that the primary caregiver had not been receiving recommended services relative to substance abuse and domestic violence during the THV period.

- A 17-year-old on a THV was observed with red marks and scratches on her neck, that she reported were the result of being choked by her mother. There was violence in the household, the mother and teenagers often became physically aggressive when angry. The youth's 15-year-old sister had threatened to kill everyone in the home and to beat the younger children, ages ten and one. When the 15-year-old got into a fight with one of her sisters, her mother held her down by her neck, choking her. The mother was substantiated for physical abuse of the two teenagers. The 17-year-old remained in the home with services provided and the 15-year-old was placed in a residential placement for one week before returning home.

- An eight-year-old had been on a THV with his mother for six months. There were three other children in the home, ages ten, six, and five, who were not in MDCPS' custody. Allegations were made that the mother was using drugs and was not providing adequate care for her children. The CPS investigator identified multiple, very serious concerns in the home. These included that the children did not have safe sleep spaces, the home was cluttered with hazardous materials, and the home was infested by insects. The home was described as "deplorable" and "unlivable" by investigators. The children had unmet medical and hygiene needs – including the eight-year-old who had a buildup of wax in his ear obstructing the ear drum. Two of the children not in custody had abnormally high levels of lead in their bloodstream. Additionally, two of the children were exposed to pornography by an adult male. Physical neglect by the mother was substantiated, and the eight-year-old was returned to a relative foster home. The other three children were also taken into MDCPS' custody. The child's caseworker had documented a visit in the home nine days before the referral and did not note any concerns.

- Two children, ages two and four, had been on a THV with their mother for two months. Law Enforcement was called to the home for a domestic violence incident. The stepfather had a knife and attacked the mother who had cuts on her arms and legs. The mother broke the windshield of the family car and cut all four tires. She has an extensive history of mental health challenges but was not taking medication. The investigator described the home as being in "deplorable" condition. In addition, there were small objects

covering the floor that could present a choking hazard for the young children. Physical neglect was substantiated and the children were placed back into a relative foster home.

- Three-year-old autistic twins and their two-year-old sibling had been on a THV with their mother for three months. Allegations were made that a driver almost ran over one of the twins who was standing in the middle of a highway. The mother and two other adults came running out when they heard the commotion. Physical neglect was unsubstantiated. However, in a separate incident during this MIC investigation, the two-year-old was hit by a car, prompting the removal of the children from their mother's care.

- Two children, ages two and four, had been on a THV with their father for three months. The father also cared for two children of his girlfriend, ages two and six, who resided in the home. The children were playing with a lighter and set fire to a pair of underwear on bedding which then caught fire while the father was in his bedroom. The six-year-old child of the girlfriend had bruising on his arms with no explanation. The father had left the children unsupervised on several occasions (including leaving them in the middle of night). He had an extensive history of drug usage including cocaine, methamphetamines, and marijuana. MDCPS reported the father's first drug test during the investigation appeared questionable, but the investigation was closed and allegations unsubstantiated prior to obtaining the results of the second drug test.

Additionally, the monitoring team reviewed case records for 62 children who completed THVs and were discharged from custody to determine if MDCPS convened a meeting with the child's parents and the child to determine the appropriateness of a final discharge. Forty-three children's case records (69.4 percent) had documentation of a final parental discharge meeting with the child's parent(s), while 19 children's case records (30.6 percent) lacked documentation that MDCPS had a final discharge meeting. Eleven children's records had documentation of a discharge meeting with age appropriate children. The monitoring team determined that nine children were too young or not developmentally appropriate for discussion. Fifty-two records (83.9 percent) had documentation that the appropriate application was made to the Youth Court for relief of custody. Ten records (16.1 percent) lacked documentation that MDCPS made the appropriate Youth Court relief of custody application.

If final discharge is determined to be appropriate, MDCPS is required to make the appropriate application to the Youth Court to be relieved of custody. The monitoring team's review found that there was documentation that MDCPS met with all appropriate parties and made an

appropriate application to the Youth Court to be relieved of custody in 34 (54.8 percent) case records.

*Final Discharge Meeting (6.3.a.6.)*

The 2nd MSA requires that before the end of any THV period, MDCPS will meet with the child's parents and the child to determine the appropriateness of final discharge. If final discharge is determined to be appropriate, MDCPS shall make the appropriate application to the Youth Court to be relieved of custody.

MDCPS did not submit quantitative data or conduct a qualitative review of final discharge meetings during 2019. Therefore, the monitoring team is unable to assess MDCPS' performance.

## Other Permanency Case Goals

*Adoption (6.3.b.1.)*

The 2nd MSA requires that by January 1, 2019, at least 90 percent of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that MDCPS will undertake to achieve adoption.

Relative to the adoption specialist, the monitoring team confirmed that 2,477 (96.0 percent) of 2,580 children with a permanency goal of adoption had an adoption worker assigned.

MDCPS completed a qualitative review of 1,077 children with a permanency goal of adoption. The Department reported that adoption plans for 1,027 children (95.4 percent) were of good quality. The monitoring team reviewed a randomly selected sample of 271 children from MDCPS' CQI review. All but one (99.6 percent) of the children's case records had an adoption worker assigned. All the cases had an adoption plan and 217 (80.1 percent) of the cases identified the child-specific activities that MDPS will undertake to achieve adoption and timeframes in which the activities will be undertaken.

*Termination of Parental Rights (6.3.b.2., 6.3.b.3.)*

MDCPS must make a termination of parental rights (TPR) referral before a child has spent more than 17 of the last 22 months in foster care unless an available exception pursuant to the federal Adoption and Safe Families Act ("ASFA") has been documented by MDCPS in the child's case record. Subsequent to the initial ASFA exception, MDCPS may continue the exception for only one additional six-month period unless continued invocation of the exception is reviewed, approved, and documented semi-annually by the Regional Director assigned to the county of responsibility for the child. MDCPS committed to meet a standard of 80 percent for this commitment by January 1, 2019. (6.3.b.2.).

Data provided by MDCPS indicate that 1,147 children reached 17 of the last 22 months in custody during 2019. Data indicate 516 (45.0 percent) of these children met the terms of the 2nd MSA, having either a timely TPR referral (258) or a timely documented ASFA exception (258).

MDCPS conducted a qualitative review of the 1,147 children subject to this commitment and determined 770 (67.1 percent) met the terms of the 2nd MSA. With respect to these children, MDCPS either made the TPR referral (313) or had a documented ASFA exception (457).

The monitoring team reviewed case records for a randomly selected sample of 68 children subject to this commitment and found 47 (69.1 percent) cases met the terms of the 2nd MSA. With respect to these children, MDCPS either made the TPR referral (40) or had a documented ASFA exception in the electronic record (7).

MDCPS is required to provide the monitor a report of all TPR referrals made during the monitoring period, the date those TPR referrals were made and the date the petition was filed with the court (6.3.b.3.). MDCPS provided data on TPR referrals for 834 children during 2019.

*Post-Adoption Services (6.3.c.)*

MDCPS committed to establish and maintain a system of post-adoptive services to stabilize and support adoptive placements. MDCPS agreed that adoptive families eligible for adoption subsidies must have access to these services, which may include counseling, mental health treatment and crisis intervention, family preservation and stabilization services, and peer support.

MDCPS reported that in SFY2019, 3,833 children were eligible for and received adoption subsidy payments totaling $15,699,474. Consistent with its 2nd MSA commitment, MDCPS continued to fund a statewide post-adoption service contract with a child and family service agency to ensure that eligible families have access to a range of post-adoption services throughout Mississippi. The contract was in effect throughout the calendar year and the provision of post-adoptive services continued throughout the entire monitoring period. [32] The monitoring team reviewed the contract and found the scope of services includes the provision of supportive counseling, mental health treatment and referrals, crisis intervention, family preservation and stabilization services, peer support, and respite services consistent with 2nd MSA requirements. During calendar year 2019, MDCPS reported that 1,436 adoptive families throughout Mississippi accessed the above-mentioned range of post-adoption services.

---

[32] During the monitoring period MDCPS renewed the post adoption services contract that had been initiated during the previous monitoring period. By doing so post adoption services were continued throughout the entire monitoring period. The value of the renewal contract which extends from October 1, 2019 to September 30, 2020 is $751,479.18.

*Durable Legal Custody and Guardianship (6.3.d.1., 6.3.d.2.)*

The parties agreed that the permanency goals of durable legal custody and guardianship may be assigned when there are documented efforts in the child's case record to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption (6.3.d.1.).

The monitoring team reviewed 51 children with the permanency goal of durable legal custody and guardianship as of the end of the third and fourth quarters of 2019 and found there were documented efforts to move the child to adoption and documentation of a reasonable basis why it was in the child's best interest not to be considered for adoption for 51 (100.0 percent) of the children.[33]

When the permanency goals of durable legal custody and guardianship are assigned to a child under the age of 14 years old or living with a non-relative, MDCPS shall provide to the monitor at the end of each monitoring period, information from the child's case record documenting efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption (6.3.d.2.).

MDCPS did not provide case record information to the monitoring team of all children under the age of 14 or living with a non-relative during the period, who were assigned the permanency goals of durable legal custody or guardianship.[34] Therefore, the monitoring team is unable to determine if MDCPS documented efforts to move a child to adoption or otherwise identified a reasonable basis why it was in a child's best interests not to be considered for adoption.

*Another Planned Permanent Living Arrangement (APPLA) (6.3.e.)*

If MDCPS concludes, after considering reunification, adoption, durable legal custody, and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, MDCPS may assign a permanency goal of APPLA for the child. In such circumstances, MDCPS agreed that, (1) the child must be at least 16 years old and (2) MDCPS must document a compelling reason why this permanency goal is in the best interest of the child.

---

[33] MDCPS completed a review of children with the permanency goal of durable legal custody (6.3.d.1.) as part of the FCR but combined the data with children with a permanency goal of APPLA (6.3.e.). The monitoring team also discovered that some children in the data had permanency goals of neither durable legal custody nor APPLA. Therefore, MDCPS did not accurately report durable legal custody FCR results.

[34] The monitoring team received information relative to a portion of the applicable children as part of the request for 6.3.d.1.

The monitoring team reviewed a sample of 136 children with the goal of APPLA in 2019.[35] There was a documented compelling reason why the permanency goal was in the best interest of the child for 108 (79.4 percent) children. The remaining 28 (20.6 percent) children were under the age of 16 years old at the time MDCPS assigned the permanency goal of APPLA, contrary to the 2nd MSA.

## Permanency Reviews

*Permanency Plan Reviews (6.4.a.)*

The 2nd MSA requires that a child's permanency plan be reviewed in a court or administrative case review, which may be a foster care review, at least every six months. MDCPS agreed to take all reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers and relevant professionals in court or administrative reviews. MDCPS committed that by January 1, 2019, at least 90 percent of foster children who have been in custody for at least six months shall have a timely court or administrative case review consistent with 2nd MSA requirements. The monitoring team's analysis of data provided by MDCPS concluded that 6,524 children were due for a permanency plan review during the period, of which 5,713 children (87.6 percent) received a timely review.

MDCPS also reported qualitatively on this commitment through the FCR. The Department reviewed 7,454 children's case records and reported 2,778 (37.3 percent) met the terms of this commitment.[36] The monitoring team reviewed a randomly selected sample of 195 Youth Court Hearing and Review Summary reports completed by MDCPS during the period, for children in custody for at least six months, to assess the participants of the permanency reviews. The monitoring team found evidence in the sample of reports that the foster care reviewer (quality assurance coordinator), social worker (caseworker), and social work supervisor (casework supervisor) were listed as being invited to the permanency review in each of the reports. Parents were listed as invited in 134 (68.7 percent) of the reports. Caregivers were listed as invited in 119 (61.0 percent) of the reports. Foster children were listed as invited in 189 (96.9 percent) of the reports. Guardians-ad-litem were listed as invited in 85 (43.5 percent) of the reports. The summary reports also indicated that a caseworker attended 148 (75.8 percent) of the reviews. Parents (23.5 percent), caregivers (49.2 percent), caseworker supervisors (32.8 percent), and the foster child (13.8 percent) each attended less than half of the permanency reviews.

---

[35] MDCPS completed a review of children with the permanency goal of APPLA (6.3.e.) as part of the FCR but combined the data with children with a permanency goal of durable legal custody (6.3.d.1.). The monitoring team also discovered that some children in the data had permanency goals of neither APPLA nor durable legal custody. Therefore, MDCPS did not accurately report APPLA FCR results.

[36] MDCPS' qualitative performance was based on the reviewer finding evidence that written notice was provided to all relevant parties for the FCR.

*Court Reviews (6.4.b.)*

The 2nd MSA also requires MDCPS to take all reasonable steps to ensure that a court review is held for each child in foster care custody within 12 months of the child's initial placement, and annually thereafter. MDCPS committed that by January 1, 2019, the agency would make reasonable efforts to have a timely annual court review scheduled consistent with 2nd MSA requirements for at least 90 percent of foster children who have been in custody for at least 12 months.

MDCPS evaluated this commitment through the FCR in 2019. The Department reviewed 5,352 cases and reported 4,928 (92.1 percent) met the terms of this commitment. The monitoring team reviewed a sample of 204 children with an annual court review due in 2019. MDCPS provided court orders and additional evidence relative to the reasonable steps taken to ensure that timely court reviews occurred for 187 (91.7 percent) of the children.

*Review of Adoption and Safe Families Act (ASFA) Exceptions (6.4.c.)*

MDCPS committed to review documented exceptions pursuant to ASFA for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review. MDCPS reported on this commitment through the Permanency Support Unit review process, as described under section 6.3.b.2.

## Permanency Performance Indicators

*Permanency Outcomes (6.5.a.)*

The 2nd MSA requires that beginning with federal fiscal year (FFY) 2019 (October 1, 2018 – September 30, 2019), MDCPS must meet performance standards for three permanency indicators, as established by the monitor. The three indicators, as agreed to by MDCPS and the monitor, are as follows:

- Of all children who enter foster care in a 12-month period, what percent discharged to permanency within 12 months of entering foster care? The entry cohort for this indicator will be children who entered care between October 1, 2017 and September 30, 2018.

- Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care between 12 and 23 months, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. The cohort for this indicator will be children in care on the first day of October 1, 2018, who had been in care for 12-23 months as of that day.

- Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care for 24 months or more, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. The cohort for this indicator will be children in care on the first day of October 1, 2018, who had been in care for 24 months or more as of that day.

The monitor established interim performance standards for MDCPS to meet for FFY2019 regarding these three indicators. The Department achieved the performance standard for each of the permanency outcomes during the reporting period.

**Table 10. Permanency Outcome Performance, FFY2019**

| 2nd MSA Section | Indicator | FFY2019 Performance Standard | MDCPS' FFY2019 Performance |
|---|---|---|---|
| *6.5.a.1* | Permanency for children entering care in a 12-month period | 43.9% | 44.2% |
| *6.5.a.2* | Permanency for children in care for 12-23 months on the first day of a 12-month period | 34.9% | 37.5% |
| *6.5.a.3* | Permanency for children in care for 24 months or more on the first day of a 12-month period | 31.4% | 37.6% |

The monitoring team reviewed case records for a sample of 186 children MDCPS reported achieved permanency timely during the reporting period, and confirmed MDCPS' performance.

*Adoption Outcomes (6.5.c., 6.5.d.)*

The 2nd MSA requires that beginning with FFY2019 (October 1, 2018 – September 30, 2019), MDCPS must meet adoption performance standards, as established by the monitor. The parties agreed that the adoption performance standards must represent a substantial improvement above the certified baseline performance established under the Stipulated Third Remedial Order (STRO).[37]

The monitor established that for FFY2019, the average length of time from the date on which a child's adoption goal was established to adoption finalization shall be 13.6 months and the median shall be 9.0 months, which, if achieved, demonstrate substantial improvement over the certified baseline. Data provided by MDCPS indicate that in FFY2019, the average length of time

---

[37] The Stipulated Third Remedial Order was entered as an order of the Court on December 19, 2016.

from the date on which a child's adoption goal was established to adoption was 28.1 months and the median was 23 months.

During 2019 data validation, the monitoring team determined that the data file MDCPS provided during the Stipulated Third Remedial Order period to establish baseline performance for this commitment (for children adopted during FFY2016) included the date of the child's most recent adoption plan rather than the date the child was initially assigned a permanency goal of adoption, the date needed to calculate baseline performance. As a result, baseline performance did not accurately capture the average and median times from the date on which a child's adoption goal was established to adoption finalization. This issue will be addressed prior to the issuance of the next annual report.

## 7. Transition to Independent Living

*Notification of Cessation of Benefits (7.1.)*

MDCPS is required to provide each youth transitioning to independence with at least six months advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition. MDCPS conducted a qualitative review of 49 youth who emancipated from care  for this commitment and reported that 45 percent of youth received the required advance notice of cessation of health benefits, 47 percent of youth received the required advance notice of cessation of financial benefits, and 40 percent of youth received the required advance notice of cessation of other benefits. [38] MDCPS was not able to provide the monitoring team documentation needed to validate this data.

*Independent Living Service Plans (7.2.)*

MDCPS is required to provide each foster youth age 14 years or older, regardless of his/her permanency plan, an opportunity to participate in the creation of an appropriate Independent Living service plan (ILP) for a successful transition to adulthood. MDCPS completed a qualitative review of this commitment during each quarter of 2019 and reported that 45 percent of youth participated in the creation of their Independent Living service plan. [39] The monitoring team cannot validate the data MDCPS provided for this commitment.

---

[38] Initial data provided by MDCPS for the first half of 2019 was poor in quality. Agreement to review this commitment in relation to the cohort of youth who emancipate from care during each quarter was reached with the monitors in September of 2019. The data provided here is therefore limited to that population of youth as reported by MDCPS.

[39] MDCPS also provided additional raw data regarding participation in the creation of ILPs during the first half of the year. However, the monitoring team and MDCPS agreed to use a sampling method for the measure for the second half of the year. MDCPS therefore did not provide the larger set of quantitative data for the second half of the year. This report provides the qualitative review data only for consistency across the entire year.

*Independent Living Services (7.3.)*

The 2nd MSA provides that each foster youth age 14 years and older will have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood. This includes Independent Living services eligible for federal reimbursement under the Chaffee program, which in part promotes employment or removes barriers to employment. MDCPS must maintain sufficient resources to deliver these services.

The monitoring team requested and MDCPS submitted data on services provided during the period to youth age 14 and older, including Independent Living skills services related to employment, community resources, transportation, communication skills, social development, youth law, money management, self-care, decision making, housing, relationships, and daily living skills. MDCPS does not have a standard curriculum in place for these services and is in the process of developing one. As a result, data reported by MDCPS on this commitment reflects a wide range of services that includes informal conversations between youth and MDCPS staff. MDCPS completed a qualitative review during each quarter of 2019 and reported 100 percent performance with this commitment because all of the cases reviewed each quarter "indicated youth (youth with a documented need) were provided assistance with attaining skills identified in their ILP." However, data provided by MDCPS indicates that no more than one third of eligible youth received services related to any one skill and most services were provided to less than 20 percent of eligible youth.

The raw number and percent of youth who were reported as having participated in the various Independent Living skills services for the first three quarters of 2019 is provided in Table 11. MDCPS initially provided an incorrect data set for the fourth quarter and a corrected data set was not provided. The data shown in Table 11 contain many of the same youth included across quarters. It is unclear if the data reflects whether youth ever received the noted independent living service or whether the service was received during the respective quarter. The monitoring team cannot validate this data because of the data quality issues and the lack of a standard curriculum for these services. However, the data provided indicates that a very small proportion of eligible youth received Independent Living skills services in 2019.

**Table 11. Youth Receiving Independent Living Skills, 2019**

| Skill | Q1 Youth participants receiving skill services (N=996) | | Q2 Youth participants receiving skill services (N=919) | | Q3 Youth participants receiving skill services (N=790) | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| Employment | 180 | 18% | 272 | 30% | 127 | 16% |
| Community Resources | 157 | 16% | 174 | 19% | 80 | 10% |
| Transportation | 150 | 15% | 193 | 21% | 85 | 11% |
| Communication Skills | 198 | 20% | 255 | 28% | 160 | 20% |
| Social Development | 170 | 17% | 214 | 23% | 158 | 20% |
| Youth Law | 112 | 11% | 113 | 12% | 56 | 7% |
| Money Management | 181 | 18% | 225 | 24% | 136 | 17% |
| Self-Care | 193 | 19% | 245 | 27% | 133 | 17% |
| Decision Making | 250 | 25% | 304 | 33% | 156 | 20% |
| Housing | 149 | 15% | 170 | 18% | 96 | 12% |
| Relationships | 186 | 19% | 235 | 26% | 127 | 16% |
| Daily Living Skills | 176 | 18% | 233 | 25% | 144 | 18% |
| No services documented | 603 | 61% | 402 | 44% | 419 | 53% |

*Medical Coverage (7.4.)*

The 2nd MSA requires MDCPS to implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid coverage so that their coverage continues without interruption at the time of emancipation. MDCPS provided its Medicaid Coverage policy[40] to the monitoring team. The policy states MDCPS is responsible to ensure that "[c]ontinued Medicaid coverage is certified by the Division of Medicaid in coordination with the DCPS."[41] MDCPS also reported that:

> "The (MDCPS) Division of Eligibility transmits a file to Medicaid monthly with the following information: Foster Care Medicaid (Yes or No), Foster Care Medicaid expiration date, Extended Medicaid start date, file transmitted to Medicaid (Yes or No) and type of Medicaid coverage. The automatic file transmission verifies that Medicaid receives the information above electronically each month. There is no way for MDCPS to verify continuation of Medicaid coverage after a youth is released from custody. Transmitting the electronic file ensure [sic] Medicaid is properly notified when a youth has exited custody. Youth who received Foster

---

[40] This policy is contained in section 8.3 of the Youth Transition Support Services Policy that was issued on October 30, 2018.

[41] The policy cross references Part 101 of the Medicaid Administrative Code for instructions on how to apply for continuation of coverage, provides a link to determine Medicaid Region, and includes contact information for the Mississippi Department of Medicaid.

Care Medicaid and exited custody at age 18 are automatically enrolled in Extended Foster Care Medicaid. Youth who were not eligible for Foster Care Medicaid and receive another type of medical coverage while in care are eligible to apply [sic] Extended Foster Care Medicaid when he/she is release[d] to emancipation at age 18."

MDCPS conducted a qualitative review regarding the transmission of files to Medicaid for 34 youth who exited care to emancipation during the second half of 2019 and reported that files had been transmitted to Medicaid for 26 (76.5 percent) of the youth.[42] MDCPS did not provide the monitoring team with any documentation of file transmission to Medicaid so the monitoring team cannot validate this commitment.

*Start-Up Stipends (7.5.)*

MDCPS must implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond receive a start-up stipend of at least $1,000.00 at the time of emancipation, or as soon as practicable thereafter.

MDCPS policy provides that "[a] Start-Up Stipend is available to youth who leave care after turning age sixteen (16) and who have participated in the available ILP activities. The youth must have been in care for a minimum of six (6) months." The policy also allows for youth to apply for this stipend six months prior to or following release from custody.

MDCPS reported on receipt of a start-up stipend for 69 youth who exited custody to emancipation between January 1, 2019 and September 24, 2019. This reporting period allowed for inclusion of any youth who may have received a start-up stipend up to six months following exit from care. MDCPS reported that 54 percent of the 69 youth received a start-up stipend. MDCPS agreed to provide data for this commitment to the monitoring team by April 30, 2020, however, MDCPS did not submit the data timely. As such, the monitoring team did not have adequate time to independently validate the data for this report.

*Housing Resource Specialists (7.6.)*

MDCPS is required to implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond have access to a housing resource specialist responsible for assisting the youth to obtain an adequate living arrangement.

MDCPS reported on qualitative reviews that included review of the youth appraisal and the Youth Transition Support Services referral form process. MDCPS reports 100 percent compliance with

---

[42] MDCPS noted that one file was not transmitted because the youth had Medicaid through SSI and that the remaining files would be timely transmitted to Medicaid.

this measure because all youth reviewed who indicated a need for a housing resource specialist in either of those documents did access a housing resource specialist. However, MDCPS provided data on 34 of the 35 youth who emancipated from care during the second half of 2019 and reported that eight youth indicated a need for a housing resource specialist and only six (75.0 percent) of those youth accessed a housing resource specialist.[43]

The monitoring team conducted a qualitative review of 33 of the 35 youth who emancipated from care during the third and fourth quarters of 2019.[44] This review found that 16 youth needed access to a housing resource specialist and seven (43.8 percent) of those youth accessed support in obtaining housing. There was no evidence that supportive housing services were provided for many youth emancipating from care. However, in these cases the worker documented ongoing comments from youth about their need to find housing prior to their emancipation from care. For example:

- In the case of a youth who emancipated from care on their 21st birthday, the youth appraisal noted a need for housing assistance and the case narrative notes documented the youth's desire for an apartment for several months prior to emancipation. There was no documentation that the youth ever received assistance from MDCPS in finding housing.

- Case narrative notes documented a 17-year-old youth's ongoing desire to live with his brother who resided in another state and the youth's regular inquiry into the progress of the Interstate Compact on the Placement of Children (ICPC) process over several months prior to turning 18. The ICPC process was never completed and the youth ran away from care the day after the youth turned 18.

- In the case of an unaccompanied refugee minor, case narrative notes documented the youth's need for housing for several months prior to emancipation from care, but there was no documentation that the youth ever received assistance from MDCPS in finding housing.

- A youth ran away from MDCPS care, stating multiple times that he/she did not want to return to a foster home or a group home. There were no documented efforts to support the youth in finding housing and the youth was released from custody after being on runaway status for nearly a year.

---

[43] Data quality during the first half of 2019 was poor and the monitoring team and MDCPS agreed to review youth who emancipated from care during each quarter for the second half of 2019.

[44] The review included MACWIS case narratives, Independent Living Services Plans, and any youth appraisals provided to the monitoring team by MDCPS. Files for two youth who emancipated from care during the second half of 2019 were locked. Therefore, the monitoring team reviewed cases of 33 of the 35 youth who emancipated from care in the second half of 2019.

*State Educational Training and Vocational (ETV) Program (7.7.)*

MDCPS must continue to implement policies and processes which ensure that youth emancipating from the foster care system at age 18 or beyond receive services and support under the State Educational Training and Vocational (ETV) Program for which they are eligible. MDCPS reported that 164 youth received an ETV in the 2018/2019 school year. This included 67 youth who were newly determined eligible to participate in the program. This is the largest number of youth served since the beginning of the ETV program. *Pursuant to commitment 10.1. of the 2nd MSA, performance during the period makes this commitment eligible to move to the "To Be Maintained" designation, pending agreement of the parties.*

*Identification and Essential Documentation (7.8.)*

MDCPS committed to assist youth in obtaining or compiling the following documents and such efforts shall be documented in the child's case record:

- educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate;

- a social security or social insurance number;

- a resume, when work experience can be described;

- a driver's license, when the ability to drive is a goal; if not a driver's license, then a state-issued photo identification;

- an original or certified copy of the youth's birth certificate;

- previous placement information;

- documentation of immigration, citizenship, or naturalization, when applicable;

- documentation of tribal eligibility or membership;

- death certificates when parents are deceased;

- a life book or compilation of personal history and photographs, as appropriate; and

- a list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties.

MDCPS conducted a qualitative review of youth who emancipated from care during each quarter to determine performance for this commitment.[45] The monitoring team conducted a qualitative

---

[45] At times, MDCPS' qualitative review included youth who emancipated from care outside of the period under review. The data in Table 12 reflects only the information provided by MDCPS for youth who emancipated from care during the relevant period.

review of this commitment of 33 of the 35 youth who emancipated from care during the second half of 2019,[46] by reviewing MACWIS and/or a completed youth appraisal. Table 12 details the number and percent of youth for whom the relevant documentation was obtained or compiled as determined in both reviews. Worker documentation of citizenship and immigration and parent death certificates is often absent, raising questions about the reliability of the data for these commitments. It is often not clear if these commitments do or do not apply to specific children.

**Table 12. Youth Receiving Identification and Essential Documentation, 2019**

| Documentation | MDCPS Emancipated youth receiving documentation (N=63) | | Monitor Emancipated youth receiving documentation (N=33) | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| Education Records (7.8.a.) | 26 | 41.3% | 17 | 51.5% |
| Social Security Card (7.8.b.) | 30 | 47.6% | 17 | 51.5% |
| Resume (7.8.c.) | 4 | 6.3% | 4 | 12.9% |
| Driver's License/State ID (7.8.d.) | 17 | 27.0% | 17 | 51.5% |
| Birth Certificate (7.8.e.) | 26 | 41.3% | 14 | 43.8% |
| Previous Placement Information (7.8.f.) | 23 | 36.5% | 8 | 25.9% |
| Citizenship/Immigration Records (7.8.g.) | 2 of 12 | 16.7% | 3 of 19 | 15.8% |
| Tribal Eligibility (7.8.h.) | 2 of 14 | 14.3% | 0 of 1 | 0.0% |
| Parent Death Certificate (7.8.i.) | 0 of 11 | 0.0% | 1 of 5 | 20.0% |
| Life Book/History (7.8.j.) | 18 | 28.6% | 5 | 15.1% |
| Known Relatives List (7.8.k.) | 22 | 34.9% | 13 | 39.4% |

# 8. Child Well-Being

## Physical and Mental Health Care

*Initial Medical Screenings (8.1.a.)*

MDCPS agreed that by July 1, 2018 at least 70 percent of children shall have an initial medical screening within seven days of the child's entry into foster care (8.1.a.1.). MDCPS conducted a quantitative review of 1,050 children with an initial medical screening due in the first half of 2019

---

[46] MDCPS provided a broad set of data on this commitment for the first half of the year and included youth for whom this commitment did not apply during the period under review. The monitoring team and MDCPS agreed, in September of 2019, to include only youth who emancipated from care during the period of review in the reporting and monitoring of this commitment. The data provided here is therefore limited to youth who emancipated from care during the period under review and the validation by the monitoring team includes only youth who emancipated from care during the second half of 2019. Files for two of those youth were locked. Therefore, the monitoring team reviewed cases of 33 youth who emancipated from care in the second half of 2019.

and found that 71 percent of those children received a timely initial medical screening.[47] The monitoring team conducted a quantitative review of 1,151 children with an initial medical screening due in the first half of 2019 and found that 76 percent of those children had documentation of a timely initial medical screening.

MDCPS agreed that by July 1, 2019 at least 80 percent of children shall have an initial medical screening within seven days of the child's entry into foster care (8.1.a.2.). MDCPS conducted a quantitative review of 1,046 youth with an initial medical screening due in the second half of 2019 and found that 72 percent of those children received a timely initial medical screening. The monitoring team conducted a quantitative review of 1,221 children with an initial medical screening due in the second half of 2019 and found that 72 percent of those children had documentation of a timely initial medical screening.

MDCPS conducted a qualitative review of children who entered care during 2019. The qualitative review should have been based on children for whom an initial medical screening was due in 2019 as some children who entered care just prior to 2019 were due for an initial medical screening in 2019. The MDCPS qualitative review is, therefore, invalid. The monitoring team attempted to conduct a qualitative review using quantitative review data of children with an initial medical screening due during the second half of 2019. That qualitative review focused on locating MACWIS documentation of a timely initial medical exam, with some substantive information regarding the health of the child in order to ascertain if the child's medical needs were being met. This review surfaced several problems, including an absence of any substantive documentation regarding the child's health or necessary follow up care, documentation that only reflected travel and did not include any information regarding the health of the child, and the same appointment listed multiple times with different labels. As a result, the monitoring team was not able to validate MDCPS performance on this commitment. The monitoring team will continue to review this commitment qualitatively in 2020 by looking for information on the health needs of children and whether or not those needs have been met.

*Comprehensive Medical Exams (8.1.b.)*

MDCPS agreed that by July 1, 2018 at least 70 percent of children shall have an initial EPSDT or other comprehensive medical examination within 60 days of the child's entry into foster care (8.1.b.1.). MDCPS conducted a quantitative review of 4,516 children who were due for a comprehensive medical exam during the first half of 2019 and found that 71 percent of those children had a timely comprehensive medical exam. The monitoring team conducted a quantitative review of 1,040 children with a comprehensive medical exam due in the first half of

---

[47] MDCPS' quantitative review of all medical commitments (8.1.a., 8.1.b., and 8.1.e.) is based on data pulled from MACWIS on medical appointments entered by workers. Capacity to retrieve this data is dependent on the worker entering in the medical tab the date of service, type of appointment, and doctor seen.

2019 and found that 78 percent of those children had documentation of a timely comprehensive medical exam.

MDCPS agreed that by July 1, 2019 at least 80 percent of children shall have an initial EPSDT or other comprehensive medical examination within 60 days of the child's entry into foster care (8.1.b.2.). MDCPS conducted a quantitative review of 7,634[48] children who were due for a comprehensive medical exam during the second half of 2019 and found that 74 percent of those children received a timely comprehensive medical exam. The monitoring team conducted a quantitative review of 1,128 children with a comprehensive medical exam due in the second half of 2019 and found that 76 percent of those children had documentation of a timely comprehensive medical exam.

MDCPS conducted a qualitative review of children who entered care during 2019. The qualitative review should have been based on children for whom an initial EPSDT or comprehensive medical exam was due in 2019 as some children who entered care prior to 2019 were due for an initial EPSDT or other comprehensive medical exam in 2019. The MDCPS qualitative review is, therefore, invalid. The monitoring team attempted to conduct a qualitative review using quantitative review data of children with an initial EPSDT or comprehensive medical exam due during the second half of 2019. That qualitative review focused on locating MACWIS documentation of a timely initial EPSDT or other comprehensive medical exam, with some substantive information regarding the health of the child in order to ascertain if the child's medical needs were being met. This review surfaced several problems, including an absence of any substantive documentation regarding the child's health or necessary follow up care, documentation that only reflected travel and did not include any information regarding the health of the child, and the same appointment listed multiple times with different labels. As a result, the monitoring team was not able to validate MDCPS performance on this commitment. The monitoring team will continue to review this commitment qualitatively in 2020 by looking for information on the health needs of children and whether or not those needs have been met.

*Periodic and Ongoing Medical Exams (8.1.c.)*

The 2nd MSA requires that following an initial EPSDT or other comprehensive medical examination, children shall receive periodic and on-going medical examinations according to the periodicity schedule set forth by the EPSDT program. The 2nd MSA calls for the monitor to set a performance standard for MDCPS to meet by July 1, 2019. The monitor established a performance standard of 45 percent. MDCPS did not have a process in place to track these exams

---

[48] MDCPS data included children who entered care as early as January 2, 2018 and hundreds of duplicated child records. It is unclear how MDCPS calculated summary performance with this commitment during the period from these data.

for children in custody in 2019 and did not report on this commitment. Therefore, the monitoring team is unable to assess MDCPS' performance.

*Follow-up Treatment (8.1.d.)*

MDCPS agreed that by July 1, 2018 at least 60 percent of children shall receive recommended follow-up treatment throughout the time they are in foster care (8.1.d.2.). MDCPS agreed that by July 1, 2019, 90 percent of children shall receive recommended follow-up treatment throughout the time they are in foster care (8.1.d.3.). MDCPS conducted a qualitative review on follow-up care for children who entered care during 2019. However, MDCPS did not have a process in place to track follow-up care for the rest of children in care in 2019 and did not report on all children subject to this commitment. Therefore, the monitoring team is unable to assess MDCPS' performance.

*Dental Exams (8.1.e.)*

MDCPS agreed that by July 1, 2018 at least 60 percent of children shall have a dental examination within 90 days of the child's entry into foster care (8.1.e.1.).[49] MDCPS conducted a quantitative review of 665 children to determine performance with this commitment and found that 48 percent of those children received a timely initial dental exam. The monitoring team conducted a quantitative review of 645 children with an initial dental exam due in the first half of 2019 and found that 48 percent of those children had documentation of a timely initial dental exam.

MDCPS agreed that by July 1, 2019 at least 80 percent of children shall have a dental examination within 90 days of the child's entry into foster care (8.1.e.2.). MDCPS conducted a quantitative review of 762 children to determine performance with this commitment and found that 51 percent of those children received a timely initial dental exam. The monitoring team conducted a quantitative review of 731 children with an initial dental exam due in the second half of 2019 and found that 52 percent of those children had documentation of a timely initial dental exam.

MDCPS conducted a qualitative review of children who entered care during 2019. The qualitative review should have been based on children for whom an initial dental exam was due in 2019 as some children who entered care prior to 2019 were due for an initial dental exam in 2019. The MDCPS qualitative review is, therefore, invalid. The monitoring team attempted to conduct a qualitative review using quantitative review data of children with an initial dental exam due during the second half of 2019. That qualitative review focused on locating MACWIS documentation of a timely initial dental exam, with some substantive information regarding the

---

[49] Exceptions include if the child has had an examination within six months prior to placement or if they are under the age of four. Foster children who reach the age of four while in foster care shall receive a dental examination within 90 calendar days of his/her fourth birthday.

dental health of the child in order to ascertain if the child's medical needs were being met. This review surfaced several problems, including an absence of any substantive documentation regarding the child's dental health or necessary follow-up care, and documentation that only reflected travel and did not include any information regarding the dental health of the child. As a result, the monitoring team was not able to validate MDCPS performance on this commitment. The monitoring team will continue to review this commitment qualitatively in 2020 by looking for information on the dental health needs of children and whether or not those needs have been met.

*Medical Records (8.1.f.)*

MDCPS committed to provide foster parents or facility staff with the completed foster child information form or other electronic record containing available medical, dental, educational, and psychological information about the child within 15 days of placement. The parties agreed that by July 1, 2018, MDCPS would meet an interim performance standard of 75 percent for this commitment (8.1.f.1.) and that MDCPS would reach a performance standard of 90 percent by July 1, 2019 (8.1.f.2.). MDCPS conducted a qualitative review of this commitment as part of the FCR. MDCPS found documentation in narratives that the caseworker timely provided this information in 25 percent of cases reviewed during the first half of 2019 and in 38 percent of cases reviewed in the second half of 2019. Based on the Department's reported performance, the monitoring team did not independently validate this commitment.

*Medicaid Information (8.1.g.)*

MDCPS agreed that by July 1, 2018, 85 percent of children shall have their Medicaid information provided to foster parents or facility staff at the time of placement. MDCPS combined reporting for 8.1.f. and 8.1.g. in the FCR; however, the FCR question only pertained to 8.1.f. As such, MDCPS did not report performance specific to the requirements of this commitment and the monitoring team is unable to assess MDCPS' performance.

## Educational Services

*Educational Record Review and Need Documentation (8.2.a., 8.2.c.1.)*

MDCPS agreed that at least 90 percent of school-age foster children who enter custody shall have their educational records reviewed and their educational needs documented by MDCPS within 30 calendar days of their entry into foster care. MDCPS reported that educational record reviews were completed for 533 children in 2019.[50] Reporting provided during the first three quarters of the year did not include any indication of how many educational records should have been

---

[50] It is not clear if all of these reviews were completed within 30 days of entry into care, as some data provided by MDCPS indicates that not all of the reviews were timely.

reviewed during the quarter in accordance with this commitment. In the fourth quarter, MDCPS reported that 293 youth entered custody during the period under review and 43 percent of their records were reviewed. Based on the Department's reported performance, the monitoring team did not independently validate this commitment.

*School Enrollment (8.2.b.)*

MDCPS agreed to take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within seven calendar days of initial placement or any placement change, including while placed in shelters or other temporary placements. MDCPS reported that educational liaisons are available to provide support and follow-up to the child's case worker through the review of the Child Custody Placement Report and provision of Best Interest Determinations (BID) consultations. MDCPS did not report on this commitment as the department is not able to report dates of registration and school attendance following initial placement or placement changes.

*Educational Continuity (8.2.c.)*

MDCPS agreed to make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences.

MDCPS reported on the results of a qualitative review of BID consultations conducted with the educational liaisons. These consultations are not required and other BIDs may have been conducted by the case worker without any consultation. However, MDCPS cannot track results of BIDs conducted outside of a consultation. The limited review conducted by MDCPS found that BIDs were conducted with educational liaisons for 860 children in 2019 and 216 (25.1 percent) of those children remained in their school of origin. The monitoring team cannot validate performance for this commitment because MDCPS was not able to provide data on all children for whom BIDs should have been conducted to ensure continuity of educational experience.

# EXHIBIT D



Report to the Mississippi Legislature

# A Review of the Mississippi Department of Child Protection Services for Fiscal Year 2019



#636
November 19, 2019

Joint Legislative Committee on Performance
Evaluation and Expenditure Review

## PEER:  The Mississippi Legislature's Oversight Agency

The Mississippi Legislature created the Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER Committee) by statute in 1973. A joint committee, the PEER Committee is composed of seven members of the House of Representatives appointed by the Speaker and seven members of the Senate appointed by the Lieutenant Governor. Appointments are made for four-year terms, with one Senator and one Representative appointed from each of the U.S. Congressional Districts and three at-large members appointed from each house. Committee officers are elected by the membership, with officers alternating annually between the two houses. All Committee actions by statute require a majority vote of four Representatives and four Senators voting in the affirmative.

Mississippi's constitution gives the Legislature broad power to conduct examinations and investigations. PEER is authorized by law to review any public entity, including contractors supported in whole or in part by public funds, and to address any issues that may require legislative action. PEER has statutory access to all state and local records and has subpoena power to compel testimony or the production of documents.

PEER provides a variety of services to the Legislature, including program evaluations, economy and efficiency reviews, financial audits, limited scope evaluations, fiscal notes, special investigations, briefings to individual legislators, testimony, and other governmental research and assistance. The Committee identifies inefficiency or ineffectiveness or a failure to accomplish legislative objectives, and makes recommendations for redefinition, redirection, redistribution and/or restructuring of Mississippi government. As directed by and subject to the prior approval of the PEER Committee, the Committee's professional staff executes audit and evaluation projects obtaining information and developing options for consideration by the Committee. The PEER Committee releases reports to the Legislature, Governor, Lieutenant Governor, and the agency examined.

The Committee assigns top priority to written requests from individual legislators and legislative committees. The Committee also considers PEER staff proposals and written requests from state officials and others.

PEER Committee
Post Office Box 1204
Jackson, MS  39215-1204

(Tel.) 601-359-1226
(Fax) 601-359-1420
(Website) www.peer.ms.gov

The Mississippi Legislature

# Joint Committee on Performance Evaluation and Expenditure Review
## PEER Committee



**SENATORS**
LYDIA CHASSANIOL
Vice Chair
KEVIN BLACKWELL
Secretary
TERRY C. BURTON
GARY JACKSON
SAMPSON JACKSON II
CHARLES YOUNGER

**TELEPHONE:**
(601) 359-1226

**FAX:**
(601) 359-1420

**REPRESENTATIVES**
BECKY CURRIE
Chair
RICHARD BENNETT
STEVE HORNE
TIMMY LADNER
MARGARET ELLIS ROGERS
RAY ROGERS
PERCY W. WATSON

**OFFICES:**
Woolfolk Building, Suite 301-A
501 North West Street
Jackson, Mississippi 39201

Post Office Box 1204
Jackson, Mississippi 39215-1204

James A. Barber
Executive Director

www.peer.ms.gov

November 19, 2019

Honorable Phil Bryant, Governor
Honorable Tate Reeves, Lieutenant Governor
Honorable Philip Gunn, Speaker of the House
Members of the Mississippi State Legislature

On November 19, 2019, the PEER Committee authorized release of the report titled *A Review of the Mississippi Department of Child Protection Services for Fiscal Year 2019.*

Representative Becky Currie, Chair

**This report does not recommend increased funding or additional staff.**

## *Table of Contents*

Letter of Transmittal ................................................................................................................ i

Report Highlights ................................................................................................................ vii

Introduction ............................................................................................................................ 1
    Authority ............................................................................................................................ 1
    Scope and Purpose ........................................................................................................... 1
    Method ................................................................................................................................ 2
    Scope Limitation ............................................................................................................... 2

Background ............................................................................................................................. 4
    Status of MDCPS's Implementation of Recommendations from PEER's Review of the
    Department for FY 2017 and FY 2018 ........................................................................... 4
    Staffing ............................................................................................................................... 6
    FY 2019 MDCPS Organizational and Administrative Changes ................................. 7

Sources and Uses of Funding ............................................................................................... 9
    Sources of Funding .......................................................................................................... 9
    Uses of Funds ................................................................................................................. 10

Caseload Analysis ............................................................................................................... 14
    Caseload Standards and Compliance Mandates Set Forth in the 2nd MSA ............... 14
    MDCPS Caseworker Caseload and Caseworker Supervisor Workload Data Problems ......... 16
    Analysis of MDCPS Compliance with Mandates Set Forth in the 2nd MSA .............. 17
    Caseload Analysis Based on Calculation of Mean FY 2019 Caseload for
        Caseworkers and Workload for Caseworker Supervisors ..................................... 20
    Inequality in the Distribution of Caseworker Caseloads and Caseworker Supervisor
        Workloads ..................................................................................................................... 22

Analysis of Annual MDCPS Turnover Rates ..................................................................... 26
    Calculating Annual Turnover ........................................................................................ 26
    Turnover Rate for Non-caseworker Staff .................................................................... 26
    Turnover Rates for Caseworkers .................................................................................. 27
    Estimated Cost of Caseworker Turnover .................................................................... 28

Development of MDCPS's New Case Management System ............................................. 30
    Problems with MDCPS's Current Case Management System (MACWIS) ................. 30
    Requirement to Develop a New Case Management System (CCWIS) ....................... 31
    History and Current Status of MDCPS's Development of CCWIS ............................ 32

Recommendations ................................................................................................................ 35

Appendix A: Brief Update of the *Olivia Y.* Lawsuit ...................................................... 37

Appendix B: MDCPS Budget Programs for FY 2020 ...................................................... 38

Appendix C: MDCPS Regions, by Field Operations Division in FY 2019 ..................... 39

Appendix D: Federal Revenues Received by MDCPS in FY 2019, by Funding Source ........ 40

Appendix E: Inventory of Child and Family Well-being Intervention Programs Funded
        by MDCPS in FY 2019 .............................................................................................. 42

Appendix F: FY 2017, FY 2018, and FY 2019 Annual Caseworker Turnover Rates and Average Number of Caseworkers, by County and Region........................................................................ 45

Appendix G: Examples of Direct and Indirect Costs of Employee Turnover.................................... 48

Appendix H: Comprehensive Child Welfare Information System (CCWIS) Requirements Established in 45 CFR Section 1355.52 ........................................................................ 49

Agency Response................................................................................................................ 51

*List of Exhibits*

Exhibit 1:   Status of MDCPS's Implementation of PEER's Recommendations
Made in its First Annual Review of MDCPS.................................................................5

Exhibit 2:   Caseworkers by Type of Work, as of May 1, 2019 ..................................7

Exhibit 3:   MDCPS Revenues, by Funding Source for State Fiscal Years
2017, 2018, and 2019................................................................................. 10

Exhibit 4:   Total MDCPS Expenditures (rounded) for FY 2017, FY 2018, and
FY 2019, by Major Object ......................................................................... 11

Exhibit 5:   Caseload Standards per Child Protection Caseworker...................................... 15

Exhibit 6:   Compliance with the 90% Weighted Caseload Mandate for Frontline
Caseworkers and Adoption and Licensure Caseworkers and 85% Workload
Mandate for Caseworker Supervisors ..................................................................... 19

Exhibit 7:   Mean and Dispersion of Caseload for Frontline Caseworkers and Adoption
and Licensure Caseworkers and Workload for Caseworker Supervisors. ....... 21

Exhibit 8:   FY 2019 Mean Weighted Caseload and Days Worked for All Frontline
Caseworkers and Adoption and Licensure Caseworkers and Mean Workload
and Days Worked for All Caseworker Supervisors ............................................. 24



PEER MISSISSIPPI

Joint Legislative Committee on Performance Evaluation and Expenditure Review

Joint Legislative Committee on Performance Evaluation and Expenditure Review

## Report Highlights
November 19, 2019

# A Review of the Mississippi Department of Child Protection Services for Fiscal Year 2019

**CONCLUSION: During FY 2019, MDCPS received 90% of its revenues from state general funds and federal funds. Over half of the Department's expenditures were for caseworker and caseworker supervisor salaries and on reimbursements made to foster parents. While MDCPS never met court-order percentage-compliant caseload mandates in FY 2019, the daily mean weighted caseloads were not far from the standards. In FY 2019, the caseworker turnover rate was 30%, a 9% increase over FY 2018. Also, as of May 1, 2019, 25% of MDCPS's positions were vacant. While the settlement agreement requires MDCPS to develop a new case management system, CCWIS, by June 30, 2021, the Department's $28.7 million RFP to develop and deploy the system contains limited documentation supporting needed system design features and associated costs.**

## Background:

The Mississippi Department of Child Protection Services (MDCPS) is the entity responsible for the development, execution, and provision of Mississippi's child welfare services and for ensuring the safety, permanency, and well-being of the state's children and families.

MISS. CODE ANN. Section 43-26-1 (7) (1972) requires PEER to annually review MDCPS's sources and uses of funding, caseloads and annual turnover rates, program effectiveness based on outcome measures, and any other matters deemed pertinent by the PEER Committee. This is PEER's second review of MDCPS, focusing on data from state fiscal year 2019.

## Sources and Uses of Funding

### Revenues

In FY 2019, MDCPS received $195.9 million in total revenues. As shown in the chart, 50% of its total revenues were state general funds and 40% were federal funds.



State Support Special Funds
$19.5 Million
10%

Other State Support Special Funds
$387,422
0%

Federal Funds
$78 Million
40%

State General Funds
$98 Million
50%

**Total Revenues
$195.9 Million**

Source: PEER analysis of MDCPS revenues provided by the Legislative Budget Office.

### MDCPS Staffing as of May 1, 2019

| | |
|---|---|
| 864 | Caseworkers |
| 214 | Caseworker Supervisors |
| 184 | Other County Staff |
| 205 | State Office Staff |

**1,467 Full-time Employees**

**487 Vacancies**

**1,954 Total PINs**

### Expenditures

During FY 2019, MDCPS expenditures for salaries, wages, and fringe benefits totaled approximately $80 million (41% of its total expenditures), including $53 million for its caseworkers and caseworker supervisors. MDCPS expended $55 million (28% of its total expenditures) on foster care maintenance payments and provided $35 million (18% of its total expenditures) to child welfare agencies delivering services and programs to Mississippi children and their families.

**Total MDCPS expenditures ($195.9 Million) increased by 4% from FY 2018 to FY 2019.**

### Recommendations for Sources and Uses of Funding:

- MDCPS should estimate and identify expenditures and full-time equivalents by accountability program.
- MDCPS should identify child and family well-being intervention programs to serve Mississippi children and families and ensure that such programs are supported by high-quality research.

## Caseload Analysis

> **90% of MDCPS caseworkers should have caseloads that do not exceed the 1.0 weighted caseload standard**
>
> **85% of MDCPS caseworker supervisors should supervise no more than 5 caseworkers**

During FY 2019, MDCPS never met the court-ordered percentage-compliant mandate for its frontline, adoption, and licensure caseworker caseloads, and only complied with the caseworker supervisor workload mandate for a few days during the fiscal year. However, despite low compliance with the percentage-compliant mandates for caseworkers, analysis indicated that the mean daily caseload for caseworkers and workload for caseworker supervisors was not far from the 1.0 weighted caseload standard for caseworkers and the standard number of caseworkers supervised (no more than 5) for caseworker supervisors. Inequality in the distribution of caseworker caseloads and caseworker supervisor workloads is the main reason for the Department's low performance on percentage-compliant mandates.

### Recommendations for Caseload Analysis:

- MDCPS should implement its written procedures for code documentation, file retention, and data entry processes.
- MDCPS should conduct a new caseload study based on current caseworkers' time and responsibilities to determine the range of time necessary for a caseworker to perform a task in accordance with best practices. MDCPS should establish new standards based on the results of this study.
- Once a new caseload study is established, MDCPS should redistribute caseworker positions so that they more closely match expected caseloads. In addition, MDCPS should consider assigning more cases to caseworkers in bordering counties to better distribute caseloads.
- MDCPS staff should confer with the court monitor and attorneys representing the Plaintiffs in the *Olivia Y.* lawsuit to discuss replacing the percentage-compliant mandates.

## Analysis of Annual MDCPS Turnover Rates

In FY 2019 the annual turnover rate for caseworkers was 30%, a 9% increase over the previous year, while the annual turnover rate for all other staff was 15%, a 2% increase. In addition, twelve of MDCPS's fourteen regions and forty-three counties had an increase in caseworker turnover from FY 2018 to FY 2019.

> **As of May 1, 2019, 25% of MDCPS's positions were vacant. Of their 487 vacant positions, 58% were caseworker and caseworker supervisor positions.**

### Recommendation for the Analysis of Annual MDCPS Turnover Rates:

- MDCPS should maintain a current list of all licensed social workers in the Department.

## Analysis of Selected MDCPS Outcome Measures

PEER was unable to assess MDCPS's performance measures for FY 2019 because the data were not yet available at the time of this review. PEER plans to include this analysis in its FY 2020 annual review of the Department.

## Development of MDCPS's New Case Management System

> **MDCPS anticipates configuration of the new case management system to take 15 to 18 months.**

MDCPS expended at least $3.2 million on staff and technical consultants between 2017 and August 2019 to begin the process of developing a new custom-built case management system (CCWIS) to replace its current outdated system (MACWIS). However, MDCPS has now decided to procure an off-the-shelf system in order to meet its impending court-imposed deadline. MDCPS is on the verge of issuing an RFP to expend up to $28.7 million to develop and deploy this system with limited documentation supporting needed system design features and associated costs.

### Recommendations for the Development of MDCPS's New Case Management System:

- The State Auditor should conduct an audit of MDCPS's expenditure of $3.2 million on contracts for the development of a custom-built case management system to ensure that all deliverables were produced according to the terms of the contracts.
- The MDCPS Commissioner should direct the Department's staff to develop a detailed business case for the CCWIS project prior to issuing a request for proposal (RFP) to procure the system, and should also direct Department staff to maintain complete and accurate documentation of the procurement process.



PEER
MISSISSIPPI
Joint Legislative Committee on Performance
Evaluation and Expenditure Review

**A Review of the Mississippi Department of Child Protection Services for FY 2019 | November 2019**
For more information, contact: (601) 359-1226 | P.O. Box 1204, Jackson, MS 39215-1204
Representative Becky Currie, Chair | James A. Barber, Executive Director

A copy of the full report is available at: www.peer.ms.gov

PEER Report #636

# A Review of the Mississippi Department of Child Protection Services for Fiscal Year 2019

## Introduction

### Authority

During its 2018 Regular Session, the Mississippi Legislature passed Senate Bill 2675 to amend MISS. CODE ANN. Section 43-26-1 (1972). Among its provisions, this legislation maintained the Department of Child Protection Services as a sub-agency independent of, though housed within, the Mississippi Department of Human Services and added subsection 7 to require the PEER Committee to review annually the programs of the Mississippi Department of Child Protection Services (hereinafter referred to as MDCPS or the Department), beginning with state fiscal year 2017 and each year thereafter.

PEER conducted this review pursuant to the authority granted by MISS. CODE ANN. Sections 5-3-57 et seq. (1972).

### Scope and Purpose

MISS. CODE ANN. Section 43-26-1(7) (1972) requires the PEER Committee to review annually:

- sources and uses of department funding;
- caseloads for social workers for each county or another appropriate geographic area;
- turnover rates of social worker staff by county or other geographic area;
- the effectiveness of any program of the department for which appropriated outcome measures have been established; and,
- any other matters that the PEER Committee considers to be pertinent to the performance of agency programs.

This is PEER's second review of MDCPS. The first review[1] focused on state fiscal years 2017 and 2018. This review focuses on state fiscal year 2019 (July 1, 2018, through June 30, 2019).

---

[1] *A Review of the Mississippi Department of Child Protection Services for Fiscal Years 2017 and 2018 (Report #627),* https://www.peer.ms.gov/Reports/reports/MDCPS-Full.pdf.

## Method

PEER reviewed:

- applicable state and federal laws and regulations;

- *Olivia Y.* lawsuit documents, including recent pleadings regarding enforcement of the 2nd Modified Mississippi Settlement Agreement and Reform Plan (hereinafter referred to as the 2nd MSA) and the court monitor reports. Appendix A on page 37 contains a brief update of the *Olivia Y.* lawsuit.;

- MDCPS administrative and financial records, including:

  – organizational charts and job descriptions,

  – expenditures reported in the state's accounting system, MAGIC,

  – annual reports and other ad hoc reports,

  – contracts, and

  – data related to caseworker caseloads, caseworker supervisor workloads, and caseworker and Department turnover;

- MDCPS employee data maintained by the Mississippi State Personnel Board; and,

- bills appropriating funds to MDCPS for FY 2019 and MDCPS's FY 2021 budget request, which contains actual expenditure data for FY 2019.

PEER also:

- interviewed the private outside counsel for the Department in the *Olivia Y.* lawsuit, the court monitor, and MDCPS staff.

## Scope Limitation

While PEER planned to update its analysis of selected MDCPS outcome measures, FY 2019 performance data was not yet available from the National Data Archive on Child and Abuse and Neglect (NDACAN) at Cornell University at the time of this review. PEER used validated MDCPS performance data from NDACAN in its last review of the Department because MDCPS computer files containing performance data were of too low quality to be useful in evaluation.

In addition, PEER made efforts to rely on performance data analysis presented in the 2019 Court Monitor Report: *Progress of the Mississippi Department of Child Protection Services,* issued on June 11, 2019, but was unable to do so because of the report's inadequate explanation of the methods that the monitor used to reach its conclusions. Specifically, the court monitor's report does not contain:

- documentation sufficient to establish that its samples are representative;

- confidence intervals or measurement-specific confidence levels for those samples; or,

- complete descriptions of data validation methods.

In PEER's follow-up contact with the court monitor to address these concerns, court monitor staff were unable to provide sufficient detail to answer PEER's questions about their evaluative methods.

# Background

**The Mississippi Department of Child Protection Services is the entity responsible for the development, execution, and provision of Mississippi's child welfare services and for ensuring the safety, permanency, and well-being of the state's children and families.**

As described in PEER's previous review of MDCPS (PEER Report #627), which report includes a comprehensive description and history of child protection services in Mississippi, the Department operates as a sub-agency of the Mississippi Department of Human Services (MDHS). Under this organizational arrangement:

- MDHS staff provide administrative support (e.g., payroll, accounts payable and receivable, travel reimbursements, grants management) to MDCPS; and,

- MDCPS staff provide intake services, child protection investigation, foster care, adoption, licensure, prevention, and in-home services to families and children in the state of Mississippi.

This chapter provides a brief update on MDCPS's:

- implementation of recommendations from PEER's FY 2017 and FY 2018 Annual Review of the Department;

- staffing as of May 1, 2019; and,

- changes to its organizational structure, child protection worker job titles and occupational class series, and additional training requirements for caseworkers and caseworker supervisors in FY 2019.

## Status of MDCPS's Implementation of Recommendations from PEER's Review of the Department for FY 2017 and FY 2018

**As of October 22, 2019, MDCPS had fully or partially implemented eight of the eleven recommendations that PEER made in its first annual review of the Department.**

PEER's first MDCPS annual review contained eleven recommendations for the Department to implement. As of October 22, 2019, MDCPS had implemented five recommendations, partially implemented three, and had not implemented three recommendations.

Exhibit 1 on pages 5-6 summarizes each recommendation made in PEER's first annual review, reports the implementation status of each, and describes MDCPS's action taken in regard to implementation of each recommendation and consequences of inaction.

**Exhibit 1: Status of MDCPS's Implementation of PEER's Recommendations Made in its First Annual Review of MDCPS**

| PEER's recommendation to MDCPS | Description of MDCPS action taken as of October 22, 2019 and consequences of inaction |
|---|---|
| **Recommendations implemented** | |
| Consult with Department of Finance and Administration (DFA) to determine the best means to account accurately and completely for MDCPS revenues and expenditures. | During FY 2019, DFA created funds in MAGIC specifically for MDCPS, by which the Department is now able to track its revenues and expenditures separate from MDHS. |
| Work with the Legislative Budget Office (LBO) and the Department of Finance and Administration (DFA) to determine which budget programs to add to the MDCPS budget by FY 2021. | During FY 2019, MDCPS worked with LBO and DFA to create eight new budget programs to take effect in FY 2020. See Appendix B on page 38. |
| Calculate turnover by county and/or region to identify factors that influence turnover and to seek appropriate solutions to reduce turnover. | MDCPS calculated turnover by region in FY 2019. |
| **Recommendations implemented, but with ongoing concerns** | |
| Continue to redistribute caseworker positions so that they more closely match expected caseloads. | Inequality in caseload distribution continues to be a problem for MDCPS. See discussion on pages 20-24. |
| Consider assigning cases to caseworkers in bordering counties to better distribute caseloads. | PEER's analysis of FY 2019 caseload data show that there are still instances where MDCPS could address inequality in caseload distribution by assigning workers to cases in neighboring counties. |
| **Recommendations partially implemented** | |
| Develop and implement written procedures for computer code documentation, file retention, and data entry processes. | While MDCPS has developed a data quality plan, this plan has not been successfully implemented as evidenced by numerous errors in the FY 2019 datasets reviewed by PEER. |
| Ensure the salary ranges of caseworker and caseworker supervisor positions are aligned to the level of duties and responsibilities assigned to positions in each occupational class. | There were no changes to caseworker and caseworker supervisor salaries during FY 2019. However, MDCPS worked with the Mississippi State Personnel Board (MSPB) in FY 2018 and FY 2019 to create a career ladder for caseworker positions and plans to implement the career ladder once funding is available. |
| Confer with the court monitor and attorneys representing the Plaintiffs in the *Olivia Y.* lawsuit to discuss replacing the percentage-compliant mandates (90% for caseworkers and 85% for caseworker supervisors). | MDCPS has filed a motion for relief from the 90% caseworker caseload requirement in the 2nd MSA; however, the motion does not include a replacement standard as recommended by PEER. |
| **Recommendations not implemented** | |
| Estimate and identify expenditures and full-time equivalents (FTEs) by accountability program. | While MDCPS added FY 2020 budget programs, it has not yet begun to estimate expenditures and FTEs at the accountability program level. Information at this level of detail increases accountability for the use of public resources, which is important to legislative oversight as well as to MDCPS staff for monitoring its own effectiveness and making resource allocation decisions. |
| Conduct a new workload study based on current caseworkers' time and responsibilities to determine the range of time necessary for a caseworker to perform a task in accordance with best practices and establish new standards based on the results of the study. | MDCPS has not implemented this recommendation due to the *Olivia Y.* lawsuit, and impending ruling from the Court regarding the plaintiff's request to turn the state's foster care system over to a court-appointed receiver. Regardless of who operates the system, it is critical to the protection of children that individual caseloads not exceed standards that can be managed in accordance with best practices for successful outcomes. |

| Maintain a current list of all licensed social workers in the agency. | MDCPS said in its response to last year's report that it sees no purpose in imposing on its staff the administrative burden of keeping up with which of its staff are licensed social workers. Because licensed social workers are specifically trained to carry out the type of work that MDCPS caseworkers perform and are better prepared to do so,[2] it is important for the Department to know which of its staff are licensed and to develop strategies to increase the percentage of its caseworker staff who are licensed social workers. |

SOURCE: PEER Analysis of information provided by MDCPS.

## Staffing

**As of May 1, 2019, 25% of MDCPS's 1,954 positions were vacant. Of the Department's 487 vacant positions, 58% were caseworkers and caseworker supervisors.**

### MDCPS Staffing as of May 1, 2019

**864 Caseworkers**

**214 Caseworker Supervisors**

**184 Other County Staff**

**205 State Office**

**1,467 Full-time Employees**

**487 Vacancies**

**1,954 Total PINs**

As of May 1, 2019, MDCPS had a total of 1,467 filled positions (75% of total PINs) and 487 vacant positions (25% of total PINs). The Department had 205 state office staff (14% of total employees) and 1,262 staff (86% of total employees) working in the 84 county offices (Bolivar and Chickasaw each have an additional county office). Of MDCPS's 487 vacant positions, 230 (47%) were caseworkers and 56 (11%) were caseworker supervisors.

As of May 1, 2019, MDCPS employed 864 caseworkers (approximately 58% of its total workforce). Exhibit 2 on page 7, presents the total number of caseworkers by type of work, i.e., frontline, adoption, and licensure. As shown in the exhibit, 635 (74%) of MDCPS's caseworkers are frontline workers. Frontline workers provide case management services to children and families in the state. 115 (13%) of MDCPS's caseworkers provide licensure services, i.e., recruitment, retention, training, and licensure of foster care parents. 114 (13%) of MDCPS's caseworkers provide adoption services to families who adopt children in the care of the state.

In addition to its caseworkers, as of May 1, 2019, MDCPS employed 214 caseworker supervisors, 12 investigation specialists,[3] and 29 quality assurance coordinators.[4]

---

[2] According to an analysis of the child protective services workforce in Texas, licensed social workers are better able to handle child protection job duties, particularly when violence and neglect are involved because of the additional training and skills learned in bachelor's and master's social work programs.

[3] As part of the Special Investigations Unit, incumbents investigate all allegations of maltreatment of foster children, regardless of placement setting, as well as reports of child fatalities that meet the criteria for investigations.

[4] Quality Assurance Coordinators ensure the coordination of work performed by MDCPS staff through periodic review of case work plans and recorded narratives, and verification that work is conducted in accordance with current laws and regulations.

**Exhibit 2: Caseworkers by Type of Work, as of May 1, 2019**



SOURCE: PEER analysis of employee data provided by MDCPS.

## FY 2019 MDCPS Organizational and Administrative Changes

**In FY 2019, MDCPS added a third field operations division, updated caseworker job titles, and increased the number of in-service training hours required for caseworkers and caseworker supervisors.**

### MDCPS added a third field operations division.

On June 1, 2018, MDCPS added a third field operations division, which created a new Field Operations Deputy Director position to increase oversight of the Department's caseworkers and caseworker supervisors. See Appendix C on page 39.

### MDCPS updated caseworker job titles to track the duties and responsibilities of each type of caseworker more efficiently.

On July 19, 2018, the Mississippi State Personnel Board (MSPB) approved the following MDCPS-specific job titles and occupational class series:

- Child and Family Protection Specialist, I through IV (frontline workers);

- Adoption Specialist, I through IV;

- Licensure Specialist, I through IV;

- Investigation Specialist, I through III; and,

- Quality Assurance Coordinator, I through IV.

Previously MDCPS used the DHS – Family Protection Specialist and Family Protection Worker job class series to hire all of its workers,

i.e. frontline, adoption, licensure, investigation, and quality assurance coordinators. By creating the new MDCPS-specific positions, Department staff is better able to track its allocation of workers to different responsibilities, and potential employees are able to better understand the duties of the position in which they are seeking employment.

**MDCPS increased its annual in-service training requirements for both caseworkers and caseworker supervisors as required by the *Olivia Y.* lawsuit.**

Pursuant to the 2nd MSA, as of January 1, 2019, MDCPS increased its annual in-service training requirements for both caseworkers and caseworker supervisors:

- Caseworkers: must receive 40 hours (increased from 20 hours in the previous year) of in-service training.

- Caseworker supervisors: must receive 24 hours (increased from 12 hours in the previous year) of in-service training.

# Sources and Uses of Funding

**MDCPS FY 2019 revenues totaled approximately $195.9 million, a 4% increase from the $187.9 million received in FY 2018. During FY 2019, MDCPS expenditures for salaries totaled approximately $80 million (41% of its total expenditures), including $53 million for its caseworkers and caseworker supervisors. MDCPS provided $35 million (18% of its total expenditures) to child welfare agencies delivering services and programs to Mississippi children and their families.**

This chapter includes discussions of sources and uses of MDCPS funding in FY 2019. As of July 1, 2019, the Department had worked with the Department of Finance and Administration to create funds specific to MDCPS for tracking its revenues and expenditures separate and apart from the Mississippi Department of Human Services.

As anticipated in *Report #627,* MDCPS had a revenue shortfall in FY 2019 due to the use of FY 2019 funds to cover FY 2018 expenses. During the Legislature's 2019 Regular Session, MDCPS requested and received a deficit appropriation of $7.5 million for the purpose of supporting the operations of the Department.

## Sources of Funding

**In FY 2019, 50% of MDCPS's total revenues were state general funds and 40% were federal funds.**

> MDCPS received approximately **$195.9 million** in FY 2019, a **4%** increase from FY 2018.

In FY 2019, MDCPS received approximately $195.9 million in revenues, a 4% increase from the $187.9 million received in FY 2018. Revenues increased in FY 2019, due to the Legislature appropriating additional Capital Expense Funds to MDCPS to support its operations during the fiscal year.

In FY 2019, MDCPS revenues included:

- **$98 million** in state general funds (**50%** of total revenues);
- **$19.5 million**[5] in state support special funds (Capital Expense Fund)[6] (**10%** of total revenues);
- **$387,422** in other state support special funds (.**002%** of total revenues); and,
- **$78 million** in federal funds (**40%** of total revenues).

Exhibit 3 on page 10, presents total MDCPS revenues, by funding source, for state fiscal years 2017, 2018, and 2019.

Appendix D on pages 40-41 provides a description of all federal revenues received by MDCPS, by funding source, in FY 2019.

---

[5] In addition to the $7.5 million deficit appropriation (from the Capital Expense Fund) MDCPS received during the Legislature's 2019 Regular Session, MDCPS also received $12 million in Capital Expense Funds appropriated by the Legislature during its 2018 Regular Session to support the operations of MDCPS for FY 2019.

[6] MISS. CODE ANN. Section 27-103-303(3) (1972) authorizes the following uses for the Capital Expense Fund: capital expense needs, repair and renovation of state-owned properties, and specific expenditures authorized by the Legislature.

**Exhibit 3: MDCPS Revenues by Funding Source for State Fiscal Years 2017, 2018, and 2019**

| Source of funding | FY 2017 | FY 2018 | FY 2019 |
|---|---|---|---|
| State General Funds | $98.3 Million | $97.9 Million | $98 Million |
| Federal Funds | $67.8 Million | $88.5 Million | $78 Million |
| State Support Special Funds | $13.4 Million | None | $19.5 Million |
| Other State Support Special Funds | $2.7 Million | $1.5 Million | $387,422 |
| **Total Revenues** | $182.4 Million | $187.9 Million | $195.9 Million |

Note: Total amounts may not add due to rounding.

SOURCE: PEER analysis of MDCPS's legislative budget requests for FY 2019, FY 2020, and FY 2021.

## Uses of Funds

**In FY 2019, MDCPS expenditures totaled approximately $195.9 million. By major object, MDCPS's largest expenditure was on personal services (44% of total expenditures).**

MDCPS currently has one budget program, Family and Children's Services. However, beginning in FY 2020, MDCPS will track its programs and expenditures by the eight new budget programs discussed in Appendix B on page 38:

- MDCPS – Administration;
- MDCPS – MACWIS;
- MDCPS – CCWIS;
- MDCPS – Trafficking;
- MDCPS – Training;
- MDCPS – Permanency;
- MDCPS – Prevention; and,
- MDCPS – Frontline (i.e., Foster Care).

MDCPS did not estimate its expenditures by accountability program for FY 2019.

**Total MDCPS expenditures increased by 4% from FY 2018 to FY 2019.**

As shown in Exhibit 4 on page 11, in FY 2019, MDCPS expenditures were approximately $195.9 million, an increase of $8 million (4%) from FY 2018. While travel, contractual services, commodities, and capital outlay all decreased from FY 2018 to FY 2019, salaries and wages increased by approximately $1 million and subsidies, loans, and grants increased by $12 million.

**Exhibit 4: Total MDCPS Expenditures (rounded) for FY 2017, FY 2018, and FY 2019, by Major Object**

| Major Object | FY 2017 Expenditures | FY 2018 Expenditures | FY 2019 Expenditures |
|---|---|---|---|
| **Personal Services** | $83 Million | $88 Million | $87 Million |
| **Salaries, wages, and fringe benefits** | $76 Million | $79 Million | $80 Million |
| **Travel** | $7 Million | $9 Million | $7 Million |
| **Contractual Services** | $39 Million | $42 Million | $41 Million |
| **Commodities** | $2 Million | $1 Million | $401,524 |
| **Capital Outlay** | $1.6 Million | $92,401 | $1,190 |
| **Subsidies, Loans, and Grants** | $55.7 Million | $56 Million | $68 Million |
| **Total Expenditures** | **$182.4 Million** | **$187.9 Million** | **$195.9 Million** |

Note: Total amounts may not add due to rounding.

SOURCE: PEER analysis of MDCPS's budget requests for FY 2019, FY 2020, and FY 2021.

**Salaries, wages, and fringe benefits were approximately 92% of total personal services expenditures in FY 2019.**

Forty-four percent of MDCPS's total FY 2019 expenditures were on personal services, i.e., salaries, wages, fringe benefits, and travel.

Total salaries, wages, and fringe benefits were approximately $80 million (92% of total personal services expenditures), including approximately:

- $53 million (66%) for caseworker and caseworker supervisor positions;[

- $17 million (21%) for administrative positions, including state office and field office staff; and,

- $10 million (13%) for other field office staff (excludes administration and caseworkers and caseworker supervisors).

Travel expenditures were approximately $7 million (8% of total personal services expenditures). According to MDCPS staff, the Department incurs a significant expense for travel specifically for its foster care and adoption staff, who are required to conduct investigations of reported allegations of child abuse and/or neglect, visit homes of children in custody, attend court hearings,

and transport children who are in state custody to and from appointments (e.g., medical appointments).

While salaries increased by less than one percent from FY 2018 to FY 2019, travel expenditures decreased by $1.8 million. According to MDCPS staff, the decrease is largely due to successful implementation of Trip Optimizer (mandated by the Department of Finance and Administration for all agencies to compute the least costly means of transportation) and reduction in overnight travel for its staff.

**Foster care maintenance payments made up 81% of total expenditures on subsidies, loans, and grants.**

Thirty-five percent of MDCPS's FY 2019 expenditures were for subsidies, loans, and grants, which include foster care maintenance payments (reimbursements made to foster parents for providing care to children in state custody), county reimbursements for foster care services, and sub-grants provided to child welfare agencies. Foster care maintenance payments made up approximately 81% ($55 million) of total expenditures in this major object.

**A majority of contractual services expenditures were for the care of children in Department custody.**

Contractual services made up 21% of MDCPS expenditures in FY 2019. A majority of contractual service expenditures were for the care of children in Department custody and those considered at risk for custody, including medical services and independent contractors hired to conduct home study services for prospective foster parents to become licensed foster homes. Expenditures in this major object also included but were not limited to the Department's legal fees, development of MDCPS's new case management system, [7] and employee tuition reimbursement and staff training.

**In FY 2019, commodities and capital outlay expenditures decreased by $716,802 (64%).**

In order to pay expenditures to support over 4,800 children in state custody, MDCPS reduced its commodities and capital outlay expenditures by $716,802 (64%), from $1.1 million ($1 million + $92,401) in FY 2018 to $402,714 ($401,524 + $1,190). MDCPS spent less of its revenues on printing, office supplies, educational materials, computer equipment and repair, etc. during FY 2019. Combined, expenditures in these two major objects only made up .21% of MDCPS's total expenditures in FY 2019.

---

[7] A child welfare case management system allows caseworkers to monitor all aspects of their assigned cases, e.g., the client's mental and physical health, family/guardian situations, education and social goals and outcomes, and social determinants of health, such as housing, food security, and family support.

**MDCPS expended approximately $35 million on child welfare agencies providing services to Mississippi children and their families.**

In FY 2019, MDCPS expended approximately $35 million on nineteen child welfare agencies providing services to children and families in Mississippi, including therapeutic foster care, emergency shelter, group home services, and intervention programs.

To determine what specific programs were being provided by these child welfare agencies and funded by MDCPS, PEER conducted an intervention program inventory survey for all child and family well-being programs serving Mississippi children and families, using subgrant and contract information obtained from MDCPS. While eight agencies responded to the survey and provided a list of programs, name of county where program is delivered, number of participants served, and total program expenditures (see Appendix E on pages 42-44), eleven agencies did not respond. Also, of those entities that did respond to the survey, there were significant gaps in the information provided. For these reasons, the expenditures on programs presented in Appendix E do not add up to the total $35 million expended by MDCPS. PEER plans to obtain the missing information for these programs and from agencies not responding to the survey, during its annual review of MDCPS for FY 2020. In addition, PEER plans to match programs to high-quality research as defined in MISS. CODE ANN. Section 27-103-159(1)(a), (1)(c), and (1)(g) (1972).

# Caseload Analysis

**The Mississippi Department of Child Protection Services could improve compliance and efficiency by continuing to redistribute caseworker and caseworker supervisor positions. Progress toward achieving reasonable caseloads for all MDCPS caseworkers would be better measured by tracking mean caseloads and deviations from the mean. Inequality in the distribution of caseworker caseloads and caseworker supervisor workloads is the main reason for the Department's low performance on percentage-compliant mandates.**

This chapter includes discussions of:

- caseload standards and compliance mandates set forth in the 2nd MSA, including PEER's concerns with both;

- MDCPS caseworker caseload and caseworker supervisor workload data problems;

- analysis of MDCPS compliance with mandates set forth in the 2nd MSA;

- caseload analysis based on the calculation of mean FY 2019 caseload for caseworkers and workload for caseworker supervisors; and,

- inequality in the distribution of caseworker caseloads and caseworker supervisor workloads.

While MISS. CODE ANN. Section 43-26-1(7)(b) (1972) requires a review of "caseloads for social workers for each county or another appropriate geographic area," because MDCPS does not track which of its employees are licensed social workers, PEER included all MDCPS workers handling cases in its caseload analysis.

## Caseload Standards and Compliance Mandates Set Forth in the 2nd MSA

**MDCPS's current caseload standards are based on outdated information and do not align with current child welfare practices. The compliance mandates for caseworkers and caseworker supervisors set forth in the 2nd MSA obscure important information about workload and service provisions and encourage inefficient and unequal distribution of labor.**

As discussed in PEER's previous annual review of MDCPS (Report #627), based on a 2005 study of the time needed to complete cases by type, the *Olivia Y.* court monitor developed standards of the maximum number of cases, by type, that a caseworker can reasonably handle.

Exhibit 5 on page 15 presents the caseload standards for child protection caseworkers by type of case. The court monitor mandated that 90% of caseworkers should have a weighted caseload no greater than 1.

**Exhibit 5: Caseload Standards per Child Protection Caseworker**

| Type of Case | Case unit | Standard number of cases | Weight Per Case (100% Capacity) |
|---|---|---|---|
| **Child Protection** (investigations level 2 and 3) | Investigation | 14 | 0.0714 |
| **Ongoing Foster Care** (placement responsibility and service) | Children | 14 | 0.0714 |
| **In-Home Cases** (protection responsibility and service, prevention responsibility and service and Interstate Compact on the Placement of Children (ICPC) - incoming) | Families | 17 | 0.0588 |
| **Adoptions** (adoption county of service) | Children | 15 | 0.0667 |
| **New Application Licensing** (resource inquiry, ICPC application, and foster home study) | Homes | 15 | 0.0667 |
| **Renewal Licensing** (foster home supervision and foster home renewal) | Homes | 36 | 0.0278 |

Note: The weighted caseload for an individual caseworker is calculated by multiplying the number of cases that the worker is assigned by the weight associated with each case type and adding the results together for workers assigned more than one type of case. An individual full-time worker's weighted caseload should be no greater than 1.0 (the weighted caseload standard), which is the estimated average capacity for an individual caseworker.

SOURCE: The 2nd MSA.

The workload standard for caseworker supervisors was derived from the Council on Accreditation's (COA) recommendation that the ratio of frontline caseworker supervisors to caseworkers in child and family services agencies should not exceed 1:5. The court monitor recommended and the parties agreed in the 2nd MSA that 85% of MDCPS caseworker supervisors must comply with this workload standard.

**Since 2005-2006, MDCPS has not conducted a workload study based on current caseworkers' time and responsibilities to determine the range of time necessary for a caseworker to perform a task in accordance with best practices.**

The current caseload standards, which were adopted over thirteen years ago, do not reflect current child welfare practice, which have significantly changed since the Child Welfare League of America (CWLA) conducted its "systems review" of the Mississippi Department of Human Services' Division of Family and Children's Services in 2005-2006. Further, there is inadequate documentation of how the standards currently in use were established. According to the CWLA, any workload analysis must be regularly updated if

an agency is to ensure that its capacity for effective service delivery is maintained. In addition, caseload standards should be carefully compared to facts on the ground, in a fully documented, reproducible process. Attention should be paid to the range of times necessary to perform a task in accordance with best practices, and individual caseloads should be assessed as to where they fall within that range of best practice.

**PEER continues to have concerns with the percentage-compliant mandates set forth in the 2nd MSA because they obscure important information and encourage inefficient and unequal distribution of labor.**

The theory behind establishing percentage-compliant mandates is that overloaded workers are less able to deliver quality service. While it is important to know the number and percentage of workers with excessive weighted caseloads and excessive number of caseworkers supervised, it is also important to know the extent to which workloads vary, in either direction, from the reasonable maximum standard. Percent-above-benchmark standards, like the 90% mandate for caseworkers, hide information about the trait being measured. In addition, a percentage-compliant mandate can distort, obscure, and reverse trends over time. When incorporated into public policy, such standards lead to distorted incentives. In this context, the mandates obscure important information about caseworker caseloads and supervisor workloads and service provision and encourage inefficient and unequal distribution of labor.

## MDCPS Caseworker Caseload and Caseworker Supervisor Workload Data Problems

**While MDCPS did ensure all caseworkers had unique worker ID numbers in FY 2019, many of the same caseload and workload data problems observed by PEER in FY 2017 and FY 2018 persisted into FY 2019.**

As in FY 2017 and FY 2018, PEER received data from MDCPS on daily caseloads for frontline, adoption, and licensure caseworkers, and workloads for caseworker supervisors for FY 2019.

In an improvement over previous years, MDCPS's FY 2019 frontline caseworker dataset had reliable and universally available worker ID numbers. The few FY 2019 cases in which ID numbers were associated with more than one name were very likely either typos or last name changes (e.g., following marriage), based on PEER's manual inspection of all such occurrences.

In other respects, MDCPS caseworker caseload and caseworker supervisor workload data presented the same problems as in FY 2017 and FY 2018, including duplicated data, missing data, inconsistent adherence to formatting and naming practices, and internally contradictory data. These are not problems of technological capacity, but of system use. These problems can be fixed at minimal cost by adherence to best practices for data management.

Four points about data quality are of particular relevance to PEER's analysis. First, not all 365 days in the fiscal year are accounted for in any of the datasets. The frontline caseworker dataset contains only 227 days of data; the caseworker supervisor dataset contains 255 days. This year, two different summaries of adoption and licensure caseworkers were provided; one had 188 days of data, the other 255 days. Many missing days are on weekends. Data for weekends and holidays should not be missing because caseworkers still carry caseloads and caseworker supervisors still carry workloads during those times. MDCPS has stated that an automated procedure for recording data on weekends and holidays stopped functioning in 2017. This procedure has either not been fixed or has not been applied.

Second, because of the improvement in worker ID assignment, all analyses of frontline caseworker data for FY 2019 used worker ID numbers as unique worker identifiers. This is a change from the method of analysis used by PEER for FY 2017 and FY 2018, in which format-corrected first name-last name combinations were used as unique identifiers. For this reason, caution should be used in drawing comparisons across years.

Third, the new datasets presenting a breakdown of adoption and licensure caseworkers' caseloads frequently disagreed with the aggregated data on those caseworkers' caseloads. MDCPS provided both breakdown and aggregate data on 39,950 caseworker-days during FY 2019. Of those, the count of cases presented in the breakdown agreed with the count of cases presented in the aggregate on only 25,895 worker-days (65% of the time). The weighted caseload agreed on only 25,180 worker-days (63% of the time). As such, there is inconsistency either in the underlying data or the operational definitions used to create the adoption and licensure caseloads. For this analysis, PEER used aggregated data for consistency with previous years. However, PEER has no assurance that either dataset is correct. Obvious inconsistencies raise the prospect of errors that cannot be detected by automated means.

Fourth, caseworker supervisor data also contain anomalies. Notably, there are 18 caseworker supervisors that, according to the data, never supervised a single caseworker for a single day; one of these supervisors nominally worked all 255 recorded days without supervising a single caseworker. This is not conceptually impossible, but it is at least a cause for closer inspection of primary data.

## Analysis of MDCPS Compliance with Mandates Set Forth in the 2nd MSA

**MDCPS never met the percentage-compliant mandate for its frontline, adoption, and licensure caseworkers during FY 2019. Caseworker supervisors complied with the mandate for a few days during FY 2019.**

The first two graphs presented in Exhibit 6 on page 19 show that the daily percentage of caseworker caseloads in compliance with

the caseload standards never met the 90% compliant mandate in FY 2019 and only met the 90% mandate once during the three-year period of FY 2017 through FY 2019, likely due to an error in the data for that date in FY 2017. As of May 30, 2019, only 55% of MDCPS frontline and adoption and licensure caseworkers had weighted caseloads meeting the 1.0 weighted caseload standard set by the Court pursuant to the *Olivia Y.* lawsuit. The annual trend lines[8] for FY 2019 show frontline caseworkers moving away from compliance with the 90% mandate and adoption and licensure caseworkers moving towards compliance with the 90% mandate.

As shown in the third graph in Exhibit 6, the workloads of caseworker supervisors are close to meeting the 85% compliance mandate set by the Court pursuant to the *Olivia Y.* lawsuit. As of May 30, 2019, 82% of MDCPS caseworker supervisors carried workloads meeting the mandate and during a few days during FY 2019, their workloads met the mandate.

---

[8] The solid blue lines on the graphs represent annual trends, by state fiscal year.

**Exhibit 6: Compliance with the 90% Weighted Caseload Mandate for Frontline Caseworkers and Adoption and Licensure Caseworkers and 85% Workload Mandate for Caseworker Supervisors**

Frontline Caseworkers



Adoption and Licensure Caseworkers



Caseworker Supervisors



SOURCE: PEER analysis of MDCPS caseworker caseload and caseworker supervisor workload data.

## Caseload Analysis Based on Calculation of Mean FY 2019 Caseload for Caseworkers and Workload for Caseworker Supervisors

**Despite low compliance with the percentage-compliant mandates for caseworkers, analysis indicated that the mean[9] daily caseload for caseworkers and workload for caseworker supervisors for FY 2017 to FY 2019 was not far from the weighted caseload standard for caseworkers and the standard number of caseworkers supervised for caseworker supervisors.**

The solid black line on the first two graphs in Exhibit 7 on page 21 shows the mean daily weighted caseload standard for frontline caseworkers (the first graph) and adoption and licensure caseworkers (the second graph) during the period of FY 2017 through FY 2019. On the third graph, the solid black line shows the mean daily number of caseworkers supervised by caseworker supervisors during the same period. In the first two graphs, the dotted line shows the weighted caseload standard (1.0) for all types of caseworkers, and in the third graph, the dotted line shows the 5.0 workload standard for caseworker supervisors. As was the case in FY 2017 and FY 2018, the FY 2019 mean weighted caseload for all types of caseworkers never varies far from the 1.0 weighted caseload standard. Further, the mean weighted workload for caseworker supervisors is always below the 5.0 workload standard for the period reviewed.

The shaded areas of the three graphs in Exhibit 7 show the dispersion of daily weighted caseloads among individual caseworkers (graphs 1 and 2) and daily number of caseworkers supervised for caseworker supervisors (graph 3). The lighter shading shows the dispersion of all weighted caseloads for caseworkers and workloads for caseworker supervisors. For frontline caseworkers (the first graph) there is wide dispersion, both above and below the standard, in the daily weighted caseloads carried by individual caseworkers. Wide dispersion also exists for the daily number of caseworkers supervised by individual caseworker supervisors. During FY 2019 there were frontline caseworkers carrying caseloads approaching four times the weighted caseload standard while there were caseworker supervisors supervising three times the standard number of caseworkers; i.e., supervising 15 caseworkers instead of the standard workload of 5 caseworkers. On a positive note, the daily dispersion of caseloads for adoption and licensure caseworkers is narrowing towards the standard.

The darker shading on the three graphs in Exhibit 7 shows the dispersion of weighted caseworker caseloads (graphs 1 and 2) and caseworker supervisor workloads falling between the 25th and 75th percentiles. This darker shading shows that 75% of the weighted caseworker caseloads and caseworker supervisor workloads fall into a range fairly close to the mean weighted caseload and workload standard over the three fiscal years reviewed.

---

[9] PEER calculated the mean weighted caseload on a given day by calculating the total weighted caseload for that day and dividing by the number of relevant caseworkers for that day.

**Exhibit 7: Mean and Dispersion of Caseload for Frontline Caseworkers and Adoption and Licensure Caseworkers, and Workload for Caseworker Supervisors**



SOURCE: PEER analysis of MDCPS caseworker caseload and caseworker supervisor workload data.

## Inequality in the Distribution of Caseworker Caseloads and Caseworker Supervisor Workloads

**A review of FY 2019 individual mean weighted caseworker caseloads and caseworker supervisor workloads by the number of days that the individual worked during the fiscal year shows that there is inequality in the distribution of individual caseworker caseloads and caseworker supervisor workloads.**

Another way to analyze MDCPS FY 2019 caseworker caseloads and caseworker supervisor workloads is by taking into consideration the number of days that each worker worked in FY 2019. It is logical that newer employees, presumably represented by those workers with few reported days worked during the fiscal year, would carry smaller caseloads and workloads.

The graphs in Exhibit 8 on page 24 plot every frontline caseworker (the first graph), adoption and licensure caseworker (the second graph), and caseworker supervisor (the third graph) on a graph of their recorded total days worked in FY 2019 (the x axis) and their mean weighted caseload or caseworkers supervised (the y axis) for FY 2019. On these graphs, the black horizontal dotted line represents the weighted caseload standard of 1.0 for caseworkers and the standard number of caseworkers supervised (5.0) for caseworker supervisors. If every caseworker carried exactly the weighted caseload standard and every caseworker supervisor only supervised 5 caseworkers, every dot on the graph would be located exactly on the dotted line in each graph. If every worker carried exactly the weighted caseload standard and workload standard, every dot on the graph would be located exactly on the workload standard line. Dots above the line indicate excessive caseloads for caseworkers and caseworkers supervised for caseworker supervisors and dots below the line indicate caseworker caseloads and caseworker supervisor workloads that are smaller than the standard.

As expected, caseworkers and caseworkers' supervisors with few reported days worked during FY 2019 tend to have caseloads and workloads falling below the dotted line (i.e., smaller caseloads and caseworker supervised). Among every caseworker and caseworker supervisor who worked every recorded day of FY 2019, the mean caseload and number of caseworkers supervised, is highly dispersed. This means there are caseworkers with excessive weighted caseloads, but at the same time there are caseworkers with weighted caseloads approaching zero. The same exist for caseworker supervisors and the number of caseworkers supervised. These graphs show inequality in the distribution of caseworker caseloads and caseworker supervisor workloads.

During PEER's exit conference with MDCPS, Department staff stated that they have been trying to address caseload inequality by assigning caseloads across counties. As evidence of this, MDCPS staff provided a method for calculating caseloads shared across counties for a subset of its frontline caseworkers. For this subset, the method suggests that an average of 2.5% of cases by weight (refer to Exhibit 5 on page 15 for case-weights) crossed county

borders during FY 2019. MDCPS staff did not attempt to document casework across county borders for the remaining subset of cases.

Under the assumptions of MDCPS's method, the Department has been sharing work across county boundaries for some time, for some subset of the population. In fact, the Department was sharing caseloads across counties at a higher rate when PEER's original recommendation to share cases across counties was created. In other words, by MDCPS's method, the progress this fiscal year was backward rather than forward. The purpose of PEER's recommendation was to redistribute excess cases among counties and thus decrease inefficient overloading and underloading. As previously discussed, this has not occurred. The original recommendation did not apply solely to the subset of cases identified by MDCPS's method.

If the business rules employed in MDCPS's method can be documented, then some work occurs across county borders. However, it is neither the case that the practice of sharing work across county boundaries has changed since the original recommendation was made, nor that the underlying issue of the inefficiency in caseload distribution has improved.

**Exhibit 8: FY 2019 Mean Weighted Caseload and Days Worked for All Frontline Caseworkers and Adoption and Licensure Caseworkers and Mean Workload and Days Worked for All Caseworker Supervisors**

Frontline Caseworkers



Adoption and Licensure Caseworkers



Caseworker Supervisors



SOURCE: PEER analysis of MDCPS caseworker caseload and caseworker supervisor workload data.

Caseloads have an impact on caseworkers' performance, and as a result on the well-being of the children in their care. There is some level of caseload beyond which any individual cannot perform adequately. That level need not be the same for any two individuals, but it exists for every individual.

The CWLA analysis discussed on pages 15-16 has been used to establish such a caseload limit for MDCPS. PEER believes this analysis to be empirically inadequate for several reasons, including:

- that it is over thirteen years old and MDCPS staff have stated that ordinary child welfare practice has changed during this time;
- the original study involved data from only nine staff of the Mississippi State Department of Human Services, Division of Family and Children's Services, an inadequate number to support generalizations;
- the original study includes no measures of performance; in other words, it does not establish that the nine individuals were achieving satisfactory outcomes for their cases. It is important, not just to measure typical time to complete a case, but typical time to complete a case with acceptable results.;
- the study does not establish a range of acceptable performance, but sets an unrealistic single numeric boundary for all cases of a given type; and,
- the study inadequately operationalized its methods for deriving expected performance.

As discussed on page 5, PEER has recommended that MDCPS conduct a new caseload study of the range of time necessary for a caseworker to perform a task in accordance with current best practices and establish new caseloads standards based on the results of the study. MDCPS has filed a motion for relief from the 90% caseworker caseload requirement in the 2nd MSA. However, the motion does not include a replacement standard as recommended by PEER.

The practical effect of the Department's unequal distribution of labor among frontline caseworkers, under the assumptions of the CWLA standards, is that the equivalent of over 1,000 children received service from caseworkers with caseloads exceeding the standard nearly every day in FY 2019 (except for one, which is likely an error). Simultaneously, caseworker capacity sufficient to serve more than 1,000 children per day goes unused.

# Analysis of Annual MDCPS Turnover Rates

**In FY 2019 the annual turnover rate for caseworkers was 30%, a 9% increase over the previous year, while the annual turnover rate for all other staff was 15%, a 2% increase.**

This chapter includes discussions of:

- calculating annual turnover;
- turnover rate for non-caseworker staff;
- turnover rates for caseworkers; and,
- estimated cost of caseworker turnover in FY 2019.

It is important to note that while MISS. CODE ANN. Section 43-26-1(7)(c) (1972) requires a review of "turnover rates of social worker staff by county or other geographic area," PEER expanded its review to include all MDCPS workers handling cases because MDCPS does not track which of its employees are licensed social workers.

## Calculating Annual Turnover

**Turnover is the rate at which employees leave positions in an agency.**

**Non-preventable turnover** includes retirement, death, marriage/parenting, returning to school, or spousal job move.

Turnover is defined as the rate at which employees leave positions in an agency. Agencies can review turnover rates to determine employee stability within the entire agency, specific counties, regions, and certain positions. Turnover rate can be calculated by including both preventable and non-preventable turnover or distinguishing between the two.

In order to calculate turnover rates for state fiscal year 2019, PEER requested MDCPS employee data from the Mississippi State Personnel Board for the period of July 1, 2018 to June 30, 2019. PEER calculated turnover by determining the sum of job losses (in which a PIN changes from occupied to vacant) and job changes (in which a PIN changes from being occupied by one person to being occupied by a different person) in a given period, and dividing by the total number of PINs in the same period.

## Turnover Rate for Non-caseworker Staff

**In FY 2019, MDCPS's annual turnover rate for non-caseworker staff increased by 2%.**

The annual turnover rate for non-caseworker positions was **15%** in FY 2019.

The annual turnover rate for all non-caseworker positions increased by 2%, from 13% in FY 2018 to 15% in FY 2019. While it is essential for MDCPS to reduce the turnover rate for its caseworkers, it is also important for the Department to maintain a knowledgeable support staff.

## Turnover Rates for Caseworkers

**In FY 2019, MDCPS's annual turnover rate for caseworkers increased, as did the turnover rate for caseworkers in 43 counties.**

### In FY 2019, MDCPS's annual turnover rate for caseworker positions increased by 9%.

> The annual turnover rate for MDCPS caseworker positions was **30%** in FY 2019.

The annual turnover rate for MDCPS caseworkers increased by 9%, from 21% in FY 2018 to 30% in FY 2019. PEER notes that for the last three years, MDCPS's turnover rate has ranged from 21% to 30%, which is comparable to the reported national average annual turnover rate for child welfare workers. However, it is important to note that the Department also has a large number of vacancies (25% of total positions), as discussed on page 6.

As reported in PEER's review of the Department for FY 2017 and FY 2018, while the national average annual turnover rate for child welfare workers is 30%, the Annie E. Casey Foundation suggests an optimal turnover rate at or below 10% to 12%. Some agency turnover can be beneficial, if it eliminates low performers, e.g., non-productive staff and/or those not willing to improve. However, high turnover in child welfare agencies, specifically of caseworkers, not only affects the agency but directly affects the children and families who are being served by the child welfare system. Research indicates that developing and maintaining a well-trained, highly skilled workforce to successfully deliver quality services and supports is key to achieving positive outcomes for vulnerable children, youth, and their families.

### Twelve of MDCPS's fourteen regions and forty-three counties had an increase in caseworker turnover from FY 2018 to FY 2019.

The statewide caseworker turnover rate was greater in FY 2019 than in FY 2018. As shown in Appendix F on pages 45-47, twelve of MDCPS's fourteen regions had an increase in caseworker turnover from FY 2018 to FY 2019. As discussed on page 6, as of May 1, 2019, 230 (47%) of MDCPS's vacant positions were caseworkers.

Considering caseworker turnover by county, from FY 2018 to FY 2019, 43 counties experienced an increase in caseworker turnover (see Appendix F on pages 45-47). While the turnover rate for counties with a small number of caseworkers can be significantly impacted by the loss of one caseworker (e.g., Tunica County), some of the counties with 15 or more caseworkers in FY 2018 experienced high turnover in FY 2019, e.g., Desoto County (84%), Warren County (60%).

From FY 2018 to FY 2019, thirteen counties did not experience any caseworker turnover. In addition, Franklin County and Jefferson County have not had caseworker turnover in the three years reviewed by PEER.

MDCPS staff stated that the increase in turnover is in part due to the large number of children in state custody and leadership changes in the Department's field offices.

**According to responses submitted on MDCPS's online voluntary employee exit interview survey, the top three reasons employees left the Department in FY 2019 were for other employment (50%), work environment (27%), and dissatisfaction with salary (25%).**

To understand why an employee departs from the agency, MDCPS began conducting online voluntary employee exit interview surveys beginning in August 2017. The online survey includes multiple choice questions regarding training, work duties, supervision and teamwork, salary and benefits, and overall job experience. At the end of the survey, employees can add comments regarding actions MDCPS can take to build a better workplace and any other comments, questions, or concerns.

In FY 2019, 124 departing employees (roughly half of the total number of departing employees) had completed the online survey. Frontline, Field Operations, and Field Support staff made up 91% of the survey respondents. More than half of the departing employees had been with MDCPS for two years or less, with 20% leaving within one year. The top three reported reasons employees left MDCPS were for other employment (50%), work environment (27%), and dissatisfaction with salary (25%).

While the exit survey responses did not reveal departing employees' dissatisfaction with training, quality of supervision, or work-related stress, 44% of respondents reported feeling like they were not valued and appreciated as an employee of MDCPS and 66% of respondents believed that their salary was not appropriate for the position they were exiting.

**MDCPS asserts that funding its career ladder for all caseworker positions will allow the Department to retain experienced staff to provide continuity in services to children and families.**

The Department anticipates reducing turnover by implementing a caseworker career ladder that MSPB approved in FY 2019. In its budget request for FY 2021, MDCPS requested $7.1 million in funding for the implementation of its caseworker career ladder. According to MDCPS staff, implementation of its career ladder will enable the Department to retain experienced caseworkers and supervisors to provide continuity in services to children and families in Mississippi.

## Estimated Cost of Caseworker Turnover

**The Annie E. Casey Foundation reports that the cost to a child welfare agency every time a caseworker leaves ranges from 30% to 200% of the exiting employee's annual salary.**

According to the Annie E. Casey Foundation, the cost to a child welfare agency every time a caseworker leaves ranges from 30% to 200% of the exiting employee's annual salary.[10] The range includes direct and indirect costs of turnover. Direct costs of turnover are the specific measurable expenditures associated with processing the departing employee's separation and the new employee's hiring

---

[10] The average annual salary for MDCPS caseworkers in FY 2019 was $32,064.98.

and training. Indirect costs of turnover include the value of lost productivity, reduced services, and impact on children and families. Indirect costs are more difficult to measure and can also be higher than direct costs.

Appendix G on page 48, provides examples of direct and indirect costs of turnover.

# Development of MDCPS's New Case Management System

**The 2ⁿᵈ MSA requires MDCPS to develop a new case management system by June 30, 2021, only twenty months away from the publication date of this report. While MDCPS expended at least $3.2 million on staff and technical consultants between 2017 and August 2019 to begin the process of developing a new custom-built case management system, MDCPS has now decided to procure an off-the-shelf system in order to meet its impending court-imposed deadline. MDCPS is on the verge of issuing an RFP to expend up to $28.7 million to develop and deploy its off-the-shelf case management system with limited documentation supporting needed system design features and associated costs.**

This chapter includes discussions of:

- problems with MDCPS's current case management system (MACWIS);

- requirement to develop a new case management system (CCWIS); and,

- history and current status of MDCPS's development of CCWIS.

## Problems with MDCPS's Current Case Management System (MACWIS)

**While MDCPS's current case management system, MACWIS, is outdated and needs to be replaced, a new system will not necessarily correct the Department's data problems resulting from errors in data entry and instances of failure to adhere to best practices for data management.**

The Mississippi Automated Child Welfare System (MACWIS), implemented in the mid to late 1990s and considered to be a "legacy" system,[11] is MDCPS's current case management system. Department staff utilize MACWIS to manage and track child abuse and neglect investigations, in-home child protection cases, and children in foster care. MDCPS staff input the status, demographic characteristics, locations, and goals for the placement of every child who is in foster care.

MACWIS is written in a computer language for which programmers are not easy to find, and has an internal structure that makes it difficult to carry out common types of analyses needed by the Department. According to MDCPS staff, MACWIS is at the end of its life cycle, is time-consuming, expensive to maintain, and does not allow for the introduction of new technologies to enable MDCPS staff to effectively manage their work and adapt to constant changes in regulations and requirements.

Over the last eleven years the court monitor in the *Olivia Y.* lawsuit has reported problems with data in MACWIS, including missing data and data that fails validation checks. The most recent court monitor report, released on June 11, 2019, notes that many of these problems intensified after personnel changes in MDCPS's IT

---

[11] A legacy system, in the context of computing, refers to outdated computer systems, programming languages, or applications that are still being used even though upgrades are available.

division in March 2018. PEER also observed that many of the Department's data problems are due to errors in data entry and instances of failure to adhere to best practices for data management.

## Requirement to Develop a New Case Management System (CCWIS)

**The 2nd MSA in the *Olivia Y.* lawsuit requires Mississippi to develop a new case management system, CCWIS, to replace MACWIS by June 30, 2021. The CCWIS project involves a revised set of federal requirements for child protection case management that enable greater flexibility in data entry methods and should reduce the time spent by MDCPS caseworkers on data entry and data management.**

In the 2nd MSA, the Court mandated that MDCPS replace MACWIS with a Comprehensive Child Welfare Information System (CCWIS).[12]

Section 1.5.a of the 2nd MSA states the following:

> *"MDCPS shall maintain comprehensive information systems that permit: (1) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement setting and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding actions in a child's case and whether they have taken place.*

In addition, section 1.5.b of the 2nd MSA states that:

> *"MDCPS shall have a Comprehensive Child Welfare Information System (CCWIS) appropriate to its size and complexity that shall meet federal requirements by June 30, 2021. Defendants shall take reasonable steps to ensure data quality and verification of the accuracy of data in CCWIS. The CCWIS system shall have the necessary controls to decrease the risk of duplication of data and to reduce the risk of incorrect or invalid data. The system shall provide a visible trail to authorized administrators of all information entered, added, deleted, or modified, and shall have necessary security to protect data integrity. This system shall be audited at least annually to ensure the accuracy and validity of data in the system."*

The CCWIS project involves a revised set of federal requirements for child protection case management systems that enable greater

---

[12] CCWIS is optional for states receiving Title IV-E federal funds for foster care. As of August 22, 2019, 46 states (including Mississippi), the District of Columbia, and Puerto Rico are in the process of replacing their current child welfare case management systems with CCWIS. These states are in various stages of CCWIS development. The 2nd MSA approved by the Court mandates MDCPS to implement CCWIS.

flexibility in data entry methods, e.g., the ability to import child data stored externally, and thus theoretically reduces data entry and data management workload on personnel, particularly caseworkers and caseworker supervisors. Appendix H on page 49, summarizes the requirements for CCWIS established in 45 CFR Section 1355.52. The regulations require MDCPS to ensure that the costs associated with the system are reasonable and beneficial and that the data maintained in the system is complete, timely, and accurate.

## History and Current Status of MDCPS's Development of CCWIS

**From 2017 to August 2019, MDCPS expended at least $3.2 million to hire IT staff and contract with several consultants to begin the process of developing a new custom-built case management system.    MDCPS subsequently decided to purchase an off-the-shelf case management system. The Department is on the verge of issuing an RFP to expend up to $28.7 million to develop and deploy its new off-the-shelf system with limited documentation supporting needed system design features and associated costs.**

As of August 2019, MDCPS had expended at least $3.2 million on development of the CCWIS project. This includes costs of MDCPS staff ($1.5 million), as well as the costs of consultants ($1.8 million) hired in 2017 to assist MDCPS staff with the development of CCWIS. According to the CCWIS contracts, the technical consultants were hired to:

- perform a systemic assessment of MACWIS and assist with the design and development of CCWIS;
- provide project management;
- establish and administer controls to ensure the quality of deliverables for the area of responsibility;
- develop and maintain a detailed work plan and schedule for the project;
- organize, direct, and coordinate planning and production of all Quality Assurance contract technical services activities;
- monitor project activities to ensure project schedules are met; and,
- provide weekly and monthly status reports on project development.

When PEER requested MDCPS to provide documentation of the deliverables required in the contracts, the MDCPS Commissioner stated in a letter to PEER that:

> *The then Deputy Commissioner for Information Technology and the then Project Director for CCWIS are no longer employed by the agency. Current staff have reviewed their files but have been unable to identify which documents may have been produced by the contractors. If such documents exist, they cannot be readily identified at this time.*

Following an exit conference with PEER for this review, MDCPS staff provided PEER with a set of computerized files purportedly containing the work products of the contractors.  However, it is not

readily apparent from these records that the consultants provided the deliverables required in their contracts.

In his letter to PEER, the MDCPS Commissioner stated that the Department determined that, due to budget deficits, funds were not available to continue the services of the CCWIS consultants and their contracts were eventually terminated. During the exit conference, MDCPS staff stated that the Department is taking a different direction with the development of a new case management system and is planning to procure an off-the-shelf system rather than developing a custom-built system in order to meet its impending court-imposed deadline.

MDCPS's previous strategic direction regarding the CCWIS project decreased the Department's control over its own case management system through the choice of non-normalized database software optimized for storing data elements with arbitrary internal structure and no regular relations to other data elements. By ceding control to an external vendor, the Department runs the risk of incurring high future costs for special analyses that the Department could run on its own in a software solution with a more fixed data structure. Available documentation of the new CCWIS project direction contains limited description of the intended software and data structure. As the project proceeds, care should be taken to avoid the kind of problems mentioned above, and more generally to ensure that both the user interface and the data structure itself meet the Department's needs.

During its 2019 Regular Session, the Legislature appropriated an additional $15 million in Capital Expense Funds to MDCPS to defray the expenses for information technology system developments, including the CCWIS project, during FY 2020. In July of 2019, MDCPS presented its business case for CCWIS to the Mississippi Department of Information Technology (ITS) Board. The case as presented contained no explanation for the Department's $28.7 million cost estimate for CCWIS, except for a one-line parenthetical note "Based on other State Procurement." The case included no documentation for the annual cost estimates nor did it present a cost-benefit analysis or discuss other options for consideration. Despite these shortcomings in the business case presented, the ITS Board gave MDCPS approval to create a request for proposals (RFP) for the CCWIS project. MDCPS had not yet released the RFP as of October 22, 2019. The Department anticipates configuration of the new database to take 15 to 18 months and estimated it to have a total life cycle costs of $28.7 million, funded with 50% state funds and 50% federal funds from the Administration for Children and Families, Children's Bureau. PEER notes that the Department only has 20 months before the Court's June 30, 2021 implementation deadline.

**While MACWIS is an outdated system and needs to be replaced, the same problems will exist with CCWIS if MDCPS does not develop a clear plan or document its processes.**

While MACWIS is an outdated system, the vast majority of the issues identified during the course of this review are primarily user issues rather than software issues, e.g., errors with data entry, storage and maintenance, and improper application of business rules. Simply having better practices regarding code documentation, file retention, and data entry would eliminate many of the observed problems. These fixes are neither expensive nor difficult; they are approximately equivalent to having established, written procedures for data entry, code documentation, and such, and then following those procedures. While MDCPS has adopted new data quality policies since PEER's last review, the persistence of data quality problems indicates these policies were not fully implemented in FY 2019. PEER notes that better data handling is vital to the mission of MDCPS, but moving ahead with its development of CCWIS without a clear plan or supporting documentation is not the way to economically achieve this goal as mandated in 45 CFR Section 1355.52(a).

# Recommendations

1. The Mississippi Office of the State Auditor should conduct an audit of the Mississippi Department of Child Protection Services' expenditure of $3.2 million on contracts for the development of a custom-built case management system to ensure that all deliverables were produced according to the terms of the contracts.

2. In order to enhance its accountability for the use of appropriated funds, the Mississippi Department of Child Protection Services (MDCPS) should estimate and identify expenditures and full-time equivalents by accountability program. (PEER Committee staff are available to assist with this effort.)

3. MDCPS should identify child and family well-being intervention programs to serve Mississippi children and families and ensure that such programs are supported by high-quality research, as defined in MISS. CODE ANN. Section 27-103-159(1)(a), (1)(c), and (1)(g), to achieve intended outcome(s). (PEER Committee staff are available to assist with this effort.)

4. With regard to data quality and accuracy issues identified by PEER, MDCPS should implement its written procedures for code documentation, file retention, and data entry processes. The Department should review its data quality assurance procedures periodically and ensure that all relevant employees are trained and demonstrate competency regarding such procedures.

5. MDCPS should conduct a new caseload study based on current caseworkers' time and responsibilities to determine the range of time necessary for a caseworker to perform a task in accordance with best practices. MDCPS should establish new standards based on the results of this study.

   Once this is accomplished, MDCPS should redistribute caseworker positions so that they more closely match expected caseloads. In addition, MDCPS should consider assigning more cases to caseworkers in bordering counties to better distribute caseloads.

6. MDCPS staff should confer with the court monitor and attorneys representing the Plaintiffs in the *Olivia Y.* lawsuit to discuss replacing the percentage-compliant mandates (90% for caseworkers and 85% for caseworker supervisors) with mandates based on statistical difference from central tendency and dispersion of caseloads abiding by best practices (as established in recommendation 5).

7. The MDCPS Commissioner should direct the Department's staff to develop a detailed business case for the CCWIS

project prior to issuing a request for proposal (RFP) to procure the system. The business case should evaluate the technical requirements of the data management system, any implementation alternatives, a detailed cost estimate for the project and a detailed timeline for the development and implementation of the new system. The MDCPS Commissioner should also direct Department staff to maintain complete and accurate documentation of the procurement process.

8. In order to document the professional competency of its frontline, adoption, and licensure staff, MDCPS should maintain a current list of all licensed social workers in the Department.

# Appendix A: Brief Update of the *Olivia Y.* Lawsuit[13]

The 2nd Modified Mississippi Settlement Agreement and Reform Plan came into effect on January 1, 2018, and supersedes the first two settlement agreements in the lawsuit. The new settlement agreement, outlines systemic infrastructure standards, including but not limited to agency leadership, caseworker qualifications, caseload measurements, and data collection and reporting. Additionally, the 2nd MSA sets forth foster care service standards and measures with specific time frames for achieving each measure.

In May 2018, Plaintiffs in the lawsuit filed a contempt motion alleging that MDCPS was not in compliance with the caseload standards and percentage-compliant mandates for caseworkers and caseworker supervisors set forth in the 2nd MSA. Therefore, the Plaintiffs requested that the Court appoint a federal "receiver" to take over Mississippi's foster care system. In response, MDCPS filed a 60(b) motion requesting that the Department be relieved of the caseload requirements.

The Court Monitor Report, *Progress of the Mississippi Department of Child Protection Services,* issued on June 11, 2019, states that MDCPS had only met 37 of the 113 requirements from the 2nd MSA and were unable to provide data for 18 of the requirements. In addition, the Court Monitor could not validate quantitative data submitted by the Department for 23 of the requirements.

At the time of this report, the Court had not yet made a ruling on the Plaintiffs request for receivership.

SOURCE: PEER analysis of *Olivia Y.* court documents.

---

[13] Appendix A on page 59 of *A Review of the Mississippi Department of Child Protection Services for Fiscal Years 2017 and 2018 (Report #627),* https://www.peer.ms.gov/Reports/reports/MDCPS-Full.pdf. contains a brief history of the *Olivia Y.* Lawsuit.

# Appendix B: MDCPS Budget Programs for FY 2020

| Budget Program Name | Description |
|---|---|
| MDCPS – Administration | This budget program includes the following areas within the agency: Commissioner's Office, human resources, federal reporting, policy, finance, eligibility, contracting, centralized intake, continuous quality improvement, and data reporting. This includes all salaries, travel, and contractual expenses associated with these areas. |
| MDCPS – MACWIS | This budget program includes all staff, contracts, and equipment costs utilized to support MDCPS's legacy case management system, MACWIS. |
| MDCPS – CCWIS | This budget program includes all staff, contracts, travel costs, and equipment costs associated with the development of a comprehensive child welfare information system. |
| MDCPS – Trafficking | This budget program is in response to H.B. 571 and H.B. 1652 passed by the Legislature during its 2019 Regular Session to provide MDCPS with funding for coordination and services of children who have been victims of human trafficking. This program has been established to provide for salary and contractual expenses. |
| MDCPS – Training | This budget program includes the training and professional development functions of the agency. This includes all salaries, travel, and contractual expenses associated with professional development and training. |
| MDCPS – Permanency | This budget program includes the areas of adoption and independent living within the agency. This includes all salaries, travel, and contractual expenses associated with in these areas. |
| MDCPS – Prevention | The adoption of the Families First Prevention and Services Act in 2018, shifts the focus of child welfare to a model that highlights the prevention of children from entering foster care through the provision of prevention services to keep families together, safely. This budget program includes salaries, travel, and contractual expenses associated with prevention programs and services. |
| MDCPS – Frontline (i.e., Foster Care) | This budget program includes the following areas within the agency: frontline (caseworkers), field support, foster care board payments, foster care contractual, foster care fund, client services, licensing of foster homes and congregate care settings, special investigations, Interstate Compact on the Placement of Children (ICPC), and contracts for licensure homes studies of potential foster care homes. |

SOURCE: MDCPS.

# Appendix C: MDCPS Regions, by Field Operations Division in FY 2019

*The new Field Operations Division is highlighted in gray.*

| Western Field Operations Division | Eastern Field Operations Division | Southern Field Operations Division |
|---|---|---|
| **Region 2 West:** Coahoma, West and East Bolivar, Sunflower, Washington, Humphreys, Issaquena, Sharkey, Leflore, Carroll, Holmes, Montgomery | **Region 2 East:** DeSoto, Tate, Tunica, Panola, Quitman, Tallahatchie, Yalobusha, Grenada | **Region 6:** Lamar, Forrest, Perry, Stone |
| **Region 3 North:** Yazoo, Madison, Rankin | **Region 1 North:** Marshall, Benton, Tippah, Alcorn, Prentiss, Tishomingo | **Region 7 East:** Greene, George, Jackson |
| **Region 3 South:** Hinds | **Region 1 South:** Lafayette, Union, Pontotoc, Lee, Itawamba, Monroe | **Region 7 Central:** Harrison |
| **Region 5 East:** Copiah, Lincoln, Lawrence, Simpson, Jefferson Davis, Covington, Smith, Marion | **Region 4 North:** Calhoun, East and West Chickasaw, Webster, Clay, Choctaw, Oktibbeha, Lowndes, Attala, Winston, Noxubee | **Region 7 West:** Pearl River, Hancock |
| **Region 5 West:** Warren, Claiborne, Jefferson, Adams, Franklin, Wilkinson, Amite, Pike, Walthall | **Region 4 South:** Leake, Neshoba, Kemper, Scott, Newton, Lauderdale, Wayne | |

SOURCE: MDCPS.

# Appendix D: Federal Revenues Received by MDCPS in FY 2019, by Funding Source

**U.S. Department of Health and Human Services' Administration for Children and Families, Children's Bureau.**

**Adoption and Legal Guardianship Incentives**                              **$270,098**

Recognizes improved performance in helping children and youth in foster care find permanent homes through adoption and legal guardianship.

**Child Abuse Prevention and Treatment Act (CAPTA)**                         **$60,988**

Provides federal funding to states in support of prevention, assessment, investigation, prosecution, and treatment activities.

**Education and Training Voucher (ETV)**                                     **$865,557**

Provides resources specifically to meet the education and training needs of youth aging out of foster care.

**Chafee Foster Care Independence Program**                                 **$805,124**

Helps current and former foster care youth achieve self-sufficiency. Grants are offered to states and tribes who submit a plan to assist youth in a wide variety of areas designed to support a successful transition to adulthood. Activities and programs include, but are not limited to, help with education, employment, financial management, housing, emotional support and assured connections to caring adults for older youth in foster care.

**Community-based Grants for the Prevention of Child Abuse and**

**Neglect (CBCAP)**                                                         **$287,365**

Supports community-based efforts to develop, operate, expand, enhance, and coordinate initiatives, programs, and activities to prevent child abuse and neglect and to support the coordination of resources and activities to better strengthen and support families to reduce the likelihood of child abuse and neglect.

**Monthly Caseworker Visit**                                               **$34,415**

Funding is intended to improve the quality of caseworker visits with children and families.

**Promoting Safe and Stable Families (PSSF) (Title IV-B, Subpart 2)**       **$3,641,819**

Provided to develop a coordinated and integrated service system that builds on the strengths of families and communities; emphasize collaborative approaches, early identification of issues and the delivery of prevention, intervention and support services; prevent child abuse and neglect, protect children from further abuse, and promote permanency for children within their own families or with kinship or adoptive families; and strengthen families and remove barriers to child safety, permanency, and well-being.

**Stephanie Tubbs Jones Child Welfare Services (Title IV-B, Subpart 1 of the Social Security Act)**                                                    **$3,159,811**

Designed to support services and activities intended to protect and promote the welfare of all children; prevent child abuse, neglect, or exploitation; permit children to remain in their own homes or return to them whenever it is safe and appropriate; promote safety, permanency, and well-being for children in foster care and adoptive families; and provide training to ensure a well-qualified child welfare workforce.

**Title IV-E Foster Care**                                                    **$19,962,319**

Provides federal reimbursement to states for the costs of children placed in foster homes or other types of out-of-home care under a court order or voluntary placement agreement. Title IV-E benefits are an individual entitlement for qualified children who have been removed from their homes.

**Title IV-E Adoption Assistance**                                                    **$17,166,407**

Funds are available for a one-time payment to assist with the costs of adopting a child as well as for monthly subsidies to adoptive families to assist with the care of the eligible child. Additionally, funds are available for: administrative costs to manage the program; training staff and adoptive parents; adoptive parent recruitment; and other related expenses.

**U.S. Department of Health and Human Services' Administration for Children and Families, Office of Refugee Resettlement.**

**Refugee Social Services Program**                                                    **$30,000**

Supports employability services and other services that address barriers to employment.

**Refugee Cash and Medical Assistance Program**                                                    **$1,734,373**

Provides short-term medical assistance to newly-arriving refugees and other populations who are eligible for ORR benefits.

**U.S. Department of Health and Human Services' Administration for Children and Families, Office of Family Assistance.**

**Temporary Assistance to Needy Families (TANF)**                                                    **$30,000,000**

Designed to help needy families achieve self-sufficiency. The four purposes of TANF are to: provide assistance to needy families so that children can be cared for in their own homes or in the homes of relatives; end the dependence of needy parents by promoting job preparation, work, and marriage; prevent and reduce the incidence of out-of-wedlock pregnancies; and encourage the formation and maintenance of two-parent families.

**Total Federal Revenues: $78,018,276**

SOURCE: PEER analysis of the MDCPS budget request for FY 2021.

# Appendix E: Inventory of Child and Family Well-being Intervention Programs Funded by MDCPS in FY 2019

| Name of entity delivering the program | County where the program is delivered | Program name | Program description | Program expenditures | Participants served |
|---|---|---|---|---|---|
| Instructional Access, Inc. | Hinds | Technology-based Entrepreneurial Youth Conference | A week-long youth conference providing interactive entrepreneurial workshops where students use technology to learn, explore, design projects, build a business plan, learn how to market their product, film, and edit their project for presentation to a large group. | $177,282.08 | 82 youth and 24 MDCPS staff |
| Apelah | DeSoto, Madison | PRIDE Model of Practice (Therapeutic Foster Care) | A week-long training on providing foster care services utilizing the 2003 edition of alternative ways of interpreting behaviors and interacting with children. | $3,336,598  This includes expenditures funded by MDCPS for all programs offered by Apelah. | 280 |
| Apelah | DeSoto, Madison | Nonviolent Crisis Intervention (Therapeutic Foster Care) | Adults, average age 35, participate in four to eight hours of information to prevent and manage escalating crisis behaviors in oneself. | see PRIDE Model of Practice expenditures above | 280 |
| Apelah | Madison | Youth Mental Health First Aid (Therapeutic Foster Care) | Discussion of skills when interacting with youth experiencing a mental health problem/crisis. | see PRIDE Model of Practice expenditures above | 150 |
| Christians in Action, Inc. | Hinds | Emergency Child Shelter | Services include individual and group therapy, family team meetings, education and enrichment activities, recreation, medical, dental, vision assessments, psychological assessments, crisis management, and independent living skills training. | $324,583 | 92 |
| Hope Village for Children, Inc. | Lauderdale | Therapeutic Group Homes | The agency provides services to group home residents, including providing an individualized treatment plan to monitor the progress toward participant's goals, and providing Trauma Informed Care-EQ2, Mental Health First | $1,080,100 | 48 |

| | | | Aid, and MANDT. In an effort to promote permanency, the agency facilitates and participates in family team meetings and provides residents independent living services. | | |
|---|---|---|---|---|---|
| Hope Village for Children, Inc. | Lauderdale | Therapeutic Transitional Living Homes | Provides therapeutic residential transitional living services to young adults who have lived in the agency's Therapeutic Group Home and are aging out of the foster care system. Participants are taught independent living skills in an effort to help them be successful adults when they leave the agency's care. | $76,650 | 3 |
| Hope Village for Children, Inc. | Lauderdale | Emergency Shelter | Emergency shelters provide short term, 45 days, residential care to Mississippi's abused and neglected foster children who are between the ages of birth through twenty-one. The agency provides individual assessments for every child utilizing Trauma Informed Care (EQ2), Mental Health First Aid, and the Mandt System. Staff facilitates and participates in family team meetings in an effort to provide the best possible outcome for children. | $249,284 | 73 |
| Hope Village for Children, Inc. | Lauderdale | Temporary Transitional Living Program | Provides temporary housing to former and current Mississippi foster children who are now attending college and have no other place to live during the times the college is closed or on holidays. | $76,650 | 6 |
| Mississippi SIDS and Infant Safety Alliance | All counties in Mississippi | Baby Basics Program | Provides education on SIDS/SUID Risk Reduction and Safe Sleep Environments to expectant and new parents, caregivers, professionals, and the general public. Participants receive baby supplies, sleep sacks, and the book, *Caring for Your Baby and Young Child*. | $8,337 | 610 (includes the entire infant safe sleep initiative) |
| Mississippi SIDS and Infant Safety Alliance | All counties in Mississippi | Cribs for Kids Program | Provides a pack 'n play to referred families that cannot afford a safe sleep area for their baby. | $3,517 | See the Baby Basics Program |
| Mississippi SIDS and Infant Safety Alliance | All counties in Mississippi | Safe Sleep Hospital Certification Program | Mississippi SIDS and Infant Safety Alliance visits birthing hospitals and provides them with tools and information to become a Cribs for Kids Safe Sleep Certified Hospital. The program requires safe sleep education be provided to families before they leave the hospital. | $217 | See the Baby Basics Program |

| | | | | | |
|---|---|---|---|---|---|
| Mississippi SIDS and Infant Safety Alliance | All counties in Mississippi | Infant Safe Sleep Initiative Marketing and Social Media | Provides safe sleep education through billboards, Facebook, Instagram, newsletters, etc. | $16,391 | See the Baby Basics Program |
| Sally Kate Winters Family Services | Clay | Emergency Shelter Program | Provides temporary placement for children and youth from birth to 17 years of age. In addition to basic shelter services for food, clothing, and housing, the program also provides an array of crisis intervention services to assist with safety, well-being, and permanency. Overnight respite services are also offered to provide foster parents a short-term break (1 to 14 days) from the role of parent and caretaker. These services can be used during a crisis with the child or when a family or child would benefit from a short-term separation from one another. Services include room and board; 24-hour supervision, crisis counseling, and recreational activities. | not provided | 91 (46 shelter participants and 45 respite participants) |
| Sunnybrook Children's Home, Inc. | Madison | Residential Program | Group home for abused and neglected children ages 10 to 20 who are either in state custody or privately placed. While in the program, residents attend public school, participate in tutoring and counseling services, learn various job skills, volunteer at various facilities, and participate in many extracurricular activities provided by volunteers and donors. | $240,000 | 23 MDCPS placed children |
| Youth Villages | Statewide | MYPAC | An in-home Medicaid service for youth that provides wraparound services, including care coordination and therapeutic services administered by separate staff members. | Funded by Medicaid | 739 |
| Youth Villages | Hinds, Forrest, Lee, and surrounding counties | In CIRCLE | In CIRCLE provides preservation for youth at risk of removal from their family and reunification for youth returning to their family. | $1,689,341.38 | 238 |

SOURCE:  Survey of Child Welfare Agencies providing programs and services to children and families in Mississippi.

# Appendix F: FY 2017, FY 2018, and FY 2019 Annual Caseworker Turnover Rates and Average Number of Caseworkers, by County and Region

| Region/County | FY 2017 Turnover | FY 2017 Average Number of Caseworkers | FY 2018 Turnover | FY 2018 Average Number of Caseworker | FY 2019 Turnover | FY 2019 Average Number of Caseworkers |
|---|---|---|---|---|---|---|
| **I-N** | **18%** | **72** | **20%** | **77** | **27%** | **51** |
| Alcorn | 15% | 27 | 16% | 19 | 57% | 11 |
| Benton | 0% | 2 | 0% | 2 | 80% | 1 |
| Marshall | 19% | 11 | 11% | 18 | 18% | 14 |
| Prentiss | 22% | 9 | 26% | 12 | 12% | 7 |
| Tippah | 21% | 14 | 40% | 15 | 30% | 8 |
| Tishomingo | 23% | 9 | 9% | 11 | 0% | 9 |
| **I-S** | **31%** | **106** | **18%** | **106** | **26%** | **66** |
| Itawamba | 28% | 11 | 24% | 12 | 0% | 9 |
| Lafayette | 30% | 10 | 19% | 10 | 18% | 5 |
| Lee | 35% | 34 | 17% | 35 | 32% | 23 |
| Monroe | 40% | 18 | 21% | 14 | 37% | 6 |
| Pontotoc | 11% | 19 | 5% | 19 | 45% | 11 |
| Union | 40% | 15 | 25% | 16 | 9% | 10 |
| **II-E** | **34%** | **71** | **16%** | **74** | **57%** | **46** |
| DeSoto | 22% | 36 | 17% | 35 | 84% | 21 |
| Grenada | 26% | 12 | 0% | 11 | 22% | 6 |
| Panola | 20% | 5 | 63% | 6 | 14% | 6 |
| Quitman | 144% | 2 | 0% | 3 | 50% | 1 |
| Tallahatchie | 46% | 4 | 0% | 4 | 0% | 2 |
| Tate | 86% | 5 | 20% | 5 | 21% | 5 |
| Tunica | 55% | 2 | 0% | 3 | 100% | 2 |
| Yalobusha | 32% | 6 | 16% | 6 | 54% | 4 |
| **II-W** | **36%** | **88** | **17%** | **84** | **19%** | **56** |
| Bolivar | 0% | 10 | 31% | 10 | 34% | 4 |
| Carroll | 0% | 4 | 25% | 4 | 0% | 3 |
| Coahoma | 49% | 8 | 22% | 9 | 14% | 6 |
| Holmes | 17% | 6 | 39% | 8 | 33% | 4 |
| Humphreys | 17% | 6 | 21% | 5 | 0% | 2 |
| Issaquena | 0% | 1 | 0% | 1 | 0% | 1 |
| Leflore | 52% | 6 | 0% | 5 | 20% | 5 |
| Montgomery | 33% | 6 | 0% | 5 | 0% | 2 |
| Sharkey | 0% | 1 | N/A | N/A | N/A | N/A |
| Sunflower | 26% | 8 | 0% | 8 | 0% | 5 |
| Washington | 44% | 44 | 18% | 39 | 22% | 24 |
| **III-N** | **35%** | **74** | **18%** | **73** | **42%** | **38** |
| Madison | 31% | 10 | 29% | 10 | 46% | 4 |
| Rankin | 35% | 55 | 17% | 52 | 39% | 27 |
| Yazoo | 42% | 9 | 9% | 11 | 50% | 8 |
| **III-S** | **31%** | **99** | **19%** | **88** | **30%** | **50** |
| Hinds | 31% | 99 | 19% | 88 | 30% | 50 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **IV-N** | **35%** | **63** | **17%** | **70** | **32%** | **47** |
| Attala | 28% | 7 | 25% | 8 | 35% | 4 |
| Calhoun | 22% | 5 | 22% | 5 | 50% | 4 |
| Chickasaw | 16% | 6 | 16% | 6 | 0% | 4 |
| Choctaw | 86% | 1 | 44% | 2 | 0% | 2 |
| Clay | 21% | 9 | 0% | 8 | 0% | 4 |
| Lowndes | 39% | 18 | 30% | 23 | 47% | 15 |
| Noxubee | 0% | 2 | 0% | 3 | 33% | 3 |
| Oktibbeha | 66% | 9 | 0% | 11 | 43% | 6 |
| Webster | 29% | 4 | 31% | 3 | 46% | 2 |
| Winston | 25% | 8 | 0% | 6 | 21% | 4 |
| **IV-S** | **35%** | **77** | **19%** | **79** | **23%** | **60** |
| Clarke | 0% | 7 | 34% | 6 | 50% | 2 |
| Jasper | 20% | 5 | 0% | 4 | 0% | 2 |
| Jones | 33% | 18 | 10% | 19 | 13% | 14 |
| Kemper | 55% | 2 | 0% | 1 | 0% | 2 |
| Lauderdale | 18% | 22 | 35% | 23 | 28% | 17 |
| Leake | 63% | 3 | 39% | 3 | 24% | 3 |
| Neshoba | 25% | 8 | 0% | 10 | 10% | 9 |
| Newton | 0% | 3 | 21% | 5 | 52% | 3 |
| Scott | 69% | 9 | 20% | 10 | 27% | 7 |
| Wayne | 87% | 6 | 20% | 5 | 31% | 2 |
| **V-E** | **23%** | **71** | **21%** | **68** | **15%** | **42** |
| Copiah | 20% | 10 | 20% | 10 | 0% | 5 |
| Covington | 0% | 4 | 28% | 4 | 0% | 3 |
| Jefferson Davis | 0% | 7 | 15% | 7 | 0% | 4 |
| Lawrence | 0% | 3 | 0% | 3 | 0% | 2 |
| Lincoln | 23% | 13 | 27% | 11 | 12% | 7 |
| Marion | 37% | 22 | 27% | 23 | 17% | 16 |
| Simpson | 27% | 11 | 12% | 9 | 36% | 4 |
| Smith | 0% | 2 | 0% | 2 | 50% | 2 |
| **V-W** | **35%** | **67** | **23%** | **69** | **34%** | **39** |
| Adams | 12% | 17 | 6% | 17 | 9% | 11 |
| Amite | 60% | 3 | 28% | 4 | 0% | 2 |
| Claiborne | 36% | 3 | 0% | 2 | 0% | 2 |
| Franklin | 0% | 2 | 0% | 2 | 0% | 3 |
| Jefferson | 0% | 3 | 0% | 3 | 0% | 2 |
| Pike | 59% | 17 | 35% | 17 | 59% | 7 |
| Walthall | 0% | 7 | 0% | 8 | 61% | 3 |
| Warren | 45% | 13 | 54% | 15 | 60% | 8 |
| Wilkinson | 100% | 2 | 0% | 2 | 0% | 2 |
| **VI** | **34%** | **79** | **35%** | **70** | **17%** | **37** |
| Forrest | 28% | 56 | 32% | 43 | 19% | 17 |
| Lamar | 67% | 9 | 56% | 14 | 22% | 11 |
| Perry | 123% | 3 | 56% | 4 | 0% | 4 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Stone | 10% | 10 | 11% | 9 | 17% | 6 |
| **VII-C** | **15%** | **129** | **18%** | **124** | **25%** | **79** |
| Harrison | 15% | 129 | 18% | 124 | 25% | 79 |
| **VII-E** | **18%** | **68** | **24%** | **67** | **38%** | **36** |
| George | 20% | 5 | 31% | 6 | 44% | 4 |
| Greene | 41% | 2 | 0% | 3 | 0% | 2 |
| Jackson | 17% | 60 | 24% | 58 | 40% | 29 |
| **VII-W** | **39%** | **72** | **29%** | **71** | **30%** | **31** |
| Hancock | 39% | 51 | 30% | 46 | 24% | 19 |
| Pearl River | 38% | 21 | 28% | 25 | 38% | 13 |

SOURCE: PEER analysis of MDCPS employee data provided by MSPB.

# Appendix G: Examples of Direct and Indirect Costs of Employee Turnover

| Direct Costs | Indirect Costs |
|---|---|
| Processing departing employees' paperwork | Productivity differential between the departing employee and the replacement |
| Pay out of any vacation pay, sick pay | Errors due to inexperience |
| Unemployment compensation payments | Lowered morale and productivity of other employees |
| Recruitment activities, including costs of advertising, and job fairs | Financial consequences of slower service resulting in longer placements in out-of-home care |
| Interviews, reference checks and other background checks | Emotional consequences for children and families due to lack of continuity and delays |
| Training, including both formal classroom training and on-the-job training provided by supervisors, coworkers, and mentors | |

SOURCE: CPS Human Resources Services Turnover Toolkit: A Guide to Understanding and Reducing Employee Turnover.

# Appendix H: Comprehensive Child Welfare Information System (CCWIS) Requirements Established in 45 CFR Section 1355.52

**(a)  Efficient, economical, and effective requirement.**

CCWIS must support the efficient, economical, and effective administration of the Title IV-B and Title IV-E plans pursuant to section 474(a)(3)(c)(iv) of the Act by: maintaining all program data required by federal, state, or tribal law or policy, not duplicating system development or software maintenance, and ensuring costs are reasonable and beneficial.

**(b)  CCWIS data requirements.**

CCWIS must maintain data required to support state, federal, or tribal child welfare laws, regulations, policies, practices, reporting requirements, audits, program evaluations, and reviews, including for: ongoing federal child welfare reports, Title IV-E eligibility determinations, authorizations of services, and expenditures under both Title IV-E and IV-B, and the National Child Abuse and Neglect Data System.

**(c)  Reporting requirements.**

CCWIS must use data to generate, or contribute to: required Title IV-B or IV-E federal reports according to applicable formatting and submission requirements; and, reports needed by state or tribal child welfare laws, regulations, policies, practices, reporting requirements, audits, and reviews that support programs and services described in Title IV-B and IV-E.

**(d)  Data quality requirements.**

Data must: meet the most rigorous of the applicable standards for completeness, timeliness, and accuracy; be consistently and uniformly collected; be exchanged and maintained in accordance with confidentiality requirements; support child welfare policies, goals, and practices; and, not be created by default or inappropriately assigned. In addition, agencies must implement and maintain automated functions in CCWIS to regularly monitor CCWIS data quality; alert staff to collect, update, correct, and enter data; prevent the need to re-enter data already captured or exchanged with CCWIS; and generate reports of continuing or unresolved data quality problems.

**(e)  Bi-directional data exchanges.**

Must be able to exchange relevant data with systems: generating financial payments and claims for Title IV-B and IV-E; operated by child welfare contributing agencies that are collecting and using data; calculating one or more components of Title IV-E eligibility determinations; and external to CCWIS used by Title IV-E agency staff to collect CCWIS data. In addition, CCWIS must support one bi-directional data exchange to exchange relevant data, including data that may benefit Title IV-E agencies and data exchange partners in serving clients and improving outcomes.

**(f)  Data exchange standard requirements.**

Must use a single data exchange standard that describes data, definitions, formats, and other specifications upon implementing CCWIS for bi-directional data exchanges between CCWIS and each child welfare contributing agency.

**(g)  Automated eligibility determination requirements.**

A state Title IV-E agency must use the same automated function or the same group of automated functions for all Title IV-E eligibility determinations.

**(h)  Software provision requirement.**

The agency must provide a copy of the agency-owned software that is designed, developed, or installed and associated documentation to the designated federal repository within the Department upon request.

**(i)  Submission requirements.**

Before claiming funding in accordance with CCWIS cost allocation, agencies must submit an Advance Planning Document or a Notice of Intent that includes: a description of how the CCWIS will meet the federal requirements; a list of all automated functions included in CCWIS; and a notation of whether each automated function meets or when implemented will meet the federal requirements, including no duplication.

SOURCE: PEER summary of 45 CFR Section 1355.52.

# Agency Response



**STATE OF MISSISSIPPI**
Phil Bryant, Governor
**DEPARTMENT OF CHILD PROTECTION SERVICES**
Jess H. Dickinson, Commissioner

November 14, 2019

James A. Barber, Executive Director
Performance Evaluation and Expenditure Review Committee
Post Office Box 1204
Jackson, Mississippi 39215-1204

Dear Mr. Barber,

The purpose of this letter is to set forth the Mississippi Department of Child Protection Services' (MDCPS) response to the Performance Evaluation and Expenditure Review Committee's (PEER) state fiscal year 2019 review of MDCPS's operations under Mississippi Code Section 43-26-1. Below is our response to each recommendation.

**1. The Mississippi Office of the State Auditor should conduct an audit of the Mississippi Department of Child Protection Services' expenditure of $3.2 million on contracts for the development of a custom-built case management system to ensure that all deliverables were produced according to the terms of the contracts.**

MDCPS will, of course, cooperate in such an audit if the Office of the State Auditor finds it necessary. That said, as this report recognizes, the contracts and expenditures in question relate to a project plan and direction for CCWIS development that is no longer being pursued by MDCPS and that was initiated by MDCPS staff no longer employed by the Agency. Accordingly, the audit in question will not provide relevant or useful information for the project as it is now being pursued.

**2. In order to enhance its accountability for the use of appropriated funds, the Mississippi Department of Child Protection Services (MDCPS) should estimate and identify expenditures and full-time equivalents by accountability program. (PEER Committee staff are available to assist with this effort.)**

**3. MDCPS should identify child and family well-being intervention programs to serve Mississippi children and families and ensure that such programs are supported by high-quality research, as defined in MISS. CODE ANN. Section 27-103-159(1)(a), (1)(c), and (1)(g), to achieve intended outcome(s). (PEER Committee staff are available to assist with this effort.)**

The purpose of tracking expenditures and FTEs by accountability program and utilizing evidence-based intervention programs supported by high-quality research is to ensure that agencies exercise their discretion regarding the expenditure of public funds in the most cost-effective manner possible. These practices inform spending decisions, allowing agencies to target spending in the most impactful manner *when* discretion exists in the use of the agency's funds. But where the agency has no discretion in how it spends public funds, the utility of these practices is eliminated.

James A. Barber
November 14, 2019
Page Two

The overwhelming majority of MDCPS's spending is not discretionary and is not devoted to intervention programs in the sense contemplated here. Rather, MDCPS expends most of its funding on nondiscretionary expenses like basic room and board for foster children; salaries for caseworkers, supervisors, and support staff; travel; the operation of its current data system; and the court-ordered development of a new data system.

Most services provided to children in MDCPS custody are paid for by Medicaid, not MDCPS. Also, MDCPS's one major source of service-related expenditures—the In-Circle intensive in-home services program—has been tested with standardized assessment before and after service delivery to demonstrate its efficacy and shown a higher that 90% success rate. So, MDCPS believes the purposes of these recommendations are already adequately addressed.

**4. With regard to data quality and accuracy issues identified by PEER, MDCPS should implement its written procedures for code documentation, file retention, and data entry processes. The Department should review its data quality assurance procedures periodically and ensure that all relevant employees are trained and demonstrate competency regarding such procedures.**

MDCPS has over one thousand users with access to its MACWIS system and responsibility for entering data. Each user is provided training on appropriate use of MACWIS in their documentation. Ultimately, MDCPS believes many of PEER's data-related concerns will be addressed by replacing MACWIS. A more user-friendly and intuitive system will improve data entry. Modern systems keep complete logs of all code changes, providing a complete audit of changes.

**5. MDCPS should conduct a new workload study based on current caseworkers' time and responsibilities to determine the range of time necessary for a caseworker to perform a task in accordance with best practices. MDCPS should establish new standards based on the results of this study. Once this is accomplished, MDCPS should redistribute caseworker positions so that they more closely match expected caseloads. In addition, MDCPS should consider assigning more cases to caseworkers in bordering counties to better distribute caseloads.**

MDCPS has requested funding for a new workload study in its FY2021 budget request. That said, MDCPS utilizes case weights included in the Olivia Y settlement agreement, which carries the weight of a court order. MDCPS has a motion pending in the federal court asking to be relieved of the caseload-related obligations in the settlement agreement. But unless that motion is granted, MDCPS will be unable to change the caseload methodology it now utilizes.

As for the cross-county assignment of cases, MDCPS assigns cases across county lines when it is appropriate to do so. The analysis of this report rests on an assumption that an even distribution of cases is always the best distribution of cases. Given that each case, child, family, and caseworker have unique abilities, challenges, needs, and complexity, that assumption is not correct.

**6. MDCPS staff should confer with the court monitor and attorneys representing the Plaintiffs in the Olivia Y. lawsuit to discuss replacing the percentage-compliant mandates (90% for caseworkers and 85% for caseworker supervisors) with mandates based on statistical difference from central tendency and dispersion of caseloads abiding by best practices (as established in recommendation 5).**

As stated above, MDCPS seeks to be relieved of its current caseload obligation through a motion filed with the federal court. The parties are not a position to simply change this obligation. The court must do so.

James A. Barber
November 14, 2019
Page Three

**7. The MDCPS Commissioner should direct the Department's staff to develop a detailed business case for the CCWIS project prior to issuing a request for proposal (RFP) to procure the system. The business case should evaluate the technical requirements of the data management system, any implementation alternatives, a detailed cost estimate for the project and a detailed timeline for the development and implementation of the new system. The MDCPS Commissioner should also direct Department staff to maintain complete and accurate documentation of the procurement process.**

MDCPS's new CCWIS project direction, and the RFP for vendors to develop that system, is being developed in conjunction with both the Mississippi Department of Information Technology Services and the Children's Bureau within the Administration for Children and Families in the United States Department of Health and Human Services. Before that work began, a business case was presented to the Board of ITS, which approved proceeding with the development of the RFP. The core business case for developing the system is that MDCPS has a legal obligation to do so under the settlement agreement in the Olivia Y litigation. MDCPS believes the involvement of those from expertise in both the state and federal government is sufficient to address the concerns contemplated by this recommendation.

**8. In order to document the professional competency of its frontline, adoption, and licensure staff, MDCPS should maintain a current list of all licensed social workers in the agency.**

MDCPS does not believe implementing this recommendation would serve any useful purpose. MDCPS considers social work degrees and social work licenses as preferred qualifications in hiring decisions. This practice addresses the concern raised in this report: growing the proportion of the workforce with these degrees. Keeping a running list of such employees would not change the composition of the workforce in any way.

Moreover, the suggestion that non-social work degree staff lack "professional competency" is incorrect. Every new MDCPS caseworker, whether they have a social work degree or not, receives 270 hours of training specific to child welfare and MDCPS practice. These individuals are well prepared to enter the workforce regardless of their degree.

Sincerely,

Jess Dickinson, Commissioner
Mississippi Department of Child Protection Services

# PEER Committee Staff

**James A. Barber, Executive Director**

Legal and Reapportionment
Ted Booth, General Counsel
Ben Collins
Barton Norfleet

Administration
Alicia Russell-Gilbert
Deborah Hardy
Gale Taylor

Quality Assurance and Reporting
Richard Boada
Tracy Bobo

Performance Evaluation
Lonnie Edgar, Principal Analyst
David Pray, Principal Analyst
Jennifer Sebren, Principal Analyst
Kim Cummins
Matthew Dry
Samuel Hearn
Matthew Holmes
Taylor Mullins
Sarah Williamson
Julie Winkeljohn
Ray Wright

Performance Accountability
Linda Triplett, Director
Kirby Arinder
Debra Monroe-Lax
Meri Clare Ringer