# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

OLIVIA Y., et al.

Plaintiffs,

     v.

CIVIL ACTION NO.
3:04-CV-251-DCB-FKB

TATE REEVES, as Governor of the State of
Mississippi, et al.

Defendants.

**PLAINTIFFS' PROPOSED AMENDED MEMORANDUM OF LAW IN SUPPORT OF
SECOND AMENDED MOTION FOR RELIEF PURSUANT TO REMEDY PHASE OF
PLAINTIFFS' RENEWED MOTION FOR CONTEMPT, AND FOR THE
<u>APPOINTMENT OF A RECEIVER</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

I.   INTRODUCTION .................................................................................. 1

II.  FACTS ................................................................................................. 3

    A.  Maltreatment of Children in Care ..................................................... 7

    B.  Child Well-Being ............................................................................. 14

    C.  Caseload Standards .......................................................................... 16

    D.  Placement Standards ........................................................................ 18

    E.  Data and Management Information Systems ..................................... 22

III. DISCUSSION ....................................................................................... 23

    A.  Defendants' Extensive, Substantial, and Relentless Noncompliance Warrants the Appointment of a Receivership ............................................................... 27

    B.  The Court May Enter a Finding of Contempt Without Appointing A Receiver ............. 30

        1.  The Court May Find Contempt and Appoint a Limited Receivership ...................... 31

        2.  The Court May Enter a Finding of Contempt and Impose Fines ............................ 33

        3.  The Court Should, at Minimum, Enter a Finding of Contempt Now ........................ 35

IV.  CONCLUSION ..................................................................................... 35

CERTIFICATE OF SERVICE ............................................................................ 36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
   228 F.3d 574 (5th Cir. 2000) ................................................26

*Brenneman v. Madigan*,
   343 F. Supp. 128 (N.D. Cal. 1972) ................................................25

*Crain v. Bordenkircher*,
   180 W. Va. 246, 376 S.E.2d 140 (1988) ................................................29

*Dixon v. Barry*,
   967 F. Supp. 535 (D.D.C. 1997) ................................................27

*Finney v. Ark. Bd. of Corr.*,
   505 F.2d 194 (8th Cir. 1974) ................................................25

*Fla. Steel Corp. v. NLRB*,
   648 F.2d 233 (5th Cir. 1981) ................................................31

*Gary v. Louisiana*,
   Civil Action No. 74-2412, 1990 U.S. Dist. LEXIS 1746 (E.D. La. Feb. 15,
   1990) ................................................29

*Gates v. Collier*,
   501 F.2d 1291 (5th Cir. 1974) ................................................24, 25

*Hamilton v. Love*,
   328 F. Supp. 1182 (E.D. Ark. 1971) ................................................25

*Hutto v. Finney*,
   437 U.S. 678, 98 S. Ct. 2565 (1978) ................................................28, 33

*Jackson v. Bishop*,
   404 F.2d 571 (8th Cir. 1968) ................................................25

*LaShawn A. v. Kelly*,
   887 F. Supp. 297 (D.D.C. 1995) ................................................31, 32, 33

*Lelsz v. Kavanagh*,
   673 F. Supp. 828 (N.D. Tex. Aug. 13, 1987) ................................................23

*M.D. v. Abbott*,
   No. 2:11-CV-0084, 2019 U.S. Dist. LEXIS 194058 (S.D. Tex. Nov. 7, 2019) ................................................34

ii

*McCord v. Maggio,*
    927 F. 2d 844 (5th Cir. 1991) ..............................................................................25

*Newman v. Alabama,*
    466 F. Supp. 628 (M.D. Ala. 1979) ......................................................................29

*Palmigiano v. Garrahy,*
    443 F. Supp. 956 (D.R.I. 1977)..............................................................................25

*Plata v. Schwarzenegger,*
    No. C01-1351 TEH, 2005 U.S. Dist. LEXIS 43796 (N.D. Cal. Oct. 3, 2005)............27, 28, 29

*Plata v. Schwarzenegger,*
    No. C01-1351TEH, 2005 U.S. Dist. LEXIS 8878 (N.D. Cal. May 10, 2005) .................29, 31

*Reynolds v. Ala. DOT,*
    84 F. Supp. 2d 1339 (M.D. Ala. 2000) ..................................................................33

*Rozecki v. Gaughan,*
    459 F.2d 6 (1st Cir. 1972)......................................................................................25

*Shaw v. Allen,*
    771 F. Supp. 760 (S.D. W. Va. 1990) ...............................................................27, 29

*Stone v. City & Cty. of S.F.,*
    968 F.2d 850 (9th Cir. 1992) .............................................................................28, 33

*United States v. Alcoa, Inc.,*
    533 F.3d 278 (5th Cir. 2008) ................................................................................26

*United States v. City of Jackson,*
    318 F. Supp. 2d 395 (S.D. Miss. 2002)..................................................................26

*Watson v. Memphis,*
    373 U.S. 526 (1963)...............................................................................................24

*Whitcraft v. Brown,*
    570 F.3d 268 (5th Cir. 2009) ................................................................................26

**Other Authorities**

Allie Morris,
    *Texas Pays $150,000 fine in foster care lawsuit*, SAN ANTONIO EXPRESS-
    NEWS (Nov. 13, 2019) ...........................................................................................34

Mississippi Department of Human Services, Division of Family and Children's
    Services, Organizational Analysis (Nov. 24, 2015)................................................18

Report to the Mississippi Legislature: A Review of the Mississippi Department of
   Child Protection Services for Fiscal Year 2019........................................................17

## I.    INTRODUCTION[1]

In 2004, Plaintiffs filed their Complaint alleging Defendants' child welfare system violated the constitutional rights of the children in their care. The parties entered their first settlement agreement in 2007, in which Defendants committed to bringing the Mississippi child welfare system up to constitutional and statutory standards. Three years thereafter Plaintiffs filed their first motion for contempt and this Court determined that Plaintiffs had made a prima facie case for contempt. Instead of entering a finding of contempt, the Court directed the parties to renegotiate the time periods for reaching compliance. Since then Defendants have had more than a decade of second-chances, multiple opportunities to re-negotiate the settlement agreement, and a full year of capacity-building without monitoring. But as the Monitor's Reports for 2018 and 2019 demonstrate, Defendants are still far from achieving compliance with the terms of the 2nd MSA.[2] Meanwhile, tens of thousands of the Mississippi's most vulnerable children have languished in Defendants' custody, helplessly waiting for Defendants to make good on their many promises to bring the child welfare system into compliance with the mandates of the United States Constitution.

It has now been a full year since Plaintiffs filed their amended motion requesting that this Court find Defendants in contempt and appoint a receiver to take the helm of Mississippi's

---

[1] Plaintiffs' position and the supporting evidence are laid out fully in their previous filings, which are all incorporated by reference herein as if fully set forth herein. *See* Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt, for an Evidentiary Hearing and for the Appointment of a Receiver [Dkt. 739], accompanying Memorandum of Law in Support [Dkt. 740], Reply in Support [Dkt. 767], Amended Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt [Dkt. 849] ("Amended Renewed Motion"), accompanying Memorandum of Law in Support [Dkt. 850], Reply Memorandum of Law in Further Support [Dkt. 864], Motion for Leave to Supplement Pending Amended Motion for Relief [Dkt. 876], and accompanying Proposed Supplemental Memorandum of Law in Support of Amended Motion for Relief [Dkt. 876-2].

[2] The 2nd Modified Mississippi Settlement Agreement and Reform Plan [Dkt. No.712] ("2nd MSA") is the currently operative settlement agreement.

foster care system. Dkt. 850. On June 26, 2020, the court-appointed neutral Monitor[3] issued its 2019 annual report[4], detailing Defendants' performance under the settlement agreement from January to December 2019. The Monitor's 2019 Report confirms that Defendants remain in flagrant, widespread and substantial violation of the currently operative and court-ordered settlement agreement. Indeed, Defendants are in compliance with less than one-third of their obligations under the 2nd MSA. In light of this new information, Plaintiffs submit this Second Amended Memorandum in support of their Second Amended Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt and their pending Amended Motion for Relief Pursuant to Remedy Phase of Plaintiffs' Renewed Motion for Contempt [Dkt. 849] ("Amended Renewed Motion").

The Monitor's 2019 Report also confirms that, contrary to Defendants' empty promises in the past, more time will *not* cure their noncompliance. Defendants are not even making such promises anymore. Nowhere in their response to this motion do Defendants promise compliance by a specific time. Instead, they responded by filing a motion to be relieved of a critical element of the 2nd MSA, the requirement to meet a particular and agreed-upon weighted caseload standard. Dkt. 756. Accordingly, Plaintiffs renew their request that this Court find Defendants in contempt and appoint a receiver to manage the state's dysfunctional child welfare system, as Defendants have persistently demonstrated they are incapable of managing it themselves. A receiver would be appointed by and answerable to this Court, establishing accountability that is so desperately needed, but clearly lacking under the current circumstances. Although Plaintiffs maintain that a full receivership is necessary here, in this

---

[3] Hereinafter referred to as the "Monitor" or "Public Catalyst".
[4] Progress of the Mississippi Department of Child Protection Services: Monitoring Report for *Olivia Y., et al. v. Bryant, et al.* covering January to December 2019 [Dkt. 897] (the "Monitor's 2019 Report").

memorandum Plaintiffs also propose alternative remedies, should the Court determine that a full receivership is not appropriate at this time.

In light of the flagrant non-compliance detailed in the Monitor's 2019 Report and the urgent need for relief, Plaintiffs are willing to withdraw their request for an evidentiary hearing on the motion and instead move to oral argument on the pending contempt motion, as well as Defendants' pending motion for relief from the weighted caseload standards. Plaintiffs in this Second Amended Motion propose that the oral argument previously scheduled for August 4, 2020, on the necessity of an evidentiary hearing be withdrawn and that instead oral argument on that date take place on Plaintiffs' pending motion for contempt and Defendants' pending motion for relief. Plaintiffs propose, alternatively, that this Court schedule oral argument on the aforementioned pending motions as soon as practicable.

To be clear, Defendants' noncompliance has visceral, human repercussions: real children are being abused and neglected by the very people bound to protect them and real children are being deprived of the many benefits Defendants agreed to provide in the 2nd MSA. The children of Mississippi have waited more than fifteen years for relief from a system that continues to fail them and violates their constitutional rights – they cannot wait any longer.

## II.    FACTS

One year ago, the Monitor published its 2018 report, chronicling Defendants' staggering noncompliance with the terms of the court-approved 2nd MSA.[5] Defendants were required to comply with 113 commitments, due in 2018. Defendants not only failed to comply with at least 35 of those commitments, but additionally failed to produce reliable data for another 41, revealing how little they know about the almost 5,000 Mississippi children in their custody and

---

[5] Progress of the Mississippi Department of Child Protection Services: Monitoring Report for *Olivia Y., et al. v. Bryant, et al.* covering January to December 2018, at 4 [Dkt. 845]("Monitor's 2018 Report").

care. Monitor's 2018 Report at 4, 19. Out of the 113 commitments, Defendants only met the required performance standards for 37. *Id.*

The Monitor's 2019 Report confirms that Defendants' noncompliance has persisted through the entirety of 2019. Of the 126 commitments due in 2019 under the 2nd MSA, Defendants failed to meet performance standards for 54 commitments. Monitor's 2019 Report at 4. For an additional 32 commitments, the Monitor was either unable to validate data submitted by Defendants or Defendants failed to provide any data at all. *Id.* Defendants only met the required performance standards for 39—less than one-third of the commitments they were required to meet. *Id.* And while all provisions of the 2nd MSA are crucial, "[a]mong the areas where MDCPS did not meet the identified performance standards are several critical to child safety." Monitor's 2019 Report at 6.

According to the 2019 Monitor's Report, Defendants failed to comply with the following commitments in 2019:

- Caseworker Caseloads – § 1.3.a

- Supervisor Staffing Ratios – § 1.3.b

- Comprehensive Information Systems – § 1.5.a

- Responding to Reports of Abuse and Neglect – § 2.1

- Special Investigations Unit and Maltreatment in Care Investigation Initiation Timeliness – § 2.2

- Maltreatment in Care Screen-Out Reviews – § 2.3

- Licensure Investigations Upon Substantiated MIC Report – § 2.4

- Licensure Investigations by Child Placing Agencies – § 2.5

- Maltreatment in Care Investigation Reviews – § 2.7

4

- Standardized Decision Making – § 2.8

- Maltreatment Investigations of Foster or Adoptive Homes – § 2.8.c

- Maltreatment Investigations of Agency Group Homes, Emergency Shelters, Private Child Placing Agency Homes, or MDCPS Licensed Facilities – § 2.8.d

- Maltreatment of Children in Care – § 2.9

- Timely Licensure of Foster Homes and Facilities – § 3.1

- Unlicensed Foster Homes and Facilities – § 3.2.a

- Unlicensed Foster Homes and Facilities, Safety Issues – § 3.2.b

- Unlicensed Foster Homes and Facilities, Non-Safety Issues – § 3.2.c

- Young Children Placed in Congregate Care Facilities – § 4.9

- Placement Moves – § 4.10

- Placement Moves – § 4.12

- Emergency and Temporary Placements – § 4.11

- Caseworker Contact with Foster Children – § 5.1.a.2

- Caseworker Contact with Foster Children in Placement – § 5.1.a.2

- Caseworker Contact with Parents With Reunification Goal – § 5.1.c.2

- Caseworker Contact with Foster Parents – § 5.1.d.2

- Child-Parent Contacts within 72 Hours of Placement – § 5.2.a

- Family Visitation Plans – § 5.2.b

- Parental Visitation Plans – §5.2.b.1

- Sibling Visitation Plans – §5.2.b.2

- Comprehensive Family Service Plans – § 6.1.a.2

- Permanency Plans – § 6.1.d.2

- Concurrent Permanency Planning – § 6.2.a.1

- Caseworker Contact With Parents with Reunification Goal (Services) – § 6.3.a.2

- After-care Plans – § 6.3.a.4

- Adoption Specialists and Adoption Plans – § 6.3.b.1.b

- Termination of Parental Rights Referrals – § 6.3.b.2.b

- Another Permanent Planned Living Arrangement (APPLA) – § 6.3.e

- Permanency Plan Reviews – § 6.4.a.2

- Start-up Stipend – § 7.5

- Assist Emancipating Youth Obtain Adequate Living Arrangements – § 7.6

- Assist In Obtaining Educational Records – § 7.8.a

- Assist In Obtaining Social Security Card – § 7.8.b

- Assist In Obtaining Resume – § 7.8.c

- Assist In Obtaining Driver's License/ State ID – § 7.8.d

- Assist In Obtaining Birth Certificate – § 7.8.e

- Assist In Obtaining Previous Placement Information – § 7.8.f

- Assist In Obtaining Citizenship/ Immigration Records – § 7.8.g

- Assist In Obtaining Tribal Eligibility – § 7.8.h

- Assist In Obtaining Parent Death Certificate – § 7.8.i

- Assist In Obtaining Lifebook/ History – § 7.8.j

- Assist In Obtaining Known Relative List – § 7.8.k

- Foster Child Information Provided to Foster Parents/Facility Staff – § 8.1.f.1

- Foster Child Information Provided to Foster Parents/Facility Staff – § 8.1.f.2

6

- Timely Review of Educational Record & Educational Needs – § 8.2.a

- Reasonable Efforts to Ensure Continuity of Child's Education – §8.2.c.1

*See* Monitor's 2019 Report at 8-20.

Further, 2019 was the first year for which the Monitor has reported on Defendants' compliance with the 2nd MSA's qualitative requirements, previously reporting only on the quantitative requirements of the 2nd MSA. As such, the Monitor's 2019 Report revealed significant and substantial discrepancies between Defendants' compliance with quantitative and qualitative requirements—meaning that while certain provisions may be completed timely, they are not completed adequately.

The Monitor's 2019 Report demonstrates that Defendants are in clear, substantial, and extensive noncompliance with the court-approved settlement agreement that Defendants themselves negotiated and entered into at the end of 2016. Defendants' noncompliance defies this Court's orders and the constitutional rights of thousands of Mississippi children.

### A. Maltreatment of Children in Care

Defendants agreed that the rate of abuse and neglect among children in foster care shall not exceed .33 percent per year. 2nd MSA §2.9. That rate was supposed to ensure children in state custody would be safe from abuse and neglect by their caregivers, a right as fundamental as any in a state child welfare system. In 2018, 1.15 percent of children in MDCPS custody were victims of abuse or neglect by their caregivers—more than *three times* the agreed-upon rate. Monitor's 2018 Report at 47. Defendants' performance on this critical metric worsened in 2019, with the rate of maltreatment in care increasing to 1.20 percent—more than *three and a half times* the agreed-

upon rate. Monitor's 2019 Report at 6. Examples of substantiated abuse and neglect of children in MDCPS custody during 2019 include the following:

- A six-year-old foster child was brought to the school nurse by her teacher due to numerous bruises covering her body and the child having difficulty walking. The investigation confirmed that the bruises were caused by the child's foster parent, who hit her with a paddle and wooden spoon. *Id.* at 52.

- A two-year-old foster child was admitted to the hospital having seizures. He was placed in the ICU on a breathing machine. Hospital records documented a subdural hematoma on the child's brain that required emergency surgery, a few retinal hemorrhages, a spinal fracture, leaking spinal fluid, and unusual bruising covering his legs, arms, and back. The doctor classified the injuries as nonaccidental and determined they occurred within eight hours of the child's arrival at the hospital. The foster parents gave an insufficient explanation for his injuries. Another foster child in the home stated the children were whipped by the foster parent when they got in trouble. *Id.*

Defendants' continued failure to meet maltreatment standards intended to prevent and reduce the maltreatment of children in Defendants' custody—such as those related to screening, investigations, and reviews of maltreatment in care—is consistent with the staggering rate of maltreatment.

First, Defendants committed to maintaining a statewide system for appropriately receiving, prioritizing, screening and investigating reports of child maltreatment. 2nd MSA §2.1. But in 2018, the Monitor noted that "many features of the system lack adequate quality controls." Monitor's 2018 Report at 5. These issues persisted in 2019, with the Monitor's 2019 Report again

emphasizing that "many features of the system lack adequate quality control." Monitor's 2019 Report at 6. For example, in 2019, MDCPS screened out 771 maltreatment reports involving children in custody. The monitoring team conducted a qualitative review of 200 of these screened out reports and concluded MDCPS made appropriate screening decisions in only 84.5 percent of the referrals. *Id.* "Fourteen of the screened-out reports met MDCPS' criteria for maltreatment and should have been assigned for investigation. Seventeen of the referrals did not include enough information to make a screening decision and required additional information prior to making the decision to screen out or accept the report for investigation." *Id.* at 42. The monitoring team noted that many of these reports were made by MDCPS staff working directly with families, who would likely have detailed information available about the families they are serving. Nonetheless, "in some of those instances, screening staff did not obtain additional information from these well-informed sources to make better-informed screening decisions." *Id.* Examples of reports that were inappropriately screened-out when they should have been investigated include the following:

- A residential facility staff person reported that a peer told a 17-year-old youth's therapist that the 17-year-old had attempted suicide through both an overdose and hanging himself. The youth had allegedly taken a peer's medication. He had multiple mental health diagnoses. *Id.*

- A report was received alleging that a foster child, age eight, who resided at a residential school for the blind during the week was seen by a staff member being dragged down the hall by teachers. The child was reportedly screaming and hollering. Additionally, the foster parent noticed a mark on the child's head; the child stated she hit her head on a pole. The bruise was blue and swollen but the swelling had gone down. The school had not contacted the foster parent. The

reporter and foster mother were concerned about the child's safety and supervision at the school. *Id.*

Further, the monitoring team conducted a qualitative review of maltreatment in care investigations completed during 2019. The monitoring team concluded that evidence supported MDCPS' findings in only 81.5 percent of the cases. *Id.* at 49. For 20 investigations, more information was needed in order to draw a proper conclusion. *Id.* Alarmingly, for 17 investigations where some or all of the allegations were determined to be unsubstantiated by Defendants, the monitoring team concluded "based on MDCPS' criteria for maltreatment, that information presented during the course of the investigation was sufficient to render a substantiation." *Id.* In other words, in 17 cases there was evidence that a child in MDCPS custody was being maltreated, but Defendants determined otherwise, leaving the child at risk of further maltreatment. Examples where allegations should have been substantiated but were not include the following:

- A foster child, age ten, and adoptive child, age 11, were left home to care for a foster child, age one. He was not changed regularly and had diaper rash. The older children changed his diaper, gave him a bath, and cleaned him with baby wipes because he was always filthy. MDCPS substantiated physical neglect of the one-year-old, but neglect was unsubstantiated for the other two children, who were caregivers for the toddler. In interviews, the children also alleged that the foster mother called them names, cursed at them, "whooped" them with belts, shoes, and other objects, and smoked around them in the home and the car. As a result of this investigation, the 10-year-old was removed from the home. However, the one-year-old remained in the home for two months, and the 11-year-old adopted child and an older adopted youth still remain in the home. *Id.* at 50.

- Physical neglect was unsubstantiated for four children, ages two, five, nine, and ten, who were placed in foster care with maternal relatives. They were found to have hair that had not been combed for some time and the home had the following hazardous and unsafe conditions: a gas fireplace without a screen with soot evident; a vase found in the tub in the girls' bathroom that had mold and fungi growing on it; a bathroom sink filled with rocks, toys, and other items, making it unusable; exposed electrical cords in the play area; electrical outlets with no covers; dishes that were unwashed for some time; grass which was quite tall and the worker "did not feel safe walking through"…There was also a concern about the children's health and whether they were receiving necessary medical care, but no verifying collateral contact with medical professionals was documented. The children remained in the relative home. *Id.*

Second, the 2nd MSA requires MDCPS to assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment of children in MDCPS' custody. 2nd MSA §2.8. "However, MDCPS has not yet implemented a system to ensure standardized decision-making." Monitor's 2019 Report at 44. Instead, the "broad distribution of responsibility and prerogative across the state into the counties, and designated down to proxies by certain Regional Directors, undermines standardized decision-making." *Id.*

Third, Defendants committed to reviewing *all* maltreatment in care reports that were screened out to assess the appropriateness of the screening decision within twenty-four hours. 2nd MSA §2.3. In 2018, only 62.3 percent of screened-out reports were reviewed. Monitor's 2018 Report at 39. In 2019, 92.7 percent of screened-out reports were review timely. However, the monitoring team conducted a review of 200 screened-out referrals and determined that 15.5

percent of the 200 reviewed referrals were inappropriately screened out. Monitor's 2019 Report at 44.

Fourth, the Safety Review Unit ("SRU") must review *all* maltreatment investigations within 30 days of completion of a maltreatment in care investigation to identify any case practice deficiencies and necessary remedial action to ensure the safety of the subject child and others in the placement. 2nd MSA §2.7. Defendants failed to meet this requirement in 2018. Monitor's 2018 Report at 44. In 2019, 97.3 percent of maltreatment investigations were reviewed timely. Monitor's 2019 Report at 48. However, the monitoring team's review of a sample of 174 SRU reports identified practice deficiencies in 40 cases, whereas the SRU only identified deficiencies in nine of those investigations and failed to identify any specific remedial actions or timeframes as required. *Id.*

Fifth, the 2nd MSA requires that proper and timely licensure investigations be conducted when children in foster care are maltreated while placed with a private child placing agency ("CPA"). 2nd MSA §2.5. Upon receipt of a substantiated report of child maltreatment in a private child placing agency foster home, MDCPS staff is required to notify the child placing agency, which must initiate a licensure investigation that is in addition to, and independent of, any child protection investigation, within 30 days. 2nd MSA §2.5. Defendants failed to meet these requirements in 2018. Monitor's 2018 Report at 43. Defendants remained noncompliant with these requirements in 2019. Monitor's 2019 Report at 46. The monitoring team conducted a qualitative review of the 20 maltreatment reports involving private child placing agencies and determined that "CPAs were not consistently conducting licensing investigations independent of the child protection investigation, as required by this commitment." *Id.* "The monitoring team found documentation in only one instance that the CPA conducted a complete licensing investigation

independent of MDCPS and the CPS investigation." *Id.* at 47. Further, there was only documentation of an on-site inspection of the foster home in five of the 20 cases. *Id.*

Finally, in 2019 the monitoring team conducted a review of child safety and stability while on trial home visits ("THVs") as required under the 2nd MSA. The monitoring team found that only 48.4 percent of children on a THV had documentation of the required twice-monthly visits with a caseworker in the home to assess the child's safety, well-being, service delivery and achievement of permanency. *Id.* at 74. The monitoring team also reviewed investigations into allegations of abuse or neglect of children during THVs. Of the 66 investigations of abuse or neglect, "sixteen of these investigations, involving 32 child victims, were substantiated for abuse, neglect, or exploitation by the parent or caregiver." *Id.* These 32 child victims are in addition to the 1.20 percent of children who were determined to have been maltreated in foster care in 2019 under 2nd MSA § 2.9. The monitoring team also reviewed case records for the 62 children who completed THVs and were discharged from MDCPS custody to determine whether MDCPS had convened a meeting with the child's parents and the child to determine the appropriateness of a final discharge, as required under the 2nd MSA. 2nd MSA §6.3.a.6. Of the 62 children who completed THVs and were discharged from MDCPS custody in 2019, only 69.4 percent had documentation of a final parental discharge meeting with the child's parent(s) and 30 percent lacked documentation that MDCPS had a final discharge meeting at all. Monitor's 2019 Report at 76.

The Monitor's 2019 Report reaffirms what the 2018 Report revealed—that Defendants are in extensive and substantial noncompliance with provisions of the 2nd MSA specifically intended to protect vulnerable children from abuse and neglect while in Defendants' custody. That failure is not simply a matter of percentage points, but represents actual, real-world suffering endured by

Mississippi children. As a result of Defendants' unreliable data and systems, improper investigations, and inadequate reviews, children across the state are being left in dangerous, potentially life-threatening situations. It is not hyperbole to say that Defendants' noncompliance puts children's lives at risk.

### B.  Child Well-Being

Defendants not only fail to comply with the 2nd MSA provisions designed to ensure children's safety, but also provisions designed to ensure children's health and well-being. For example, the 2nd MSA requires Defendants to ensure that the vulnerable children in their care have access to timely and adequate physical and mental healthcare. Defendants made a commitment that by 2018, 70 percent of children entering foster care would receive an initial medical screening within seven days of entering care. 2nd MSA §8.1.a. However, in 2018, only 59.2 percent of children received a timely initial medical examination. Monitor's 2018 Report at 78. For 2019, the monitoring team "was not able to validate MDCPS performance on this commitment." Monitor's 2019 Report at 90.

Defendants similarly made a commitment that by July 1, 2018, 70 percent of children entering foster care would receive a comprehensive medical exam within 60 days of entering care. 2nd MSA §8.1.b. In 2018, only 51 percent of children received a timely comprehensive medical examination. Monitor's 2018 Report at 79. For 2019, the monitoring team "was not able to validate MDCPS performance on this commitment". Monitor's 2019 Report at 91.

Additionally, MDCPS agreed that by July 1, 2018, at least 60 percent of children would receive recommended follow-up treatment throughout their time in foster care. 2nd MSA §8.1.d.2. Defendants also agreed that by July 1, 2019, 90 percent of children would receive recommended follow-up treatment throughout their time in foster care. 2nd MSA §8.1.d.3. But, the Monitor's 2019 Report concluded that "MDCPS did not have a process in place to track follow-up care for

the rest of children in care in 2019 and did not report on all children subject to this commitment." Monitor's 2019 Report at 92.

Under the 2nd MSA, Defendants are required to ensure that 80 percent of children have a dental examination within 90 days of the child's entry into foster care. 2nd MSA §8.1.e.2. The monitoring team conducted a quantitative review of children due for an initial dental examination in the second half of 2019 and concluded that only 52 percent had a documented timely initial dental exam. Monitor's 2019 Report at 92. The monitoring team was unable to validate data for the qualitative component of this provision, *i.e.* that those examinations actually met the child's medical needs. *Id.* at 93.

Defendants failed to report any data on a number of important 2nd MSA provisions related to the medical care of children in MDCPS' custody, including: percentage of children receiving periodic and ongoing medical examinations (2nd MSA §8.1.c.2), percentage of children receiving practitioner-recommended follow-up treatment (2nd MSA §8.1.d.2), and percentage of children whose Medicaid information was provided to foster parents or facility staff at the time of placement (2nd MSA §8.1.g). Monitor's 2019 Report at 91-93.

Defendants committed to ensuring that 90 percent of school-age foster children who enter custody shall have their educational records reviewed and their educational needs documented within 30 days. 2nd MSA §8.2.a, §8.2.c.1. MDCPS reported that educational record reviews were conducted for 533 children in 2019 but failed to indicate how many educational reviews *should* have been reviewed during the first three quarters of 2019. Monitor's 2019 Report at 93. Additionally, the monitoring team was unable to validate the timeliness of the reviews. *Id.* at n. 50. For the fourth quarter of 2019, only 43 percent of children entering foster care had their records reviewed. *Id.* at 94.

MDCPS also committed to take reasonable steps to ensure that school-age foster children are enrolled and attending accredited schools within seven days of their initial placement or any placement change. 2nd MSA §8.2.b. Defendants failed to provide any data for this provision for 2019, as they are "not able to report dates of registration and school attendance following initial placement or placement changes". Monitor's 2019 Report at 94. Similarly, MDCPS committed to taking reasonable efforts to ensure the continuity of a child's education by keeping the child in a familiar or current school and neighborhood, feasible and in the child's best interest. 2nd MSA §8.2.c. The monitoring team was unable to validate data for this provision in 2019, as Defendants were unable to provide data on all children. Monitor's 2019 Report at 94.

The 2nd MSA also contains a number of provisions intended to ensure that MDCPS provides transition-age youth the resources and assistance necessary to successfully transition to independent living. Defendants are failing youth at this critical juncture in almost every requirement. MDCPS is required to provide *all* youth transitioning to independence with at least six months advance notice of cessation of any health, financial, or other benefits that will occur at the time of transition. 2nd MSA §7.1. While the monitor was unable to validate data provided by MDCPS for this provision, Defendants' own qualitative review concluded that only 45 percent of youth received notice of cessation of health benefits, only 47 percent received notice of cessation of financial benefits, and only 40 percent of youth received notice of cessation of other benefits. Monitor's 2019 Report at 83. The 2019 Report indicates that "a very small proportion of eligible youth received Independent Living skills services in 2019" as required under 2nd MSA §7.3 – although data quality issues prevented the monitoring team from validating this data. *Id.* at 84.

### C. Caseload Standards

Caseload standards are essential to ensuring children in foster care receive constitutionally adequate care. Reasonable caseloads are also key to accomplishing most of the

2nd MSA's objectives. Caseloads directly impact a caseworker's ability to timely respond to reports of abuse or neglect. They also determine how often, and how effectively, a caseworker can visit children to monitor their safety and the adequacy of their placement. Caseloads similarly affect a caseworker's ability to implement case plans to meet children's needs. Simply put, a child welfare system cannot function when caseworkers are routinely overburdened with high caseloads.

A crucial provision of the 2nd MSA requires that 90 percent of caseworkers have caseloads that do not exceed established caseload standards by January 1, 2018. 2nd MSA §1.3.a. Individual MDCPS caseworkers who carry a mixed caseload are held to a weighted, pro-rated standard. Monitor's 2019 Report at 30. Defendants did not meet the caseload standards at any point during 2018. The closest Defendants came to the 90 percent requirement was 60 percent, with compliance dropping as low as 47 percent. Monitor's 2018 Report at 28. The situation has not improved in 2019. The closest Defendants came to the 90 percent requirement was 59 percent in Q4, with compliance dropping to 48 percent in Q3. Monitor's 2019 Report at 31. Moreover, Defendants are unable to say when, or even if, they will ever reach compliance with the 90 percent weighted caseload standard to which they agreed.

The 2019 Report to the Mississippi Legislature[6] by the Joint Legislative Committee on Performance Evaluation and Expenditure Review ("PEER") also highlighted Defendants' failure to meet caseload standards, as well as high caseworker turnover, and the large number of MDCPS job vacancies.[7] 2019 PEER Report at vii. According to the PEER Report, in 2019 the caseworker

---

[6] Report to the Mississippi Legislature: A Review of the Mississippi Department of Child Protection Services for Fiscal Year 2019 (hereinafter "2019 PEER Report").

[7] One significant factual inaccuracy must be addressed to this Court. The 2019 PEER Report recommends that "MDCPS should conduct a new caseload study based on current caseworkers' time and responsibilities to determine the range of time necessary for a caseworker to perform a task in accordance with best practices. MDCPS should establish new standards based on the results of this study." 2019

turnover rate was 30 percent, a nine percent increase over 2018. *Id.* The turnover rate increased statewide, as "twelve of MDCPS's fourteen regions and forty-three counties had an increase in caseworker turnover from FY 2018 to FY 2019." *Id.* at viii. As of May 1, 2019, 25 percent of MDCPS' positions were vacant. *Id.* Of the 487 vacancies, 58 percent were positions for caseworkers or caseworker supervisors. *Id.* at 6.

The gap between the caseload compliance requirements of the 2nd MSA and the actual achieved compliance is enormous. This is not a near miss, or substantial compliance; this is a wholesale failure to meet a fundamental requirement to which Defendants had agreed only two years earlier. The caseload compliance requirement is a vital measure by which Defendants can produce better outcomes for children, protect them from harm, and provide necessary services. And yet, Defendants remain unable to say if, or when, they will reach compliance.

### D. Placement Standards

Placement standards ensure that children in foster care, who have already experienced some amount of trauma as a result of removal from their families, are not re-traumatized through frequent, unstable placements. Placement standards also ensure that children in foster care are placed in safe, home-like settings suited to their individual needs and which allow them to maintain connections with their families and home communities. Both parties agreed to, and this Court ordered, certain specific placement standards. Defendants remain in noncompliance with a number

---

PEER Report at viii. But this recommendation is based on an inaccurate assumption: that the current caseload standards are based on a 2005 workload study. *Id.* at 14. In 2015, in determining the appropriateness of caseload standards that would be used for the 2nd MSA, the Monitor reviewed the caseloads standards and determined they were consistent with reasonable child welfare practice and consistent with those in the profession. The Monitor deemed it unnecessary to conduct a new workload study, as it was unlikely to change the standards, which were already consistent with good practice. *See* Mississippi Department of Human Services, Division of Family and Children's Services, Organizational Analysis (Nov. 24, 2015), available at *https://www.mdhs.ms.gov/wp-content/uploads/2018/01/MDHS_DFCS-Final-Organizational-Analysis-Report-2015-11-24.pdf.*

of those standards, all of which have serious implications for children's safety, security, and long-term well-being.

Defendants committed to placing 60 percent of siblings who enter foster care around the same time together, with limited exceptions, by July 1, 2018. 2nd MSA §4.6, 4.16. Defendants further committed that they would reach 75 percent by July 1, 2019. 2nd MSA §4.16.b. However, the most recent Monitor's Report confirms that the Monitor was "unable to validate the data MDCPS produced for this commitment." Monitor's 2019 Report at 62. That is because Defendants produced sibling-related files that were "created using the same method used in 2018, which the monitoring team identified then as problematic." *Id.* For example, Defendants identified siblings as "placed together despite the siblings' placement histories showing they were never in the same placement." *Id.* The Monitor was also unable to validate Defendants' compliance with these provisions in 2018, noting significant data issues and inaccuracies. Monitor's 2018 Report at 57. Defendants' failure to comply with provisions intended to ensure that siblings are not unnecessarily separated has serious ramifications for children's safety, security, and well-being.

The 2nd MSA further requires Defendants to take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. For children subject to an actual or potential placement disruption, Defendants must document the immediate reasonable steps taken to address placement stability. §4.7, 4.17. Defendants made a commitment that 60 percent of children in Defendants' custody would meet this requirement by July 1, 2018. 2nd MSA §4.17.a. Defendants also made a commitment that 75 percent of children would meet this requirement by July 1, 2019. However, the most recent Monitor's Report concludes that "the monitoring team was unable to validate MDCPS' performance for 2019." Monitor's 2019 Report at 63. Defendants failed to report on this requirement in 2018. Monitor's 2018 Report at 11.

Defendants' failure to comply with provisions intended to ensure placement stability for children in their care and custody has clear consequences for children's safety, security, and well-being.

To further ensure placement stability, the 2nd MSA requires that children remain in their existing placement and not be moved to another placement unless MDCPS specifically documents in the child's case record justifications for that move and the move is approved by an MDCPS supervisor. 2nd MSA §4.10, 4.12. Defendants made a commitment to meeting a performance standard of 70 percent by July 1, 2018, and a performance standard of 80 percent by July 1, 2019. 2nd MSA §4.12. However, the Monitor's 2019 Report found, after reviewing a randomly selected sample of case narratives and approvals, that only 60.7 percent of cases were in compliance. Monitor's 2019 Report at 64. Importantly, the Monitor's findings did not support Defendants' report of 88.5 percent compliance, suggesting issues with Defendants' data quality. *Id.* at 64. Defendants were also not in compliance with this provision in 2018.  Monitor's 2018 Report at 59.

The 2nd MSA states that *no child* under the age of ten is to be placed in a congregate care setting unless an approved exception exists. 2nd MSA §4.9. However, the most recent Monitor's Report found that only 69 percent of such placements in 2019 had adequate approval and an allowable exception documented. Monitor's 2019 Report at 63-64. Defendants previously failed to comply with this commitment in 2018. Monitor's 2018 Report at 58. The Monitor's 2019 Report also points out inaccuracies in Defendants' reporting; while Defendants reported 145 such placements, "[t]he monitoring team determined there were 155 placements." Monitor's 2019 Report at 63.

Caseworker visits are critical to ensuring child safety. The 2nd MSA requires that caseworkers "meet with the child in person at least twice monthly to assess the child's safety and well-being, service delivery, and achievement of permanency and other service goals." 2nd MSA

§5.1.a. The 2nd MSA also requires that at least one visit per month take place in the child's placement. 2nd MSA §5.1.a.2. Defendants made a commitment that by January 1, 2019, they would meet a performance standard of 90 percent. The Monitor conducted a qualitative review of visitation case narratives for a random sample of children and found that only 58 percent of visitation narratives contained the required documentation, and that only 58 percent of worker-child contacts occurred timely. Monitor's 2019 Report at 65. Ultimately, only 44.1 percent of the contacts met the qualitative standards of the 2nd MSA. *Id.* The Monitor's Report specifically notes that "[o]verall, the monitoring team found that narratives lacked detail about visitation, and at times, any information at all." *Id.* Importantly, the Monitor's Report does not support Defendants' report of 80.3 percent compliance, suggesting issues with data quality.

The 2nd MSA also states that children who are sent home on 90-day trial home visits *must* be visited by a caseworker at least two times per month, in the child's home. §5.1.b.2. Similarly, the 2nd MSA states that children who remain in an out-of-home placement following a substantiated investigation into a report of maltreatment in that placement *must* be visited once per week for the first month and twice per month for three months. §2.8.b. The Monitor's 2019 Report confirmed that it was unable to validate the data provided by Defendants on either provision. Monitor's 2019 Report at 66, 47. For example, the Monitor's Report states that the monitoring team "identified several problems in the data, including the manner in which MDCPS defined the population of children who were placed in THVs [trial home visits] and incorrect identification of the prior placement change reason." *Id.* at 66.

Defendants' noncompliance with the 2nd MSA's placement standard provisions results in actual, demonstrable harm to Mississippi children. Siblings are being separated, children's lives are being needlessly uprooted, and small children are spending their childhoods in inappropriate

institutional settings. Defendants must be held accountable for their wanton noncompliance with the 2nd MSA and this Court's orders.

### E.  Data and Management Information Systems

In the 2nd MSA, Defendants committed to maintaining a comprehensive child welfare data and tracking system that permits timely access to information, including current and historical case documents. This provision is designed to support child safety and continuity of care across placement settings and services, with the goal of improving MDCPS' ability to account for and manage its work with vulnerable children. 2nd MSA §1.5. However, the Monitor's 2019 Report concluded that Defendants have "been unable to report consistently and reliably from [data system] MACWIS current and historical data of children in custody for numerous 2nd MSA commitments." Monitor's 2019 Report at 34. The 2019 Report also notes that "[d]ata problems include files missing a substantial number of records for individuals or events applicable to a commitment, files missing a significant amount of data for one or more fields needed to calculate performance, and files provided by MDCPS that the monitoring team was unable to replicate using the established business rule." *Id.* at 35. The Monitor's 2019 Report further specifies that "[t]he monitoring team found significant and recurring data quality problems," including "data quality problems that made it impossible to validate certain visitation commitments in the 2nd MSA." *Id.* The Monitor previously emphasized "substantial and ongoing" data problems in 2018, which "create blind spots that impair MDCPS management's ability to lead the Department and ensure the safety, well-being and permanency of children consistent with the 2nd MSA." Monitor's 2018 Report at 4. Data problems identified by the Monitor in 2018 also included "the manner in which the Department documents and identifies certain data fields, coding errors and performance calculations that are inconsistent with the established rules." Monitor's 2018 Report at 4.

The Monitor's 2019 Report confirms that, just as in 2018, Defendants still know very little

about the children in their care with regard to a significant number of critical settlement agreement provisions. Without access to basic, accurate information about the children for whom it is responsible, it is virtually impossible for Mississippi to provide them constitutionally adequate care. Defendants are failing the children in Mississippi's foster care system across the board despite having been given repeated opportunities to address these issues. At this point, it is reasonable to conclude Defendants are both unwilling and unable to bring the system into compliance

## III.    DISCUSSION

Despite Defendants' admission that they are not in compliance with court-ordered agreements requiring improved outcomes for Mississippi foster children, Defendants have never, in this case's long history, been held in contempt. Contempt is appropriate where a party fails "in meaningful respects to achieve substantial and diligent compliance with a clear and unambiguous court decree." *Lelsz v. Kavanagh*, 673 F. Supp. 828, 839 (N.D. Tex. Aug. 13, 1987) (citations and internal quotation marks omitted). This Court acknowledged, back in 2011, that "plaintiffs obviously have met their burden to present a prima facie case" for civil contempt. Dkt. 557 at 4. Defendants' ongoing noncompliance means that statement is just as true today. Every day Defendants remain in violation of the court-approved 2nd MSA, vulnerable Mississippi children suffer.

Nearly a year ago, Defendants promised this Court that "[p]roviding Defendants with additional time to comply with the commitments found in the 2nd MSA will not result in more of the same." Dkt. 858 at 23. As the most recent Monitor's Report makes abundantly clear, however, more time *does* result in more of the same. Defendants assured this Court just last year that "[e]very single day MDCPS improves as a state child welfare agency", *id.*, and yet the Monitor's Report contains several instances where Defendants' compliance with provisions designed to protect child

safety and well-being has stagnated or *worsened.* Defendants declared that they were "vigilantly working…to fix the data validation issues identified in the Monitor's report." *Id.* And yet, the Monitor's Report contains dozens of instances where Defendants' data was so incomplete or erroneous that it could not be validated by the Monitor. Indeed, the Monitor even specifically notes at times that Defendants' data is "created using the same method used in 2018, which the monitoring team identified then as problematic." Monitor's Report at 62. All of this demonstrates that entering a finding of civil contempt is not only appropriate but also necessary to prevent further irreparable harm.

Defendants attempt to place the blame for their continued failure to operate a constitutionally adequate child welfare system on the Mississippi state legislature's failure to appropriate adequate funding. But, as the Supreme Court has explained, "it is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. Memphis*, 373 U.S. 526, 537 (1963). The Court went on to point out "the questionable premise implicit in this argument". *Id.* The Fifth Circuit, in upholding injunctive relief for plaintiffs alleging constitutional violations by the Mississippi State Penitentiary, established the same: "Shortage of funds is not a justification for continuing to deny citizens their constitutional rights." *Gates v. Collier*, 501 F.2d 1291, 1320 (5th Cir. 1974). In *Gates*, the Fifth Circuit acknowledged that "as far as the State of Mississippi is concerned…compliance will cost the State a considerable amount of money," making compliance "onerous." However, the court emphasized that

> *The district court did not require that the legislature appropriate monies for prison reform; it simply held, in keeping with a plethora of precedent on the fund shortage problem, that if the State chooses to run a prison it must do so without depriving inmates of the rights guaranteed to them by the federal constitution.* Mississippi wants this Court to hold that the conditions described in the district court opinion

> should be allowed to continue until funds needed to correct them are available and the Legislature acts on appropriations. This position is unsupported by the law…

*Id.* (emphasis in original).

As such, in the Fifth Circuit, "[w]here state institutions have been operating under unconstitutional conditions and practices, the defenses of fund shortage and the inability of the district court to order appropriations by the state legislature" are to be "rejected". *Id.* at 1319. *See also McCord v. Maggio,* 927 F. 2d 844, 847 (5th Cir. 1991) ("lack of funds is not a sufficient justification for neglect of a citizen's constitutional rights").

Indeed, courts across the country have consistently held that neither insufficient funds, nor political struggles over legislatures and appropriations, are permissible defenses to the state's violation of the constitutional rights of the public it serves. *See, e.g. Hamilton v. Love*, 328 F. Supp. 1182, 1194 (E.D. Ark. 1971) ("Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights."); *Jackson v. Bishop*, 404 F.2d 571, 580 (8th Cir. 1968) ("Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations…"); *Brenneman v. Madigan*, 343 F. Supp. 128, 139 (N.D. Cal. 1972) ("the present existence of deficiencies in staff, facilities, and finances cannot excuse indefinitely depriving" detainees of their constitutional rights, further noting that "[s]everal courts have considered and rejected the claims of the State that inadequate resources excuse unconstitutional practices or procedures"); *Palmigiano v. Garrahy*, 443 F. Supp. 956, 985 (D.R.I. 1977) ("it is clear beyond doubt that inadequate funding is no answer to the existence of unconstitutional conditions"); *Finney v. Ark. Bd. of Corr.*, 505 F.2d 194, 202 (8th Cir. 1974) (where "deficiencies are of a constitutional nature", rejecting argument that "lack of funds or facilities justify lack of competent medical care"); *Rozecki v. Gaughan*, 459 F.2d 6, 8 (1st Cir.

1972) (that "representatives of the state were doing the best they could" is not "any excuse for continuous" unconstitutional treatment).

Defendants' ongoing noncompliance constitutes civil contempt. Neither party genuinely disputes that fact. To demonstrate civil contempt, a party must establish: "1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Whitcraft v. Brown*, 570 F.3d 268, 271 (5th Cir. 2009). The 2nd MSA is a court-approved settlement agreement "properly enforceable by the court's contempt power." Dkt. 557 at 5 n.1. *See also United States v. Alcoa, Inc.*, 533 F.3d 278, 286 (5th Cir. 2008) (district courts "must hold parties to the terms of a consent decree" by declaring contempt and implementing remedies). Second, the 2nd MSA undoubtedly requires specific conduct of Defendants, and even includes directives to meet certain standards by numerical measures calculated by the Monitor in conjunction with Defendants. Dkt. 712. And lastly, Defendants have—by their own admission—failed to comply with the 2nd MSA.

Defendants' noncompliance need not be willful or intentional to constitute contempt— Plaintiffs must simply demonstrate Defendants' lack of compliance. *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000). Even Defendants' good faith is no defense to contempt. *United States v. City of Jackson*, 318 F. Supp. 2d 395, 417 (S.D. Miss. 2002) ("the mere fact that a party may have taken steps toward achieving compliance is not a defense to a contempt charge"). Nor, as discussed above, is Defendants' lack of funds. To be sure, Defendants have no cognizable defense to their decade-long flouting of settlement agreements approved by this Court, which were intended to remedy Defendants' unconstitutional treatment of Mississippi children in their custody and care.

### A. Defendants' Extensive, Substantial, and Relentless Noncompliance Warrants the Appointment of a Receivership

Defendants have caused Mississippi's child welfare system to fail so thoroughly, and for so long—in direct defiance of this Court's orders—that it is both proper and necessary for this Court to appoint a receiver. Plaintiffs have previously expounded the desperate need for a receivership. Dkt. 850 at 32-36. And courts across the country have recognized that "it is abundantly clear that a court may appoint a receiver to force public officials to comply with court orders." *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997); *see also Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990) ("Where more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances", a court is "justified…in implementing less common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate."). Indeed, "federal courts might be called upon to engage in long-term institutional oversight." *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 U.S. Dist. LEXIS 43796, at *63 (N.D. Cal. Oct. 3, 2005). The usage of receiverships "expanded during the civil rights era" as courts established receiverships to combat school segregation, *id.* at *63-64, and since then, "[t]he use of receivers to reform public institutions has spread to analogous contexts in the civil rights arena." *Id.* at *64.

Considerations of import here in determining whether to appoint a receiver include, "whether there were repeated failures to comply with the Court's orders", "if there is a lack of sufficient leadership to turn the tide within a reasonable time period", and "whether a receiver can provide a quick and efficient remedy." *Dixon*, 967 F. Supp. at 550. To date, Defendants have failed to comply with:

1) the Stipulated Settlement Agreement [Dkt. 425] (2007),

2) the Period 1 Implementation Plan [Dkt. 459] (2008),

3) the Mississippi Settlement Agreement & Reform Plan [Dkt. 459] (2008),

4) the Period 2 Implementation Plan [Dkt. 487] (2009),

5) the Bridge Plan [Dkt. 501] (2010),

6) the Modified Mississippi Settlement Agreement & Reform Plan [Dkt. 571] (2012),

7) the Period 3 Implementation Plan [Dkt. 571] (2012),

8) the Period 4 Implementation Plan [Dkt. 590] (2013),

9) the Period 5 Implementation Plan [Dkt. 618] (2014),

10) the July 9th Order [Dkt. 607] (2014), and

11) the 2nd Modified Mississippi Settlement Agreement & Reform Plan [Dkt. 712] (2016).

It is highly unlikely, to say the least, that yet another order from this Court will affect Defendants' conduct. Indeed, Defendants' trajectory shows no signs of changing. As the Supreme Court has explained, "federal courts are not reduced to issuing injunctions against state officers and hoping for compliance." *Hutto v. Finney*, 437 U.S. 678, 690, 98 S. Ct. 2565, 2573 (1978); see also *Stone v. City & Cty. of S.F.*, 968 F.2d 850, 861 (9th Cir. 1992) ("federalism concerns in institutional reform litigation…do not automatically trump the powers of the federal courts to enforce the Constitution or a consent decree"); *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 U.S. Dist. LEXIS 43796, at *70 (N.D. Cal. Oct. 3, 2005) ("[T]he Court is not required to restrict its powers to those means that have proven inadequate, or that show no promise of being fruitful."). A Fifth Circuit court concluded that the state's continued noncompliance with orders to remedy the unconstitutional treatment of children in institutions necessitated increased judicial intervention, explaining that, "[t]he Court has already exhausted the avenues ordinarily undertaken by other courts in cases of this kind to implement relief: appointment of a Special Master; appointment of a Monitor; formal and informal conferences with the parties and counsel; warnings

as to possible contempt and related sanctions…Notwithstanding these efforts, progress in meeting plaintiffs' constitutional rights continues to be elusive…stronger relief, specifically tailored to address the causes of non-compliance, is essential." *Gary v. Louisiana*, Civil Action No. 74-2412, 1990 U.S. Dist. LEXIS 1746, at *79 (E.D. La. Feb. 15, 1990). Accordingly, appointing a receiver is not only well within the authority of this Court, but it is undoubtedly the best means of achieving compliance and, as a result, better outcomes for Mississippi children.

As several courts have acknowledged, "receivership is not the most extreme remedy conceivable." *See Plata v. Schwarzenegger*, No. C01-1351TEH, 2005 U.S. Dist. LEXIS 8878, at *23 n.4 (N.D. Cal. May 10, 2005). Courts deciding civil rights actions involving prisoners, in particular, have suggested as a last resort that defendants' failure to remedy unconstitutional conditions could result in the release of prisoners from custody altogether. The court in *Crain v. Bordenkircher*, for example, "fe[lt] compelled to point out that the release sought by the petitioners may be the only remaining alternative to this Court after July 1, 1992, if the conditions of confinement are not remedied." *Crain v. Bordenkircher*, 180 W. Va. 246, 248, 376 S.E.2d 140, 142 (1988). *See also Newman v. Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) ("failure to comply with the minimum standards set forth in the order would necessitate the closing of several prison facilities…the more reasonable and the more promising approach is the appointment of….[a] receiver for the prison system."); *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 U.S. Dist. LEXIS 43796, at *80 (N.D. Cal. Oct. 3, 2005) ("The Court also could consider either closing some institutions or ordering the release of some prisoners (perhaps those who are at highest risk of receiving inadequate medical care, or those who pose the least security risk as a means of general population reduction)."); *Shaw v. Allen*, 771 F. Supp. 760, 763 (S.D. W. Va.

1990) (receivership "is not as drastic and intrusive as the ultimate course of action this Court could, and may yet, effectuate—that of ordering the McDowell County Jail closed.").

While the constitutional harms alleged by prisoners and by foster children bear substantial similarities—both are in a "special relationship" with the state, and therefore dependent upon the state for their safety and security—it is worth noting that certain "last resort" remedies are wholly unavailable to the children protected by this action. The children here cannot simply be "released" from Defendants' custody if MDCPS continues to fail to comply with constitutional mandates. To the contrary, there are limited alternatives available for the children in Defendants' custody and care even in the face of unconstitutional conditions. In that context, receivership is not an "extreme" remedy at all. It is an appropriate, necessary, and equitable means of ensuring the safety of children entirely at Defendants' mercy, for whom there are very limited options.

Finally, Defendants complain that progress under receivership would take too long, and criticize the receivership imposed on the Washington, D.C. child welfare system because it did not fix the system in eighteen months. *See* Dkt. 858 at 25. Defendants even feign shock and indignation that "[a]fter five years under two receivers, D.C.'s child welfare system still had failed to achieve the needed improvement." *Id.* at 26. But Defendants make no complementary claim that they could bring the Mississippi child welfare system into compliance in eighteen months. They do not even claim they can do it in five years. Defendants have pointedly and consistently refused to give Plaintiffs or this Court any kind of timeline at all. The question therefore is "too long" compared to what? Another twelve years of constitutional violations, harm to children, and inaction?

### B.  The Court May Enter a Finding of Contempt Without Appointing A Receiver

While a full receivership is wholly warranted and offers the greatest potential for turning around Mississippi's long-dysfunctional child welfare system, Plaintiffs would be remiss to fail to

proffer alternatives to this Court. As an alternative to the appointment of a full receivership, this Court may hold Defendants in contempt and appoint only a partial receiver. This Court may also hold Defendants in contempt and impose fines to induce Defendants' compliance. Or, this Court may hold Defendants in contempt now and hold a hearing on the appropriateness of a full receivership. "[T]he only limitation upon the sanctions imposed is that they be remedial or coercive but not penal." *Fla. Steel Corp. v. NLRB*, 648 F.2d 233, 239 (5th Cir. 1981).

Regardless of which specific remedial measures this Court issues, the fact remains: Defendants are in noncompliance with this Court's orders, and have no plans to come into compliance. As Plaintiffs have repeatedly demonstrated—and as the newest data from the Monitor re-confirms—their noncompliance is both severe and sustained. A timely finding of contempt is not only warranted but required to prevent further irreparable harm to abused and neglected Mississippi children.

### 1.  The Court May Find Contempt and Appoint a Limited Receivership

This Court may, as an alternative to Plaintiffs' request for full receivership, hold Defendants in contempt and appoint a limited receivership, addressing first the most critical of Defendants' failures to comply. Other courts have recognized the propriety of such limited receiverships. *See Plata v. Schwarzenegger*, No. C01-1351TEH, 2005 U.S. Dist. LEXIS 8878, at *32 (N.D. Cal. May 10, 2005) (acknowledging potential receivership "would be limited to the area of health care delivery and the scope of the appointment will not extend beyond that field. The state officials in charge of operating all non-medical aspects of the Department of Corrections will retain their full powers."). This Court may then re-evaluate the propriety of appointing a full receivership in six months. A similar approach was adopted in the child welfare context by the court in *LaShawn A. v. Kelly*, which imposed three limited receiverships until, "when it became

clear that the defendants had no plan to comply" with the court's other orders, the court imposed a full receivership. *LaShawn A. v. Kelly*, 887 F. Supp. 297, 300 (D.D.C. 1995).

Here, if the Court decides to hold Defendants in contempt and appoint only limited receiverships, the Court should appoint a receiver with powers limited to those areas most critical to the safety of Mississippi children, where the need for reform is most urgent. Plaintiffs identify two such areas, both with the benefit of being easily divisible from the day-to-day operations of the Mississippi child welfare system: the administration of child protective services, and the state's child welfare information systems.

Plaintiffs have repeatedly pointed out Defendants' substantial noncompliance with provisions approved by this Court related to abuse and neglect investigations. That noncompliance has obvious and serious consequences for the safety of Mississippi children. The administration of child protective services is well-suited to limited receivership, as the functions of investigating and assessing child maltreatment are easily divisible from Defendants' other functions. Given how fundamental the adequate provision of child protective services is to the safety of Mississippi children, if this Court chooses to appoint a limited receivership, it should begin with a receivership tasked with reforming Defendants' inadequate child protective services.

Plaintiffs have also repeatedly pointed out what Defendants themselves routinely demonstrate: that they are in noncompliance with provisions approved by this Court related to data collection and maintenance. That failure to comply is particularly significant as it impairs the ability of all parties, including the Monitor, to verify and assess Defendants' compliance by various metrics. Indeed, Defendants have never been able to adequately quantify all the information required to measure compliance with this Court's orders. Like the administration of child protective services, Defendants' computerized information system is easily divisible from

Defendants' day-to-day operations, making it well-suited for receivership. A compliant information system would, further, enable the Monitor and the parties—and as a result, this Court—to more accurately assess Defendants' compliance with other provisions and orders.[8] Accordingly, if this Court decides to appoint a limited receivership, it should also begin with a receivership tasked with reforming Defendants' inadequate information system.

After appointing those limited receiverships, the Court may then re-assess Defendants' compliance with the parties' agreements after six months to determine whether a full receivership is warranted—as was the approach taken by the court in *LaShawn A. v. Kelly*, 887 F. Supp. 297, 300 (D.D.C. 1995).

## 2.   The Court May Enter a Finding of Contempt and Impose Fines

If this Court declines to appoint either a full or limited receivership, it may alternatively find contempt and impose monetary sanctions. The Supreme Court has acknowledged "[c]ivil contempt may also be punished by a remedial fine", noting that "[i]f a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance." *Hutto v. Finney*, 437 U.S. 678, 691 (1978). Defendants in civil rights cases similar to this one have been held in contempt and had such financial penalties levied against them. *See Stone v. City & Cty. of S.F.*, 968 F.2d 850, 853 (9th Cir. 1992) ("district court found the City in contempt" and "ordered that the City immediately comply with the consent decree and imposed sanctions of $ 300 per day per inmate for each day…that the City violated the order"); *Reynolds v. Ala. DOT*, 84 F. Supp. 2d 1339, 1344 (M.D. Ala. 2000) (finding defendants in contempt and issuing daily fines until compliance achieved). Recently, a district court in Texas, in this circuit, found child welfare defendants in contempt and imposed a fine of $50,000 a day, increasing to

---

[8] Because such a receivership would require coordination with the Children's Bureau and other detailed knowledge, Plaintiffs propose that the Monitor lead that effort.

$100,000 a day after one week, "until they follow and satisfy the Court's Order". *M.D. v. Abbott*, No. 2:11-CV-0084, 2019 U.S. Dist. LEXIS 194058, at *4-5 (S.D. Tex. Nov. 7, 2019). Defendants paid $150,000 in fines before certifying their compliance to the court.[9] This Court may, accordingly, find Defendants in contempt and impose such monetary sanctions as it deems sufficient to induce timely compliance.

Plaintiffs have previously advised the Court that they do not seek the imposition of fines, *see* Dkt. 850 at 18, and Plaintiffs understand that Defendants attribute their noncompliance in part to a lack of funding. That does not mean, however, that they are to be protected from fines when the situation has become so dire and long-standing. This state has been in non-compliance from the time the Court entered the first settlement agreement. The state has never come close to compliance. Just three-and-a-half years ago, Defendants agreed to new and not significantly different provisions in a new settlement agreement. To be sure, Plaintiffs have not previously requested the imposition of fines. But that does not immunize Defendants from the imposition of fines, particularly when Defendants have put forth no plans to comply within anything resembling a reasonable time period, particularly where, as here, Defendants have manifested a decades-long disregard for court-approved settlement agreements designed to protect Mississippi children. Defendants have clearly failed to respond to this Court's orders or settlement agreements approved by this Court. Defendants have repeatedly rejected Plaintiffs' attempts to negotiate. Defendants cannot even promise imminent compliance. But this Court has not, as of yet, imposed on Defendants a financial penalty for their noncompliance. Accordingly, this Court may decide to

---

[9] Allie Morris, *Texas Pays $150,000 fine in foster care lawsuit*, SAN ANTONIO EXPRESS-NEWS (Nov. 13, 2019), https://www.expressnews.com/news/local/politics/article/Texas-pays-150-000-fine-in-foster-care-lawsuit-14832087.php.

find Defendants in contempt and impose fines to induce compliance with the parties' settlement agreements.

### 3. The Court Should, at Minimum, Enter a Finding of Contempt Now

Neither party disputes the fact that Defendants are in substantial noncompliance with the 2nd MSA. Indeed, this Court declared back in 2011 that it was "unquestionably true" that Defendants had failed to comply with "most of the requirements established by the court-approved" agreement and that Plaintiffs "obviously have met their burden to present a prima facie case" for civil contempt. Dkt. 557 at 4. This Court declined to hold Defendants in contempt due to doubts that such a finding would "serve any fruitful purpose." *Id.* at 10. But now, it is just as unquestionably true that without some action from this Court, Defendants will *continue* to fail to comply, leaving the safety of Mississippi children in the balance—just as Defendants have done for the past nine years.

Accordingly, Plaintiffs request that this Court, at minimum, enter a finding of contempt against Defendants and hold a hearing to determine whether Defendants' contempt warrants a full receivership. Such a finding of contempt would, at the very least, convey the gravity of Defendants' noncompliance—which, every day, affects the safety and security of vulnerable Mississippi children—and would signal this Court's willingness to exercise its authority in achieving compliance.

### IV.    CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court find that Defendants in noncompliance with the 2nd MSA, hence in contempt of Court; appoint a general receiver with full authority to administer Mississippi's child welfare system and to bring it into compliance with the orders of this Court; and grant such other and further relief as this Court deems necessary and proper.

RESPECTFULLY SUBMITTED, this the _____ of July 2020.

/s/ Marcia Robinson Lowry
Marcia Robinson Lowry (*pro hac vice*)


**CERTIFICATE OF SERVICE**

I hereby certify that on _____ 2020, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will deliver copies to all counsel of record.

/s/ Marcia Robinson Lowry
Marcia Robinson Lowry (*pro hac vice*)