# Progress of the Mississippi Department of Child Protection Services

Monitoring Report for *Olivia Y., et al. v. Reeves, et al.*
2ND MODIFIED MISSISSIPPI SETTLEMENT AGREEMENT
AND REFORM PLAN

**ISSUED JUNE 24, 2021**

REPORT 8

JANUARY TO DECEMBER 2020



PUBLIC
CATALYST

# CONTENTS

Introduction .................................................................................................................... 3

    Summary of Progress and Challenges ........................................................................ 4

    2020 Summary of Commitments ............................................................................... 7

    Methodology .............................................................................................................. 20

    Demographics............................................................................................................. 21

    Operational Budget ................................................................................................... 25

Systemic Infrastructure Standards................................................................................ 25

    Department Leadership ............................................................................................. 25

    Staff Qualifications and Training .............................................................................. 26

    Caseloads and Supervision ........................................................................................ 29

    Continuous Quality Improvement............................................................................. 32

    Management Information Systems & Data Reporting .............................................. 32

    Performance Based Contracting ............................................................................... 36

    Foster Care Maintenance Payments ........................................................................ 38

Child Safety and Maltreatment in Care ........................................................................ 39

    Screening Reports of Abuse and Neglect.................................................................. 39

    Investigating Maltreatment in Care ......................................................................... 42

Family-Based Placements ............................................................................................. 49

Placement Standards .................................................................................................... 54

Visitation ...................................................................................................................... 61

    Worker Contact and Monitoring............................................................................... 61

    Developing and Maintaining Connections ................................................................ 64

Child and Youth Permanency ........................................................................................ 67

    Comprehensive Family Service Plans ........................................................................ 67

    Concurrent Permanency Planning ............................................................................ 69

    Reunification and Trial Home Visitation ................................................................... 69

    Other Permanency Case Goals .................................................................................. 72

    Permanency Reviews ................................................................................................. 75

Permanency Performance Indicators.................................................................................... 77

Transition to Independent Living ........................................................................................ 78

Child Well-Being.................................................................................................................. 84

Physical and Mental Health Care .................................................................................... 84

Educational Services........................................................................................................ 88

Monitoring .......................................................................................................................... 89

Movement of Commitments to Maintenance Status .................................................... 89

## FIGURES

Figure 1. Age of Children in Custody on December 31, 2020 ................................................ 22

Figure 2. Placement Types of Children in Custody on December 31, 2020 ............................... 23

Figure 3. Length of Stay in Care of Children in Custody on December 31, 2020 ...................... 24

Figure 4. Percent of Workers Meeting the Caseload Standard, 2020 ..................................... 30

Figure 5. Percent of Caseworker Supervisors Meeting the Supervision Ratio Standard, 2020 ............... 31

Figure 6. Placement Type of Children in Care and Substantiated MIC Victims in 2020............................ 49

## TABLES

Table 1. Race of Children in Custody on December 31, 2020 ....................................................... 22

Table 2. Exits from Care by Exit Type, January 1, 2020 to December 31, 2020 .......................... 24

Table 3. Federal Goals for Children in Custody as of December 31, 2020................................... 25

Table 4. 2nd MSA Caseload Standards by Case Type................................................................ 30

Table 5. Resource Board Payment Schedule as of January 1, 2020 ....................................... 39

Table 6. ANE Reports by Intake Action, 2020.......................................................................... 40

Table 7. Background Checks for Relative Home Studies, 2020 ................................................ 52

Table 8. Number of Foster Homes Meeting Licensure Standards, 2020 .................................. 55

Table 9. Post Adoption Services – Families Served by Month, 2020 ....................................... 74

Table 10. Permanency Outcome Performance, FFY2020.......................................................... 77

Table 11. Youth Receiving Identification and Essential Documentation, 2020 ......................... 84

Table 12. Movement of Commitments to Maintenance Status ................................................ 90

## Introduction

This document serves as the eighth annual report to the United States District Court for the Southern District of Mississippi, Northern Division in the matter of *Olivia Y. v. Reeves* and the first report to the Honorable Halil S. Ozerden, recently assigned to this case. On December 19, 2016, the State of Mississippi, the Mississippi Department of Child Protection Services (MDCPS) and A Better Childhood, counsel for the plaintiffs, jointly submitted to the Court a 2nd Modified Mississippi Settlement Agreement and Reform Plan (the "2nd MSA") that provides a path for improvement of Mississippi's child welfare system. The Court had previously entered as orders of the Court the Mississippi Settlement Agreement and Reform Plan on January 4, 2008 (the "Initial Settlement Agreement") and the Modified Mississippi Settlement Agreement and Reform Plan on July 6, 2012. MDCPS is the statewide child welfare agency that provides child protection, abuse prevention, and placement services on behalf of the State of Mississippi. A Better Childhood is a national advocacy organization with experience in class action litigation on behalf of children in child welfare systems. The Court entered an order directing implementation of the 2nd MSA following its submission by the parties.

In sum, the 2nd MSA, which became effective on January 1, 2018, sets forth the child welfare infrastructure, standards, and outcomes that Mississippi must meet within specific timeframes statewide. Specifically, the 2nd MSA:

- provides the plaintiff class relief by committing MDCPS to specific improvements in the State's care for vulnerable children, with respect to their safety, permanency, and well-being;

- requires the implementation of a comprehensive child welfare data and tracking system, with the goal of improving MDCPS' ability to account for and manage its work with vulnerable children;

- establishes benchmarks and performance standards in order to prevent harm to children in the class; and

- provides a clear path for MDCPS to exit court supervision after the successful achievement and maintenance of performance standards.

Pursuant to the 2nd MSA, the Court appointed Public Catalyst as the monitor, charged with reporting on MDCPS' progress implementing its commitments. The monitor is responsible for assessing Mississippi's performance under the 2nd MSA, including determining whether the State's performance during the period makes certain commitments eligible to move to the "To Be Maintained" designation pursuant to Section 10 of the 2nd MSA. The parties agreed the

monitor shall consider timeliness, appropriateness, and quality in reporting on MDCPS' performance. The monitor is required to verify data reports and statistics provided by MDCPS and shall periodically conduct case record and qualitative reviews to monitor, evaluate, and validate the State's performance with respect to the commitments in the 2nd MSA. In evaluating MDCPS' performance, the monitor draws no conclusion of whether the Department has achieved or maintained substantial compliance in accordance with Section 11.3. of this 2nd MSA. The monitor is required to provide a written report to the Court and the parties no less frequently than annually, verifying if MDCPS has or has not met the performance standards and commitments due during the reporting period.

This is the monitor's third annual report to the Court under the 2nd MSA and reflects the status of Mississippi's reform efforts as of December 31, 2020. This report includes MDCPS' progress for the entirety of calendar year 2020.

## Summary of Progress and Challenges

During 2020, MDCPS issued guidance for all its staff that was intended to provide staff procedures to ensure the safety and wellbeing of all children in MDCPS custody while minimizing the risk of exposure to COVID-19. The extent to which COVID-19 impacted the State's implementation of any 2nd MSA commitments is noted in the relevant sections of this report.

Of 123 commitments due in 2020 in the 2nd MSA, the monitor confirmed that MDCPS met required performance standards 32 times and did not do so in 75 other areas. The monitoring team was unable to determine the performance standard for one commitment.[1] The Department did not provide data for an additional six commitments, and the monitoring team cannot validate data and information submitted by MDCPS for another nine commitments.[2] The 15 commitments for which MDCPS either did not provide data or provided inaccurate data that cannot be validated are listed in the Summary of Commitments and the relevant sections of this report. MDCPS' ongoing data problems include the manner in which the Department documents and identifies certain data fields, coding errors, and performance calculations that are inconsistent with the established rules. While MDCPS did not report data for several commitments during the period or the monitoring team was unable to validate data MDCPS

---

[1] For commitment 6.5.d, the monitoring team determined during 2019 data validation that the data file MDCPS provided during the Stipulated Third Remedial Order period to establish baseline performance did not accurately capture the average and median times from the date on which a child's adoption goal was established to adoption finalization. As baseline performance was used to establish the performance standards for this commitment, the standards need to be revisited before performance can be accurately measured.

[2] There were an additional three commitments for which the monitoring team cannot validate the quantitative data provided by MDCPS. However, due to qualitative reporting, the monitoring team was able to assess MDCPS' performance for these commitments.

provided, the Department improved its data reporting for some 2^(nd) MSA commitments that were problematic in the prior period.

Among the areas where MDCPS showed progress in 2020 are:

- *Movement of Commitments to Maintenance Status:* MDCPS attained the highest designated performance standard in 2019 and 2020, as validated by the monitor, for a series of Systemic Infrastructure Standards warranting those commitments to be moved to maintenance status.

- *New Non-relative Homes*: MDCPS licensed 357 new non-relative foster homes in 2020, exceeding the annual target of 351 homes established by the monitor after consultation with the Department.

- *Placement in Least Restrictive Setting:* Placement of a child in the least restrictive setting that meets their needs is an important step in quality foster care. During 2020, MDCPS ensured that at least 95 percent of children in custody were placed in the least restrictive setting that met their individual needs.

- *Post-Adoption Services:* MDCPS administered a system of statewide post-adoptive services to stabilize and maintain adoptive placements. Adoptive families eligible for adoption subsidies have access to these services which include supportive counseling, mental health treatment and crisis intervention, family preservation and stabilization services, peer support, and respite services.

Among the areas where MDCPS did not meet the identified performance standard are several critical to child safety, including:

- *Caseloads:* The parties negotiated and agreed MDCPS would achieve workload standards for at least 90 percent of its caseworkers. MDCPS did not meet the standard for its staff at any time in 2020. Performance varied between a high of 68 percent in May 2020 to a low of 53 percent in January 2020.

- *Maltreatment in Care:* Data provided by MDCPS and verified by the monitoring team indicate that 117 children (1.94 percent) in MDCPS' custody were victims of abuse or neglect by their caregivers. This is close to six times the agreed upon rate of maltreatment and MDCPS should have protected at least 98 more children from abuse or neglect in their placement in 2020 in order to meet the agreed upon safety standard.

- *Relative Background Checks:* The monitoring team identified lapses in completing the initial background checks for all adult household members prior to the start of a child's placement. The monitoring team found that a substantial number of background checks for the primary applicant were being completed after a child was placed in the home.

- *Transition to Independent Living:* MDCPS agreed to provide youth age 14 years and older with, among other things, an opportunity to create an appropriate Independent Living service plan, access to a range of supportive skills and services for a successful transition to adulthood, and assistance in obtaining and compiling documents they will need after emancipating from foster care. The monitoring team conducted qualitative reviews for these commitments and found 1.2 percent of youth participated in the creation of an appropriate Independent Living service plan and between zero and 25.4 percent of youth who emancipated from care received relevant documents, as agreed. The monitoring team could not validate the number of eligible youth who received services related to any one Independent Living skill or service.

## 2020 Summary of Commitments

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **2nd MSA Introduction** | Defendants shall request state funds and any federal/special fund authorization sufficient to affect the provisions and outcome measures set forth in the 2nd MSA. | Yes | 25 |
| **SYSTEMIC INFRASTRUCTURE STANDARDS** | | | |
| **1.** | MDCPS shall maintain a Commissioner of Child Protection Services having responsibility for the oversight and management of the MDCPS. | Yes | 25 |
| **1.1.a.** | MDCPS shall hire caseworkers who have, at minimum, a bachelor's degree in social work or a related human services degree. The monitor shall review and determine which degrees qualify as related human services degrees. | Yes | 26 |
| **1.1.b.** | MDCPS shall hire or promote to the position of caseworker supervisor only persons who have a master's degree in social work or a related human services degree and two years of experience working with children and families, preferably in foster care; or a bachelor's degree in social work or a related human services degree with three years of experience working with children and families, preferably in foster care. | Yes | 27 |
| **1.2.a.** | MDCPS shall maintain a Training Unit headed by a qualified director of training (see 2nd MSA for full requirements of the Training Unit). | Yes | 27 |
| **1.2.b.** | MDCPS caseworkers shall receive a minimum of 270 hours of pre-service training, which includes instructional training and supervised field training, and may include E-Learning. Any E-Learning training is subject to the approval of the monitor (see 2nd MSA for more info). | Yes | 27 |
| **1.2.c.** | MDCPS caseworker trainees, as part of pre-service training, may be assigned specific tasks or activities in connection with a case that is the primary responsibility of an experienced caseworker and may, under appropriate supervision, be assigned responsibility for a "training caseload" with progressively responsible caseload assignment. | N/A | 28 |
| **1.2.d.** | MDCPS caseworkers shall receive a minimum of 40 hours of in-service training, and all supervisors shall receive a minimum of 24 hours of in-service training. | Yes | 28 |
| **1.2.e.** | MDCPS caseworker supervisors, within 90 days of hire or promotion, shall receive a minimum of 40 hours of training, directed specifically at the supervision of child welfare caseworkers. | Yes | 29 |
| **1.3.a.** | 90% of MDCPS caseworkers will have caseloads which do not exceed the caseload standards set forth in the 2nd MSA (pg. 3-4). Individual MDCPS caseworkers with generic caseloads shall not carry a mixed caseload that exceeds 100% capacity as calculated by weights per case type set forth in the 2nd MSA (pg. 3-4). | No | 29 |
| **1.3.b.** | 85% of MDCPS supervisors shall be responsible for no more than five caseworkers. | Yes | 31 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **1.4.a.** | By December 1st of each year, MDCPS shall develop an annual Continuous Quality Improvement Plan, which shall be subject to the approval of the monitor after consultation with the parties. | Yes | 32 |
| **1.4.b.** | Upon approval, MDCPS will implement the CQI Plan and will do so with sufficient staff and resources to assess compliance with those provisions of the 2nd MSA that were identified for review in the Plan. The reviews will assess case practice, analyze outcomes, and produce analysis that will be shared with managers and stakeholders to achieve performance improvement. | Yes | 32 |
| **1.5.a.** | MDCPS shall maintain comprehensive information systems that permit: (1) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding required actions in a child's case and whether they have taken place. | No | 32 |
| **1.6.a.** | MDCPS shall provide to all county agency staff with child welfare responsibilities access to computer services, word processing, and electronic mail and access to the current management information systems and access to CCWIS, once implemented. | No | 35 |
| **1.6.b.** | Data related to compliance with the 2nd MSA's Foster Care Service Standards will be collected, analyzed, and made available, at least quarterly, to MDCPS regional and county staff. | Yes | 35 |
| **1.6.c.** | MDCPS county staff shall have access to an electronic statewide database of available placement resources. | Yes | 36 |
| **1.7.a.** | Defendants shall establish, maintain, and assess the effectiveness of a performance-based contracting system to evaluate annually contract agency compliance with the terms of the 2nd MSA. Defendants shall take all reasonable steps to ensure contract agency remediation of any identified deficiencies within three months. | Yes | 36 |
| **1.7.b.** | Prior to MDCPS contracting for case management services for children in custody, MDCPS shall submit for review and approval to the monitor a detailed plan to ensure accountability and provide supervision and oversight of such agencies. | N/A | 38 |
| **1.8.a.** | Defendants shall ensure that all licensed foster families (regardless of whether they are supervised directly by MDCPS or by private providers, and whether they are kinship or unrelated foster families) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the 2nd MSA. | To be maintained | 38 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **1.8.b.** | Defendants shall pay to all licensed foster families at least the basic monthly foster care maintenance payments. Every two years thereafter, Defendants shall provide increases in the foster care maintenance payments, based upon the previous year's rate of inflation. | Yes | 38 |
| **1.8.c.** | Defendants shall deliver to the monitor a written report regarding the adequacy of a proposed schedule of foster care maintenance payments made to foster care providers serving children and the actual cost in the state of Mississippi to provide such care (see 2nd MSA for specific report requirements). Following review of the Defendants' report, the monitor shall establish the rates that Defendants shall then implement. | Achieved in 2018 | -- |
| **CHILD SAFETY AND MALTREATMENT IN CARE** | | | |
| **2.1.** | MDCPS shall ensure that it maintains a statewide system to appropriately receive, screen, and investigate reports of child maltreatment (see 2nd MSA for system requirements). Any extensions of the timeframes set forth in MDCPS policy for the completion of investigations are subject to the review and approval of the monitor. | No | 39, 46 |
| **2.2.** | MDCPS shall continue to maintain a special investigations unit whose responsibility is to investigate reports of maltreatment of children in custody. | Yes | 42 |
| **2.2.** | The initiation of a special investigation shall not extend beyond 24 hours. | No | 42 |
| **2.3.** | MDCPS will develop and implement policies and procedures, subject to the review and approval of the monitor, for the Agency to review all maltreatment in care reports that were screened-out and assess the appropriateness within 24 hours of all screen-out determinations. If the decision to screen out the report is determined to be inappropriate, MDCPS shall ensure the report is referred for investigation immediately. | No | 40 |
| **2.4.** | Upon receipt of a substantiated report of child maltreatment in a contract agency group home or emergency shelter, MDCPS shall, within 30 calendar days, initiate a licensure investigation, that is in addition to and independent of the child protection investigation (see 2nd MSA for investigation requirements). | No | 43 |
| **2.5.** | Upon receipt of a report of child maltreatment in a private child placing agency foster home, MDCPS staff will notify the child placing agency, who shall, within 30 calendar days, initiate a licensure investigation that is in addition to and independent of, any child protection investigation (see 2nd MSA for investigation requirements). | No | 43 |
| **2.6.** | All allegations of maltreatment of a child in custody shall be investigated by a worker who has received training on intake and investigations processes, policies, and investigation techniques and has no ongoing connection to the foster care case. | Yes | 42 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **2.7.** | Within 30 days of the completion of any investigation of maltreatment of a child in custody, as required in Section 2.1, MDCPS shall review the maltreatment investigation (see 2nd MSA for review requirements). | No | 45 |
| **2.8.** | MDCPS shall assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment of children in MDCPS' custody. | No | 41 |
| **2.8.a.1.** | By July 1, 2018, at least 90% of maltreatment-in-care investigations will be initiated and completed within 30 days. | Yes | 42 |
| **2.8.b.1** | Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker according to the following schedule: 1) Once per week for the first month and twice per month for three months if the investigation is found to be substantiated. | No | 44 |
| **2.8.b.2** | Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker according to the following schedule: 2) Twice per month in accordance with MDCPS policy if the investigation is found to be unsubstantiated. | No | 44 |
| **2.8.c.** | When a maltreatment investigation involves a foster or adoptive home, MDCPS shall file a copy of the approved final investigative report, and any recommendations and/or corrective actions MDCPS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and with the Bureau Director for Licensure. MDCPS shall also provide those records to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor. | Yes | 46 |
| **2.8.d.** | When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by MDCPS, a copy of the final investigative report shall be filed in the child's case record, with the Director of Congregate Care Licensure, and sent to the licensed provider facility. MDCPS shall provide the report to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor. | Yes | 46 |
| **2.9.** | The rate of child abuse and neglect among children in foster care shall not exceed 0.33% per year effective for the period beginning 1/1/18 (see 2nd MSA for full definition of this metric). | No | 48 |
| | **FAMILY-BASED PLACEMENTS** | | |
| **3.1.** | Nonrelative Foster Homes: All foster homes and facilities with children placed who are in the custody of MDCPS shall be timely licensed. | No | 49 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **3.1.** | Relative Foster Homes: All foster homes and facilities with children placed who are in the custody of MDCPS shall be timely licensed. | No | 49 |
| **3.1.** | All foster homes and facilities with children placed who are in the custody of MDCPS shall be subject to the licensure process approved by Public Catalyst on December 31, 2016. | Yes | 49 |
| **3.2.a.** | No child shall remain in a foster home or facility determined to be unable to meet MDCPS licensing standards, absent an order by a state court with jurisdiction over child custody directing the placement of the child into a specific unlicensed placement. | No | 50 |
| **3.2.b.** | Safety Issues: If it is determined that an unlicensed foster home or facility is unable to meet MDCPS licensing standards due to a safety issue, Defendants shall take all reasonable efforts to immediately ensure the child's safety and to remove the child, including, if required by the court, seeking an emergency court order. If the child is not in imminent danger, MDCPS shall implement a safety plan and within five calendar days, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only. | No | 51 |
| **3.2.c.** | Non-safety Issues: If MDCPS determines an unlicensed foster home to be unable to meet MDCPS licensing standards due to a non-safety issue, Defendants shall, within 30 calendar days of that determination, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only. | No | 51 |
| **3.3.a.** | MDCPS, in conjunction with the monitor, shall establish annual statewide and county performance requirements and time periods for new foster home licensure. The monitor will report to the parties MDCPS progress on achieving the performance requirements. The Defendants shall meet the performance requirements, including time periods. | Yes | 53 |
| **3.3.b.** | MDCPS shall begin to implement the annual plan to recruit and retain additional licensed foster home placements and shall maintain the additional number of total placements, as necessary during the applicability of the 2nd MSA. | Yes | 54 |
| | **PLACEMENT STANDARDS** | | |
| **4.1./ 4.13.b.** | By July 1, 2019, 80% of foster homes shall provide care for no more than five children (including foster, biological, and adoptive children) at any given time (see 2nd MSA for allowable exceptions). | Yes | 54 |
| **4.1./4.13.c.** | By July 1, 2020, 95% of foster homes shall provide care for no more than five children (including foster, biological, and adoptive children) at any given time (see 2nd MSA for allowable exceptions). | No | 54 |
| **4.2./4.14.b.** | By July 1, 2019, 75% of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs. | Cannot validate | 55 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **4.2./4.14.c.** | By July 1, 2020, 95% of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs. | Cannot validate | 56 |
| **4.3./4.15.** | At least 95% of children in MDCPS' custody shall be placed in the least restrictive setting that meets their individual needs as determined by a review of all intake, screening, assessment and prior placement information regarding the child available at the time of placement. | Yes | 56 |
| **4.4./4.18.** | 90% of children who enter MDCPS' custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless one of the exceptions provided in this 2nd MSA is documented as applying. | Yes | 57 |
| **4.5./4.19.** | 90% of children who enter MDCPS' custody in Regions II-East, II-West, and V-West shall be placed within his/her own county or within 75 miles of the home from which he/she was removed unless one of the exceptions provided in this 2nd MSA is documented as applying. | No longer required | -- |
| **4.6./4.16.b.** | By July 1, 2019, 75% of siblings entering MDCPS' custody at or near the same time shall be placed together (see 2nd MSA for allowable exceptions). If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file. | No | 57 |
| **4.6./4.16.c.** | By July 1, 2020, 90% of siblings entering MDCPS' custody at or near the same time shall be placed together (see 2nd MSA for allowable exceptions). If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file. | No | 58 |
| **4.7./4.17.b.** | By July 1, 2019, 75% of children in MDCPS' custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability consistent with 2nd MSA requirements. | Cannot validate | 58 |
| **4.7./4.17.c.** | By July 1, 2020, 90% of children in MDCPS' custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability consistent with 2nd MSA requirements. | Cannot validate | 59 |
| **4.8.** | No child shall remain overnight in an MDCPS office or other nonresidential facility that provides intake functions. | No | 59 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **4.9.** | No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless: a) The child has exceptional needs that cannot be met in a licensed foster home; or b) In order to keep a sibling group together for a temporary period, not to exceed 15 days and the RD has granted documented approval for the congregate care placement; or c) To enable a mother and baby to be placed together and there is not an available foster home for both of them. | No | 59 |
| **4.10./4.12.b.** | By July 1, 2019, 80% of children will remain in his/her existing placement and not be moved to another placement unless MDCPS specifically documents in the child's case record justifications for that move and the move is approved by a MDCPS supervisor. | No | 60 |
| **4.10./4.12.c.** | By July 1, 2020, 90% of children will remain in his/her existing placement and not be moved to another placement unless MDCPS specifically documents in the child's case record justifications for that move and the move is approved by a MDCPS supervisor. | No | 60 |
| **4.11.** | No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others with documented approval from the RD. | No | 61 |
| | **VISITATION** | | |
| **5.1.a.2.** | By January 1, 2019, at least 90% of foster children shall have an MDCPS caseworker meet with the child at least two times per month (see 2nd MSA requirements for visits). At least one visit per month shall take place in the child's placement. | No | 61 |
| **5.1.b.2.** | By January 1, 2019, at least 90% of foster children receiving a 90-day trial home visit period shall have an MDCPS caseworker meet with the child in the home at least two times per month. | No | 62 |
| **5.1.c.2.** | By January 1, 2019, for a least 90% of foster children with a goal of reunification, MDCPS shall meet with the child's parents at least monthly unless the child's parent(s) reside out-of-state or are incarcerated. | No | 63 |
| **5.1.d.2.** | By January 1, 2019 at least 90% of foster parents with at least one foster child in the home shall have MDCPS visit the home monthly. | No | 63 |
| **5.2.a.** | MDCPS shall arrange contact for the child with his/her parents and with any siblings not in the same placement within 72 hours of foster care placement unless there are documented reasons why contact should not occur. If a visit cannot be arranged within 72 hours, a telephone call to parents, siblings, or extended family members shall be provided to the child. | No | 64 |
| **5.2.b.** | For children entering foster care, a visitation plan for the child and his/her family shall be developed as part of the Family Service Plan. The visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child. | No | 64 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| **5.2.b.1.** | If parental visitation is appropriate, this visitation plan shall include a minimum of two visits per month with the parents, unless the court order in the child's case limits such visits or unless it is documented that a parent failed to make himself or herself available. | Yes | 65 |
| **5.2.b.1.a.** | By January 1, 2019, 90% of children shall be provided with contacts with their parents consistent with the 2nd MSA requirements. | No | 65 |
| **5.2.b.2.** | The child's visitation plan, regardless of permanency goal, shall include at least monthly visits with any siblings not in the same placement. | No | 65 |
| **5.2.b.2.a./ 5.2.b.3./ 5.2.b.4.** | By January 1, 2019, 80% of children shall be provided with contacts with any siblings in custody not in the same placement consistent with 2nd MSA requirements. | No | 65 |
| **5.2.c.** | MDCPS and its contracting agencies shall implement a policy that prohibits cancellation of visits as a form of discipline against children. | To be maintained | 66 |
| **CHILD AND YOUTH PERMANENCY** | | | |
| **6.1.a.2.** | By January 1, 2019 at least 90% of Family Service Plans shall be submitted by the caseworker consistent with 2nd MSA requirements, within 30 calendar days of a child's entry into custody. The supervisor shall review the Plan for approval within 15 calendar days. The Family Service Plan shall be considered complete upon documented supervisory review and approval. | No | 67 |
| **6.1.b.** | In instances in which it is impossible to meet with one or both parents, the service planning process will proceed, notwithstanding the parent's absence. | No | 68 |
| **6.1.c.2.** | By January 1, 2019, in at least 90% of placement cases in which the whereabouts of one or both parents is unknown, MDCPS shall, within 30 days, institute a diligent search for the parent(s), which shall be documented in the child's case record. | No | 68 |
| **6.1.d.2.** | By January 1, 2019, for at least 90% of foster children who enter custody, permanency plans shall be submitted within 30 calendar days of the child's entry into custody by the caseworker consistent with 2nd MSA requirements. The supervisor shall review the plan for approval within 15 calendar days. The permanency plan shall be considered complete upon documented supervisory review and approval. | No | 68 |
| **6.2.a.1.** | At least 95% of children in custody with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements. | No | 69 |
| **6.3.a.1.b.** | By January 1, 2019, at least 90% of foster children with a permanency goal of reunification shall have service plans for their parents that identify those services MDCPS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that MDCPS made those identified services available directly or through referral. | No | 69 |

14

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **6.3.a.2.** | For a child with a permanency goal of reunification, the child's MDCPS caseworker shall meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances. | No | 70 |
| **6.3.a.3.** | For children with a permanency goal of reunification, the case record shall document opportunities provided to parents in support of reunification. | No | 70 |
| **6.3.a.4.** | When a recommendation to reunify a child with his/her family has been made, MDCPS shall develop an after-care plan with the family that identifies the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured. MDCPS shall take reasonable steps to provide or facilitate access to services necessary to support the child during the trial home visit. | No | 70 |
| **6.3.a.5.b.** | By January 1, 2019, at least 90% of foster children who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During the trial home visit period, MDCPS shall provide or facilitate access to the services identified in the child's after-care plan, consistent with the 2nd MSA requirements. | No | 71 |
| **6.3.a.6.** | Before the end of any trial home visit period, MDCPS shall convene a meeting with the child's parents and the child to determine the appropriateness of a final discharge. If final discharge is determined to be appropriate, MDCPS shall make the appropriate application to the Youth Court to be relieved of custody. | No | 71 |
| **6.3.b.1.b.** | By January 1, 2019, at least 90% of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child specific activities that MDCPS will undertake to achieve adoption. | No | 72 |
| **6.3.b.2.c.** | By January 1, 2020, a termination of parental rights referral shall be made on behalf of at least 90% of children who have spent more than 17 of the last 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception pursuant to the federal Adoption and Safe Families Act ("ASFA") has been documented by MDCPS in the child's case record. | Cannot validate | 72 |
| **6.3.b.3.** | MDCPS shall provide to the monitor a report of all TPR referrals made during the monitoring period, the date those TPR referrals were made, and the date the TPR petition was filed with the court. | Yes | 73 |

| Section | Commitment | Achieved | Report Page |
|---------|-----------|----------|-------------|
| **6.3.c.** | Defendants shall establish and maintain a system of post-adoptive services to stabilize and maintain adoptive placements. Adoptive families eligible for adoption subsidies shall have access to these services, which may include services such as counseling, mental health treatment and crisis intervention, family preservation and stabilization services, and peer support. | Yes | 73 |
| **6.3.d.1.** | The permanency goals of durable legal custody and guardianship may be assigned when there are documented efforts in the child's case record to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. | No, but close | 74 |
| **6.3.d.2.** | When the permanency goals of durable legal custody and guardianship are assigned to a child under the age of 14 years old or living with a non-relative, MDCPS shall provide to the monitor at the end of each monitoring period, information from the child's case record documenting efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. | No | 74 |
| **6.3.e.** | If MDCPS concludes, after considering reunification, adoption, durable legal custody and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, MDCPS may assign a permanency goal of APPLA for the child (see 2nd MSA for APPLA requirements). | No | 75 |
| **6.4.a.2.** | By January 1, 2019, at least 90% of foster children who have been in custody for at least six months shall have a timely court or administrative case review consistent with 2nd MSA requirements. | No | 75 |
| **6.4.b.2.** | By January 1, 2019, for at least 90% of foster children who have been in custody for at least 12 months, MDCPS shall make reasonable efforts to have a timely annual court review scheduled consistent with 2nd MSA requirements. | Yes | 76 |
| **6.4.c.** | MDCPS shall review documented exceptions pursuant to ASFA for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review. | Cannot Validate | 76 |
| **6.5.a.1.** | Of all children who enter foster care in a 12-month period, the percent who discharged to permanency within 12 months of entering foster care. | No | 77 |
| **6.5.a.2.** | Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care between 12 and 23 months, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. | No | 77 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **6.5.a.3.** | Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care for 24 months or more, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. | Yes | 77 |
| **6.5.d.** | For all children in the custody of MDCPS who were adopted in FFY2019, the monitor shall validate the average and median lengths of time to adoption finalization for each child from the date on which the child's adoption goal was established. | Unable to determine | 78 |
| | **TRANSITION TO INDEPENDENT LIVING** | | |
| **7.1.** | MDCPS shall provide each youth transitioning to independence with at least six months' advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition. | Cannot validate | 78 |
| **7.2.** | Each foster youth age 14 years and older, regardless of his/her permanency plan, shall be provided with an opportunity to participate in the creation of an appropriate Independent Living service plan for a successful transition to adulthood. | No | 79 |
| **7.3.** | Each foster youth age 14 years and older shall have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood. MDCPS shall maintain sufficient resources to deliver Independent Living services to all youth described herein. | Cannot validate | 79 |
| **7.4.** | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid coverage so that their coverage continues without interruption at the time of emancipation. | Yes | 80 |
| **7.5.** | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond receive a start-up stipend of at least $1,000.00 at the time of emancipation, or as soon as practicable thereafter. | No | 80 |
| **7.6.** | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond have access to a housing resource specialist responsible for assisting the youth obtain an adequate living arrangement. | No | 81 |
| **7.7.** | MDCPS shall continue to implement policies and processes which ensure that youth emancipating from the foster care system at age 18 or beyond receive services and support under the State Educational Training and Vocational (ETV) Program for which they are eligible. | Cannot validate | 82 |
| **7.8.a.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate. | No | 82 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **7.8.b.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A social security or social insurance number. | No | 82 |
| **7.8.c.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A resume, when work experience can be described. | No | 82 |
| **7.8.d.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A driver's license, when the ability to drive is a goal; if not a driver's license, then a state-issued, photo identification. | No | 82 |
| **7.8.e.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: An original or certified copy of the youth's birth certificate. | No | 82 |
| **7.8.f.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Previous placement information. | No | 82 |
| **7.8.g.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Documentation of immigration, citizenship, or naturalization, when applicable. | No | 82 |
| **7.8.h.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Documentation of tribal eligibility or membership. | No | 82 |
| **7.8.i.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Death certificates when parents are deceased. | No | 82 |
| **7.8.j.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A life book or a compilation of personal history and photographs, as appropriate. | No | 82 |
| **7.8.k.** | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties. | No | 82 |
| **CHILD WELL-BEING** | | | |
| **8.1.a.2.** | By July 1, 2019, 80% of children shall have an initial medical screening within 7 days of the child's entry into foster care. | No | 84 |
| **8.1.a.3.** | By July 1, 2020, 90% of children shall have an initial medical screening within 72 hours of the child's entry into foster care. | No | 85 |
| **8.1.b.2.** | By July 1, 2019, 80% of children shall have an initial EPDST or other comprehensive medical examination within 60 days of the child's entry into foster care. | No | 85 |
| **8.1.b.3.** | By July 1, 2020, 90% of children shall have an initial EPDST or other comprehensive medical examination within 30 days of the child's entry into foster care. | No | 85 |

18

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **8.1.c.2.** | By July 1, 2019, 45% of children shall be provided with periodic and on-going medical examinations. | Did not report | 86 |
| **8.1.c.3.** | By July 1, 2020, 90% of children shall be provided with periodic and on-going medical examinations. | Did not report | 86 |
| **8.1.d.3.** | By July 1, 2019, 90% of children shall be provided with practitioner recommended follow-up treatment. | Did not report | 86 |
| **8.1.e.2.** | By July 1, 2019, 80% of children shall have a dental examination within 90 days of the child's entry into foster care. | No | 86 |
| **8.1.e.3.** | By July 1, 2020, 90% of children shall have a dental examination within 90 days of the child's entry into foster care. | No | 87 |
| **8.1.f.2.** | By July 1, 2019, 90% of children shall have the completed foster child information form or other electronic record containing available medical, dental, educational, and psychological information about the child provided to foster parents or facility staff within 15 days of placement. | No | 87 |
| **8.1.g.** | By July 1, 2018, 85% of children shall have their Medicaid information provided to foster parents or facility staff at the time of placement. | No | 87 |
| **8.2.a./8.2.c.1.** | At least 90% of school-age foster children who enter custody shall have their educational records reviewed and their educational needs documented by MDCPS within 30 calendar days of their entry into foster care. | Did not report | 88 |
| **8.2.b.** | MDCPS shall take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within seven calendar days of initial placement or any placement change, including while placed in shelters or other temporary placements. | Did not report | 88 |
| **8.2.c.** | MDCPS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences. | Did not report | 88 |

## Methodology

To prepare this report, the monitoring team conducted a series of verification activities to evaluate MDCPS' progress implementing its commitments in the 2nd MSA. In accordance with Section 9.3., the monitoring team independently verified and analyzed a wide range of aggregate and detail data reports and statistics produced by MDCPS,[3] including data related to caseloads and workloads, maltreatment in care, foster home licensure, and federal permanency outcomes. MDCPS also submitted "cohort" data, which identifies children's entries and exits from foster care during the period, the population of children served during the period, and the population of children in care at the beginning and end of the period.

Multiple verifications and data quality checks were performed against the data MDCPS provided. These checks focused on examining problems (e.g., missing data, internal consistency, duplicate records) with any variables used to identify children eligible for the indicator, to calculate derived variables, or measure the outcome. The monitoring team analyzed the information to verify the data quality, assessed the methodology used to compute performance for each metric, and attempted to replicate the performance calculations made by MDCPS. In these efforts, both MDCPS and the monitoring team relied on business rules jointly developed between the monitoring team and MDCPS and insights obtained from prior validation efforts. Problems related to data quality, if discovered, are noted. When possible, the monitoring team shared with MDCPS information about specific records that caused discrepancies or were flagged as a potential data quality issue.

Numerous meetings were convened with key MDCPS personnel as needed relative to the data provided. When possible, multiple iterations of analyses were conducted and resubmitted by MDCPS based on the monitoring team's preliminary findings. The final data submitted were then analyzed and the results were compared to those provided by MDCPS.

MDCPS also produced the results of qualitative reviews it conducted of thousands of children's records using MDCPS' Foster Care Review (FCR) and other qualitative review processes using a statistically significant review sample based on at least a 95 percent confidence level. To verify the information produced by MDCPS, the monitoring team conducted staff interviews, cross-data validation, and extensive qualitative case record reviews of more than 5,000 children's cases, including many of the same case records MDCPS reviewed to determine performance with a specific commitment. In addition, the monitoring team reviewed 300 home studies, for both licensed and unlicensed homes. The monitoring team's findings are included in the relevant

---

[3] MDCPS' primary information system is the Mississippi Automated Child Welfare Information System (MACWIS). MDCPS also has ancillary information systems or tracking tools that are not directly connected to MACWIS but may leverage data from it, such as Excel sheets used to track and report on newly licensed and closed homes and resource homes involved in expedited pending relative placements.

sections of this report. In most instances, the sample sizes for the monitoring team's case record verification reviews were based on a statistically significant sample of cases and methodology based on a 95 percent confidence level.

The monitoring team examined thousands of MDCPS administrative records including organizational charts, employee hiring and training records, financial and budgetary information, performance-based contracts, court documents and pleadings associated with this litigation, hundreds of child-level court orders related to placement and permanency of children in MDCPS custody, relevant statutes and regulations, and MDCPS policies and bulletins issued to staff.

The monitoring team held quarterly meetings with the parties pursuant to Section 9.4. of the 2nd MSA, regular meetings with MDCPS leadership and program staff, and meetings with management and staff at MDCPS regional and county offices.

## Demographics

MDCPS produced demographic data for the period from January 1, 2020 to December 31, 2020. MDCPS data indicate there were 4,188 children in custody on January 1, 2020 and 3,738 children in custody as of December 31, 2020. During the monitoring period, 1,907 youth were placed in foster care and 2,357 exited care.[4] MDCPS served 6,095 children during the monitoring period. Young children age zero to six years made up the largest portion (1,649 or 44 percent) of children in custody on December 31, 2020. Twenty-two percent of youth (831) were 12 to 17 years of age, 29 percent of children (1,091) were seven to 11 years of age, and four percent of youth (167) were 18 years and over, as detailed in Figure 1.

---

[4] The monitoring team identified 18 children who appear twice in MDCPS' entry cohort. Each of these children entered foster care more than once during the monitoring period. The monitoring team also identified 12 children who appeared twice in the exit cohort. Each of these children exited foster care two times during the monitoring period.

**Figure 1. Age of Children in Custody on December 31, 2020**

*n=3,738*



The population of children in care on December 31, 2020 was approximately evenly split by gender, with 50 percent of children in care male and 50 percent female. Regarding race, the population of children was 54 percent White, 39 percent African American, 0.2 percent Asian, 0.1 percent Native Hawaiian or Pacific Islander, and 0.1 percent Native American. Additionally, three percent of children reported being of mixed race. Three percent of children were identified with Hispanic ethnicity and can be of any race. The race of three percent of children was undetermined.[5]

**Table 1. Race of Children in Custody on December 31, 2020**

| Race | Count | Percent |
|---|---|---|
| White | 2,024 | 54% |
| African American | 1,460 | 39% |
| Mixed Race | 128 | 3% |
| Unable to Determine | 113 | 3% |
| Asian | 7 | 0.2% |
| Native Hawaiian, Pacific Islander | 3 | 0.1% |
| Native American | 3 | 0.1% |
| **Total** | **3,738** | **100%** |
| Hispanic ethnicity and of any race | 113 | 3% |

Note: Percentages may not add up to 100 due to rounding.

---

[5] Children whose race was explicitly marked as 'Unable to Determine' and whose race was not found in the case record are combined into the entry for 'Unable to Determine'.

As the following figure demonstrates, 88 percent of children in MDCPS' custody on December 31, 2020 lived in family settings, including foster families (49 percent), with relatives (29 percent), with their own parents (9 percent), in homes that intend to adopt (0.8 percent), and in homes of unrelated caregivers (0.4 percent). Of children in custody, 385 (10 percent) lived in institutional settings, including residential treatment and other congregate care facilities. Another six youth (0.2 percent) resided in Supervised Independent Living placements which serve youth who are preparing to transition out of care.

**Figure 2. Placement Types of Children in Custody on December 31, 2020**
*n=3,738*



Of the children in care on December 31, 2020, 37 percent were in care less than one year, while 21 percent were in care for more than three years.

**Figure 3. Length of Stay in Care of Children in Custody on December 31, 2020**
*n=3,738*



As the following table indicates, 2,357 children exited MDCPS custody during the monitoring period. The most common exit types were to reunification (53 percent), adoption (22 percent), and living with other relatives (13 percent).

**Table 2. Exits from Care by Exit Type, January 1, 2020 to December 31, 2020**

| Exit Type | Count | Percent |
|---|---|---|
| Reunification | 1,238 | 53% |
| Adoption | 524 | 22% |
| Living with other relatives | 298 | 13% |
| Guardianship | 168 | 7% |
| Emancipation | 64 | 3% |
| County of Service Placement Change | 38 | 2% |
| Runaway | 13 | 0.6% |
| Transfer to another agency | 10 | 0.4% |
| Death of a child | 4 | 0.2% |
| **Total** | **2,357** | **100%** |

Note: Percentages may not add up to 100 due to rounding.

As Table 3 demonstrates, of the children in custody on December 31, 2020, most children (1,871 or 50 percent) had reunification as a federal goal. For the remaining children, 1,442 (39 percent) had a goal of adoption, 178 (5 percent) had a goal of another planned living arrangement (APPLA), 39 (1 percent) had a goal of durable legal custody or guardianship, and 112 (3 percent) had placement with a relative as a federal goal. There were 96 children (3 percent) with missing federal goal codes.

**Table 3. Federal Goals for Children in Custody as of December 31, 2020**

| Federal Goal | Count | Percent |
|---|---|---|
| Reunification | 1,871 | 50% |
| Adoption | 1,442 | 39% |
| APPLA | 178 | 5% |
| Custody with a relative | 112 | 3% |
| No plan documented (less than 45 days in custody) | 69 | 2% |
| Durable legal custody / guardianship | 39 | 1% |
| No plan documented (no current approved FSP) | 27 | 0.7% |
| **Total** | **3,738** | **100%** |

Note: Percentages may not add up to 100 due to rounding.

## Operational Budget

The 2nd MSA requires MDCPS to request state funds and any federal/special fund authorization sufficient to affect the provisions and outcome measures set forth in this 2nd MSA. For state fiscal year (SFY) 2020 (July 1, 2019 to June 30, 2020), MDCPS was appropriated $110,548,860 in general funds and $15,157,835 in state special funds. During the 2020 Mississippi legislative session, MDCPS requested a state fund appropriation of $126,798,404 in general funds, and $15,157,835 in state special funds for SFY2021 (July 1, 2020 to June 30, 2021). This request sought an increase of $16,249,544 from the prior fiscal year's state funding. MDCPS' request for increased funding centered on its desire to hire additional staff to achieve compliance with the caseload requirement in the 2nd MSA, and its need to develop a Comprehensive Child Welfare Information System (CCWIS) data system as required by the 2nd MSA. However, the Mississippi Legislature appropriated MDCPS $111,499,443 in state general funds and $14,328,343 in state special funds, for a total state funding of $125,827,786 which represented an increase of $121,091 over SFY2020 funding but fell short of MDCPS' request by $16,128,453. MDCPS also received $77,176,495 in federal funds in SFY2020 and estimated receiving $117,580,807 in federal funds in SFY2021.

## Systemic Infrastructure Standards

## Department Leadership

MDCPS committed in the 2nd MSA to maintain a Commissioner of Child Protection Services having responsibility for the oversight and management of the Department. The Commissioner must possess at least a bachelor's degree from an accredited institution of higher learning and ten years' experience in management, public administration, finance, or accounting or a master's or

doctoral degree from an accredited institution of higher learning and five years' experience in management, public administration, finance, law, or accounting.

During the period, there were changes in executive leadership in MDCPS. Commissioner Dickinson resigned, effective January 16, 2020. Governor Tate Reeves appointed Taylor Cheeseman to serve as Acting Interim Commissioner of MDCPS, effective January 14, 2020, until the appointment of Commissioner Andrea Sanders, effective November 9, 2020.

The monitoring team had an opportunity to meet with Commissioner Andrea Sanders and review her qualifications for the position. Commissioner Sanders possesses a Juris Doctorate degree from the Mississippi College School of Law and a Master of Social Work degree from Tulane University, and has more than 25 years of experience in social work and law, serving in various case management roles and attorney positions in both the public and private sectors in Mississippi. Commissioner Sanders possesses the requisite qualifications to serve as commissioner of MDCPS. *Pursuant to Section 10.1. of the 2nd MSA, the monitoring team validates that MDCPS has attained the highest designated performance standard for 24 months for this commitment. The monitor authorizes this commitment to move to the "To Be Maintained" designation.*

## Staff Qualifications and Training

MDCPS committed to ensure that staff serving Mississippi's at-risk children and families have appropriate qualifications and receive adequate training.

*Caseworker Qualifications (1.1.a.)*

MDCPS reported 223 caseworkers were hired in 2020. All caseworkers are required to have, at minimum, a bachelor's degree in social work or a related human services field that is approved as a qualifying degree by the monitor.[6] Comparing the reported degrees for all the caseworkers hired in 2020 to the list of qualifying degrees, all the caseworkers possessed an approved degree. The monitoring team also reviewed the paper degrees or official transcripts for all caseworkers hired in 2020 and confirmed that the caseworkers' degrees were accurately reported. *Pursuant to Section 10.1. of the 2nd MSA, the monitoring team validates that MDCPS has attained the*

---

[6] In addition to the previously approved related human services degrees (Child and Family Studies, Child Development, Counseling, Criminal Justice, Disciplinary Studies, Early Childhood and Family, Education, Educational Psychology, Education and Human Science, Elementary Education, Family Studies, General Studies, Guidance Education, Interdisciplinary Studies, Marriage and Family Therapy, Nursing, Political Science, Psychology, Social Services, and Sociology), the monitoring team reviewed and approved five additional degrees in 2020: Child and Adolescent Counseling, Family and Consumer Science, Human Development and Family Science, School Counseling, and Social Sciences.

*highest designated performance standard for 24 months for this commitment. The monitor authorizes this commitment to move to the "To Be Maintained" designation.*

*Supervisory Qualifications (1.1.b.)*

In the 2nd MSA, MDCPS agreed that new caseworker supervisors must possess either a master's degree in social work or an approved qualifying human services degree and two years of experience working with children and families or a bachelor's degree in social work or an approved qualifying human services degree with three years of experience working with children and families. MDCPS reported 39 caseworker supervisors were appointed during 2020. The monitoring team compared the reported degrees for all the caseworker supervisors appointed in 2020 to the list of qualifying degrees. The team also reviewed the paper degrees or official transcripts and job applications for the caseworker supervisors and determined that all the supervisors possessed an approved degree and the requisite years of experience. *Pursuant to Section 10.1. of the 2nd MSA, the monitoring team validates that MDCPS has attained the highest designated performance standard for 24 months for this commitment. The monitor authorizes this commitment to move to the "To Be Maintained" designation.*

*Training Unit (1.2.a.)*

MDCPS committed to maintain a Training Unit headed by a qualified director of training with adequate staffing, funding, and resources to assure that comprehensive child welfare training is provided to caseworkers, supervisors, and other child welfare employees. The child welfare training should enable staff to comply with the relevant mandates of the 2nd MSA, MDCPS policy, and reasonable professional standards. During 2020, the MDCPS Office of Professional Development (OPD) administered training and professional development in order to prepare MDCPS employees to assume their job responsibilities and enhance their knowledge, skills, and abilities. Specifically, OPD delivered pre-service, supervisory, and in-service training to Department staff during the period. Beginning in late March 2020, all training was transitioned from face-to-face to a virtual environment due to COVID-19. The training material remained the same during this time. OPD was led by a senior manager with an advanced degree and 11 years of experience as a director of workforce development and a director of professional development in Mississippi's child welfare agency. Unit staff included 27 training coordinators and practice model coaches, along with four supervisors.

*Pre-Service Training (1.2.b.)*

All new MDCPS caseworkers must complete a total of 270 hours of pre-service training, which includes classroom instruction, field instruction, and E-Learning. The pre-service training program

offered by MDCPS' OPD exceeds 270 hours of training with a combination of eight alternating weeks of classroom instruction and on-the-job training.[7]

MDCPS reported that 42 workers who were hired in late 2019 completed pre-service training in the first quarter of 2020. Of the 223 new workers hired in 2020, 151 completed pre-service training during the period. Twenty-one caseworkers previously employed and trained by MDCPS were rehired by the Department and exempt from pre-service training.[8] Fifteen workers left the Department either before starting or before completing training. The remaining 36 workers were hired into their positions late in the period and were enrolled in training that ended in the first quarter of 2021.

The monitoring team reviewed the attendance records and the four competency exams administered during pre-service training for the 42 caseworkers hired in late 2019 and the 151 caseworkers hired in 2020 who completed training during the period and confirmed that all 193 caseworkers attended training and achieved a passing score of 70 or higher on each of the four exams.

*Training Caseloads (1.2.c.)*

The 2nd MSA allows a trainee to be assigned responsibility for a "training caseload," under appropriate supervision, that gradually increases as the trainee successfully completes pertinent competence-based examinations. MDCPS has elected not to implement training caseloads at this time. MDCPS will notify the monitor before instituting training caseloads so the required competency exams and standards for passing the exams can first be reviewed and approved by the monitor as required by the 2nd MSA.

*In-Service Training (1.2.d.)*

MDCPS agreed that all caseworkers must complete a minimum of 40 in-service training hours in 2020 and all supervisors must complete a minimum of 24 in-service training hours in 2020. MDCPS provided detailed data to the monitoring team indicating that 776 caseworkers and investigators received 40 or more in-service training hours and 210 supervisors received 24 or more in-service training hours during 2020, as required. The monitoring team verified for each worker that in-service training covered a wide range of relevant topics including: The Interstate Compact on the Placement of Children (ICPC), communication under stress, helping youth create their life narrative, safety planning, independent living for youth, family team meetings, in-home

---

[7] Due to the COVID-19 pandemic, MDCPS transitioned to virtual pre-service training in March 2020.
[8] Caseworkers and supervisors who have successfully completed MDCPS' current pre-service training are not required to attend training again.

services, locating and engaging fathers, understanding the psychological impact of trauma and how children cope, and implementation of the case practice model.

*Supervisor Training (1.2.e.)*

MDCPS committed in the 2nd MSA that caseworker supervisors must complete a minimum of 40 hours of training directed specifically at the supervision of child welfare caseworkers within 90 days of assuming a supervisory position. OPD offers a clinical supervisory training program consisting of 40 hours of classroom training based on identified competencies.[9]

MDCPS provided information indicating that one caseworker supervisor hired late in 2019 completed supervisory training in the first quarter of 2020. Of the 39 caseworker supervisors appointed in the period, 13 supervisors met the 90-day requirement for training completion. Four supervisors appointed late in 2020 were pending training at the end of the period; 17 supervisors were promoted in the period but had completed supervisory training in a prior period and were exempt from completing it again; and four supervisors who had been previously employed and trained by MDCPS, were rehired as a supervisor, and exempt from supervisory training. One individual appointed as a supervisor left the agency before attending supervisory training. The monitoring team reviewed the attendance records and the competency exam scores for the exam administered at the end of supervisory training for the 14 supervisors who completed training in 2020 and confirmed that all had attended training and achieved a passing score of 70 or higher.

## Caseloads and Supervision

*Caseworker Caseloads (1.3.a.)*

The 2nd MSA sets forth caseload standards for caseworkers and supervisors performing child welfare functions. The 2nd MSA states that 90 percent of MDCPS caseworkers must have caseloads that do not exceed the caseload standards for each type of case. Individual MDCPS caseworkers who carry a mixed caseload are held to a weighted, pro-rated standard. The following table details the caseload standards for each type of case.

---

[9] Due to the COVID-19 pandemic, MDCPS transitioned to virtual supervisory training in March 2020.

**Table 4. 2nd MSA Caseload Standards by Case Type**

| Type of Case | Included Categories | Standards | Weight Per Case – 100% Capacity |
|---|---|---|---|
| Child Protection | Investigations Level 2<br>Investigations Level 3 | 14 Investigations | 0.0714 |
| Ongoing Foster Care | Placement Responsibility & Service | 14 Children | 0.0714 |
| Ongoing Foster Care | Placement County of Responsibility<br>Placement County of Service | | 0.0357 |
| In-Home | Protection Responsibility & Service<br>Prevention Responsibility & Service | 17 Families | 0.0588 |
| In-Home | Protection or Prevention County of Responsibility<br>Protection or Prevention County of Service | | 0.0294 |
| Adoption | Adoption County of Service | 15 Children | 0.0667 |
| New Application Licensing | Resource Inquiry<br>ICPC Application<br>Foster Home Study | 15 Homes | 0.0667 |
| Renewal Licensing | Foster Home Supervision<br>Foster Home Renewal | 36 Homes | 0.0278 |

As detailed in the figure below, MDCPS did not meet the 90 percent caseload standard for its staff in any quarter during 2020. Performance varied between a high of 68 percent in May 2020 to a low of 53 percent in January 2020.

**Figure 4. Percent of Workers Meeting the Caseload Standard, 2020**



*Data as of the end of March, June, September, and December*     **Source: MDCPS Data**

*Supervisor Staffing Ratios (1.3.b.)*

MDCPS agreed that 85 percent of supervisors would be responsible for overseeing no more than five caseworkers each. As the chart below indicates, MDCPS met the standard during three of four quarters in 2020, and averaged 85 percent performance for the year.

**Figure 5. Percent of Caseworker Supervisors Meeting the Supervision Ratio Standard, 2020**



*\*Data as of the end of March, June, September, and December*          **Source: MDCPS Data**

*Caseload Verification*

The monitoring team conducted a thorough review of caseload reporting for the period. From October to December 2020, the monitoring team interviewed casework staff about their workloads in eight MDCPS county and regional offices. Interviews included both supervisory and caseload-carrying staff randomly selected by the monitoring team, working in Forrest, Hancock, Hinds, Jackson, Lauderdale, Marion, Pontotoc, and Washington counties. Interviews were conducted virtually, via video conference software, and staff members were directed to send printouts of their caseloads, typically from the previous workday, to the monitoring team. The monitoring team reviewed the caseload assignments with the workers or their supervisors and inquired whether the printouts represented all their caseload assignments as of that day. The monitoring team then compared the workload printouts of these thousands of cases identified across all the interviews, with caseload data submitted by MDCPS to determine if they aligned.

Based on interviews with 135 caseworkers, 40 supervisors, and data analysis involving thousands of cases statewide, the monitoring team concluded the caseload data and information provided by the Department accurately reflected MDCPS' caseload performance during the period.

# Continuous Quality Improvement

*Continuous Quality Improvement Plan (1.4.a.)*

Pursuant to the 2nd MSA, MDCPS is required to develop an annual Continuous Quality Improvement (CQI) Plan by December 1st of each year, which shall be subject to the approval of the monitor after consultation with the parties.

The monitoring team reviewed the initial draft CQI Plan for 2021, which was submitted timely by MDCPS on September 29, 2020. Based on feedback from the monitoring team, MDCPS timely submitted updates to the Plan, with an accompanying grid, and supporting CQI review and tracking tools. The monitoring team also shared the CQI Plan with plaintiffs' counsel, who provided their feedback. The monitoring team approved the 2021 CQI Plan for implementation on February 15, 2021.

*Continuous Quality Improvement Plan Implementation (1.4.b.)*

MDCPS was required by the 2nd MSA to implement the 2020 CQI Plan, upon approval by the monitors, with sufficient staff and resources to assess compliance with those provisions of the 2nd MSA that were identified for review in the Plan. The reviews must assess case practice, analyze outcomes, and produce analysis that will be shared with managers and stakeholders to achieve performance improvement.

The monitor previously reported, in the 2019 monitoring report, that MDCPS timely submitted its CQI Plan for 2020 and the monitor approved the Plan on March 27, 2020. MDCPS began implementing the approved 2020 CQI Plan in April 2020. The results of MDCPS' qualitative reviews with respect to 2nd MSA commitments included in the Plan are delineated in the relevant sections of this report.

# Management Information Systems & Data Reporting

*Comprehensive Information Systems and Reporting (1.5.a.)*

The 2nd MSA requires MDCPS to maintain comprehensive information systems that permit: (1) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding required actions in a child's case and whether they have taken place.

MDCPS' primary information system is the Mississippi Automated Child Welfare Information

System (MACWIS). MDCPS also has ancillary information systems or tracking tools that are not directly connected to MACWIS but may leverage data from it, such as Excel sheets used to track resource homes involved in expedited pending relative placements,[10] to track and report on newly licensed and closed homes, and to facilitate and document the results of manual reviews of substantiated reports of maltreatment.

MDCPS reported employees are granted the appropriate level of access to MACWIS as part of the new hire process for caseworkers, supervisors, and identified State Office staff with positions and job responsibilities that require access to the system. A unique MACWIS ID is assigned to new caseworkers typically during the first week of pre-service classroom training. MDCPS reports quarterly to the monitor the MACWIS ID of new caseworkers granted access to the system.

The monitoring team generally has been able to identify children across multiple MACWIS data files to create a timeline of their placement settings and services while in MDCPS custody. MDCPS, however, has been unable to report consistently and reliably from MACWIS current and historical data of children in custody for numerous 2nd MSA commitments as noted in the pertinent sections of this report.

MACWIS contains a financial module the monitoring team used to verify that MDCPS was issuing foster care board payments to foster parents consistent with the child's age and placement type. The monitoring team requested and received from MDCPS quarterly data from MACWIS relating to the board rates foster parents were receiving for children during 2020.

The monitoring team confirmed that MDCPS' responses to various 2nd MSA commitments included many of the required data elements for the National Child Abuse and Neglect Data System (NCANDS) and the Adoption and Foster Care Analysis and Reporting System (AFCARS). MDCPS also provided correspondence from the Administration for Children and Families within the United States Department of Health and Human Services accepting MDCPS' FFY2020 NCANDS Child File and Agency File and its 2020A National Youth in Transition Database submissions derived from MDCPS data systems. MDCPS reported that MACWIS users have view-only access of TANF and child support data systems.

The monitoring team received from MDCPS a MACWIS Tickler Types Report listing alert notifications available to staff for actions taken and actions needed.

MDCPS produced data from MACWIS to demonstrate performance on some but not all commitments for the 2nd MSA and to document baseline populations and samples for qualitative reviews. MDCPS also submitted "cohort" data, which identifies children's entries and exits from

---

[10] MDCPS refers to unlicensed relative home placements awaiting licensure as expedited pending relative placements.

foster care during the period, the population of children served during the period, and the population of children in care at the beginning and end of the period. The monitoring team analyzed the information to verify the data quality, assessed the methodology used to compute performance for each metric, and attempted to replicate the performance calculations made by MDCPS. In these efforts, both MDCPS and the monitoring team relied on business rules jointly developed between the monitoring team and MDCPS and insights obtained from prior validation efforts.

As noted above, MDCPS is required to capture, track, and report applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements. MDCPS did not report data on six commitments and the monitoring team cannot validate data and information submitted by MDCPS for another nine commitments.[11] These 15 commitments are delineated in the Summary of Commitments and the relevant sections of this report. Data problems include files missing a substantial number of records for individuals or events applicable to a commitment, files missing a significant amount of data for one or more fields needed to calculate performance, and files provided by MDCPS that the monitoring team was unable to replicate using the established business rules.

The monitoring team found significant and recurring data quality problems during the period including tracking worker visits, accurately identifying qualitative review populations, and reporting independent living services for youth.

- <u>Tracking worker visits</u>. The monitoring team was unable to validate certain visitation commitments in the 2nd MSA again this period. These include Sections 5.1.a. (Worker Contacts with Foster Children), 5.1.c. and 6.3.a.2. (Worker Contacts with Reunification Parents), and 5.1.d. (Worker Contacts with Foster Parents). MDCPS notified the monitoring team the visits file that would be used to validate these commitments was produced based on code that MDCPS is not confident correctly includes all the required information. MDCPS has not been able to reliably produce complete visitation data since the inception of the 2nd MSA.

- <u>Accurately identifying qualitative review populations.</u> The monitoring team identified issues with the qualitative review populations MDCPS utilized for several commitments (Sections 2.8.b., 4.2., 4.7., 5.1.b., 6.3.a.4., 6.3.a.5., 6.3.a.6., 8.1.a., 8.1.b., and 8.1.e.). For many of the commitments, MDCPS included children not subject to the commitment as part of the review. Additionally, when MDCPS purported to review the entire population of children subject to a commitment, the monitoring team often identified applicable

---

[11] There were an additional three commitments for which the monitoring team cannot validate the quantitative data provided by MDCPS. However, due to qualitative reporting, the monitoring team was able to assess MDCPS' performance for these commitments.

children who were excluded from the review. MDCPS' inability to accurately identify qualitative review populations resulted in the monitoring team being unable to validate performance for two commitments, Sections 4.2. (Children with Special Needs Placed with Resources Meeting Those Needs) and 4.7. (Placement Disruptions).

- <u>Reporting independent living services for youth</u>. The monitoring team identified problems with the consistency and quality of MDCPS' data reporting for several of the Independent Living (IL) services commitments. Due to a lack of complete, accurate, or consistent data and documentation during the period, the monitoring team was unable to validate data for three IL commitments in 2020, Sections 7.1 (Notification of Cessation of Benefits), 7.3 (Independent Living Services), and 7.7 (State Educational Training and Vocational Program).

*Staff Resources (1.6.a.)*

Pursuant to the 2nd MSA, MDCPS committed to provide to all its county staff with child welfare responsibilities access to computer services, word processing and electronic mail, access to the current management information systems, and access to a revised modular information system, CCWIS, once implemented.[12] MDCPS produced quarterly the names, email addresses, network IDs, MACWIS IDs, and job titles for newly hired workers. Additionally, the monitoring team verified this information during interviews with 175 MDCPS staff across Mississippi.

*Staff Access to Data (1.6.b.)*

MDCPS committed to collect, analyze, and make available, at least quarterly, to MDCPS regional and county staff, data related to compliance with the 2nd MSA's Foster Care Service Standards. MDCPS produces Focus on Data (FOD) reports that are available to all staff and are scheduled to be updated daily with point in time data. The reports were accessible to all MDCPS staff throughout 2020.

In October 2020, MDCPS informed the monitoring team of a newly developed custom report site, known as the Centralized Online Reporting Environment (CORE). The CORE site is modeled after the layout of the FOD site, but extrapolates data directly from database sources, whereas FOD used an indirect method to pull data for reports. MDCPS reports that this method is faster and provides more reliable report generation. CORE was initially implemented to a limited number of MDCPS staff in February 2020 to allow for vetting of the site and was released to all staff on October 29, 2020. On that date, all MDCPS staff were provided with a mandatory virtual in-service training on how to utilize the site. CORE currently generates 81 separate reports,

---

[12] CCWIS is not required to be implemented until June 30, 2021.

approximately 20 more than FOD.[13] The monitoring team reviewed CORE and found that while data was accessible to staff, certain reports contained unreliable or inaccurate data. The monitoring team will continue to evaluate the reliability of the data published to staff.

*Electronic Placement Database (1.6.c.)*

MDCPS agreed to provide county staff with access to an electronic statewide database of available placement resources.

All staff have access to the Resource Directory within MACWIS, which contains a listing of available placement resources. The Directory includes filters that allow staff to search for resource homes located within a specific county, within a specific region, within the entire state, and for placements located outside the state. After conducting a search, the results list includes the applicable resources and displays the name of the head of household, the region, the county where the resource worker assigned to the home is located, the number of available slots by gender, the total number of available slots, the current status of the foster home license, and the date the license is set to expire. Staff can then click on a specific home and see the address, contact information for the resource parent(s), any prior maltreatment allegations in the home, the name of the licensure worker, a list of foster children currently placed in the home, and a list of all foster children who have ever been placed in the home. The monitoring team reviewed the MACWIS Resource Directory and determined it to be a suitable electronic statewide database of available placement resources. In addition, the monitoring team interviewed 175 caseworkers and supervisors from throughout Mississippi who all confirmed that they had access to an electronic statewide database of available placement resources. *Pursuant to Section 10.1. of the 2nd MSA, the monitoring team validates that MDCPS has attained the highest designated performance standard for 24 months for this commitment. The monitor authorizes this commitment to move to the "To Be Maintained" designation.*

## Performance Based Contracting

*Performance Based Contracting (1.7.)*

MDCPS committed to establish, maintain, and assess the effectiveness of a performance-based contracting system to evaluate annually contract agency compliance with the terms of the 2nd MSA (1.7.a.). MDCPS further agreed to take all reasonable steps to ensure contract agency remediation of identified deficiencies within three months. An agency's failure to participate in remediation efforts is grounds for contract termination.

---

[13] MDCPS reported that the FOD site is scheduled to be decommissioned in the second or third quarter of 2021.

MDCPS reported that for this monitoring period there were 14 therapeutic foster care, group home, and shelter programs subject to performance-based contracts.[14] Each of these contracts includes performance-based outcome standards. Included in the contract's scope of services is the following language that requires agencies to comply with 2nd MSA commitments:

> "Independent contractor will perform and complete in a timely manner and satisfactory manner the services described in the 'Scope of Services' attached hereto as Exhibit A, and the 'Second Modified Mississippi Settlement Agreement Reform Plan,' attached hereto as Exhibit B, and incorporated herein by reference."

During the monitoring period, MDCPS conducted performance evaluations of 14 contracts against the performance-based standards. The monitoring team reviewed all 14 contracts and found that performance-based standards are embedded in the contracts relative to service delivery, quality of services delivered, and licensing evaluations. The performance-based evaluation process includes case record reviews conducted by MDCPS' performance-based contract unit (PBC) of the following practice areas:

- initial strengths and needs assessment,
- preserving connections,
- teaming and permanency planning,
- service provision,
- preparing youth for adulthood,
- placement stability and discharge planning,
- caseworker contact with the child, and
- child safety.

PBC and contract agency staff meet prior to the case record reviews for an entrance conference, complete a tool that ranks the frequency and quality of services provided, complete the review with a description of findings, and conduct an exit conference. For any area that is found deficient, MDCPS requires a corrective action plan (CAP) be implemented and the deficiencies remediated within three months. During the monitoring period, one agency was required to submit a CAP. The agency needed to address concerns regarding four of the eight practice areas:

- initial strengths and needs assessment,
- teaming and permanency planning,

---

[14] MDCPS reported the licensing of one new contract agency in 2020, not due for a review until 2021.

- service plan, and

- placement stability and discharge planning.

The agency responded in a CAP for each area of concern, including timeframes for undertaking the actions to improve quality of services to children, and began implementing the CAP.

*Pursuant to Section 10.1. of the 2nd MSA, the monitoring team validates that MDCPS has attained the highest designated performance standard for 24 months for this commitment. The monitor authorizes this commitment to move to the "To Be Maintained" designation.*

The 2nd MSA requires that prior to MDCPS contracting for case management services for children in custody, the Department must submit for the monitors' review and approval a detailed plan that ensures accountability, supervision, and oversight of such agencies (1.7.b.). MDCPS did not contract for case management of children in custody during the monitoring period.

## Foster Care Maintenance Payments

*Licensed Foster Families' Reimbursement Rates (1.8.a.)*

MDCPS is required to ensure that all licensed foster families (regardless of whether they are supervised directly by MDCPS or by private providers, and whether they are kinship or unrelated foster families) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the 2nd MSA.

*Pursuant to commitment 10.1 of the 2nd MSA, the parties unanimously agreed to designate this commitment as "To Be Maintained" based on MDCPS' performance, validated by the monitor, for calendar year 2019.* See the Movement of Commitments to Maintenance Status section for additional information.

*Foster Care Maintenance Payments (1.8.b.)*

As of January 1, 2018, the effective date of the 2nd MSA, MDCPS agreed to pay to all licensed foster families at least the basic monthly foster care maintenance payments. The following table contains the current approved basic monthly rates for licensed foster homes, which were increased effective January 1, 2020 based on the previous year's rate of inflation, as required by the 2nd MSA.

**Table 5. Resource Board Payment Schedule as of January 1, 2020**

| Age/Status | Board | Clothing | Allowance | Payment | Daily Per Diem |
|---|---|---|---|---|---|
| 0-8 | $602.80 | $80.00 | $30.00 | $ 712.80 | $ 23.76 |
| 9-15 | $690.80 | $80.00 | $50.00 | $ 820.80 | $ 27.36 |
| 16-21 | $756.70 | $80.00 | $60.00 | $ 896.70 | $ 29.89 |
| Special Needs I | $859.60 | $80.00 | ** | $ 939.60 | $ 31.32 |
| Special Needs II | $923.80 | $80.00 | ** | $ 1,003.80 | $ 33.46 |
| Foster Teen Parent | $1,359.80 | $160.00 | $90.00 | $ 1,609.80 | $ 53.66 |
| Emergency Shelters | $4,412.10 | - | - | $ 4,412.10 | $ 147.07 |
| Regular Group Homes | $1,096.60 | $80.00 | ** | $ 1,176.60 | $ 39.22 |
| Therapeutic Resource Homes | $2,823.10 | $80.00 | ** | $ 2,903.10 | $ 96.77 |
| Therapeutic Group Homes | $5,170.00 | $80.00 | ** | $ 5,250.00 | $ 175.00 |
| Related Therapeutic Placement | $1,293.70 | $80.00 | ** | $ 1,373.70 | $ 45.79 |

**Personal Allowance is based on the age of the child and is included in the total board payment.

# Child Safety and Maltreatment in Care

## Screening Reports of Abuse and Neglect

*Responding to Reports of Abuse and Neglect (2.1.)*

Mississippi Centralized Intake (MCI), established by MDCPS in 2009, is charged with receiving, prioritizing, and dispatching reports of child maltreatment. Reports to MCI alleging child abuse, neglect, exploitation, or risk are forwarded to local MDCPS offices for additional screening and investigation. If a report alleges maltreatment of a child in the State's custody, the information is required to be referred to the centralized Special Investigations Unit (SIU) for handling. MCI received 31,420 alleged abuse, neglect, or exploitation (ANE) reports during 2020. Of the ANE reports received, 7,778 reports (24.8 percent) were screened out, 23,620 (75.2 percent) were assigned for investigation, and three to nine reports remained in screening at the end of each respective quarter, for a total of 22 reports.

**Table 6. ANE Reports by Intake Action, 2020**

| Action | Q1 | Q2 | Q3 | Q4 | Year |
|---|---|---|---|---|---|
| Assigned for Investigation | 6,674 | 4,747 | 6,074 | 6,125 | 23,620 |
| Screened Out | 2,147 | 1,405 | 2,039 | 2,187 | 7,778 |
| In Screening | 5 | 3 | 9 | 5 | 22 |
| **Total Referrals Received** | **8,826** | **6,155** | **8,122** | **8,317** | **31,420** |

The monitoring team conducted a review of Mississippi's screening process in 2020. The review consisted of 150 randomly selected, screened-out abuse and neglect referrals involving children in MDCPS' custody, all from 2020. The monitoring team determined that MDCPS made appropriate screening decisions in 142 (94.7 percent) of 150 instances, a ten percent improvement from 2019. Five of the screened-out reports met MDCPS' criteria for maltreatment[15] and should have been assigned for investigation. Three of the referrals did not include enough information to make a screening decision and required additional information prior to making the decision to screen out or accept the report for investigation.

The monitoring team flagged an additional three screen-outs from the first half of 2020 that involved alleged ANE of children in MDCPS custody by teachers or school staff. At the time of the screen-out determinations, SIU was operating according to MDCPS policy, effective August 10, 2018, which stated that MDCPS does not investigate reports in out-of-home[16] settings, unless ordered to do so by the Youth Court. MDCPS subsequently updated their intake policy, effective June 19, 2020, to state that MDCPS will now investigate reports regarding out-of-home settings, such as a school or daycare, if the child involved is in the custody of MDCPS, the alleged perpetrator is a foster parent, or ordered to do so by the Youth Court.

*Maltreatment-in-Care Screen-Out Reviews (2.3.)*

MDCPS committed to develop and implement policies and procedures, subject to the review and approval of the monitor, for the Department to review all maltreatment in care (MIC) reports that were screened-out and assess the appropriateness within 24 hours of all screen-out determinations. If the decision to screen out the report is determined to be inappropriate, MDCPS shall ensure the report is referred for timely investigation.

The Department's CQI Safety Review Unit (SRU) is charged with reviewing all screened-out MIC reports. Data provided by MDCPS indicate that 650 MIC referrals were screened out for

---

[15] In accordance with Section 43-21-105 of the Mississippi Code of 1972 and MDCPS' Intake/Assessment Policy Effective June 24, 2019.

[16] "Out-of-home" is defined by MISS. CODE ANN. § 43-21-105(x) as: temporary supervision or care of children by: staff of licensed day care centers, staff of public, private and state schools, staff of juvenile detention facilities, staff of unlicensed residential care facilities and group homes, or staff of individuals representing churches, civic or social organizations.

investigation during 2020. Of the 650 screened-out MIC reports, 623 (95.8 percent) were reviewed timely by SRU. Twenty-seven referrals were reviewed more than 24 hours after the screen out determination was approved by SIU. SRU determined that 649 of the 650 referrals reviewed were appropriately screened out. For one referral, SRU requested that it be reconsidered, and a new referral was made and assigned for investigation. As detailed under 2.1 above, the monitoring team reviewed 150 screened-out referrals alleging maltreatment of children in MDCPS' custody that were reviewed by SRU. The monitoring team found that eight (5.3 percent) of the 150 referrals were inappropriately screened out.

*Standardized Decision-Making (2.8.)*

The 2nd MSA requires MDCPS to assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment of children in MDCPS' custody. However, MDCPS is still in the process of developing and implementing a system to ensure standardized decision-making.

When MCI identifies that a foster child is the subject of the maltreatment referral, the unit is required to send it to the SIU. If the SIU supervisor decides to screen out the referral, the supervisor is required to advise the Director of Field Support Programs who, upon approving the screen-out determination, must notify the SRU of the screen-out. The SIU's screen-out judgments are routinely final. Of the hundreds of screen-outs the SRU reviewed in 2020, data and information from MDCPS indicates there was one instance where a reversal was recommended by SRU.

In those instances where MCI is unaware that the child described in a referral is in foster care, the maltreatment referrals are sent to the 82 counties and the referrals are then subject to review by the Regional Director or her/his designee. The Regional Directors, and their designees, have the unilateral power in their counties to change the disposition and screen-out the referral. There is no evidence to suggest those judgments, made by different county-based individuals across the state, are subject to rigorous scrutiny by State Office staff or further discussion with MCI staff to establish standardization.

To improve screening in instances where MCI is unable to determine if the alleged victim(s) are in foster care, MDCPS revised its Investigations Policy and Procedures, effective June 19, 2020. Under the revised policy, all alleged victims are required to be confirmed in MACWIS no more than 24 hours after the first face-to-face contact with the alleged victim(s). After confirmation, if the child(ren) is determined to be in foster care, the report is to be redirected to SIU. For further enhancement, MDCPS reported that the Department is assessing potential changes to create more structured decision making by MCI staff. MDCPS could then confidently remove the right of county and regional staff to override initial screening decisions. If implemented properly, this

change would ensure that all screening determinations made by MCI were final, eliminating any potential variation across Mississippi's 82 counties.

## Investigating Maltreatment in Care

*Special Investigations Unit and MIC Investigation Initiation Timeliness (2.2.)*

Pursuant to the 2nd MSA, MDCPS is required to continue to maintain a special investigations unit whose responsibility is to investigate reports of maltreatment of children in custody. The initiation of that investigation shall not extend beyond 24 hours.

MDCPS continued to maintain SIU, charged with investigating reports of maltreatment of children in custody throughout 2020. Data provided by MDCPS indicate that of the 568 investigations conducted by SIU that were due for approval in 2020, 537 (94.5 percent) were initiated timely.

*MIC Worker Training (2.6.)*

Pursuant to the 2nd MSA, all allegations of maltreatment of a child in custody are to be investigated by a worker who has received training on intake and investigations processes, policies, investigation techniques, and has no ongoing connection to the foster care case. SIU workers receive training on intake policy, investigations into maltreatment in care, and facility investigations, in addition to the pre-service training that all workers are required to receive. Ongoing foster care workers do not receive the same level of investigative training.

MDCPS provided investigative training dates for all current SIU staff who are responsible for conducting MIC investigations. SIU initiated 501 MIC investigations during 2020. Additionally, both MDCPS and the monitoring team identified investigations of MIC that were not completed by SIU. The monitoring team reviewed all 20 investigations with a custodial child victim that were conducted by non-SIU workers to determine if the investigator had an ongoing connection to the foster care case. The monitoring team identified only three instances where an investigation of maltreatment of a child in custody was conducted by a worker with an ongoing connection to the foster care case of one of the alleged victims. MDCPS performance exceeded 99 percent for this commitment.

*MIC Investigation Completion Timeliness (2.8.a.)*

MDCPS committed that at least 90 percent of MIC investigations will be initiated and completed within 30 days. Data provided by MDCPS indicate that of the 568 MIC investigations due for completion in 2020, 550 (96.8 percent) were completed timely. The monitoring team's case record review of 150 MIC investigations confirmed that MDCPS met the performance standard for this commitment during 2020.

*Licensure Investigations of Emergency Shelters and Group Homes (2.4.)*

MDCPS committed to initiate a licensure investigation of contract agency group homes and emergency shelters within 30 calendar days following a substantiated report of child maltreatment. The licensure investigations are required to occur in addition to and independent of child protection investigations and must include an on-site inspection by MDCPS of the group home or emergency shelter to determine the contract provider's compliance with MDCPS' licensure standards. A provider has ten calendar days to submit a CAP with timeframes to rectify any identified violation of licensure standards and comply with the approved CAP timeframes. If the provider does not comply with the licensure standards based on the approved CAP and timeframes, MDCPS shall revoke the license.

MDCPS reported seven substantiated reports of child maltreatment in 2020 relevant to this commitment, occurring in five group homes and one shelter; two of the investigations involved one facility. The monitoring team reviewed the documentation provided by MDCPS for these seven incidents. MDCPS documented virtual on-site inspections of the facility were completed for five of the seven cases.[17] MDCPS found licensing violations in six of the seven investigations. MDCPS requested CAPs for six of the seven cases and made recommendations for one case. The CAPs included timeframes to rectify the violations and were submitted timely for five of the six cases. In the sixth case, the CAP was submitted two weeks late.

*Licensure Investigations by Child Placing Agencies (2.5.)*

The 2nd MSA requires that upon receipt of a report of child maltreatment in a private child placing agency (CPA) foster home, MDCPS must notify the CPA, which shall within 30 calendar days initiate an independent licensure investigation, including an on-site inspection of the foster home, to determine the provider's compliance with licensure standards. If the foster home provider is found to be in violation of licensure standards, the provider shall have ten calendar days to submit a CAP with timeframes to rectify the violation and comply with the approved plan. MDCPS shall recommend that the foster home license be revoked if the provider does not comply based on the approved CAP and timeframes.

Data and information provided by MDCPS indicate there were ten reports of maltreatment involving CPA foster homes in 2020. The monitoring team conducted a qualitative review of licensing reports provided by MDCPS for the ten screened-in cases. The monitoring team reviewed the documentation provided by MDCPS for eight unsubstantiated and two substantiated incidents.

---

[17] MDCPS reports that two on-site inspections were not conducted due to COVID-19.

Upon the receipt of a child maltreatment report, MDCPS notified the CPA within 30 calendar days for nine (90.0 percent) of the ten cases. There was documentation that the CPA initiated an independent licensure investigation within 30 calendar days for eight (80.0 percent) of the ten cases. There was documentation in eight (80.0 percent) of the ten cases that an on-site inspection of the foster home was completed. MDCPS cited licensing violations in three of the cases. Two of the violations were for physical discipline that resulted in the closure of the foster homes. For the third violation, MDCPS requested and monitored the foster home through a CAP.[18] The CPA recommended to close foster homes in three instances.

*Worker Contacts with Custody Children after a MIC Substantiation (2.8.b.)*

The 2nd MSA requires that any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker once per week for the first month and twice per month for three months if the investigation is found to be substantiated (2.8.b.1.).

MDCPS reported on this commitment through the quarterly CQI review and determined that seven (26.9 percent) of 26 children met the requirements of the 2nd MSA.[19]

The monitoring team identified 11 children who were found to have been maltreated in their placement and remained in the same placement. Visitation narratives were reviewed by the monitoring team for all 11 children to ensure each child was visited in the placement in the required timeframes. There were 95 visits required, of which 79 (83.2 percent) occurred. Fifteen (15.8 percent) of the contacts assessed the child's safety and well-being and met the quality standards of the 2nd MSA.

The 2nd MSA also requires that any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker twice per month if the investigation is found to be unsubstantiated (2.8.b.2.).

MDCPS reported on this commitment through the quarterly CQI review and determined that 136 (73.5 percent) of 185 children met the requirements of the 2nd MSA.[19]

The monitoring team identified 99 children who were found to have an investigation into a report that the child was maltreated in and remained in that placement and conducted a qualitative

---

[18] The CAP submitted by the provider agency did not include timeframes to rectify the situation; however, the provider agency did provide the requested paperwork for compliance.

[19] MDCPS included children who are not subject to this commitment as part of the review. Examples include children on trial home visits, incidents that occurred prior to custody or in a prior placement, children who were in care less than 30 days, and substantiated maltreatment with a minor listed as the substantiated perpetrator.

review of visitation case narratives for those children. The visitation narratives were reviewed to ensure the child was visited in the placement, in accordance with the schedule. There were 522 visits required, of which 494 (94.6 percent) occurred. Three hundred fifty-seven (68.4 percent) of the contacts assessed the child's safety and well-being and met the quality standards of the 2nd MSA.

*MIC Investigation Reviews (2.7.)*

Within 30 calendar days of the completion of any investigation of maltreatment of a child in custody, as required in Section 2.1, MDCPS must review the maltreatment investigation. This review will:

- identify any case practice deficiencies in the investigation and any remedial actions necessary to ensure the safety of the child who is the subject of the investigation, as well as any other children in the home or placement;

- identify a timeframe in which any recommended remedial action must take place; and

- monitor the initiation and completion of the remedial actions regarding individual child safety and case practice.

When any remedial actions have not been initiated or completed timely, MDCPS must notify the supervisor, Regional Director, and Director of Field Operations.

Reviews of MIC investigations are completed by the MDCPS Safety Review Unit (SRU). Data provided by MDCPS indicate that 549 investigations were due for review by SRU during 2020. Of these 549 investigations, 547 (99.6 percent) were reviewed timely by SRU. Two investigations were reviewed more than 30 days after the completion of the investigation.

The monitoring team reviewed SRU reports for 147[20] of the 150 MIC investigations evaluated under commitment 2.1. SRU identified case practice deficiencies in four of the investigations. These included alleged perpetrators and collateral contacts not being interviewed, law enforcement referrals not being made, and the Physical Home Environment Assessment not being completed. Additionally, there was one investigation where the SRU reviewer noted the case should have been substantiated; however, MDCPS did not reconsider the investigation findings and substantiate for ANE. The monitoring team identified case practice deficiencies in 25 investigations. These included alleged perpetrator(s) not being interviewed, required safety plans not being put in place, necessary collateral contacts and information not being obtained

---

[20] Three of the MIC investigations reviewed by the monitoring team were not due for review by the SRU until 2021.

before rendering a finding, and in 12 instances the monitoring team, applying MDCPS' criteria for maltreatment, did not agree with the investigation findings.

*Filing of MIC Investigations (2.8.c., 2.8.d.)*

Pursuant to the 2nd MSA, when a MIC investigation involves a foster or adoptive home, MDCPS must file a copy of the approved final investigation report, and any recommendations and/or corrective actions MDCPS has deemed necessary, in the case record of the foster child. The Department must also file a copy of the approved final investigation report, and any recommendations and/or corrective actions MDCPS has deemed necessary in the file of the foster or adoptive parents, along with a copy of the letter of notification to the foster or adoptive parents, and with the Bureau Director for Licensure. MDCPS must also provide those records to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor (2.8.c.).

Additionally, when a MIC investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by MDCPS, a copy of the final investigative report must be filed in the child's case record, with the Director of Congregate Care Licensure, and sent to the licensed provider facility. MDCPS must also provide the report to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor (2.8.d.).

MDCPS stores investigation reports in MACWIS, which are linked to the child(ren) and provider(s) involved in the report. Upon completion of a MIC investigation, the special investigator mails a copy of the finalized investigation packet to the youth court judge(s) with jurisdiction over the child(ren) involved in the report. MDCPS reports on these commitments as part of the MIC investigation review completed by the SRU. Information provided by MDCPS indicates that 542 (98.7 percent) of the 549 investigations reviewed by SRU in 2020 documented a date the investigation findings were mailed to the youth court. The monitoring team reviewed a random sample of 100 cases and confirmed MDCPS' performance for the year.

*Investigating Reports of Abuse and Neglect (2.1.)*

The monitoring team conducted a qualitative review of a random sample of MIC investigations conducted during 2020, alleging ANE of a child in MDCPS' custody. The review included 150 investigations involving 244 alleged child victims. Fifty-three of the 150 investigations, involving 90 children, were substantiated for abuse and/or neglect. The monitoring team's review involved reading investigation reports and available supporting documentation including medical reports, forensic interview reports, and law enforcement records.

The monitoring team found that SIU workers made face-to-face contact or attempted to make face-to-face contact with child victims within 24 hours of the report date and time in 149 (99.3 percent) of the 150 investigations. The alleged perpetrator and collateral contacts were typically

interviewed during the course of the investigation, although in seven investigations (4.7 percent) at least one of the alleged perpetrators was not interviewed and should have been per MDCPS policy. The entire investigation was completed and approved within 30 calendar days of the initial intake report date and time in all of the 150 investigations. However, the monitoring team found that in cases where investigations were completed timely, additional time was sometimes needed to gather information and complete a thorough assessment. In eight instances, MDCPS rendered a finding before forensic interviews, medical/psychological exams, or information from law enforcement, as requested by MDCPS, were received.

The monitoring team concluded the evidence supported MDCPS' findings in 138 of 150 investigations (92.0 percent). The monitoring team concluded in four investigations (2.7 percent) more information was needed in order to draw a proper conclusion. There were eight investigations (5.3 percent) where some or all of the allegations were found to be unsubstantiated by MDCPS, but the monitoring team concluded, based on MDCPS' criteria for maltreatment, that information presented during the course of the investigation or added post-closing was sufficient to render a substantiation. Examples where allegations should have been substantiated include:

- A foster parent made a referral concerning the conduct of the ongoing worker for two foster children, ages 11 and one, who were recently placed in her home. When the worker arrived at the placement, she reportedly did not bring any information on the children, she was unkempt, and was acting strange. The one-year-old had thrush in his mouth and needed to go to the doctor, but the worker had not responded to any calls from the foster parent since placing the children. The children still needed to obtain all of their clothing. The 11-year-old stated that the worker was smoking while driving the children in the car, causing breathing issues for the children. Additionally, the child stated she found a beer bottle under the seat of the worker's car and drugs in the glove compartment. The employee initially agreed to undergo drug testing as part of the investigation, however she later refused, was placed on administrative leave, and resigned six days after the report was received. Physical neglect and emotional abuse/neglect were unsubstantiated. When SRU reviewed this investigation, the reviewer stated that the investigation should have been substantiated. However, MDCPS did not reconsider the decision to unsubstantiate.

- A foster child, age five, disclosed during a forensic interview that his foster mother, his great-great-grandmother, whipped him with a belt in the eye. He had an injury near his eye consistent with this allegation, observed and documented by the ongoing supervisor. Additionally, the SAFE center medical exam documented many other marks over the

child's entire body that were never fully explained. Physical abuse by the grandmother was unsubstantiated.

The following are examples of investigations where more information was needed in order to make a proper investigative finding:

- A foster youth, age 16, placed in a group home, disclosed sexual abuse by her paternal uncle to her therapist. A referral was made to MCI and assigned for SIU investigation in June 2020. A forensic interview was scheduled but had to be rescheduled due to the youth being hospitalized. Sexual abuse was unsubstantiated as there was not enough evidence to substantiate without a forensic interview. The findings of the forensic interview were to be added post-closing once it occurred. The forensic interview reportedly occurred in January 2021, but there was no documentation of the results added to the investigation.

- A foster child, age four, disclosed sexual abuse by his older brother, age 14, to his therapist. The therapist called the daycare who confirmed that the child was exhibiting sexualized behaviors. This abuse would have occurred when the child was living with his mother, prior to entering MDCPS custody. The mother who was the caretaker at the time of the alleged abuse, was not interviewed or investigated for neglect. Additionally, the four-year-old's therapist, who made the referral, was not interviewed as part of the investigation. SIU determined that sexual abuse by the older brother was unsubstantiated.

*Maltreatment of Children in Care (2.9.)*

Pursuant to the 2nd MSA, MDCPS agreed that the rate of child abuse and neglect among children in foster care shall not exceed 0.33 percent per year. A child is counted as having been maltreated in foster care if the perpetrator of the maltreatment was identified as a foster parent or a residential facility staff member. This was a federal outcomes standard (based on the federal Child and Family Services Review, Round Two) focused on keeping children in foster care safe from abuse and neglect by their caregivers.

Data provided by MDCPS and verified by the monitoring team indicate that 117 children (1.94 percent) in MDCPS' custody were victims of abuse or neglect by their caregivers in 2020. This is almost six times the agreed upon rate of maltreatment and represents a 62 percent increase in maltreatment in care from 2019. MDCPS should have protected at least 98 more children from abuse or neglect in their placement in 2020 in order to meet the agreed upon safety standard.

The following chart describes the placement types of the child victims at the time of maltreatment in care in comparison to the placement types of the custodial population.

**Figure 6. Placement Type of Children in Care and Substantiated MIC Victims in 2020**
*n=3,410 children in out-of-home placement on December 31, 2020;[21] 117 MIC victims during 2020*



## Family-Based Placements

*Foster Home Licensure (3.1.)*

In order to ensure that children who are removed from their families due to abuse and neglect are placed in the most appropriate and least restrictive setting, MDCPS agreed to develop a safe array of family-based placement resources. The 2nd MSA requires MDCPS to both recruit and license a target number of non-relative foster families and to ensure that when MDCPS places children with relatives, those homes are timely licensed. MDCPS agreed to utilize the licensure process approved by the monitor when assessing prospective relative and non-relative homes.

The licensure process requires MDCPS to provide pre-service training for applicants, conduct home visits with the prospective applicants and family members, assess the physical and mental health of applicants, conduct home environment safety checks, obtain references regarding the applicants, and complete full background checks that include state and federal fingerprints for all adults in the home. MDCPS is also required to complete a foster home study that synthesizes information obtained during the home study process and documents the agency's licensure decision.

---

[21] This count excludes the 328 children placed in parental homes as of December 31, 2020, as abuse or neglect by natural parents is not counted towards the MIC rate.

MDCPS agreed to license non-relative homes within 120 days of the prospective foster parent's inquiry regarding foster parenting. For 2020, data provided by MDCPS indicate that 317 (88.5 percent) of 358 homes were licensed timely. The monitoring team reviewed a randomly selected sample of 90 non-relative foster homes licensed during the monitoring period and found that MDCPS licensed non-relative homes consistent with both the requirements of the approved licensure process and agency licensure standards. More specifically, the monitoring team found in its review that 86 (95.6 percent) met the performance standard and four (4.4 percent) did not. Two homes were not licensed timely, one had improper weapon storage, and the fourth was missing required documentation.

The Department agreed to complete the home study process for relative homes within 90 days of a child being placed in a home. For 2020, data provided by MDCPS indicate that 473 (82.1 percent) of 576 homes were processed timely. Of the 473 homes with timely action, 275 (58.1 percent) were licensed and 198 (41.9 percent) were not licensed.

*Unlicensed Placements (3.2.a.)*

MDCPS committed that no child will remain in a foster home or facility determined to be unable to meet licensure standards absent an order by a state court with jurisdiction over the child's custody directing the placement of the child into a specific unlicensed placement. MDCPS is not held accountable for a state court's order as long as MDCPS documents that it presented information to the court that the foster home has not met licensing standards, the reasons why the foster home has not and cannot meet licensing standards, and an explanation that a licensed foster home or facility is available, or one time only, an appropriate expedited relative placement.

MDCPS data show that during the monitoring period 268 children were placed in court-ordered unlicensed homes and facilities. Thirty-three of those were placements of children in unlicensed shelters. Thirty-six children were placed in court-ordered unlicensed non-relative homes and 199 children were placed in unlicensed relative homes during the period. MDCPS produced to the monitoring team some form of documentation (Court Order, narrative, or information on the Unlicensed Placement Spreadsheet) for 198 of the 199 children placed into relative unlicensed placements during 2020. The monitors conducted quality reviews on all 198 cases submitted. Three of the 198 cases were entered incorrectly in MACWIS, they should have been entered as expedited relatives and not court-ordered placements. Of the remaining 195 cases, evidence was presented to the Judge as to why the foster home had not and could not meet licensing standards in 102 cases (52.3 percent); evidence was not presented in 93 cases (47.7 percent). Additionally, evidence was presented to the Judge that a licensed foster home or facility was available, or one time only, an appropriate expedited relative placement in 91 cases (46.7 percent); evidence was not presented in 21 cases (10.7 percent). The monitoring team was unable to verify if evidence was presented in 83 cases (42.6 percent). MDCPS did not consistently produce evidence that the

court was advised whether or not it would be safe for a child to remain in a relative home when that home could not be licensed, including the reasons why the home could not be licensed and an explanation that a licensed placement was available.

Additionally, the monitoring team identified at least six instances of youth in MDCPS custody being placed in hotels and motels in 2020, which are unlicensed, non-residential facilities, including the following examples:

- A 19-year-old was placed and re-placed in a hotel repeatedly, including three times after being hospitalized for ingesting harmful objects such as a razor, broken glass, and a large quantity of pills, and once after running away from the hotel and being returned there by the police.

- A 16-year-old youth was placed in a hotel for two months after MDCPS was unable to locate another placement following a stay at an acute care facility. The youth disclosed that the sitter was making her feel uncomfortable and had inappropriately touched her. MDCPS found allegations of both sexual abuse and emotional abuse/neglect to be unsubstantiated.

- A 17-year-old youth was placed in a hotel for a week following a stay at a residential treatment facility. The youth alleged that he had smoked marijuana with a hired sitter during his stay at the hotel. MDCPS found the allegation of physical neglect to be unsubstantiated.

*Safety and Non-Safety Issues (3.2.b., 3.2.c.)*

When a child in the custody of MDCPS needs an out-of-home placement, potential relatives are always considered as the first placement resource. MDCPS policy states that "first priority for placement shall be given to a relative when it is suitable and appropriate to do so" and the Department committed to license all unlicensed relative homes with limited exceptions, as described below.

The assessment of a relative's home for potential placement begins when the child's caseworker initiates MDCPS' emergency placement process that includes a pre-placement safety assessment. The child's worker is responsible for walking through the entire home, both inside and outside, to ensure that safety issues do not exist or when safety issues are identified, they are remediated prior to a child's placement. MDCPS must also complete and assess the results of criminal, law enforcement, and child abuse registry background checks prior to approving the placement. After the initial safety process is completed and supervisory staff approve the child's placement, casework staff must make a referral to the regional licensure unit for continuation of the 90-day licensure process.

When MDCPS determines that an unlicensed foster home or facility is unable to meet MDCPS licensing standards due to a safety issue, MDCPS must take all reasonable efforts to immediately ensure the child's safety, including, when necessary, seeking an emergency court order to remove a child. If the child is not in imminent danger, MDCPS must implement a safety plan and within five calendar days, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only.

When MDCPS determines an unlicensed foster home cannot meet licensing standards due to a non-safety issue, the Department must, within 30 calendar days of that determination, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only.

The monitoring team conducted quality reviews of 200 expedited pending relative placements made during 2020. The monitoring team confirmed that MDCPS continued to utilize the licensure process approved by the monitor for relative homes. Although, performance was only achieved in 61 cases (30.5 percent) and performance was not achieved in 139 cases (69.5 percent). During the reviews, the monitoring team identified lapses in completing the initial background checks for all adult household members prior to the start of a child's placement. Specifically, the monitoring team found that a substantial number of background checks for the primary applicant were being completed after a child was placed in the home. The monitoring team communicated this concern to MDCPS verbally during teleconferences and in the 2019 monitoring report. The table below illustrates, of the 200 cases reviewed, the number and percentage of timely background checks.

**Table 7. Background Checks for Relative Home Studies, 2020**

| Background checks for Applicant #1 | Completed Prior to Placement | |
|---|---|---|
| | Count | Percent |
| MACWIS | 122 | 61.1% |
| Internet/Social Media | 121 | 60.5% |
| Local Police Department[22] | 66 | 33.0% |
| Sheriff[22] | 83 | 41.5% |
| Child Abuse Registry | 70 | 35.0% |
| Sex Offender | 105 | 52.5% |

Additionally, of the 200 cases reviewed, documentation of the initial home walk-through was missing for 11 placements (5.5 percent) and indicated the walk-through was completed late for 19 placements (9.5 percent).

---

[22] The licensing process approved by the monitor requires that either a local police department or sheriff check be completed prior to placement.

For 2020, MDCPS submitted to the monitoring team two types of reports monthly: A Safety Issues Report and a Non-Safety Issues Report, both meant to document issues identified during the expedited pending relative initial safety check and home study process. However, the monitoring team found that MDCPS did not consistently utilize these reports to track and monitor resolution of safety and non-safety issues.

Rather, the monitoring team found that MDCPS documents safety and non-safety issues identified during the initial home walk-through and home study process and the resolution of those issues in the final home environment checklist or the written foster home study. Examples of safety issues identified by MDCPS are lack of fire extinguishers and carbon monoxide detectors. However, because MDCPS did not consistently utilize the safety and non-safety report tracking system, the monitoring team is unable to evaluate if all those issues were remediated within the timeframes agreed to in the 2nd MSA.

*Foster Home Development (3.3.)*

The 2nd MSA provides that MDCPS, in conjunction with the monitor, shall establish annual statewide and county performance targets for developing new foster homes. These targets are to be met during specific time periods as outlined below. For calendar year 2020, the Department conducted a foster home needs assessment to identify the number of available licensed foster homes and determine the number of licensed foster homes needed. The assessment was designed to inform MDCPS' efforts to build capacity over time so that safe and appropriate placement matches could be made. This includes ensuring that children are placed with siblings and near their community. Utilizing segments of MDCPS' assessment analysis, as well as child custody data, licensure data, and foster home development and closure data, the monitor established the 2020 new foster home licensure target at 351 homes. The interim targets for new home licensure were set at:

- 175 new homes licensed by June 30, 2020.

- 263 new homes licensed by September 30, 2020.

- 351 new homes by December 31, 2020.

During the monitoring period, MDCPS provided to the monitoring team monthly new foster home licensure data. Through ongoing data verification and a randomly selected sample review of new foster home records, the monitoring team confirmed that MDCPS licensed 357 new foster homes during 2020, exceeding the target of 351 new homes. MDCPS also met the interim target for June 30, 2020 by licensing 189 homes; however, MDCPS did not meet the interim target goal for September 30, 2020, licensing 241 homes and missing the target by 22 homes. By year's end, MDCPS accelerated the pace of licensure and met the annual target. This is a significant

accomplishment made during the COVID-19 pandemic, which had a significant impact on child welfare operations throughout the nation.

To expand the pool of foster homes available for placement, MDCPS committed to recruit and retain additional licensed foster home placements and maintain the additional number of placements, as necessary during the applicability of the 2nd MSA (3.3.b.). Taking into consideration the new home target and historical foster home closure data, the monitoring team established a net gain target of 61 additional foster homes for 2020.

MDCPS licensed 357 new homes and the monitoring team verified that 387 homes closed during the monitoring period, resulting in a net loss of 30 homes for the calendar year. Again, it should be noted that this period was impacted by the COVID-19 pandemic, which may have affected MDCPS' ability to meet the net gain target. Moving forward it will be necessary for MDCPS to understand the reasons for home closure in order to maintain a robust pool of foster homes available to meet the needs of children in the Department's custody.

## Placement Standards

*Foster Home Licensure Limits (4.1., 4.13.)*

MDCPS agreed that no foster home shall provide care for more than five children (including foster, birth, and adoptive children) at any given time, in accordance with the following:

- foster homes may provide care for more than three foster children, up to a total of five, only with the documented approval of MDCPS Office of Licensure determining that the foster children can be safely maintained in the foster home;

- no more than two children in the foster home may be under the age of two or have therapeutic needs, including the biological and/or adoptive children; and

- notwithstanding the above, a sibling group may be placed together in the same foster home in excess of these limits, but only if they are the only children in the home, and only upon written approval by the MDCPS Licensure Director determining that the foster children can be safely maintained in the home.

The parties agreed that by July 1, 2019, MDCPS would meet an interim performance standard of 80 percent for this commitment (4.13.b.), and by July 1, 2020, MDCPS agreed to meet a final performance standard of 95 percent (4.13.c.). MDCPS provided data for this commitment, which was validated by the monitoring team. MDCPS' performance as of the last day of each month of 2020 is charted in Table 8.

**Table 8. Number of Foster Homes Meeting Licensure Standards, 2020[23]**

| Month | Number of foster homes with a child placed | Number of foster homes meeting licensure standards | Percent of foster homes meeting licensure standards | Performance Standard |
|---|---|---|---|---|
| January | 1,806 | 1,688 | 93.5% | |
| February | 1,816 | 1,696 | 93.4% | |
| March | 1,815 | 1,699 | 93.6% | 80% |
| April | 1,846 | 1,709 | 92.6% | |
| May | 1,797 | 1,669 | 92.9% | |
| June | 1,786 | 1,656 | 92.7% | |
| July | 1,753 | 1,626 | 92.8% | |
| August | 1,712 | 1,584 | 92.5% | |
| September | 1,702 | 1,584 | 93.1% | 95% |
| October | 1,652 | 1,538 | 93.1% | |
| November | 1,636 | 1,525 | 93.2% | |
| December | 1,607 | 1,498 | 93.2% | |

The monitoring team conducted a qualitative review of this commitment through virtual interviews with MDCPS licensure specialists and discussed a total of 66 homes for which the workers were responsible. Sixty-four of the 66 homes met the terms of this commitment.

*Children with Special Needs Placed with Resources Meeting Those Needs (4.2., 4.14.)*

The 2nd MSA states that children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs. MDCPS is to ensure that each county office has access to resource workers within its region who have the ability to ascertain the placement resources available and their suitability for each child who needs placement.

Mississippi Code 43-27-101(f) defines a special needs child as:

> "A child with a variety of handicapping conditions or disabilities, including emotional or severely emotional disorders. These conditions or disabilities present the need for special medical attention, supervision and therapy on a regimented basis."

The parties agreed by July 1, 2019, 75 percent of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs (4.14.b.). MDCPS

---

[23] Homes listed in the data as "sub-resources" were included in this calculation but counted as noncompliant as MDCPS cannot report on the number of biological and adoptive children in these homes. The number of these homes at the end of each month ranged from 85 to 109. Additionally, there were a small number of children listed as being placed in "umbrella agencies" or "residential facilities" for whom MDCPS could not report on the specific placement home. These children were excluded from the calculations. The number of these children at the end of each month ranged from zero to 36.

evaluated performance for this commitment through the FCR. The Department reviewed a total of 2,409 cases and reported 2,393 (99.3 percent) met the terms of this commitment during the first half of 2020.

The parties agreed by July 1, 2020, 95 percent of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs (4.14.c.). During the second half of 2020, MDCPS reviewed a total of 566 cases through the FCR and reported 564 (99.6 percent) met the terms of this commitment.

The monitoring team was unable to validate this commitment during the 2020 monitoring period. As part of the 2020 CQI plan, approved in March 2020, MDCPS agreed to only evaluate children with special needs for this commitment, instead of all children in custody. The Department implemented this change beginning in the second quarter. In the second half of the year, the monitoring team discovered there were dozens of children receiving therapeutic and special needs board rates who were not included in MDCPS' review of special needs children, and many of the children included in the review were receiving regular board rates. MDCPS subsequently acknowledged that children receiving therapeutic and special needs board rates do not always have a clear diagnosis in the case record and may not meet the Department's standard of a special needs child. MDCPS also noted that it was possible for a child receiving a regular board rate to be considered a special needs child.

The Department implemented additional guidance and questions into the FCR for this commitment beginning in late October 2020, that include identifying the child's placement rate, placement type, and generating corrective actions when a child's placement rate does not appear to match their status as a special needs or non-special needs child. The monitoring team found the updated guidance to be an improvement over the previous methodology. However, as of the end of the period, it remains unclear what operational definition of "special needs" MDCPS' reviewers are utilizing to determine which children should be included in this review. For example, one child was listed in the review as having diagnoses of ADHD-combined, oppositional defiant disorder, and adjustment disorder and was on approximately six medications, but was listed by MDCPS as "not meeting the definition of special needs." There were also instances where MDCPS noted a child had diagnoses but was not currently displaying behavioral issues, or the child was receiving therapy or had an Individualized Education Plan (IEP) but did not meet the definition of "special needs child."

*Children Placed in Least Restrictive Setting (4.3., 4.15.)*

MDCPS committed that each foster child shall be placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment, and prior placement information available at the time of placement. In order of consideration this means

placement with relatives, foster home care within reasonable proximity to the child's home community, foster home care outside of the child's home community, group home care, or institutional care. The parties agreed to a 95 percent performance standard for this commitment.

MDCPS evaluated this commitment through the FCR. The Department reviewed a total of 8,412 cases in 2020 and determined that 8,389 (99.7 percent) cases reviewed met the terms of this commitment. The monitoring team undertook validation of a randomly selected sample of 221 children reviewed by MDCPS for this commitment, including children placed in family-based settings and those in congregate care. The children were in a total of 438 placements during the quarterly periods under review evaluated by the monitoring team. The monitoring team determined 422 (96.3 percent) of those placements were made appropriately in order to meet the individual child's identified needs.

*Children Placed Within Proximity to Home (4.4., 4.18.)*

MDCPS agreed to ensure that each child who enters placement shall be placed within his/her own county or within 50 miles of the home from which he/she was removed, unless:

- the child's needs are so exceptional that they cannot be met by a family or facility within his/her own county or within 50 miles of the home from which he/she was removed;

- the child is placed through the ICPC consistent with its terms;

- the child is appropriately placed with relatives;

- the child, age 14 years or older, is pursuing educational or vocational opportunities;

- the child is ordered to be placed in a child-specific foster care setting by a court; or

- the child is placed in an adoptive home.

The parties agreed to a 90 percent performance standard for this commitment. The monitoring team confirmed that there were 8,518 placements made in 2020. Of these placements, data provided by MDCPS indicate that 8,188 (96.1 percent) met the proximity terms of the 2nd MSA. This includes placements made within 50 miles from the child's home of removal (6,364) and placements that exceeded 50 miles but had an approved exception consistent with the commitment (1,824). The monitoring team reviewed a random sample of 176 exceptions MDCPS reported were consistent with the terms of this commitment and found that 161 (91.5 percent) contained sufficient documentation to support the exception decision.

*Placing Siblings Together (4.6., 4.16.)*

The 2nd MSA requires MDCPS to place siblings together when they enter placement at or near the same time. Exceptions can be made if placing the siblings together would be harmful to one

or more of the siblings, one of the siblings has exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts must be documented and maintained in the case file. The parties agreed that by July 1, 2019, MDCPS would meet an interim performance standard of 75 percent for this commitment (4.16.b.).

The monitoring team conducted an analysis of 192 sibling groups who entered custody during the first half of 2020 and found that 106 (55.2 percent) of the groups were placed together. An additional 24 of the groups had an allowable exception, documentation to support the exception, and documentation to locate or recruit a foster family in whose home the siblings can be reunited, when appropriate.[24],[25] A total of 130 (67.7 percent) of the 192 sibling groups met the terms of this commitment.

The parties agreed that by July 1, 2020, MDCPS would meet a final performance standard of 90 percent (4.16.c.).

The monitoring team conducted an analysis of 215 sibling groups who entered custody during the second half of 2020 and found that 133 (61.9 percent) of the groups were placed together.[26] An additional 26 of the groups had an allowable exception, documentation to support the exception, and documentation to locate or recruit a foster family in whose home the siblings can be reunited, when appropriate. A total of 159 (74.0 percent) of the 215 sibling groups met the terms of this commitment.

*Placement Disruptions (4.7., 4.17.)*

MDCPS committed to take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. If there is a documented indication that a placement may disrupt, the caseworker shall immediately take steps to determine the following:

- the cause of the potential disruption;

- whether the placement is appropriate for the child;

---

[24] The monitoring team conducted a qualitative review of all of the exceptions during the period under review.
[25] Documentation to locate or recruit a foster family in whose home the siblings can be reunited is applicable when MDCPS indicated the "size of sibling group" exception applies.
[26] The monitoring team's analysis of the second half of the year excluded sibling group entries from December 2020 due to the period of review under the current business rules that covers the first 60 days of the current quarter and the last 30 days of the previous quarter.

• whether additional services are necessary to support the placement;

• whether the child needs another placement; and

• if another placement is necessary, what that placement should be.

The efforts made by MDCPS to avoid disruption and to ensure placement stability are required to be documented in the child's case record. The parties agreed that by July 1, 2019, 75 percent of children in MDCPS' custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability consistent with 2nd MSA requirements (4.17.b.). MDCPS reported 223 (73.1 percent) of 305 cases met the terms of this commitment during the first half of 2020 based on children reviewed through the FCR.

MDCPS committed to a final performance standard of 90 percent by July 1, 2020 (4.17.c.). MDCPS reported 314 (69.2 percent) of 454 cases met the terms of this commitment during the second half of 2020 based on children reviewed through the FCR.

The monitoring team identified errors in MDCPS' reporting that included counting placement moves that were not disruptions as disruptions. As such, the monitoring team was unable to validate MDCPS' performance for 2020.

*Overnight Stays in an Office or Other Nonresidential Facility (4.8.)*

MDCPS agreed to ensure that no child shall remain overnight in an MDCPS office or other nonresidential facility that provides intake functions. MDCPS reported that there was one instance in which this occurred during calendar year 2020. A 17-year-old child remained overnight in an MDCPS office from approximately 11:00 pm to 8:30 am of the following day before being placed in a foster home.

In addition, the monitoring team interviewed 175 caseworkers and supervisors, and all reported that they had not seen or been made aware of any child sleeping overnight in an MDCPS office during 2020. After reviewing thousands of cases throughout the year, the monitoring team did not discover any additional instances of a child staying overnight in an MDCPS office.

*Young Children Placed in Congregate Care Facilities (4.9.)*

MDCPS committed that no child under 10 years of age shall be placed in a congregate care setting, including group homes and shelters. Exceptions can be made if:

• the child has exceptional needs that cannot be met in a licensed foster home;

- in order to keep a sibling group together for a temporary period, not to exceed 15 days, and the Regional Director has granted documented approval for the congregate care placement; or

- to enable a mother and baby to be placed together and there is not an available foster home for both of them.

MDCPS reported 121 placements of children under age 10 into a congregate care setting during calendar year 2020. The monitoring team determined there were 90 placements of children under age 10 in a congregate care setting during the year.[27] Of the 90 placements between January 1, 2020 and December 31, 2020, the monitoring team found that 68 (75.6 percent) had the required approval and an allowable exception documented.[28]

*Placement Moves (4.10., 4.12.)*

No child is to be moved from his/her existing placement to another placement unless MDCPS specifically documents in the child's case record justifications for that move and an MDCPS supervisor approves the move. The parties agreed that by July 1, 2019, MDCPS would meet an interim performance standard of 80 percent for this commitment (4.12.b.). MDCPS evaluated performance for this commitment through the FCR. MDCPS reviewed a total of 1,445 cases and reported 1,030 (71.3 percent) met the terms of this commitment during the first half of 2020.[29] The monitoring team reviewed a randomly selected sample of case narratives and approvals for 195 children who experienced at least one placement move during the period. The team found that 110 (56.4 percent) of the cases had a documented placement change reason and were timely approved by a supervisor.

By July 1, 2020, the parties agreed that MDCPS would meet a performance standard of 90 percent for this commitment (4.12.c.). MDCPS reviewed a total of 1,283 cases through the FCR and reported 700 (54.6 percent) met the terms of this commitment during the second half of 2020. The monitoring team reviewed a randomly selected sample of case narratives and approvals for 119 children who experienced at least one placement move during the period. The team found

---

[27] MDCPS included 10 placements in hospitals that were not subject to this commitment. Additionally, MDCPS counted 21 residential placements for a child that regularly moves between a specialized residential school and a foster home; the monitoring team removed this child from the sample.

[28] If the documented reason is for a sibling group, then the placement must be for 15 or fewer days and be approved by an RD. For monitoring purposes, the RD approval must be documented within ten days of placement in order to be considered properly approved.

[29] Beginning with the Q2 2020 FCR, MDCPS implemented a methodology change requested by the monitoring team to only count a placement move as compliant if the supervisory approval occurred within seven days. MDCPS' reported performance declined significantly after making this change.

that 72 (60.5 percent) of the cases had a documented placement change reason and were timely approved by a supervisor.

*Multiple Emergency Placements (4.11.)*

MDCPS agreed to ensure that no child is placed in more than one emergency or temporary facility within one episode of foster care. Exceptions can be made if an immediate placement move is necessary to protect the safety of the child or of others with documented approval from the Regional Director.

Data provided by MDCPS indicate that 29 children experienced multiple stays in shelter care during 2020.[30] Seventeen (58.6 percent) of the 29 children who experienced multiple emergency shelter placements during 2020 had an exception timely approved by the Regional Director indicating that each successive shelter placement was necessary to protect the safety of the child or of others.[31]

The monitoring team reviewed case records for all 29 children placed in an emergency shelter multiple times during the reporting period. Case records for only five (17.2 percent) of the children contained information supporting the determination that each successive placement was necessary to protect the safety of the child or of others.

## Visitation

## Worker Contact and Monitoring

*Caseworker Contact with Foster Children (5.1.a.)*

The 2nd MSA requires that MDCPS shall meet with the child in person at least twice monthly to assess the child's safety and well-being, service delivery, and achievement of permanency and other service goals. At least one visit per month shall take place in the child's placement. The parties agreed that MDCPS would meet a performance standard of 90 percent for this commitment.

---

[30] MDCPS reported that 94 children experienced multiple stays in shelter care during the period. Contrary to the agreed upon business rules, MDCPS counted shelter care placements that occurred prior to 2020. The monitoring team excluded such placements from the data analysis and determined that 29 children experienced multiple stays in shelter care during 2020.

[31] Emergency placements should be approved by an RD. For monitoring purposes, the RD approval must be documented within ten days of placement in order to be considered adequately approved.

MDCPS reported on this commitment through the FCR[32] and determined that 6,798 (80.8 percent) of 8,412 cases reviewed met the 2nd MSA standards. The monitoring team conducted a qualitative review of visitation case narratives for 218 randomly selected children who were in the custody of MDCPS during 2020 and subject to this commitment. The visitation narratives were reviewed to determine if the 2nd MSA requirements to assess safety, well-being, services, permanency, and other service goals were documented. There were 1,295 worker-child contacts required, of which 1,171 (90.4 percent) occurred during the period under review. Seven hundred and fifty-seven (64.6 percent) of the contacts met the quality standards of the 2nd MSA.[33]

Overall, the monitoring team found that narratives lacked detail about visitation, and at times, any information at all. Examples included narratives that were repetitive each month with no evidence of a safety assessment or active service planning, workers documenting they made observations without engaging with the age-appropriate child, and workers asking how the child was doing with no follow-up questions or development of the conversation.

*Caseworker Contact with Children on Trial Home Visits (5.1.b.)*

MDCPS committed that at least 90 percent of foster children on a 90-day trial home visit (THV) would be visited by an MDCPS caseworker in the home at least two times each month.

MDCPS reported on this commitment through a qualitative review process that was approved by the monitoring team in March 2020. The review encompassed commitments 5.1.b., 6.3.a.4., 6.3.a.5., and 6.3.a.6. Through the review, MDCPS determined that 524 (96.3 percent) of 544 cases reviewed met the 2nd MSA standards for this commitment.[34] The monitoring team conducted a review of 81 randomly selected children on THVs during the period. The monitoring team determined that there were 472 worker-child contacts required for these children, of which 407 (86.2 percent) occurred. Two hundred and fifty-nine (54.9 percent) of the contacts met the quality standards of the 2nd MSA, as specified in commitment 5.1.a.[33]

---

[32] As in prior reporting periods, MDCPS is unable to produce quantitative data for this commitment and continues to report performance through a qualitative review.

[33] The monitoring team assessed quality to include a discussion of safety and well-being, service delivery, and achievement of permanency and other service goals, as well as whether the required number of visits per month occurred in the child's placement.

[34] MDCPS and the monitoring team agreed that the population for this review would consist of all children who exited custody during the period and met the following three criteria: in custody for at least 90 days, had a permanency plan and service outcome of reunification, and their last placement was "own-home." The monitoring team identified applicable children who were excluded from MDCPS' qualitative review, ranging from 13 to 35 children each quarter. Additionally, there were children MDCPS reported on who did not meet the agreed upon criteria, ranging from 24 to 60 children each quarter.

*Caseworker Contact with Parents (5.1.c.)*

MDCPS committed to meet at least monthly with the parents of no less than 90 percent of foster children with a goal of reunification to discuss progress on the Family Service Plan (FSP) and the child's well-being. Exceptions include if the child's parent(s) reside out-of-state or are incarcerated.

MDCPS reported on this commitment through the FCR[35] and determined that 1,371 (39.8 percent) of 3,444 cases reviewed met the terms of this commitment. The monitoring team conducted a qualitative review of visitation case narratives for a randomly selected sample of 166 children who were in the custody of MDCPS in 2020 and subject to this commitment. The monitoring team evaluated if the 2nd MSA requirements for MDCPS to assess progress on the FSP and the child's well-being were documented. There were 481 worker-parent contacts required, of which 291 (60.5 percent) occurred during the period under review. One hundred and eight (37.4 percent) of the contacts met the quality standards of the 2nd MSA. There were narratives that lacked detail and did not address the FSP or the child's well-being.

*Caseworker Contact with Foster Parents (5.1.d.)*

MDCPS committed that at least 90 percent of foster parents with at least one foster child in the home must be visited by MDCPS monthly in the home.

MDCPS reported on this commitment through the FCR[35] and determined that 6,137 (77.9 percent) of 7,881 cases reviewed met the performance standard. The monitoring team conducted a qualitative review of visitation case narratives for 182 randomly selected foster parents with at least one foster child in the home during the second half of the year. The visitation narratives were reviewed to assess the child's safety and well-being in the placement and ensure appropriate services are provided. There were 527 worker-foster parent contacts required, of which 458 (86.9 percent) occurred during the period under review. Three hundred and fifty-six (67.6 percent) of the contacts met the quality standards of the 2nd MSA.

Overall, the monitoring team found that narratives lacked detail about visitation, and at times, any information at all. There were cases where the caseworker never discussed the child's or foster parent's needs. There were instances where the worker asked the foster parent "how things were going," but there was no evidence of an assessment of safety, well-being, or the efficacy of services provided.

---

[35] As in prior reporting periods, MDCPS is unable to produce quantitative data for this commitment and continues to report performance through a qualitative review.

## Developing and Maintaining Connections

*Child-Parent Contacts within 72 Hours of Placement (5.2.a.)*

The 2nd MSA requires MDCPS to arrange contact for the foster child with his/her parents and with any siblings not in the same placement within 72 hours of foster care placement unless there are documented reasons why contact should not occur. If MDCPS cannot arrange a visit within 72 hours, a telephone call to parents, siblings, or extended family members must be provided to the child.

MDCPS completed a review of children relevant to this commitment in 2020 as part of the FCR. The Department reviewed 1,575 cases and reported 718 (45.6 percent) met the terms of this commitment. [36,37] The monitoring team reviewed the case narratives for 100 children who entered custody in 2020. The team found eight children had a documented reason why a visit should not occur. Of the remaining 92 children reviewed, the team found 28 (30.4 percent) children had a visit with their parent within 72 hours of their removal. In the absence of a 72-hour visit there was no documentation of phone calls between parents and children found in case narratives for the remainder of the 64 children.

Of the 100 children the monitoring team reviewed, 31 children had at least one sibling in a separate placement. The monitoring team found that 11 children (35.5 percent) had a visit with their sibling(s) within 72 hours of their removal. In the absence of a 72-hour visit there was no documentation of telephone contact between siblings found in case narratives for the remaining 20 children.[38]

*Family Visitation Plan and Parent Contacts (5.2.b., 5.2.b.1., 5.2.b.1.a.)*

For children entering foster care, a visitation plan for the child and his/her family shall be developed as part of the FSP. The visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child (5.2.b.).

MDCPS reported on this commitment through the FCR and determined that 3,163 (60.1 percent) of 5,259 cases reviewed met the terms of this commitment. The monitoring team reviewed visitation plans for 96 children who were removed from their parent(s) in 2020 and were subject

---

[36] MDCPS does not complete a child's FCR until the child has been in custody for six months, so the FCRs completed for the first half of 2020 include children who entered care and had contacts due in 2019. The monitoring team completed this review during the second half of the year, reviewing only 2020 entries.

[37] MDCPS updated the FCR question for this commitment on April 1, 2020. MDCPS' reported performance prior to the change was 64.6 percent, and declined to 37.3, 33.0, and 37.5 percent in subsequent quarters.

[38] Case records sometimes included broad language about FaceTime, text messages, or other electronic contact between siblings in custody in separate placements. The documentation did not include dates or a list of participants for the monitoring team to be able to ascertain if this contact occurred within 72 hours of placement.

to this commitment. There was a visitation plan for the child and his/her family developed as part of the FSP in all of the cases. The plan was developed in collaboration with the parents in 38 (39.6 percent) of the cases. The foster parents were part of the development in 21 (21.9 percent) of the cases. The plan was developed with both the parents and the foster parents in 15 (15.6 percent) of the cases. In 25 (26.0 percent) of the cases, there was no indication that any person, other than MDCPS staff, was involved in the development of the visitation plan.

If parental visitation is appropriate, this visitation plan shall include a minimum of two visits each month with the parents, unless the court order in the child's case limits such visits or unless it is documented that a parent failed to make himself or herself available for visits (5.2.b.1.).

MDCPS reported on this commitment through the FCR and determined that 3,434 (95.2 percent) of 3,608 cases reviewed met the terms of this commitment. The monitoring team reviewed visitation plans for 96 children and excluded one case as the FSP or court order limited visitation. Of the remaining 95 cases, the monitoring team found 90 (94.7 percent) included a minimum of two visits each month with the parents.

The 2nd MSA requires 90 percent of children shall be provided with contacts with their parents consistent with 2nd MSA requirements (5.2.b.1.a.).

MDCPS reported on this commitment through the FCR and determined that 923 (20.2 percent) of 4,574 cases reviewed met the terms of this commitment. The monitoring team conducted a qualitative review of visitation case narratives for a randomly selected sample of 96 children who were in the custody of MDCPS in 2020 and subject to this commitment. The monitoring team determined there were 538 child-parent contacts required, of which 99 (18.4 percent) occurred during the period under review.

*Sibling Contacts (5.2.b.2., 5.2.b.2.a., 5.2.b.3., 5.2.b.4.)*

MDCPS committed that a child's visitation plan, regardless of permanency goal, shall include at least monthly visits with any siblings not in the same placement (5.2.b.2.).

MDCPS reported on this commitment through the FCR and determined that of 2,937 cases reviewed, 1,241 (42.3 percent) met the terms of this commitment. The monitoring team reviewed visitation plans for 96 children who were in the custody of MDCPS in 2020 and subject to this commitment. There were visitation plans for the child and their siblings developed as part of the FSP for 44 (45.8 percent) of the children.

MDCPS committed that 80 percent of children shall be provided with contact with any siblings in custody, not in the same placement consistent with 2nd MSA requirements (5.2.b.2.a.). Requirements include that all reasonable efforts shall be made to facilitate twice-monthly in-

person visits for children six years of age and younger, while all other children shall have at least monthly visits among separated siblings. MDCPS reported on this commitment through the FCR and determined that of 2,658 cases reviewed, 567 (21.3 percent) met the terms of this commitment. The monitoring team conducted a qualitative review of visitation case narratives for a randomly selected sample of 95 children who were in the custody of MDCPS in 2020 and subject to this commitment. The visitation narratives were reviewed to assess if visits were provided. The monitoring team determined that 11 (11.6 percent) of the contacts met the standards of the 2nd MSA.

Additionally, MDCPS committed that siblings shall have interim contact by alternative means such as email, texts, telephone calls, Facetime, and/or Skype (5.2.b.3.). Exceptions to the sibling visitation requirement are:

- the child or sibling is placed out-of-state pursuant to ICPC;

- the visit may be harmful to one or more of the siblings as determined by the court or documented in the record why the visit would be harmful to one or more of the children; or

- one of the siblings is above the age of 14 and refuses such visits and the reason for such refusal is documented in the case record (5.2.b.4.).

MDCPS reported on this commitment through the FCR and determined that of 2,658 cases reviewed, 665 (25.0 percent) met the terms of this commitment. The monitoring team conducted a qualitative review of visitation case narratives for a randomly selected sample of 96 children who were in the custody of MDCPS in 2020 and subject to this commitment. The visitation narratives were reviewed to assess if visitations were provided, along with interim contact. The monitoring team determined that 21 (21.9 percent) of the contacts met the standards of the 2nd MSA.

MDCPS reported 104 (39.1 percent) of 2,658 cases were subject to the exception component of this commitment. The monitoring team found one of 96 cases were subject to the exception component of this commitment.

*Cancellation of Visits (5.2.c.)*

The 2nd MSA requires MDCPS and its contracting agencies to implement a policy that prohibits cancellation of visits as a form of discipline against children.

*Pursuant to commitment 10.1 of the 2nd MSA, the parties unanimously agreed to designate this commitment as "To Be Maintained" based on MDCPS' performance, validated by the monitor, for*

*calendar year 2019.* See the Movement of Commitments to Maintenance Status section for additional information.

## Child and Youth Permanency

### Comprehensive Family Service Plans

*Comprehensive Family Service Plans (6.1.a.)*

The 2nd MSA requires that a comprehensive Family Service Plan (FSP) that addresses the strengths, needs, and services required for both the child and their parent(s) shall be completed within 45 days of a child's entry into foster care. In developing the FSP, the MDCPS caseworker must consult with the child, the child's parents, and the foster care provider. MDCPS committed that at least 90 percent of FSPs will be submitted by the caseworker consistent with 2nd MSA requirements, within 30 calendar days of a child's entry into custody and approved by the supervisor within 15 calendar days. The FSP shall be considered complete upon documented supervisory review and approval.

The monitoring team validated that there were 1,653 children who entered custody during the period of review and the 45th day in custody fell during the calendar year. Of the 1,653 FSPs due during the period, 922 (55.8 percent) were completed within 30 days of a child's entry into foster care and 1,530 (92.6 percent) were approved within 15 days. A total of 1,195 (72.2 percent) of the 1,653 FSPs due during the period were submitted and approved within 45 days.

MDCPS also reported qualitatively on this commitment through the FCR. The Department reviewed 1,621 cases and reported 732 (45.2 percent) met the terms of this commitment. The monitoring team reviewed a randomly selected sample of 97 initial FSPs completed during the period to assess whether the plans were developed in accordance with 2nd MSA requirements.[39] Sixty (61.9 percent) of the FSPs in the sample were developed in consultation with the child's parents or the foster care provider. Only 12 of the plans reflected consultation with an age-appropriate child during development of the initial FSP. There is no indication any person was involved, other than MDCPS staff, in the development of 34 (35.1 percent) of the plans. As such, strengths, needs, and services for parents and children could not be evaluated in these instances.

---

[39] The monitoring team reviewed Initial FSPs due in the third and fourth quarters of 2020.

*Parents' Inclusion in Service Planning (6.1.b.)*

The 2nd MSA provides that in instances in which it is impossible to meet with one or both parents, the service planning process will proceed as described above, notwithstanding the parent's absence.

MDCPS reported qualitatively on this commitment through the FCR. The Department determined 447 cases were subject to this commitment and reported 300 (67.1 percent) met the terms. The monitoring team reviewed a randomly selected sample of 97 initial FSPs completed and found 20 plans with documentation indicating it was impossible to meet with one or both parents. The service planning process proceeded, notwithstanding the parent's absence, in 16 instances (80.0 percent).

*Diligent Search for Parents (6.1.c.)*

MDCPS committed that in those cases in which the whereabouts of one or both parents are unknown, MDCPS shall, within 30 days, institute a diligent search for the parent(s) and document the search in the child's case record. MDCPS committed to a performance standard of 90 percent for this commitment.

MDCPS reported on this commitment through the FCR and determined that 115 (38.9 percent) of 296 cases reviewed met the terms of this commitment. The monitoring team conducted a qualitative review of 74 of the cases and determined that diligent searches were conducted and documented in 27 instances (36.5 percent). However, the diligent searches were conducted within 30 days in only 17 (23.0 percent) of the cases reviewed.

*Permanency Plans (6.1.d.)*

The 2nd MSA requires that within 45 days of a child's initial placement into foster care, MDCPS shall complete a permanency plan that specifies the child's permanency goal, a timeframe for achieving permanency, and activities that support permanency. MDCPS committed that for at least 90 percent of children who enter custody, permanency plans will be submitted within 30 calendar days of a child's entry into custody by the caseworker consistent with 2nd MSA requirements and approved by the supervisor within 15 calendar days. The permanency plan shall be considered complete upon documented supervisory review and approval.

The monitoring team validated there were 1,653 children whose 45th day in custody fell during the period. Of the 1,653 permanency plans due during the period, 859 (52.0 percent) were completed within 30 days of a child's entry into foster care and 1,547 (93.6 percent) were approved within 15 days. A total of 1,196 (73.4 percent) of the 1,653 permanency plans due during the period were submitted and approved within 45 days.

MDCPS also reported qualitatively on this commitment through the FCR. The Department reviewed 1,621 cases and reported 1,406 (86.7 percent) met the terms of this commitment. The monitoring team reviewed a randomly selected sample of 97 initial FSPs completed during the period to assess whether the FSPs were developed in accordance with the 2nd MSA requirements, inclusive of a permanency plan. The monitoring team found that 93 (95.9 percent) of the FSPs in the sample contained a permanency plan that stated the child's permanency goal, as required. Of the 93 FSPs containing a permanency plan with a stated goal, 92 (98.9 percent) plans included a timeframe for achieving permanency. Of the 97 FSPs reviewed, 74 (76.3 percent) indicated activities that support permanency. A total of 74 (76.3 percent) of the initial FSPs contained a permanency plan that stated the child's permanency goal, a timeframe for achieving permanency, and activities that support permanency.

## Concurrent Permanency Planning

*Concurrent Permanency Planning (6.2.a.)*

MDCPS agreed within the first six months of a child's entry into care, to begin to engage in concurrent permanency planning. MDCPS committed that at least 95 percent of children in custody with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements.

MDCPS reported on this commitment through the FCR and determined that 1,405 (62.3 percent) of 2,255 cases reviewed had case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements.

The monitoring team reviewed FSPs completed during the period for a randomly selected sample of 97 children with a goal of reunification to assess whether the plans included any documentation of a concurrent permanency goal or active concurrent permanency planning. The monitoring team found that 96 (99.0 percent) of the FSPs in the sample included documentation of a concurrent permanency planning goal, of which 69 (71.1 percent) contained evidence of active concurrent permanency planning.

## Reunification and Trial Home Visitation

*Reunification (6.3.a.1.)*

The 2nd MSA requires when a child's permanency goal is reunification that MDCPS identify in the FSP and make available, directly or through referral, those services MDCPS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child. Caseworkers must monitor the provision of services through visits and updating of service plans. MDCPS committed to a performance standard of 90 percent.

MDCPS reported on this commitment through the FCR and determined that 2,169 (78.8 percent) of 2,753 cases reviewed met the terms of this commitment.[40]

The monitoring team reviewed the case records of 97 children and found 91 cases (93.8 percent) identified services. Eighty-one (83.5 percent) of the cases had evidence that services were made available directly or through a referral and met the terms of this commitment.

*Caseworker Contact with Parents (6.3.a.2.)*

For a child with a permanency goal of reunification, MDCPS committed to have the child's caseworker meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances. See Section 5.1.c. for this analysis.

*Reunification Supports for Parents (6.3.a.3.)*

MDCPS committed in the 2nd MSA to document in the case record of children with a permanency goal of reunification, opportunities provided to their parents in support of reunification.

MDCPS reported qualitatively on this commitment through the FCR and determined 2,735 (78.5 percent) of 3,485 cases met the terms of the commitment. The monitoring team reviewed a randomly selected sample of 97 initial FSPs subject to this commitment and found 74 (76.3 percent) had documented opportunities provided to parents in support of reunification.[41]

*After-Care Plans (6.3.a.4.)*

The 2nd MSA requires that when a recommendation is made to reunify a child with his or her family, MDCPS must develop an after-care plan that identifies services necessary to ensure that the conditions leading to the child's placement have been addressed, and that the child's safety and stability can be assured. MDCPS is also required to take reasonable steps to provide or facilitate access to services necessary to support the child during the trial home visit (THV).

---

[40] In the first quarter of 2020, MDCPS combined data reporting for 6.3.a.1., 6.3.a.2., and 6.3.a.3. in the FCR; however, the FCR question only pertained to 6.3.a.2.
[41] The monitoring team reviewed Initial FSPs due in the third and fourth quarters of 2020.

MDCPS reported on this commitment through a qualitative review and determined that 383 (70.4 percent) of 544 cases reviewed met the terms of this commitment.[42] The monitoring team reviewed the case records of 81 children whose parent(s) had full custody restored in 2020 to determine if the children had after-care plans consistent with the 2nd MSA. Thirty-three of the children (40.7 percent) had an after-care plan developed with the family. All 33 of these after-care plans identified and documented reasonable efforts to provide or facilitate access to services necessary to ensure the child's safety and stability during the THV, and that the conditions leading to the child's placement had been addressed.

*Trial Home Visits (6.3.a.5.)*

The 2nd MSA provides that for each child who has a permanency goal of reunification and who is in fact returned home for the purpose of reunification, MDCPS will provide that child with a 90-day THV if the child has been in custody for at least 90 days, subject to the approval of the Youth Court. During the THV period, a MDCPS caseworker shall meet with the child in the home at least two times per month.

MDCPS committed that at least 90 percent of foster children who are reunified and who were in custody longer than 90 days would receive a 90-day THV period or have case record documentation reflecting the Youth Court's objection to such a THV. During the THV, MDCPS must provide or facilitate access to the services in the child's after-care plan, consistent with the 2nd MSA requirements. MDCPS reported on this commitment through a qualitative review and determined that 502 (92.3 percent) of 544 cases reviewed met the standards of the commitment.[42] The monitoring team reviewed and reported on the visitation component of this commitment in section 5.1.b. and the access to services component of this commitment in section 6.3.a.4. The monitoring team conducted a review of 81 children on trial home visits during the period and determined that all had Youth Court approval for the THV period to begin.

*Final Discharge Meeting (6.3.a.6.)*

The 2nd MSA requires that before the end of any THV period, MDCPS will meet with the child's parents and the child to determine the appropriateness of final discharge. If final discharge is determined to be appropriate, MDCPS shall make the appropriate application to the Youth Court to be relieved of custody.

---

[42] MDCPS and the monitoring team agreed that the population for this review would consist of all children who exited custody during the period and met the following three criteria: in custody for at least 90 days, had a permanency plan and service outcome of reunification, and their last placement was "own-home." The monitoring team identified applicable children who were excluded from MDCPS' qualitative review, ranging from 13 to 35 children each quarter. Additionally, there were children MDCPS reported on who did not meet the agreed upon criteria, ranging from 24 to 60 children each quarter.

MDCPS conducted a qualitative review of this commitment and determined that 198 (36.4 percent) of 544 cases met the terms of the commitment.[42] The monitoring team completed a qualitative review and determined that 30 (37.0 percent) of 81 children had evidence of both a final discharge meeting with all appropriate parties and that the appropriate application was filed with the Youth Court for the child to be relieved of custody.

## Other Permanency Case Goals

*Adoption (6.3.b.1.)*

The 2nd MSA requires that at least 90 percent of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that MDCPS will undertake to achieve adoption.

Relative to the adoption specialist, the monitoring team confirmed that 2,114 (97.7 percent) of 2,164 children with a permanency goal of adoption had an adoption worker assigned.

MDCPS completed a qualitative review of 952 children with a permanency goal of adoption. The Department reported that adoption plans for 866 children (91.0 percent) were of good quality. The monitoring team reviewed a randomly selected sample of 168 children from MDCPS' CQI review. All but one (99.4 percent) of the children's case records had an adoption worker assigned. All the cases had an adoption plan and 116 (69.1 percent) of the cases identified the child-specific activities that MDCPS will undertake to achieve adoption and timeframes in which the activities will be undertaken.[43]

*Termination of Parental Rights (6.3.b.2., 6.3.b.3.)*

MDCPS must make a termination of parental rights (TPR) referral before a child has spent more than 17 of the last 22 months in foster care unless an available exception pursuant to the federal Adoption and Safe Families Act ("ASFA") has been documented by MDCPS in the child's case record. Subsequent to the initial ASFA exception, MDCPS may continue the exception for only one additional six-month period unless continued invocation of the exception is reviewed, approved, and documented semi-annually by the Regional Director assigned to the county of responsibility for the child. MDCPS committed to meet a standard of 80 percent for this commitment by January 1, 2019. (6.3.b.2.).

MDCPS reported that 1,380 children were subject to this commitment in 2020. The Department determined through a qualitative review that 414 (30.0 percent) of those children met the terms

---

[43] The monitoring team assessed three consecutive months of adoption status narratives for each child for this review to determine whether the child-specific activities to achieve adoption were undertaken within the identified timeframes. MDCPS reviewed only one month of adoption status narratives for each child and declined the monitoring team's request to modify its methodology.

of the 2nd MSA. With respect to these children, MDCPS either made the TPR referral (281) or had a documented ASFA exception (133). The monitoring team was unable to validate performance for this commitment; the discrepancies between the monitoring team's data calculations versus MDCPS' data calculations were too numerous and too large to have confidence in the validation.

MDCPS is required to provide the monitor a report of all TPR referrals made during the monitoring period, the date those TPR referrals were made and the date the petition was filed with the court (6.3.b.3.). MDCPS provided data on TPR referrals for 651 children during 2020.

*Post-Adoption Services (6.3.c.)*

MDCPS committed to establish and maintain a system of post-adoptive services to stabilize and support adoptive placements. MDCPS agreed that adoptive families eligible for adoption subsidies must have access to these services, which may include counseling, mental health treatment and crisis intervention, family preservation and stabilization services, and peer support.

MDCPS reported that an average of 4,075 children were eligible for and received adoption subsidy payments during each quarter of 2020, totaling to an annual amount of $17,266,356. Consistent with its 2nd MSA commitment, MDCPS continued to fund a statewide post-adoptive service contract with a child and family service agency to ensure that eligible families have access to a range of post-adoptive services throughout Mississippi. The contract was in effect throughout the calendar year and the provision of post-adoptive services continued throughout the entire monitoring period. The monitoring team reviewed the contract[44] and found the scope of services includes the provisions of supportive counseling, mental health treatment, crisis intervention, family preservation and support, peer support, and respite services consistent with 2nd MSA requirements. The monitoring team also reviewed materials sent by the post-adoptive service agency to adoptive parents who have recently adopted a child, describing the range of services available and advising families how to access those services. Families can access services through their MDCPS Adoption Specialist or through direct contact with the post-adoptive service provider, at any time day or night. MDCPS reported the following services required by the 2nd MSA were provided to families during 2020.

---

[44] On October 1, 2020 MDCPS renewed the post-adoptive services contract for a one-year period. The total contract budget is $751,474.86.

**Table 9. Post Adoption Services – Families Served by Month, 2020**

| Service Type | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Supportive Counseling | 21 | 25 | 42 | 18 | 20 | 26 | 36 | 17 | 27 | 27 | 30 | 19 | **308** |
| Mental Health Treatment | 10 | 13 | 3 | 0 | 0 | 5 | 20 | 10 | 27 | 33 | 22 | 26 | **169** |
| Crisis Intervention | 3 | 0 | 0 | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | **6** |
| Family Preservation/ Stabilization Services | 18 | 34 | 41 | 34 | 44 | 51 | 16 | 16 | 27 | 19 | 14 | 20 | **334** |
| Peer Support | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 6 | 18 | 5 | 10 | 3 | **47** |
| Respite | 20 | 20 | 12 | 8 | 16 | 12 | 6 | 8 | 12 | 14 | 19 | 17 | **164** |
| **Total** | **73** | **93** | **98** | **60** | **81** | **96** | **81** | **57** | **111** | **98** | **95** | **85** | **1,028** |

*Durable Legal Custody and Guardianship (6.3.d.1., 6.3.d.2.)*

The parties agreed that the permanency goals of durable legal custody and guardianship may be assigned when there are documented efforts in the child's case record to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption (6.3.d.1.).

MDCPS evaluated this commitment through the FCR in 2020. The Department reviewed 220 cases and reported 217 (98.6 percent) met the terms of this commitment.[45] The monitoring team reviewed 119 children with the permanency goal of durable legal custody or guardianship during the monitoring period and found there were documented efforts to move the child to adoption and documentation of a reasonable basis why it was in the child's best interest not to be considered for adoption for 117 (98.3 percent) of the children.[46]

When the permanency goals of durable legal custody and guardianship are assigned to a child under the age of 14 years old or living with a non-relative, MDCPS shall provide to the monitor at the end of each monitoring period, information from the child's case record documenting efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption (6.3.d.2.).

---

[45] In the first quarter of 2020, MDCPS completed a review of children with the permanency goal of durable legal custody or guardianship (6.3.d.1.) as part of the FCR but combined the data with children with a permanency goal of APPLA (6.3.e.). The total of 220 cases is the sum of only the second, third, and fourth quarters of 2020.

[46] The monitoring team discovered that children in the data had permanency goals of custody with a relative. These children were reviewed as part of the commitment as MDCPS reported some Youth Courts in Mississippi utilize the goals interchangeably, for the same permanency outcome.

The monitoring team reviewed a random sample of 56 children under the age of 14 years old or living with a non-relative with the permanency goal of durable legal custody or guardianship during the monitoring period. The team found there were efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption for 54 (96.4 percent) of the children.[47]

*Another Planned Permanent Living Arrangement (APPLA) (6.3.e.)*

If MDCPS concludes, after considering reunification, adoption, durable legal custody, and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, MDCPS may assign a permanency goal of APPLA for the child. In such circumstances, MDCPS agreed that the child must be at least 16 years old and MDCPS must document a compelling reason why this permanency goal is in the best interest of the child.

MDCPS evaluated this commitment through the FCR in 2020. The Department reviewed 353 cases and reported 345 (97.7 percent) met the terms of this commitment.[48] The monitoring team reviewed a random sample of 122 children with the goal of APPLA during the monitoring period. There was a documented compelling reason why the permanency goal was in the best interest of the child for 108 children (88.5 percent). The remaining 14 children (11.5 percent) were under the age of 16 years old at the time MDCPS assigned the permanency goal of APPLA, contrary to the 2nd MSA.

## Permanency Reviews

*Permanency Plan Reviews (6.4.a.)*

The 2nd MSA requires that a child's permanency plan be reviewed in a court or administrative case review, which may be a foster care review, at least every six months. MDCPS agreed to take all reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers and relevant professionals in court or administrative reviews. MDCPS committed that at least 90 percent of foster children who have been in custody for at least six months shall have a timely court or administrative case review consistent with 2nd MSA requirements. The monitoring team's analysis of data provided by MDCPS concluded that 5,738 children were due for a permanency plan review during the period, of which 5,145 children (89.7 percent) received a timely review.

---

[47] The monitoring team discovered that children in the data had permanency goals of custody with a relative. These children were reviewed as part of the commitment as MDCPS reported some Youth Courts in Mississippi utilize the goals interchangeably, for the same permanency outcome.

[48] In the first quarter of 2020, MDCPS completed a review of children with the permanency goal of APPLA (6.3.e.) as part of the FCR but combined the data with children with a permanency goal of durable legal custody (6.3.d.1.). The total of 353 cases is the sum of the second, third, and fourth quarters.

MDCPS also reported qualitatively on this commitment through the FCR. The Department reviewed 8,412 children's case records and reported 4,293 (51.0 percent) met the terms of this commitment. The monitoring team reviewed a randomly selected sample of 167 Youth Court Hearing and Review Summary reports completed by MDCPS during the period, for children in custody for at least six months, to assess the participants of the permanency reviews. The monitoring team found evidence in the sample of reports that the foster care reviewer (quality assurance coordinator), social worker (caseworker), and social work supervisor (casework supervisor) were listed as being invited to the permanency review in each of the reports. Parents were listed as invited in 109 (74.2 percent) of the reports.[49] Caregivers were listed as invited in 118 (70.7 percent) of the reports. Foster children were listed as invited in 161 (96.4 percent) of the reports. Guardians-ad-litem were listed as invited in 87 (52.1 percent) of the reports. The summary reports also indicated that a caseworker attended 142 (85.0 percent) of the reviews. Parents (39.5 percent), caregivers (29.3 percent), caseworker supervisors (34.7 percent), and the foster child (6.0 percent) each attended less than 40 percent of the permanency reviews.

*Court Reviews (6.4.b.)*

The 2nd MSA requires MDCPS to take all reasonable steps to ensure that a court review is held for each child in foster care custody within 12 months of the child's initial placement, and annually thereafter. MDCPS committed that the agency would make reasonable efforts to have a timely annual court review scheduled consistent with 2nd MSA requirements for at least 90 percent of foster children who have been in custody for at least 12 months.

MDCPS evaluated this commitment through the FCR in 2020. The Department reviewed 5,512 cases and reported 5,425 (98.4 percent) met the terms of this commitment. The monitoring team reviewed a random sample of 157 children with an annual court review due during the period. MDCPS provided court orders and additional documentation relative to the reasonable steps taken to ensure that timely court reviews occurred for 147 (93.6 percent) of the children.

*Review of Adoption and Safe Families Act (ASFA) Exceptions (6.4.c.)*

MDCPS committed to review documented exceptions pursuant to ASFA for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review. MDCPS reported on this commitment through the Permanency Support Unit review process, as described under section 6.3.b.2.

---

[49] The denominator for parents excludes 20 cases where parental rights have been terminated.

## Permanency Performance Indicators

*Permanency Outcomes (6.5.a.)*

The 2nd MSA requires that each federal fiscal year (FFY), MDCPS must meet performance standards for three permanency indicators, as established by the monitor. The three indicators, as agreed to by MDCPS and the monitor, are as follows:

- Of all children who enter foster care in a 12-month period, what percent discharged to permanency within 12 months of entering foster care? The entry cohort for this indicator will be children who entered care between October 1, 2018 and September 30, 2019.

- Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care between 12 and 23 months, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. The cohort for this indicator will be children in care on the first day of October 1, 2019, who had been in care for 12-23 months as of that day.

- Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care for 24 months or more, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. The cohort for this indicator will be children in care on the first day of October 1, 2019, who had been in care for 24 months or more as of that day.

The monitor established interim performance standards for MDCPS to meet for FFY20 (October 1, 2019 – September 30, 2020) regarding these three indicators. As the following table indicates, the Department achieved the performance standard for one of the three permanency outcomes during the reporting period.

**Table 10. Permanency Outcome Performance, FFY2020**

| 2nd MSA Section | Indicator | FFY2020 Performance Standard | MDCPS' FFY2020 Performance |
|---|---|---|---|
| *6.5.a.1* | Permanency for children entering care in a 12-month period | 45.7% | 42.2% |
| *6.5.a.2* | Permanency for children in care for 12-23 months on the first day of a 12-month period | 38.3% | 36.6% |
| *6.5.a.3* | Permanency for children in care for 24 months or more on the first day of a 12-month period | 32.7% | 37.5% |

The monitoring team reviewed case records for a random sample of 247 children MDCPS reported achieved permanency timely during the reporting period and confirmed MDCPS' performance.

*Adoption Outcomes (6.5.c., 6.5.d.)*

The 2nd MSA requires that each fiscal year, MDCPS must meet adoption performance standards, as established by the monitor. The parties agreed that the adoption performance standards must represent a substantial improvement above the certified baseline performance established under the Stipulated Third Remedial Order (STRO).[50]

Data provided by MDCPS indicate that in FFY2020, the average length of time from the date on which a child's adoption goal was established to adoption was 29.3 months and the median was 24 months.

As detailed in the previous report, during 2019 data validation, the monitoring team determined that the data file MDCPS provided during the Stipulated Third Remedial Order period to establish baseline performance for this commitment (for children adopted during FFY2016) included the date of the child's most recent adoption plan rather than the date the child was initially assigned a permanency goal of adoption, the date needed to calculate baseline performance. As a result, baseline performance did not accurately capture the average and median times from the date on which a child's adoption goal was established to adoption finalization. Baseline performance and the previously established performance standards need to be revisited to establish attainable targets for the Department. MDCPS has work to do around understanding any systemic causes of delays in adoption before this can be achieved.

## Transition to Independent Living

*Notification of Cessation of Benefits (7.1.)*

MDCPS is required to provide each youth transitioning to independence with at least six months advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition. MDCPS did not have a process in place to provide and track the six months advance notice required by this commitment until the third quarter of 2020, when a function to inform youth age 16 and older of what supports and services will cease at the time of their exit from care was implemented as part of the youth appraisal. MDCPS reported that four (25.0 percent) of 16 youth who emancipated from care during the fourth quarter were provided six months advance notice of the cessation of health, financial, and other benefits. The monitoring

---

[50] The Stipulated Third Remedial Order was entered as an order of the Court on December 19, 2016.

team was not able to validate this commitment for 2020 due to the inability of MDCPS to report for the majority of the year.

*Independent Living Service Plans (7.2.)*

MDCPS is required to provide each foster youth age 14 years or older, regardless of his/her permanency plan, an opportunity to participate in the creation of an appropriate Independent Living service plan (ILP) for a successful transition to adulthood. MDCPS completed a qualitative review of this commitment during each quarter of 2020 and reported that 912 (79.9 percent) of 1,141 youth participated in the creation of their ILP. It is not clear if the MDCPS review included only documentation that the youth had a completed youth appraisal or that the youth participated in the creation of their youth appraisal for the second and third quarters of 2020, as MDCPS reporting reflected the number of youth with a completed youth appraisal, without reference to youth participation. The monitoring team conducted a qualitative review of 171 youth age 14 and older. The review required that the youth had a completed ILP (either a youth appraisal or an ILP in MACWIS) which was completed during the period under review, that there was documentation that the youth participated in creation of that plan, and that the completed plan included goals. The monitoring team found that only two cases (1.2 percent) met these criteria.

*Independent Living Services (7.3.)*

The 2nd MSA provides that each foster youth age 14 years and older will have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood. This includes independent living services eligible for federal reimbursement under the Chaffee program, which in part promotes employment or removes barriers to employment. MDCPS must maintain sufficient resources to deliver these services.

MDCPS did not have a standard program in place for these services for the majority of 2020. As a result, data reported by MDCPS on this commitment during the first three quarters reflects informal conversations between youth and MDCPS staff. The monitoring team and MDCPS agreed that these informal conversations could not be verified as the provision of independent living services and that MDCPS reporting on this commitment should cease until MDCPS contracted with a provider for a more structured program of independent living services. MDCPS completed a competitive bidding process for a new independent living services contractor in 2020 and the monitoring team approved a new plan for MDCPS reporting on this commitment beginning in 2021. The plan includes an annual report with more accurate verifiable data based on implementation of the contracted online independent living services and development of partnerships with community-based resources.

*Medical Coverage (7.4.)*

The 2nd MSA requires MDCPS to implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid coverage so that their coverage continues without interruption at the time of emancipation.

According to MDCPS, the agency transmits files of youth to the Department of Medicaid (DOM) at the time that the foster care Medicaid coverage for a youth ends and DOM then enrolls youth in extended Medicaid coverage. MDCPS conducted a qualitative review regarding the transmission of files to DOM for 46 youth who exited care to emancipation during 2020 and reported that files had been transmitted to DOM for 45 (97.8 percent) of the youth. The MDCPS reporting shifted throughout 2020, including only youth who were eligible for extended Medicaid during the period under review for the first three quarters and then including all youth who exited care to emancipation during the fourth quarter. According to MDCPS, youth become eligible for extended Medicaid once their existing period of Medicaid eligibility under a different funding source ends, which does not necessarily coincide with a youth's exit from foster care. Therefore, MDCPS reporting did not include all youth who exited care to emancipation in 2020.

The monitoring team verified Medicaid enrollment for 64 youth who exited care to emancipation in 2020. The monitoring team found that 62 (96.9 percent) of the 64 youth who emancipated from care in 2020 at age 18 or beyond were enrolled in Medicaid coverage so that their coverage continued without interruption at the time of emancipation.[51]

*Start-Up Stipends (7.5.)*

MDCPS must implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond receive a start-up stipend of at least $1,000.00 at the time of emancipation, or as soon as practicable thereafter.

MDCPS policy provides that "[a] Start-Up Stipend is available to youth who leave care after turning age sixteen (16) and who have participated in the available ILP activities. The youth must have been in care for a minimum of six (6) months." The policy also allows for youth to apply for this stipend six months prior to or following release from custody.

---

[51] No Medicaid information was provided for one youth and the other youth without coverage was incarcerated at the time he emancipated from care. Two additional youth remained enrolled in Medicaid for a very short time following their emancipation from care. One of those youth, who had been covered with state funded Medicaid, continued to be covered for two months and then the Medicaid case was closed and not converted to extended Medicaid. The second youth was in receipt of Medicaid through SSI and continued to have active Medicaid coverage for 29 days after emancipation from care. Medicaid coverage then ended.

MDCPS reported that 69 (50.7 percent) of 136 youth[52] who exited custody to emancipation between January 1, 2020 and September 30, 2020 received a start-up stipend. This reporting period allowed for inclusion of any youth who may have received a start-up stipend up to six months following exit from care. MDCPS provided information on a process to provide start-up stipends to the 67 youth who did not receive them and to more accurately provide start-up stipends in the future, stating that "[t]he Department is working to make contact with those youth and issue their Start-Up stipends. Additionally, the Department implemented a monthly review process to ensure youth exiting care, ages 18 to 21, are receiving their Start-Up stipends timely. A list of youth who emancipated from care, during the month, will be pulled at the end of each month by Youth Transition Support Services. Youth on the list who have not received their Start-Up stipends will be contacted by their Transition Navigators, and stipends will be issued through the Department's case management process or Chafee debit card program once established (RFP in-process)."

The monitoring team did not validate MDCPS performance on this commitment due to the apparent data discrepancy and planned corrective action reported by MDCPS.

*Housing Resource Specialists (7.6.)*

MDCPS is required to implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond have access to a housing resource specialist responsible for assisting the youth to obtain an adequate living arrangement.

MDCPS evaluated this commitment through a qualitative review of youth case records for the reporting period. MDCPS transition navigators learn of the youth's need for a housing resource specialist if the youth indicates that need in a completed youth appraisal. Based on these reviews, MDCPS reported that 23 of 62 youth who emancipated from care during 2020 needed a housing resource specialist and that all 23 of those youth received assistance from a housing resource specialist.

The monitoring team conducted a qualitative review of 63 youth who emancipated from care during 2020.[53] This review included case records for the six months prior to release from custody and completed youth appraisals. The monitoring team found indications in the case records that 41 of the 63 youth needed access to a housing resource specialist. Documentation of MDCPS assistance with housing was found in five (12.2 percent) of those 41 cases. There was no evidence that supportive housing services were provided for many youth emancipating from care despite

---

[52] It is not clear why the number of youth MDCPS reported on for this commitment varied substantially from the number of youth MDCPS reported on as the emancipation cohort for other commitments. For example, MDCPS reported on 62 youth as the emancipation cohort for the entire year for commitments under 7.8.

[53] The monitoring team included one youth who emancipated from care during 2020 who was not included in the MDCPS review.

youth raising the need for housing in the youth appraisal process or in conversations with their workers. Gaps in documentation of MDCPS housing assistance were commonly found in cases in which youth ran away from care, often after voicing dissatisfaction with their living situations; in cases of unaccompanied refugee minors; and in cases in which youth were living at community college and lacked a stable housing resource for school breaks. For example:

- After identifying that she needed assistance with housing during her youth appraisal and voicing to her worker that she wanted to be released from custody, a youth ran away from her resource home placement with her grandmother in March 2020 and was released from custody on her 20th birthday in November 2020 while still on runaway status. There is no evidence that MDCPS provided any support to the youth regarding housing as a result of the youth appraisal or the youth's statements that she was ready to be released from custody.

- In the case of an unaccompanied refugee minor, the worker documented conversations with the youth about his plan to get an apartment following emancipation. It is unclear if the youth acquired an apartment. There is no documentation in the case record of MDCPS assistance regarding the youth obtaining housing following emancipation.

- A youth was living at community college at the time of release from custody. It is not clear if he had any stable, year-round housing resource at the time of release. There was no documentation in the case record that the youth had a viable placement during breaks and when he was not residing at the community college campus.

*State Educational Training and Vocational (ETV) Program (7.7.)*

MDCPS must continue to implement policies and processes which ensure that youth emancipating from the foster care system at age 18 or beyond receive services and support under the State Educational Training and Vocational (ETV) Program for which they are eligible. MDCPS reported that 173 youth received an ETV in the 2019/2020 school year. This included 99 youth who were newly determined eligible to participate in the program. The monitoring team did not validate this commitment because MDCPS was not able to report on the total number of youth eligible for an ETV. MDCPS revised its reporting plan for this commitment for 2021 and will report on the number of youth who applied for an ETV as well as the number of youth who received an ETV.

*Identification and Essential Documentation (7.8.)*

MDCPS committed to assist youth in obtaining or compiling the following documents and such efforts shall be documented in the child's case record:

- educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate;

- a social security or social insurance number;

- a resume, when work experience can be described;

- a driver's license, when the ability to drive is a goal; if not a driver's license, then a state-issued photo identification;

- an original or certified copy of the youth's birth certificate;

- previous placement information;

- documentation of immigration, citizenship, or naturalization, when applicable;

- documentation of tribal eligibility or membership;

- death certificates when parents are deceased;

- a life book or compilation of personal history and photographs, as appropriate; and

- a list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties.

MDCPS conducted a qualitative review of case records for 62 youth who emancipated from care during 2020 to determine performance for this commitment. The monitoring team conducted a qualitative review of this commitment of 63 youth who emancipated from care during 2020, by reviewing MACWIS and any completed youth appraisal.[54] Table 11 details the number and percent of youth for whom the relevant documentation was obtained or compiled as determined in both reviews. Worker documentation of citizenship and immigration and parent death certificates is often absent, raising questions about the reliability of the data for these commitments. It is often not clear if these commitments apply to specific children.

---

[54] The monitoring team identified one youth who emancipated from care in 2020 who was not included in the MDCPS review.

**Table 11. Youth Receiving Identification and Essential Documentation, 2020**

| Documentation | MDCPS Emancipated youth receiving documentation (N=62) | | Monitor Emancipated youth receiving documentation (N=63) | |
|---|---|---|---|---|
| | **Count** | **Percent** | **Count** | **Percent** |
| Education Records (7.8.a.) | 31 | 50% | 3 | 4.8% |
| Social Security Card (7.8.b.) | 43 | 69.4% | 13 | 20.6% |
| Resume (7.8.c.) | 9 | 14.5% | 0 | 0% |
| Driver's License/State ID (7.8.d.) | 28 | 45.2% | 16 | 25.4% |
| Birth Certificate (7.8.e.) | 40 | 64.5% | 16 | 25.4% |
| Previous Placement Information (7.8.f.) | 27 | 43.5% | 2 | 3.2% |
| Citizenship/Immigration Records (7.8.g.) | 2 of 3 | 66.7% | 3 of 33 | 9.1% |
| Tribal Eligibility (7.8.h.) | N/A | N/A | 0 of 1 | 0% |
| Parent Death Certificate (7.8.i.) | 2 of 3 | 66.7% | 0 of 20 | 0% |
| Life Book/History (7.8.j.) | 21 | 33.9% | 1 | 1.6% |
| Known Relatives List (7.8.k.) | 32 | 51.6% | 1 | 1.6% |

# Child Well-Being

## Physical and Mental Health Care

*Initial Medical Screenings (8.1.a.)*

MDCPS agreed that by July 1, 2019 at least 80 percent of children shall have an initial medical screening within seven days of the child's entry into foster care. MDCPS applied an incorrect performance standard when reporting for the first quarter of 2020. That information is therefore excluded from this report and the monitoring team did not verify that data. MDCPS conducted a qualitative review[55] of 351 children who were due for an initial health screen during the second quarter of 2020. MDCPS reported that 306 of those youth (87.2 percent) received an initial health screening within seven days of the child's entry into foster care. The monitoring team conducted a qualitative review of 89 children who were due for an initial health screening during the second quarter of 2020 and found evidence of a timely initial health screen for 45 of those children (50.6 percent).

---

[55] For the qualitative reviews for this commitment, MDCPS purported to review the entire population of children due for initial medical screenings during the period. The monitoring team identified applicable children who were excluded from MDCPS' qualitative review, ranging from 48 to 86 children each quarter. Additionally, there were children MDCPS reported on who were not due for an initial medical screening during the period, ranging from 34 to 77 children each quarter.

MDCPS agreed that by July 1, 2020 at least 90 percent of children shall have an initial medical screening within 72 hours of the child's entry into foster care. MDCPS conducted a qualitative review of 423 children who were due for an initial health screen during the third quarter of 2020. MDCPS reported that 271 of those youth (64.1 percent) received an initial health screening within 72 hours of the child's entry into foster care. MDCPS conducted a qualitative review of children who were due for an initial health screen during the fourth quarter of 2020. MDCPS erroneously reported in the fourth quarter that 359 children were included in its review and that all 359 children received a timely initial health screen. MDCPS also reported performance as 63 percent for the fourth quarter. The monitoring team conducted a qualitative review of 95 children who were due for an initial health screening during the second half of 2020 and found evidence of a timely initial health screen for 36 of those children (37.9 percent).

*Comprehensive Medical Exams (8.1.b.)*

MDCPS agreed that by July 1, 2019 at least 80 percent of children shall have an initial EPSDT or other comprehensive medical examination within 60 days of the child's entry into foster care. MDCPS used an incorrect performance standard when reporting for the first quarter of 2020. That information is therefore excluded from this report and the monitoring team did not verify that data. MDCPS conducted a qualitative review[56] of 701 children who were due for an initial EPSDT or other comprehensive medical exam during the second quarter of 2020. MDCPS reported that 567 (80.9 percent) of those youth received an initial EPSDT or other comprehensive medical exam within 60 days of the child's entry into foster care. The monitoring team conducted a qualitative review of 95 children who were due for an EPSDT or other comprehensive medical exam during the second quarter of 2020 and found evidence of a timely initial EPSDT or other comprehensive medical exams for 45 (47.4 percent) of those children.

MDCPS agreed that by July 1, 2020 at least 90 percent of children shall have an initial EPSDT or other comprehensive medical examination within 30 days of the child's entry into foster care. MDCPS conducted a qualitative review of 771 children who were due for an initial EPSDT or other comprehensive medical exam during the second half of 2020. MDCPS reported that 669 (86.8 percent) of those youth received an initial EPSDT or other comprehensive medical exam within 30 days of the child's entry into foster care. MDCPS noted that some exams may have occurred beyond the 30-day requirement due to COVID-19. The monitoring team conducted a qualitative review of 95 children who were due for an initial EPSDT or other comprehensive medical exam

---

[56] For the qualitative reviews for this commitment, MDCPS purported to review the entire population of children due for comprehensive medical exams during the period. The monitoring team identified applicable children who were excluded from MDCPS' qualitative review, ranging from 28 to 179 children each quarter. Additionally, there were children MDCPS reported on who were not due for a comprehensive medical exam during the period, ranging from 42 to 434 children each quarter.

during the second half of 2020 and found evidence of a timely EPSDT or other comprehensive medical exam for 33 (34.7 percent) of those children.

*Periodic and Ongoing Medical Exams (8.1.c.)*

The 2nd MSA requires that following an initial EPSDT or other comprehensive medical examination, children shall receive periodic and on-going medical examinations according to the periodicity schedule set forth by the EPSDT program. The 2nd MSA requires the monitor to set a performance standard for MDCPS to meet by July 1, 2019. The monitor established a performance standard of 45 percent. MDCPS agreed that by July 1, 2020, 90 percent of children shall be provided with periodic and on-going medical examinations. MDCPS did not have a process in place to track these exams for children in custody in 2020 and did not report on this commitment. Therefore, the monitoring team is unable to assess MDCPS' performance.

*Follow-up Treatment (8.1.d.)*

MDCPS agreed that by July 1, 2019, 90 percent of children shall receive recommended follow-up treatment throughout the time they are in foster care. MDCPS conducted a qualitative review on follow-up care for children who entered care during 2020. However, MDCPS did not have a process in place to track follow-up care for the rest of children in care in 2020 and did not report on all children subject to this commitment. Therefore, the monitoring team is unable to assess MDCPS' performance.

*Dental Exams (8.1.e.)*

MDCPS agreed that by July 1, 2019 at least 80 percent of children shall have a dental examination within 90 days of the child's entry into foster care. MDCPS conducted a qualitative review[57] of 1,212 children who were due for an initial dental exam during the first half of 2020.[58] MDCPS reported that 695 (57.3 percent) of those youth received an initial dental exam within 90 days of the child's entry into foster care. MDCPS noted that performance on this commitment may have been impacted by COVID-19. The monitoring team conducted a qualitative review of 87 children[59] who were due for an initial dental exam during the first half of 2020 and found evidence of a timely initial dental exams for 22 (25.3 percent) of those children.

---

[57] For the qualitative reviews for this commitment, MDCPS purported to review the entire population of children due for initial dental exams during the period. Each quarter, the monitoring team identified children MDCPS reported on who were not due for initial dental exams during the period, ranging from 29 to 639 children.

[58] It is not clear how MDCPS identified this large number of children as the population in need of an initial dental exam during the first half of 2020 (1,212) and a much smaller number of children in the second half of 2020 (589).

[59] The monitoring team began with a sample of 90 children and three were excluded because they were not in care for 90 days or their files were not accessible in MACWIS.

MDCPS agreed that by July 1, 2020 at least 90 percent of children shall have a dental examination within 90 days of the child's entry into foster care. MDCPS conducted a qualitative review of 589 children who were due for an initial dental exam during the second half of 2020. MDCPS reported that 322 (54.7 percent) of those youth received an initial dental exam within 90 days of the child's entry into foster care. MDCPS noted that performance on this commitment may have been impacted by COVID-19. The monitoring team conducted a qualitative review of 93 children[60] who were due for an initial dental exam during the second half of 2020 and found evidence of a timely initial dental exam for 26 (28.0 percent) of those children.

The monitoring team found that some children who turned four years old while in foster care did not have an exam that met the requirement in the 2nd MSA because the requirement does not provide that a dental exam within the six months prior to turning four years old exempts MDCPS from ensuring that children receive dental care within 90 calendar days of their fourth birthday. The monitoring team did find evidence that some children in care began receiving dental care prior to turning four years old and were already on a semi-annual dental schedule.

*Medical Records (8.1.f.)*

MDCPS committed to provide foster parents or facility staff with the completed foster child information form or other electronic record containing available medical, dental, educational, and psychological information about the child within 15 days of placement. The parties agreed that by July 1, 2019, MDCPS would reach a performance standard of 90 percent. MDCPS conducted a qualitative review of this commitment as part of the FCR. MDCPS found documentation in narratives that the caseworker timely provided this information in 2,518 (75.4 percent) of the 3,340 of cases reviewed during 2020. The monitoring team conducted a qualitative review and found that 48 (47.1 percent) of 102 children had documented evidence that the foster parents or facility staff were provided with the completed foster child information form or other electronic record containing available medical, dental, educational, and psychological information about the child within 15 days of placement.

*Medicaid Information (8.1.g.)*

MDCPS agreed that by July 1, 2018, 85 percent of children shall have their Medicaid information provided to foster parents or facility staff at the time of placement. MDCPS conducted a qualitative review of this commitment as part of the FCR. MDCPS found documentation that the caseworker provided the foster parents or facility staff with the child's Medicaid, private insurance, or other coverage in 2,463 (73.7 percent) of 3,341 applicable cases. The monitoring team conducted a qualitative review and found that 77 (75.5 percent) of 102 children had

---

[60] The monitoring team began with a sample of 96 children and three were excluded because MDCPS provided evidence that three of those children had an exam six months prior to entry into care.

documented evidence that their Medicaid information was provided to foster parents or facility staff at the time of placement.

## Educational Services

*Educational Record Review and Need Documentation (8.2.a., 8.2.c.1.)*

MDCPS agreed that at least 90 percent of school-age foster children who enter custody shall have their educational records reviewed and their educational needs documented by MDCPS within 30 calendar days of their entry into foster care. MDCPS reported that educational record reviews were completed for 510 of 519 children during the first three quarters of 2020. Due to the lack of available documentation needed to verify reporting for this provision, MDCPS and the monitoring team agreed to halt reporting at the end of the third quarter and for MDCPS to create a new plan for reporting on this commitment. MDCPS submitted and the monitoring team approved a plan for reporting and documenting the date and substance of educational record reviews for verification in 2021.

*School Enrollment (8.2.b.)*

MDCPS agreed to take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within seven calendar days of initial placement or any placement change, including while placed in shelters or other temporary placements. MDCPS is not able to report dates of registration and school attendance following initial placement or placement changes. MDCPS reported timely enrollment for 286 (91.2 percent) of 313 children during the first three quarters of 2020. Due to data inconsistency and the lack of available documentation for verification, MDCPS and the monitoring team agreed to halt MDCPS reporting on this commitment at the end of the third quarter and for MDCPS to create a new plan for reporting on this commitment. MDCPS submitted and the monitoring team approved a new plan for reporting and documenting this commitment in 2021, including use of an enrollment verification form.

*Educational Continuity (8.2.c.)*

MDCPS agreed to make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences.

MDCPS reported on the results of a qualitative review of Best Interest Determination (BID) consultations conducted with the Department's educational liaisons. These consultations are not required by MDCPS and other BIDs may have been conducted by the case worker without any

consultation with an educational liaison. However, MDCPS cannot track results of BIDs conducted outside of an educational liaison consultation. The limited review conducted by MDCPS found that BIDs were conducted with educational liaisons for 216 children in the first and third quarters of 2020. MDCPS reported that BIDs were put on hold during the second quarter of 2020 due to school closures as a result of the COVID-19 pandemic. Due to data inconsistency and the lack of available documentation for verification, MDCPS and the monitoring team agreed to halt MDCPS reporting on this commitment at the end of the third quarter and for MDCPS to create a new plan for reporting on this commitment. MDCPS submitted and the monitoring team approved a new plan for reporting and documenting this commitment in 2021.

## Monitoring

### Movement of Commitments to Maintenance Status

*To Be Maintained Designation (10.1, 10.2)*

Pursuant to Section 10.1. of the 2nd MSA, when MDCPS performance, as validated by the monitor, has attained the highest designated performance standard or standards for one 12-month reporting period, as to any eligible section of the 2nd MSA,[61] the parties agree to conduct good faith discussions at the next scheduled quarterly meeting following the publication of the monitor's annual report regarding whether the applicable commitment can be designated as "To Be Maintained."

In the event the parties are unable to reach a unanimous decision whether the section shall be designated as "To Be Maintained," the monitor shall have the authority to make the designation but only after consultation with the parties and validation by the monitor that MDCPS performance in that section has attained the highest designated performance standard or standards for 24 months. Upon designation as "To Be Maintained," the section will not be actively monitored (10.2.).

The monitor reported in the 2019 annual report that 13 sections of the 2nd MSA were eligible for movement to maintenance status based on performance for the 12-month period of January 1, 2019 through December 31, 2019. As required by the 2nd MSA, the parties convened on

---

[61] The sections eligible for designation as "To Be Maintained" exclude: §1.3 Caseloads, §2 Child Safety and Maltreatment in Care, §3 Family-Based Placements, §4 Placement Standards, §6 Child and Youth Permanency and Adoption.

September 15, 2020[62] to conduct good faith discussions regarding whether the referenced sections would be designated as "To Be Maintained" (TBM) by agreement of the parties.

The table below reflects the agreement of the parties, when reached, or the monitor's decision based on validated performance for the 24-month period of January 1, 2019 through December 31, 2020 when the parties did not reach agreement.[63]

### Table 12. Movement of Commitments to Maintenance Status

| 2nd MSA Section | Eligible Commitment | Agreement of the Parties after 12-Month Validation of Attainment | Monitor Designated as TBM after 24-Month Validation of Attainment |
|---|---|---|---|
| 1 | MDCPS shall maintain a Commissioner of Child Protection Services having responsibility for the oversight and management of the MDCPS. | - | Yes |
| 1.1.a. | MDCPS shall hire caseworkers who have, at minimum, a bachelor's degree in social work or a related human services degree. | - | Yes |
| 1.1.b. | MDCPS shall hire or promote to the position of caseworker supervisor only persons who have a master's degree in social work or a related human services degree and two years of experience working with children and families, preferably in foster care; or a bachelor's degree in social work or a related human services degree with three years of experience working with children and families, preferably in foster care. | - | Yes |
| 1.6.c. | MDCPS county staff shall have access to an electronic statewide database of available placement resources. | - | Yes |
| 1.7.a. | Defendants shall establish, maintain, and assess the effectiveness of a performance-based contracting system to evaluate annually contract agency compliance with the terms of the 2nd MSA. Defendants shall take all reasonable steps to ensure contract agency remediation of any identified deficiencies within three months. | - | Yes |
| 1.8.a. | Defendants shall ensure that all licensed foster families (regardless of whether they are supervised directly by MDCPS or by private providers, and whether they are kinship or unrelated foster families) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the 2nd MSA. | Yes | N/A |

---

[62] The parties originally convened on August 25, 2020, the next scheduled quarterly meeting following the publication of the monitor's annual report on June 29, 2020 but did not complete the "To Be Maintained" discussions at that time. The parties agreed to reconvene on September 15, 2020 to continue discussions of movement of the eligible sections.

[63] Of the 13 eligible commitments referenced in the 2019 annual report, the monitor did not designate sections 1.2.a. (Training Unit), 1.2.b. (Pre-Service Training), 1.2.d. (In-Service Training), 1.2.e. (Supervisory Training), 1.6.a. (Management Information System/CCWIS), and 1.6.b. (Foster Care Service Standards Data Availability) for movement to maintenance status at this time.

| 2nd MSA Section | Eligible Commitment | Agreement of the Parties after 12-Month Validation of Attainment | Monitor Designated as TBM after 24-Month Validation of Attainment |
|---|---|---|---|
| *5.2.c.* | MDCPS and its contracting agencies shall implement a policy that prohibits cancellation of visits as a form of discipline against children. | Yes | N/A |