**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

| | | |
|---|---|---|
| **OLIVIA Y., et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **3:04-CV-251-HSO-FKB** |
| | ) | |
| **TATE REEVES, as Governor of the** | ) | |
| **State of Mississippi, et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DECLARATION OF MARCIA ROBINSON LOWRY

Marcia Robinson Lowry, an attorney of record in this civil action, makes this declaration under penalty of perjury and under 28 U.S.C. § 1746.

1.    I am a member of the Bar of New York and admitted to practice in this Court *pro hac vice.*  I am lead counsel for the Plaintiff Class in this case along with local counsel, Michael Bentley, of the firm of Bradley Arant Boult Cummings LLP.  I am the Executive Director of A Better Childhood ("ABC").  I give this Declaration in support of Plaintiffs' Motion For Award of Class Counsel's Fees and Expenses.

2.    As demonstrated by my resume, submitted as Attachment A to this Declaration and incorporated herein, I graduated from New York University School of Law in 1969.  I have been an attorney litigating child welfare cases since 1970.  For six years, I was the Director of the Children's Rights Project of the New York Civil Liberties Union, where I instituted and directed a program

EXHIBIT
**1**

to reform the New York City child welfare system. From 1979 until 1995, I was the Project Director of the Children's Rights Project of the American Civil Liberties Union ("ACLU"), where I directed major litigation efforts in jurisdictions throughout the United States designed to promote major reform of child welfare systems. In 1995, I carried this work over to Children's Rights, which I founded. I was the Executive Director of Children's Rights until August 2014, at which time I founded and became Executive Director of ABC

3.  I have been counsel in more than 20 class action lawsuits representing hundreds of thousands of children against systems that have failed to provide lawful child welfare services including, for example:

- <u>Ashley W. and Betty W. v. Holcomb</u>, a class action against the Indiana child welfare system concerning violations of foster children's rights under federal and constitutional law;
- <u>Baby Neal v. Casey</u>, a class action against the Philadelphia child welfare system and the Pennsylvania public welfare department for failure to comply with constitutional standards and applicable federal statutes;
- <u>Brian A. v. Sundquist</u>, a class action against the Tennessee child welfare system concerning violations of foster children's rights under federal and constitutional law;
- <u>Carson P. v. Heineman</u>, a class action against the Nebraska child welfare system concerning violations of foster children's rights under federal and constitutional law;
- <u>Charlie H. v. Whitman</u>, a class action against the New Jersey child welfare system and the state of New Jersey for failure to comply with constitutional standards and applicable federal law;
- <u>D.G. v. Henry</u>, a class action against the Oklahoma child welfare system concerning violations of foster children's rights under federal and constitutional law;
- <u>Dwayne B. v. Granholm</u>, a class action against the Michigan child welfare system concerning violations of foster children's rights under federal and constitutional law;

- <u>E.C. v. Blunt</u>, a class action against the Missouri governor and child welfare officials challenging the facial validity of an adoption assistance law on constitutional statutory grounds;
- <u>Foster Children Bonnie L. v. Bush</u>, a class action against the Florida child welfare system and the state of Florida concerning violations of foster children's rights under federal and constitutional law;
- <u>G.L. v. Zumwalt</u>, a class action challenging federal statutory and constitutional infirmities within the foster care system in Kansas City, Mo;
- <u>Jeanine B. v. Thompson</u>, a class action against the Milwaukee County child welfare system and state of Wisconsin for failure to comply with local laws, federal statutes, and federal constitutional protections applying to children at risk for placement or in foster care;
- <u>Jonathan R. v. Justice</u>, a class action against the West Virginia child welfare system concerning violations of foster children's rights under federal and constitutional law;
- <u>Joseph A. v. New Mexico Dept. of Human Services</u>, a federal statutory and constitutional challenge to the foster care system in the state of New Mexico brought on a class basis;
- <u>Juan F. v. Rell</u>, a class action against the Connecticut social services system, based on failure to comply with constitutional standards and applicable federal statutes;
- <u>Kenny A. v. Perdue</u>, a class action against the Governor of Georgia and other state officials concerning violations of foster children's rights in DeKalb and Fulton Counties, Georgia, under federal and constitutional law;
- <u>LaShawn v. Barry</u>, a class action against the District of Columbia child welfare system for failure to comply with constitutional standards, federal statutes, and applicable District of Columbia law;
- <u>Marisol A. v. Giuliani</u>, a class action against the New York City and State, regarding all aspects of New York City's child welfare system, for failure to comply with federal constitutional, federal statutory, state constitutional, state statutory, and state regulatory standards;
- <u>Olivia Y. v. Barbour</u>, this class action against the Mississippi child welfare system concerning violations of foster children's rights under federal and constitutional law;
- <u>Sam M. v. Carcieri</u>, a class action against the Rhode Island child welfare system concerning violations of foster children's rights under federal and constitutional law;
- <u>Sheila A. v. Finney</u>, a class action in state court against the Kansas child welfare system based on violations of state, federal statutory, and federal constitutional law;
- <u>Wilder v. Sugarman</u>, a challenge to New York's statutory scheme for the provision of foster care services on the grounds of racial and religious discrimination and violation of the establishment and free exercise clauses of the First Amendment; and

- <u>Wyatt B. v. Brown</u>, a class action against the Oregon child welfare system concerning violations of foster children's rights under federal and constitutional law.

4.    In addition to my litigation activities in child welfare cases, I have written and spoken extensively on child welfare reform and child welfare litigation. These speaking engagements and publications have included: Fordham Urban Law Journal, "Why Settle When You Can Win: Institutional Reform and Marisol v. Giuliani," Vol. XXVI, May 1999; University of Michigan Journal of Law Reform, "Why Children Still Need a Lawyer," Fall 2007; Speaker/Panelist, St. John's Journal of Legal Commentary Symposium on Legal Reform and Children's Human Rights (April 9, 1999); Speaker, American Bar Association's 9th National Conference on Children and Law (April 9, 1999); Keynote Speaker, New Jersey Child Placement Review Annual Conference (April 10, 2007); and Panelist, University of Michigan Law School, "Looking Ahead to the Next 30 Years of Child Advocacy" (March 30, 2007).  Other publications and professional activities are listed on my resume, which I've included as Attachment A to this Declaration.

5.    I have also presented testimony before both houses of Congress on child welfare and foster care issues, and in October 1998 I was a recipient of a Foundation for Improvement of Justice Award.

6.     On May 6, 2016, this Court set Plaintiffs' fee rates.  *See* Dkt. No. 691 at 11. For the past five years, Defendants have paid Plaintiffs according to that rate.

7.      In December 2021, Plaintiffs filed a Motion for Attorney Fees and Expenses, formally requesting that this Court increase their fee rates for the time period from January 1, 2021 through June 30, 2021. (Dkt. Nos. 924-925).

8.      In part because this Court has not yet resolved that Motion, the parties agreed to a settlement for fees that Plaintiffs' counsel accrued between July 1 and December 31, 2021.

9.      On October 12, 2022, Plaintiffs emailed Defendants a letter which includes a copy of ABC's Invoice #60 along with Bradley's Invoice #1587325, which combined contain Plaintiffs' counsel's total fees for the period of January 1, 2022 through June 30, 2022. I've submitted that letter as Attachment B to this Declaration. The invoices in that letter contained moderate hourly fee increases.

10.     On November 22, 2022, Defendants sent Plaintiffs a letter, indicating they did not object to any billing entry contained in Invoice #60. Defendants did, however, object to any increased fee amount, contending that all hourly rates "should remain consistent" with this Court's most recent fee schedule. Moreover, Defendants specified "the payment of any agreed upon settlement shall be subject to obtaining a specific deficit appropriation from the legislature to cover the agreed upon amount." Plaintiffs, though, have never agreed to the payment of attorneys' fees and expenses being contingent on legislative appropriation. I've submitted this letter as Attachment C to this Declaration.

11.     Pursuant to Federal Rule of Civil Procedure 23(h), Plaintiffs request that the Court approve Plaintiffs' motion for fees and expenses incurred during this

post-judgment monitoring period.  Plaintiffs seek a total of $17,383.92.  This includes reimbursement of 56.45 hours expended on this litigation by Plaintiffs' attorneys (including travel), and by paralegals (3 hours).  These hours include Plaintiffs' counsel's ongoing monitoring of non-compliance and efforts to seek remedies to ensure the protection of the Plaintiff class, including two conferences, which both occurred in New York.  Moreover, Plaintiffs' counsel also continued to work with the Monitor, reviewing current data and discussing findings and additional data needs with the Monitor.

12.     The resumes of, Michael Bentley, Anastasia Benedetto, and Jonathan Borle, the other attorneys for whom plaintiffs seek fees for their work on this matter during this billing period, are submitted as attachments to their declarations.

13.     Included within Attachment B is a copy of ABC's Invoice #60, which includes the total billable hours performed by the lawyers and paralegals on this case from January 1, 2022 through June 30, 2022.  It also includes a summary of case expenses advanced in this case during this same period.  Each compilation has been personally reviewed by myself or by my staff attorneys, Anastasia Benedetto or Jonathan Borle, and I have written off charges that I deemed, in the exercise of my billing judgment, excessive or non-compensable.  I believe these summaries to be an accurate and reliable account of the work Plaintiffs' counsel has performed, and the compensable work of support staff.

14.     During the period this motion for fees covers, it was the consistent policy and business practice of all counsel and support staff on this case to maintain

contemporaneous and specific records of all time worked in a particular case, and for such records to be entered into an online database. Both ABC attorneys and co-counsel who worked on this case kept contemporaneous and specific records of all the work they performed. I attest that all the hours submitted in Invoice #60 were reasonable and necessary to furnish adequate representation for the Plaintiffs.

15.     For purposes of calculating Plaintiffs' fee award for hours worked during this billing period, the following rates were used: Marcia Robinson Lowry (ABC) — $475 per hour; Anastasia Benedetto (ABC)--$225 per hour; Jonathan Borle (ABC)—$250 per hour; Michael Bentley (Bradley Arant Boult Cummings) — $325; Paralegal—$120. For this billing period, Plaintiffs' counsel do not seek reimbursement of any expenses, given that both conferences between the Parties occurred at ABC's New York City office. In addition, I am not seeking out-of-district rates for any of my billable time.

16.     Based on my 50-plus years of experience in the field of child welfare law and my involvement in numerous similar institutional reform litigations throughout the country, it is my opinion that all of the intensive work done during the past reporting period was necessary to ensure that Plaintiff class gets the relief to which they are entitled. The hours expended by myself and my co-counsel in working to advance the plaintiffs' causes were necessary to meet our obligations to the Plaintiff class during this billing period.

17.    The Parties' practice until now has been for Plaintiffs to send an invoice twice a year, and for Defendants to remit payment once a year, after its Legislature has appropriated necessary funds.

18.    The Mississippi legislature convened this month and is not scheduled to adjourn until April 2, 2023.  I am attaching a copy of the legislative calendar as Attachment D.  If payment is remitted according to legislative appropriation, Plaintiffs' Counsel will have to wait more than six months from when they sent Invoice #60 to actually receiving payment.  In the past, Defendants have forced Plaintiffs to wait even longer.  In July 2020, for example, Defendants paid for three separate invoices all at once: (1) July 1, 2018, through December 31, 2018 [*see* Dkt. 843], (2) January 1, 2019, through June 30, 2019 [see Dkt. 870], and (3) July 1, 2019, through December 31, 2019 [see Dkt. 883].  In total, Plaintiffs waited about (1) 17 months, (2) 12 months, and (3) 6 months to receive payment for each of those respective invoices.

19.    Plaintiffs request that Defendants timely pay attorneys' fees and expenses within thirty (30) days from entry of the requested fee order.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this the 25th day of January, 2023 in Chappaqua, New York.


*/s/ Marcia Robinson Lowry*
Marcia Robinson Lowry (*pro hac vice*)
*Attorney for Plaintiffs*

# MARCIA ROBINSON LOWRY

**1095 Hardscrabble Rd.**
**Chappaqua, N.Y. 10514**
**646-808-7344**                                                **www.ABetterChildhood.org**

*Founder and executive director*
**A Better Childhood**                                                                    **2014 – present**
> Director of a non-profit advocacy organization committed to taking innovative and effective approaches to reform dysfunctional child welfare systems across the country. Lead counsel in class actions in Mississippi, Oklahoma, New Jersey, the District of Columbia, New York City, and Minnesota; co-lead counsel in ongoing lawsuit in Texas.

*Founder and Executive Director*
**Children's Rights**                                                                          **1995 to 2014**
> Director of the leading national, non-profit organization fighting for the rights of children in state foster care custody. Children's Rights protects America's most vulnerable children using policy, public education, and the power of the courts. Directs class action litigation on behalf of thousands of children nationwide. Instrumental in promoting and implementing systemic reform of major child welfare systems. Recognized as a leading advocate for children in legislative and public forums. Assumes all administrative and leadership functions for national organization.

*Director, Children's Rights Project*
**American Civil Liberties Union**                                                          **1979 - 1995**
> Directed major litigation efforts in jurisdictions throughout the United States designed to promote major reform of child welfare systems. Identified and implemented project priorities. Supervised all staff. Assumed leadership role in all fund raising and public education activities.

*Director, Children's Rights Project*
**New York Civil Liberties Union**                                                          **1973 - 1979**
> Instituted and directed program of litigation to reform the New York City child welfare system. Coordinated all Project legal, legislative, and public education activities.

*Special Assistant to Commissioner*                                                          **1972 - 1973**
**Special Services for Children, New York City Human Resources Administration**
> Planned and developed programs and worked on special problems for the Commissioner.

*Reginald Heber Smith Community Law Fellow and General Staff Attorney*                        **1969 - 1972**
**Community Action for Legal Services**
> General litigation involving such issues as abortion and Medicaid reimbursements, juvenile justice, and civil commitment of children to mental hospitals. Also responsible for coordination of family law litigation among legal services offices.

*Reporter*                                                                                    **1963 - 1966**
**Long Island Press**

*Education*
New York University School of Law, J.D. degree, 1969, cum laude
Northwestern Univ., Evanston, IL, B.S. degree in journalism, 1962
London School of Economics and Political Science, University of London, 1960-61

**EXHIBIT A**

- 2 -

*Admitted to Practice*
New York State
United States District Courts for the Southern and Eastern Districts of New York, the Eastern District of Kentucky and the Eastern District of Michigan
Court of Appeals for the Second, Third, Fifth, Ninth, Tenth and Eleventh Circuits and for the District of Columbia
Supreme Court of the United States

## Cases

Wilder v. Sugarman, decision reported at 385 F. Supp. 1013 (S.D.N.Y. 1974).  Superseded by Wilder v. Bernstein, 499 F.Supp 980 (S.D.N.Y. 1980), 645 F. Supp. 1292 (S.D.N.Y. 1986), 848 F.2d 1338 (2d Cir. 1988), Nos. 94-7322, 94-7324 (2d Cir. Feb. 23, 1995).  Challenge to New York's statutory scheme for the provision of foster care services on the grounds of racial and religious discrimination and violation of the establishment and free exercise clauses of the First Amendment.  Consent Decree approved, over objections of sectarian agencies, in lengthy opinion prohibiting religious discrimination and the imposition of religious practices on children, and approving extensive monitoring of sectarian child welfare agencies receiving public funds.  Attempt to narrow class by excluding children placed with relatives denied by court.   Case concluded and principles of settlement agreement incorporated into Marisol A. v. Giuliani, discussed below.

G.L. v. Sherman.  In 1983, Children's Rights joined Legal Aid of Western Missouri in a class action aimed at reforming the grossly inadequate child welfare system in Jackson County, Missouri. The federal complaint charges the Missouri Division of Family Services (DFS) with endangering the lives of children in state custody by failing to properly investigate and monitor foster homes.  A settlement agreement was reached with Missouri officials in 1983, mandating top-to-bottom reform of the foster care system. After the state repeatedly failed to implement court-ordered reforms, Children's Rights and co-counsel successfully filed a contempt motion against the state and a full trial was held in 1992. A new settlement agreement was reached in 1994, which mandated such improvements as training for foster parents and mandatory criminal history and child abuse checks for prospective foster families. Over the next ten years, with court oversight, DFS successfully implemented all of the reforms required by the consent decree. On February 1, 2006, the court conditionally dismissed the case, court oversight officially ended, and the state agreed to keep in place until 2009 the policies, practices and staff positions created as a result of the lawsuit.

G.L. v. Zumwalt, consent judgment reported at 564 F. Supp. 1030 (W.D. Mo. 1983).  Superseded by G.L. v. Stangler, consent judgment reported at 873 F. Supp. 252 (W.D. Mo. 1994), and later reported as G.L. v. Sherman.  Federal statutory and constitutional challenge to foster care system in Jackson County, Mo. Class certified, motion to dismiss denied.  Consent judgment established widespread reforms in screening, training and supervision of foster parents, mandates appropriate treatment and permanency planning for foster children, and provides continuing court jurisdiction for enforcement. Motion for contempt granted December 7, 1992, revised consent decree negotiated, implementation and monitoring plan agreed to, internal receivership created by defendants in an effort to achieve compliance.  Plaintiffs worked to enforce and monitor compliance with consent decree, which resulted in substantial improvements to the Kansas City foster care system.  On February 2, 2006, the case successfully concluded with the state having complied with the terms of the consent decree. The state agreed to keep in place until July 2009 our policies, practices and positions created by the consent decree.

Joseph A. v. New Mexico Dept. of Human Services, 575 F. Supp. 346 (D.N.M. 1983), vacated and remanded, 69 F. 3d 1081 (10th Cir. 1995), and concluded as Joseph A. v. Bolson.  Federal statutory and constitutional challenge to foster care system in the state of New Mexico. Class certified, motions to dismiss and for qualified

- 3 -

immunity denied. Earlier consent judgment mandated sweeping system-wide reforms involving worker training and qualifications, caseloads, permanency planning for children, citizen review boards, and monitoring. Consent decree terminated by district court based on finding of substantial compliance with consent decree and denial of contempt motion, but this was reversed by 10th Circuit Court of Appeals. Consent decree reinstated on November 9, 1995, contempt finding recommended by Special Master. Decree renegotiated 1998 to incorporate standards of quality practice, with compliance determined by an expert neutral third party. Case again dismissed, this time on abstention grounds, and was again reinstated by the 10th Circuit. Case then entered a new stage, and the parties agreed on a court-ordered Exit Plan, utilizing external consultants to focus on children whose goal is adoption, to ensure they get adopted on a timely basis. The new Exit Plan required the external consultants to review cases every 60 days to ensure they are progressing towards adoption. Case successfully concluded, with compliance having been reached, in February 2005.

Martin A. v. Gross, 546 N.Y.S.2d 75, 153 A.D.2d 812 (1st Dep't 1989), 677 N.Y.S. 2d 292, 247 A.D. 2d 15 (1st Dep't 1998). Originally brought as a single action, then consisting of six separate lawsuits on behalf of six different families seeking damages for New York City's failure to provide appropriate protective and preventive services. Trial of first case resulted in jury verdict finding that City was negligent in failing to provide safe and adequate foster care for two twins with AIDS. Jury awarded $87,500 in damages. After Court of Appeals decisions authorizing cases to proceed, cases settled for substantial damages.

Sheila A. v. Finney, No. 89-CV-33 (Kan. Dist. Ct., filed Jan. 8, 1989). Class action in state court against Kansas child welfare system based on violations of state, federal statutory and federal constitutional law. Case settled on eve of trial with sweeping consent decree mandatory system-wide reform. Plaintiffs, defendants and a task force of state and national experts negotiated details of compliance monitoring and implementation, which now concluded, with the state substantially complying with the settlement agreement.

LaShawn v. Barry, 762 F. Supp. 959 (D.D.C. 1991), aff'd, 990 F.2d 1319 (D.C. Cir. 1993). Class action against the District of Columbia child welfare system for failure to comply with constitutional standards, federal statutes, and applicable District of Columbia law. Full trial on the merits, decision finding liability on local statutory, federal statutory and constitutional grounds on April 18, 1991. Affirmed on narrower grounds by the Court of Appeals for the D.C. Circuit, April, 1993. System placed in full receivership May 22, 1995, with broad authority to take all necessary steps to ensure implementation. Further appeals are reported at 69 F.3d 556 (D.C. Cir. 1995), vacated and in banc review granted, 74 F.3d 303 (D.C. Cir.) (in banc), aff'd, 107 F.3d 923 (D.C. Cir, 1996), cert. denied, 117 S. Ct. 2431 (1997). Receivership terminated October 2000. Comprehensive Implementation Plan developed April 2003, charting course for full compliance with Court's order by December 31, 2006. Ongoing monitoring activity.

Baby Neal v. Casey, 821 F. Supp. 320 (E.D. Pa. 1993), vacated in part, 43 F.3d 48 (3d Cir. 1994). Class action against the Philadelphia child welfare system and the Pennsylvania public welfare department for failure to comply with constitutional standards and applicable federal statutes. Motion to dismiss denied, motion for class action denied, reversed on appeal by Third Circuit Court of Appeals and class certified. Settled in late 1998, with the city, the state and the court system, with city agreeing to be held to generally accepted practices, and disputes to be reviewed by social work expert before being submitted to court. Case successfully concluded in 2000, with defendants having complied with terms of settlement agreements.

Juan F. v. O'Neill, 37 F.3d 874 (2d Cir. 1994), now Juan F. v. Rell. Class action against the Connecticut social services system, based on failure to comply with constitutional standards and applicable federal statutes. Case submitted to binding mediation process, resulting in broad-ranging consent decree and monitoring process in 1991. Court order to enforce various provisions of the decision affirmed by the Second Circuit Court of Appeals in 1994. Subsequently, numerous negotiated resolutions to non-compliance as well as contempt hearings. Plaintiffs' contempt request in 2003 resulted in an unprecedented voluntary handover of express

- 4 -

management authority of the system from the state to the federal court monitor. New Exit Plan negotiated and ordered in 2004 mandating achievement on 22 outcome measures. Management authority returned to the state in 2005. Plaintiffs' assertion of noncompliance in January 2006 resulted in the development of an Action Plan, finalized in March 2007, to improve the state's performance in treatment planning and meeting children's needs. Ongoing implementation and compliance activity.

Jeanine B. v. Thompson, now Jeanine B. V. Walker, 877 F. Supp. 1268 (E.D.N.Y. 1995). Class action against Milwaukee County and state of Wisconsin for failure to comply with local laws, federal statutes and federal constitutional protections for children at risk for placement or in foster care. Class certified, motion to dismiss denied in first decision establishing continued viability of post-Suter federal statutory claims. State of Wisconsin assumed direct responsibility for Milwaukee's child welfare system on January 1, 1998 and began a plan of reform. A later decision in the case was the first to explicitly recognize an additional federal statutory right to timely adoption petitions under the new Adoption and Safe Families Act. A consent decree was entered by the Court in December 2002, which calls for court enforceable benchmarks and outcome measures to be achieved over a three-year period. Ongoing implementation and compliance activity.

Marisol A. v. Giuliani, 95-Civ-10533 (S.D.N.Y. 1995), 126 F.3d 372 (2d Cir. 1997). Class action against New York City and State, regarding all aspects of New York City's child welfare system, for failure to comply with federal constitutional, federal statutory, state constitutional, state statutory and state regulatory standards. Filed on December 13, 1995. Motions to dismiss denied, and class of approximately 100,000 children certified on June 18, 1996, class certification upheld on appeal. On eve of trial, November, 1998, settlement reached with city and state defendants 1) requiring vigorous monitoring of city operation by state agency and 2) creating a panel of experienced national experts to recommend, and assist in necessary reform or, if reforms are not implemented, to become plaintiffs' experts in further court proceedings. Settlement affirmed in Joel A. v. Giuliani, 218 F.3d 132 (2d Cir. 2000). Reforms implemented, court jurisdiction ended over New York City, but extended against state after a finding of non-compliance based on failure to implement statewide computer system.

Jeremy M. and Joanne M. v. Giuliani, 00 Civ. 6498 (RJW) (S.D.N.Y. 2000). Federal lawsuit filed in August 2000 on behalf of five-year-old child held in NYC foster system for two years after legal custody had expired, despite his mother's desire to take him home. Settled with monetary damages for mother and child and with city child welfare agency taking action to end large number of illegal placements.

Brian A. v. Sundquist, now Brian A. v. Haslam, 149 F. Supp.2d 941 (M.D. Tenn. 2000). Federal civil rights lawsuit filed in May 2000. After the plaintiff children had won a sweeping victory on the legal issues in the case, a federal judge ordered the parties to attempt negotiations to resolve the lawsuit without a trial. After over five months of intense negotiations, an agreement was reached, which imposes unprecedented changes throughout Tennessee's foster care system. The settlement was approved by the federal court in 2001. In November 2003, following the release of a monitoring report identifying significant and widespread non-compliance with the settlement agreement, plaintiffs filed a motion seeking to hold Governor Phil Bredesen and the commissioner of Tennessee's child welfare agency in contempt of court. Resolution of the contempt motion resulted in the replacement of the commissioner, with the state admitting non-compliance and the state's development of a court-enforceable implementation plan with the aid and approval of a panel of national experts. Ongoing compliance and monitoring activities.

Kenny A. v. Perdue, 1:02-cv-1686-MHS, 218 F.R.D. 277 (N.D. Ga. 2003). Class action against Governor of Georgia and other state officials on behalf of all of the approximately 3,000 foster children in Fulton and DeKalb Counties, Georgia (metropolitan Atlanta). Complaint originally filed in state court in June 2002. Case was immediately removed to federal court. Claims asserted under U.S. Constitution, federal statutes and state law. Preliminary injunction sought to close two emergency shelters in Fulton and DeKalb Counties, hearing

conducted in November 2002. Preliminary injunction was denied upon Defendants' promise to close shelters, court found "few concrete steps were taken to close the shelters before this lawsuit was filed." 1:02-cv-1686-MHS, Docket No. 126 (N.D. Ga. Dec. 12, 2002.) Amended complaint filed in January 2003 seeking to add claim for inadequate foster care maintenance payments under federal statute. Both shelters closed by March of 2003. Class certification granted and motion to dismiss denied in August 2003. All claims upheld except for claims concerning shelters, which were dismissed as moot. Case settled. Ongoing monitoring and compliance activity underway.

Olivia Y. v. Barbour, Civ. Act. No. 3:04CV251LN (S.D. Miss. Filed Mar. 3, 2004). Federal class action suit charging that the Mississippi Division of Family and Children's Services (DFCS) placed the three thousand children under its care in danger and at risk of harm, and has left many thousands more to fend for themselves in abusive and neglectful homes. The case was filed on behalf of 12 named plaintiffs - children who have suffered physical and psychological harm while in DFCS custody, or who have been simply abandoned by DFCS despite multiple reports to the agency. Defendants' motion to dismiss and motion for summary judgment denied. The state conceded liability in a preliminary settlement agreement approved by the court in June 2007. A final, comprehensive settlement agreement mandating top to bottom reform of the child welfare system was reached by the parties in October 2007 and signed by the judge on January 4, 2008. Ongoing compliance and monitoring activities.

Charlie H. v. McGreevey, 83 F. Supp.2d 476 (D.N.J. 2000), now Charlie and Nadine H. v. Christie. Federal class action lawsuit brought against the state of New Jersey charging that the state's child welfare system was poorly managed, overburdened and harming the health and safety of children who depended upon it. Filed in December 1999, the class was certified in March 2002. In July 2002, over strenuous objections from the defendants, the court ordered that plaintiffs' experts be granted access to over 500 foster children's case files to collect information on harm children were experiencing while in defendants' custody. In a later decision, the Court ruled that those expert reports could be released to local and national media, again over defendants' objections. In February 2003, the parties entered mediation, and the parties agreed to a wide-ranging settlement in June 2004. The settlement agreement required the state of New Jersey to undertake a full-scale reform of its foster care system, under the guidance of a panel of independent experts. Under the agreement, defendants were obligated to implement a reform plan they created with the approval of the expert panel and that requires them to immediately expend an additional 23.8 million dollars to fund new workers, equipment and the recruitment of more foster homes and expend an additional 300 million dollars in the next three years, to undertake emergency measures identified in the agreement as necessary to protect foster children and improve specific and measurable outcomes for children. State's progress stalled and in December 2005 plaintiffs filed a motion for contempt of the court-ordered settlement. In July 2006, plaintiffs settled with newly elected administration officials who created a separate children's agency and agreed to far-reaching steps to get reform on track. Ongoing monitoring and compliance activity underway.

E.C. v. Sherman. Children's Rights filed this class action in August of 2005, together with a broad coalition of local advocates, when a new Missouri law threatened to cut off critical adoption subsidies for special needs foster children. Children's Rights secured initial temporary orders preventing the law from taking effect until the trial. Shortly thereafter, Children's Rights won class certification so that the case could proceed on behalf of the thousands of children who would be hurt by the new law. Following a federal trial in April of 2006, the plaintiff children won on all legal claims and the court permanently banned the adoption subsidy provisions of Senate Bill 539 from ever taking effect. The defendant — Director of the Missouri Department of Social Services K. Gary Sherman — immediately appealed the ruling, but the appeal was later withdrawn and the permanent ban on Senate Bill 539 remains in place.

Dwayne B. v. Granholm, On August 8, 2006 Children's Rights commenced a class action suit seeking to reform the ailing foster care system in the state of Michigan. The federal complaint alleges that the state of Michigan

- 6 -

violates the constitutional, federal statutory and federal common law rights of children in foster care by failing to provide them with permanent homes on a timely basis, failing to furnish adequate medical, dental and mental health services, failing to provide safe and stable temporary foster homes, and failing to prepare children who will "age out" of the foster care system at the age of majority to live independently as adults. The complaint further avers that the child welfare system in the state of Michigan is badly understaffed, under-funded and inadequately managed. The state of Michigan operates the nation's 7th largest foster care system with approximately 19,000 abused and neglected children residing in state legal custody. In July 2008, the parties reached a comprehensive settlement agreement, which is set for review and approval by the judge on October 7, 2008.

Sam and Tony M. v Carcieri, now Cassie M. v. Chafee, 608 F.3d 77 (1st Cir. 2010). On June 28, 2007, Children's Rights, together with the Rhode Island Child Advocate and the law firm, Weil, Gotshal & Manges LLM, filed a class action lawsuit to reform the Rhode Island child welfare system on behalf of the 3,000 children in state foster care. The federal complaint alleges that the state of Rhode Island violates the constitutional, federal statutory, and federal common law rights of children in foster care and causes harm to these children by failing to protect them from abuse and neglect while in foster care, placing children in orphanage-like institutions instead of homes, and returning children to their homes when it is unsafe to do so.

D. G. v. Henry, now D.G. v. Yarbrough. On February 13, 2008, Children's Rights, together with the Tulsa law firm Seymour & Graham, international firm Kaye Scholer and other local co-counsel, filed a class action lawsuit to reform the Oklahoma child welfare system on behalf of the more than 10,000 children in state custody. The federal complaint alleges that the state of Oklahoma violates the constitutional rights of the children in its care and causes those children harm by routinely placing them in unsafe, unsupervised, and unstable living situations, where they are frequently subjected to further maltreatment.

S.W. v. City of New York, et al. This lawsuit seeks damages on behalf of ten special needs children who were egregiously abused by their mother, who adopted them between 1988 and 1996 from New York City's child welfare system. Judith Leekin was able to skirt restrictions on the number of foster children she could care for by assuming a number of different aliases, any one of which would have been found fraudulent had child welfare officials properly undertaken the background checks necessary to ensure foster children are placed in safe homes. Once Ms. Leekin fraudulently adopted the children, she moved with them to Florida, where she held them captive while she lived lavishly on the adoption subsidy checks she collected from New York City. On July 4, 2007, one of the daughters was found wandering in a St. Petersburg supermarket, leading Florida police to investigate Leekin's house. There they discovered that for over a decade the children had been repeatedly beaten, starved, imprisoned in handcuffs, and denied medical care as well as any access to the outside world. In February 2010 we joined the suit already initiated by our co-counsel in Florida, Colodny, Fass, Talenfeld, Karlinsky & Abate, P.A., against the City of New York, the New York Administration of Children's Services and several independent child welfare agencies that contracted with New York to provide services to the plaintiff children. The suit charges that during the late 1980's and early 1990's, New York City's child welfare system was so grossly mismanaged that it operated with reckless disregard of the children's safety and failed to perform basic monitoring tasks that would have readily uncovered the Leekin fraud.

Connor B. v. Patrick. Citing one of the nation's highest rates of abuse of children in foster care and other persistent and severe problems throughout the Massachusetts child welfare system, Children's Rights and Boston law firm Nutter McClennen & Fish LLP—with the support of advocates and families throughout the state—filed a class action in federal court on April 15, 2010, seeking broad reform on behalf of 8,500 abused and neglected children statewide. The suit charges the state's Department of Children and Families with violating the constitutional rights of children by routinely placing them in dangerous and unstable situations once removed from their parents' care and failing to take necessary actions to meet the legal and moral obligation of the state-run child welfare system to ensure the safety and well-being of children in its custody.

- 7 -

M.D. v. Perry, 152 F. Supp. 3d 684 (S.D. Tex. 2015), affirmed in part by M.D. v. Abbott, 2018 U.S. App. LEXIS 29410 (5th Cir. 2018). Citing longstanding and pervasive issues that have caused thousands of children in Texas foster care to spend their childhoods in poorly-supervised institutions while repeatedly moving from one far-flung place to another, Children's Rights joined the prominent Texas law firms Haynes and Boone, Yetter Coleman, and Canales & Simonson in filing a class action in federal court seeking widespread reform on behalf of approximately 12,000 abused and neglected children in long-term foster care statewide. The suit charges Texas's Department of Family and Protective Services (DFPS) with violating the constitutional rights of children who generally have been in foster care for at least a year by routinely failing either to return them safely to their families or to find them safe, appropriate, and permanent new families — and, therefore, failing to meet its legal obligation to ensure the safety, permanency, and well-being of all children in its custody.

John Doe v. SCDSS. Unacceptably lax policies, combined with officials turning a blind eye to child-on-child assaults at an institution licensed and supervised by the South Carolina Department of Social Services (SCDSS), paved the way for an 11-year-old Abbeville County boy to be attacked and sexually assaulted at the facility in March of 2011. An amended complaint was filed in the Abbeville County Court on May 30, 2013, against the SCDSS. The filing names South Carolina Governor Nikki Haley as a defendant, along with SCDSS Director Lillian Koller, as well as other SCDSS officials and staff at the Boys Home of the South (BHOTS), where the incident occurred. The lawsuit has been brought by two South Carolina law firms and national advocacy organization Children's Rights. The initial complaint in this case was filed on April 1, 2013, in state court in Abbeville County, SC. The newly filed amended complaint adds significant detail and alleges federal civil rights violations on the part of Governor Haley, DSS officials and staff at BHOTS.

Elisa W., et al. v. The City of New York, et al. 2018 U.S. Dist. LEXIS 33857 (S.D.N.Y. February 28, 2018) (Pitman, J.). Citing the fact that children in New York City spend longer in foster care and are more frequently maltreated in care than almost any other children else in the country, A Better Childhood and Cravath, Swaine, and Moore brought this lawsuit on July 8, 2015. The suit was brought on behalf of 10 foster children as well as the Public Advocate of New York. The suit alleged that the State fails to exercise sufficient oversight over New York City's child welfare system and, in turn, that the City fails to monitor the private agencies through with which it contracts for foster care services, causing children in its care irreparable harm. The case is currently in discovery. Plaintiffs have prevailed on several important issues, including winning a challenge to the ability of the adult "next friends" to litigate on behalf of the children that they represent.

T.F., et al. v. Hennepin County, et al., 2018 U.S. Dist. LEXIS 165952, 2018 WL 4654716 (D. Minn. September 27, 2018). On May 31, 2017, A Better Childhood and the largest law firm in Minnesota, Faegre Baker Daniels, filed suit against Hennepin County and the state of Minnesota, alleging that both their child protection and child welfare systems were underfunded and negligent, and routinely violated children's constitutional, federal statutory, and state law rights. Among other reforms, the suit seeks improved maltreatment investigations, increased recruitment of qualified foster care homes, and increased and timely permanent placements for children. Plaintiffs have survived two attempts by Defendants to dismiss the case, and are currently in discovery.

## PROFESSIONAL ACTIVITIES
- Gloria and Stanley Plesent Lecture on Family Law, "The State as a Neglectful Parent," March, 2015, Cardozo Law School
- Speaker, Yale Law School, American Constitution Society Plaintiff's Bar Speaker Series (December 5, 2013)
- Panelist, University of Pennsylvania, "One Child, Many Hands: A multidisciplinary Conference on

- 8 -

Child Welfare," (June 13, 2013)

- Panelist, Center for the Study of Social Policy Advisory Group of Improving Child Welfare Outcomes through Class Action Litigation, Boston, MA (January 8, 2013)
- Keynote Speaker, New Jersey Child Placement Review Annual Conference (April 10, 2007)
- Panelist, University of Michigan Law School, "Looking Ahead to the Next 30 Years of Child Advocacy" (March 30, 2007)
- Panelist, University of Pennsylvania, "One Child, Many Hands: A Multidisciplinary Conference on Child Welfare" (June 3, 2005)
- Keynote Speaker, Lawyers' Association for Women, Nashville, TN (November 16, 2004)
- Speaker, Shoulder to Shoulder Sixth Annual Conference, Portland, OR (November 4, 2004)
- Speaker, Juvenile Law Section of the Oregon State Bar, "Race, Class & Culture in Juvenile Court," Portland, OR (April 22, 2004)
- Speaker/Panelist, Cardozo Public Law, Policy, and Ethics Journal Symposium, "Advocating for Change: The Status and Future of America's Child Welfare System 30 Years After CAPTA" (April 19, 2004)
- Recipient, New York University School of Law Public Service Award, April 17, 2004
- Speaker, Amherst College, "The Constitution and the 'Other America' in the Twenty-First Century" (April 2, 2004)
- Speaker, Brooklyn College, "Children and the Law in New York Policy Symposium" (March 11, 2004)
- Speaker/Panelist, Yale Law School 10th Annual Rebellious Lawyering Conference, "Reforming the Foster Care System" (February 21, 2004)
- Speaker, The New Mexico Council on Crime and Delinquency 41st Annual Luncheon, January 23, 2004
- Testimony before the Subcommittee of Human Resources of the Committee on Ways and Means on examining the recent failure to protect child safety, November 6, 2003
- Recipient, Raymond A. Brown, Esq. Social Justice Award from Babyland Family Services, Inc., October 23, 2003
- Panelist, Fordham University School of Law, "Litigation and Social Change: Reflections on the Lost Children of Wilder" (February, 11, 2002)
- Speaker, National Association of Women Judges 23rd Annual Conference (October 7, 2001)
- Speaker, 24th National Children's Law Conference of the National Association of Counsel for Children, "Advocacy for Children and Families: Moving from Sympathy to Empathy," Coronado, CA (October 1, 2001)
- Speaker/Panelist, St. John's Journal of Legal Commentary Symposium on Legal Reform & Children's Human Rights, 4/9/99
- Recipient, Brookwood Commitment to Children Award from Brookwood Child Care Agency, 1999
- Speaker, American Bar Association's 9th National Conference on Children & Law, April 9, 1999
- Recipient, Foundation For Improvement of Justice Award, October, 1998
- Speaker, Loyola University Chicago "Forum on the Child" (Chicago, IL October 13-14, 1997)
- Speaker, Casey Journalism Center, "Rethinking the Blame Game: New Approaches to Covering Child Abuse and Protection" (Baltimore, MD, June 12, 1997)
- Speaker, Child Welfare Legal Services Seminar, Florida State Department: Keynote address and leader of liability workshop for State Department attorneys who represent children. (Orlando, Florida, June 13, 1995)
- Speaker, National Association of Counsel for Children's Law Conference: Address on disposition of class action litigation cases. (Boston, September 16, 1995)

- 9 -

- Speaker, National Council for Crime and Delinquency: Roundtable discussion for media on crisis in child abuse and neglect.  (New York City, October 17, 1995)
- Speaker, Casey Journalism Center, "Child Welfare and the Media". (Baltimore, May, 1995)
- Guest Expert, "Troubled Kids", MacNeil/Lehrer Newshour, February 20, 1995
- Testimony, Subcommittee on Human Resources, House Ways and Means Committee and the Early Childhood, Youth and Families Subcommittee, House Economic and Educational Opportunities Committee Concerning Child Care and Child Welfare (February 3, 1995)
- Speaker, "Children and the Justice Systems," Johns Hopkins University (December 1, 1994)
- Keynote Speaker, Child Welfare League of America, "Building a Case With Florida's Families", 6/13/94
- Speaker, The Woman Advocate '94, Prentice Hall Law & Business (March 1994)
- Speaker, "In Whose Best Interests?: Bias in the Family Court System," New York University School of Law Root-Tilden-Snow public policy colloquium (March 8, 1994)
- Panelist, Child Welfare League of America, "Consent Decrees, Court Monitors and Child Welfare Reform in the 1990s" (September 1993)
- Speaker, National Symposium on Child Victimization (May 19, 1992)
- Speaker, American Bar Association's 6th National Conference on Children & Law (April 30, 1992)
- Speaker, "Empowering Families," National Association for Family-Based Services (12/4/91)
- Speaker, "Child Welfare Litigation at the State and Local Level: The Advocate's View" (July 23, 1991)
- Speaker/panelist, "Advocating for Children:  Rights and Discrimination, Protection and Paternalism," McGill-Loyola 2nd Annual Comparative Health Law and Policy Conference, (June 1991)
- Testimony, Senate Committee on Ways & Means, Subcommittee on Human Resources, "State of Nation's Child Welfare System" (May 1991)
- Speaker, ABA Invitational Symposium on Civil and Criminal Liability in Child Welfare Work (May 1990)
- Faculty Member, National Court Appointed Special Advocate Association Ninth Annual National Conference, Children: The Time is Now (April 1990)
- Panelist, Practicing Law Institute seminar, Child Abuse, Neglect, and the Foster Care System (March 1990)
- Speaker, "Developments in Foster Care Law," University of Tennessee and Tennessee Bar Association seminar, Representing Children (December 1989)
- Speaker, New York University School of Law Root-Tilden seminar on children and families (November 1989)
- Speaker, AFSCME Child Welfare Workers Conference General Session, "Working for the Rights of Children," (October 1989)
- Panelist, "State Perspectives on Legal Activities in Child Welfare," National Association of Public Welfare Administrators, Children's Services Administrators Forum, Direction Setting for Child Welfare:  The Impact of Litigation on the Delivery System (June 1989)
- Panelist, Practicing Law Institute seminar, The Foster Child:  From Abandonment to Adoption (March 1989)
- Speaker, Third National Conference of the Association of Child Advocates (September 1987)
- Speaker, National Conference of State Legislators on the implementation of litigation in child welfare (1986)
- Testimony before the United States Senate Labor and Human Resources Committee on barriers to adoption (1985)

- 10 -

- Speech on litigation strategy at the ABA National Resource Center symposium on children's issues (1985)

## PUBLICATIONS

- "A Powerful Route to Reform or When to Pull the Trigger: The Decision to Litigate," For the Welfare of Children: Lessons Learned from Class Action Litigation, Center for the Study of Social Policy, January 2012
- "Why Children Still Need a Lawyer," University of Michigan Journal of Law Reform, Fall 2007.
- "Putting Teeth into ASFA: The Need for Statutory Minimum Standards," Children and Youth Services Review, 26 (2004), pp. 1021-1031.
- "Why Settle When You Can Win: Institutional Reform and Marisol v. Giuliani," The Fordham Urban Law Journal 1335, 1999
- "We're suing the city for kids' sake," Daily News Op-Ed page, April 1, 1998
- New York Law Journal, The Lawyer's Bookshelf (reviewing Edward Humes, No Matter How Loud I Shout: A Year in the Life of Juvenile Court), May 3, 1996
- "Children Deserve a Family of their Own" in Opinion The Flint Journal, December 19, 1994
- "Fix Foster Care to Fix Crime," Asbury Park Sunday Press, May 29, 1994
- "The Failure of Foster Care" Detroit Free Press, April 7, 1994
- "Foster Kids are put on the Shelf" in Fort Worth Star Telegram, September 5, 1993
- "Class Actions: The Risks Due to Systemic Problems" in Liability in Child Welfare and Protection Work: Risk Management Strategies, ABA Center on Children and the Law, 1991
- "Hugging Them Is Not Enough" in New York Forum, New York Newsday, p. 138, December 19, 1990
- "Justice's Rusted Wheels" in Opinion, Manhattan Lawyer, p. 12, December 5, 1988
- "A Mission Is Not a Home" in New York Forum, New York Newsday, p. 92, June 17, 1988
- "Kids Floating, Kids Drowning" in New York Forum, New York Newsday, p. 66, April 15, 1987
- "Derring-Do in the 1980s: Child Welfare Impact Litigation After the Warren Years," in Family Law Quarterly, Summer, 1986; reprinted in Besharov, Protecting Children from Abuse and Neglect, Policy and Practice, 1988
- "Legal Strategies to Facilitate Adoption of Children in Foster Care," in Foster Children in the Courts, Butterworth Legal Publishers, 1983
- "Individual Rights and the Interstate Placement of Children: From Expediency to Exportation," in Readings in Public Policy, Academy for Contemporary Problems, 1981
- "Children's Rights," in Advocating for Children in the Courts, ABA National Institute, 1979
- "When the Family Breaks Down: Massive and Misapplied Intervention by the State," in Vardin and Brody, Children's Rights: Contemporary Perspectives, Teacher's College Press, 1978
- New York University Law Review, "The Judge v. the Social Worker: Can Arbitrary Decision Making Be Tempered by the Courts," Vol. 52, November, 1977
- The New York Times Op-Ed page, Legal Ceiling-In of Foster Children, 5/21/76
- Journal of Psychiatry and Law, "Symposium: Children's Rights -- Psychiatry and the Law," Winter, 1975

In 2000, Nina Bernstein highlighted Ms. Lowry's work in New York City with the publication of *The Lost Children of Wilder: An Epic Struggle to Change Foster Care*. This book explores the background and aftermath of the landmark 1973 Wilder lawsuit Ms. Lowry filed against the City of New York's foster care system.



**Via electronic mail**

William C. Pentecost, Esq.
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
One Eastover Center
100 Vision Drive, Suite 400
Jackson, Mississippi 39211

October 12, 2022

**Re:**  *Olivia Y. v. Bryant*
**Attorneys' Fees and Expenses for A Better Childhood and Bradley Arant for January 1, 2022 through June 30, 2022**

**PRIVILEGED AND CONFIDENTIAL**

Dear Counsel,

Plaintiffs' counsel in the above named action seek a total of **$17,383.92** for attorneys' fees and expenses for the period of January 1, 2022 through June 30, 2022 in the following amounts:

| | | |
|---|---|---|
| ABC Time | $ | 17,335.92 |
| Bradley Time | $ | 48.00 |
| **Total**: | $ | **17,383.92** |

     We have submitted this invoice with the following increased rates that we will be asking the Court to set: $475 for Marcia Lowry; $250 for Jonathan Borle; $225 for Anastasia Benedetto and $120 for ABC and Bradley Arant paralegals.

     We understand that the Court still needs to resolve our disagreement with respect to individual fee rates. That said, we would appreciate if Defendants stipulated to the substance of the invoice for this period. We have exercised customary billing judgment throughout the application.

     As always, we are available should you wish to discuss further. We would appreciate a response by November  2, 2022.

Sincerely,
/s/ Marcia Robinson Lowry
Executive Director
A Better Childhood, Inc.

┌─────────────────┐
│  **EXHIBIT**    │
│                 │
│     **B**       │
└─────────────────┘

355 Lexington Avenue New York, NY 10017,
Floor 16
(646) 795-4456 | abetterchildhood.org



# INVOICE

Invoice # 60
Date: 10/12/2022
Due On: 11/14/2022

## A Better Childhood, Inc.

355 Lexington Avenue, Floor 16
New York, NY 10017

Mississippi

## Mississippi

## Olivia Y - child welfare reform case in Mississippi

| Type | Date | Description | Quantity | Attorney | Rate | Total |
|------|------|-------------|----------|----------|------|-------|
| Service | 01/03/2022 | (1) Legal Documents- draft/edit/revise: Edit fee motion brief. | 0.30 | ML | $475.00 | $142.50 |
| Service | 01/03/2022 | (14) Meeting: Communicate w/ M. Lowry, A. Benedetto re motions. | 0.20 | JB | $250.00 | $50.00 |
| Service | 01/03/2022 | (14) Meeting: Communicate w/ A. Benedetto re meeting prep. | 0.20 | JB | $250.00 | $50.00 |
| Service | 01/03/2022 | (14) Meeting: Meeting w/ M.Lowry, J.Borle re motions. | 0.20 | AB | $225.00 | $45.00 |
| Service | 01/03/2022 | (14) Meeting: Conference call w/ A. Benedetto, J. Borle re motion. | 0.20 | ML | $475.00 | $95.00 |
| Service | 01/03/2022 | (14) Meeting: Communicate w/ J. Borle re meeting prep. | 0.20 | AB | $225.00 | $45.00 |
| Service | 01/04/2022 | (14) Meeting: Communicate w/ A. Benedetto re brief. | 0.10 | JB | $250.00 | $25.00 |
| Service | 01/04/2022 | (14) Meeting: Communicate w/ A. Benedetto re child welfare issue call notes. | 0.50 | JB | $250.00 | $125.00 |
| Service | 01/04/2022 | (1) Legal Documents- draft/edit/revise: Revise brief. | 1.80 | JB | $250.00 | $450.00 |
| Service | 01/04/2022 | (20) Telephone call: Call w/ anonymous source re child welfare issues. | 1.00 | KA | $120.00 | $120.00 |
| Service | 01/04/2022 | (14) Meeting: Communicate w/ J. Borle re brief. | 0.10 | AB | $225.00 | $22.50 |
| Service | 01/04/2022 | (14) Meeting: Communicate w/ J. Borle re child welfare issue call notes. | 0.50 | AB | $225.00 | $112.50 |

| Service | 01/06/2022 | (20) Telephone call: Call w/ anonymous source re child welfare issues. | 1.00 | KA | $120.00 | $120.00 |
|---|---|---|---|---|---|---|
| Service | 01/20/2022 | (14) Meeting: Communicate w/ M. Lowry. re litigation strategy. | 0.20 | JB | $250.00 | $50.00 |
| Service | 01/20/2022 | (14) Meeting: Communicate w/ J. Borle re litigation strategy. | 0.20 | ML | $475.00 | $95.00 |
| Service | 01/27/2022 | (14) Meeting: Communicate w/ A. Benedetto, E. Stokes-Raab re meeting planning. | 0.20 | JB | $250.00 | $50.00 |
| Service | 01/27/2022 | (14) Meeting: Communicate w/ J. Borle, E. Stokes-Raab re meeting planning. | 0.20 | AB | $225.00 | $45.00 |
| Service | 02/14/2022 | (10) Document review: Reviewed January MS monthly data. | 1.00 | AB | $225.00 | $225.00 |
| Service | 02/14/2022 | (15) Meeting-Preparation for: Reviewed data, research and prepared questions and priority areas for meeting. | 1.00 | AB | $225.00 | $225.00 |
| Service | 02/14/2022 | (14) Meeting: Communicate w/ M. Lowry re meeting prep. | 0.10 | JB | $250.00 | $25.00 |
| Service | 02/14/2022 | (14) Meeting: Communicate w/ J. Borle re meeting prep. | 0.10 | ML | $475.00 | $47.50 |
| Service | 02/16/2022 | (15) Meeting-Preparation for: Review A. Benedetto's notes for parties meeting. | 0.75 | ML | $475.00 | $356.25 |
| Service | 02/16/2022 | (15) Meeting-Preparation for: Review APSR for parties meeting. | 1.00 | ML | $475.00 | $475.00 |
| Service | 02/16/2022 | (5) Conference call: Call w/ J. Borle, A. Benedetto re meeting agenda. | 0.25 | ML | $475.00 | $118.75 |
| Service | 02/16/2022 | (15) Meeting-Preparation for: Review data documents, emails to A. Benedetto. | 0.75 | ML | $475.00 | $356.25 |
| Service | 02/16/2022 | (22) Administration: Prepare meeting documents for M. Lowry. | 1.00 | KA | $120.00 | $120.00 |
| Service | 02/16/2022 | (15) Meeting-Preparation for: Prepared outline for meeting w/ Defs. | 1.00 | AB | $225.00 | $225.00 |
| Service | 02/16/2022 | (14) Meeting: Meeting w/ J.Borle, M.Lowry re parties meeting prep. | 0.25 | AB | $225.00 | $56.25 |
| Service | 02/16/2022 | (15) Meeting-Preparation for: Reviewed data and APSR for meeting outline. | 3.83 | AB | $225.00 | $861.75 |
| Service | 02/16/2022 | (14) Meeting: Communicate w/ M. Lowry, A. Benedetto re meeting prep. | 0.25 | JB | $250.00 | $62.50 |
| Service | 02/16/2022 | (15) Meeting-Preparation for: Prepare for MS conference. | 0.40 | JB | $250.00 | $100.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Service | 02/17/2022 | (15) Meeting-Preparation for: Review docs, data for meeting prep. | 0.50 | ML | $475.00 | $237.50 |
| Service | 02/17/2022 | (14) Meeting: Meeting w/ Defs, Commissioner Sanders re status. | 5.50 | ML | $475.00 | $2,612.50 |
| Service | 02/17/2022 | (14) Meeting: Meeting w/ Defs, Commissioner Sanders re status. | 5.50 | AB | $225.00 | $1,237.50 |
| Service | 02/17/2022 | (14) Meeting: Debrief meeting w/ M.Lowry, J.Borle. | 0.50 | AB | $225.00 | $112.50 |
| Service | 02/17/2022 | (14) Meeting: Meeting w/ Defs, Commissioner Sanders re status. | 5.50 | JB | $250.00 | $1,375.00 |
| Service | 02/17/2022 | (14) Meeting: Communicate w/ M. Lowry re meeting prep. | 0.30 | JB | $250.00 | $75.00 |
| Service | 02/17/2022 | (14) Meeting: Debrief meeting w/ M. Lowry, A. Benedetto. | 0.50 | JB | $250.00 | $125.00 |
| Service | 02/17/2022 | (14) Meeting: Debrief meeting w/ J. Borle, A. Benedetto. | 0.50 | ML | $475.00 | $237.50 |
| Service | 02/17/2022 | (14) Meeting: Communicate w/ J. Borle re meeting prep. | 0.30 | ML | $475.00 | $142.50 |
| Service | 02/18/2022 | (14) Meeting: Meeting w/ K.Abrams re case status. | 0.50 | AB | $225.00 | $112.50 |
| Service | 02/24/2022 | (14) Meeting: Communicate w/ A. Benedetto re case status. | 0.10 | JB | $250.00 | $25.00 |
| Service | 02/24/2022 | (14) Meeting: Communicate w/ J. Borle re case status. | 0.10 | AB | $225.00 | $22.50 |
| Service | 02/28/2022 | (14) Meeting: Communicate w/ A. Benedetto re data, enforcement strategy. | 0.10 | JB | $250.00 | $25.00 |
| Service | 02/28/2022 | (14) Meeting: Communicate w/ J. Borle re data, enforcement strategy. | 0.10 | AB | $225.00 | $22.50 |
| Service | 04/07/2022 | (4) Factual Research: Researched information from source about MDCPS issues in Hines county. | 1.00 | AB | $225.00 | $225.00 |
| Service | 04/08/2022 | (18) Review memos, letters reports: Reviewed monthly data. | 1.00 | AB | $225.00 | $225.00 |
| Service | 04/18/2022 | (3) Discovery- Review: Review and analyze monthly data. | 0.50 | AB | $225.00 | $112.50 |
| Service | 04/28/2022 | (14) Meeting: Meeting w/ A. Benedetto, M. Lowry re data. | 0.30 | JB | $250.00 | $75.00 |
| Service | 04/28/2022 | (14) Meeting: Meeting w/ J.Borle, M. Lowry re data. | 0.30 | AB | $225.00 | $67.50 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Service | 04/28/2022 | (14) Meeting: Meeting w/ A. Benedetto, J.Borle re data. | 0.30 | ML | $475.00 | $142.50 |
| Service | 05/05/2022 | (14) Meeting: Meeting w/ A. Benedetto, M. Lowry re data. | 0.20 | JB | $250.00 | $50.00 |
| Service | 05/05/2022 | (14) Meeting: Meeting w/ M. Lowry, J. Borle re data. | 0.20 | AB | $225.00 | $45.00 |
| Service | 05/05/2022 | (14) Meeting: Meeting w/ A. Benedetto, J. Borle re data. | 0.20 | ML | $475.00 | $95.00 |
| Service | 05/19/2022 | (15) Meeting-Preparation for: Review A. Benedetto's list of questions for meeting. | 0.50 | ML | $475.00 | $237.50 |
| Service | 05/19/2022 | (15) Meeting-Preparation for: Review MS rebuilding order. | 0.40 | JB | $250.00 | $100.00 |
| Service | 05/21/2022 | (15) Meeting-Preparation for: Review outline for meeting w/ Defs. | 0.17 | ML | $475.00 | $79.17 |
| Service | 05/25/2022 | (14) Meeting: Meeting w/ A. Benedetto, Defs, Monitors. | 4.25 | ML | $475.00 | $2,018.75 |
| Service | 05/25/2022 | (14) Meeting: Debrief w/ A. Benedetto. | 0.25 | ML | $475.00 | $118.75 |
| Service | 05/25/2022 | (14) Meeting: Meeting w/ M. Lowry, Defs, and monitors. | 4.25 | AB | $225.00 | $956.25 |
| Service | 05/25/2022 | (14) Meeting: Debrief w/ M. Lowry. | 0.25 | AB | $225.00 | $56.25 |
| Service | 06/01/2022 | (11) Letter- Draft/Edit/Revise: Review information and interview notes from anonymous sources and draft email to Defs re information from anonymous sources. | 1.00 | AB | $225.00 | $225.00 |
| Service | 06/17/2022 | (10) Document review: Review monthly data. | 1.50 | AB | $225.00 | $337.50 |
| Service | 06/22/2022 | (14) Meeting: Communicate w/ A. Benedetto re motion. | 0.10 | JB | $250.00 | $25.00 |
| Service | 06/22/2022 | (1) Legal Documents- draft/edit/revise: Prepare motion for fees, memorandum in support, and declaration of M. Lowry. | 3.00 | JB | $250.00 | $750.00 |
| Service | 06/22/2022 | (14) Meeting: Communicate w/ J. Borle re motion. | 0.10 | AB | $225.00 | $22.50 |
| Service | 06/27/2022 | (1) Legal Documents- draft/edit/revise: Edit and revise motion for fees & expenses. | 0.50 | AB | $225.00 | $112.50 |

| Time Keeper | Quantity | Rate | Total |
|---|---|---|---|
| Anastasia Benedetto | 25.58 | $225.00 | $5,755.50 |
| Jonathan Borle | 14.45 | $250.00 | $3,612.50 |

| | | | |
|---|---|---|---|
| Marcia Lowry | 16.02 | $475.00 | $7,607.92 |
| Kayla Abrams | 3.0 | $120.00 | $360.00 |
| | | **Subtotal** | **$17,335.92** |
| | | **Total** | **$17,335.92** |

Please make all amounts payable to: A Better Childhood, Inc.



**Bradley Arant Boult Cummings LLP**

Bradley  Pro Bono

August 10, 2022
Invoice No. 1587325

Matter No. 999000-301268
Re: ABetterChildhood

For professional services posted through June 30, 2022

<table>
<tr><td colspan="2" align="center">**Current Invoice Summary**</td></tr>
<tr><td>Current Professional Services</td><td align="right">$48.00</td></tr>
<tr><td>Current Expenses</td><td align="right">$0.00</td></tr>
<tr><td>**Current Invoice**</td><td align="right">**$48.00**</td></tr>
</table>

Thank you for your business.



**Bradley Arant Boult Cummings LLP**

**Invoice Detail**

Bradley  Pro Bono
**Re: ABetterChildhood**

Matter No. 999000-301268

Page 2
August 10, 2022
Invoice No. 1587325
For legal services posted through June 30, 2022

| | Professional Services | | | | |
|---|---|---|---|---|---|

| Date | Description | Tkpr | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 1/4/22 | Finalize reply brief; electronically submit reply brief to court for filing and services | JGAL | 0.40 | 120.00 | 48.00 |

**Total Professional Services** **$48.00**

| | Expenses | |
|---|---|---|

| Date | Description | Amount |
|---|---|---|
| 1/20/22 | COMPUTERIZED LEGAL RESEARCH-WESTLAW Westlaw User: DRINKWATER,W W | 0.00 |
| 4/28/22 | COMPUTERIZED LEGAL RESEARCH-WESTLAW Westlaw User: DRINKWATER,W W | 0.00 |
| 5/4/22 | COMPUTERIZED LEGAL RESEARCH-WESTLAW Westlaw User: DRINKWATER,W W | 0.00 |

**Total Expenses** **$0.00**

| | Timekeeper Summary | | | | |
|---|---|---|---|---|---|

| Timekeeper | Initials | Title | Hours | Rate | Amount |
|---|---|---|---|---|---|
| Jeannette Altobelli | JGAL | Paralegal | 0.40 | $120.00 | $48.00 |

**Total Professional Services** **$48.00**



BEARMAN, CALDWELL & BERKOWITZ, PC

ONE EASTOVER CENTER
100 VISION DRIVE, SUITE 400
JACKSON, MISSISSIPPI 39211

P.O. BOX 14167
JACKSON, MISSISSIPPI 39236

PHONE:   601.351.2400
FAX:      601.351.2424
www.bakerdonelson.com

CLINT PENTECOST, OF COUNSEL
**Direct Dial**: 601.351.2452
**E-Mail Address**: cpentecost@bakerdonelson.com

November 22, 2022

*Via electronic mail*

Marcia Robinson Lowry, Esq.
Anastasia Benedetto, Esq.
Jonathan Borle, Esq.
A Better Childhood, Inc.
355 Lexington Avenue
16th Floor
New York, NY  10011
mlowry@abetterchildhood.org
abenedetto@abetterchildhood.org
jborle@abetterchildhood.org

Re:     *Olivia Y., et al. v. Tate Reeves, et al.*
        In the United States District Court for the Southern District, Jackson Division
        Civil Action No. 3:04cv251

Dear Marcia:

Defendants have reviewed Plaintiffs' invoice for the period January 1, 2022 to July 31, 2022
(Invoice #60) and the related correspondence dated October 12, 2022.

We appreciate that your invoice is more in line with the court's prior directives.  In response to
your October 12 letter, Defendants do not object to any specific entries contained in Invoice #60
for purposes of trying to reach an agreement on the payment of Invoice #60.  Defendants do,
however, object to the increased hourly rates utilized in Invoice #60.  Instead, the hourly rates
utilized for Plaintiffs' invoices should remain consistent with those set forth in the Court's July
2017 Memorandum Opinion and Order.

For the purposes of settlement negotiations only, Defendants agree to payment in the amount of
**$15,168.50** as a complete satisfaction of the fees and expenses set forth in Invoice #60.  This
amount reflects the total amount which the Invoice would be had the court-ordered rates been
applied to the time entries in Invoice #60 instead of the proposed higher rates.

EXHIBIT
C

ALABAMA • FLORIDA • GEORGIA • LOUISIANA • MARYLAND • MISSISSIPPI • SOUTH CAROLINA • TENNESSEE • TEXAS • VIRGINIA • WASHINGTON, D.C.

Marcia Robinson Lowry, Esq.
Anastasia Benedetto, Esq.
Jonathan Borle, Esq.
November 22, 2022
Page 2

In offering to pay the amount above, Defendants do not waive their rights to contest future fee requests for the reasons previously stated or other reasons that may arise.  Also, as always, the payment of any agreed upon settlement shall be subject to obtaining a specific deficit appropriation from the legislature to cover the agreed upon amount.

Sincerely,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC

Clint Pentecost

CP:llt

## TIMETABLE FOR PROCESSING LEGISLATION 2023
### 90 Day Session

| Day | Deadline |
|---|---|
| 9th day Wed. Jan. 11 | Deadline for making REQUESTS for general bills and constitutional amendments to be drafted.*** |
| 14th day Mon. Jan. 16 | Deadline for INTRODUCTION of general bills and constitutional amendments.* |
| 29th day Tues. Jan. 31 | Deadline for COMMITTEES TO REPORT general bills and constitutional amendments originating in OWN House.*+ |
| 38th day Thurs. Feb. 09 | Deadline for ORIGINAL FLOOR ACTION on general bills and constitutional amendments originating in OWN HOUSE.* |
| 39th day Fri. Feb. 10 | Deadline for RECONSIDERATION AND PASSAGE of general bills and constitutional amendments originating in OWN HOUSE.* |
| 42nd day Mon. Feb. 13 | Deadline to DISPOSE OF MOTIONS TO RECONSIDER general bills and constitutional amendments originating in OWN HOUSE.* |
| 51st day Wed. Feb. 22 | Deadline for ORIGINAL FLOOR ACTION on APPROPRIATIONS and REVENUE bills originating in OWN HOUSE. |
| 52nd day Thurs. Feb. 23 | Deadline for RECONSIDERATION AND PASSAGE OF APPROPRIATIONS and REVENUE bills originating in OWN HOUSE. |
| 53rd day Fri. Feb. 24 | Deadline to DISPOSE OF MOTIONS TO RECONSIDER APPROPRIATIONS and REVENUE bills originating in OWN HOUSE. |
| 57th day Tues. Feb. 28 | Deadline for COMMITTEES TO REPORT general bills and constitutional amendments originating in OTHER HOUSE.*+ |
| 65th day Wed. Mar. 08 | Deadline for ORIGINAL FLOOR ACTION on general bills and constitutional amendments originating in OTHER HOUSE.* |
| 66th day Thurs. Mar. 09 | Deadline for RECONSIDERATION AND PASSAGE of general bills and constitutional amendments originating in OTHER HOUSE.* |
| 67th day Fri. Mar. 10 | Deadline to DISPOSE OF MOTIONS TO RECONSIDER general bills and constitutional amendments originating in OTHER HOUSE.* |
| 71st day Tues. Mar. 14 | Deadline for ORIGINAL FLOOR ACTION on APPROPRIATIONS and REVENUE bills originating in OTHER HOUSE. |
| 72nd day Wed. Mar. 15 | Deadline for RECONSIDERATION AND PASSAGE of APPROPRIATIONS and REVENUE bills originating in OTHER HOUSE. |
| 73rd day Thurs. Mar. 16 | Deadline to DISPOSE OF MOTIONS TO RECONSIDER APPROPRIATIONS and REVENUE bills originating in OTHER HOUSE. |
| 74th day Fri. Mar. 17 | Deadline to CONCUR OR NOT CONCUR in amendments from OTHER HOUSE to APPROPRIATIONS and REVENUE bills, and for INTRODUCTION of LOCAL and PRIVATE bills that are REVENUE bills. |
| 77th day Mon. Mar. 20 | Deadline to DISPOSE OF MOTIONS TO RECONSIDER concurrence or nonconcurrence in APPROPRIATIONS and REVENUE bills. |
| 80th day Thurs. Mar. 23 | Deadline to CONCUR OR NOT CONCUR in AMENDMENTS from OTHER HOUSE to GENERAL bills and CONSTITUTIONAL amendments. |
| 81st day Fri. Mar. 24 | Deadline for INTRODUCTION of LOCAL and PRIVATE bills that are not revenue bills. |
| 82nd day Sat. Mar. 25 | Deadline for CONFERENCE REPORTS on APPROPRIATIONS and REVENUE bills to be filed.**+ |
| 84th day Mon. Mar. 27 | Deadline for FINAL ADOPTION of CONFERENCE REPORTS on APPROPRIATIONS and REVENUE bills**+, and for CONFERENCE REPORTS on GENERAL BILLS and CONSTITUTIONAL AMENDMENTS to be filed.**+ |
| 85th day Tues. Mar. 28 | Deadline to DISPOSE OF MOTIONS TO RECONSIDER conference reports on APPROPRIATIONS and REVENUE bills. |
| 86th day Wed. Mar. 29 | Deadline for FIRST CONSIDERATION of conference reports on general bills and constitutional amendments. |
| 87th day Thurs. Mar. 30 | Deadline for FILING conference reports on general bills and constitutional amendments that had been RECOMMITTED for further conference.+ |
| 88th day Fri. Mar. 31 | Deadline for ADOPTION of conference reports on general bills and constitutional amendments after RECOMMITTAL. |
| 89th day Sat. Apr. 01 | Deadline to DISPOSE OF MOTIONS TO RECONSIDER conference reports on general bills and constitutional amendments. |
| 90th day Sun. Apr. 02 | SINE DIE |

**EXHIBIT D**

* Appropriation, revenue, and local and private bills, and bills to restore suffrage are excluded from these deadlines. For purposes of the deadlines herein set forth, the term "revenue bills" shall include only those bills whose primary purpose is to increase or decrease taxes or to authorize the issuance of bonds or the borrowing of money. Bills which are primarily for regulatory purposes which have revenue provisions included shall not be considered as revenue bills for deadline purposes. The deletion from a bill of the features which made it a revenue bill shall render the bill a general bill for deadline purposes.

** Conference reports on all bills must be filed with the Secretary/Clerk no later than the time of adjournment on the day prior to being called up and considered. Appropriation bills which actually appropriate money and are recommitted for further conference are excluded from the requirement that the subsequent conference report be filed and lay on table one (1) day before being considered; however, original action must be taken on all appropriation conference reports by 2:00 p.m. on the 84th day and subsequent reports must be filed no later than 6:00 p.m.

*** Requests for general bills and constitutional amendments to be drafted must be made no later than 6:00 p.m. on the 9th day. The Rules Committee of the House or Senate, as the case may be, may authorize any member of its respective house to make requests, for one or more general bills or constitutional amendments to be drafted, after the expiration of the deadline for making such drafting requests but before the deadline for introduction of bills and constitutional amendments, upon a determination by the Rules Committee that such drafting requests are in response to conditions of an emergency nature arising subsequent to the deadline for making requests for general bills and constitutional amendments to be drafted.

+ Committee reports and conference reports that are subject to being filed on these deadlines must be filed with the Secretary/Clerk no later than 8:00 p.m.

Whenever the word "day" appears in this rule, it shall mean calendar day.

The above schedule shall not be deviated from except by the passage of a concurrent resolution adopted by a vote of two-thirds (2/3) of the membership of the House and Senate present and voting.