# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

OLIVIA Y., et al          )
                             )

Plaintiffs                )

                             )

v.                             )        CIVIL ACTION NO. 3:04-cv-251-HSO-ASH

                             )

TATE REEVES, as Governor of the    )
State of Mississippi, et al.         )

                             )

Defendants              )

---

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION
## OR, IN THE ALTERNATIVE, TO VACATE THE 2ND MSA

---

William C. (Clint) Pentecost (MSB #99841)
Jennifer E. Salvo (MSB #101208)
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC
One Eastover Center
100 Vision Drive, Suite 400
Jackson, MS 39211
Telephone: (601) 351-2400
Facsimile:  (601) 351-2424
cpentecost@bakerdonelson.com
jsalvo@bakerdonelson.com

Douglas T. Miracle (MSB #9648)
Deputy Attorney General
MISSISSIPPI ATTORNEY
GENERAL'S OFFICE
550 High Street
Jackson, MS 39201
Telephone: (601) 359-5654
doug.miracle@ago.ms.gov

***Attorneys for Defendants***

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND FACTS AND PROCEDURAL HISTORY ............................................. 3

     Litigation on the Amended Complaint (2004-2007) ........................................ 3

     The Settlement and Original Consent Decree (2008-2012)............................. 5

     The Modified Settlement Agreement (2012-2017)............................................ 6

     The Second Modified Settlement Agreement (2018-2021)............................... 8

     Suspension of the Second Modified Settlement Agreement (2021-2025)................... 10

          Legislative Advancements ................................................................. 11

          Staffing Improvements....................................................................... 12

          Programmatic and Practice Enhancements............................................. 14

          Technology Upgrades ........................................................................ 16

          Placement Array Developments ......................................................... 16

III.  LEGAL AUTHORITIES AND ANALYSIS ...................................................... 17

     A.    Defendants have proactively taken the necessary steps to address and protect Plaintiffs'
     substantive due process rights.  The Court should return control over Mississippi's child
     welfare system to Defendants. ................................................................................. 18

          1.    Plaintiffs' substantive due process claims have been remedied by Defendants'
          purposeful actions. ...................................................................................... 19

               a.    Plaintiffs have a narrow set of substantive due process rights to personal security
               and reasonably safe living conditions. ...................................................... 19

               b.    Defendants cannot be said to be deliberately indifferent to Plaintiffs' substantive due
               process rights; to the contrary, Defendants have taken purposeful action to ensure
               personal security and reasonably safe living conditions for children in MDCPS custody...
               ...................................................................................................................... 22

                    i. Staffing Improvements (Caseload Management) ...................................... 25

                    ii. Placement Array Developments ........................................................ 27

                    iii. Programmatic and Practice Enhancements........................................... 29

                    iv. Legislative Advancements and Structural Realignment of MDCPS...................... 31

                    iv. Technology Upgrades...................................................................... 32

               c.    Defendants' policies and practices are not the moving force behind the deprivation
               of any constitutional right that Plaintiffs may have. ...................................... 33

          2.    Because Defendants have addressed Plaintiffs' alleged constitutional deprivations, the
          Court now lacks jurisdiction to continue oversight of Mississippi's child welfare system.. 35

B.      Alternatively, the Court should vacate the 2nd MSA pursuant to Rule 60(b)(5) because its prospective enforcement is no longer equitable. ................................................................ 36

   1.   The Court's equitable powers are critical to bringing consent decrees, like the 2nd MSA, to an end and returning control to the State. ............................................................. 36

   2.   The Court should vacate the 2nd MSA by exercising its equitable powers under Rule 60(b)(5). ............................................................................................................................. 38

      a.   Federalism concerns call for a flexible approach to Rule 60(b)(5) in the context of this institutional reform case. ........................................................................................... 39

      b.   The 2nd MSA has prospective application. ............................................................. 41

      c.   Continued enforcement of the 2nd MSA is no longer equitable. ............................... 41

      i.  The 2nd MSA should be vacated because significant changes in circumstances render its continued enforcement onerous and detrimental to the public interest .................... 41

         (a) Suspension of the 2nd MSA, itself, was a significant change. ............................. 42

         (b) The law governing Mississippi's child welfare system has changed. .................. 43

         (d) MDCPS has implemented several significant programmatic changes ................ 45

         (e) MDCPS has dramatically improved staffing. ....................................................... 45

         (f) MDCPS has made significant technological advances. ....................................... 46

         (g) MDCPS has transformed available placement options. ..................................... 46

      ii.   Vacating the 2nd MSA is suitably tailored to the changed circumstances, and the objective of the 2nd MSA has been attained. .................................................................. 47

         (a) There is no ongoing violation of federal law as contemplated by the 2nd MSA.  48

         (b) Vacating the 2nd MSA is suitably tailored because a durable remedy exists. ..... 49

      iii.   Similar institutional reform cases show that continued enforcement of the 2nd MSA is no longer equitable. ...................................................................................... 50

IV.  CONCLUSION ............................................................................................................. 53

# TABLE OF AUTHORITIES

**CASES**

*Agostini v. Felton,*
521 U.S. 203 (1997) ...................................................................................................41

*Allen v. Louisiana,*
14 F.4th 366 (5th Cir. 2021) .................................................................................18, 36

*Anderson v. City of New Orleans,*
38 F.4th 472 (5th Cir. 2022) ......................................................................................39

*Andrew C. et al. v. Raimondo et al.,*
No. 1:07-cv-00241-WES (D.R.I.) ..............................................................................53

*Bd. of Educ. v. Dowell,*
498 U.S. 237 (1991) ...................................................................................................18

*B.H. et al. v. Johnson et al.,*
No. 1:88-cv-05599-HSO (N.D. Ill.) ...........................................................................53

*Blackledge v. City of Hattiesburg,*
809 F. Supp. 3d 443 (S.D. Miss. 2025) .....................................................................35

*Bustillos v. El Paso Cnty. Hosp. Dist.,*
226 F. Supp. 3d 778 (W.D. Tex. 2016) ......................................................................23

*Chafin v. Chafin,*
568 U.S. 165 (2013) .............................................................................................35, 36

*Chisom v. Louisiana ex rel. Landry,*
116 F.4th 309 (5th Cir. 2024) ...............................................................18, 35, 36, 50

*Connor B. ex rel. Vigurs v. Patrick,*
985 F. Supp. 2d 129 (D. Mass. 2013) ........................................................................50

*Cook v. Birmingham News,*
618 F.2d 1149 (5th Cir. 1980) ...................................................................................41

*DeShaney v. Winnebago County Department of Social Services,*
489 U.S. 189 (1989) .............................................................................................19, 20

*Dierlam v. Trump,*
977 F.3d 471 (5th Cir. 2020) .....................................................................................35

*Doe as Next Friend of Doe v. Smith*,
  2026 WL 196607 (S.D. Miss. Jan. 26, 2026)........................................................................22

*Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*,
  675 F.3d 849 (5th Cir. 2012)..............................................................................................20

*Doe v. Dall. Indep. Sch. Dist.*,
  153 F.3d 211 (5th Cir. 1998)..............................................................................................23

*Dwayne B. et al. v. Whitmer et al.*,
  No. 2:06-cv-13548 (E.D. Mich.)........................................................................................53

*E.T. v. Paxton*,
  19 F.4th 760 (5th Cir. 2021)...............................................................................................37

*Ex Parte McCardle*,
  74 U.S. 506 (1868)..............................................................................................................35

*Farmer v. Brennan*,
  511 U.S. 825 (1994)............................................................................................................23

*Firefighters v. Cleveland*,
  478 U.S. 501 (1986)............................................................................................................37

*Fraire v. City of Arlington*,
  957 F.2d 1268 (5th Cir. 1992)............................................................................................33

*Frew ex rel. Frew v. Hawkins*,
  540 U.S. 431 (2004) ................................................................................................37, 38, 51

*Griffith v. Johnston*,
  899 F.2d 1427 (5th Cir. 1990)............................................................................................20

*Guajardo v. Texas Dep't of Crim. Just.*,
  363 F.3d 392 (5th Cir. 2004)........................................................................................18, 36

*Hall v. Smith*,
  497 F. App'x 366 (5th Cir. 2012).......................................................................................23

*Hernandez  v. Texas Dep't of Protective & Regul. Servs.*,
  380 F.3d 872 (5th Cir. 2004)........................................................................................20, 22

*Hernandez v. Hines*,
  159 F. Supp. 2d 378 (N.D. Tex. 2001)...............................................................................20

*Horne v. Flores*,
  557 U.S. 433 (2009) ...................................................................... 38-41, 47, 49, 52

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
  456 U.S. 694 (1982) ........................................................................................35

*Jackson v. Los Lunas Cmty. Program,*
  880 F.3d 1176 (10th Cir. 2018)........................................................ 36, 37, 40, 47-49

*Jeremiah M. v. Crum*,
  695 F. Supp. 3d 1060 (D. Alaska 2023)...................................................21, 22, 30

*John B. v. Emkes*,
  710 F.3d 394 (6th Cir. 2013)...........................................................................47

*Jonathan R. v. Morrisey*,
  768 F. Supp. 3d 756  (S.D. W. Va. 2025) ....................................................51, 52

*Kenny A. et al. v. Kemp et al.*,
  No. 1:02-cv-01686 (N.D. Ga.) ........................................................................53

*Kentucky v. Graham*,
  473 U.S. 159 (1985) .......................................................................................33

*Kiera M. v. Quin*,
  2026 WL 937311 (M.D. Tenn., April 2026)........................................................22

*L.J. v. Ruth Massinga*,
  No. 1:84-cv-04409-SAG (D. Md.) ....................................................................52

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*,
  659 F.3d 421 (5th Cir. 2011)........................................................................38, 42

*Lozano v. Baylor Univ.*,
  408 F. Supp. 3d 861 (W.D. Tex. 2019)..............................................................23

*MCG, Inc. v. Great W. Energy Corp.*,
  896 F.2d 170 (5th Cir. 1990)...........................................................................35

*M.D. by Stukenberg v. Abbott*,
  907 F.3d 237 (5th Cir. 2018).................................................................... passim

*M.D. v. Abbott*,
  119 F.4th 373 (5th Cir. 2024).........................................................................51

*Mary B. v. Dompeling,*
      2026 WL 892039 (D. Alaska Mar. 31, 2026) ........................................................21

*Matter of Kutner,*
      656 F.2d 1107 (5th Cir. 1981)...........................................................................35

*Milliken v. Bradley,*
      433 U.S. 267 (1977) ........................................................................................37

*Piotrowski v. City of Houston,*
      237 F.3d 567 (5th Cir. 2001)............................................................................33

*Police Ass'n of New Orleans Through Cannatella v. City of New Orleans,*
      100 F.3d 1159 (5th Cir. 1996)..........................................................................42

*Reynolds v. McInnes,*
      338 F.3d 1201 (11th Cir. 2003)........................................................................51

*Rufo* v. *Inmates of Suffolk County Jail,*
      502 U.S. 367 (1992) .........................................................................38, 40, 41, 47

*Save the Bay, Inc. v. U.S. Army,*
      639 F.2d 1100 (5th Cir. 1981)..........................................................................35

*Smith v. Hosemann,*
      2022 WL 2168960 (S.D. Miss. May 23, 2022)..................................................41

*Smith v. Sch. Bd. of Concordia Par.,*
      906 F.3d 327 (5th Cir. 2018) ...........................................................................37

*Students for Fair Admissions, Inc. v. Univ. of Texas at Austin,*
      142 F. 4th 819 (5th Cir. 2025)..........................................................................35

*United States v. Lawrence Cty. Sch. Dist.,*
      799 F.2d 1031 (5th Cir. 1986)..........................................................................38

*United States v. Mississippi,*
      82 F.4th 387 (5th Cir. 2023)..................................................................37, 50, 51

*United States v. Swift & Co.,*
      286 U.S. 106 (1932) ........................................................................................38

*United States v. United Shoe Mach. Corp.,*
      391 U.S. 244 (1968) ........................................................................................42

*Williams v. Edwards,*
    87 F.3d 126 (5th Cir. 1996)............................................................................................47

*Wyatt B. by McAllister v. Brown,*
    2021 WL 4434011 (D. Or. Sept. 27, 2021)...............................................................22, 24

**<u>STATUTES</u>**
Miss. Code Ann. § 43-21-613....................................................................................................29
Miss. Code Ann. § 43-26-1..........................................................................................................8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| OLIVIA Y., et al | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:04-cv-251-HSO-ASH |
| | ) | |
| TATE REEVES, as Governor of the | ) | |
| State of Mississippi, et al. | ) | |
| | ) | |
| Defendants | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**
**OR, IN THE ALTERNATIVE, TO VACATE THE 2ND MSA**

Defendants, by and through counsel, submit the following memorandum in support of their

Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the alternative, to Vacate the 2nd

MSA ("Motion to Dismiss/Vacate"), showing the Court as follows:

## I.   INTRODUCTION

For decades, institutional reform litigation has purportedly sought to effect systemic

improvements in child welfare agencies across the country. Over time, though, the focus of

institutional reform cases—like this action—has improperly evolved. Time and resources that

would be better spent on developing and sustaining a competently administered system focused

on the best interests of the children is expended on data collection and legal bills that sustain the

institutional reform litigation cottage industry. The recent history of this very case proves this

point: The greatest strides in institutional reform here in the 22 years since this case was filed have

been accomplished when the settlement agreement and reform plan have been suspended and

Defendants could turn their attention to the system's true purpose—meeting the needs of

Mississippi children, not those of self-interested professional plaintiffs.

1

Plaintiffs filed this action seeking injunctive relief to effect broad changes to Mississippi's child welfare system and to correct alleged legal violations. The parties eventually settled, resulting in a series of consent decrees the Court entered to develop and implement a system to protect Plaintiffs' legal rights. The current consent decree, the 2nd Modified Settlement Agreement and Reform Plan ("2nd MSA"), went into effect on January 1, 2018. After only limited implementation, the 2nd MSA was suspended by party agreement from June 2021 to April 2025.

During the 2nd MSA suspension, Defendants have developed and implemented the very system Plaintiffs have sought in this litigation. Defendants have driven improvements in Mississippi's child welfare system through significant legislative advancements, staffing improvements, programmatic and practice enhancements, technology upgrades, and placement array developments.

Continued enforcement of the 2nd MSA will not ensure legal compliance—because Defendants are in compliance with the relevant constitutional requirements. Simply put, today, Mississippi's child welfare system does not violate Plaintiffs' substantive due process rights. As the Fifth Circuit has recognized, children in the custody of the Mississippi Department of Child Protection Services ("MDCPS" or the "Agency") have a right to personal security and reasonably safe living conditions. Defendants' purposeful actions focusing on system fundamentals—their lack of deliberate indifference—ensure Plaintiffs' substantive due process rights are adequately protected now and in the future. Because the relevant constitutional deficiencies have been addressed, judicial oversight of Mississippi's child welfare system is no longer warranted.

Even if the Court determines it still has jurisdiction, significant changes in circumstances render the 2nd MSA's continued prospective application no longer equitable. At this juncture, further enforcement of the 2nd MSA can only seek to achieve individual litigants' preferred policy

outcomes. But the law ensures protection of Constitutional rights, not guaranteed or preferred outcomes. Indeed, Defendants' systemic changes made during the suspension of the 2nd MSA have now eliminated the basis for that very consent decree. Therefore, the Court should vacate the 2nd MSA, ending judicial oversight of Mississippi's child welfare system.

## II.    BACKGROUND FACTS AND PROCEDURAL HISTORY

Plaintiffs filed this institutional reform case on March 30, 2004, and filed an Amended Complaint for Injunctive and Declaratory Relief on May 17, 2004. *See* ECF No. 25 (the "Amended Complaint"). In the Amended Complaint, the named Plaintiffs, on behalf of both children in state custody and those who may enter state custody, alleged that Defendants[1] violated class members' rights under the Due Process Clause, Equal Protection Clause, and Substantive Due Process Clause of the United States Constitution, along with various statutes. On March 11, 2005, the Court certified the "In-Custody Class" as "all children who are or will be in the legal and/or physical custody of [MDCPS]"—based solely on "violation of [the class members'] substantive due process rights" under the Fourteenth Amendment. *See* ECF No. 84, p. 1.[2]

### *Litigation on the Amended Complaint (2004-2007)*

The Amended Complaint alleged a collapsing child welfare system resulting from "years" of "mismanagement, underfunding, and deliberate indifference." Amended Complaint, ¶ 1. Plaintiffs alleged a series of systemic failures due to inadequate staffing, resources, and programmatic reform, claiming Mississippi's child welfare system:

---

[1] Due to changes in administrations and the creation of MDCPS, the parties to the Litigation now include Tate Reeves, as Governor of the State of Mississippi, Andrea Sanders, as Commissioner, MDCPS, and Kimberly Wheaton, as Deputy Commissioner of Child Welfare, MDCPS (collectively, "Defendants").

[2] The Court had previously dismissed all claims of the Protective Services Class and the claims of the In-Custody Class for alleged procedural due process rights violations and alleged violation of the Adoptive Assistance and Child Welfare Act. *See*, Memorandum Opinion and Order, ECF No. 57, pp. 23-24; Memorandum Opinion and Order, ECF No. 84, pp. 2.

- had a shortage of foster homes, inadequate foster care maintenance payments, and overcrowded foster homes. *Id.* at ¶¶ 143-48.

- over-institutionalized foster children, over-used emergency shelters, and over-looked licensing requirements—all allegedly leading to adverse effects on children in custody. *Id.* at ¶¶ 149-56.

- was unable to determine what medical care had been provided or to provide the medical care needed, failed to provide relevant medical information, and was unable to provide necessary placements based on the needs of the children. *Id.* at ¶¶ 161-70.

- failed to timely file petitions to terminate parental rights because of a shortage of social workers and attorneys which caused children to languish in the system longer than necessary. *Id.* at ¶¶ 171-77.

- was "incapacitated" by a shortage of caseworkers who allegedly "carry caseloads far in excess" of applicable standards, are "not provided necessary training," and "lack basic equipment necessary to perform their jobs." *Id.* at ¶¶ 179-84.

- failed to "take advantage" of federal matching funds due to alleged "mismanagement" by Defendants and failed to "engage in needed programmatic reform." *Id.* at ¶¶ 185-92.

Plaintiffs alleged Defendants knew "of the harm that pervasive and long-standing failures of the child welfare system are causing to children" and that Defendants had been "warned that Mississippi's child welfare system fails to protect and poses dangers to Mississippi's children." *Id.* at ¶¶ 3, 5. The "system" as portrayed by Plaintiffs lacked "a minimally adequate number of caseworkers and foster care placements" and cycled children "through unsuitable foster care placements or institutions." *Id.* at 7. Throughout the Amended Complaint, Plaintiffs alleged these "systemic deficiencies" resulted in children in the foster care system being "denied safe, stable and appropriate placements necessary to their health and well-being" by the Division of Family and Children's Services ("DFCS"). *Id.* at ¶ 142.[3] Plaintiffs claimed these actions "amount[ed] to a pattern, practice, and custom of failure to exercise reasonable professional judgment and deliberate

---

[3] DFCS, a former division of the Mississippi Department of Human Services ("MDHS"), was the predecessor to MDCPS responsible for caring for abused and neglected children in the state's custody.

4

indifference to in-custody Plaintiff children's constitutional rights." *Id.* at ¶ 204.

During the three years after filing, the parties engaged in extensive discovery and motion practice. After multiple continuances, the Court set a jury trial for May 7, 2007. *See* ECF No. 354. On April 3, 2007, the parties filed a Joint Motion for Preliminary Approval of Stipulated Settlement Agreement, which the Court entered on June 15, 2007. *See* ECF 401, 425.

### *The Settlement and Original Consent Decree (2008-2012)*

The Court approved the Mississippi Settlement Agreement and Reform Plan ("Original Consent Decree") on January 4, 2008, fully resolving all remaining claims in this action. *See* ECF No. 459. The Original Consent Decree set forth numerous standards and best practice process metrics to be accomplished within five years and appointed Grace Lopes as the Court-appointed Monitor, who produced and filed two progress reports, one in 2009 and one in 2010.[4] The Monitor's 2010 report highlighted some progress[5] but also detailed Defendants' alleged failure to comply with most of the over one hundred requirements for the period under review, emphasizing:

> a critical shortage in individualized and effective reunification services statewide; pervasive deficits in case file documentation related to medical, dental and mental health screening and evaluation that can impact the efficacy of services; substantial limitations in access to an adequate array of mental health services; significant shortcoming in access to dental services, particularly in rural areas; the failure to document somatic health screenings in case files; the failure to provide resource parents with Medicaid cards and with relevant health-related information concerning the medical needs of the children placed in their homes; the failure to develop and implement individualized independent living plans or to provide individualized services tailored to each eligible in-custody youth's strengths and needs; inconsistent implementation of foster care policy and practice among regions and counties within regions; the failure to treat resource parents as partners in decision making; an inadequate number of placement options for children entering foster care; application costs which serve as a financial barrier to the recruitment of foster families; the absence of recruitment plans for resource families; a lack of funding to support initiatives for recruiting resource families;

---

[4] *See* Monitor's Report to the Court Regarding Defendants' Progress, June 5, 2009, ECF No. 488; Monitor's Report to the Court Regarding Defendants' Progress, September 8, 2010, ECF No. 503.

[5] *See* ECF No. 503, pp. 126 – 127.

failure to establish a single contact with statewide information about placement resources; and the absence of an efficient and effective process to ensure appropriate therapeutic placements and services.

*Monitor's 2010 Report*, ECF No. 503, pp. 80 – 81.[6] The Monitor's 2010 Report also addressed staffing, noting that "retention goals are undermined by insufficiencies in the infrastructure to support existing and newly-hired personnel . . . contributing to delays in providing pre-service training, a shortage of adequate office space and limitations in reasonable access to computer equipment and services for newly hired staff in at least some counties, and persistent limitations in caseworker and supervisory access to MACWIS." *Id.* at 35. The report also studied inadequacies of MACWIS[7], noting that "[i]n the absence of a reliable data system . . . assessing progress is inefficient at best, and impossible at worst."[8] *Id.* at 35, 67, 74.

In response to the Monitor's September 2010 report, Plaintiffs filed a Motion for Contempt and for the Appointment of a Receiver on October 5, 2010 ("First Contempt Motion"). *See* ECF No. 511. The Court denied the First Contempt Motion on May 17, 2011, finding that the requirements and related timelines "were both highly ambitious and, it seems, ultimately unrealistic" making it "apparent to the court that defendants lacked the capability to comply fully, or even substantially" with the Original Consent Decree's requirements, and directed the parties to work toward modification. *See* ECF No. 557, pp. 7, 9.

### *The Modified Settlement Agreement (2012-2017)*

The Court entered the Modified Mississippi Settlement Agreement and Reform Plan (the

---

[6] Defendants had also not "develop[ed] a plan to establish the resources and infrastructure necessary to maximize federal funding." ECF No. 503, p. 76.

[7] MDCPS's legacy information and data systems is referred to as Mississippi Automated Child Welfare Information System ("MACWIS").

[8] Defendants were not able to provide "validated data reports" on a number of items because of system limitations. *See, generally*, ECF No. 503, pp. 88 – 96.

"MSA") as a consent decree on July 6, 2012, superseding the Original Consent Decree. *See* ECF No. 571. Like its predecessor, the MSA set forth standards and best practice process metrics to be accomplished within five years, with Grace Lopes continuing as Monitor.[9] The Monitor's 2014 report highlighted some progress but also detailed certain lingering noncompliance issues. In response, Plaintiffs again filed a Motion for Contempt and for the Appointment of a Receiver on March 9, 2015 ("Second Contempt Motion"). *See* ECF No. 622. The parties agreed to continue the hearing on the Second Contempt Motion and agreed that a third-party entity, Public Catalyst,[10] would "conduct an organizational analysis of [DFCS] with regard to the provision of welfare and foster care services." *See* ECF No. 664.

Public Catalyst released its report to the parties on November 15, 2015, recommending that the Agency strengthen its organizational structure and focus on the fundamentals of a child welfare system. *See* Public Catalyst, *Organizational Analysis Mississippi Department of Human Services Division of Family and Children's Services* (Nov. 24, 2015) ("Organizational Analysis"), attached as Exhibit 1 to Affidavit of Andrea Sanders ("Sanders Affidavit"), which is attached as Exhibit A to Defendants' Motion to Dismiss. Key recommendations included:

- Legislative Advancements (*Organizational Analysis*, pp. 8-9)
    - Create an independent child welfare agency and restructure regional operations of it
- Staffing Improvements (*Organizational Analysis*, pp. 16-18, 20)
    - Employ manageable caseloads
    - Expedite the hiring process
    - Improve training
    - Increase compensation for workers
    - Improve retention of workers
    - Provide essential tools for workers like computers and cell phones

---

[9] *See* Monitor's Report to the Court Regarding Defendants' Progress, January 25, 2013, ECF No. 580; Monitor's Report to the Court Regarding Defendants' Progress, May 8, 2014, ECF No. 604.

[10] Public Catalyst is a consulting firm which focuses on child welfare, juvenile justice and other human services areas, including serving as a court monitor for institutional reform litigation in several states.

- Programmatic and Practice Enhancements (*Organizational Analysis*, pp. 19, 22-23)
  - Implement plans to provide health care and coverage for children in custody
  - Maximize funding strategies
  - Improve the legal process
- Technology Upgrades (*Organizational Analysis*, pp. 23-27)
  - Prioritize data quality, reporting, analysis, and performance management
  - Replace MACWIS
- Placement Array Developments (*Organizational Analysis*, pp. 9, 11)
  - Increase family-based placements
  - Timely license relative foster parents
  - Reduce in shelter care

Taking Public Catalyst's recommendations into consideration, the Court entered a series of remedial orders designed to build capacity and put in motion the system changes outlined in the Organizational Analysis.[11] Among the requirements, the Interim Remedial Order required Defendants to implement an "in-but-not-of" model to house DFCS within MDHS but independent of MDHS oversight. During that same month, then-Governor Phil Bryant appointed David Chandler as DFCS's Executive Director. *See* Sanders Affidavit, ¶ 16. In 2016, the Legislature created what is now known as MDCPS as a new state agency with a transition plan effective July 1, 2018. *See* Miss. Code Ann. § 43-26-1, added by Laws 2016, Ch. 494 (S.B. No. 2179) § 1. David Chandler retired in August 2017, and then-Governor Bryant appointed Jess H. Dickinson as Commissioner effective September 18, 2017. *See* Sanders Affidavit, ¶ 18.

### *The Second Modified Settlement Agreement (2018-2021)*

The 2nd MSA became effective on January 1, 2018,[12] superseding the MSA. The 2nd MSA detailed best practice process metrics with additional metrics phased in over subsequent years. The 2nd MSA appointed Public Catalyst as the new monitor and established a framework for Public

---

[11] *See* Interim Remedial Order, December 22, 2015, ECF No. 671; Stipulated Second Remedial Order, May 19, 2016, ECF No. 694; and Stipulated Third Remedial Order, December 19, 2016, ECF No. 713.

[12] While the 2nd MSA was entered by the Court on December 19, 2016, the effective date of the 2nd MSA was January 1, 2018. *See* ECF No. 712.

Catalyst to evaluate MDCPS's performance related to the metrics.[13] Not even six months into the effective period of the 2nd MSA, Plaintiffs filed yet another Motion for Contempt and for the Appointment of a Receiver on May 31, 2018 ("Third Contempt Motion"), basing their motion on caseload statistics dated *just one day* after the 2nd MSA went into effect.[14] After extensive discovery, the Court deferred ruling on the Third Contempt Motion until after the Monitor's 2018 report. *See* ECF No. 839.

In 2018, Defendants produced more than 6,300 pages of documents, with supporting spreadsheets and data files to the Monitor in service to the 2nd MSA. *See* Sanders Affidavit, ¶ 27. On June 11, 2019, the Monitor filed its "Progress of the Mississippi Department of Child Protection Services – Report 6 January to December 2018" in which it found Defendants were in compliance with 41 of the 121 best practice metrics evaluated for the year. *See* ECF No. 845. Based on the Report, Plaintiffs filed an Amended Motion for Contempt and for the Appointment of a Receiver on July 3, 2019 ("Fourth Contempt Motion"). *See* ECF No. 849.

In 2019, Defendants produced nearly 24,000 pages of documents, with supporting spreadsheets and data files to the Monitor under the 2nd MSA. *See* Sanders Affidavit, ¶ 27. On June 26, 2020, the Monitor filed its "Progress of the Mississippi Department of Child Protection Services – Report 7 January to December 2019" in which it found Defendants were in compliance with 46 of the 144 best practice metrics evaluated for the year. *See* ECF No. 897. Plaintiffs responded with a Motion for Leave to Amend their previous contempt motion—a fifth attempt to

---

[13] *See* Order appointing Lisa Taylor, Eileen Crummy and Kevin Ryan as Court Monitors, June 12, 2018, ECF No. 744.

[14] Plaintiffs referenced "the *undisputed* Monitor's January 2, 2018 Caseload Statistics, [that] Defendants have failed to meet the caseload compliance goal of 90% by the agreed upon December 31, 2017 deadline. . . . Instead, as of January 2, 2018, MDCPS had a statewide aggregate of approximately 58% of workers meeting the caseload standard." *See* ECF No. 740, p. 8-9 (emphasis in original).

hold Defendants in contempt and appoint a receiver.[15] *See* ECF No. 898.

In 2020, Defendants produced nearly 72,000 pages of documents, with supporting spreadsheets and data files to the Monitor under the 2nd MSA. *See* Sanders Affidavit, ¶ 27. On June 25, 2021, the Monitor filed its "Progress of the Mississippi Department of Child Protection Services – Report 8 January to December 2020" in which it found Defendants were in compliance with 38 of the 143 best practice metrics evaluated for the year. *See* ECF No. 918.

Following the resignation of Commissioner Dickinson on January 16, 2020, and temporary service of an interim commissioner, Governor Tate Reeves appointed Andrea A. Sanders to serve as the MDCPS Commissioner effective November 9, 2020. *See* Sanders Affidavit, ¶¶ 21-22.

### *Suspension of the Second Modified Settlement Agreement (2021-2025)*

In June 2021, the parties agreed to suspend reporting, monitoring, and enforcement under the 2nd MSA until May 1, 2023, to provide MDCPS with an opportunity to engage in a period of rebuilding. *See* ECF No. 917. Through subsequent orders, the suspension continued through April 15, 2025.[16]

It is during—and because of—this suspension period that MDCPS has actually been able to make the significant systemic changes sought by Plaintiffs and ultimately recommended by Public Catalyst. Outlined in detail below, these changes have included championing large scale legislative advancements and crafting a structural realignment of the Agency; improving staffing by reducing caseloads through strategic and proactive management and increasing workforce morale and wellbeing to reduce turnover; implementing widespread programmatic and practice

---

[15] The Court entered a TEXT ONLY ORDER on December 13, 2023, denying without prejudice the pending Second, Third, and Fourth Contempt Motions along with this Motion for Leave to Amend.

[16] *See* ECF Nos. 946, 953, 955, and 964. Based on the last Order continuing the suspension of the 2nd MSA, the reporting, monitoring and enforcement of the 2nd MSA went back into effect on April 15, 2025.

enhancements incorporating maximized funding strategies, a revamped legal process, and refined continuous quality improvement efforts; modernizing the Agency's technology infrastructure; and expanding the placement array by increasing placement options for youth and improving the foster and adoptive parent experience. *See*, *generally*, Sanders Affidavit, ¶¶ 32-103.

### Legislative Advancements

During the suspension, and over the past four legislative sessions, Defendants have taken an active role in championing legislative change, resulting in the passage of comprehensive legislative policies that clear the path to permanency for children in MDCPS. In 2023, the Legislature fully separated MDCPS from MDHS, authorizing MDCPS as a stand-alone agency to formulate policy and carry out child welfare programs statewide. *Id.* at ¶ 35.a.i. MDCPS worked alongside legislative sponsors to advance additional changes in 2023, which included making MDCPS a necessary party at all stages of proceedings involving a child in its custody; establishing termination of parental rights and adoption proceedings as priority cases; creating commissions to study the youth court system and adoption statutes; and creating the Foster Parents' Bill of Rights. *Id.* at ¶ 35.

In 2024, MDCPS collaborated with other stakeholders to successfully advance legislative changes based on recommendations of the Mississippi Task Force on Foster Care and Adoption.[17] As a result, the Legislature passed a comprehensive policy package that amended the definition of "neglected child" to exclude failure to provide food, clothing or shelter where caused primarily by financial inability; codified that attorneys for all parties in youth court proceedings owe their party

---

[17] The Task Force was comprised of legislators, chancery judges, county court judges, youth court referees, and representatives from MDCPS, the foster community, and court advocates. The Task Force was charged with performing a comprehensive review of statutes affecting adoptions including youth court provisions for the purpose of making recommendations to the Legislature to revise provisions to assist in the overall placement of youth. *See* Sanders Affidavit, ¶ 35.b.

client the duties prescribed by the Mississippi Rules of Professional Conduct; authorized MDCPS to hire in-house Agency legal counsel to represent the Agency at all stages of proceedings involving a child in MDCPS custody; established 90-day timelines for termination of parental rights hearings; established that all parents have the right to appointed counsel in a termination of parental rights proceeding; modified the time requirements for conducting permanency hearings; and clarified which youth court orders are appealable. *Id.* at ¶ 38.a.

During the 2025 legislative session, MDCPS again advocated for policy changes impacting the work of the Agency which resulted in the Legislature passing bills that revised the timeline for permanency hearings in youth court, requiring those hearings to occur at least every ninety days; and changed the definition of "kinship" to include fictive kin with a familial bond with the child(ren), to allow for board payments for fictive kin guardianship placements. *Id.* at ¶ 40.

In the 2026 session, the Legislature, with input from MDCPS, established the Foster Youth Earned Benefits Protection for Success Act. This Act ensures that any eligible federal benefits are protected for children in MDCPS custody, and directs MDCPS to establish a Success Sequence Savings and Disbursement Plan so a child may access a portion of his/her conserved benefits upon completion of certain milestones and receive any remaining funds upon termination of MDCPS custody. *Id.* at ¶ 41.a. The Legislature also passed bills that added MDCPS employees to the group of first responders with heightened protections; added a definition of false reports to the MDCPS Hotline and additional penalties for making false reports; and clarified how a name is added to the central registry of substantiated perpetrators of abuse and neglect. *Id.* at ¶¶ 41.b.-d.

<u>**Staffing Improvements**</u>

During the suspension, MDCPS has strategically focused on ensuring manageable caseworker workloads through increased compensation, strategic hiring, specialized work roles,

12

transformed recruitment and training, essential tools for workers, and improved retention. In December 2021, MDCPS unfroze its career ladder, and in November 2022 implemented a salary realignment resulting in an average 20% pay increase for case-carrying staff, with additional shift differential pay implemented in 2023. *Id.* at ¶¶ 44-45. Also in 2022, MDCPS developed and implemented a web-based caseload dashboard to strategically allocate employees and analyze trends impacting individual caseloads—such as geography, courts, lack of resource, or agency structure/management—with the goal to methodically right-size the caseloads of MDCPS workers in real-time. *Id.* at ¶¶ 55-56.

Using the recommended performance categories from the Organizational Analysis, the statewide caseload percentages as of March 31, 2026, were: 90% Met; 8% Close; and 2% Over.[18] *Id.* at ¶ 60. Even more, the statewide average number of cases assigned to a Specialist as of March 2026 was 11.3 with no Specialist having more than 28 cases assigned. *Id.* at ¶ 59.

In 2023, MDCPS created the Operations and Strategic Plans department to provide internal support to management teams, including delivering essential information for critical decision-making, tracking key data indicators for creating solutions to meet established Agency goals, and facilitating the establishment of priorities and synchronizing the efforts of divisional and departmental staffs through the tracking, development and submission of the Commissioner's directives. *Id.* at ¶ 37.

MDCPS also worked with Dr. Jerome Kolbo at the University of Southern Mississippi School of Social Work to restructure recruitment and training, developing a multi-pronged approach to include scholarship opportunities and structured training along with professional

---

[18] At the beginning of the suspension on June 30, 2021, the statewide caseload percentages were: 60% Met; 15% Close; and 25% Over. *See* Sanders Affidavit, ¶ 60.

13

development and continuing education. *Id.* at ¶ 48. MDCPS began partnering with accredited social work programs at eight universities to create the Mississippi Academic Pathways Scholarship ("MAP") to enable social work students to pursue careers with MDCPS by offering scholarships, dedicated internships, and career coaching. *Id.* at ¶ 49. Since inception in 2023, more than $900,000 in scholarships have been awarded and MDCPS has engaged 199 interns, 97 of whom graduated and then transitioned to employment with MDCPS. *Id.* at ¶ 49.

In 2021, MDCPS implemented a lifecycle replacement procedure for laptops and cell phones that ensures frontline case workers have reliable, secure, and up-to-date tools, which boosts productivity and reduces downtime. *Id.* at ¶ 50. MDCPS also established the Workforce Wellbeing Department to focus on workforce stabilization through targeted recruitment and retention efforts, resulting in a reduction of case-carrying staff turnover since 2020. *Id.* at ¶¶ 61-64.

### Programmatic and Practice Enhancements

Also, during the suspension, MDCPS has engaged in several programmatic changes and enhancements directly related to its provision of services. In October 2022, MDCPS contracted with Youth Villages to implement its Intercept Services program, an integrated approach to in-home parent skill development that offers a variety of evidence-based practices to meet the individualized needs of a family and child, with specialized focus on children at high risk of entry or re-entry into foster care. *Id.* at ¶ 69. Since December 2022, approximately 1,830 youth have been served through the Intercept Services program. *Id.*

From 2021 to 2026, the Legislature increased state funding each fiscal year. *Id.* at ¶ 42. At the same time, the percentage of children in MDCPS custody who are eligible for federal Title IV-E funding has risen over the past four years from 32% in September 2021 to 46% in February 2026, increasing the amount of federal dollars MDCPS has drawn down. *Id.* at ¶ 66.

14

The Legislature also appropriated funding for an MDCPS attorney representation pilot program at the local (county) level, which began in September 2024. *Id.* at ¶ 68. The pilot program has developed a system of Agency legal representation that provides uniform training and procedures for attorneys and support staff and creates consistent interactions between legal staff and direct services staff so that reliable services are implemented statewide by all counsel who serve MDCPS, including contract attorneys, Attorney General's Office attorneys, and in-house Agency attorneys. *Id.*

Recognizing the importance of adoption assistance, MDCPS updated its adoption assistance categories and payment rates in January 2022 to address long-standing concerns regarding payment adequacy and the significant disparity between foster care board rates and adoption assistance rates. This resulted in an increase in adoptions subsidies to be equal to 75% of the corresponding foster care board rate. *Id.* at ¶ 71.

MDCPS also created the state's Plan under the federal Family First Prevention Services Act ("FFPSA"), with final approval of that Plan by the U.S. Children's Bureau on August 11, 2025, and implementation beginning in 2026. *Id.* at ¶ 70. The FFPSA Plan creates increased capacity for prevention services, reinforcing MDCPS's priority of meeting the needs of families to keep children safely at home using approved, evidence-based prevention programs focused on mental health, substance abuse prevention and treatment services, and in-home skills-based parenting programs. *Id.*

MDCPS has partnered with local school districts across the state and established a new statewide collaboration with the Department of Health for children in custody to receive Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") and comprehensive exams at school-based clinics and local Health Departments. *Id.* at ¶ 72.

**Technology Upgrades**

In June 2022, MDCPS initiated the replacement of MACWIS with a new federally compliant Comprehensive Child Welfare Information System ("CCWIS"), known internally as Pathways. *Id.* at ¶ 75. As a federally compliant CCWIS, Pathways will improve case management efficiency, enable real-time data sharing, and support continuous quality improvement when fully implemented in the fall of 2026. *Id.* at ¶¶ 74-78.

MDCPS also established a Data Management Team in 2022 to manage data governance, security, and lifecycle processes and to support data migration, dashboard development, and semantic modeling—all of which are key components in building a data-driven culture that enables smarter analytics and more responsive service delivery. *Id.* at ¶¶ 80-82. In September 2023, MDCPS created a Geographic Information System ("GIS") program to optimize service delivery by identifying geographic patterns, enabling predictive planning and prevention. *Id.* at ¶¶ 83-87.

**Placement Array Developments**

During the suspension, MDCPS overhauled its Licensure Unit, transforming its policies, procedures, structure, and administrative rules to provider better coordination and quicker responses to placement options, better understanding of licensing needs, and accountability of licensed homes. *Id.* at ¶¶ 89-91. In addition, Governor Reeves recently signed a joint proclamation with the Administration for Children and Families, formally entering Mississippi into the "A Home for Every Child" initiative to expand foster homes, increase kinship placements, and strengthen prevention services. *Id.* at ¶ 92.

As a result of State Capitol advocacy by MDCPS, the Legislature passed legislation in 2024 enabling MDCPS to utilize Qualified Residential Treatment Programs ("QRTP") to provide opportunities for a child in MDCPS custody to be in a placement where his or her psychological

16

or behavioral needs can be stabilized. *Id.* at ¶ 38.b. Additional legislation created a public-private partnership to provide a minimum of 33 beds at the Canopy CARES Center for youth under the care of MDCPS and the Department of Mental Health, enabling higher-level in-state treatment. *Id.* at ¶ 38.c.

Effective July 1, 2025, MDCPS entered into new contracts with its network of partnering agencies to develop a continuum of care to help ensure that, when an out-of-home placement has been deemed in the best interest of a child, that child is provided with the appropriate level of quality residential services that are safe, licensed, child and family centered, trauma focused, and time limited. *Id.* at ¶ 93.

To improve intake screening, MDCPS changed the process for receiving reports of abuse or neglect bringing the Mississippi Centralized Intake and Assessment unit in-house and establishing the Centralized Screening Unit to provide centralized screening of reports. *Id.* at ¶ 95. Reports involving children in MDCPS custody are assigned to the Senior Safety Team, composed of clinical specialists with extensive investigation experience. *Id.* at ¶ 96. In 2025, MDCPS established the MIC/Fatality Review Committee—composed of representatives from various areas of the Agency, including licensure, legal, continuous quality improvement, and clinical support—to review all Senior Safety investigations related to reports of maltreatment of a child in custody. Investigations cannot be deemed complete without this critical review. *Id.* at ¶ 97.

### III. LEGAL AUTHORITIES AND ANALYSIS

After more than two decades, the 2nd MSA no longer serves its intended purpose of ensuring Plaintiffs' substantive due process rights are protected. Since the suspension of the 2nd MSA, Defendants have taken purposeful actions to ensure Plaintiffs' rights to personal security and reasonably safe living conditions resulting in systemic changes that ensure Plaintiffs' rights

are adequately protected now and in the future. Because the relevant constitutional deficiencies have been addressed, the Court now lacks jurisdiction and judicial oversight of Mississippi's child welfare system is no longer warranted. As such, this action should be fully and finally dismissed. Even if the Court determines it still has jurisdiction, the 2nd MSA should, nevertheless, be vacated under the Court's equitable powers because significant changes in circumstances render its continued prospective application no longer equitable.

**A.      Defendants have proactively taken the necessary steps to address and protect Plaintiffs' substantive due process rights.  The Court should return control over Mississippi's child welfare system to Defendants.**

This action was filed 22 years ago. In the past two decades, the Court has entered a series of consent decrees seeking to achieve Plaintiffs' goals and preferences for Mississippi' child welfare system. In response, Plaintiffs have continuously sought to hold Defendants in contempt. Only during the suspension of the 2nd MSA were Defendants finally able to effect sweeping changes to Mississippi's child welfare system. Defendants have now taken purposeful and comprehensive actions to remedy the Plaintiffs' alleged constitutional violations and to protect Plaintiffs' substantive due process rights to personal security and reasonably safe living conditions. The time has come for this Court to return control of Mississippi's child welfare system to Defendants. "Institutional consent decrees are 'not intended to operate in perpetuity". *Guajardo v. Texas Dep't of Crim. Just.*, 363 F.3d 392, 394 (5th Cir. 2004) (quoting *Bd. of Educ. v. Dowell*, 498 U.S. 237, 248 (1991)); *see also*, *Allen v. Louisiana*, 14 F.4th 366, 373 (5th Cir. 2021). In cases like this one, where Defendants have demonstrated that they have addressed the subject constitutional violations, "it is the courts' duty to bring federal control over the issue to its proper end." *Chisom v. Louisiana ex rel. Landry*, 116 F.4th 309, 316 (5th Cir. 2024).

18

1.    **Plaintiffs' substantive due process claims have been remedied by Defendants' purposeful actions.**

Article III does not give federal courts the power to order relief to uninjured parties, class action or not. Here, Plaintiffs seek ongoing oversight and forward-looking relief based on alleged risk of future harm – but under the law, that risk must be sufficiently imminent and substantial to afford relief. Plaintiffs cannot make that showing in the face of Defendants' durable structural reforms to the state's child welfare system. As such, there is no longer a live case or controversy supporting ongoing federal judicial supervision. Because Defendants have taken intentional steps to protect Plaintiffs' substantive due process rights, jurisdiction no longer exists for this 22-year-old action.

a.    **Plaintiffs have a narrow set of substantive due process rights to personal security and reasonably safe living conditions.**

Under § 1983, a substantive due process claim arises when plaintiffs are "1) . . . deprived of a cognizable constitutional right; 2) the State acted with 'deliberate indifference' to the protected right; and 3) the policies or practices complained of were the direct cause of the constitutional deprivation." *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 248 (5th Cir. 2018) (internal citations omitted) ("*Abbott*").

Plaintiffs' specific substantive due process rights to personal security and reasonably safe living conditions can be traced to the U.S. Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 200 (1989). In that case, the Supreme Court made clear that the Due Process Clause is "a limitation on the State's power to act, not . . . a guarantee of certain minimal levels of safety and security." *Id.* at 195. Citing its prior cases, the Supreme Court reiterated that "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196. However, the

19

Court recognized an exception when the State takes custody of a person, creating a "special relationship" and a "duty to assume some responsibility for [the person's] safety and general well-being." *Id.* at 199-200; *see also*, *Abbott*, 907 F.3d at 249.

The Fifth Circuit has recognized that a "special relationship" arises in child welfare when a state removes children and places them under state supervision, creating a substantive due process right to "personal security and reasonably safe living conditions." *Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regul. Servs.*, 380 F.3d 872, 880 (5th Cir. 2004); *see also*, *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 856 (5th Cir. 2012); *Abbott*, 907 F.3d at 250; *Griffith v. Johnston*, 899 F.2d 1427, 1439 (5th Cir. 1990) (A "special relationship" exists when a child is removed "from their natural home[] and placed [] under state supervision."). Prior to *Abbott*, the "precise contours" of this substantive due process right had not been "fleshed-out at length" by the courts. *Abbott*, 907 F.3d at 250.

*Abbott* is an institutional reform case centered around the Texas foster care system, with allegations of the deprivation of constitutional rights similar to those asserted in this action—e.g., an insufficient number of caseworkers, inadequate placement options, inappropriate placements, deficiencies in oversight and monitoring of placements, separation of sibling groups. In its ruling in *Abbott*, the Fifth Circuit shaped a framework for the right to personal security and reasonably safe living conditions without setting finite boundaries, also importantly identifying what is *not* included within these asserted rights.[19] For example, the "Fourteenth Amendment does not entitle plaintiffs to receive optimal treatment and services, nor does it afford them the right to be free

---

[19] Other courts have stated the right slightly differently by further qualifying personal security as "adequate food, shelter, clothing, medical care, [coupled with] a right to be free from harm while in state managed foster care." *Hernandez v. Hines*, 159 F. Supp. 2d 378, 385 (N.D. Tex. 2001).

from any and all psychological harm at the hands of the State." *Id.* at 251.

While *DeShaney* held that the State has "some responsibility" for the "safety" and "general well-being" of children in state custody, the *Abbott* court clarified that "there is a significant amount of daylight between physical abuse and maximum personal psychological development, optimal treatment, or the most appropriate care." *Id.* at 250-51. The *Abbott* court went on to explain that the substantive due process right "includes the very limited right to be free from *severe psychological abuse and emotional trauma*", but the court acknowledged that some "inherent features of the foster care system . . . have negative psychological consequences" which the Constitution simply does not prohibit. *Id.* at 251 (emphasis in original). Though "it is clear that foster children are, at minimum, entitled to protection from physical abuse and violations of bodily integrity, . . . the State [is not required] to guarantee the individual's betterment or unconditional stability." *Id.* at 250.

Other courts have similarly limited foster children's substantive due process rights. *See Jeremiah M. v. Crum*, 695 F. Supp. 3d 1060, 1092–93 (D. Alaska 2023) (collecting authorities, including *Abbott*, "that substantive due process does not encompass placement in the least-restrictive environment or being subject to either (1) conditions reasonably related to the purpose and assumption of government custody or (2) durational limitations on the government custody.").[20] Recognizing foster children are not entitled to "receive optimal treatment and services," the *Jeremiah M.* court did observe that the limited substantive due process rights may include "freedom from the foreseeable risk of maltreatment while under the protective supervision

---

[20] After an eleven-day bench trial, the court in *Jeremiah M.* found no named plaintiff had proven a substantial risk of harm while in custody due to the agency's polices/practices and had, therefore, not proven an injury for standing purposes. *See Mary B. v. Dompeling*, 2026 WL 892039, *14 (D. Alaska Mar. 31, 2026).

of the State," "protection from unnecessary intrusions into the child's emotional wellbeing," and "treatment and care consistent with the purpose and assumptions of government custody." *Id.*; *see also*, *Wyatt B. by McAllister v. Brown*, 2021 WL 4434011, at \*8 (D. Or. Sept. 27, 2021) ("The weight of authority clearly demonstrates that the rights secured by the Fourteenth Amendment, though significant, are strictly limited in scope."); *Kiera M. v. Quin*, 2026 WL 937311, \*22 (M.D. Tenn., April 2026) (relying in part on *Abbott's* limits of what is constitutionally required when partially dismissing substantive due process claims against Tennessee Dept. of Children's Services).

In sum, while Plaintiffs have narrow substantive due process rights to "personal security and reasonably safe living conditions," there is no constitutional right to what "may reflect the 'best practices' of the child-welfare community." *Abbott*, 907 F.3d at 272.[21]

      b.      **Defendants cannot be said to be deliberately indifferent to Plaintiffs' substantive due process rights; to the contrary, Defendants have taken purposeful action to ensure personal security and reasonably safe living conditions for children in MDCPS custody.**

The Court must next consider if "the State 'at a minimum acted with deliberate indifference toward the plaintiff[s']'" substantive due process rights. *Id.* at 251; *Doe as Next Friend of Doe v. Smith*, 2026 WL 196607, at \*6 (S.D. Miss. Jan. 26, 2026). Deliberate indifference requires that "a state actor must consciously disregard a known and excessive risk to the victim's health and safety." *Abbott*, 907 F.3d at 252; *see also*, *Hernandez*, 380 F.3d at 880 ("the plaintiff must show that the state acted in a manner that 'shocks the conscience.'"). This standard requires "a degree

---

[21] The substantive due process claims asserted by Plaintiffs at the outset of this action included the "right to protection from harm while in state custody—physical, emotional, developmental, or otherwise; [r]ight not to remain in state custody unnecessarily; [r]ight to treatment; [r]ight to treatment related to the cause of their confinement; [and r]ight to receive care, treatment and services consistent with competent professional judgment." *See*, Amended Complaint, ¶ 204.

of culpability beyond mere negligence or even gross negligence; it 'must amount to an intentional choice, not merely an unintentionally negligent oversight.'" *Abbott*, 907 F.3d at 251-52. Since the suspension of the 2nd MSA, Defendants' actions have been focused on providing personal security and reasonably safe living conditions for children in MDCPS custody. There is no evidence of deliberate indifference here.

The State acts with deliberate indifference when it is "both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [it] must also draw that inference." *Id.* (quoting *Doe v. Dall. Indep. Sch. Dist.*, 153 F.3d 211, 218 (5th Cir. 1998)). However, the deliberately indifferent standard requires "a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight." *Id.* at 251-52 ("liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.") (citation modified).

The key to analyzing deliberate indifference is not the existence of harm, but the actions of the State. *See*, *Abbott*, 907 F.3d at 252 ("the State is not deliberately indifferent to a substantial risk of serious harm if, aware of the risk, it 'respond[s] reasonably ... even if the harm ultimately was not averted.'") (quoting *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)). "Reasonable steps to cure the problem, even if ultimately ineffective, would negate . . . deliberate indifference." *Abbott*, 907 F.3d at 261. Plaintiffs have a "significantly high burden" to demonstrate deliberate indifference. *Id.* at 252 (quoting *Doe*, 153 F.3d at 218); *see also*, *Lozano v. Baylor Univ.*, 408 F. Supp. 3d 861, 888 (W.D. Tex. 2019); *Hall v. Smith*, 497 F. App'x 366, 377 (5th Cir. 2012); *Bustillos v. El Paso Cnty. Hosp. Dist.*, 226 F. Supp. 3d 778, 793 (W.D. Tex. 2016).

In *Abbott*, the court identified four areas of policies and practices impacting children in custody: "1) caseload management, 2) monitoring and oversight, 3) placement array, and 4) foster

23

group homes." *Abbott*, 907 F.3d at 256.[22] Similar to *Abbott*, the allegations of the Amended Complaint in this action can be categorized as: (1) staffing improvements (caseload management), (2) placement array developments, and (3) programmatic and practice enhancements[23] Defendants have made significant systemic improvements in these three areas, along with championing legislative advancements and modernizing MDCPS's technology infrastructure. Defendants' actions align precisely with the recommendations set forth in the Organizational Analysis[24]:

| Accomplished | Recommendation | Area of Improvement |
|:---:|:---|:---:|
| ☑ | Expedite hiring process | Staffing |
| ☑ | Improve training | Staffing |
| ☑ | Increase compensation | Staffing |
| ☑ | Improve retention | Staffing |
| ☑ | Provide essential tools | Staffing |
| ☑ | Timely license foster parents | Placement Array |
| ☑ | Reduce reliance on shelter care | Placement Array |
| ☑ | Plans for health care for children in custody | Programmatic |
| ☑ | Maximize funding strategies | Programmatic |
| ☑ | Improve legal process | Programmatic |
| ☑ | Independent child welfare agency | Legislative |

---

[22] The court in *Wyatt B.* followed *Abbott* and its approach to reviewing categories of policies and practices. *See*, *Wyatt B.*, 2021 WL 4434011 at *7-9.

[23] *See* Amended Complaint, ¶¶ 178-184 (staffing improvements); ¶¶ 142-160 (placement array developments); ¶¶ 161-177, 185-192 (programmatic and practice enhancements).

[24] *See* Sanders Affidavit, ¶ 15, and generally, ¶¶ 32-103.

24

| | | |
|---|---|---|
| ☑ | Restructuring regional operation of agency | Legislative |
| ☑ | Prioritize data quality, reporting, analysis, and performance management | Technology |
| ☑ | Replacement of MACWIS | Technology |

Defendants' actions demonstrate there is no deliberate indifference here. Plaintiffs' alleged constitutional violations have been addressed. This lawsuit has served its purpose, and the Court should discontinue its oversight and control over Mississippi's child welfare system.[25]

### i. Staffing Improvements (Caseload Management)

As detailed above, MDCPS has executed a calculated plan to improve staffing through strategic caseload management, increased compensation, specialized work roles, transformed recruitment and training, and improved retention. This likewise refutes any claim of deliberate indifference.

The *Abbott* court filled several pages addressing how caseload management ultimately affects delivery of services[26] (*id.* at 256-65), then concluded: "[A] policy or practice of maintaining

---

[25] Upon being appointed by Governor Reeves, Commissioner Sanders identified the need for an early focus on specialization of staff in the field, improving workforce morale and wellbeing to reduce turnover, replacing the Agency's information system (MACWIS) to eliminate barriers in its limitations, improving the foster and adoptive parent experience, and increasing placement options for youth with significant therapeutic needs. *See* Sanders Affidavit, ¶ 29. Since that initial assessment, MDCPS has continued to assess the root causes of challenges which face the Agency and has continued to identify priority areas of improvement. *Id.* at ¶ 30.

[26] To begin, the *Abbott* court considered that, despite the "lack of reliable, up-to date-statistics", the caseload numbers for Texas caseworkers exceeded professional standards where "nearly half of CVS caseworkers carry caseloads of 21 children or more, 22% carry caseloads of 26 children or more, and nearly 10% carry caseloads of 31 children or more." *Id.* at 257. In turn, the court recognized that "Oversized workloads are also the primary cause of the exceedingly high rate of caseworker turnover." *Id.* And high turnover itself leads to issues such as difficulty with hiring and training quickly enough to fill vacancies which leads to a "vicious cycle [which] is never-ending: unmanageable workloads and a caustic work environment lead to high rates of caseworker turnover; turnover further exacerbates caseworker burnout, low morale, and a negative agency culture, which feeds more turnover." *Id.* at 258. The court concluded this "cycle of crisis" allows children in custody to "fall through the cracks." *Id.*

25

overburdened caseworkers directly causes all [in-custody] children to be exposed to a serious risk of physical and psychological harm . . . Moreover, the principle seems obvious: when workloads exceed caseworker bandwidth, caseworkers are not able to effectively safeguard children's health and well-being." *Id.* at 264-65.

Since the suspension of the 2nd MSA in 2021, MDCPS has implemented multiple systemic approaches aimed at overall caseload management and workforce stabilization, including:

- Career ladder and increased salaries—provides opportunities for career advancement and better pay;

- Specialization of work for caseworkers—allows case specialists and management to become subject matter experts and to gain efficiency through repetitive actions;

- Graduated caseloads for new hires—offer new hires the chance to better learn the job prior to a full caseload;

- Mississippi Academic Pathways Scholarship—offers scholarships, dedicated internships, and career coaching for students as part of education and training for current and prospective MDCPS employees;

- Lifecycle Equipment Replacement—implemented a lifecycle replacement procedure for laptops and cell phones that ensure frontline caseworkers have reliable, secure, and up-to-date tools, which boosts productivity and reduces downtime;

- Caseload Dashboard—allows MDCPS to more effectively allocate its resources to address the needs across the state; and

- Workforce Wellbeing Department—established to focus on workforce stabilization through intentional recruitment and retention efforts.

*See* Sanders Affidavit, ¶¶ 43-64. These systemic approaches were the direct result of Defendants' focus on their top priority: what is best for children in MDCPS custody. The 2nd MSA stalled Defendants' ability to implement new, effective strategies because of the overwhelming amount of time required to comply with and report compliance with the 2nd MSA. While the 2nd MSA was suspended, however, Defendants were able to effect real, positive change. The results— manageable caseloads and lower turnover—enable Defendants "to effectively safeguard children's

26

health and well-being." *Abbott*, 907 F.3d at 265.

The caseload standards in the 2nd MSA are based on Public Catalyst's 2015 Organizational Assessment, using three categories: Met (at or below 1.0 FTE); Close (1.01-1.19 FTE); and Over (greater than 1.2 FTE).[27] *See* Sanders Affidavit, ¶ 53. Prior to the suspension, approximately 25% of caseworkers were Over; now, that figure is consistently in the single digits. *Id.* at ¶¶ 57-60. The average caseload statewide in March 2026 was 11.3 cases per caseworker with no one exceeding 28 cases—a stark contrast to the Amended Complaint's allegations of average caseloads exceeding 100 children per worker[28] in several counties. *Id.* at ¶ 59.

These undeniable improvements are the direct result of purposeful actions guided by the goal of providing personal security and reasonable safety for children in MDCPS custody. That these improvements came during the suspension demonstrates the 2nd MSA only hinders Defendants' ability to continue systemic improvements.

### ii. Placement Array Developments

The *Abbott* court also specifically addressed placement array—the types and locations where children in custody are placed along with the services offered there. Unlike caseload management, however, the *Abbott* court found that "inadequate placement array does not unacceptably increase the risk that a child will be exposed to serious physical or psychological harm." *Abbott*, 907 F.3d at 268. The court further explained that "[c]ertainly, placing a child in-region, in a placement ideal for his service level and personal needs, or with his siblings when appropriate would be good practice" but the failure to do so does not "amount to a deprivation of their substantive due process rights." *Id.* State agencies like MDCPS do not have a "'responsibility

---

[27] Public Catalyst recommended replacing the "minutes-based" methodology of calculating caseloads with a 1.0 full-time equivalent or FTE methodology.  *See* Organizational Analysis, p. 20.

[28] *See* Amended Complaint, ¶ 179.

to [ ] maximize[ ] [foster children's] personal psychological development,' and children have no 'right to a stable environment' or a right 'not to be moved from home to home,' despite the 'significant literature which indicates a traumatic effect of such moves on young children'" because "those negative effects are not constitutionally cognizable harms." *Id.* (internal citations omitted).

If there is no legally cognizable harm as to inadequate placement array, then Defendants— as a matter of law—cannot be deliberately indifferent on this point. Still, Defendants have made a focused effort to develop the placement array for children in MDCPS custody, including transforming the licensure process, establishing a continuum of care, preventing maltreatment in care, and expanding continuous quality control.[29] And those efforts are working. For example, thanks to MDCPS's restructuring of its Licensure Unit and strengthening of its tools to recruit and support foster families, MDCPS licensed 427 non-relative foster homes (net gain of 136) from July 2024 through February 2026, and 845 relative foster homes during that same period. *See* Sanders Affidavit, ¶ 90.e.

Similarly, effective July 1, 2025, MDCPS entered into new contracts with its network of partnering agencies to develop a continuum of care providing quality residential services across multiple settings, including Intake and Assessment Center; Traditional Group Home; Therapeutic Group Home; Permanency Assessment Center; Adolescent Diversion Unit; Qualified Residential Treatment Program; Supervised Independent Living; Prenatal and Parenting Teen Home; and Specialized Group Care for Minor Victims of Human (Sex) Trafficking. *Id.* at ¶ 93.

---

[29] The Amended Complaint asserts several claims related to placement array alleging Defendants have failed to provide safe, stable and appropriate placements; failed to recruit a sufficient number of homes and adequately fund board payment.

28

MDCPS's advocacy helped secure passage of legislation that has led to more placement options, including QRTPs for stabilizing children's psychological or behavioral needs and 33 beds at the Canopy CARES Center for higher-level in-state treatment. *Id.* at ¶¶ 39.b.-c. The Legislature also revised permanency hearing timelines, requiring hearings at least every ninety days when, among other things, the court considers the permanency plan of the child.[30] *Id.* at ¶ 40; *see, also,* Miss. Code Ann. § 43-21-613(3)(a)(ii). MDCPS has also taken intentional steps to address maltreatment in care through changes to intake and screening processes, a new investigation review process, and expanded continuous quality improvement monitoring. *Id.* at ¶¶ 95-98.

Although placement array does not rise to a constitutionally cognizable claim, Defendants have, nevertheless, made positive systemic improvements to a uniquely complicated issue. Like caseload management, the improvements in areas related to placement array are the direct result of purposeful actions taken by Defendants guided by the goal of providing for the personal security and reasonable safety for children in MDCPS custody.

### iii. Programmatic and Practice Enhancements

The *Abbott* court did not specifically address programmatic and practice enhancements as a specific category (like caseloads) but did consider "crossover provisions" addressing "more than one violation simultaneously," finding that some "may reflect 'best practices' or the personal policy preferences of the district court," but they are not necessary to achieve constitutional compliance. *Abbott*, 907 F.3d at 273, 283.

Plaintiffs' claims in their Amended Complaint related to programs and practice centered around adoptions, medical/mental health services, failure to maximize funding, and general best

---

[30] The 2nd MSA calls for a permanency plan to be reviewed by a court or an administrative review at least every six months and for a permanency hearing to occur every twelve months. *See* 2nd MSA, ¶¶ 6.4.a. and 6.4.b.

29

practices. Although these claims are not constitutionally cognizable, Defendants have made improvements related to these areas since the suspension of the 2nd MSA.[31]

Defendants recognize that adoption is critical as a permanency option for many children in MDCPS custody. To aid in adoptions, MDCPS initiated the development of updated adoption assistance categories, increasing subsidies to 75% of the corresponding foster care board rate effective October 1, 2022. *Sanders Affidavit* at ¶ 71. As of March 2026, MDCPS had 78 adoption specialists carrying at least one case. *Id.* at ¶ 58.[32] MDCPS also began a pilot program in September 2024 for MDCPS attorney representation at all stages of local proceedings. *Id.* at ¶ 68.

MDCPS has partnered with local school districts for children in custody to receive EPSDT and comprehensive exams at school-based clinics and has established a statewide collaboration with local Health Departments to ensure EPSDT requirements are met while also promoting the overall health and well-being of the youth we serve. *Id.* at ¶ 72.

MDCPS has strengthened its Title IV-E eligibility identification and documentation processes to increase eligibility penetration and improve federal funding. Since September of 2021, the eligibility penetration rate has increased by 14% with each percentage point increase representing approximately an additional $850,000 in federal reimbursement. *Id.* at ¶ 66. After separating from MDHS, MDCPS was able to establish its own Cost Allocation Plan which has also allowed it to maximize funding opportunities. *Id.* at ¶ 67.

MDCPS has also engaged in other programmatic changes, including entering into an

---

[31] In *Abbott*, the court invalidated several provisions of the subject injunction related to timing of medical services and similar best practices. *See Abbott*, 907 F.3d at 283-87. Likewise, the court in *Jeremiah M.* found that substantive due process does not encompass claims related to duration of foster care, length of stay, or permanency. *See Jeremiah M.*, 695 F. Supp. 3d at 1092-93.

[32] The Amended Complaint alleges that only eighteen caseworkers supported the entire state's adoption efforts. *See* Amended Complaint, ¶ 173.

agreement with Youth Villages in October 2022 for implementation of its evidence-based Intercept Services program and obtaining approval of Mississippi's FFPSA plan in August 2025, which augments systemic improvement through evidence-based prevention programs focused on mental health, substance abuse prevention and treatment services, and in-home skills-based parenting programs. *Id.* at ¶ 69.

Bottom line: Under relevant caselaw, failure to provide programmatic and practice enhancements does not rise to a constitutionally cognizable claim. Still, Defendants have gone above the Constitutional baseline to make positive systemic improvements through purposeful actions to provide for the personal security and reasonable safety of children in MDCPS custody.

### iv. Legislative Advancements and Structural Realignment of MDCPS

Though not specifically tied to those areas addressed in *Abbott*, Defendants have made other significant systemic changes that demonstrate their lack of deliberate indifference toward Plaintiffs' rights to personal security and reasonably safe living conditions.

MDCPS has undergone significant organizational changes, most notably the full separation from MDHS, making MDCPS a fully stand-alone state agency to carry out child welfare programs throughout the state. *See* Sanders Affidavit, ¶ 35.a. MDCPS reorganized its workforce into a service area model for more focused effort in caseload management, meeting requirements for children in custody, and personnel management. *Id.* at ¶ 32. At the same time, MDCPS is working toward moving all functions into the service area model to give it a common operating picture of all requirements when reporting, resourcing, and conducting management practices. *Id.* In addition, MDCPS created the Operations and Strategic Plans department to support internal management teams, which has provided more efficient production of strategic and operational plans, facilitated the analysis and development of courses of action to create efficiencies, and synchronized continuous updates to the Commissioner to provide essential information to

31

leadership for critical decision-making efforts that guide the Agency. *Id.* at ¶ 37.

Defendants have also championed legislative change over the past four sessions, focusing on the legal pathway to permanency for children. Key changes include making MDCPS a necessary party at all proceedings; providing MDCPS the right to hire Agency counsel to represent it in those proceedings; making termination of parental rights and adoption proceedings priority cases; establishing parental rights to appointed counsel in a termination of parental rights proceeding; creating study commissions; amending the definition of neglected child to exclude failure to provide food, clothing or shelter caused primarily by financial inability; modifying permanency hearing timelines; and creating the Foster Parents' Bill of Rights. *Id.* at ¶¶ 35, 38, 40-41. The Legislature has also provided additional funding for MDCPS each year to support the work of the Agency. *Id.* at ¶ 42.

### iv. Technology Upgrades

MDCPS began replacing its legacy MACWIS data system with a federally compliant CCWIS in June 2022, established a Data Management Team in 2022, and created a GIS program in 2023 to optimize service delivery through geographic data analysis. *Id.* at ¶¶ 75, 80, 83.

\* \* \*

The intentional work by Defendants has led to improved caseloads for MDCPS staff, stabilization of the workforce, improved and additional placement options for children in custody, numerous program changes and improvements, structural realignment of MDCPS, important legislative changes, increased funding for MDCPS, and modernization of the MDCPS management information system—clearly demonstrating a lack of deliberate indifference. Of course, any injury to a child in MDCPS custody—including those unknown, infrequent, or incidental—is contrary to every goal of Defendants. But this lawsuit cannot aim to achieve perfect results or 100% compliance with best practices. This lawsuit can only ensure what is guaranteed

by the Constitution. And as a matter of constitutional *law*, Defendants have taken purposeful actions—especially since suspension of the 2nd MSA and continuing today—to ensure the personal security and reasonably safe living conditions of children in MDCPS. Defendants cannot be said to be acting with deliberate indifference toward the Plaintiffs' substantive due process rights.

**c.**      **Defendants' policies and practices are not the moving force behind the deprivation of any constitutional right that Plaintiffs may have.**

"In addition to culpability, there must be a direct causal link between the municipal policy and the constitutional deprivation." *Piotrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001). To support a substantive due process claim, Defendants must be "the 'moving force' behind the [constitutional] deprivation." *Abbott*, 907 F.3d at 253 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). In other words, MDCPS policies and practices "must have played a part in the violation of federal law," and this "direct causal link" requires "more than a mere 'but for' coupling between cause and effect." *Abbott*, 907 F.3d at 253 (quoting *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992)). The "touchstone for establishing *customary policy* is a persistent and widespread practice." *Piotrowski*, 237 F.3d at 581 (emphasis added).

Even if Defendants were deliberately indifferent—and they are not—there is no evidence that Defendants' conduct is a "moving force" behind any ongoing constitutional deprivation. To the contrary, Defendants' persistent and widespread practices are to ensure the personal security and reasonably safe living conditions of Plaintiffs, not to deprive Plaintiffs of those rights.

The Amended Complaint alleges a series of systemic policies and practices which led to a violation of Plaintiffs' substantive due process rights. As presented in the Amended Complaint, these system policies and practices can generally be considered in the following categories: (1) *staffing*—lack of adequate staffing, compensation, resources, training, and retention (Amended Complaint, ¶¶ 178-184); (2) *placement array*—shortage of foster homes, inadequate foster care

33

maintenance payments, overcrowded foster homes, over-institutionalized foster children, over-use of emergency shelters, failure to follow licensing requirements, and lack of least restrictive placement (*Id.* at ¶¶ 142-160); and (3) *programs and practice*—failure to maximize federal funding, an inability to provide the necessary medical care needed, the inability to provide necessary placements based on the needs of the children, and failure to timely file petitions to terminate parental rights (*Id.* at ¶¶ 161-177, 185-192). Plaintiffs claimed that all these actions by Defendants "amount[ed] to a pattern, practice, and custom of failure to exercise reasonable professional judgment and deliberate indifference to in-custody Plaintiff children's constitutional rights." *Id.* at ¶ 204. These allegations are precisely what Defendants have spent the last four-plus years working to address.

Even if deliberate indifference could be shown—and it cannot—the requisite causal link is still missing. As demonstrated more fully above and in the Sanders Affidavit[33], Defendants' persistent and widespread practices provide adequate staffing with manageable caseloads, necessary resources and training, timely foster home licensing, adequate foster payments, a continuum of care for quality residential services, intentional step to address maltreatment in care, sufficient adoption specialists and subsidies, access to medical exams, maximized funding, and additional services. Defendants' efforts to advance meaningful legislation and to upgrade technology systems have further enabled delivery of these results. Defendants' current widespread practices negate any direct causal link between Defendants' customary policies and Plaintiffs' alleged constitutional deprivation.

---

[33] *See*, *e.g.*, Sanders Affidavit ¶¶ 32-42 (legislation and agency realignment), ¶¶ 43-64 (staffing), ¶¶ 65-73 (programs and practice), ¶¶ 74-87 (technology), and ¶¶ 88-103 (placement array).

**2.      Because Defendants have addressed Plaintiffs' alleged constitutional deprivations, the Court now lacks jurisdiction to continue oversight of Mississippi's child welfare system.**

Jurisdiction "is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 142 F. 4th 819, 824 (5th Cir. 2025) (quoting *Ex Parte McCardle*, 74 U.S. 506, 514 (1868)); *see also*, *Chisom*, 116 F.4th at 316 ("the starting point for courts in consent-decree cases is an understanding that the decree has an end, and it is the courts' duty to ensure that control is returned to the State when that end is reached."). Article III's "case-or-controversy requirement persists 'through all stages of federal judicial proceedings.'" *Dierlam v. Trump*, 977 F.3d 471, 476 (5th Cir. 2020) (citations omitted); *Blackledge v. City of Hattiesburg*, 809 F. Supp. 3d 443, 457 (S.D. Miss. 2025) (citations omitted). When the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome, there is no case or controversy. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).[34]

When the parties consented to this Court's continuing jurisdiction as part of the 2nd MSA, this case and the parties were in an entirely different posture. The current scenario, following the Defendants' comprehensive systemic improvements, calls for a new review of the Court's jurisdiction. Defendants have proactively taken the necessary steps to ensure their policies and practices are not the moving force behind any violation of Plaintiffs' rights. Defendants have

---

[34] Federal courts have an ongoing obligation to determine whether they have jurisdiction. *See Matter of Kutner*, 656 F.2d 1107, 1110 (5th Cir. 1981); *see also*, *Save the Bay, Inc. v. U.S. Army*, 639 F.2d 1100, 1102 (5th Cir. 1981) (Because federal courts are courts of limited jurisdiction, "it is incumbent upon federal courts . . . to constantly examine the basis of jurisdiction."); *MCG, Inc. v. Great W. Energy Corp.*, 896 F.2d 170, 173 (5th Cir. 1990) ("Federal courts, both trial and appellate, have a continuing obligation to examine the basis for their jurisdiction."). This obligation to examine jurisdiction is reinforced by Federal Rule of Civil Procedure 12(h)(3) which provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). And, "no action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant . . . ." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

35

remedied the conditions that gave rise to Plaintiffs' claims. The controversy is no longer "live," and the Court lacks Article III jurisdiction. *Chafin*, 568 U.S. at 172. As a result, this action should be dismissed.

**B.      Alternatively, the Court should vacate the 2nd MSA pursuant to Rule 60(b)(5) because its prospective enforcement is no longer equitable.**

A consent decree that persists beyond its useful life devolves from a tool of constitutional compliance into an instrument of policy-driven micromanagement. Instead, a court should exercise its equitable power to return control to the state. Although Defendants' primary position is that this Court lacks jurisdiction, the Court need not resolve that question to grant the relief sought. Even assuming jurisdiction, the 2nd MSA should also be vacated under Rule 60(b)(5) because its prospective enforcement is no longer equitable.

**1.      The Court's equitable powers are critical to bringing consent decrees, like the 2nd MSA, to an end and returning control to the State.**

While consent decrees play a role in institutional reform cases, courts recognize that consent decrees "are 'not intended to operate in perpetuity' . . . because 'case-by-case resolution and accountability is the norm from the perspective of our national Constitution.'" *Chisom*, 116 F.4th at 316 (citations omitted); *see also*, *Guajardo*, 363 F.3d at 394; *Allen*, 14 F.4th at 373 (reiterating that federal decrees are not intended to operate indefinitely and must be subject to modification or termination when circumstances warrant). Instead, consent decrees are "temporary solutions that may be kept in place only as long as necessary to cure an unlawful condition." *Jackson v. Los Lunas Cmty. Program,* 880 F.3d 1176, 1192 (10th Cir. 2018). Because consent decrees like the 2nd MSA "are the rare exception . . . a 'federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials.'" *Chisom*, 116 F.4th at 316 (citation omitted).

36

The Supreme Court has established that "a federal consent decree must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citing *Firefighters v. Cleveland*, 478 U.S. 501, 525 (1986)); *see also*, *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 335 (5th Cir. 2018) ("the permissible scope of a consent decree is not unlimited."); *United States v. Mississippi*, 82 F.4th 387, 398 (5th Cir. 2023) (An institutional reform "[i]njunction[] must be narrowly tailored within the context of the substantive law at issue to address the specific relief sought.") (quoting *E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021)). In *Frew*, the Court recognized that consent decrees "may improperly deprive future officials of their designated legislative and executive powers" and "may also lead to federal-court oversight of state programs for long periods of time even absent an ongoing violation of federal law." *Frew*, 540 U.S. at 441.

A court's equitable powers in the consent decree context focus on three factors: the decree must be "designed as nearly as possible to restore the victims of [illegal] conduct to the position they would have occupied"; it must "directly address and relate to the [federal-law] violation itself"; and "principles of federalism require that federal courts give 'significant weight to the views of government officials,' and that 'state officials with front-line responsibility for administering [a state program] be given latitude and substantial discretion.'" *Jackson*, 880 F.3d at 1192-93 (citing *Milliken v. Bradley*, 433 U.S. 267, 280 (1977) and *Frew*, 540 U.S. at 442). As the Supreme Court cautioned in *Frew*:

> The federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials. As public servants, the officials of the State must be presumed to have a high degree of competence in

37

deciding how best to discharge their governmental responsibilities. *A State, in the ordinary course, depends upon successor officials, both appointed and elected, to bring new insights and solutions to problems of allocating revenues and resources.* The basic obligations of federal law may remain the same, but the precise manner of their discharge may not. If the State establishes reason to modify the decree, the court should make the necessary changes . . . .

*Frew*, 540 U.S. at 442 (emphasis added). A consent decree "directed to events to come is subject always to adaptation as events may shape the need." *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 436 (5th Cir. 2011) (citing *United States v. Swift & Co.,* 286 U.S. 106, 114 (1932)). Whether a decree is entered as a result of litigation or through agreement by the parties, "a court does not abdicate its power to revoke or modify its mandate, if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong." *Id.*

> 2.      **The Court should vacate the 2nd MSA by exercising its equitable powers under Rule 60(b)(5).**

Federal Rule of Civil Procedure 60(b)(5) provides that a party may obtain relief from a judgment or order if, among other things, "applying [the judgment or order] prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). Rule 60(b)(5) recognizes that "federal courts have inherent equitable power to modify their own decrees, including consent decrees." *City of Boerne*, 659 F.3d at 436; *see also*, *United States v. Lawrence Cty. Sch. Dist.*, 799 F.2d 1031, 1046 (5th Cir. 1986)("The federal courts have always affirmed their equitable power to modify any final decree that has prospective application."). In fact, the Supreme Court has noted "Rule 60(b)(5) serves a particularly important function in what we have termed 'institutional reform litigation.'" *Horne*, 557 U.S. at 447 (2009) (citing *Rufo* v. *Inmates of Suffolk County Jail,* 502 U.S. 367, 380 (1992)).

As discussed above, since the entry of the 2nd MSA—and in particular, during its suspension—circumstances have changed which make the continued enforcement of the 2nd MSA no longer equitable. "If a durable remedy has been implemented, continued enforcement of the

38

order is not only unnecessary, but improper." *Anderson v. City of New Orleans*, 38 F.4th 472, 479 (5th Cir. 2022) (quoting *Horne*, 557 U.S. at 450). Applying a proper Rule 60(b)(5) analysis, the most suitably tailored solution here is vacatur of the 2nd MSA.

### a. Federalism concerns call for a flexible approach to Rule 60(b)(5) in the context of this institutional reform case.

The Supreme Court has cautioned that courts should take a "flexible approach" when applying Rule 60(b)(5) to institutional reform cases because such decrees often remain active for many years, "raise sensitive federalism concerns" involving "areas of core state responsibility," and may "bind state and local officials to the policy preferences of their predecessors*." Horne, 557 U.S.* at 448-50. Wide-ranging decrees pose problems because they have "the effect of dictating state or local budget priorities," they may "improperly deprive future officials of their designated legislative and executive powers," and the State "depen[ds] upon successor officials, both appointed and elected, to bring new insights and solutions." *Id.* at 448-49. "Where 'state and local officials ... inherit overbroad or outdated consent decrees that limit their ability to respond to the priorities and concerns of their constituents,' they are constrained in their ability to fulfill their duties as democratically-elected officials." *Id.* at 449.

Because of these features, "courts must take a 'flexible approach' to Rule 60(b)(5) motions addressing such decrees" and "remain attentive to the fact that 'federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law].'" *Id.* at 450 (internal citations omitted). The Supreme Court has further cautioned that if a decree such as the 2nd MSA is "not limited to reasonable and necessary implementations of federal law, it may 'improperly deprive future officials of their designated legislative and executive powers.'" *Id.*

Applying this analysis here, Rule 60(b)(5) counsels modification of the 2nd MSA. The rule

provides in relevant part:

> (b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> * * *
>
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; **or applying it prospectively is no longer equitable** . . .

Fed. R. Civ. P. 60 (emphasis added). "Use of the disjunctive 'or' makes it clear that each of the provision's three grounds for relief is independently sufficient." *Horne*, 557 U.S. at 454. Relatedly, each of these grounds for relief require a different focus by the reviewing court. *See Jackson*, 880 F.3d at 1201 ("a motion for relief from a consent decree based on an assertion that 'applying it prospectively is no longer equitable' demands a different focus than a motion based on an assertion that 'the judgment has been satisfied, released or discharged.'") (citation omitted).

With respect to the satisfaction of a judgment prong, "it is appropriate for a court to focus on whether the movant has satisfied each obligation set forth in the consent decree." *Jackson*, 880 F.3d at 1201. That analysis does not apply here. Instead, where—as here—relief is sought on the ground that prospective enforcement is no longer equitable, a court should "modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne*, 557 U.S. at 447.[35] Under this prong, "the court must broadly inquire whether the party obligated by the decree is **at that time** in compliance with federal law." *Jackson*, 880 F.3d at 1202 (emphasis added).

---

[35] In *Rufo*, the Supreme Court also noted that "Modification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous [or] when a decree proves to be unworkable because of unforeseen obstacles." *Rufo*, 502 U.S. at 384.

### b.  The 2nd MSA has prospective application.

"[J]udgments operate 'prospectively' within the meaning of Rule 60(b)(5) if they 'involve the supervision of changing conduct or conditions.'" *Smith v. Hosemann*, 2022 WL 2168960, at *5 (S.D. Miss. May 23, 2022) (quoting *Cook v. Birmingham News*, 618 F.2d 1149, 1152 (5th Cir. 1980)). The 2nd MSA has prospective application because it requires Defendants to perform over 100 future acts, requires the Court through its Monitor to supervise ongoing conditions, and is executory by its terms. *See Smith*, at *5-6 (S.D. Miss. May 23, 2022).

### c.  Continued enforcement of the 2nd MSA is no longer equitable.

Defendants seek relief under the third prong identified in Rule 60(b)(5)—enforcement of the 2nd MSA is no longer equitable. Therefore, Defendants are not required to show they have complied with every obligation enumerated in the 2nd MSA, but instead, Defendants must establish: (1) "a significant change in circumstances warrants revision of the decree"; and (2) "the proposed modification is suitably tailored to the change circumstance." *Rufo,* 502 U.S. at 383. "[O]nce a party carries this burden, a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Horne*, 557 U.S. at 447 (citing *Agostini v. Felton,* 521 U.S. 203, 215 (1997)).

#### i.  The 2nd MSA should be vacated because significant changes in circumstances render its continued enforcement onerous and detrimental to the public interest.

Rule 60(b)(5) serves a critical function in institutional reform cases because such decrees "often remain in force for many years, and the passage of time frequently brings about changed circumstances—*changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights*—that warrant reexamination of the original judgment." *Horne*, 557 U.S. at 447–48 (emphasis added). When a party to a consent decree is fulfilling its legal obligations "by new means that reflect new policy insights and other changed

circumstances[,] Rule 60(b)(5) provides the vehicle for petitioners to bring such an argument." *Id.* at 439.

Mississippi's child welfare system has undergone a radical transformation since the Amended Complaint was filed more than twenty years ago. The system today stands in stark contrast to the one described in the Amended Complaint—and even to the system that existed four-plus years ago when the 2nd MSA was initially suspended. The changing landscape of child welfare in Mississippi is the direct result of new policy insights together with changes in the law which have been aimed at revitalizing the child welfare services provided across the state. These significant changes are a durable remedy forming long-term institutional change rendering the continued enforcement of the 2nd MSA detrimental to the public interest.

### (a) Suspension of the 2nd MSA, itself, was a significant change.

A significant change in circumstance can be shown "by showing that the decree was not meeting its intended purpose." *City of Boerne*, 659 F.3d at 437-38 (citing *Police Ass'n of New Orleans Through Cannatella v. City of New Orleans*, 100 F.3d 1159, 1168 (5th Cir. 1996)) and *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 252 (1968). The fact that Defendants made such significant improvements during the suspension—not during the 2nd MSA's enforcement period—underscores that the 2nd MSA did not, and will not, meet its intended purpose of resolving Plaintiffs' substantive due process claims.

During the suspension, MDCPS could focus resources on its core mission rather than the arduous task of producing tens of thousands of pages to the Monitor to attempt to show legal compliance. For the years in which the 2nd MSA was in effect, the Monitor developed a "production grid" which included the type of documents/data requested for each provision, along with a production schedule that required MDCPS to report on a monthly, quarterly, semi-annual,

and/or annual basis. *See* Sanders Affidavit, ¶ 26. MDCPS regularly produced *more* documents in response to ad hoc follow-up requests from the Monitor. *Id*. The volume of productions ballooned from 6,303 pages in 2018 to 71,845 in 2020, not counting supporting spreadsheets and data files. *Id*. at ¶ 27. Relieved of this administrative burden during the suspension, Defendants were free to make substantial strides in establishing a system that meets Plaintiffs' substantive due process rights and implements services beyond the constitutional minimum.

### (b) The law governing Mississippi's child welfare system has changed.

During its 2023 session, the Legislature passed the Pathway to Permanency Act, which fully separated MDCPS from MDHS[36], made MDCPS a necessary party at all stages of youth court proceedings, and established termination of parental rights and adoption proceedings as priority cases. *Id*. at ¶ 35.a. The Legislature also established the Mississippi Task Force on Foster Care and Adoption and passed the Foster Parents' Bill of Rights. *Id.* at ¶ 35.b.

In 2024, the Legislature passed another comprehensive package based on the Task Force's recommendations, which:

- Amended the definition of neglected child to exclude failure to provide food, clothing or shelter caused primarily by financial inability unless relief services have been offered and refused and the child is in imminent risk of harm;

- Affirmed that attorneys for all parties in youth court proceedings owe their party client the duties prescribed by the Mississippi Rules of Professional Conduct;

- Provided MDCPS the right to hire Agency counsel to represent it at all stages of proceedings involving a child for whom it has custody;

- Established that a petition for termination of parental rights must be heard within 90 days of filing, absent extraordinary circumstances;

- Established that all parents have the right to appointed counsel in a termination of parental rights proceeding;

---

[36] The separation fully authorized MDCPS, as a stand-alone agency, to formulate policy and implement powers and duties of the Agency in carrying out child welfare programs throughout the state.

- Modified the time requirements for conducting permanency hearings; and

- Clarified which youth court orders are appealable.

*Id.* at ¶ 38.a. The Legislature also passed legislation enabling MDCPS to utilize QRTPs and creating the Canopy CARES Center public-private partnership providing 33 beds for higher-level in-state treatment. *Id.* at ¶¶ 38.b.-c.

During its 2025 session, the Legislature revised permanency hearing timelines to at least every ninety days, expanded the definition of "kinship" to include fictive kin, and provided state funding for the Guardianship Assistance Program ("GAP"). *Id.* at ¶¶ 40, 73.

These legislative changes have substantially altered the landscape of child welfare in Mississippi, establishing new requirements and oversight mechanisms that overlap with provisions of the 2nd MSA. These are substantial changes in circumstances that help to ensure protection of Plaintiffs' substantive due process rights and renders the Court's continued oversight unnecessary.

MDCPS has also undergone structural changes related to and as a result of these legislative changes. In October 2022, MDCPS restructured from a regional model to a service area model organizing the state into seven service areas based on geography and workloads to provide a more focused effort in caseload management, in meeting requirements for children in custody, and in personnel management. *Id.* at ¶ 32.

In 2023, MDCPS implemented specialization of work to allow case specialists and management to become subject matter experts in the areas of investigations, safety, child wellbeing, and adoption. *Id.* at ¶ 46. MDCPS also created the Operations and Strategic Plans department in 2023 to, among other things, assist with facilitating the use of data and strategic plans for creating solutions to meet established Agency goals and synchronizing the efforts of divisional and departmental staffs through the tracking, development and submission of Commissioner's directives. *Id.* at ¶ 37.

44

These structural changes have allowed Defendants to continually improve services provided to children in MDCPS custody. Coupled with the significant legislative changes discussed above, these demonstrate substantial changes in circumstances under Rule 60(b)(5) that counsel the Court to discontinue oversight.

### (d) MDCPS has implemented several significant programmatic changes.

Since the initial suspension of the 2nd MSA, MDCPS has entered into an agreement with Youth Villages for its Intercept Services program, obtained approval of Mississippi's FFPSA plan, and entered into new contracts developing a more robust continuum of care for quality residential services. *Id.* at ¶¶ 69-70, 93. MDCPS has received increased state funding each of the past five years, totaling a 26% increase from SFY-2022 to SFY-2026, with $140,814,395 in state general funds appropriated for SFY-2027. *Id.* at ¶ 42. The federal eligibility penetration rate rose from 32% in September 2021 to 46% in March 2026, with each percentage point increase representing approximately $850,000 in additional federal reimbursement. *Id.* at ¶ 66. MDCPS also submitted a new standalone Cost Allocation Plan effective July 1, 2023, in connection with its separation from MDHS. *Id.* at ¶ 67. These programmatic changes are likewise substantial changes in circumstances making continued oversight under the 2nd MSA unnecessary.

### (e) MDCPS has dramatically improved staffing.

MDCPS's deliberate plan to improve staffing has resulted in manageable caseloads and improved retention. MDCPS has provided case-carrying staff with necessary resources to effectively do their work and has lifted the historical freeze of its career ladder and realigned salaries resulting in an average 20% pay increase for MDCPS case-carrying staff. *Id.* at ¶¶ 44-45. MDCPS has also partnered with accredited social work programs at eight universities to enable social work students to pursue careers with MDCPS and has established the Workforce Wellbeing

45

Department to focus on workforce stabilization. *Id*. at ¶¶ 49, 61. These efforts have resulted in a reduction in case-carrying staff turnover; 90% of case-carrying staff meeting the recommended caseload performance from the Organizational Analysis; and the statewide average of only 11.3 cases assigned to a Specialist as of March 2026, with no Specialist having more than 28 cases assigned. *Id.* at ¶¶ 64, 60, 59. These staffing improvements also represent substantial changes in circumstances which eliminate the need for continued oversight under the 2nd MSA.

<u>**(f) MDCPS has made significant technological advances.**</u>

In June 2022, MDCPS began replacing its legacy MACWIS with a federally compliant CCWIS (Pathways) to improve case management efficiency, enable real-time data sharing, and support continuous quality improvement. *Id.* at ¶¶ 75-76. When Pathways goes live later in 2026, it will transform the way in which MDCPS is able to provide services to children and families. MDCPS also established a Data Management Team in 2022 for data governance, security, and lifecycle processes, and created a GIS program in September 2023 to optimize service delivery through geographic data analysis and predictive planning. *Id.* at ¶¶ 80, 83. These technological advances have allowed Defendants to continually improve the services provided to children in the custody of MDCPS. These are all substantial changes in circumstances making continued oversight unnecessary.

<u>**(g) MDCPS has transformed available placement options.**</u>

MDCPS has introduced new policies, procedures, and administrative rules for licensure of both foster families and facilities; Governor Reeves has signed a joint proclamation with the Administration for Children and Families to expand foster homes, increase kinship placements, and strengthen prevention services; and the Legislature has passed legislation enabling MDCPS to utilize QRTPs to provide opportunities for placement where a child's psychological or behavioral

46

needs can be stabilized and legislation creating a public-private partnership to provide a minimum of 33 beds at the Canopy CARES Center, enabling higher-level in-state treatment. *Id.* at ¶¶ 89-92, 38.b.-c. MDCPS also entered into new contracts with its network of partnering agencies to develop a continuum of care ensuring a child is provided with the correct level of quality residential services. *Id.* at ¶ 93.

These placement array developments are a combination of both new policy insights and new laws. Therefore, they are all substantial changes in circumstances making continued oversight unnecessary.

### ii.    *Vacating the 2ⁿᵈ MSA is suitably tailored to the changed circumstances, and the objective of the 2ⁿᵈ MSA has been attained.*

When a request to vacate "relates to the vindication of a constitutional right, the modification must be 'suitably tailored to the changed circumstance.'" *Williams v. Edwards*, 87 F.3d 126, 131 (5th Cir. 1996) (citing *Rufo*, 502 U.S. at 383).[37] In addition, "when a party seeks termination or vacatur of a consent decree based on the inequity of continued oversight, a court must determine not only whether changed circumstances exist, but also whether the 'objective' of the decree—that is, whether compliance with federal law—has been attained." *Jackson*, 880 F.3d at 1201 (citing multiple cases). Where the Rule 60(b)(5) analysis is based on the decree no longer being equitable, "the court must broadly inquire whether the party obligated by the decree is at that time in compliance with federal law." *Id.* at 1202; *see also*, *Horne*, 557 U.S. at 454; *John B. v. Emkes*, 710 F.3d 394, 398 (6th Cir. 2013) ("Consent decrees are not entitlements. Instead, a decree may remain in force only as long as it continues to remedy a violation of federal law.").

---

[37] "[I]t is well settled that consent decrees once entered remain dynamic. . . . Indeed, 'there is little question that the district court has wide discretion to interpret and modify a forward-looking consent decree.'" *Williams*, 87 F.3d at 131–32 (citations omitted).

"[I]f Defendants here can show they are no longer violating the class members' federal rights, and the district court has reason to believe Defendants' compliance with federal law is durable, then 'continued enforcement of the District Court's original order[s] is inequitable within the meaning of Rule 60(b)(5), and relief is warranted.'" *Jackson*, 880 F.3d at 1203 (citation omitted).

The four-year suspension itself demonstrates that vacatur of the 2nd MSA is suitably tailored. Unburdened by the 2nd MSA, Defendants made substantial strides in both meeting Plaintiffs' substantive due process rights and implementing improvements beyond the constitutional minimum. Due to Defendants' comprehensive efforts, a durable remedy exists, and there is no longer a need for a consent decree.

### (a) There is no ongoing violation of federal law as contemplated by the 2nd MSA.

The overarching purpose of the 2nd MSA is to "resolve all remaining claims"—Plaintiffs' substantive due process claims. As demonstrated above, Defendants have taken purposeful actions to ensure the personal security and reasonably safe living conditions of children in MDCPS custody.

Recognizing the obligations set forth in a consent decree "are merely a means of accomplishing [compliance with federal law], not the end," the *Jackson* court recognized that Defendants may fulfill "federal-law obligations to class members by means other than those provided in the decrees." *Jackson*, 880 F.3d at 1206-07. So, whether Defendants achieved compliance through the 2nd MSA, or by other means while it was suspended, is immaterial, *what matters is whether Defendants are currently in compliance with federal law—and Defendants are.* As such, the Court should vacate the 2nd MSA. *See id.* at 1202 ("Because compliance with federal law has been attained, a court must return control over the program to the state and its officials, provided a durable remedy is in place.").

**(b) Vacating the 2nd MSA is suitably tailored because a durable remedy exists.**

As the Supreme Court has recognized, what is critical for a Rule 60(b)(5) inquiry is whether the objective of the decree has been achieved. *See*, *Horne*, 557 U.S. at 450. "If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Id.* "Defendants may satisfy the durability required by *Horne* in a number of ways, including: by taking specific, long-term actions aimed at curing the federal violations, by making good faith efforts to obtain compliance, or by operating in conformity with federal law for a reasonable period of time." *Jackson*, 880 F.3d at 1204.

The significant changes outlined above demonstrate that Defendants' compliance with federal law is not fleeting but durable—Defendants made substantial systemic improvements during the suspension of the 2nd MSA in good faith. With no enforcement action available to Plaintiffs during the suspension period, Defendants could have chosen inaction but instead proactively fostered change to ensure—at minimum—constitutionally adequate care. The wide-ranging statutory changes establish specific, long-term actions demonstrating commitment to future compliance. These legislative changes, along with programmatic, staffing, technology, and placement improvements, have drastically changed the landscape of child welfare in Mississippi. Since Defendants have "show[n] they are no longer violating the class members' federal rights, and [that] . . . compliance with federal law is durable, then 'continued enforcement of the District Court's original order[s] is inequitable.'" *Id.* at 1203.

Vacating the 2nd MSA is a suitably tailored course of action because a durable remedy exists. The durability of these reforms is confirmed by their legislative foundation, which binds current and future administrations and cannot be unilaterally reversed. Moreover, the safeguard that remains once the decree is dissolved is the law itself: "If the [S]tate again violates federal law,

49

victims may file a new lawsuit to bring the [S]tate back into compliance." *Chisom*, 116 F.4th at 317. That safeguard—not perpetual federal oversight—is the remedy our constitutional structure provides.

### iii.    *Similar institutional reform cases show that continued enforcement of the 2nd MSA is no longer equitable.*

The 2nd MSA became intertwined with the day-to-day operations of MDCPS and, indirectly, the state youth courts, legislature, other state agencies, and other child welfare partners. Similar cases demonstrate that continued enforcement is no longer equitable.

"[I]nstitutional reform litigation is a creature poorly suited for the courts, as the role of the workaday trial judge in such litigation is often rather precarious at best and downright ineffectual at worst." *Connor B. ex rel. Vigurs v. Patrick*, 985 F. Supp. 2d 129, 157 (D. Mass. 2013), *aff'd*, 774 F.3d 45 (1st Cir. 2014). In *Connor B.*, involving claims similar to those here, the court found the relief sought "would encroach upon terrain that is rightfully the province of the legislature" and "would commit this Court to the near-perpetual oversight of an already-complex child-welfare regime, [and] the redistribution of scarce governmental resources would no doubt produce certain negative externalities, not the least of which include the deprivation of other state agencies of the means needed to perform their functions fully." *Id.* (internal citations omitted).

The Fifth Circuit has similarly cautioned against such entanglements with political branches and executive agencies. *See U.S. v. Mississippi*, 82 F.4th 387 (5th Cir. 2023). In that case, an institutional reform case involving Mississippi's mental health system, the court reviewed an injunction which had "a broad mission with an elusive target." *Id.* at 400. The court took particular issue with the fact "the order terminates only when Mississippi 'has attained substantial compliance' with each paragraph of the order and 'maintain[ed] that compliance for one year as

determined by this Court.'"[38] *Id.* The Fifth Circuit found that "utterly vague language could 'commit [the district] Court to the near-perpetual oversight of an already-complex' state-run mental health system." *Id.* More recently, the Fifth Circuit reiterated these concerns, cautioning that "federal judges are not allowed to become permanent de facto superintendents of major state agencies" and should not "thwart the state's self-management, where the state is taking strides to eliminate the abuses that led to the original decree." *M.D. v. Abbott*, 119 F.4th 373, 395 (5th Cir. 2024). "Nor are federal judges even suited, by training or temperament, to manage institutions, personnel, or the provision of vital state services, even if counselled by monitors." *Id.*; *see also*, *Frew v. Hawkins*, 540 U.S. at 441 (noting that "remedies outlined in consent decrees involving state officeholders may improperly deprive future officials of their designated legislative and executive powers").

In a strikingly similar case to the case at bar, a West Virginia court dismissed claims against the state's child welfare agency, finding that federal courts should not be "in the business of administering state agencies." *Jonathan R. v. Morrisey*, 768 F. Supp. 3d 756, 763 (S.D. W. Va. 2025); *see also*, *Reynolds v. McInnes*, 338 F.3d 1201, 1219 (11th Cir. 2003) ("[W]oven throughout the Constitution is a commitment to democratic self-rule through officials answerable to the people [which means] Federal court oversight of and interference in the operations of a state government department or agency 'should be as narrow and short-lived' as fulfilling the [purpose of the decree] allows."). More pointedly, the *Jonathan R.* court observed that a "court cannot write a state budget,

---

[38] The 2nd MSA provides similar language related to exit: "Defendants may seek an order dismissing court jurisdiction of this matter and any remedial orders that remain open at the time the application is made, upon Defendants' showing that they have achieved and maintained substantial compliance of all of the provisions of this 2nd MSA based upon 12 continuous months of data that has been verified by the Monitor, prior to the application." 2nd MSA, ¶ 11.3. The 2nd MSA also provides that Defendants may file a motion pursuant to Rule 60(b). *See* 2nd MSA, ¶ 11.2.a.

51

hire state employees, or oversee child welfare administration as Plaintiffs request. The court cannot move state funds and shift local priorities to enact statewide reform. Nor can the court craft DHS policy that defines 'adequate,' 'appropriate,' 'sufficient,' 'unnecessary,' and 'unreasonable' as the Plaintiffs ask." *Jonathan R.*, 768 F. Supp. 3d at 763 (internal citations omitted).[39] The *Jonathan R.* court ultimately dismissed the case on the eve of trial after more than five years of litigation finding the relief sought by Plaintiffs would require the court "to create state policy"—something that "is not the role of the federal courts"—the *Jonathan R.* court found it lacked subject matter jurisdiction. *Id.* at 768-69.

The *L.J. v. Ruth Massinga* case in Maryland illustrates the challenges of consent decrees in child welfare. *See* Cause No. 1:84-cv-04409-SAG (D. Md.). More than thirty-five years after the original consent decree, the district court lamented that "we are spending a lot of money and resources on this reporting, and we're not necessarily getting any closer to achieving anything by virtue of this consent decree" and questioned whether the decree was "potentially even making things worse in terms of diverting resources toward something that doesn't seem to be having great effect." Transcript of Motions Hearing (July 29, 2024), ECF Doc. 716, at 4-5.

Throughout the 143-minute hearing in *Massinga*, the court expressed its concern about the role of the court, the feasibility of its effective takeover of Maryland's child welfare system, and the effect of such failures on the reputation of the court. To that end, the court noted that it "has now been put in a position where it has been sort of the in-perpetuity supervisor of the foster care system which is not something that the court is well suited to do." *Id.* at 8.

Like Maryland, some federal courts have provided decades-long oversight of state child

---

[39] The court cited *Horne v. Flores*, 557 U.S. 433, 448 (2009) for the proposition that "Federalism concerns are heightened when, as in these cases, a federal court decree has the effect of dictating state or local budget priorities."

welfare systems as a result of institutional reform litigation. *See, e.g.*, *B.H. et al. v. Johnson et al.*, No. 1:88-cv-05599-HSO (N.D. Ill.) (original consent decree entered on Dec. 20, 1991); *Kenny A. et al. v. Kemp et al.*, No. 1:02-cv-01686 (N.D. Ga.) (original consent decree entered on Oct. 27, 2005); *Dwayne B. et al. v. Whitmer et al.*, No. 2:06-cv-13548 (E.D. Mich.) (original consent decree entered on Oct. 24, 2008); *M.D. et al. v. Abbott et al.*, No. 2:11-cv-00084 (S.D. Tex.) (original court injunction entered on Dec. 17, 2015); and *Andrew C. et al. v. Raimondo et al.*, No. 1:07-cv-00241-WES (D.R.I.) (original consent decree entered on May 15, 2018).

Point being: institutional reform cases, while perhaps well-intentioned, rarely result in truly reformed systems and commonly lead to expenditure of unnecessary state funds and court time and resources, with little progress. Similar to the many cases above, in this case, continued enforcement of the 2nd MSA is no longer an equitable remedy justifying the Court's continued oversight of the state's child welfare system.

## IV.  CONCLUSION

After more than two decades, Mississippi's child welfare system is markedly different from that portrayed in the Amended Complaint. This contrast is the direct result of purposeful actions taken by Defendants—especially steps taken during the suspension of the 2nd MSA when Defendants had the opportunity to focus efforts and achieve systemic reforms and improvements— to ensure Plaintiffs' rights to personal security and reasonably safe living conditions. Defendants' comprehensive overhaul of the child welfare system over the past several years demonstrates that the 2nd MSA no longer serves its intended purpose. Defendants have addressed Plaintiffs' alleged constitutional violations and are not deliberately indifferent to Plaintiffs' rights; therefore, the Court should dismiss this action for lack of subject matter jurisdiction. But even assuming jurisdiction persists, the unprecedented scope of Defendants' legislative, structural, programmatic,

and technological reforms compels vacatur of the 2nd MSA under Rule 60(b)(5). Continued

enforcement will not protect Plaintiffs' rights; it will only entrench federal micromanagement of a

state agency that has demonstrated its capacity to self-govern.

RESPECTFULLY SUBMITTED, this the 11th day of May, 2026.

> TATE REEVES, as Governor of the State of Mississippi, ANDREA SANDERS, as Commissioner, Mississippi Department of Child Protection Services, and KIMBERLY WHEATON, as Deputy Commissioner of Child Welfare, Mississippi Department of Child Protection Services

> By: /s/ *Clint Pentecost*
>   CLINT PENTECOST

OF COUNSEL:
William C. (Clint) Pentecost (MSB #99841)
Jennifer E. Salvo (MSB #101208)
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC
One Eastover Center
100 Vision Drive, Suite 400
Jackson, MS 39211
Telephone: (601) 351-2400
cpentecost@bakerdonelson.com
jsalvo@bakerdonelson.com

Douglas T. Miracle (MSB #9648)
Deputy Attorney General
MISSISSIPPI ATTORNEY GENERAL'S OFFICE
550 High Street
Jackson, MS 39201
Telephone: (601) 359-5654
doug.miracle@ago.ms.gov

*Attorneys for Defendants*

54

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing *Response* with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel of record.

This 11th day of May, 2026.

/s/ Clint Pentecost
CLINT PENTECOST

55