# Progress of the Mississippi Department of Child Protection Services

Monitoring Report for *Olivia Y., et al. v. Reeves, et al.*
2nd MODIFIED MISSISSIPPI SETTLEMENT AGREEMENT AND REFORM PLAN

**REPORT 9**
**APRIL TO DECEMBER 2025**

**ISSUED JULY 29, 2026**



PUBLIC CATALYST

# CONTENTS

Introduction ................................................................................................................ 4

   Summary of Progress and Challenges ................................................................. 5

   2025 Summary of Commitments ........................................................................ 8

   Summary of Commitments Achieving Maintenance Status ................................ 22

   Methodology ...................................................................................................... 23

   Demographics .................................................................................................... 24

   Operational Budget ............................................................................................ 29

Systemic Infrastructure Standards ............................................................................ 29

   Staff Qualifications and Training ........................................................................ 29

   Caseloads and Supervision ................................................................................ 32

   Continuous Quality Improvement ...................................................................... 35

   Management Information Systems & Data Reporting ......................................... 36

   Performance Based Contracting ......................................................................... 39

   Foster Care Maintenance Payments ................................................................... 39

Child Safety and Maltreatment in Care ..................................................................... 40

   Screening Reports of Abuse and Neglect ........................................................... 40

   Investigating Maltreatment in Care ................................................................... 42

Family-Based Placements .......................................................................................... 52

Placement Standards ................................................................................................. 60

Visitation ................................................................................................................... 67

   Worker Contact and Monitoring ........................................................................ 67

   Developing and Maintaining Connections ......................................................... 69

Child and Youth Permanency ..................................................................................... 72

   Comprehensive Family Service Plans .................................................................. 72

   Concurrent Permanency Planning ...................................................................... 74

   Reunification and Trial Home Visitation ............................................................ 74

   Other Permanency Case Goals ........................................................................... 77

   Permanency Reviews ......................................................................................... 81

Permanency Performance Indicators.................................................................................... 83

Transition to Independent Living............................................................................................ 84

Child Well-Being...................................................................................................................... 89

Physical and Mental Health Care ...................................................................................... 89

Educational Services.......................................................................................................... 93

# FIGURES

Figure 1. Age of Children in Custody on December 31, 2025 ...................................................... 25
Figure 2. Sex of Children in Custody on December 31, 2025...................................................... 26
Figure 3. Placement Types of Children in Custody on December 31, 2025................................. 27
Figure 4. Length of Stay in Care of Children in Custody on December 31, 2025 ....................... 28
Figure 5. Percent of Workers Meeting the Caseload Standard, April – December 2025 ........................... 33
Figure 6. Percent of Caseworker Supervisors Meeting the Supervision Ratio Standard, April – December 2025 ......................................................................................................................................34
Figure 7. Age of Children in Hotels, Q2 – Q4 2025 .................................................................... 56
Figure 8. Number of Hotel Stays Per Child, Q2 – Q4 2025 ........................................................ 57
Figure 9. Number of Shelter Care Placements, 2025.................................................................. 67

# TABLES

Table 1. Children in Custody by Time Period - 2025 ................................................................... 24
Table 2. Race and Ethnicity of Children in Custody on December 31, 2025............................... 25
Table 3. Exits from Custody by Exit Type, April 1, 2025 to December 31, 2025 ........................ 28
Table 4. Federal Permanency Goals for Children in Custody as of December 31, 2025 ........................... 29
Table 5. Caseload Standards by Case Type ................................................................................. 32
Table 6. Resource Board Payment Schedule as of January 1, 2024............................................ 40
Table 7. ANE Reports by Intake Action, Q2 - Q4 2025 ............................................................... 41
Table 8. Placement Type at Time of Investigation, 2025 ........................................................... 47
Table 9. Non-relative Foster Homes Licensed Untimely, 2025................................................... 53
Table 10. Background Checks for Relative Home Studies, 2025.................................................. 54
Table 11. Relative Foster Homes Licensed Untimely, 2025 ....................................................... 55
Table 12. Total Length of Time Spent in Hotels Per Child, Q2 – Q4 2025.................................. 57
Table 13. Number of Foster Homes Meeting Licensure Capacity Standards, Q2 – Q4 2025 ..................... 61
Table 14. Cumulative Days Spent In Shelter Care, 2025............................................................. 66
Table 15. Post Adoption Services – Families Served by Month, 2025 ........................................ 79
Table 16. Permanency Plan Review Participants, Q2 – Q4 2025................................................ 81
Table 17. Permanency Outcome Performance, FFY2025 ........................................................... 83
Table 18. Youth Receiving Identification and Essential Documentation, Q2 – Q4 2025 ........................... 89

Table 19. Initial Medical Screenings Not Meeting Standard, Q2 – Q4 2025 ..............................................90
Table 20. Initial EPSDT or Comprehensive Exams Not Meeting Standard, Q2 – Q4 2025.........................91
Table 21. Initial Dental Exams Not Meeting Standard, Q2 – Q4 2025......................................................92

## Introduction

This document, submitted to the Honorable Halil S. Ozerden, serves as the ninth annual report to the United States District Court for the Southern District of Mississippi, Northern Division in the matter of *Olivia Y. v. Reeves.* On December 19, 2016, the State of Mississippi, the Mississippi Department of Child Protection Services (MDCPS) and A Better Childhood, counsel for the plaintiffs, jointly submitted to the Court a 2nd Modified Mississippi Settlement Agreement and Reform Plan (the "2nd MSA") that provides a path for improvement of Mississippi's child welfare system. The Court had previously entered as orders of the Court the Mississippi Settlement Agreement and Reform Plan on January 4, 2008 (the "Initial Settlement Agreement") and the Modified Mississippi Settlement Agreement and Reform Plan on July 6, 2012. MDCPS is the statewide child welfare agency that provides child protection, abuse prevention, and placement services on behalf of the State of Mississippi. A Better Childhood is a national advocacy organization with experience in class action litigation on behalf of children in child welfare systems. The Court entered an order directing implementation of the 2nd MSA following its submission by the parties.

In sum, the 2nd MSA, which became effective on January 1, 2018, sets forth the child welfare infrastructure, standards, and outcomes that Mississippi must meet within specific timeframes statewide. Specifically, the 2nd MSA:

- commits MDCPS to specific improvements in the State's care for vulnerable children, with respect to their safety, permanency, and well-being;

- requires the implementation of a comprehensive child welfare data and tracking system, with the necessary controls to reduce duplication and the risk of incorrect or invalid data;

- establishes benchmarks and performance standards to be met by MDCPS within specified timeframes; and

- provides a clear path for MDCPS to exit court supervision after the successful achievement and maintenance of performance standards.

Pursuant to the 2nd MSA, the Court appointed Public Catalyst as the monitor, charged with reporting on MDCPS' progress implementing its commitments. The monitor is responsible for assessing Mississippi's performance under the 2nd MSA. The parties agreed the monitor shall consider timeliness, appropriateness, and quality in reporting on MDCPS' performance. The monitor is required to verify data reports and statistics provided by MDCPS and shall periodically conduct case record and qualitative reviews to monitor, evaluate, and validate the State's performance with respect to the commitments in the 2nd MSA. In evaluating MDCPS'

4

performance, the monitor draws no conclusion of whether the Department has achieved or maintained substantial compliance in accordance with Section 11.3. of this 2nd MSA. The monitor is required to provide a written report to the Court and the parties no less frequently than annually, verifying if MDCPS has or has not met the performance standards and commitments due during the reporting period.

The parties jointly submitted to the Court a series of remedial orders suspending operation of the 2nd MSA between June 24, 2021 and April 15, 2025,[1] when the State's responsibility to perform under the 2nd MSA resumed. As such, this is the monitor's fourth annual report to the Court under the 2nd MSA and reflects the status of Mississippi's reform efforts as of December 31, 2025. This report includes MDCPS' progress from April 15 through December 31, 2025, unless otherwise noted.[2]

## Summary of Progress and Challenges

Of 113 commitments due in 2025 in the 2nd MSA, the monitor confirmed that MDCPS met required performance standards 22 times and did not do so in 73 other areas. The monitoring team was unable to determine MDCPS' performance for eight commitments. The Department did not provide data for four commitments, and six commitments were not applicable during the period under review and are delineated in the relevant sections of the report. MDCPS' ongoing data problems include the way the Department documents and identifies certain data fields, coding errors, and performance calculations that are inconsistent with the established rules.

---

[1] On June 24, 2021, the parties filed a negotiated Joint Stipulated Order for 2nd MSA Rebuilding Period in which the parties stipulated that Defendants "do not currently have the capacity to comply with the 2nd MSA" and allowed for a period of rebuilding from October 1, 2021 until January 31, 2023. During the Rebuilding Period, MDCPS would seek to attain benchmarks related to key metrics in the areas of family-based placements, child safety and maltreatment in care, caseloads, and child well-being. All reporting, monitoring, and enforcement under the 2nd MSA was stayed until May 1, 2023, except as provided in the Rebuilding Period Order. The monitor submitted reports to the Court and the parties with respect to MDCPS' performance during the Rebuilding Period on November 15, 2022 and April 28, 2023. By agreement of the parties, the monitor was required to submit reports to the parties only for the subsequent remedial orders. On April 25, 2023, the parties filed a negotiated Order extending suspension of reporting, monitoring, and enforcement under the 2nd MSA to June 30, 2023. The parties filed another negotiated Order suspending the 2nd MSA on July 17, 2023 which continued to provide time for MDCPS to attain benchmarks related to caseload metrics and to submit its raw data in approximately 20 key areas and verified data and information in approximately five key areas. Enforcement of MDCPS' performance under the 2nd MSA was again stayed, this time until December 1, 2023. On December 12, 2023, the parties filed a Joint Stipulated Order Continuing Suspension of the 2nd MSA until September 1, 2024, providing time for MDCPS to produce data to the monitor to be validated for data accuracy in approximately 45 key areas. The monitor was also charged with assessing the quality of MDCPS' performance in these areas however, enforcement of performance standards under the 2nd MSA remained suspended during pendency of the Order. Finally, the parties filed a negotiated Joint Stipulated Order with the Court on October 18, 2024 in which they agreed to further continue the suspension of the 2nd MSA and to meet to negotiate revisions to the 2nd MSA. Like the previous Continuing Suspension Order, the monitor was charged with validating and assessing the quality of performance in the same key areas. The Order continued suspension of reporting, monitoring, and enforcement under the 2nd MSA until April 15, 2025.

[2] Commitments that include data from the first quarter of 2025 are: 2.9., 3.1., 3.3., 4.11., and 6.3.c.

While MDCPS did not report data for several commitments during the period or the monitoring team was unable to determine MDCPS' performance, the Department improved its data reporting for some 2nd MSA commitments that were problematic in prior periods.[3]

Among the areas where MDCPS showed progress toward the agreed-upon standard are:

- *Caseloads:* The monthly percentage of workers meeting the caseload standard increased to between a high of 84 percent and a low of 66 percent during the period.

- *Licensure Capacity Standards*: MDCPS continued to ensure that when children were placed in foster homes during the period, most of those homes did not exceed the capacity for which the home was licensed. MDCPS' performance in this area ranged between 90 percent and 92 percent during the period.

Among the areas where challenges persist there are several critical to child safety, including:

- *Maltreatment in Care:* MDCPS did not fully or accurately report the number of children who were victims of abuse or neglect by their foster parent or a residential facility staff member in 2025.  A review of the calendar year data provided by MDCPS resulted in varying counts of child victims ranging between 25 and 30. However, the monitoring team identified 48 children (0.74 percent) who were maltreated by their foster parent or a residential facility staff member. MDCPS did not report the additional children who had been maltreated and should have been included in the MIC rate. This is more than twice the agreed-upon rate of maltreatment (0.33 percent) and MDCPS would need to protect at least 27 more children from abuse or neglect by their caregiver to have met the agreed-upon safety standard.

- *Relative Background Checks:* The monitoring team identified gaps in completing the initial background checks for all adult household members prior to the start of a child's placement. The monitoring team found that a substantial number of background checks for the primary applicant, including MACWIS and child abuse registry checks, were completed after a child had been placed in the home.

- *Unlicensed Placements:* A recurring issue noted by the monitoring team was that at least 155 children experienced stays in hotels or motels during the period, which are unlicensed, non-residential facilities, with the children often supervised by caseworkers or contracted sitters. More than a third of these children experienced multiple stays in hotels during the period, with an average length of stay of 65 days.

---

[3] After collaboration with the Department, the monitoring team was able to validate several visitation commitments (5.1.a., 5.1.c., 5.1.d.) for the first time. Additionally in the second half of 2025, MDCPS was able to better identify sibling groups who entered custody during the period (4.6.).

- Visitation: MDCPS committed to a series of visitation commitments with children, parents, and foster care providers to assess the safety, permanency, and well-being of children, as well as to ensure service planning and the provision of services. MDCPS did not meet the visitation requirements outlined in the 2nd MSA, both in the number and the quality of visits required.

7

## 2025 Summary of Commitments

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **2nd MSA Introduction** | Defendants shall request state funds and any federal/special fund authorization sufficient to affect the provisions and outcome measures set forth in the 2nd MSA. | Yes | 29 |
| **SYSTEMIC INFRASTRUCTURE STANDARDS** | | | |
| **1.2.a.** | MDCPS shall maintain a Training Unit headed by a qualified director of training (see 2nd MSA for full requirements of the Training Unit). | Yes | 29 |
| **1.2.b.** | MDCPS caseworkers shall receive a minimum of 270 hours of pre-service training, which includes instructional training and supervised field training, and may include E-Learning. Any E-Learning training is subject to the approval of the monitor (see 2nd MSA for more info). | Yes | 30 |
| **1.2.c.** | MDCPS caseworker trainees, as part of pre-service training, may be assigned specific tasks or activities in connection with a case that is the primary responsibility of an experienced caseworker and may, under appropriate supervision, be assigned responsibility for a "training caseload" with progressively responsible caseload assignment. | N/A | 31 |
| **1.2.d.** | MDCPS caseworkers shall receive a minimum of 40 hours of in-service training, and all supervisors shall receive a minimum of 24 hours of in-service training. | Did not report | 31 |
| **1.2.e.** | MDCPS caseworker supervisors, within 90 days of hire or promotion, shall receive a minimum of 40 hours of training, directed specifically at the supervision of child welfare caseworkers. | No | 31 |
| **1.3.a.** | 90% of MDCPS caseworkers will have caseloads which do not exceed the caseload standards set forth in the 2nd MSA (pg. 3-4). Individual MDCPS caseworkers with generic caseloads shall not carry a mixed caseload that exceeds 100% capacity as calculated by weights per case type set forth in the 2nd MSA (pg. 3-4). | No | 32 |
| **1.3.b.** | 85% of MDCPS supervisors shall be responsible for no more than five caseworkers. | Yes | 33 |
| **1.4.a.** | By December 1st of each year, MDCPS shall develop an annual Continuous Quality Improvement Plan, which shall be subject to the approval of the monitor after consultation with the parties. | No | 35 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 1.4.b. | Upon approval, MDCPS will implement the CQI Plan and will do so with sufficient staff and resources to assess compliance with those provisions of the 2nd MSA that were identified for review in the Plan. The reviews will assess case practice, analyze outcomes, and produce analysis that will be shared with managers and stakeholders to achieve performance improvement. | N/A | 35 |
| 1.5.a. | MDCPS shall maintain comprehensive information systems that permit: (1) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding required actions in a child's case and whether they have taken place. | No | 36 |
| 1.5.b. | MDCPS shall have a Comprehensive Child Welfare Information System (CCWIS) appropriate to its size and complexity that shall meet federal requirements by June 30, 2021. Defendants shall take reasonable steps to ensure data quality and verification of the accuracy of data in CCWIS. The CCWIS system shall have the necessary controls to decrease the risk of duplication of data and to reduce the risk of incorrect or invalid data.  The system shall provide a visible trail to authorized administrators of all information entered, added, deleted, or modified, and shall have necessary security to protect data integrity.  This system shall be audited at least annually to ensure the accuracy and validity of data in the system. | No | 37 |
| 1.6.a. | MDCPS shall provide to all county agency staff with child welfare responsibilities access to computer services, word processing, and electronic mail and access to the current management information systems and access to CCWIS, once implemented. | Yes | 38 |
| 1.6.b. | Data related to compliance with the 2nd MSA's Foster Care Service Standards will be collected, analyzed, and made available, at least quarterly, to MDCPS regional and county staff. | Yes | 38 |
| 1.7.b. | Prior to MDCPS contracting for case management services for children in custody, MDCPS shall submit for review and approval to the monitor a detailed plan to ensure accountability and provide supervision and oversight of such agencies. | N/A | 39 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 1.8.b. | Defendants shall pay to all licensed foster families at least the basic monthly foster care maintenance payments. Every two years thereafter, Defendants shall provide increases in the foster care maintenance payments, based upon the previous year's rate of inflation. | Yes | 39 |
| **CHILD SAFETY AND MALTREATMENT IN CARE** | | | |
| 2.1. | MDCPS shall ensure that it maintains a statewide system to appropriately receive, screen, and investigate reports of child maltreatment (see 2nd MSA for system requirements). Any extensions of the timeframes set forth in MDCPS policy for the completion of investigations are subject to the review and approval of the monitor. | No | 40, 46 |
| 2.2. | MDCPS shall continue to maintain a special investigations unit whose responsibility is to investigate reports of maltreatment of children in custody. | Yes | 42 |
| 2.2. | The initiation of a special investigation shall not extend beyond 24 hours. | No | 42 |
| 2.3. | MDCPS will develop and implement policies and procedures, subject to the review and approval of the monitor, for the agency to review all maltreatment in care reports that were screened-out and assess the appropriateness within 24 hours of all screen-out determinations. If the decision to screen out the report is determined to be inappropriate, MDCPS shall ensure the report is referred for investigation immediately. | No | 41 |
| 2.4. | Upon receipt of a substantiated report of child maltreatment in a contract agency group home or emergency shelter, MDCPS shall, within 30 calendar days, initiate a licensure investigation, that is in addition to and independent of the child protection investigation (see 2nd MSA for investigation requirements). | Yes | 45 |
| 2.5. | Upon receipt of a report of child maltreatment in a private child placing agency foster home, MDCPS staff will notify the child placing agency, who shall, within 30 calendar days, initiate a licensure investigation that is in addition to and independent of, any child protection investigation (see 2nd MSA for investigation requirements). | Yes | 45 |
| 2.6. | All allegations of maltreatment of a child in custody shall be investigated by a worker who has received training on intake and investigations processes, policies, and investigation techniques and has no ongoing connection to the foster care case. | Yes | 43 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 2.7. | Within 30 days of the completion of any investigation of maltreatment of a child in custody, as required in Section 2.1, MDCPS shall review the maltreatment investigation (see 2nd MSA for review requirements). | No | 49 |
| 2.8. | MDCPS shall assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment of children in MDCPS' custody. | Yes | 41 |
| 2.8.a.1. | By July 1, 2018, at least 90% of maltreatment-in-care investigations will be initiated and completed within 30 days. | No | 44 |
| 2.8.b.1 | Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker according to the following schedule: 1) Once per week for the first month and twice per month for three months if the investigation is found to be substantiated. | No | 46 |
| 2.8.b.2 | Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker according to the following schedule: 2) Twice per month in accordance with MDCPS policy if the investigation is found to be unsubstantiated. | No | 46 |
| 2.8.c. | When a maltreatment investigation involves a foster or adoptive home, MDCPS shall file a copy of the approved final investigative report, and any recommendations and/or corrective actions MDCPS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and with the Bureau Director for Licensure. MDCPS shall also provide those records to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor. | Did not report | 50 |
| 2.8.d. | When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by MDCPS, a copy of the final investigative report shall be filed in the child's case record, with the Director of Congregate Care Licensure, and sent to the licensed provider facility. MDCPS shall provide the report to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor. | Did not report | 50 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 2.9. | The rate of child abuse and neglect among children in foster care shall not exceed 0.33% per year effective for the period beginning 1/1/18 (see 2nd MSA for full definition of this metric). | No | 51 |
| **FAMILY-BASED PLACEMENTS** | | | |
| 3.1. | All foster homes and facilities with children placed who are in the custody of MDCPS shall be subject to the licensure process approved by Public Catalyst on December 31, 2016. | Yes | 52 |
| 3.1. | Nonrelative Foster Homes: All foster homes and facilities with children placed who are in the custody of MDCPS shall be timely licensed. | No | 52 |
| 3.1. | Relative Foster Homes: All foster homes and facilities with children placed who are in the custody of MDCPS shall be timely licensed. | No | 53 |
| 3.2.a. | No child shall remain in a foster home or facility determined to be unable to meet MDCPS licensing standards, absent an order by a state court with jurisdiction over child custody directing the placement of the child into a specific unlicensed placement. | No | 55 |
| 3.2.b. | Safety Issues: If it is determined that an unlicensed foster home or facility is unable to meet MDCPS licensing standards due to a safety issue, Defendants shall take all reasonable efforts to immediately ensure the child's safety and to remove the child, including, if required by the court, seeking an emergency court order. If the child is not in imminent danger, MDCPS shall implement a safety plan and within five calendar days, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only. | No | 59 |
| 3.2.c. | Non-safety Issues: If MDCPS determines an unlicensed foster home to be unable to meet MDCPS licensing standards due to a non-safety issue, Defendants shall, within 30 calendar days of that determination, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only. | No | 59 |
| 3.3.a. | MDCPS, in conjunction with the monitor, shall establish annual statewide and county performance requirements and time periods for new foster home licensure. The monitor will report to the parties MDCPS progress on achieving the performance requirements. The Defendants shall meet the performance requirements, including time periods. | N/A | 59 |

12

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **3.3.b.** | MDCPS shall begin to implement the annual plan to recruit and retain additional licensed foster home placements and shall maintain the additional number of total placements, as necessary during the applicability of the 2nd MSA. | N/A | 59 |
| **PLACEMENT STANDARDS** | | | |
| **4.1./4.13.c.** | By July 1, 2020, 95% of foster homes shall provide care for no more than five children (including foster, biological, and adoptive children) at any given time (see 2nd MSA for allowable exceptions). | No | 60 |
| **4.2./4.14.c.** | By July 1, 2020, 95% of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs. | No | 61 |
| **4.3./4.15.** | At least 95% of children in MDCPS' custody shall be placed in the least restrictive setting that meets their individual needs as determined by a review of all intake, screening, assessment and prior placement information regarding the child available at the time of placement. | No | 62 |
| **4.4./4.18.** | 90% of children who enter MDCPS' custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless one of the exceptions provided in this 2nd MSA is documented as applying. | No | 62 |
| **4.5./4.19.** | 90% of children who enter MDCPS' custody in Regions II-East, II-West, and V-West shall be placed within his/her own county or within 75 miles of the home from which he/she was removed unless one of the exceptions provided in this 2nd MSA is documented as applying. | No longer required | -- |
| **4.6./4.16.c.** | By July 1, 2020, 90% of siblings entering MDCPS' custody at or near the same time shall be placed together (see 2nd MSA for allowable exceptions). If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file. | No | 63 |
| **4.7./4.17.c.** | By July 1, 2020, 90% of children in MDCPS' custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability consistent with 2nd MSA requirements. | No | 63 |
| **4.8.** | No child shall remain overnight in an MDCPS office or other nonresidential facility that provides intake functions. | No | 64 |

13

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 4.9. | No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless: a) The child has exceptional needs that cannot be met in a licensed foster home; or b) In order to keep a sibling group together for a temporary period, not to exceed 15 days and the RD has granted documented approval for the congregate care placement; or c) To enable a mother and baby to be placed together and there is not an available foster home for both of them. | No | 64 |
| 4.10./4.12.c. | By July 1, 2020, 90% of children will remain in his/her existing placement and not be moved to another placement unless MDCPS specifically documents in the child's case record justifications for that move and the move is approved by a MDCPS supervisor. | No | 65 |
| 4.11. | No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others with documented approval from the RD. | No | 65 |
| **VISITATION** | | | |
| 5.1.a.2. | By January 1, 2019, at least 90% of foster children shall have an MDCPS caseworker meet with the child at least two times per month (see 2nd MSA requirements for visits). At least one visit per month shall take place in the child's placement. | No | 67 |
| 5.1.b.2. | By January 1, 2019, at least 90% of foster children receiving a 90-day trial home visit period shall have an MDCPS caseworker meet with the child in the home at least two times per month. | No | 68 |
| 5.1.c.2. | By January 1, 2019, for a least 90% of foster children with a goal of reunification, MDCPS shall meet with the child's parents at least monthly unless the child's parent(s) reside out-of-state or are incarcerated. | No | 68 |
| 5.1.d.2. | By January 1, 2019 at least 90% of foster parents with at least one foster child in the home shall have MDCPS visit the home monthly. | No | 69 |
| 5.2.a. | MDCPS shall arrange contact for the child with his/her parents and with any siblings not in the same placement within 72 hours of foster care placement unless there are documented reasons why contact should not occur. If a visit cannot be arranged within 72 hours, a telephone call to parents, siblings, or extended family members shall be provided to the child. | No | 69 |

14

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 5.2.b. | For children entering foster care, a visitation plan for the child and his/her family shall be developed as part of the Family Service Plan. The visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child. | No | 70 |
| 5.2.b.1. | If parental visitation is appropriate, this visitation plan shall include a minimum of two visits per month with the parents, unless the court order in the child's case limits such visits or unless it is documented that a parent failed to make himself or herself available. | Yes | 70 |
| 5.2.b.1.a. | By January 1, 2019, 90% of children shall be provided with contacts with their parents consistent with the 2nd MSA requirements. | No | 70 |
| 5.2.b.2. | The child's visitation plan, regardless of permanency goal, shall include at least monthly visits with any siblings not in the same placement. | No | 71 |
| 5.2.b.2.a./ 5.2.b.3./ 5.2.b.4. | By January 1, 2019, 80% of children shall be provided with contacts with any siblings in custody not in the same placement consistent with 2nd MSA requirements. | No | 71 |
| | **CHILD AND YOUTH PERMANENCY** | | |
| 6.1.a.2. | By January 1, 2019 at least 90% of Family Service Plans shall be submitted by the caseworker consistent with 2nd MSA requirements, within 30 calendar days of a child's entry into custody. The supervisor shall review the Plan for approval within 15 calendar days. The Family Service Plan shall be considered complete upon documented supervisory review and approval. | No | 72 |
| 6.1.b. | In instances in which it is impossible to meet with one or both parents, the service planning process will proceed, notwithstanding the parent's absence. | No | 72 |
| 6.1.c.2. | By January 1, 2019, in at least 90% of placement cases in which the whereabouts of one or both parents is unknown, MDCPS shall, within 30 days, institute a diligent search for the parent(s), which shall be documented in the child's case record. | No | 73 |
| 6.1.d.2. | By January 1, 2019, for at least 90% of foster children who enter custody, permanency plans shall be submitted within 30 calendar days of the child's entry into custody by the caseworker consistent with 2nd MSA requirements. The supervisor shall review the plan for approval within 15 calendar days. The permanency plan shall be considered complete upon documented supervisory review and approval. | No | 73 |

15

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 6.2.a.1. | At least 95% of children in custody with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements. | No | 74 |
| 6.3.a.1.b. | By January 1, 2019, at least 90% of foster children with a permanency goal of reunification shall have service plans for their parents that identify those services MDCPS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that MDCPS made those identified services available directly or through referral. | No | 74 |
| 6.3.a.2. | For a child with a permanency goal of reunification, the child's MDCPS caseworker shall meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances. | No | 75 |
| 6.3.a.3. | For children with a permanency goal of reunification, the case record shall document opportunities provided to parents in support of reunification. | No | 75 |
| 6.3.a.4. | When a recommendation to reunify a child with his/her family has been made, MDCPS shall develop an after-care plan with the family that identifies the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured. MDCPS shall take reasonable steps to provide or facilitate access to services necessary to support the child during the trial home visit. | No | 75 |
| 6.3.a.5.b. | By January 1, 2019, at least 90% of foster children who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During the trial home visit period, MDCPS shall provide or facilitate access to the services identified in the child's after-care plan, consistent with the 2nd MSA requirements. | No | 75 |
| 6.3.a.6. | Before the end of any trial home visit period, MDCPS shall convene a meeting with the child's parents and the child to determine the appropriateness of a final discharge. If final discharge is determined to be appropriate, MDCPS shall make the appropriate application to the Youth Court to be relieved of custody. | No | 76 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 6.3.b.1.b. | By January 1, 2019, at least 90% of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist. | Yes | 77 |
| 6.3.b.1.b. | By January 1, 2019, at least 90% of children in custody with the primary permanency goal of adoption shall have an adoption plan that identifies the child specific activities that MDCPS will undertake to achieve adoption. | Did not report | 77 |
| 6.3.b.2.c. | By January 1, 2020, a termination of parental rights referral shall be made on behalf of at least 90% of children who have spent more than 17 of the last 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception pursuant to the federal Adoption and Safe Families Act ("ASFA") has been documented by MDCPS in the child's case record. | No | 78 |
| 6.3.b.3. | MDCPS shall provide to the monitor a report of all TPR referrals made during the monitoring period, the date those TPR referrals were made, and the date the TPR petition was filed with the court. | Yes | 78 |
| 6.3.c. | Defendants shall establish and maintain a system of post-adoptive services to stabilize and maintain adoptive placements. Adoptive families eligible for adoption subsidies shall have access to these services, which may include services such as counseling, mental health treatment and crisis intervention, family preservation and stabilization services, and peer support. | Yes | 79 |
| 6.3.d.1. | The permanency goals of durable legal custody and guardianship may be assigned when there are documented efforts in the child's case record to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. | No | 80 |
| 6.3.d.2. | When the permanency goals of durable legal custody and guardianship are assigned to a child under the age of 14 years old or living with a non-relative, MDCPS shall provide to the monitor at the end of each monitoring period, information from the child's case record documenting efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption. | No | 80 |
| 6.3.e. | If MDCPS concludes, after considering reunification, adoption, durable legal custody and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, MDCPS may assign a permanency goal of APPLA for the child (see 2nd MSA for APPLA requirements). | Yes | 80 |

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **6.4.a.2.** | By January 1, 2019, at least 90% of foster children who have been in custody for at least six months shall have a timely court or administrative case review consistent with 2nd MSA requirements. | Yes | 81 |
| **6.4.b.2.** | By January 1, 2019, for at least 90% of foster children who have been in custody for at least 12 months, MDCPS shall make reasonable efforts to have a timely annual court review scheduled consistent with 2nd MSA requirements. | Yes | 82 |
| **6.4.c.** | MDCPS shall review documented exceptions pursuant to ASFA for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review. | No | 82 |
| **6.5.a.1.** | Of all children who enter foster care in a 12-month period, the percent who discharged to permanency within 12 months of entering foster care. | No | 83 |
| **6.5.a.2.** | Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care between 12 and 23 months, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. | Yes | 83 |
| **6.5.a.3.** | Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care for 24 months or more, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period. | Yes | 83 |
| **6.5.d.** | For all children in the custody of MDCPS who were adopted in FFY2019, the monitor shall validate the average and median lengths of time to adoption finalization for each child from the date on which the child's adoption goal was established. | N/A | 83 |
|  | **TRANSITION TO INDEPENDENT LIVING** | | |
| **7.1.** | MDCPS shall provide each youth transitioning to independence with at least six months' advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition. | No | 84 |
| **7.2.** | Each foster youth age 14 years and older, regardless of his/her permanency plan, shall be provided with an opportunity to participate in the creation of an appropriate Independent Living service plan for a successful transition to adulthood. | Unable to determine | 85 |

18

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 7.3. | Each foster youth age 14 years and older shall have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood. MDCPS shall maintain sufficient resources to deliver Independent Living services to all youth described herein. | Unable to determine | 85 |
| 7.4. | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid coverage so that their coverage continues without interruption at the time of emancipation. | No | 86 |
| 7.5. | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond receive a start-up stipend of at least $1,000.00 at the time of emancipation, or as soon as practicable thereafter. | No | 86 |
| 7.6. | MDCPS shall implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond have access to a housing resource specialist responsible for assisting the youth obtain an adequate living arrangement. | No | 86 |
| 7.7. | MDCPS shall continue to implement policies and processes which ensure that youth emancipating from the foster care system at age 18 or beyond receive services and support under the State Educational Training and Vocational (ETV) Program for which they are eligible. | Unable to determine | 87 |
| 7.8.a. | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate. | No | 87 |
| 7.8.b. | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A social security or social insurance number. | No | 87 |
| 7.8.c. | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A resume, when work experience can be described. | No | 87 |
| 7.8.d. | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A driver's license, when the ability to drive is a goal; if not a driver's license, then a state-issued, photo identification. | No | 87 |

19

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 7.8.e. | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: An original or certified copy of the youth's birth certificate. | No | 87 |
| 7.8.f. | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Previous placement information. | No | 87 |
| 7.8.g. | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Documentation of immigration, citizenship, or naturalization, when applicable. | No | 87 |
| 7.8.h. | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Documentation of tribal eligibility or membership. | No | 87 |
| 7.8.i. | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: Death certificates when parents are deceased. | No | 87 |
| 7.8.j. | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A life book or a compilation of personal history and photographs, as appropriate. | No | 87 |
| 7.8.k. | MDCPS shall assist youth in obtaining or compiling the following document(s) and such efforts shall be documented in the child's case record: A list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties. | No | 87 |
| **CHILD WELL-BEING** | | | |
| 8.1.a.3. | By July 1, 2020, 90% of children shall have an initial medical screening within 72 hours of the child's entry into foster care. | No | 89 |
| 8.1.b.3. | By July 1, 2020, 90% of children shall have an initial EPSDT or other comprehensive medical examination within 30 days of the child's entry into foster care. | No | 90 |
| 8.1.c.3. | By July 1, 2020, 90% of children shall be provided with periodic and on-going medical examinations. | Unable to determine | 91 |
| 8.1.d.3. | By July 1, 2019, 90% of children shall be provided with practitioner recommended follow-up treatment. | Unable to determine | 91 |
| 8.1.e.3. | By July 1, 2020, 90% of children shall have a dental examination within 90 days of the child's entry into foster care. | No | 92 |

20

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| **8.1.f.2.** | By July 1, 2019, 90% of children shall have the completed foster child information form or other electronic record containing available medical, dental, educational, and psychological information about the child provided to foster parents or facility staff within 15 days of placement. | No | 92 |
| **8.1.g.** | By July 1, 2018, 85% of children shall have their Medicaid information provided to foster parents or facility staff at the time of placement. | No | 93 |
| **8.2.a./8.2.c.1.** | At least 90% of school-age foster children who enter custody shall have their educational records reviewed and their educational needs documented by MDCPS within 30 calendar days of their entry into foster care. | Unable to determine | 93 |
| **8.2.b.** | MDCPS shall take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within seven calendar days of initial placement or any placement change, including while placed in shelters or other temporary placements. | Unable to determine | 93 |
| **8.2.c.** | MDCPS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences. | Unable to determine | 94 |

## Summary of Commitments Achieving Maintenance Status[4]

| Section | Commitment | Achieved | Report Page |
|---|---|---|---|
| 1 | MDCPS shall maintain a Commissioner of Child Protection Services having responsibility for the oversight and management of the MDCPS. | Achieved in 2020 | N/A |
| 1.1.a. | MDCPS shall hire caseworkers who have, at minimum, a bachelor's degree in social work or a related human services degree. | Achieved in 2020 | N/A |
| 1.1.b. | MDCPS shall hire or promote to the position of caseworker supervisor only persons who have a master's degree in social work or a related human services degree and two years of experience working with children and families, preferably in foster care; or a bachelor's degree in social work or a related human services degree with three years of experience working with children and families, preferably in foster care. | Achieved in 2020 | N/A |
| 1.6.c. | MDCPS county staff shall have access to an electronic statewide database of available placement resources. | Achieved in 2020 | N/A |
| 1.7.a. | Defendants shall establish, maintain, and assess the effectiveness of a performance-based contracting system to evaluate annually contract agency compliance with the terms of the 2nd MSA. Defendants shall take all reasonable steps to ensure contract agency remediation of any identified deficiencies within three months. | Achieved in 2020 | N/A |
| 1.8.a. | Defendants shall ensure that all licensed foster families (regardless of whether they are supervised directly by MDCPS or by private providers, and whether they are kinship or unrelated foster families) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the 2nd MSA. | Achieved in 2019 | N/A |
| 1.8.c. | Defendants shall deliver to the monitor a written report regarding the adequacy of a proposed schedule of foster care maintenance payments made to foster care providers serving children and the actual cost in the state of Mississippi to provide such care (see 2nd MSA for specific report requirements). Following review of the Defendants' report, the monitor shall establish the rates that Defendants shall then implement. | Achieved in 2018 | N/A |
| 5.2.c. | MDCPS and its contracting agencies shall implement a policy that prohibits cancellation of visits as a form of discipline against children. | Achieved in 2019 | N/A |

---

[4] The movement of commitments to maintenance status, as defined in section 10.1. of the 2nd MSA means that MDCPS attained the highest designated performance standard or standards for a 12-month or 24-month reporting period. Upon designation as "To Be Maintained", the section will not be actively monitored (10.2.).

22

## Methodology

To prepare this report, the monitoring team conducted a series of verification activities to evaluate MDCPS' progress implementing its commitments in the 2nd MSA. In accordance with Section 9.3., the monitoring team independently verified and analyzed a wide range of aggregate and detail data reports and statistics produced by MDCPS,[5] including data related to caseloads and workloads, maltreatment in care, foster home licensure, and federal permanency outcomes. MDCPS also submitted "cohort" data, which identifies children's entries and exits from foster care during the period, the population of children served during the period, and the population of children in care at the beginning and end of the period.

The monitoring team performed multiple verifications and data quality checks against the data MDCPS provided. These checks focused on examining problems (e.g., missing data, internal consistency, duplicate records) with any variables used to identify children eligible for the indicator, to calculate derived variables, or measure the outcome. The monitoring team analyzed the information to verify the data quality, assessed the methodology used to compute performance for each metric, and attempted to replicate the performance calculations made by MDCPS. In these efforts, both MDCPS and the monitoring team relied on business rules jointly developed between the monitoring team and MDCPS and insights obtained from prior validation efforts. Problems related to data quality, if discovered, are noted. When possible, the monitoring team shared with MDCPS information about specific records that caused discrepancies or were flagged as a potential data quality issue.

Several meetings were convened with key MDCPS personnel as needed relative to the data provided. When possible, multiple iterations of analyses were conducted and resubmitted by MDCPS based on the monitoring team's preliminary findings. The final data submitted were then analyzed and the results were compared to those provided by MDCPS.

MDCPS also produced the results of qualitative reviews it conducted of thousands of children's records using MDCPS' Foster Care Review (FCR) and other qualitative review processes using a statistically significant review sample based on at least a 90 percent confidence level. To verify the information produced by MDCPS, the monitoring team conducted staff interviews, cross-data validation, and extensive qualitative case record reviews of almost 3,000 children's cases, including many of the same case records MDCPS reviewed to determine performance with a specific commitment. In addition, the monitoring team reviewed over 100 home studies, for both

---

[5] MDCPS' primary information system is the Mississippi Automated Child Welfare Information System (MACWIS). MDCPS also has ancillary information systems or tracking tools that are not directly connected to MACWIS but may leverage data from it, such as Excel sheets used to track and report on newly licensed and closed homes and resource homes involved in expedited pending relative placements.

relative and nonrelative homes, and over 300 investigations of abuse and neglect for children in MDCPS custody. The monitoring team's findings are included in the relevant sections of this report. In most instances, the sample sizes for the monitoring team's case record verification reviews were based on a statistically significant sample of cases and methodology based on a 90 percent confidence level.

The monitoring team examined thousands of MDCPS administrative records including organizational charts, employee hiring and training records, financial and budgetary information, child-level court orders related to placement and permanency of children in MDCPS custody, relevant statutes and regulations, and MDCPS policies.

## Demographics

Table 1 reflects demographic data for children in custody for the period under review for most of the 2nd MSA commitments discussed in this report and for the full calendar year of 2025.

**Table 1. Children in Custody by Time Period - 2025**

| April 1 - December 31, 2025 | Count | January 1- December 31, 2025 | Count |
|---|---|---|---|
| Children in Custody on April 1, 2025 | 4,018 | Children in Custody on January 1, 2025 | 4,026 |
| Children in Custody on December 31, 2025 | 3,870 | Children in Custody on December 31, 2025 | 3,870 |
| Children Placed in Foster Care during the Period | 1,884 | Children Placed in Foster Care during the Period | 2,530 |
| Children Served during the Period | 5,902 | Children Served during the Period | 6,556 |
| Children Exiting Foster Care during the Period | 2,032 | Children Exiting Foster Care during the Period | 2,686 |

Among children in care on the last day of the period (December 31, 2025), young children aged zero to six years made up the largest portion (1,703 or 44.0 percent). Children aged seven to 11 accounted for a total of 861 (22.2 percent), 1,088 (28.1 percent) youth were 12 to 17 years of age, and 218 youth (5.6 percent) were 18 years and over, as detailed in Figure 1.

24

**Figure 1. Age of Children in Custody on December 31, 2025**

*n=3,870*



The race and ethnicity of children in care on the last day of the period, December 31, 2025,[6] is detailed in Table 2.

**Table 2. Race and Ethnicity of Children in Custody on December 31, 2025**

| Race | Count | Percent |
|------|-------|---------|
| African American | 1,817 | 47.6% |
| White | 1,625 | 42.6% |
| Two or More Races | 176 | 4.6% |
| Hispanic or Latino (of any race) | 107 | 2.8% |
| Unknown Race/Ethnicity | 82 | 2.1% |
| American Indian or Alaska Native | 3 | 0.1% |
| Native Hawaiian or Other Pacific Islander | 2 | 0.1% |
| Asian | 2 | 0.1% |
| **Total** | **3,814** | **100%** |

Note: Percentages may not add up to 100 due to rounding.

Of children in care on the last day of the period, December 31, 2025,[7] 1,900 (49.1 percent) were male and 1,966 (50.9 percent) were female, as detailed in Figure 2.

---

[6] Excludes 56 children with data quality issues.
[7] Excludes four children with data quality issues.

**Figure 2. Sex of Children in Custody on December 31, 2025**
*n=3,866*



As Figure 3 indicates, 83.8 percent of children in MDCPS' custody on December 31, 2025 lived in family settings, including 1,456 (37.6 percent) with foster families, 1,372 (35.5 percent) with relatives, 394 (10.2 percent) with their own parents, 10 (0.3 percent) children lived in homes that intended to adopt, and 11 (0.3 percent) children resided in homes of unrelated caregivers. Of children in custody, 420 (10.9 percent) lived in institutional settings, including residential treatment and other congregate care facilities. Another 55 (1.4 percent) youth resided in Supervised Independent Living placements which serve youth who are preparing to transition out of care.  However, the monitoring team determined when verifying MDCPS' data that over the course of the year at least 155 children included above and categorized as placed in supervised independent living, court ordered non-licensed shelter, and court ordered non-licensed non-relative placements were actually residing in hotels or motels, which are unlicensed facilities.

**Figure 3. Placement Types of Children in Custody on December 31, 2025[8]**

*n=3,870*



As Figure 4 demonstrates, of the children in care on December 31, 2025, 48.2 percent were in care less than one year, while 11.4 percent were in care for three years or longer.

---

[8] Placement type categories are derived from MDCPS' facility type field as follows: Parents = Own Home-Father, Own Home-Other Caretaker, Own Home-Parents, Own Home-Mother; Institutional = Acute Care, Chemically Dependent Group, CO NonLicensed Det/Trng School, CO NonLicensed Shelter, Contract Facility-Non MDHS, Emergency Shelter, Group Home, Juvenile Detention, Medical Treatment Group Home, Residential Child Caring Facil, Residential Treatment, Specialized Residential School, Therapeutic Group Home; Foster Family = Therapeutic Foster Home, Teenage Parent Foster Home, Medical/Treatment Foster Home, Foster Home; Relatives = CO Non Licensed Relative, Expedited Pending Relative Res, Relative Foster Home; Non-relative caregivers = CO Non Licensed Non-Relative. Values not matching any category (e.g., Adoptive Home, ICPC, Supervised Indep. Living, Runaway, Respite Foster Home) are reported under their original label.

**Figure 4. Length of Stay in Care of Children in Custody on December 31, 2025**

*n=3,870*



As Table 3 indicates, MDCPS reported that 2,032 children exited custody during the reporting period. The most common exit types were reunification (50.9 percent), adoption (24.2 percent), and living with other relatives (11.8 percent).

**Table 3. Exits from Custody by Exit Type, April 1, 2025 to December 31, 2025**

| Exit Type | Count | Percent |
|---|---|---|
| Reunification | 1,035 | 50.9% |
| Adoption | 491 | 24.2% |
| Living with other relatives | 240 | 11.8% |
| Guardianship | 207 | 10.2% |
| Emancipation | 39[9] | 1.9% |
| Runaway | 10 | 0.5% |
| No Outcome Recorded | 5 | 0.2% |
| Transfer to another agency | 3 | 0.1% |
| Death of a child | 2 | 0.1% |
| **Total** | **2,032** | **100%** |

Note: Percentages may not add up to 100 due to rounding.

As Table 4 details of the children in custody on December 31, 2025, most children (2,173 or 56.1 percent) had reunification as a federal permanency goal. For the remaining children, 1,112 (28.7

---

[9] The 39 youth with a custody exit type of emancipation differ slightly from the emancipation cohort reported on in Section 7. The monitoring team's review of these youth determined that some youth with an exit type of emancipation exited to a form of permanency and were therefore excluded from the cohort. Additionally, the monitoring team included some youth with other exit types in the emancipation cohort because they did not exit to a form of permanency.

percent) had a goal of adoption, 248 (6.4 percent) had a goal of another planned permanent living arrangement (APPLA), 55 (1.4 percent) had a goal of durable legal custody or guardianship, and 73 (1.9 percent) had placement with a relative as a federal goal. There were 209 children (5.4 percent) with missing federal goal codes.

**Table 4. Federal Permanency Goals for Children in Custody as of December 31, 2025**

| Federal Permanency Goals | Count | Percent |
|---|---|---|
| Reunification | 2,173 | 56.1% |
| Adoption | 1,112 | 28.7% |
| APPLA | 248 | 6.4% |
| No plan documented (less than 45 days in custody) | 116 | 3.0% |
| No plan documented (more than 45 days in custody) | 93 | 2.4% |
| Custody with a relative | 73 | 1.9% |
| Durable legal custody / guardianship | 55 | 1.4% |
| Total | 3,870 | 100% |

Note: Percentages may not add up to 100 due to rounding

## Operational Budget

The 2nd MSA requires MDCPS to request state funds and any federal/special fund authorization sufficient to affect the provisions and outcome measures set forth in this 2nd MSA. For state fiscal year (SFY) 2025 (July 1, 2024 to June 30, 2025), MDCPS was appropriated $136,336,290 in general funds and $46,142,140 in state special funds. During the 2025 Mississippi legislative session, MDCPS requested a state fund appropriation of $157,992,625 in general funds, and $22,523,599 in state special funds for SFY2026 (July 1, 2025 to June 30, 2026). The Mississippi Legislature appropriated MDCPS $137,868,953 in state general funds and $21,760,178 in state special funds, for a total state funding of $159,629,131. MDCPS also received $132,956,757 in federal funds in SFY2025 and estimated receiving $123,090,511 in federal funds in SFY2026.

# Systemic Infrastructure Standards

## Staff Qualifications and Training

MDCPS committed to ensure that staff serving Mississippi's at-risk children and families have appropriate qualifications and receive adequate training.

*Training Unit (1.2.a.)*

MDCPS committed to maintain a Training Unit headed by a qualified director of training with adequate staffing, funding, and resources to assure that comprehensive child welfare training is provided to caseworkers, supervisors, and other child welfare employees. The child welfare

training should enable staff to comply with the relevant mandates of the 2nd MSA, MDCPS policy, and reasonable professional standards.

MDCPS submitted to the monitoring team a Professional Development Training Plan, which covers the years 2025-2029. The noted purpose of the training plan is to empower MDCPS employees with the knowledge, skills, and resources essential for safeguarding children, strengthening families, and fostering enduring family bonds. The plan notes that MDCPS remains steadfast in its mission to empower and support their workforce through robust professional development opportunities that will elevate skills, enhance service delivery, and ultimately transform lives. The plan further states that the Director of Professional Development Services provides strategic direction for planning, developing, and executing comprehensive training programs aligned with the mission of MDCPS. The Director's listed responsibilities include: designing a comprehensive curriculum, identifying training needs, partnership development, continuous improvement, and cultural and professional development. MDCPS reported that the Director oversees a team that includes 50 professional development staff.

The Professional Development Services unit administers pre-service training for incoming MDCPS employees, MDCPS supervisory training, ongoing in-service staff training, and several trainings where MDCPS staff can earn a certification or practitioner status, such as Non-Violent Crisis Intervention training and Certified Trauma Professional training. MDCPS also reported it has partnered with eight public universities to collaborate on advancing competencies essential for navigating complex organizational challenges, fostering innovation, and promoting a culture of continuous improvement. As detailed in sections 1.2.b., 1.2.d., and 1.2.e. below, MDCPS has allocated resources to the Professional Development Services unit to ensure that adequate child welfare training is provided to MDCPS staff.

*Pre-Service Training (1.2.b.)*

All new MDCPS caseworkers must complete a total of 270 hours of pre-service training, which includes classroom instruction, field instruction, and E-Learning. The pre-service training program offered by MDCPS' Professional Development Services unit includes at least 270 hours of training with a combination of eight alternating weeks of classroom instruction and on-the-job training. MDCPS reported that following completion of the pre-service training program, all case-carrying new workers receive dedicated support from Professional Development Services for 18 months.

Of the 234 new workers hired between the second and fourth quarters of 2025, 153 completed pre-service training during the period. Thirty-seven caseworkers previously employed and trained by MDCPS were rehired by the Department and exempt from pre-service training.[10]

---

[10] Caseworkers and supervisors who successfully completed MDCPS' pre-service training within five years of their rehire date are exempt from attending training again.

Fourteen workers left the Department either before starting or before completing training. The remaining 30 workers were hired into their positions late in the period and were enrolled in training that ended in the first quarter of 2026.

*Training Caseloads (1.2.c.)*

The 2nd MSA allows a trainee to be assigned responsibility for a "training caseload," under appropriate supervision, that gradually increases as the trainee successfully completes pertinent competence-based examinations. MDCPS did not elect to implement training caseloads during the period. MDCPS will notify the monitor before instituting training caseloads so the required competency exams and standards for passing the exams can first be reviewed and approved by the monitor as required by the 2nd MSA.

*In-Service Training (1.2.d.)*

MDCPS agreed that all caseworkers must complete a minimum of 40 in-service training hours each year and all supervisors must complete a minimum of 24 in-service training hours each year. MDCPS noted in the Professional Development Training Plan the importance of continuous professional development and that training initiatives encompass both online and classroom modules. The plan listed a significant number of ongoing trainings offered, a sample of which include adoption case staffing, building professional working relationships, cultural competency, engaging incarcerated parents, ethics and accountability in child welfare, investigation policy, preserving and maintaining connections, quality visits, and youth transition support services policy. The monitoring team requested but MDCPS did not provide the individual caseworker or supervisor-level in-service training data for the period. Therefore, the monitoring team could not assess whether caseworkers and supervisors received the requisite number of in-service training hours.

*Supervisor Training (1.2.e.)*

MDCPS committed in the 2nd MSA that caseworker supervisors must complete a minimum of 40 hours of training directed specifically at the supervision of child welfare caseworkers within 90 days of assuming a supervisory position. The Professional Development Services unit rebranded supervisory training as "DEAL: Developing Effective and Accountable Leaders". The initial supervisory training consists of 40 hours of classroom training, but the overall program is an eight-month curriculum delivered in several parts. MDCPS and the monitoring team only assessed performance for the initial 40 hours of training required in the 2nd MSA.

Of the 33 caseworker supervisors appointed during the period, six supervisors met the 90-day requirement for training completion based on information provided by MDCPS. The remaining 27 supervisors either completed training in 2025 beyond the 90-day mark or the training

31

completion date was not provided by MDCPS, so the monitoring team could not assess the 90-day requirement. MDCPS reported many of the supervisors hired or promoted through the year were scheduled to attend the May 2026 training which would be well beyond the 90-day requirement for 2025 supervisory hires.

## Caseloads and Supervision

*Caseworker Caseloads (1.3.a.)*

The 2nd MSA sets forth caseload standards for caseworkers and supervisors performing child welfare functions. The 2nd MSA states that 90 percent of MDCPS caseworkers must have caseloads that do not exceed the caseload standards for each type of case. Individual MDCPS caseworkers who carry a mixed caseload are held to a weighted, pro-rated standard. The following table details the caseload standards for each type of case.

**Table 5. Caseload Standards by Case Type**

| Type of Case | Included Categories | Standards | Weight Per Case – 100% Capacity |
|---|---|---|---|
| Child Protection | Investigations Level 2<br>Investigations Level 3 | 14 Investigations | 0.0714 |
| Ongoing Foster Care | Placement Responsibility & Service | 14 Children | 0.0714 |
| Ongoing Foster Care | Placement County of Responsibility<br>Placement County of Service | | 0.0357 |
| In-Home | Protection Responsibility & Service<br>Prevention Responsibility & Service | 17 Families | 0.0588 |
| In-Home | Protection or Prevention County of Responsibility<br>Protection or Prevention County of Service | | 0.0294 |
| Adoption | Adoption County of Service | 15 Children | 0.0667 |
| New Application Licensing | Resource Inquiry<br>ICPC Application<br>Foster Home Study | 15 Homes | 0.0667 |
| Renewal Licensing | Foster Home Supervision<br>Foster Home Renewal | 36 Homes | 0.0278 |

Figure 5 reflects the monitoring team's analysis of MDCPS monthly caseload data. The monthly percentage of workers meeting the caseload standard was between a high of 84 percent and a low of 66 percent between April and December 2025.

32

**Figure 5. Percent of Workers Meeting the Caseload Standard, April – December 2025**

*Data as of the end of each month*

*Supervisor Staffing Ratios (1.3.b.)*

The parties agreed that 85 percent of supervisors would be responsible for overseeing no more than five caseworkers each. As Figure 6 indicates, the percentage of supervisors meeting the staffing ratio exceeded 85 percent during the reporting period and averaged 91.9 percent performance. Additionally, the monitoring team conducted caseload verification interviews, by video conference software, with 59 supervisors where 58 of the 59 supervisors (98.3 percent) met the staffing ratio.

33

**Figure 6. Percent of Caseworker Supervisors Meeting the Supervision Ratio Standard, April - December 2025[11]**



*\*Data as of the end of each month*

During the period MDCPS excluded from the performance calculation supervisors with caseloads as outlined in 1.3.a. The monitoring team will further assess this methodology for supervisors with caseloads during 2026.

During caseload interviews,[12] the monitoring team spoke with supervisors from Service Area 2 who had children listed on their workload reports. Supervisors clarified that many of these children were on their workload report for administrative reasons, such as transferring, assigning, or closing cases. However, some MDCPS supervisors reported that due to ongoing staffing shortages, some supervisors were actively managing certain cases themselves.

*Caseload Verification*

The monitoring team conducted staff interviews regarding their workloads in 40 MDCPS county and regional offices. Interviews included both supervisory and caseload-carrying staff randomly selected by the monitoring team, working in all counties from Service Areas 2, 4, and 5. Frontline, adoption, licensure, and safety unit investigations staff were interviewed. Interviews were conducted virtually, by video conference software, and staff members were directed to send printouts of their caseloads to the monitoring team, typically from two business days prior to the

---

[11] The monitoring team requested but MDCPS did not provide the October 2025 file necessary to calculate supervision ratios for that month.

[12] The monitoring team conducted caseload interviews with staff working in 40 MDCPS county and regional offices by video conference software. Interviews included both supervisory and caseload-carrying staff randomly selected by the monitoring team, working in all counties from Service Areas 2, 4, and 5.

interview. The monitoring team reviewed the caseload assignments with the workers or their supervisors and inquired whether the printouts represented all their caseload assignments as of the designated day. The monitoring team then compared the workload printouts of these thousands of cases identified across all the interviews, with caseload data submitted by MDCPS to determine if they aligned.

Based on interviews with 156 caseworkers, 59 supervisors, and data analysis involving thousands of cases statewide, the monitoring team concluded that the caseload data and information provided by the Department accurately reflected MDCPS' workloads during the period.[13]

## Continuous Quality Improvement

*Continuous Quality Improvement Plan (1.4.a.)*

Pursuant to the 2nd MSA, MDCPS is required to develop an annual Continuous Quality Improvement (CQI) Plan by December 1st of each year, for the following year, which shall be subject to the approval of the monitor after consultation with the parties.

MDCPS submitted its 2025 CQI Plan on October 15, 2025. Since the 2nd MSA resumed on April 15, 2025, the 2025 CQI Plan was already in effect and was not subject to the approval process set forth in the 2nd MSA.

The monitor requested MDCPS submit a draft of its 2026 CQI Plan by October 15, 2025, but MDCPS did not do so until February 26, 2026. The monitoring team observed that the 2026 plan appears to be the same as the 2025 plan, with no identified updates. Given the lateness of the submission, the 2026 CQI Plan was also already in effect by the time it was received and did not go through the consultation and approval process required by the 2nd MSA.

MDCPS will be subject to the review and approval process for the 2027 CQI Plan, a draft of which was requested by the monitor on April 27, 2026 with a due date of October 1, 2026.

*Continuous Quality Improvement Plan Implementation (1.4.b.)*

MDCPS implemented its 2025 CQI Plan to assess compliance with those provisions of the 2nd MSA that were identified for review in the Plan. The reviews must assess case practice, analyze outcomes, and produce analysis that will be shared with managers and stakeholders to achieve performance improvement.

---

[13] The monitoring team observed minor anomalies in workload alignment because of family service plans that had not been initiated, completed, and/or approved; data lag with respect to report timing and submission; and a case not assigned to a worker.

MDCPS uses the State and federally mandated Foster Care Review (FCR) process as a primary method of conducting its CQI reviews. An administrative case review is required to be conducted for each child in MDCPS custody at least once every six months. As such, the FCR results often include children more than once, producing a sizable denominator. The results of MDCPS' qualitative reviews with respect to 2nd MSA commitments included in the Plan are delineated in the relevant sections of this report.

## Management Information Systems & Data Reporting

*Comprehensive Information Systems and Reporting (1.5.a.)*

The 2nd MSA requires MDCPS to maintain comprehensive information systems that permit: (1) timely access by authorized MDCPS staff to information, including current and historical case documents, to support child safety and continuity of care across placement settings and services; (2) capturing, tracking, and reporting of applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements; and (3) prompts for workers and supervisors regarding required actions in a child's case and whether they have taken place.

MDCPS' primary information system is the Mississippi Automated Child Welfare Information System (MACWIS). MDCPS also has ancillary information systems or tracking tools that are not directly connected to MACWIS but may leverage data from it, such as Excel sheets used to track resource homes involved in expedited pending relative placements,[14] to track and report on newly licensed and closed homes, and to facilitate and document the results of manual reviews of substantiated reports of maltreatment.

MDCPS reported employees are granted the appropriate level of access to MACWIS as part of the new hire process for caseworkers, supervisors, and identified State Office staff with positions and job responsibilities that require access to the system.

The monitoring team generally has been able to identify children across multiple MACWIS data files to create a timeline of their placement settings and services while in MDCPS custody. MDCPS, however, has been unable to report consistently and reliably from MACWIS current and historical data of children in custody for some 2nd MSA commitments as noted inthe pertinent sections of this report.

MACWIS contains a financial module the monitoring team used to verify that MDCPS was issuing foster care board payments to foster parents consistent with the child's age and placement type.

---

[14] MDCPS refers to unlicensed relative home placements awaiting licensure as expedited pending relative placements.

For its 2025 submission, MDCPS again provided correspondence from the Administration for Children and Families within the United States Department of Health and Human Services accepting MDCPS' FFY2020 NCANDS Child File and Agency File and its 2020A National Youth in Transition Database submissions derived from MDCPS data systems. MDCPS did not provide the requested correspondence for FFY2025.

The monitoring team requested but MDCPS did not provide the MACWIS Tickler Types Report listing alert notifications available to staff for actions taken and actions needed.

MDCPS produced data from MACWIS to demonstrate performance on some but not all commitments for the 2nd MSA and to document baseline populations and samples for qualitative reviews. The monitoring team analyzed the information to verify the data quality, assessed the methodology used to compute performance for each metric, and attempted to replicate the performance calculations made by MDCPS.

As noted above, MDCPS is required to capture, track, and report applicable financial information, quantitative 2nd MSA compliance, longitudinal performance, and child welfare information, including federally required elements. MDCPS did not report data on four commitments. These commitments are delineated in the Summary of Commitments and the relevant sections of this report.

Data problems include files missing a substantial number of records for individuals or events applicable to a commitment; files submitted with incorrect configurations, such as a missing group-by clause causing children to be counted over the wrong time period; files provided by MDCPS that the monitoring team was unable to replicate using the established business rules; and significant methodological differences between MDCPS and the monitoring team for commitments where MDCPS did provide data.

The monitoring team found significant and recurring data quality problems relative to fully and accurately reporting maltreatment in care victims and perpetrators, trial home visit business rules, quantitative reporting on permanency hearings, reporting independent living services for youth, tracking periodic and on-going medical examinations and follow-up treatment for children and youth, and reporting educational services for children.

*Comprehensive Child Welfare Information System (1.5.b.)*

MDCPS committed to have a Comprehensive Child Welfare Information System (CCWIS) appropriate to its size and complexity that shall meet federal requirements by June 30, 2021. Defendants shall take reasonable steps to ensure data quality and verification of the accuracy of data in CCWIS. The CCWIS system shall have the necessary controls to decrease the risk of duplication of data and to reduce the risk of incorrect or invalid data. The system shall provide a

37

visible trail to authorized administrators of all information entered, added, deleted, or modified, and shall have necessary security to protect data integrity. This system shall be audited at least annually to ensure the accuracy and validity of data in the system.

MDCPS reported on its development of a new CCWIS (Pathways) to replace MACWIS. The update describes the design and goals of the future system.  As of the end of the reporting period, CCWIS was not yet operational and remained in final user acceptance testing. There were a number of planned launch dates during the period that were postponed, with Labor Day 2026 as the current go-live date, more than five years after the commitment's June 30, 2021 due date.

*Staff Resources (1.6.a.)*

Pursuant to the 2nd MSA, MDCPS committed to provide to all its county staff with child welfare responsibilities access to computer services, word processing and electronic mail, access to the current management information systems, and access to a revised modular information system, CCWIS, once implemented.[15] MDCPS produced quarterly the names, email addresses, network IDs, and MACWIS IDs[16] for newly hired workers. Additionally, the monitoring team verified this information during interviews with 140 MDCPS staff across Mississippi.

*Staff Access to Data (1.6.b.)*

MDCPS committed to collect, analyze, and make available, at least quarterly, to MDCPS regional and county staff, data related to compliance with the 2nd MSA's Foster Care Service Standards. MDCPS produces Centralized Online Reporting Environment (CORE) reports that are available to all staff and are scheduled to be updated daily with point-in-time data.

MDCPS reported they have continued to expand and improve CORE since its original implementation in late 2020, including adding enhanced authentication, interactive reporting tools, export functions, monitoring capabilities, and workflow support features. Specific updates include service area summaries for the number of children in custody, number of placements, and number of investigations. Users can also now export report data directly into an Excel spreadsheet. CORE currently generates several dozen separate reports. The monitoring team reviewed CORE and found that the opening page includes an interactive map of the state where the user can view county-level data for the number of children in custody and the Chancery Court district assigned to the county. Examples of reports CORE can generate include: licensed homes statistics, which lists resource homes, licensure end dates, and available placements in the

---

[15] See section 1.5.b. of this report for additional information on CCWIS. CCWIS was not implemented during the 2025 review period.

[16] A small number of MACWIS IDs were missing from MDCPS' reporting. In response to the monitoring team's question about this, MDCPS noted that they are limited to the details their IT Department can provide at any given point in time.

homes; custody child disabilities and allergies; custody child maltreatment in care (MIC) involvement, which lists the number of MIC reports since custody start and the number of reports that were substantiated; and the number of runaway episodes for each child. Overall, CORE appears to be an intuitive system and potentially useful for MDCPS caseworkers and supervisors, but exact staff utilization is unknown.

## Performance Based Contracting

*Contracting for Case Management Services (1.7.b.)*

The 2nd MSA requires that prior to MDCPS contracting for case management services for children in custody, the Department must submit for the monitors' review and approval a detailed plan that ensures accountability, supervision, and oversight of such agencies. MDCPS did not elect to implement this commitment during the reporting period. MDCPS will notify the monitor before contracting for case management services for children in custody so the requisite detailed plan can first be reviewed and approved by the monitor as required by the 2nd MSA.

## Foster Care Maintenance Payments

*Foster Care Maintenance Payments (1.8.b.)*

As of January 1, 2018, the effective date of the 2nd MSA, MDCPS agreed to pay all licensed foster families at least the basic monthly foster care maintenance payments. The following table contains the current approved basic monthly rates for licensed foster homes, which were increased effective January 1, 2024[17] based on the previous year's rate of inflation, as required by the 2nd MSA.

The monitoring team reviewed a sample of board rates for foster families and verified that families were receiving the published rates.

---

[17] MDCPS updates the resource board payment schedule every two years. The next change went into effect January 1, 2026, after the current period under review.

**Table 6. Resource Board Payment Schedule as of January 1, 2024**

| Age/Status | Board | Clothing | Allowance | Payment | Daily Per Diem |
|---|---|---|---|---|---|
| 0-8 | $651.00 | $80.00 | $30.00 | $ 761.00 | $ 25.37 |
| 9-15 | $746.40 | $80.00 | $50.00 | $ 876.40 | $ 29.22 |
| 16-21 | $817.50 | $80.00 | $60.00 | $ 957.50 | $ 31.92 |
| Special Needs I | $926.70 | $80.00 | ** | $ 1,006.70 | $ 33.56 |
| Special Needs II | $995.40 | $80.00 | ** | $ 1,075.40 | $ 35.85 |
| Foster Teen Parent | $1,552.80 | $160.00 | $90.00 | $ 1,802.80 | $ 57.43 |
| Emergency Shelters | $4,744.20 | - | - | $ 4,744.20 | $ 158.14 |
| Regular Group Homes | $1,181.40 | $80.00 | ** | $ 1,261.40 | $ 42.05 (all ages) |
| Therapeutic Resource Homes | $3,037.80 | $80.00 | ** | $ 3,117.80 | $ 103.93 |
| Therapeutic Group Homes | $5,561.40 | $80.00 | ** | $ 5,641.40 | $ 188.05 |
| Related Therapeutic Placement | $1,393.20 | $80.00 | ** | $ 1,473.20 | $ 49.11 |

**Personal Allowance is based on the age of the child and is included in the total board payment.

## Child Safety and Maltreatment in Care

## Screening Reports of Abuse and Neglect

*Responding to Reports of Abuse and Neglect (2.1.)*

Mississippi Centralized Intake and Assessment (MCIA), is charged with receiving, prioritizing, and dispatching reports of child maltreatment. To improve the intake screening process, MDCPS reports that MCIA was brought in-house in 2023 and a Centralized Screening Unit was established to provide centralized screening of alleged maltreatment reports, as opposed to screening at the county level. If a report alleges maltreatment of a child in the State's custody, the information is required to be referred to the centralized Senior Safety Team for handling. MDCPS reports that as of the end of 2025, MCIA included 27 full-time social service specialists, 13 part-time social service specialists, eight full-time supervisors/team leads, two part-time supervisors, and one full-time social services manager. A previous contractual arrangement for staffing was reduced and then ended entirely in June 2025, so all MCIA staff were employed full-time or part-time with MDCPS.

MCIA received 20,821 alleged abuse, neglect, or exploitation (ANE) reports between the second and fourth quarters of 2025. Of the ANE reports received, 2,813 reports (13.5 percent) were

screened out, 17,988 (86.4 percent) were assigned for investigation, and one to 11 reports remained in screening at the end of each respective quarter, for a total of 20 reports.

**Table 7. ANE Reports by Intake Action, Q2 - Q4 2025**

| Action | Q2 | Q3 | Q4 | Total |
|---|---|---|---|---|
| Assigned for Investigation | 6,008 | 6,282 | 5,698 | 17,988 |
| Screened Out | 892 | 930 | 991 | 2,813 |
| In Screening | 8 | 1 | 11 | 20 |
| **Total Referrals Received** | **6,908** | **7,213** | **6,700** | **20,821** |

*Maltreatment-in-Care Screen-Out Reviews (2.3.)*

MDCPS committed to develop and implement policies and procedures, subject to the review and approval of the monitor, for the Department to review all maltreatment in care (MIC) reports that were screened-out and assess the appropriateness within 24 hours of all screen-out determinations. If the decision to screen out the report is determined to be inappropriate, MDCPS shall ensure the report is referred for timely investigation.

The Department's CQI Safety Review Unit (SRU) is charged with reviewing all screened-out MIC reports. Data provided by MDCPS from the SRU's review indicates that only 16 MIC referrals were screened out for investigation between the second and fourth quarters of 2025. Of the 16 screened-out MIC reports, 15 (93.8 percent) were reviewed timely by SRU. One referral was reviewed more than 24 hours after the screen-out determination was approved. SRU determined that all 16 referrals reviewed were appropriately screened out.

The monitoring team determined there were 54 screened out MIC referrals in the MIC data files MDCPS submitted during the period. There is no indication in the data provided that MDCPS reviewed the remaining 38 screened out MIC referrals as required. The monitoring team did not complete an independent qualitative assessment of screened out referrals.

*Standardized Decision-Making (2.8.)*

The 2nd MSA requires MDCPS to assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment of children in MDCPS' custody. As noted above, MDCPS reports that a Centralized Screening Unit was established to provide centralized screening of alleged maltreatment reports, as opposed to screening at the county level. If a report alleges maltreatment of a child in the State's custody, the information is required to be referred to the centralized Senior Safety Team for handling.

MDCPS reported that in addition to the MCIA staff noted in section 2.1, there is a group of 16 staff and one manager dedicated to the secondary screening of intakes statewide to help ensure

41

screening accuracy, and limit duplicate reporting, assessment, and assignments. These staff help provide a consistent, centralized statewide screening process prior to assignment and assessment.

MDCPS reports that during the period, they continued to utilize a five-question MACWIS screening tool for ANE reports that includes the following questions:

- Is this a duplicate report of the same incident?
- Can the family be located?
- Is the alleged perpetrator the parent, guardian, custodian, person responsible for the child's care or support or an adult relative or household member with access to the child?
- Is there an allegation that meets the legal definition of an abused child or neglected child as defined in the MS Code and meets at least one additional criteria?[18]
- Are there other allegations or a risk of abuse/neglect that require intervention?

During the period under review, MDCPS reported that standardized decision-making was utilized, as MCIA's screening decisions are reported to be final.

MDCPS further reported that during the period, they collaborated with a non-profit agency to develop a new Structured Decision-Making (SDM) tool for intake screening. MDCPS noted this tool is expected to be implemented in Phase 2 of the CCWIS system launch in the fourth quarter of 2026. The monitoring team will review and report on this updated tool in the next annual report.

## Investigating Maltreatment in Care

*Special Investigations Unit and MIC Investigation Initiation Timeliness (2.2.)*

Pursuant to the 2nd MSA, MDCPS is required to continue to maintain a special investigations unit whose responsibility is to investigate reports of maltreatment of children in custody. The initiation of that investigation shall not extend beyond 24 hours.

In May 2025, MDCPS implemented a new unit, the Senior Safety Team (SST), which is tasked with investigating reports of maltreatment of children in custody. MDCPS reported the SST is

---

[18] The additional criteria are: child is in the current legal custody of MDCPS; there are prior ANE reports within the past 12 months or multiple ANE reports involving the alleged victim; a child is at imminent risk of harm; the current allegations include sexual abuse; the neglect is suspected to be life-threatening; any of the victims are age 5 or younger; any of the victims have special needs; the allegation could be felony child abuse or neglect under state or federal law; includes an allegation of Human Trafficking of a child under the age of 18 or a child of any age in MDCPS custody.

composed of clinical specialists who have extensive investigation experience. In addition, in June 2025, MDCPS implemented a MIC Review Committee that assesses all investigations related to reports of maltreatment of a child in custody.[19] The MIC Review Committee meets weekly to review all SST investigations before they can be considered complete. The Review Committee assesses the thoroughness of investigations and investigative findings. All final MIC investigation determinations must be reached through a unanimous vote of participating members of the Review Committee. The Review Committee includes four voting members from various areas of the Department and a non-voting legal representative. Data provided by MDCPS indicate that of the 314 investigations that were due for approval during the period,[20] 249 (79.3 percent) were initiated timely.[21] The monitoring team conducted a review of 68 maltreatment in care investigations from the period and determined that in 56 instances (82.4 percent), the investigation was initiated within 24 hours, including 53 investigations where all child victims were seen within 24 hours of the intake and three investigations where adequate attempts to see the child victims were made within 24 hours and continued daily until the child was located.

*MIC Worker Training (2.6.)*

Pursuant to the 2nd MSA, all allegations of maltreatment of a child in custody are to be investigated by a worker who has received training on intake and investigations processes, policies, investigation techniques, and has no ongoing connection to the foster care case. SST workers receive training on intake policy, investigations into maltreatment in care, and facility investigations, in addition to the pre-service training that all workers are required to receive.

MDCPS provided an SST organizational chart that lists a director, five team leaders, and 12 team members. MDCPS also submitted a list of SST staff and a sign-in sheet for those who attended MIC training on May 6, 2025 and began to assume investigations on May 15, 2025. MDCPS

---

[19] The MIC Review Committee also reviews investigations involving employees, high-profile cases, and fatalities.

[20] For commitments 2.2 and 2.8.a., MDCPS submitted data for the second and third quarters of 2025 that defined a maltreatment in care intake as one in which a custody child was "attached" to the report, regardless of whether an SST or a county investigator conducted the investigation. However, Q4 2025 data from MDCPS counted MIC intakes as those where a custody child was attached and the SST owned and completed the investigation. The SST owns an investigation based on one of three criteria being met: a custody child is attached to the investigation, the investigation involves a child fatality, or the investigation involves a serious injury. The monitoring team alerted MDCPS that several intakes with a custody child attached and the investigation was owned by SST at some point, but was redirected to the county because the above criteria were determined to not be applicable to the investigation, were in fact maltreatment in care investigations. The monitoring team included those MIC investigations for purposes of its analysis of Sections 2.2 and 2.8.a. The monitoring team and MDCPS identified a nearly identical number of MIC investigations with approval due in the second and third quarters of 2025, but the monitoring team identified 15 more MIC investigations than MDCPS in the fourth quarter of the year.

[21] MDCPS policy states that an investigation is considered "initiated" when face-to-face contact or attempted face-to-face contact is made with the alleged victim(s). Attempted face-to-face contact for the initiation of an investigation is considered met when two (2) or more locations have been checked including the child's identified home and one of the following: 1. Nearby relatives; 2. Known family friends; 3. Neighbors; 4. School; or 5. Daycare.

reported that one supervisor started in the SST on September 16, 2025, but was not responsible for investigations until after completing MIC training on October 22, 2025. MDCPS submitted data for commitment 2.7 (detailed below) that included a list of safety investigators responsible for each completed MIC investigation. Several of the names listed were not a part of the SST organizational chart or listed as participating in the May 6, 2025 MIC training. These individuals appear to be county-level safety unit investigators and supervisors, but not members of the SST. These staff receive training on investigations policy and procedures, but MDCPS did not specify if they are provided the same level of specialized training that SST members receive.

MDCPS did not independently report whether there were any MIC investigations assigned to a worker with an ongoing connection to the foster care case who conducted all or part of the investigation. The monitoring team conducted a review of 68 maltreatment in care investigations from the period and determined that none were conducted by a worker with an ongoing connection to the foster care case. During the prior 2nd MSA review period in 2020, ongoing foster care caseworkers often were assigned mixed caseloads that could include investigations. Since then, MDCPS created a safety unit that investigates all maltreatment reports, including the SST noted in section 2.2 that handles custody child investigations, and county-level safety investigators who handle non-custody child investigations. The creation of this separate safety unit has decreased the likelihood that a worker with an ongoing connection to a foster care case could be assigned an investigation for that case.

*MIC Investigation Completion Timeliness (2.8.a.)*

The parties agreed that all investigations into reports of maltreatment of children in MDCPS custody must be completed within 30 calendar days, including supervisory approval. MDCPS shall ensure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in custody at risk. The agreed-upon performance standard is 90 percent.

Data provided by MDCPS indicate that of the 314 investigations due for completion during the period, 156 (49.7 percent)[22] were completed timely. The monitoring team's case record review of 68 investigations determined that 34 (50.0 percent) investigations were completed timely.[23]

---

[22] The quantitative data analyzed by the monitoring team did not include information regarding extension requests. Therefore, the analysis was limited to whether an investigation was approved within 30 days.

[23] MDCPS policy states that in limited circumstances, the completion and approval of an investigation may extend beyond thirty (30) days. Written approval for an extension of time must be obtained from the Deputy Commissioner of Child Safety before the 25th day of the investigation. When an investigation is approved to extend beyond thirty

*Licensure Investigations of Emergency Shelters and Group Homes (2.4.)*

MDCPS reported two substantiated cases of child maltreatment during the reporting period for this commitment. The monitoring team reviewed all documentation provided by MDCPS for each incident. In both cases, MDCPS initiated a licensure investigation, including on-site inspections of the respective facilities.

Licensing violations were identified in both investigations. As a result, MDCPS requested corrective action plans (CAPs). The CAPs included specific timelines for addressing the violations and were submitted in a timely manner. In one case, it remained unclear whether the Department complied with the corrective action plan.

*Licensure Investigations by Child Placing Agencies (2.5.)*

The 2nd MSA requires that upon receipt of a report of child maltreatment in a private child placing agency (CPA) foster home, MDCPS must notify the CPA, which shall within 30 calendar days initiate an independent licensure investigation, including an on-site inspection of the foster home, to determine the provider's compliance with licensure standards. If the foster home provider is found to be in violation of licensure standards, the provider shall have ten calendar days to submit a CAP with timeframes to rectify the violation and comply with the approved plan. MDCPS shall recommend that the foster home license be revoked if the provider does not comply based on the approved CAP and timeframes.

Data and information provided by MDCPS indicate that there were 11 reports of maltreatment involving CPA foster homes in 2025. Of these reports, eight were unsubstantiated and three were substantiated. The monitoring team conducted a qualitative review of the licensing reports and documentation supplied by MDCPS for all 11 investigations.

Upon receiving a report of child maltreatment, MDCPS notified the CPA within 30 calendar days for each report. The CPA then initiated an independent licensure investigation within 30 days for all the reports and documentation showed that an on-site inspection of the foster home was conducted for all 11 licensing investigations.

---

(30) days, the Investigation Specialist will have an additional fourteen (14) days to complete the investigation. If the investigation cannot be completed within the additional fourteen-day period, the Bureau Director must staff with their supervisor and the Deputy Commissioner of Child Safety at least weekly from fourteenth day following the approval to provide a status report. Twenty-four (35.3 percent) investigations had at least an initial extension requested by the investigator and approved by the assistant deputy commissioner. The monitoring team verified that extensions were requested in MACWIS however, not all followed the requisite policy regarding extension timeliness and weekly conferences. Ten (14.7 percent) investigations were completed beyond the 30-day mark with no extension requested.

In the three substantiated cases, MDCPS cited licensing violations in all investigations, which led to the closure of all the homes. In the eight unsubstantiated investigations, no licensing violations were cited; however, ongoing therapeutic services were recommended in two investigations.

*Worker Contacts with Custody Children after a MIC Substantiation (2.8.b.)*

MDCPS agreed that any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker once per week for the first month and twice per month for three months if the investigation is found to be substantiated (2.8.b.1.).

The monitoring team conducted a qualitative review of visitation narratives of four children who were in MDCPS custody during 2025 and subject to this commitment. The monitoring team reviewed the visitation narratives to ensure each child was visited in the placement by a caseworker in the required timeframes. Only one child met the quantitative requirement as outlined in this commitment, but the visits did not meet the quality standards of the 2nd MSA.

MDCPS also agreed that any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated in that placement shall be visited in the placement by an MDCPS caseworker twice per month if the investigation is found to be unsubstantiated (2.8.b.2.).

The monitoring team conducted a qualitative review of visitation narratives of a random sample of 42 children who were in MDCPS custody during the period under review and subject to this commitment. All 42 children required visits from a caseworker. However, only eight children (19.0 percent) received all the required visits.[24] Five of the required visits met the quality standards of the 2nd MSA.

*Investigating Reports of Abuse and Neglect (2.1.)*

As noted previously, the monitoring team completed a qualitative review of a sample of investigations of maltreatment of children in MDCPS custody, conducted between the second and fourth quarters of 2025. The monitoring team placed particular emphasis on examining unsubstantiated maltreatment investigations in which the alleged perpetrator was identified as a relative foster parent, non-relative foster parent, or facility staff member. Sixty-eight investigations involving 116 alleged child victims were reviewed. Fourteen of the 68 investigations resulted in a substantiated finding and 54 were found by MDCPS to be unsubstantiated for abuse and/or neglect. The monitoring team's review involved reading investigation reports and, in instances when available, supporting documentation. The review's

---

[24] The monitoring team reviewed 162 contacts for the 42 children included in the sample.

purpose was to assess the quality and timeliness of investigations of maltreatment of children in MDCPS custody. The monitoring team also assessed the MDCPS Safety Review Unit's[25] review of investigations of maltreatment of children in MDCPS custody, as described below relative to Commitment 2.7 of the 2nd MSA.

Fifty-two of the 68 investigations involved children who lived in family-based settings, 12 investigations involved children placed in congregate care settings, two investigations were related to alleged maltreatment while the child was visiting a family member, and two investigations involved a child staying in a hotel. Table 8 details the placement type at the time of the investigation.

**Table 8. Placement Type at Time of Investigation, 2025**

| Placement Type at Time of Investigation | Number of Investigations |
|---|---|
| Non-Relative Foster Homes | 24 |
| Expedited Relative Homes Pending Licensure | 11 |
| Relative Foster Homes | 8 |
| Residential Facilities | 7 |
| Therapeutic Group Homes | 5 |
| Trial Home Visits (THV) | 3 |
| Therapeutic Foster Homes | 3 |
| Own-Home (not THV) | 2 |
| Weekend Visitation with Family | 2 |
| Hotel Stay | 2 |
| Court-Ordered Non-Licensed Home | 1 |

Of the 116 alleged child victims, 26 children were aged 0-5 years, 49 children were aged 6-14 years, and 41 youth were 15 years or older.

The monitoring team concluded that the evidence gathered and documented by MDCPS supported its findings in 56 (82.4 percent) of 68 investigations. For 11 investigations (16.2 percent), the monitoring team could not reach a conclusion regarding the investigative findings due to deficiencies in MDCPS' investigative practice. One investigation was found to be unsubstantiated, but the monitoring team concluded, based on MDCPS' criteria for maltreatment, that the information gathered and documented was sufficient to render a finding of substantiated maltreatment.

---

[25] The Safety Review Unit is part of MDCPS' Continuous Quality Improvement Unit and is separate from the MIC Review Committee described in Section 2.2.

Overall, the deficiencies in MDCPS' investigative practice included lack of adherence to Department policy including the review of all medical records and supplemental documents related to a forensic interview or medical forensic examination prior to MDCPS determining an investigation finding; lack of required interviews or lack of documentation of interviews with perpetrators, reporters, critical witnesses, and collateral contacts; and failure to address all allegations disclosed during an investigation or from the initial referral and to ask pertinent follow-up questions.

Case specific examples of investigations the monitoring team determined were deficient include:

- Several allegations were made against a non-relative foster parent after three teenage foster children moved to new placements. One child reported that the foster parent encouraged fights among the children in the home. Another child reported being told that "nobody else is going to want [her]" and that the foster parent was the only person who loved her. She also alleged that the foster parent had taken part of her paycheck. A third child reported that the foster parent controlled a bank account in the child's name and that the child no longer had access to her funds. The foster parent was also alleged to have attempted to discharge a child from an acute care facility after learning she would not receive board payments while the child was absent from the home. During interviews with all three alleged child victims, they described negative experiences in the placement, and two confirmed that the foster parent would encourage fights and then watch them occur. One child reported experiencing suicidal thoughts and entering acute care after leaving the foster home.  MDCPS found the allegations of physical neglect and emotional abuse unsubstantiated due to insufficient evidence, noting that some actions by the foster parent were inappropriate but did not meet the threshold for abuse or neglect. The monitoring team found the investigation to be deficient as the record did not document follow-up on several allegations, including the attempted discharge from acute care, nor did it indicate a review of the bank records or potential inappropriate use of board payments.

- Two siblings, ages 10 and 11, reported that during a six-day foster placement, the foster mother yelled, cursed, imposed bedtime when she was angry, denied bathroom access, struck one child on the hand, left them home alone twice, and exposed them to a "strange man" who frequented the home and appeared at locations they visited. Both children stated they did not feel safe. The foster mother denied the allegations, stating the children had unrestricted access to bathrooms, were never left alone, and likely made the report in retaliation after she reported that they had urinated on items in her closet. Interviews with two former foster children revealed reports of arguments in the home, with one child alleging the foster mother threw a water bottle at her head. MDCPS determined the allegations of physical abuse, physical neglect, and emotional abuse were

48

unsubstantiated. The investigation did not document any inquiry with the foster mother regarding the reported "strange man," and the resource parent record did not clearly indicate that additional training or corrective support was provided. However, the investigation findings narrative noted concerns regarding inappropriate discipline, yelling, and cursing by the foster parent, with licensure staff expected to address those concerns. This was the foster parent's fourth unsubstantiated investigation in approximately 18 months, all involving allegations of physical and emotional abuse, including allegations of foster children expressing fear, and having their arms and hair pulled.

- A 16-year-old foster youth was reportedly staying away from her expedited pending relative resource home for days at a time, with the foster parent allegedly aware of and permitting this to occur. The reporter expressed concern due to the youth's history of multiple overdoses, but the investigation did not address or document follow-up regarding those incidents. All parties interviewed confirmed the youth had repeatedly stayed overnight with her boyfriend and others. The record reflects that a drug screen was requested for the youth, but it does not indicate whether it occurred or its results. The youth's older brother admitted purchasing alcohol for her to discourage drug use, yet no follow-up questions were documented. The investigator only noted this as a concern in the findings. MDCPS determined the allegation of physical neglect was unsubstantiated, but the monitoring team found the investigation to be deficient as it is unclear how this determination was made without pertinent information being addressed and documented in the record.

*SRU Investigation Reviews (2.7. a-d.)*

MDCPS agreed that within 30 calendar days of the completion of any investigation of maltreatment of a child in custody, MDCPS must review the maltreatment investigation. This review will:

- identify any case practice deficiencies in the investigation and any remedial actions necessary to ensure the safety of the child who is the subject of the investigation, as well as any other children in the home or placement;

- identify a timeframe in which any recommended remedial action must take place; and

- monitor the initiation and completion of the remedial actions regarding individual child safety and case practice.

When any remedial actions have not been initiated or completed in a timely manner, MDCPS must notify the supervisor, Regional Director, and Director of Field Operations.

49

MDCPS' Safety Review Unit (SRU) is charged with completing the reviews of investigations of maltreatment of children in MDCPS custody. Information provided by MDCPS indicates that SRU conducted reviews of 267 investigations between the second and fourth quarters of 2025. The monitoring team identified 45 additional investigations of maltreatment of children in MDCPS custody that were due for SRU review in the period and were not included on the log of SRU reviews completed.

The monitoring team reviewed SRU reports for 61[26] of the 68 maltreatment investigations in the qualitative review described in the section above. All 61 SRU reviews were completed timely. SRU identified case practice deficiencies in 40 of the 61 investigation reviews, including that: required safety assessments were not timely and/or thorough, required collateral contacts or other individuals pertinent to the investigation were not interviewed, investigations were not initiated and/or completed timely, extension requests were not completed by the 25th day or documented weekly past the 45th day, and physical home environment assessments were not completed. The monitoring team identified additional case practice and/or safety issues that were not identified by SRU in 15 of the same 61 investigations and noted that seven of the 15 were deficient investigations.

SRU identified various policy deficiencies during the period but appeared to lack a clear follow-up mechanism when significant investigation quality issues were identified. In the SRU logs for the second through fourth quarters of 2025, the monitoring team found four investigations where the SRU reviewer answered "no" to the question "was a thorough investigation conducted?". Additionally, there were 10 investigations where the SRU reviewer answered "no" when assessing whether the overall evidence from the investigation record supported the finding. None of these investigations included recommended corrective actions or documented communication between the SRU reviewer and the investigation specialist regarding the deficiencies.

*Filing of MIC Investigations (2.8.c., 2.8.d.)*

Pursuant to the 2nd MSA, when a MIC investigation involves a foster or adoptive home, MDCPS must file a copy of the approved final investigation report, and any recommendations and/or corrective actions MDCPS has deemed necessary, in the case record of the foster child. The Department must also file a copy of the approved final investigation report, and any recommendations and/or corrective actions MDCPS has deemed necessary in the file of the foster or adoptive parents, along with a copy of the letter of notification to the foster or adoptive parents, and with the Bureau Director for Licensure. MDCPS must also provide those records to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor (2.8.c.).

---

[26] No SRU review was completed for seven intakes in the monitoring team's review sample.

Additionally, when a MIC investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by MDCPS, a copy of the final investigative report must be filed in the child's case record, with the Director of Congregate Care Licensure, and sent to the licensed provider facility. MDCPS must also provide the report to the Youth Court Judge with jurisdiction over the child and, upon request, to the monitor (2.8.d.).

MDCPS stores investigation reports in MACWIS, which are linked to the child(ren) and provider(s) involved in the report. Upon completion of a MIC investigation, the SST investigator reportedly mails a copy of the finalized investigation packet to the Youth Court Judge(s) with jurisdiction over the child(ren) involved in the report. The monitoring team requested but MDCPS did not provide summary data or analysis for these commitments for the review period.

*Maltreatment of Children in Care (2.9.)*

MDCPS agreed that the rate of child abuse and neglect among children in foster care shall not exceed 0.33 percent per year. For purposes of determining the rate, a child is counted as having been maltreated in foster care if the perpetrator of the maltreatment was identified as a foster parent or a residential facility staff member. This was a federal outcomes standard (based on the federal Child and Family Services Review, Round Two) focused on keeping children in foster care safe from abuse and neglect by their caregivers. Performance for this outcome is calculated annually.

The monitoring team could not replicate MDCPS' reported maltreatment data for this commitment. In a memo dated May 18, 2026 submitted to the monitoring team, MDCPS reported 30 unique child victims[27] with a substantiated finding and a foster parent or residential facility staff member as the perpetrator of abuse or neglect in 2025. However, MDCPS submitted quarterly data files relative to this commitment that indicate 27 unique custody child victims. The monitoring team performed a separate manual review of substantiated maltreatment in care intakes and determined that 48 children (0.74 percent) in MDCPS' custody were victims of abuse or neglect by a foster parent or a residential facility staff member in 2025. This is more than twice the agreed-upon rate of maltreatment (0.33 percent) set by the parties.

When comparing the 48 children the monitoring team identified to the 27 children MDCPS identified, 25 children were a part of both calculations. MDCPS included two children that the monitoring team excluded. One intake initially had a substantiated finding that MDCPS later changed to unsubstantiated and should have been removed from the count. In the second intake, MDCPS erroneously counted a non-household member substantiated perpetrator as a non-relative foster parent.[28] The monitoring team identified in the Department's data a total of 23

---

[27] The memo noted that there were 30 confirmed child victims but did not delineate specific child and intake IDs.
[28] This intake also included a non-relative foster parent perpetrator who MDCPS found to be unsubstantiated.

child victims that MDCPS did not report. Among the children MDCPS did not include in its MIC rate are children who were victimized by relative foster parents who were in the process of being licensed, by licensed foster parents, and by residential facility staff. It is unknown to the monitoring team why MDCPS excluded these children from their MIC rate count.

Data verified by the monitoring team indicate that MDCPS should have protected at least 27 more children from abuse or neglect in their placement in 2025 to meet the agreed-upon safety standard.

## Family-Based Placements

*Foster Home Licensure (3.1.)*

*Foster Home Licensure, Non-relative Foster Homes (3.1.)*

The 2nd MSA requires MDCPS to timely license non-relative foster families and to utilize the licensure process approved by the monitor when assessing prospective non-relative homes.

The approved licensure process requires MDCPS to provide pre-service training for applicants, conduct home visits with the prospective applicants and family members, assess the physical and mental health of applicants, conduct home environment safety checks, obtain references regarding the applicants, and complete full background checks that include state and federal fingerprint results for all adults in the home. MDCPS is also required to complete a foster home study that synthesizes information obtained during the home study process and documents the Department's licensure decision. MDCPS agreed to license non-relative homes within 120 days of the prospective foster parent's inquiry regarding foster parenting. MDCPS is currently transitioning to the SAFE home study model. This model was used to approve some homes licensed during this period.

Data provided by MDCPS indicate that in calendar year 2025, MDCPS licensed 292 non-relative foster homes. This includes 280 new homes and 12 homes that were reopened or converted from relative to non-relative status. One hundred and sixty- eight (60.0 percent) of the 280 new homes were licensed within the required 120 days. The monitoring team reviewed a random sample of 63 non-relative foster homes licensed during the period. The monitoring team determined that 35 homes (55.6 percent) were licensed consistent with both the requirements of the approved licensure process and Department licensure standards. Twenty-eight homes (44.4 percent) did not meet the requirements of the approved licensure process and Department licensure standards. Of the 28 homes not meeting licensure standards, 11 were licensed timely.

Other concerns noted in the 28 homes that did not meet the requirements of the licensure process included potential safety issues, missing applicant information, unresolved questions related to the applicant's capacity to foster, and deviations from the licensure process. Examples included applicants' criminal charges that were not addressed in the home study, missing child abuse registry checks from other states, missing or incomplete Initial Home Environment Checklists, and missing alternate caregivers background checks. There were also home studies that lacked documentation of sufficient income, lacked specific information regarding sleeping arrangements and about child care arrangements for the foster child during the applicant's overnight work hours, and homes with pools without the required safeguards.

There were 20 homes that were licensed beyond the required timeframe. Table 9 details the amount of time past the 120-day timeframe for each of the 20 homes that were not timely licensed.

**Table 9. Non-relative Foster Homes Licensed Untimely, 2025**

| Days Late | Number of Homes |
|---|---|
| 1 – 10 days | 11 |
| 11 – 20 days | 3 |
| 21 – 30 days | 2 |
| 50 – 55 days | 2 |
| 155 – 184 days | 2 |

The number of newly licensed homes accepting placement is commendable. Fifty-five (87.3 percent) of the 63 homes in the sample had accepted placement within three months of being licensed.

*Foster Home Licensure, Relative Foster Homes (3.1.)*

The 2nd MSA requires MDCPS to timely license relative foster families and to utilize the licensure process approved by the monitor when assessing prospective relative homes.

The assessment of a relative's home for potential placement begins when the child's caseworker initiates MDCPS' emergency placement process that includes a pre-placement safety assessment. The child's worker is responsible for walking through the entire home, both inside and outside, to ensure that safety issues do not exist or when safety issues are identified, they are remediated prior to a child's placement. MDCPS must also complete and assess the results of criminal, law enforcement, and child abuse registry background checks prior to approving the placement. After the initial safety process is completed and supervisory staff approve the child's placement, casework staff must make a referral to the licensure unit for continuation of the 90-day licensure process.

53

The Department agreed to complete the home study process for relative homes within 90 days of a child being placed in a home. Data provided by MDCPS indicate that in calendar year 2025, 589 (51.8 percent) of 1,137 relative homes were processed timely.[29] Of the 589 homes with timely action, 307 (52.1 percent) were licensed and 282 (47.9 percent) were not licensed.

The monitoring team conducted quality reviews of a random sample of 63 relative homes licensed during the period. The monitoring team confirmed that MDCPS continued to utilize the licensure process approved by the monitor for relative homes. MDCPS adhered to the approved licensure process in 37 cases (58.7 percent) and did not adhere to the process in 26 cases (41.2 percent). MDCPS did not complete all the initial background checks for 45 of the 63 relative homes prior to the start of a child's placement. Table 10 illustrates the number and percentage of timely background checks for the 63 homes.

**Table 10. Background Checks for Relative Home Studies, 2025**

| Background Checks for Applicant #1 (n=63) | Completed Prior to Placement | |
|---|---|---|
| | Count | Percent |
| MACWIS | 40 | 63.5% |
| Internet/Social Media | 41 | 65.1% |
| Local Police Department[30] | 34 | 54.0% |
| Sheriff[30] | 34 | 54.0% |
| Child Abuse Registry | 32 | 50.8% |
| Sex Offender | 21 | 33.3% |

Additionally, of the 63 cases reviewed, the initial home walk-through was completed late for five placements (7.9 percent) and 12 homes (19.0 percent) were not licensed in the required 90 days.

Children were residing in the 26 homes that did not adhere to the licensing process. Other licensing concerns included home studies that did not address applicants' criminal charges or substance use history, missing background checks for other household members, missing police references, incomplete or missing Initial or Final Home Environment Checklists, adequate sleeping arrangements were not specified, and required car seats were not verified, among other issues.

Table 11 details the number of days past the 90-day timeframe for each of the 12 homes that were not licensed timely.

---

[29] 386 homes were missing an action taken and 397 homes were missing an action date in the data provided by MDCPS. Homes with either of these fields missing were counted as untimely.
[30] The licensing process approved by the monitor requires that either a local police or sheriff's department check be completed prior to placement.

**Table 11. Relative Foster Homes Licensed Untimely, 2025**

| Days Late | Number of Homes |
|---|---|
| 1 - 10 days | 6 |
| 12 - 17 days | 3 |
| 24 - 27 days | 2 |
| 141 days | 1 |

*Unlicensed Placements (3.2.a.)*

MDCPS committed that no child will remain in a foster home or facility determined to be unable to meet licensure standards absent an order by a state court with jurisdiction over the child's custody directing the placement of the child into a specific unlicensed placement. MDCPS is not held accountable for a state court's order as long as MDCPS documents that it presented information to the court that the foster home has not met licensing standards, the reasons why the foster home has not and cannot meet licensing standards, and an explanation that a licensed foster home or facility is available, or one time only, an appropriate expedited relative placement.

MDCPS data show that during the period 266 children were placed in court-ordered unlicensed homes and facilities. Twenty-eight children were placed in court-ordered unlicensed non-relative homes and 192 children were placed in unlicensed relative homes during the period. The monitoring team conducted quality reviews of a random sample of 63 children listed as being placed in court-ordered unlicensed relative homes during the period. MDCPS presented to the court[31] the reasons why the foster home had not and could not meet licensing standards in 14 cases (22.2 percent) but did not do so in 43 cases (68.3 percent). In six cases (9.5 percent), the monitoring team was unable to determine if evidence was presented to the judge as to why the foster home had not and could not meet licensing standards.

In 60 cases (95.2 percent), documented evidence was not presented to the court that a licensed foster home or facility was available, or one time only, an appropriate expedited relative placement. In three cases (4.8 percent) the monitoring team was unable to determine if documented evidence was presented to the court. MDCPS did not consistently produce evidence that the court was advised whether it would be safe for a child to remain in a relative home when that home could not be licensed, including the reasons why the home could not be licensed and an explanation that a licensed placement was available.

---

[31] MDCPS submitted documentation for each of the cases in the sample including court orders, custody orders, placement orders, shelter orders, disposition orders, and MACWIS screenshots. The monitoring team reviewed these orders as well as MACWIS narratives for written documentation that the judge was informed of the reasons why the foster home had not and could not meet licensing standards.

55

The monitoring team identified at least 155 children in MDCPS custody who remained in a hotel or motel during the period, which are unlicensed, non-residential facilities. The age range of children in hotels was seven to 19 years old, with 92 children aged 15 to 17 years old making up the largest group (59.4 percent). Figure 7 shows the ages of children with hotel stays during the period.

**Figure 7. Age of Children in Hotels, Q2 – Q4 2025**

*n=155*



For all eight children between the ages of seven and ten, case records confirm that the children were diagnosed with various special needs, including one autistic non-verbal child. Such diagnoses included: ADHD, ODD, PTSD, and DMDD. The case records did not specify if the sitters possessed special qualifications to care for high-needs children.

The 155 children experienced a total of 260[32] separate stays in hotels during the period, with the number of hotel stays per child ranging from one to 15. Figure 8 details the number of hotel stays per child for the 155 children.

---

[32] MDCPS previously advised the monitoring team that due to MACWIS limitations, hotel and motel stays are categorized as court-ordered non-licensed shelter placements, although they are not shelters, and court orders are not necessarily issued directing the action.

**Figure 8. Number of Hotel Stays Per Child, Q2 – Q4 2025**

*n=155*



The total length of time children spent in hotels ranged from one to 479 days,[33] with an average of 65 days and a median of 34 days. Table 12 outlines the total number of days each child spent in hotels during the period.[34]

**Table 12. Total Length of Time Spent in Hotels Per Child, Q2 – Q4 2025**

*n=155*

| Total length of time spent in hotels | Number of children | Percent |
|---|---|---|
| 1-7 days | 34 | 21.9% |
| 8-14 days | 12 | 7.7% |
| 15-30 days | 28 | 18.1% |
| 31-60 days | 23 | 14.8% |
| 61-99 days | 26 | 16.8% |
| 100-286 days | 27 | 17.4% |
| 287-365 days | 3 | 1.9% |
| 366–479 days | 2 | 1.3% |
| **Total** | **155** | **100%** |

Note: Percentages may not add up to 100 due to rounding

---

[33] Each hotel stay is counted from its start date to the earlier of its end date or January 5, 2026, the date of the MDCPS placement data extract. A stay that ended before January 5, 2026 counts its actual length. A stay that ended after that date, or that had not ended, counts only the days through January 5, 2026.

[34] The monitoring team included hotel stays that started in 2024 and ended in 2025, and hotel stays that started in 2025 and ended in 2026 as the child remained in the setting during 2025.

Youth placed in hotels were supervised by caseworkers, or sitters contracted through independent agencies. Below are four investigations from 2025 involving youth who stayed in hotels. In three cases, maltreatment in care was substantiated. In one instance, a single youth experienced 15 separate hotel stays.

● A 17-year-old was placed in a hotel supervised by a contracted sitter service. The child in care left the hotel room unsupervised in the early morning hours. It was alleged the sitter on duty delayed contacting CPS and law enforcement, and that by the time a report was made, the child had already been unaccounted for roughly eight hours. The child returned to the hotel two days later, then left again within days; the pattern of unauthorized departures continued over the subsequent weeks, including a separate runaway episode for which a statewide alert was issued. The sitter service terminated the sitter's employment, citing failure to report a runaway. MDCPS substantiated physical neglect against the sitter for failing to follow runaway reporting protocol.

● An 18-year-old female and a 16-year-old male were staying in the same hotel supervised by separate sitter services, where it was alleged both were inadequately supervised. The youth in care were allowed to leave the hotel grounds together unsupervised and enter a nearby wooded area on multiple occasions, despite the sitter service having been directed to keep the two apart. The 18-year-old youth disclosed to a sitter that the 16-year-old youth had sexually assaulted her but gave inconsistent accounts across subsequent interviews and a medical evaluation, ultimately stating the contact was not forced. The 16-year-old youth in care denied the allegations of sexual assault. MDCPS substantiated physical neglect against both sitters for failing to maintain supervision and for allowing unauthorized contact between the youth in care.

● A 15-year-old and a 17-year-old were staying in a hotel supervised by a contracted sitting service. It was alleged that one sitter used illegal substances while assigned to supervise the youth and transported them without court approval to an unauthorized family visit and brought her own children to stay overnight at the hotel during her shift. The investigation documented that the sitter had a prior substantiated maltreatment history involving the neglect of her own children. One day before this referral, her biological children entered MDCPS custody due to homelessness and the sitter's positive drug screen. The sitter subsequently tested positive for amphetamines, cocaine, cannabinoids, and methamphetamines.

• An 18-year-old with a history of significant behavioral and mental health needs experienced 15 hotel stays in 2025. His final hotel stay began in October 2025 and lasted seven months, ending in May 2026, when he was placed on a trial home visit (THV) with his mother.

*Safety and Non-Safety Issues (3.2.b., 3.2.c.)*

When MDCPS determines that an unlicensed foster home or facility is unable to meet MDCPS licensing standards due to a safety issue, MDCPS must take all reasonable efforts to immediately ensure the child's safety, including, when necessary, seeking an emergency court order to remove a child. If the child is not in imminent danger, MDCPS must implement a safety plan and within five calendar days, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only.

When MDCPS determines an unlicensed foster home cannot meet licensing standards due to a non-safety issue, the Department must, within 30 calendar days of that determination, either cure the licensing deficiency if feasible, or move the child to a licensed foster home or facility, or to an appropriate expedited relative placement, one time only.

The monitoring team found that MDCPS documented safety and non-safety issues identified during the initial home walk-through and home study process and, in some instances, the resolution of those issues in the final home environment checklist or the written foster home study. MDCPS submitted monthly disposition sheets to the monitoring team which outline safety and non-safety issues and whether the issue was remediated in the specified timeframes.

Data provided by MDCPS indicate that safety issues were remediated timely in 36 (10.4 percent) of 346 identified circumstances. Examples of safety issues identified by MDCPS include the lack of fire extinguishers, carbon monoxide detectors, and retractable ladders for two story homes. Data provided by MDCPS indicate that non-safety issues were remediated timely in 44 (43.1 percent) of 102 identified circumstances.

The monitoring team was unable to evaluate if all the issues were remediated within the agreed-upon timeframes, as MDCPS identified safety and non-safety issues in their initial home walk-through and home study process that did not appear in the monthly disposition reports. In some instances, MDCPS did not report how the safety/non-safety issues were resolved. In addition, contradictory information provided in the monthly disposition reports indicates that MDCPS resolved several safety issues before the date the issues were identified.

*Foster Home Development (3.3.)*

The 2nd MSA provides that MDCPS, in conjunction with the monitor, shall establish annual statewide and county performance targets for developing new foster homes. These targets are to be met during specific time periods (3.3.a.). Additionally, MDCPS committed to recruit and retain additional licensed foster home placements and maintain the additional number of placements, as necessary during the applicability of the 2nd MSA (3.3.b.). Since the 2nd MSA was not in effect until April 15th, resource licensure and net gain targets were not set for 2025.

59

MDCPS submitted resource licensure data for all twelve months of 2025, and the monitoring team determined MDCPS licensed 292 homes during the year, including 280 that were newly licensed and 12 that were converted or re-opened in accordance with policy.

In early 2026, the Department conducted a foster home needs assessment to identify the number of available licensed foster homes and determine the number of licensed foster homes needed. The assessment was designed to inform MDCPS' efforts to build capacity over time so that safe and appropriate placement matches can be made. This includes ensuring that children are placed with siblings and near their community. Utilizing segments of MDCPS' assessment analysis, as well as child custody data, licensure data, and foster home development and closure data, the monitor established a 2026 new foster home licensure target of 320 homes and a net gain target of 109 homes. The monitoring team will report on MDCPS' progress toward these targets in the next annual report.

## Placement Standards

*Foster Home Licensure Limits (4.1.a-c)*

MDCPS agreed that no foster home shall provide care for more than five children (including foster, birth, and adoptive children) at any given time, in accordance with the following:

- foster homes may provide care for more than three foster children, up to a total of five,[35] only with the documented approval of the MDCPS Office of Licensure determining that the foster children can be safely maintained in the foster home;

- no more than two children in the foster home may be under the age of two or have therapeutic needs, including the biological and/or adoptive children; and

- notwithstanding the above, a sibling group may be placed together in the same foster home in excess of these limits, but only if they are the only children in the home, and only upon written approval by the MDCPS Licensure Director determining that the foster children can be safely maintained in the home.

---

[35] MDCPS policy was updated as of May 27, 2025, and states: "Homes may have no more than a total of six (6) children, including biological, foster, or adopted children. No more than two (2) children in the foster home may be under the age two (2); No more than one (1) child may have therapeutic/special needs; and these requirements may be waived with written approval from a MDCPS Licensure Manager for sibling sets or any other child if doing so would not create an unsafe environment for the children." The monitoring team continues to assess this commitment based on the 2nd MSA standard of no more than five children in a foster home.

The performance standard is 95 percent. MDCPS provided data for this commitment, which the monitoring team validated. MDCPS' performance as of the last day of each month of the period in 2025 is delineated in Table 13.

**Table 13. Number of Foster Homes Meeting Licensure Capacity Standards, Q2 – Q4 2025[36]**

| Month | Number of foster homes with a child placed | Number of foster homes meeting licensure capacity standards | Percent of foster homes meeting licensure capacity standards |
|---|---|---|---|
| April | 1,471 | 1,339 | 91% |
| May | 1,459 | 1,329 | 91% |
| June | 1,465 | 1,344 | 92% |
| July | 1,437 | 1,307 | 91% |
| August | 1,439 | 1,306 | 91% |
| September | 1,429 | 1,293 | 90% |
| October | 1,433 | 1,297 | 91% |
| November | 1,421 | 1,291 | 91% |
| December | 1,431 | 1,301 | 91% |

The monitoring team conducted a qualitative review of this commitment through virtual interviews with MDCPS licensure specialists. The monitoring team discussed the licensure capacity status of a total of 136 foster homes for which the workers were responsible. [37] Licensure specialists confirmed that 134 (98.5 percent) of the 136 homes met the terms of this commitment.

*Children with Special Needs Placed with Resources Meeting Those Needs (4.2., 4.14.)*

The 2nd MSA states that children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs. MDCPS is to ensure that each county office has access to resource workers within its region who have the ability to ascertain the placement resources available and their suitability for each child who needs placement.

Mississippi Code 43-27-101(f) defines a special needs child as:

> "A child with a variety of handicapping conditions or disabilities, including emotional or severely emotional disorders. These conditions or disabilities present the need for special medical attention, supervision and therapy on a regimented basis."

---

[36] Homes listed in the data as "sub-resources" were included in this calculation but counted as noncompliant as MDCPS cannot report on the number of biological and adoptive children in these homes.

[37] MDCPS licensure workers are not responsible for therapeutic foster homes. Third-party agencies oversee the licensing and monthly visits for these homes. The monitoring team was unable to assess compliance for this resource type during virtual caseload verification interviews.

The parties agreed that 95 percent of children with special needs shall be matched with placement resources that meet their therapeutic and medical needs (4.14.c.). During the period under review, MDCPS reviewed a total of 2,346 cases through the FCR and reported 2,316 (98.7 percent) met the terms of this commitment.

The monitoring team reviewed a random sample of 68 children with identified special needs who were in at least one placement during the period under review. The team found that 61 (89.7 percent) met the terms of this commitment.

*Children Placed in Least Restrictive Setting (4.3., 4.15.)*

MDCPS committed that each foster child shall be placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment, and prior placement information available at the time of placement. In order of consideration this means placement with relatives, foster home care within reasonable proximity to the child's home community, foster home care outside of the child's home community, group home care, or institutional care. The parties agreed to a 95 percent performance standard for this commitment.

MDCPS evaluated this commitment through the FCR. The Department reviewed a total of 6,082 cases[38] during the period under review and determined that 6,020 (99.0 percent) cases reviewed met the terms of this commitment. The monitoring team analyzed a randomly selected sample of 64 children, including children placed in supervised independent living, specialized care, and those in congregate care. The children were living in a total of 116 placements during the quarterly periods under review evaluated by the monitoring team. The monitoring team determined 57 (89.0 percent) of the children were placed appropriately to meet the individual child's identified needs.

*Children Placed Within Proximity to Home (4.4., 4.18.)*

MDCPS agreed to ensure that each child who enters placement shall be placed within his/her own county or within 50[39] miles of the home from which he/she was removed, unless:

- the child's needs are so exceptional that they cannot be met by a family or facility within his/her own county or within 50 miles of the home from which he/she was removed;

- the child is placed through the ICPC consistent with its terms;

- the child is appropriately placed with relatives;

---

[38] MDCPS reviews a single placement for each child, whereas the monitoring team reviews all placements throughout the quarter under review.

[39] During Q1 2019, the monitoring team determined that the 75-mile exception noted in the 2nd MSA was no longer necessary, and regions affected by the previously used 75-mile exception are no longer reported separately.

- the child, age 14 years or older, is pursuing educational or vocational opportunities;

- the child is ordered to be placed in a child-specific foster care setting by a court; or

- the child is placed in an adoptive home.

The parties agreed to a 90 percent performance standard for this commitment. Data provided by MDCPS indicate there were 8,028 placements made during the period under review. However, the monitoring team confirmed that there were 7,853 placements made during the period under review. Of these placements, 7,507 (95.6 percent) were identified by the monitor as meeting the proximity standard or exception provisions of the 2nd MSA. The monitoring team reviewed a random sample of 67[40] children's exceptions MDCPS reported were consistent with the terms of this commitment and found that 43 (64.2 percent) contained sufficient documentation to support the exception decision.

*Placing Siblings Together (4.6.,4.16.)*

MDCPS agreed to place siblings together when they enter placement at or near the same time. Exceptions can be made if placing the siblings together would be harmful to one or more of the siblings, one of the siblings has exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a foster family in whose home the siblings can be reunited. These efforts must be documented and maintained in the case file. The performance standard is 90 percent.

Data provided by MDCPS indicate that 413 sibling groups entered custody during the reporting period and that 216 (52.3 percent) of the groups were placed together.  MDCPS further indicates that an additional 124 of the sibling groups had an allowable exception. The monitoring team reviewed a random sample of 58 sibling groups with an allowable exception and determined that 31 (53.4 percent) had documentation to support the exception, and documentation of efforts to locate or recruit a foster family in whose home the siblings can be reunited, when appropriate.

*Placement Disruptions (4.7., 4.17.)*

MDCPS committed to take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. If there is a documented indication that a placement may disrupt, the caseworker shall immediately take steps to determine the following:

---

[40] Twelve children had another permanent plan resource as an exception; however, this is not a 2nd MSA-approved exception for this commitment.

- the cause of the potential disruption;

- whether the placement is appropriate for the child;

- whether additional services are necessary to support the placement;

- whether the child needs another placement; and

- if another placement is necessary, what that placement should be.

The efforts made by MDCPS to avoid disruption and to ensure placement stability are required to be documented in the child's case record.

MDCPS agreed that 90 percent of children in MDCPS' custody with a documented indication that they were subject to a potential or actual placement disruption shall have documented in the child's case record the reasonable steps taken to address placement stability consistent with 2nd MSA requirements.

MDCPS reported 571 (71.4 percent) of 800 cases met the terms of this commitment during the period based on children reviewed through the FCR. The monitoring team reviewed a random sample of 68 children that experienced at least one disruption during the period. The team found that 47 (69.1 percent) of 68 children met the terms of this commitment.

*Overnight Stays in an Office or Other Nonresidential Facility (4.8.)*

MDCPS agreed to ensure that no child shall remain overnight in an MDCPS office or other nonresidential facility that provides intake functions. During caseload verification interviews with 215 caseworkers and supervisors, two caseworkers each identified an instance of children spending the night in an MDCPS office.  Since the interviews occurred months after the overnight stays, neither the caseworkers nor the Department were able to provide details or context about the children who stayed overnight in offices in 2025.

*Young Children Placed in Congregate Care Facilities (4.9.)*

MDCPS committed that no child under 10 years of age shall be placed in a congregate care setting, including group homes and shelters. Exceptions can be made if:

- the child has exceptional needs that cannot be met in a licensed foster home;

- in order to keep a sibling group together for a temporary period, not to exceed 15 days, and the Regional Director has granted documented approval for the congregate care placement; or

- to enable a mother and baby to be placed together and there is not an available foster home for both.

MDCPS data included 58 placements of children under age 10 in a congregate care setting during the period. The monitoring team determined there were 54, not 58, [41] congregate care placements in the reporting period involving 49 children between the ages of six months and nine years of age. Of the 54 placements,[42] the monitoring team found that 32 (59.3 percent) had the required approval and an allowable exception documented.[43] The remaining 22 placements of young children in congregate care settings lacked the requisite approvals or qualifying exceptions MDCPS committed to in the 2nd MSA.

*Placement Moves (4.10., 4.12.)*

No child is to be moved from his/her existing placement to another placement unless MDCPS specifically documents in the child's case record justifications for that move and an MDCPS supervisor approves the move. By July 1, 2020, the parties agreed that MDCPS would meet a performance standard of 90 percent for this commitment (4.12.c.).

MDCPS evaluated performance for this commitment through the FCR. MDCPS reviewed a total of 4,335 placement moves during the period and reported 2,370 (54.7 percent) met the terms of this commitment.

The monitoring team reviewed a randomly selected sample of case narratives and approvals for 68 children who experienced at least one placement move during the period. The team found that 27[44] (39.7 percent) of the cases had a documented placement change reason and were timely approved by a supervisor.

*Multiple Emergency Placements (4.11.)*

MDCPS agreed to ensure that no child is placed in more than one emergency or temporary facility within one episode of foster care. Exceptions can be made if an immediate placement move is necessary to protect the safety of the child or of others with documented approval from the Social Service Regional Director.

---

[41] MDCPS data included four placements in hospitals that were not subject to this commitment.

[42] The monitoring team identified 10 children whose listed exception was not correctly coded. Nine children were listed as having exceptional needs but were placed with a sibling group and the monitoring team could not locate evidence to support the listed exceptional need. For one of the children the exception listed was placement with a sibling group, however the data indicated that the child was placed with their mother in an emergency shelter.

[43] If the documented reason is for a sibling group to be kept together, then the placement must be for 15 or fewer days and be approved by an RD. For monitoring purposes, the RD approval must be documented within 10 days of placement to be considered properly approved.

[44] The monitoring team measured performance with this commitment by child for each quarter (i.e., all placement moves for a child in the sample in the respective quarter needed to be compliant to count). MDCPS counted compliance per placement move.

The monitoring team reviewed the case records of the 17 children who MDCPS reported as having experienced multiple stays in an emergency shelter during the period and determined that MDCPS included three children in its reporting that did not in fact have multiple shelter stays.[45] Of the 14 children experiencing multiple shelter stays, four children were five to 11 years old and ten children were 13 to 16 years old. None of the children's case records contained evidence supporting the determination that each successive shelter placement was necessary to protect the safety of the child or others[46]. In several instances, the children's case records indicate that emergency shelter placements were necessary due to statewide placement denials and a shortage of available foster homes. In two instances, the emergency shelter served as a respite placement for a foster child. Some children required treatment at an acute care facility during their shelter stay and subsequently returned to the shelter. In other situations, children were placed in shelters because their relative foster homes could not be licensed. Additionally, some children entered shelter care due to a lack of space in group homes and remained until a placement became available.

During the period under review, three children spent over 100 days in multiple shelter care placements. The table below shows the count of days children spent in shelter care. Figure 9 shows the number of subsequent shelter care placements in 2025.

**Table 14. Cumulative Days Spent In Shelter Care, 2025**

| Cumulative Days in Shelter Care | Total Children |
|---|---|
| 13-35 days | 3 |
| 36-50 days | 4 |
| 51-99 days | 4 |
| 100-192 days | 3 |

---

[45] Data from MDCPS show that the placement history for two children inaccurately indicated multiple shelter placements when only one occurred. For the third child, the facility was incorrectly listed as a shelter in MACWIS.

[46] To be considered compliant, each placement must have documentation demonstrating its necessity and RD approval obtained within 10 days.

66

**Figure 9. Number of Shelter Care Placements, 2025**

*n=14*

# Visitation

## Worker Contact and Monitoring

*Caseworker Contact with Foster Children (5.1.a.)*

MDCPS agreed to meet with foster children in person at least twice monthly to assess the child's safety and well-being, service delivery, and achievement of permanency and other service goals. At least one visit per month shall take place in the child's placement. MDCPS committed to a performance standard of 90 percent for this commitment.

During the period under review, MDCPS reviewed a total of 6,082 cases through the FCR and reported 2,225 (36.6 percent) met the quantitative terms of this commitment. Additionally, MDCPS reported on the quality of visits and found that 3,021 (49.7 percent) of 6,082 cases met the terms of this commitment.

The monitoring team conducted a qualitative review of visitation case narratives for a random sample of 80 children who were in MDCPS custody during the period under review and subject to this commitment. The visitation narratives were reviewed to determine if the 2nd MSA requirements to assess safety, well-being, services, permanency, and other service goals were documented. All 80[47] children required visits from an MDCPS caseworker each month. However, only 28 children (35.0 percent) received all required caseworker visits, including monthly in-

---

[47] The monitoring team reviewed 417 worker-child contacts for the 80 children included in the sample.

placement visits to assess their safety, well-being, and permanency as required in this commitment.

*Caseworker Contact with Children on Trial Home Visits (5.1.b.)*

MDCPS committed that 90 percent of foster children on a 90-day Trial Home Visit (THV)[48] would be visited by an MDCPS caseworker in the home at least two times each month.

The monitoring team could not validate the data submitted by MDCPS for this commitment due to significant differences in how the monitoring team and MDCPS identified the population of children subject to this commitment.[49]

However, the monitoring team reviewed a random sample of 60 children identified as being on THVs during the period.[50] All 60 children required visits from an MDCPS caseworker each month of their THV. However, only nine children (15.0 percent) received all required in-home visits from a caseworker.[51] Of the children who received the required visits, eight children had a caseworker visit to assess their safety, well-being, and permanency during their THV, consistent with the quality standards specified in commitment 5.1.a.[52]

*Caseworker Contact with Parents (5.1.c.)*

MDCPS committed to meet at least monthly with the parents of foster children with a goal of reunification to discuss progress on the Family Service Plan (FSP) and the child's well-being. Exceptions include if the child's parent(s) reside out-of-state or are incarcerated. MDCPS committed to a performance standard of 90 percent for this commitment.

During the period under review, MDCPS reviewed a total of 3,132 cases through the FCR and reported 708 (22.6 percent) met the terms of this commitment. The monitoring team conducted a qualitative review of visitation case narratives for a randomly selected sample of 50[53],[54] children who were in MDCPS custody during the period under review and subject to this commitment.

---

[48] Ninety-day trial home visits may be shorter than 90 days if disrupted or may extend beyond 90 days in some cases.
[49] These differences include THV identification criteria, population timing, reporting period assignment, compliance evaluation approach, and the definition of a month. The monitoring team requested but MDCPS did not provide a response regarding the interpretation of the population of children on a Trial Home Visit.
[50] The monitoring team selected a random sample from the population of children whose trial home visits concluded in 2025, including both successful exits to reunification and disrupted THVs.
[51] The monitoring team reviewed 265 child worker contacts for the 60 children included in the sample.
[52] The monitoring team assessed quality to include a discussion of safety and well-being, service delivery, and achievement of permanency and other service goals as required by the 2nd MSA.
[53] The monitoring team's initial sample was 53 children, but three children had a goal of reunification and were excluded from the analysis because their parents were either deceased or incarcerated for the entire review period.
[54] The monitoring team reviewed 68 completed worker-parent contacts for the 50 applicable children in the sample.

The monitoring team evaluated if the 2nd MSA requirements for MDCPS to assess progress on the Family Service Plan and the child's well-being were documented.

Of the 50 children in the sample who required an MDCPS worker to meet with their parent at least monthly, 13 (26.0 percent) parents of the children had all such contacts occur during the review period. Of these, nine contacts included a discussion of progress on the family service plan and the child's well-being required by the 2nd MSA.

*Caseworker Contact with Foster Parents (5.1.d.)*

MDCPS committed that foster parents with at least one foster child in the home must be visited by MDCPS monthly in the home to assess the child's safety and well-being in the placement and ensure appropriate services are provided. MDCPS committed to a performance standard of 90 percent for this commitment.

During the period under review, MDCPS reviewed a total of 5,380 cases through the FCR and reported 2,536 (47.1 percent) met the terms of this commitment.

The monitoring team conducted a qualitative review of visitation case narratives for a random sample of 70[55] foster parents with at least one foster child in their home during the period under review.  The visitation narratives were reviewed to assess the child's safety and well-being in the placement and ensure appropriate services are provided. Of the 70 foster parents in the sample who required MDCPS to visit them at least monthly, 43 (61.4 percent) met the quantitative terms of the commitment during the review period. Of these, MDCPS assessed the child's safety and well-being in the placement in 39 visits, as required in the 2nd MSA.

## Developing and Maintaining Connections

*Child-Parent Contacts within 72 Hours of Placement (5.2.a.)*

The 2nd MSA requires MDCPS to arrange contact for the foster child with his/her parents and with any siblings not in the same placement within 72 hours of foster care placement unless there are documented reasons why contact should not occur. If MDCPS cannot arrange a visit within 72 hours, a telephone call to parents, siblings, or extended family members must be provided to the child.

MDCPS completed a review of children relevant to this commitment in 2025 as part of the FCR. The Department reviewed 1,321 cases and reported 438 (33.2 percent)[56] met the terms of this

---

[55] The monitoring team reviewed 156 worker-foster parent contacts for the 70 applicable children in the sample.

[56] Based on the monitoring team's review of child-parent custody narratives, it appears that MDCPS may consider placing a child with relatives as also satisfying its commitment to maintain connections between a foster child and his/her parents and siblings who are not in the same placement.

commitment. The monitoring team reviewed the case narratives for 60 children who entered custody in 2025. The team found two children had a documented reason why a visit should not occur. Of the remaining 58 children reviewed, the team found five (8.6 percent) children had a visit with their parents within 72 hours of their removal. In the absence of a 72-hour visit there was no documentation of phone calls between parents and children found in case narratives for the remaining 53 children.

*Family Visitation Plan and Parent Contacts (5.2.b., 5.2.b.1., 5.2.b.1.a.)*

For children entering foster care, a visitation plan for the child and his/her family shall be developed as part of the FSP. The visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child (5.2.b.).

MDCPS reported on this commitment through the FCR and determined that 1,974 (51.7 percent) of 3,817 cases reviewed met the terms of this commitment. The monitoring team reviewed visitation plans for 68 children who were removed from their parent(s) care in 2025 and were subject to this commitment. There was a visitation plan for the child and his/her family developed as part of the FSP in all cases. The plan was developed in collaboration with the parents in 36 (52.9 percent) of the cases. The foster parents were part of the development in four (5.9 percent) of the cases. The plan was developed with both the parents and the foster parents in four (5.9 percent) of the cases. In 14 (20.6 percent) of the cases, there was no indication that any person, other than MDCPS staff, was involved in the development of the visitation plan. In 15 (22.1 percent) of the cases there was no supporting documentation that a meeting was held.

If parental visitation is appropriate, this visitation plan shall include a minimum of two visits each month with the parents, unless the court order in the child's case limits such visits or unless it is documented that a parent failed to make himself or herself available for visits (5.2.b.1.).

MDCPS reported on this commitment through the FCR and determined that 3,460 (90.6 percent) of 3,817 cases reviewed met the terms of this commitment. The monitoring team reviewed visitation plans for 68 children and excluded seven cases as the FSP or court order limited visitation. Of the remaining 61 cases, the monitoring team found 60 (98.3 percent) cases included in the visitation plan a minimum of two visits each month with the parents.

The 2nd MSA requires 90 percent of children shall be provided with contacts with their parents consistent with 2nd MSA requirements (5.2.b.1.a.).

MDCPS reported on this commitment through the FCR and determined that 923 (24.2 percent) of 3,817 cases reviewed provided children with contacts with their parents as required. The monitoring team conducted a qualitative review of visitation case narratives for a randomly selected sample of 68 children who were in the custody of MDCPS during the period and subject

70

to this commitment. The monitoring team determined there were 308 child-parent contacts required, but these children visited with their parents just a quarter (79, 25.6 percent) of the time during the period under review.

*Sibling Contacts (5.2.b.2., 5.2.b.2.a., 5.2.b.3., 5.2.b.4.)*

MDCPS committed that a child's visitation plan, regardless of permanency goal, shall include at least monthly visits with any siblings not in the same placement (5.2.b.2.). MDCPS reported on this commitment through the FCR and determined that of 2,207 children's cases reviewed, 568 (25.7 percent) children visited with their siblings who were not in the same placement during the period.

MDCPS committed that 80 percent of children shall be provided with contact with any siblings in custody, not in the same placement consistent with 2nd MSA requirements (5.2.b.2.a.). Requirements include that all reasonable efforts shall be made to facilitate twice-monthly in-person visits for children six years of age and younger, while all other children shall have at least monthly visits among separated siblings. MDCPS reported on this commitment through the FCR and determined that of 2,205 children's cases reviewed, less than a quarter (518, 23.5 percent) of these children visited with their siblings who were not in the same placement.

Additionally, MDCPS committed that siblings shall have interim contact by alternative means such as email, texts, telephone calls, Facetime, and/or Skype (5.2.b.3.). Exceptions to the sibling visitation requirement are:

- the child or sibling is placed out-of-state pursuant to ICPC;

- the visit may be harmful to one or more of the siblings as determined by the court or documented in the record why the visit would be harmful to one or more of the children; or

- one of the siblings is above the age of 14 and refuses such visits and the reason for such refusal is documented in the case record (5.2.b.4.).

MDCPS reported on this commitment through the FCR and determined that of 2,202 children's cases reviewed, less than a quarter (500, 22.7 percent) of these children had contact with their siblings by text, email, telephone calls, or other alternative means of interim contact. MDCPS reported 84 cases were subject to the exception component of this commitment. Based on the Department's reported performance which was significantly below the agreed-upon standard, the monitoring team did not independently assess these commitments.

# Child and Youth Permanency

## Comprehensive Family Service Plans

*Comprehensive Family Service Plans (6.1.a.)*

The 2nd MSA requires that a comprehensive Family Service Plan (FSP) that addresses the strengths, needs, and services required for both the child and their parent(s) shall be completed within 45 days of a child's entry into foster care. In developing the FSP, the MDCPS caseworker must consult with the child, the child's parents, and the foster care provider. MDCPS committed that at least 90 percent of FSPs will be submitted by the caseworker consistent with 2nd MSA requirements, within 30 calendar days of a child's entry into custody and approved by the supervisor within 15 calendar days. The FSP shall be considered complete upon documented supervisory review and approval.

The monitoring team validated that there were 1,753 children who entered custody during the period under review and the 45th day in custody fell during the calendar year. Of the 1,753 initial FSPs due during the period, 874 (49.9 percent) were completed within 30 days of a child's entry into foster care and 1,474 (84.1 percent) were approved within 15 days. A total of 1,102 (62.9 percent) of the 1,753 FSPs due during the period were submitted and approved within 45 days.

MDCPS also reported qualitatively on this commitment through the FCR. The Department reviewed 1,411 cases and reported 526 (37.3 percent) met the terms of this commitment. The monitoring team reviewed a randomly selected sample of 66 initial FSPs completed during the period to assess whether the plans were developed in accordance with 2nd MSA requirements. Fifty-one (77.3 percent) of the FSPs in the sample were developed in consultation with the child's parents and/or the foster care provider. Only eight of the plans reflected consultation with an age-appropriate child during development of the initial FSP.[57] There is no indication any person was involved, other than MDCPS staff, in the development of 15 (22.7 percent) of the plans. In FSPs developed in consultation with the appropriate parties, 39 (59.1 percent) identified strengths, needs, and services for parents and children.[58]

*Parents' Inclusion in Service Planning (6.1.b.)*

The 2nd MSA provides that in instances in which it is impossible to meet with one or both parents, the service planning process will proceed as described above, notwithstanding the parent's absence.

---

[57] Thirty-nine children were age-appropriate and applicable to this commitment.

[58] Eight FSPs had strength, needs, and services identified however, there was no indication any person(s) was involved (other than MDCPS).

MDCPS reported qualitatively on this commitment through the FCR. The Department determined 282 cases were subject to this commitment and reported 185 (65.6 percent) met the terms agreed upon in the 2nd MSA. The monitoring team reviewed a randomly selected sample of 66 initial FSPs completed and found 23 plans with documentation indicating it was impossible to meet with one or both parents. The service planning process proceeded, notwithstanding the parent's absence, in 19 instances (82.6 percent).

*Diligent Search for Parents (6.1.c.)*

MDCPS committed that in those cases in which the whereabouts of one or both parents are unknown, MDCPS shall, within 30 days, institute a diligent search for the parent(s) and document the search in the child's case record. MDCPS committed to a performance standard of 90 percent for this commitment.

MDCPS reported on this commitment through the FCR and determined that 39 (25.5 percent) of 153 cases reviewed met the terms of this commitment. Based on the Department's reported performance which was significantly below the agreed-upon standard, the monitoring team did not independently assess this commitment.

*Permanency Plans (6.1.d.)*

The 2nd MSA requires that within 45 days of a child's initial placement into foster care, MDCPS shall complete a permanency plan that specifies the child's permanency goal, a timeframe for achieving permanency, and activities that support permanency. MDCPS committed that for at least 90 percent of children who enter custody, permanency plans will be submitted within 30 calendar days of a child's entry into custody by the caseworker consistent with 2nd MSA requirements and approved by the supervisor within 15 calendar days. The permanency plan shall be considered complete upon documented supervisory review and approval.

The monitoring team validated there were 1,749 children whose 45th day in custody fell during the period.[59] Of the 1,749 permanency plans due during the period, 801 (45.8 percent) were completed within 30 days of a child's entry into foster care and 1,487 (85.0 percent) were approved within 15 days. A total of 1,094 (62.6 percent) of the 1,749 permanency plans due during the period were submitted and approved within 45 days.

MDCPS also reported qualitatively on this commitment through the FCR. The Department reviewed 1,411 cases and reported 830 (58.8 percent) met the terms of this commitment. The monitoring team reviewed a randomly selected sample of 66 initial FSPs completed during the period to assess whether the FSPs were developed in accordance with the 2nd MSA

---

[59] The 6.1.a. and 6.1.d. populations differ slightly because the agreed-upon business rules for commitment 6.1.a. count custody start date plus 44 days while commitment 6.1.d. counts custody start date plus 45 days.

requirements, inclusive of a permanency plan. The monitoring team found that all 66 of the FSPs in the sample contained a permanency plan that stated the child's permanency goal and included a timeframe for achieving permanency. Of the 66 FSPs reviewed, 47 (71.2 percent) indicated activities that support permanency.

## Concurrent Permanency Planning

*Concurrent Permanency Planning (6.2.a.)*

MDCPS agreed within the first six months of a child's entry into care to begin to engage in concurrent permanency planning. MDCPS committed that at least 95 percent of children in custody with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements.

MDCPS reported on this commitment through the FCR and determined that 1,033 (82.0 percent) of 1,259 cases reviewed had case record documentation reflecting active concurrent permanency planning consistent with 2nd MSA requirements.

The monitoring team reviewed FSPs completed during the period for a randomly selected sample of 66 children with a goal of reunification to assess whether the plans included any documentation of a concurrent permanency goal or active concurrent permanency planning. The monitoring team found that all 66 of the FSPs in the sample included documentation of a concurrent permanency planning goal, of which 47 (71.2 percent) contained evidence of active concurrent permanency planning.

## Reunification and Trial Home Visitation

*Reunification (6.3.a.1.)*

The 2nd MSA requires when a child's permanency goal is reunification that MDCPS identify in the FSP and make available, directly or through referral, those services MDCPS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child. Caseworkers must monitor the provision of services through visits and updating of service plans. MDCPS committed to a performance standard of 90 percent.

MDCPS reported on this commitment through the FCR and determined that 2,721 (85.6 percent) of 3,180 cases reviewed met the terms of this commitment.

The monitoring team reviewed the case records of 66 children and found 54 cases (81.8 percent) identified needed services. Twenty-six (39.4 percent) of the cases had documentation to support

74

that all services were made available directly or through a referral and met the terms of this commitment, while 22 (33.3 percent) had evidence that only some services were made available.

*Caseworker Contact with Reunification Parents (6.3.a.2.)*

For a child with a permanency goal of reunification, MDCPS committed to have the child's caseworker meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances. See Section 5.1.c. for this analysis.

*Reunification Supports for Parents (6.3.a.3.)*

MDCPS committed in the 2nd MSA to document in the case record of children with a permanency goal of reunification, opportunities provided to their parents in support of reunification.

MDCPS reported qualitatively on this commitment through the FCR and determined 2,654 (83.5 percent) of 3,180 cases met the terms of the commitment. The monitoring team reviewed a randomly selected sample of 66 initial FSPs subject to this commitment and found 45 (68.2 percent) had documented opportunities provided to parents in support of reunification.

*After-Care Plans (6.3.a.4.)*

The 2nd MSA requires that when a recommendation is made to reunify a child with his or her family, MDCPS must develop an after-care plan that identifies services necessary to ensure that the conditions leading to the child's placement have been addressed, and that the child's safety and stability can be assured. MDCPS is also required to take reasonable steps to provide or facilitate access to services necessary to support the child during the trial home visit (THV).

MDCPS submitted raw performance data from a qualitative review for this commitment; however, they did not include summary performance calculations.

The monitoring team reviewed the case records of 60 children who exited THVs during the period to determine whether they had after-care plans in place prior to initiation of the THV. Thirty-one of the children (51.7 percent) had an after-care plan. Twenty-five (41.7 percent) of those after-care plans identified appropriate services, and 21 (35.0 percent) had documented reasonable efforts to provide or facilitate services necessary to ensure the child's safety and stability during the THV, and that the conditions leading to the child's placement had been addressed.

*Trial Home Visits (6.3.a.5.)*

The 2nd MSA provides that for each child who has a permanency goal of reunification and who is in fact returned home for the purpose of reunification, MDCPS will provide that child with a

75

90-day THV if the child has been in custody for at least 90 days, subject to the approval of the Youth Court. During the THV period, a MDCPS caseworker shall meet with the child in the home at least two times per month.

MDCPS committed that at least 90 percent of foster children who are reunified and who were in custody longer than 90 days would receive a 90-day THV period or have documentation in the case record reflecting the Youth Court's objection to such a THV. During the THV, MDCPS must provide or facilitate access to the services in the child's after-care plan, consistent with the 2nd MSA requirements.

The monitoring team could not validate the data submitted by MDCPS for this commitment due to significant differences in how the monitoring team and MDCPS identified the population of children subject to the commitment. [60]

The monitoring team conducted a review of 60 children on THVs during the period and determined that 43 of 60 of the children (71.7 percent) had documentation in MACWIS of Youth Court approval for the THV period to begin. The monitoring team requested but MDCPS did not provide a response regarding the interpretation of the population of children on a Trial Home Visit.

The monitoring team reviewed and reported on the visitation component of this commitment in section 5.1.b. and the access to services component of this commitment in section 6.3.a.4.

*Final Discharge Meeting (6.3.a.6.)*

The 2nd MSA requires that before the end of any THV period, MDCPS will meet with the child's parents and the child to determine the appropriateness of final discharge. If final discharge is determined to be appropriate, MDCPS shall make the appropriate application to the Youth Court to be relieved of custody.

MDCPS submitted raw performance data from a qualitative review for this commitment but did not include summary performance calculations.

The monitoring team conducted a qualitative review of 60 children placed in THVs, all of whom were scheduled for final discharge in 2025. Twelve THVs were disrupted; as a result, those children are not included in the denominator. The monitoring team determined that less than a third (15, 31.3 percent) of the remaining 48 children had evidence of both a final discharge

---

[60] These differences include THV identification criteria, population timing, reporting period assignment, compliance evaluation approach, and the definition of a month. The monitoring team requested but MDCPS did not provide a response regarding the interpretation of the population of children on a Trial Home Visit.

meeting with all appropriate parties and that the appropriate application was filed with the Youth Court for the child to be relieved of custody.  THV durations ranged from one to five months.

Of the 12 children whose THVs were disrupted, one required hospitalization in acute care, and two children were placed in detention. Five children returned to foster care after their parent had a substance use relapse.  The Department visited the children twice per month as required, in only one of these five cases, and in all five cases, the case narratives were insufficient and lacked meaningful detail.

 Examples of the disruptions include:

- A child on a THV was living in the home with the mother, however there was no documentation of planning with the stepfather who lived in the home. The child remained on a THV for three months before being physically abused by the stepfather and returned to foster care. The child received four visits during the THV, but one narrative simply noted the child was sleeping, providing little insight into the child's safety and well-being.
- A child who was initially removed from parental care due to deplorable home conditions, spent 11 months in foster care before beginning a THV. After just 34 days at home, the child was removed again when the home reverted to its previous unsafe condition.
- A child's THV disrupted after 32 days when the mother requested removal, stating she could not manage the child's behavior. Despite the caseworker's efforts to offer services, the mother declined assistance.

In these instances, required visits were often missed, and documentation routinely lacked sufficient detail, underscoring gaps in monitoring the child's safety and any needed support.

## Other Permanency Case Goals

*Adoption (6.3.b.1.)*

The 2nd MSA requires that at least 90 percent of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that MDCPS will undertake to achieve adoption.

Relative to the adoption specialist, the monitoring team confirmed that 1,695 (96.6 percent) of 1,754 children with a permanency goal of adoption had an adoption worker assigned to their case.

During the period under review, MDCPS did not submit its own qualitative review for this commitment. In prior 2nd MSA review periods, MDCPS reviewed and rated the quality of

adoption plans and included their findings in the data and information given to the monitor for this commitment.

The monitoring team selected and reviewed a random sample of case records for 66 children with the primary permanency goal of adoption.[61] The monitoring team found that 63 (95.5 percent) of the children's case records had an adoption worker assigned. All the cases had an adoption plan and 40 (60.6 percent) of the cases contained adoption status meeting narratives in MACWIS for three consecutive months during the monitoring team's quarterly reviews. Twenty-eight (42.4 percent) of the 66 children's records contained adoption status meetings that identified the child-specific activities that MDCPS will undertake to achieve adoption and timeframes in which the activities will be undertaken.

*Termination of Parental Rights (6.3.b.2., 6.3.b.3.)*

MDCPS must make a termination of parental rights (TPR) referral before a child has spent more than 17 of the previous 22 months in foster care, unless an available exception pursuant to the federal Adoption and Safe Families Act ("ASFA") has been documented by MDCPS in the child's case record. After the initial ASFA exception, MDCPS may continue the exception for only one additional six-month period unless continued invocation of the exception is reviewed, approved, and documented semi-annually by the Regional Director assigned to the county of responsibility for the child. The performance standard is 90 percent.

The monitoring team reviewed data provided by MDCPS and determined that 1,214 children were subject to this commitment. A timely TPR referral was made to the Mississippi Attorney General's Office for 481 (39.6 percent) of the 1,214 children during calendar year 2025. MDCPS reported that 1,331 children were subject to this commitment[62], and a timely TPR referral was made for 469 (35.2 percent) children. Based on the Department's reported performance of 35.2 percent relative to a 90 percent standard, the monitoring team did not independently conduct a qualitative review for commitment 6.3.b.2.

MDCPS is required to provide the monitor a report of all TPR referrals made during the monitoring period, the date those TPR referrals were made and the date the petition was filed with the court (6.3.b.3.). MDCPS provided data on TPR referrals for 531 children during 2025.

---

[61] The monitoring team assessed three consecutive months of adoption status narratives for each child for this review to determine whether the child-specific activities to achieve adoption were undertaken within the identified timeframes.

[62] MDCPS counts children whose 15th month (of 22) fell in 2025; the monitoring team counts children whose 17th month (of 22) fell in 2025 as required by the 2nd MSA, which results in differing counts.

*Post-Adoption Services (6.3.c.)*

MDCPS committed to establishing and maintaining a system of post-adoptive services to stabilize and support adoptive placements. MDCPS agreed that adoptive families eligible for adoption subsidies must have access to these services, which may include counseling, mental health treatment and crisis intervention, family preservation and stabilization services, and peer support.

MDCPS reported that an average of 5,233 children were eligible for and received adoption subsidy payments during each quarter of 2025, totaling an annual amount of $44,621,177.

Consistent with its 2nd MSA commitment, MDCPS continued to fund statewide post-adoptive service contracts with two child and family service agencies to ensure that eligible families have access to a range of post-adoptive services throughout Mississippi. The contracts were in effect throughout the calendar year and the provision of post-adoptive services continued throughout the entire monitoring period. Families can access services through their MDCPS Adoption Specialist or through direct contact with the post-adoptive service providers, at any time day or night. MDCPS reported that one post-adoptive services contractor experienced significant restructuring and staff turnover during the period which impacted service delivery, but the provider is currently working to rebuild and strengthen their structure to better serve children and families. MDCPS reported the following services required by the 2nd MSA were provided to families during 2025.

**Table 15. Post Adoption Services – Families Served by Month, 2025**

| Service Type | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Supportive Counseling | 8 | 5 | 4 | 7 | 24 | 4 | 16 | 17 | 11 | 4 | 12 | 1 | 113 |
| Mental Health Treatment | 4 | 0 | 0 | 2 | 2 | 1 | 0 | 0 | 3 | 3 | 2 | 2 | 19 |
| Crisis Intervention | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Family Preservation/ Stabilization Services | 9 | 5 | 4 | 10 | 6 | 25 | 3 | 9 | 4 | 1 | 4 | 0 | 80 |
| Peer Support | 3 | 3 | 2 | 3 | 4 | 4 | 4 | 4 | 4 | 3 | 3 | 3 | 40 |
| Respite | 14 | 17 | 29 | 21 | 19 | 20 | 20 | 16 | 24 | 20 | 25 | 22 | 247 |
| **Total** | **38** | **30** | **39** | **43** | **55** | **54** | **43** | **46** | **46** | **31** | **46** | **28** | **499** |

*Durable Legal Custody and Guardianship (6.3.d.1., 6.3.d.2.)*

The parties agreed that the permanency goals of durable legal custody and guardianship may be assigned when there are documented efforts in the child's case record to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption (6.3.d.1.).

MDCPS evaluated this commitment through the FCR during the period under review. The Department reviewed 235 cases and reported that all 235 (100.0 percent) met the terms of this commitment. The monitoring team reviewed a random sample of 49 children with the goal of durable legal custody or guardianship during the monitoring period and found there were documented efforts to move the child to adoption and documentation of a reasonable basis why it was in the child's best interest not to be considered for adoption for 41 (83.7 percent) of the children.[63][64]

When the permanency goals of durable legal custody and guardianship are assigned to a child under the age of 14 years old or living with a non-relative, MDCPS shall provide to the monitor at the end of each monitoring period, information from the child's case record documenting efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption (6.3.d.2.).

The monitoring team's review sample included 31 children under the age of 14 years old or living with a non-relative with the permanency goal of durable legal custody or guardianship during the monitoring period. The team found there were efforts to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption for 27 (87.1 percent) of the children.

*Another Planned Permanent Living Arrangement (APPLA) (6.3.e.)*

If MDCPS concludes, after considering reunification, adoption, durable legal custody, and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, MDCPS may assign a permanency goal of APPLA for the child. In such circumstances, MDCPS agreed that the child must be at least 16 years old and MDCPS must document a compelling reason why this permanency goal is in the best interest of the child.

---

[63] The monitoring team determined that children in the data had permanency goals of custody with a relative. These children were reviewed as part of the commitment as MDCPS reported some Youth Courts in Mississippi utilize the goals interchangeably, for the same permanency outcome.

[64] The monitoring team requested court orders for a sample of 54 children with a primary permanency goal of durable legal custody or guardianship. Five children had a primary permanency goal that was not durable legal custody or guardianship and were removed from the sample.

MDCPS evaluated this commitment through the FCR during the period under review. The Department reviewed 468 cases and reported that all 468 (100.0 percent) met the terms of this commitment. The monitoring team reviewed a random sample of 50 children with the goal of APPLA during the monitoring period.[65] There was a documented compelling reason why the permanency goal was in the best interest of the child for all 50 children (100.0 percent).

## Permanency Reviews

*Permanency Plan Reviews (6.4.a.)*

The parties agreed that a child's permanency plan would be reviewed in a court or administrative case review, which may be a foster care review, at least every six months. MDCPS must take all reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers and relevant professionals in court or administrative reviews. The performance standard is 90 percent.

Data provided by MDCPS indicate that 3,455 children were due for a permanency plan review during the period of which 3,375 children (97.7 percent) received a timely review. The monitoring team reviewed case records for a random sample of 68 youth due for permanency plan reviews during the period to assess whether reasonable steps were taken to ensure relevant participants attended the permanency reviews. The monitoring team determined that 66 (97.1 percent) children received a timely permanency plan review. Table 16 details the number and percent of relevant participants the monitoring team found to have been invited to and to have attended the permanency plan reviews.

**Table 16. Permanency Plan Review Participants, Q2 – Q4 2025**
*n=68*

| Participant | Invited | | Attended | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| Foster care reviewer (quality assurance coordinator) | 67 | 98.5% | 67 | 98.5% |
| Social worker (caseworker) | 67 | 98.5% | 62 | 91.2% |
| Social work supervisor (casework supervisor) | 67 | 98.5% | 27 | 39.7% |
| Foster child[66] | 45 of 46 | 97.8% | 1 of 46 | 2.2% |
| Guardian-ad-litem | 43 | 63.2% | 2 | 2.9% |
| Caregiver(s)[67] | 39 of 63 | 61.9% | 21 of 63 | 33.3% |
| Parent(s)[68] | 44 of 56 | 78.6% | 13 of 56 | 23.2% |

---

[65] The monitoring team requested court orders for a sample of 54 children with a primary permanency goal of APPLA. Four children had a primary permanency goal of adoption in the submitted court orders and one of the four was under the age of 16. All four children were removed from the sample.

[66] Twenty-two children under 6 years old were excluded from this denominator.

[67] Five children on a trial home placement were excluded from this denominator.

[68] Twelve children whose parents' rights had been terminated were excluded from this denominator.

*Court Reviews (6.4.b.)*

The 2nd MSA requires MDCPS to take all reasonable steps to ensure that a court review is held for each child in foster care custody within 12 months of the child's initial placement, and annually thereafter. MDCPS committed that the Department would make reasonable efforts to have a timely annual court review scheduled consistent with 2nd MSA requirements for at least 90 percent of foster children who have been in custody for at least 12 months.

During the period, MDCPS reviewed 3,432 cases through the FCR and reported 3,393 (98.9 percent) met the terms of this commitment.[69] Quantitative data provided by MDCPS indicate that 1,285 children were due for annual court reviews between the second and fourth quarters of 2025.[70]

The monitoring team examined MACWIS records[71] for a random sample of 68 children with an annual court review due during the period. The monitoring team concluded that timely court reviews occurred for 57 (83.8 percent) of the 68 children, and reasonable efforts were demonstrated for five additional children, bringing performance to 91.2 percent.

*Review of Adoption and Safe Families Act (ASFA) Exceptions (6.4.c.)*

Pursuant to the 2nd MSA, MDCPS committed to review documented exceptions pursuant to ASFA for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review. As described in Section 6.3.b.2, the monitoring team typically reviews relevant sections of the case record for each of the children who did not have a timely TPR referral to identify children with an ASFA exception. However, based on the Department's reported performance of 35.2 percent relative to a 90 percent standard, the monitoring team did not independently conduct a qualitative review for this commitment.

---

[69] MDCPS uses evidence of court hearings in Mycids and/ or the case file, evidence of the Department's requests for a hearing: can be located in Reasons 3 tab of the Part C of the County Conference tab, request for hearing in the MACWIS Court tab, letters or emails to the court requesting a hearing located in the paper case file.

[70] MDCPS and the monitoring team both report markedly different performance when assessing this commitment quantitatively and qualitatively. Quantitative performance indicates that 88 (6.8 percent) of the 1,285 children due for a court hearing during the period received a timely hearing. There appears to be significant issues with the quantitative reporting for this commitment. The monitoring team is in communication with MDCPS regarding the issue.

[71] The monitoring team reviewed the following sections in MACWIS: Legal History, County Conference, Narratives, and Family Service Plan.

## Permanency Performance Indicators

*Permanency Outcomes (6.5.a.)*

The parties agreed that each federal fiscal year (FFY), MDCPS must meet performance standards for three permanency indicators, as established by the monitor. The three indicators, as agreed to by MDCPS and the monitor, are as follows:

- Of all children who enter foster care in a 12-month period, what percent were discharged to permanency within 12 months of entering foster care?

- Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care between 12 and 23 months, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period.

- Of all children in foster care on the first day of a 12-month period, which shall commence on October 1st of any given year, who had been in care for 24 months or more, the percent of children discharged from foster care to permanency within 12 months of the first day of the 12-month period.

The monitor established performance standards for MDCPS to meet regarding these three indicators. As Table 17 indicates, the Department achieved the performance standard for two of the three permanency outcomes during the FFY2025 reporting period.

**Table 17. Permanency Outcome Performance, FFY2025**

| 2nd MSA Section | Indicator | Performance Standard | MDCPS' FFY2025 Performance |
|---|---|---|---|
| *6.5.a.1* | Permanency for children entering care in a 12-month period | 45.7% | 36.7% |
| *6.5.a.2* | Permanency for children in care for 12-23 months on the first day of a 12-month period | 41.0% | 47.3% |
| *6.5.a.3* | Permanency for children in care for 24 months or more on the first day of a 12-month period | 32.7% | 42.2% |

*Adoption Outcomes (6.5.c., 6.5.d.)*

The 2nd MSA requires that each fiscal year, MDCPS must meet adoption performance standards, as established by the monitor. The parties agreed that the adoption performance standards must

83

represent a substantial improvement above the certified baseline performance established under the Stipulated Third Remedial Order (STRO).[72]

In FFY2020, the monitoring team determined the average length of time from the date on which a child's adoption goal was established to adoption finalization was 29.3 months and the median was 24 months, based on MDCPS data. The monitoring team did not assess performance for FFY2025 since the 2nd MSA was not in effect until April 15, 2025, and will report on FFY2026 performance in the next report.

## Transition to Independent Living

*Notification of Cessation of Benefits (7.1.)*

The 2nd MSA requires that MDCPS will provide each youth transitioning to independence (emancipation) with at least six months advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition. MDCPS identified and reported on only 30 of the emancipated youth the monitoring team identified as being subject to this commitment. The monitoring team determined there were 41 youth who exited care at age 18 or older without achieving permanency.[73] MDCPS reported that 23 (76.7 percent) of the 30 youth the Department reviewed received at least six months advance notice of the cessation of benefits. The monitoring team reviewed the MACWIS records of the 41 youth in the emancipation group and found documentation that just seven (17.1 percent) of those youth received at least six months advance notice of the cessation of benefits.

MDCPS policy states that the Youth Appraisal will guide the development of an appropriate Transitional Living plan to allow for the youth to successfully transition to adulthood.[74] According to the Department's policy the Youth Appraisal should be completed for all youth in care who are age 14 and older and a new Youth Appraisal is required every six months. The monitoring team did not have access to the completed youth appraisals[75] for the youth in the emancipation cohort. MDCPS provided some appraisals; however, they were over inclusive, including many

---

[72] The Stipulated Third Remedial Order was entered as an order of the Court on December 19, 2016.

[73] Permanency includes placement with a relative, adoption, guardianship, durable legal custody, and reunification with a parent.

[74] Youth Transition Support Services Policies and Procedures (2018), §2.2A.1.

[75] The youth appraisal includes the following language: "By signing below, the youth acknowledges that once they leave custody of MDCPS, their health, financial, and other benefits provided by MDCPS will end. It will be the responsibility of the youth and/or guardian to secure health insurance, financial, or other assistance needed. Youth exiting care at or after the age of 18 to emancipation may be eligible for Extended Foster Care Medicaid until the age of 26 based on their eligibility ruling upon release. The youth's COR worker should assist the youth with completing this process at the time of release from MDCPS custody."

youth who were not in the emancipation cohort, and under inclusive, as appraisals for many youth in the emancipation cohort could not be found in the submission MDCPS provided.

*Independent Living Service Plans (7.2.)*

The 2nd MSA requires that MDCPS will provide each foster youth age 14 years or older, regardless of his/her permanency plan, an opportunity to participate in the creation of an appropriate Independent Living service plan (ILP) for a successful transition to adulthood. MDCPS submitted a wide range of documents for this commitment in a manner that rendered them unusable for verification by the monitor. MDCPS provided approximately 415 documents related to this commitment and commitment 7.3. The documents were routinely labeled in a manner that had no connection to the substance of the document and were largely unresponsive to the requirements in commitments 7.2 and 7.3.[76] There was no standard naming convention for these documents.[77] When a youth's name was included in the file name it was frequently mislabeled. Finally, MDCPS did not provide overall findings regarding performance with this commitment for the monitoring team to verify. Given the manner in which the information was provided, the monitoring team could not independently assess performance for this commitment.

*Independent Living Services (7.3.)*

The 2nd MSA requires that each foster youth age 14 years and older will have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood. This includes independent living services eligible for federal reimbursement under the Chaffee program, which in part promotes employment or removes barriers to employment. MDCPS must maintain sufficient resources to deliver these services.

MDCPS submitted the same set of documents for this commitment as the set of documents submitted for commitment 7.2 above. As described above, MDCPS submitted the documents in a manner that rendered them unusable for verification by the monitor. Additionally, MDCPS did not provide overall findings regarding performance with this commitment for the monitoring team to verify. Given the way in which the information was provided, the monitoring team could not independently assess performance of this commitment.

---

[76] Many documents provided were related to commitment 7.5., start-up stipend requests and supplemental information, such as court orders, that supported those requests.

[77] For example, the document titles included: a first initial and a last name; a first and last name; a first initial and a last name followed by YA or YTLAppraisal; a first and last name followed by "Runaway;" "Document;" "Screenshot 2025-09-22 131101.png;" "SD" with a name that followed; and "IMG_1948.jpeg."

85

*Medical Coverage (7.4.)*

The 2nd MSA requires that MDCPS will implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid coverage so that their coverage continues without interruption at the time of emancipation.

MDCPS provided the monitoring team screenshots from the Medicaid eligibility system for 32 of 41 youth who exited foster care to emancipation during the period. The monitoring team was able to verify that 26 (63.4 percent) of the 41 youth were enrolled in Medicaid coverage so that their coverage continued without interruption at the time of emancipation. MDCPS did not provide its own analysis regarding performance with this commitment.

*Start-Up Stipends (7.5.)*

The 2nd MSA requires that MDCPS will implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond receive a start-up stipend of at least $1,000.00 at the time of emancipation, or as soon as practicable thereafter.

MDCPS policy provides that "[a] Start-Up Stipend is available to youth who leave care after turning age sixteen (16) and who have participated in the available ILP activities. The youth must have been in care for a minimum of six (6) months." The policy also allows youth to apply for this stipend six months prior to or following their exit from custody.

MDCPS reporting on this commitment was both over inclusive, in that information was provided about many youth who were not in the emancipation cohort, and under inclusive, in that information was not provided for all the youth in the emancipation cohort. As described in other commitments in this section, MDCPS reported on 30 of the 41 youth who emancipated from care during the period under review. MDCPS reported that a start-up stipend was requested[78] for 28 (93.3 percent) of those 30 youth. The monitoring team reviewed the MACWIS records of the 41 youth who emancipated from care at age 18 or older during the period and found documented evidence that 21 (51.2 percent) of those youth received a stipend.

*Housing Resource Specialists (7.6.)*

MDCPS is required to implement a policy and a process by which youth emancipating from the foster care system at age 18 or beyond have access to a housing resource specialist responsible for assisting the youth to obtain an adequate living arrangement.

---

[78] MDCPS reported on when a start-up stipend request was submitted. The submission of a request does not necessarily equate to the issuance of payment to the youth. The monitoring team reviewed MACWIS records to verify the number of youth for whom payment of a start-up stipend was issued.

MDCPS reporting on this commitment was both over inclusive, in that information was provided about many youth who were not in the emancipation cohort, and under inclusive, in that information was not provided for all the youth in the emancipation cohort. There were 30 youth who were in the information reported by MDCPS and also in the emancipation cohort. MDCPS reported that seven (23.3 percent) of those 30 youth requested and were provided housing resources. The monitoring team conducted a qualitative review of the 41 youth who emancipated from care during the period. This review included MACWIS narratives for the year prior to release from custody. The monitoring team found notations in the case records that four of the 41 youth had a documented need for access to a housing resource specialist. Documentation was found in three of those four cases that MDCPS provided housing assistance to the youth. However, the monitoring team found no evidence that MDCPS provides youth access to a "housing resource specialist" as required by the commitment. When the monitoring team found evidence of assistance obtaining housing that assistance was provided by the transition navigator. Based on information contained in MACWIS narratives, it appears that transition navigators are responsible for completing youth appraisals and have a range of responsibilities related to older youth in care. There is no evidence that they specialize in providing housing assistance for youth emancipating from care.

*State Educational Training and Vocational (ETV) Program (7.7.)*

MDCPS must continue to implement policies and processes which ensure that youth emancipating from the foster care system at age 18 or beyond receive services and support under the State Educational Training and Vocational (ETV) Program for which they are eligible. MDCPS reported only "MDCPS' Educational and Training Voucher Program follows a State Plan which was approved by the Secretary of Health and Human Services. The approved State Plan can be found in Section D: Foster Care Policy. For purposes of reporting for § 7.7 of the 2nd MSA, YTSS will report on the youth who complete the ETV enrollment and receive ETV funds during the FFY. MDCPS' analysis and all evidence of compliance for this provision, including a copy of the report on the ETV program as completed as part of the Annual Progress Service Report (APSR) will be submitted to the monitor in September of each year." However, MDCPS did not provide the monitoring team with its analysis and evidence of performance, including a copy of the report on the ETV program completed as part of the APSR. The monitoring team is unable to identify which youth were eligible for an ETV during the reporting period nor who among the eligible youth received an ETV.

*Identification and Essential Documentation (7.8.)*

MDCPS committed to assist youth in obtaining or compiling the following documents and such efforts shall be documented in the child's case record:

- educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate;

- a social security or social insurance number;

- a resume, when work experience can be described;

- a driver's license, when the ability to drive is a goal; if not a driver's license, then a state-issued photo identification;

- an original or certified copy of the youth's birth certificate;

- previous placement information;

- documentation of immigration, citizenship, or naturalization, when applicable;

- documentation of tribal eligibility or membership;

- death certificates when parents are deceased;

- a life book or compilation of personal history and photographs, as appropriate; and

- a list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties.

MDCPS reporting on this commitment was both over inclusive, in that information was provided about many youth who were not in the emancipation cohort, and under inclusive, in that information was not provided for all the youth in the emancipation cohort. There were 30 youth who were in the information reported by MDCPS and also in the emancipation cohort. The monitoring team conducted a qualitative review of this commitment for 41 youth who emancipated from care during the period, by reviewing MACWIS narratives. Table 18 details the number and percent of youth for whom the relevant documentation was obtained or compiled as determined in both reviews. Worker documentation of citizenship and immigration status and parent death certificates is often absent in MACWIS, raising questions about the reliability of the data for these commitments. Further, it is often not clear from the MACWIS narratives used to verify these commitments if these commitments apply to specific children.

**Table 18. Youth Receiving Identification and Essential Documentation, Q2 – Q4 2025**

| Documentation | MDCPS Emancipated youth receiving documentation (N=30) | | Monitor Emancipated youth receiving documentation (N=41) | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| Education Records (7.8.a.) | 22 | 73.3% | 10 | 24.4% |
| Social Security Card (7.8.b.) | 24 | 80.0% | 19 | 46.3% |
| Resume (7.8.c.) | 22 | 73.3% | 11 | 26.8% |
| Driver's License/State ID (7.8.d.) | 23 | 76.7% | 23 | 56.1% |
| Birth Certificate (7.8.e.) | 24 | 80.0% | 16 | 39.0% |
| Previous Placement Information (7.8.f.) | 11 | 36.7% | 6 | 14.6% |
| Citizenship/Immigration Records (7.8.g.) | 0 of 1 | 0% | 1 of 3 | 33.3% |
| Tribal Eligibility (7.8.h.) | 0 of 1[79] | 0% | 0 of 0 | N/A |
| Parent Death Certificate (7.8.i.) | 0 of 1 | 0% | 0 of 2 | 0% |
| Life Book/History (7.8.j.) | 16 | 53.3% | 4 | 9.8% |
| Known Relatives List (7.8.k.) | 24 | 80.0% | 10 | 24.4% |

# Child Well-Being

## Physical and Mental Health Care

*Initial Medical Screenings (8.1.a.)*

The 2nd MSA requires that by July 1, 2020, 90% of children shall have an initial medical screening within 72 hours of the child's entry into foster care. MDCPS reported performance with this commitment based on seven days which is an earlier standard in the 2nd MSA that has not applied since June 30, 2020.[80] Under the misapplication of the prior standard, MDCPS reported 1,160 (62.4 percent) of the 1,858 children who were due for an initial health screen received that exam within seven days of entry into foster care during the period under review. MDCPS submitted a spreadsheet detailing performance with this commitment. The spreadsheet showed that MDCPS sometimes incorrectly counted an initial medical screening from a child's episode in foster care in a prior year, before the current 2025 episode in care, to count as compliance for the required initial medical screening following the 2025 entry into care.

---

[79] It is not clear that this youth had tribal eligibility. Monitoring team review of the MACWIS record of this child indicated that he did not, but MDCPS reported "no" as opposed to "NA," as they reported for all other youth.

[80] The 2nd MSA standard in 2018 required that 70% of children have an initial medical screening within seven days of the child's entry into foster care. That standard increased to 80% of children by July 1, 2019, and was changed to the currently applicable standard that 90% of children have an initial medical screening within 72 hours of the child's entry into care beginning on July 1, 2020.

The monitoring team reviewed a sample of 75 children due for an initial health screen during the period under review to validate MDCPS reporting.[81] The monitoring team found that 39 (52.0%) of children had an initial health screen within 72 hours of entry into foster care in accordance with the 2nd MSA standard. The table below shows the documented initial health screen information for the 36 children in the sample who did not receive an initial health screen within 72 hours of entry into foster care.

**Table 19. Initial Medical Screenings Not Meeting Standard, Q2 – Q4 2025**
*n=75*

| Documented Findings | Number of Children | Percent |
|---|---|---|
| Initial Medical Screen 73 hours – 7 days after entry | 11 | 14.7% |
| Initial Medical Screen 8 – 14 days after entry | 3 | 4.0% |
| Initial Medical Screen 15 – 40 days after entry | 3 | 4.0% |
| Initial Medical Screen 73 days after entry | 1 | 1.3% |
| No documentation of Initial Medical Screen | 9 | 12.0% |
| No information about child's health documented[82] | 9 | 12.0% |

*Comprehensive Medical Exams (8.1.b.)*

The 2nd MSA requires that by July 1, 2020, 90% of children shall have an initial Early and Periodic Screening, Diagnosis and Treatment (EPSDT) or other comprehensive medical examination within 30 days of the child's entry into foster care. MDCPS data indicate that during the reporting period, 973 (54.8 percent) of the 1,776 children who were due for an initial EPSDT or comprehensive exam received that exam within 30 days of the child's entry into foster care.[83]

The monitoring team reviewed a random sample of 75 children due for an initial EPSDT or comprehensive exam during the reporting period. The monitoring team found that 26 (34.7 percent) children had an initial EPSDT or comprehensive exam within 30 days of entry into foster care. The table below shows the documented initial EPSDT or comprehensive exam information for the remaining 49 (65.3 percent) children who did not have a timely EPSDT or comprehensive exam.

---

[81] The monitoring team reviewed a sample of cases that were randomly selected at a 90/10 confidence level.

[82] The monitoring team continued to use the standard that it has been using since 2019, counting a documented exam as sufficient if there was basic information about the visit and any documentation about the child's health.

[83] The documentation provided by MDCPS in support of their findings included cases in which EPSDT exams following entries into foster care prior to the period under review were incorrectly used as evidence of compliance for the EPSDT or other comprehensive exam due as the result of a new entry into foster care during the period under review.

**Table 20. Initial EPSDT or Comprehensive Exams Not Meeting Standard, Q2 – Q4 2025**
*n=75*

| Documented Findings | Number of Children | Percent |
|---|---|---|
| Exam completed 31 – 39 days after entry | 5 | 6.7% |
| Exam completed 40 – 80 days after entry | 7 | 9.3% |
| Exam completed 81 – 217 days after entry | 3 | 4.0% |
| No documentation that exam was completed | 18 | 24.0% |
| No information about child's health documented[84] | 5 | 6.7% |
| Could not determine that the exam was an EPSDT or comprehensive[85] | 11 | 14.7% |

*Periodic and Ongoing Medical Exams (8.1.c.)*

The 2nd MSA requires that following an initial EPSDT or other comprehensive medical examination, 90 percent of children must receive periodic and ongoing medical examinations, including physical, mental, developmental, dental, hearing, and vision, according to the periodicity schedule set forth by the EPSDT program. For the period under review, MDCPS submitted six Excel spreadsheets to report on the second quarter and five spreadsheets to report on quarters three and four. These spreadsheets included reporting on thousands of children who were due for medical exams outside of the period under review and internal inconsistencies regarding the number of children included and whether timeliness was measured. It is unclear from the reporting how or whether MDCPS is able to track children's need for periodic and ongoing medical exams.

MDCPS did not provide a summary of its findings based on this reporting and it is not possible for the monitoring team to discern MDCPS's performance. In addition, there is no standard tracking of periodic and ongoing medical exams in MACWIS. The monitoring team is therefore not able to report on MDCPS' performance for this commitment.

*Follow-up Treatment (8.1.d.)*

The 2nd MSA requires that by July 1, 2019, 90% of children shall be provided with practitioner recommended follow up treatment. MDCPS does not have a process in place to specifically track follow-up treatment in MACWIS. MDCPS submitted two spreadsheets for this commitment. One spreadsheet includes a count of children, with no identifying information for the child, for each month of 2025 totaling 3,043 children in 2025 and reported there were no follow up treatment exams needed for any of these children. MDCPS submitted a second spreadsheet that includes data on 25,572 youth, 22,629 of whom exited care before the period under review and appears

---

[84] The monitoring team continued to use the standard that it has been using since 2019, counting a documented exam as sufficient if there was basic information about the visit and any documentation about the child's health.
[85] The monitoring team continued to use the standard that it has been using since 2019, including that an EPSDT or comprehensive exam must also include documentation that indicates that the exam was comprehensive in nature.

to track only required annual exams (under commitment 8.1.c.) and not needed follow-up care as required by this commitment. MDCPS did not report overall performance with this commitment, and the monitoring team cannot determine MDCPS' performance from these spreadsheets.

The monitoring team tracked children's follow-up treatment needs documented in MACWIS while conducting reviews of the 2025 samples related to initial and comprehensive medical exams. A total of 26 follow-up care needs were indicated for 24 children that were due in 2025 and before the child exited care. Documentation that the children received the needed follow-up treatment was found for seven (26.9 percent) of the 26 documented follow-up care needs.

*Dental Exams (8.1.e.)*

The 2nd MSA requires that by July 1, 2020, 90% of children shall have a dental examination within 90 days of the child's entry into foster care. MDCPS data indicate that during the reporting period, 462 (43.3 percent) of the 1,068 children who were due for a dental exam received that exam within 90 days of entry into foster care.

The monitoring team reviewed a random sample of 75 children due for a dental exam during the reporting period to validate MDCPS reporting. The monitoring team found that 36 (48.0 percent) of the children in the sample received an initial dental exam within 90 days of entry into foster care. Table 21 shows the documented initial dental exam information for the 39 (52.0 percent) remaining children who did not receive an initial dental exam.

**Table 21. Initial Dental Exams Not Meeting Standard, Q2 – Q4 2025**

| Documented Findings | Number of Children | Percent |
|---|---|---|
| Exam completed 92 – 110 days after entry | 7 | 9.3% |
| Exam completed 111 – 137 days after entry | 5 | 6.7% |
| Exam completed 138 – 183 days after entry | 6 | 8.0% |
| Exam completed 184 – 219 days after entry | 4 | 5.3% |
| No documentation that exam was completed | 14 | 18.7% |
| No information about child's dental health documented[86] | 3 | 4.0% |

*Medical Records (8.1.f.)*

MDCPS committed to provide foster parents or facility staff with the completed foster child information form or other electronic record containing available medical, dental, educational, and psychological information about the child within 15 days of placement. MDCPS agreed to meet a

---

[86] The monitoring team continued to use the standard for compliance that it has been using since 2019, counting a documented exam as compliant if there was basic information about the visit and any documentation about the child's dental health.

performance standard of 90 percent. MDCPS reported less than 25 percent compliance with this provision during the period, including 22.5 percent compliance in the fourth quarter. Based on the Department's reported performance which was significantly below the agreed-upon standard, the monitoring team did not independently assess this commitment.

*Medicaid Information (8.1.g.)*

MDCPS agreed that by July 1, 2018, 85 percent of children shall have their Medicaid information provided to foster parents or facility staff at the time of placement. MDCPS reported less than 20 percent compliance with this provision during the period, including 16.4 percent compliance in the fourth quarter. Based on the Department's reported performance which was significantly below the agreed-upon standard, the monitoring team did not independently assess this commitment.

## Educational Services

*Educational Record Review and Need Documentation (8.2.a., 8.2.c.1.)*

The 2nd MSA requires that MDCPS review the educational record of at least 90 percent of school-age children who enter custody and document each child's educational needs within 30 calendar days of their entry into foster care. MDCPS reported on educational record reviews for 392 children who entered care during the period. According to MDCPS reporting, education records were received and reviewed for 103 (26.3 percent) of those children. MDCPS reported that there were no education concerns for 99 (96.1 percent) of those 103 children. Education record reviews are not documented in MACWIS. The monitoring team therefore has no method available for verifying compliance with this provision.

*School Enrollment (8.2.b.)*

The 2nd MSA requires MDCPS to take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within seven calendar days of initial placement or any placement change, including while placed in shelters or other temporary placements. MDCPS did not report on school enrollment for children during Q2 or Q3. MDCPS submitted a spreadsheet detailing school enrollment dates for 887 youth during Q4. However, there are no associated dates for placement changes, making it impossible to know if the date of school enrollment was timely. Additionally, the spreadsheet includes a column labeled "enrolled within 7 days." The information in that column states "not verified" or "not enrolled" for 795 (89.6 percent) of the 887 youth. MDCPS did not report overall performance for this commitment

and school enrollment is not tracked in MACWIS. Therefore, the monitoring team cannot verify performance for this commitment.

*Educational Continuity (8.2.c.)*

The 2nd MSA requires MDCPS to make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences.

MDCPS reported that 335 Best Interest Determinations (BIDs) were completed during the period.[87] MDCPS did not track the total number of BIDs that were due during the period under review, so the total number of BIDs that should have occurred is not known. MDCPS reported that 194 (57.9 percent) of the completed BIDs resulted in a school change. The monitoring team was unable to determine performance because BID information is not contained in MACWIS.

---

[87] A BID is the collaborative decision about whether a student placed in foster care should continue to attend his or her school of origin or be immediately enrolled in a new school.