**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| OLIVIA Y., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:04-cv-251-HSO-FKB |
| | ) | |
| TATE REEVES, as Governor of the State of Mississippi, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS OR VACATE**

# TABLE OF CONTENTS


INTRODUCTION .......... 1

BACKGROUND AND PROCEDURAL HISTORY .......... 4

ARGUMENT .......... 13

I. Defendants Cannot Obtain Dissolution by Recasting a Consent-Decree Exit Inquiry as Jurisdictional. .......... 13

II. Defendants Have Not Carried Their Burden Under Rule 60(b)(5). .......... 20

A. The Changes Defendants Invoke Make Compliance Easier, Not More Onerous. .......... 21

i. The suspension of the 2nd MSA was an absence of change circumstance, not a changed circumstance. .......... 22

ii. New state laws reduce, rather than increase, the burden of compliance. .......... 25

iii. Operational improvements at MDCPS were contemplated by the decree, not unforeseen changes beyond Defendants' control. .......... 25

B. Continued Federal Oversight Serves the Public Interest Because the Underlying Violation Persists and No Durable Remedy Exists. .......... 26

i. Defendants have not cured the constitutional violation. .......... 28

ii. MDCPS's own data shows the risk of harm remains unabated. .......... 35

a. MDCPS still cannot reliably investigate maltreatment. .......... 36

b. Licensing and placement screening still fails to protect children. .......... 38

c. Caseworkers still do not reliably monitor children after placement. .......... 40

d. Children are still warehoused in unlicensed settings incapable of meeting their individualized needs. .......... 41

e. Medical and behavioral health needs still go undiagnosed and untreated. .... 43

f. Communication breakdowns still prevent MDCPS from acting on known risks.... 44

g. MDCPS's own quality-control systems still cannot catch its failures. .... 45

h. Taken together, these failures show a system that still cannot protect children. .... 47

iii. Defendants have not shown that any improvement is durable. .... 49

C. Vacatur Is Not a Tailored Remedy. .... 53

CONCLUSION .... 58

## TABLE OF AUTHORITIES

**Cases**


*Anderson v. City of New Orleans*,
38 F.4th 472 (5th Cir. 2022) .......... 29

*Armour & Co. v. Worldwide Cosmetics, Inc.*,
402 U.S. 673 (1971) .......... 14, 15

*Ball v. LeBlanc*,
792 F.3d 584 (5th Cir. 2015) .......... 32, 35

*Borel ex rel. A.L. v. School Board of Saint Martin Parish*,
44 F.4th 307 (5th Cir. 2022) .......... 17, 18

*Brown v. Bd. of Educ. of Topeka, Kan.*,
349 U.S. 294 (1955) .......... 56, 57

*Brown v. Plata*,
563 U.S. 493 (2011) .......... 57

*Chisom v. Louisiana ex rel. Landry*,
116 F.4th 309 (5th Cir. 2024) .......... 14, 15, 16, 17

*Coleman v. Wilson*,
912 F. Supp. 1282 (E.D. Cal. 1995) .......... 32

*Cooper v. Aaron*,
358 U.S. 1 (1958) .......... 54

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
489 U.S. 189 (1989) .......... 30

*Farmer v. Brennan*,
511 U.S. 825 (1994) .......... 31, 32, 34

*Frew v. Hawkins*,
540 U.S. 431 (2004) .......... 15, 16

*Frew v. Janek*,
2015 WL 13357954 (E.D. Tex. Jan. 20, 2015) .......... 52, 54

*Gates v. Cook*,
376 F.3d 323 (5th Cir. 2004) .......... 32, 35

*Harris v. Angelina County*,
31 F.3d 331 (5th Cir. 1994) .......... 33

*Helling v. McKinney*,
509 U.S. 25 (1993) .......... 32

*Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regul. Servs.*,
380 F.3d 872 (5th Cir. 2004) .......... 31, 32

*Hope v. Pelzer*,
536 U.S. 730 (2002) .......... 32

*Horne v. Flores*,
557 U.S. 433 (2009) .......... 20, 51

*Inmates of Suffolk Cnty. Jail v. Rufo*,
12 F.3d 286 (1st Cir. 1993) .......... 52

*Jackson v. Los Lunas Cmty. Program*,
880 F.3d 1176 (10th Cir. 2018) .......... 29, 52, 54

*John B. v. Emkes*,
710 F.3d 394 (6th Cir. 2013) .......... 29, 51

*Jonathan R. v. Morrisey*,
178 F.4th 139 (4th Cir. 2026) .......... 59, 60

*Jonathan R. v. Morrisey*,
768 F. Supp. 3d 756 (S.D. W. Va. 2025) .......... 59

*Kentucky v. Graham*,
473 U.S. 159 (1985) .......... 33

*Laube v. Haley*,
234 F. Supp. 2d 1227 (M.D. Ala. 2002) .......... 35

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne, Police Ass'n of New Orleans Through Cannatella v. City of New Orleans*,
100 F.3d 1159 (5th Cir. 1996) .......... 23

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
478 U.S. 501 (1986) .......... 16, 17

*LULAC, Dist. 19 v. City of Boerne*,
659 F.3d 421 (5th Cir. 2011) .......... 20, 28

*M.D. v. Abbott*,
119 F.4th 373 (5th Cir. 2024) .......... 59

*M.D. v. Abbott*,
907 F.3d 237 (5th Cir. 2018) .......... passim

*Rhodes v. Chapman*,
452 U.S. 337 (1981) .......... 33, 37

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) .......... passim

*Shakman v. Pritzker*,
43 F.4th 723 (7th Cir. 2022) .......... 50

*Smith v. Sch. Bd. of Concordia Par.*,
906 F.3d 327 (5th Cir. 2018) .......... 16, 17, 18, 19

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
402 U.S. 1 (1971) .......... 57

*United States v. Alcoa, Inc.*,
533 F.3d 278, 286 (5th Cir. 2008) .......... 19

*United States v. Mississippi*,
82 F.4th 387 (5th Cir. 2023) .......... 57, 58

*United States v. United Shoe Mach. Corp.*,
391 U.S. 244 (1968) .......... 23

*Webb v. Livingston*,
618 F. App'x 201 (5th Cir. 2015) .......... 35

*Wilson v. Seiter*,
501 U.S. 294 (1991) .......... 31, 33, 37

*Youngberg v. Romeo*,
457 U.S. 307 (1982) .......... 31

**Rules**

Rule 60(b)(5) .......... 19

**Constitutional Provisions**

U.S. Const. art. VI, cl. 3 .......... 51

## INTRODUCTION

Plaintiffs—thousands of abused and neglected children in Mississippi's foster care system—have fought for years to secure the most basic protections the Constitution guarantees: adequate care and freedom from harm while in the State's custody. For nearly twenty years, Defendants' response has vacillated between undisguised disdain and blatant disregard, interrupted only by fleeting periods of cooperation. Indeed, Defendants' Memorandum does not make it past the first page before resorting to name-calling and unfounded attacks on institutional reform litigation. Now, Defendants ask this Court to vacate the Second Modified Mississippi Settlement Agreement and Reform Plan ("2nd MSA")[1] and end judicial oversight of Mississippi's child welfare system, arguing that Mississippi's foster care system no longer violates Plaintiffs' constitutional rights.

But the court-appointed neutral Monitor's annual report for 2025 (the "Monitor's 2025 Report")[2] demonstrates widespread noncompliance with the provisions of the 2nd MSA—a Consent Decree that the Parties entered into voluntarily and agreed was necessary to ensure the safety and wellbeing of children in Mississippi's foster care system. The neutral monitor[3] found that Defendants failed

[1] ECF No. 712.

[2] Progress of the Mississippi Department of Child Protection Services Monitoring Report 9, ECF No. 984, hereinafter the "Monitor's 2025 Report." The Monitor's 2025 Report reflects Defendants' performance for the period of April through December 2025 because the 2nd MSA resumed full force and effect on April 15, 2025.

[3] This Court appointed Public Catalyst (the "Monitor" or "Public Catalyst") to serve as the neutral monitor under the 2nd MSA. ECF No. 744. The Monitor is tasked with independently verifying MDCPS's data and statistics and conducting case-record and qualitative reviews of the State's compliance with each of the 2nd MSA's.

to meet the required performance standards for 73 of 113 commitments (64.6%) and have met performance standards for only 22 commitments (19.5%).[4]

Defendants claim they have addressed all "constitutional deficiencies," but the Monitor's neutral validation of Defendants' own data for 2025 found that "among the areas where challenges persist . . . are several critical to child safety."[5] In 2025, Defendants continued to struggle with maltreatment in care, resulting in 48 children suffering maltreatment by their foster parent or residential facility staff member.[6] In 2025, Defendants placed *at least* 155 of the Mississippi's most vulnerable children in hotels or motels—unlicensed, non-residential facilities where children are supervised by caseworkers or third party contract "sitters." In 2025, Defendants failed to complete a substantial number of initial background checks on relatives before placing a child in the home, including Mississippi Automated Child Welfare Information System ("MACWIS") and child abuse registry checks. This is not the record of a State who has ensured that Plaintiffs' due process rights are "adequately protected now and in the future."[7] It certainly is not the record of a state entitled to walk away from federal court oversight and accountability.

---

commitments. Public Catalyst also provides important guidance and technical expertise to Defendants to help facilitate systemic reform.

[4] ECF No. 984 at 7.

[5] ECF No. 964 at 8.

[6] ECF No. 964 at 8.

[7] ECF No. 978 at 10.

The 2nd MSA was meticulously negotiated by the Parties and entered by this Court in 2016. Following a year-long capacity building period,[8] the 2nd MSA went into effect on January 1, 2018. It is not, as Defendants suggest, an idealistic list of best practices that expect or require full compliance. Rather, it sets forth child welfare infrastructure, standards, and outcomes designed to ensure that Mississippi's child welfare system is adequately protecting the children in its care. The 2nd MSA, for example, provides that children in foster care receive timely medical and dental assessments and treatment; regular visitation from their caseworkers to ensure safety; and are placed in homes that are licensed and safe. Contrary to Defendants' claim that continued enforcement of the 2nd MSA will only achieve Plaintiffs' "preferred policy outcomes," continued enforcement the 2nd MSA ensures that foster children receive the basic constitutional protections to which they are entitled.

Defendants conceded in 2021 that they lacked capacity to comply with the 2nd MSA. Accordingly, the Parties agreed to temporarily suspend enforcement of the Consent Decree for a limited rebuilding period to allow MDCPS to build capacity and achieve compliance with the 2nd MSA. The Parties also agreed that the rebuilding period would be time-limited and that the 2nd MSA would either resume full force

---

[8] The Stipulated Third Remedial Order ("STRO"), ECF No. 713, was entered on December 19, 2016. Under the STRO, for the entirety of 2017 the State would not be monitored for compliance with a settlement agreement but would only be responsible for a broad range of "capacity-building" activities, embodied in the remedial orders, designed to bring the state to a point at which they could begin compliance with the 2nd MSA in 2018.

and effect or be renegotiated by the Parties. ECF No. 917 at 1. The 2nd MSA went back into effect on April 15, 2025. ECF No. 964 at 5.

The Monitors submitted their 2025 Report to the Court on July 29, 2026, after a thorough review of MDCPS's data and careful analysis of the results. The Monitor's 2025 Report demonstrates that Mississippi's foster care system is far from constitutionally adequate, that the majority of the 2nd MSA's commitments have not been met, and that Defendants are nowhere near substantially compliant with the terms of the 2nd MSA. Defendants now ask this Court to authorize abandoning federal court oversight, accountability, and the Monitor's invaluable technical guidance at a pivotal moment that would be detrimental to the thousands of children who are, or will be, in foster care in Mississippi.

## BACKGROUND AND PROCEDURAL HISTORY

Defendants' failure to comply with settlement agreements in this case is longstanding, widespread, and substantial. Plaintiffs filed their first motion for contempt in this case in 2010 in response to the State's failure to comply with Court orders. ECF No. 511. The Court declined to hold Defendants in contempt at that time but found that "Plaintiffs obviously have met their burden to present a prima facie case" for civil contempt, adding that "defendants' shortcomings in the performance of the duties prescribed by the parties' agreements are in virtually all areas covered by the agreements." ECF No. 557 at 4, 8. For the next decade, the Parties were locked in an endless cycle: egregious noncompliance was followed by Defendants' pledges to reform their child welfare system, the Parties renegotiated settlement agreements and remedial orders, Defendants' noncompliance continued and Plaintiffs filed

contempt motions in an attempt to hold Defendants accountable.[9] Very little forward progress was made and thousands of Mississippi's most vulnerable children continued to suffer while waiting for relief. Throughout, Plaintiffs have remained willing to engage in negotiations with Defendants to modify the settlement agreement, if specific provisions are problematic, while also ensuring that Mississippi brings its beleaguered foster care system into compliance with constitutional requirements.[10]

### I. The Second Modified Mississippi Settlement Agreement and Reform Plan: January 2018 – May 2021

The current operative settlement agreement, the 2nd MSA, was agreed to by the parties and ordered by this Court on December 19, 2016. ECF No. 712 at § 11.1. The 2nd MSA "resolve[d] all remaining claims in [] *Olivia Y. v. Bryant, et al.*" while providing that the "United States District Court for the Southern District of Mississippi, Northern Division, shall have continuing jurisdiction to enforce the terms of this 2nd MSA." *Id.* at 4. The 2nd MSA became effective on January 1, 2018 in order to "set forth and maintain the child welfare infrastructure, standards, and outcomes that Defendants must meet within specified timeframes statewide." *Id.*

---

[9] *See, e.g.*, Mississippi Settlement Agreement and Reform Plan entered in 2008 (ECF No. 459), Plaintiffs' Motion for Contempt filed 2010 (ECF No. 511), Modified Mississippi Settlement Agreement and Reform Plan entered in 2012 (ECF No. 571), Plaintiffs' Renewed Motion for Contempt filed 2015 (ECF No. 622), Agreed Ordered entered in 2015 (ECF No. 664), Interim Remedial Order entered in 2015 (ECF No. 671), Stipulated Second Remedial Order entered in 2016 (ECF No. 694), Joint Motion for Suspension of Specific Obligations entered in 2016 (ECF No. 702), Stipulated Third Remedial Order entered in 2016 (ECF No. 713), 2nd MSA became effective in 2018 (ECF No. 712).

[10] Declaration of Marcia Robinson Lowry (the "Lowry Decl."). Attached hereto as **Exhibit 1**.

The Monitor's 2018 Report was the first annual report documenting performance under the 2nd MSA. ECF No. 845. The 2018 Report found that out of the 113 commitments due in 2018, Defendants met required performance standards for only 37 commitments and failed to do so for at least 35 others.[11] For the remaining 41 commitments, MDCPS either did not provide data or provided inaccurate data that could not be validated. ECF No. 845 at 5. On June 26, 2020, the Monitor released its annual report for 2019.[12] The Monitor's 2019 Report found that of the 126 commitments due in 2019, MDCPS met required performance standards for 39 commitments and failed to do so for 54 others. ECF No. 897 at 6. For the remaining 32 commitments, MDCPS either did not provide data or provided inaccurate data that could not be validated. ECF No. 897 at 6. Notably, Defendants complied with more 2nd MSA provisions in 2018 and 2019 than they did in 2025. In November of 2020 Andrea Sanders became MDCPS Commissioner.

**II. The Rebuilding Period: June 2021 – April 2025**

The Rebuilding Period was not merely a period of suspended oversight to give Defendants a respite from paperwork. It was a carefully crafted series of evolving agreements during which Defendants were meant to focus concerted efforts on meaningful reform. Indeed, oversight and close collaboration with the Monitoring team continued throughout the rebuilding and suspension periods.

---

[11] Progress of the Mississippi Department of Child Protection Services Monitoring Report 6, ECF No. 845 at 5, hereinafter the "Monitor's 2018 Report".

[12] Progress of the Mississippi Department of Child Protection Services Monitoring Report 7, ECF No. 897, hereinafter the "Monitor's 2019 Report".

The Parties met in March of 2021 and Commissioner Sanders expressed a desire to cooperate with Plaintiffs and utilize the Monitor's technical expertise to improve Mississippi's foster care system.[13] Following negotiations, and because Defendants did "not currently have the capacity to comply with the 2nd MSA," the Parties negotiated a period of remediation known as the "Rebuilding Period," which went into effect on June 24, 2021. ECF No. 917 at 1. The Monitor provided input on the terms of the Rebuilding Period agreement, the purpose of which was to allow Defendants to "engage in a period of rebuilding during which MDCPS [would] seek to attain benchmarks related to key metrics." ECF No. 917 at 1. Ultimately, the Parties agreed to enter a rebuilding period to allow Defendants time to implement specific, critical provisions as the building blocks for the larger structural reform laid out in the 2nd MSA.

The agreed-upon subset of 2nd MSA provisions was selected carefully by the Parties in consultation with the Monitor. ECF No. 917 at 1-4. The initial Joint Stipulated Order for 2nd MSA Rebuilding Period included provisions most critical to child safety and well-being that the Parties agreed were foundational to building a functional child welfare system, including: (1) the availability of family-based placements, with basic requirements such as requiring homes and facilities housing children to be licensed, (2) child safety and maltreatment in care, including developing a concrete plan to decrease the rate of child abuse and neglect among children in foster care, (3) providing for reasonable caseworker caseloads, and (4)

[13] Lowry Decl. at ¶ 2.

child well-being, including provisions requiring children in care to receive initial and ongoing dental and healthcare services. ECF No. 917 at 1-5. In addition to its role in selecting these foundational provisions, the Monitor was also tasked with measuring Defendants' compliance with the agreement through regular reporting requirements. ECF No. 917 at 2-4. Moreover, the Monitor provided clinical and technical expertise and support to Defendants. For example, the Monitor was tasked with conducting a root cause analysis of substantiated maltreatment in care which Defendants would use to develop a plan "to improve the rate of child abuse and neglect among children in foster care." ECF No. 917 at 2-4.

The Rebuilding Period commenced on October 1, 2021, and was to remain in effect through January 31, 2023, or approximately sixteen months. ECF No. 917 at 3. However, the Rebuilding Period was subsequently extended several times. On April 25, 2023, on motion from the parties, the Court extended the Rebuilding Order to June 30, 2023, pending further negotiations. ECF No. 946 at 1-2. Despite having nearly two years to focus their efforts on improving performance in these limited areas, Defendants still needed more time.

On July 17, 2023, to "provide time for the Mississippi Department of Child Protection Services [] to attain benchmarks related to key metrics," the parties stipulated to a further suspension of the 2nd MSA through November 30, 2023, which the Court ordered on July 17, 2023. ECF No. 953 at 1-2. This agreement provided further interim requirements, such as graduated caseloads for new caseworkers, as well as providing for production of quarterly data to the Monitor and Plaintiffs on 20

key provisions of the 2nd MSA agreed upon by the parties. ECF No. 953 at 1-6. The Monitor again played a central role in measuring compliance under this agreement, as well as facilitating collaboration among the parties. The Agreement required the Monitor to "convene regular meetings with MDCPS to discuss the Monitor's findings" and to convene all the parties periodically regarding Defendants' progress. ECF No. 953 at 3, 4.

On December 12, 2023, the Court entered a further Joint Stipulated Order, again negotiated by the parties with the Monitor's input, continuing the suspension of the 2nd MSA through September 1, 2024, to provide Defendants additional time to attain benchmarks related to various key metrics. ECF No. 955 at 1. This order again broadened the subset of the 2nd MSA provisions for the Defendants to prioritize and for the Monitor to verify, bringing the number to 45. ECF No. 955 at 1–2. The agreement also contemplated that Defendants would utilize the Monitor's technical expertise and assistance, as well as provided for the Monitor's reviews of a statistically significant random sample of cases to further inform Defendants' rebuilding efforts. *Id.*

On October 18, 2024, the Court entered the parties' final stipulation regarding the Rebuilding Period, again negotiated with the Monitor's input, continuing the suspension of the 2nd MSA through April 15, 2025. ECF No. 964 at 1. One of the purposes of this final extension was to provide the parties an opportunity to "meet during the continued suspension period to engage in good faith negotiations related to revisions to the 2nd MSA." *Id.* at 2.

In total, the Rebuilding Period lasted for nearly four years, from June 24, 2021, until April 15, 2025. This period was marked by the Parties' continuous effort to identify concrete, measurable goals for Defendants to improve agreed-upon standards, including in such key areas as child safety, maltreatment in care, and caseworker caseloads. It was also a good-faith effort on behalf of Plaintiffs to give Defendants a defined period in which to achieve a graduated set of benchmarks before full enforcement under the 2nd MSA resumed. These efforts were substantially aided by the Monitor's efforts to shape the benchmarks Defendants were expected to meet and relied heavily upon the application of Defendants' data reporting requirements to identify the root causes of continuing problems for Defendants. As the Rebuilding Period was extended, additional 2nd MSA reporting requirements were added back in, and the Monitor's role grew to include providing technical assistance with data collection as well as providing for their validation of that data. During this period, the Monitor's role was not simply to measure Defendants' compliance, but instead to act as an active partner in Defendants' remediation efforts. As such, to the extent that Defendants tout progress made toward these goals during this time (ECF No. 977 at 10-11), it is unquestionably because of, and not in spite of, the Monitor's active participation in this case.

On August 15, 2025, the Monitor issued the 2024 Continued Suspension Order (the "2024 Report"), which reflects the Monitor's review of the data and performance of Defendants for the period of January 1, 2024 to December 31, 2024. ECF No. 979–2 at 2, 6. Caseloads were noted as an area of progress, with the monthly percentage

of case workers meeting the caseload standard found to be between 63 and 75% during this period (against a goal of 90%). *Id.* at 6, 18. However, the Monitor's 2024 Report identified several troubling areas, noted as "critical to child safety," where Defendants were struggling. *Id.* at 6. For example, the report notes that "89 children (1.37%) in MDCPS's custody were victims of abuse or neglect by their foster parent or a residential facility staff member. This is more than four times the agreed-upon rate of maltreatment and MDCPS would need to protect at least 68 more children from abuse or neglect by their caregiver to have met the agreed-upon safety standard." *Id.* at 7 (emphasis added). Concerningly, the Monitor noted that Defendants had undercounted this number as only 59 children before "the monitoring team identified 30 additional children whose perpetrator relationships were incorrectly recorded in MDCPS's data." *Id.* at 6–7. Regarding background checks of adult household members, the monitoring team found that "a substantial number of background checks for the primary applicant, including MACWIS and child abuse registry checks, were completed after a child was already placed in the home." *Id.* at 7. Another "recurring issue noted by the monitoring team was that at least 181 children and youth were placed in hotels or motels during the period, which are unlicensed, non-residential facilities, with the children often supervised by contracted sitters. More than one-third of these children experienced multiple placements in hotels in 2024, with an average length of stay of 45 days." *Id*. Prior to the suspension of the 2nd MSA, the performance standard for Defendants to receive recommended follow-up medical treatment throughout their time in foster care was

90%. *Id.* at 52. Not only was it noted that "MDCPS does not have a process in place to specifically track follow-up treatment in MACWIS," but based on the monitoring teams review of documented needed follow-up treatment, documentation that the children received the needed follow-up treatment was found for just 26.2% children. *Id.*

Defendants construct a false narrative that the consent decree itself prevented MDCPS from implementing meaningful reforms, and that only after federal oversight and monitoring were suspended was the agency able to make progress. This narrative is misleading for myriad reasons, but foremost because it mistakes correlation for causation. Andrea Sanders became commissioner in November 2020. The Rebuilding Period commenced on October 1, 2021. ECF No. 917. The alleged efforts listed in Defendants' self-assessment[14] occurred during Commissioner Sanders' tenure as commissioner. But none of the efforts detailed in Commissioner Sanders' affidavit would have been impossible prior to entry of the Rebuilding Order, they simply were not undertaken by prior commissioners. Additionally, Defendants now claim the 2nd MSA was so burdensome that reform was impossible until their obligations were suspended under the Rebuilding Order. But at the time Commissioner Sanders assumed her position as MDCPS commissioner, the 2nd MSA had only been in effect for two years. Two years of the 2nd MSA cannot shoulder the blame for two decades of Defendants' failure to reform Mississippi's failing foster care system.

---

[14] ECF No. 976-1.

Finally, Defendants' retelling leads the Court to believe that from October 1, 2021 through April 25, 2025, all monitoring and reporting obligations under the 2nd MSA were suspended in their entirety. This is patently false. While Plaintiffs conceded their ability to move for a finding of contempt due to noncompliance with the 2nd MSA during this period, by December of 2023 Defendants' reporting obligations under the Joint Stipulated Order had largely resumed. ECF No. 955 at 2.

## ARGUMENT

The state advances two theories for dismantling the court-ordered settlement agreement: a primary argument that the Court lacks jurisdiction because it has cured the underlying constitutional violation, and an alternative argument under Rule 60(b)(5) on the ground that prospective enforcement is no longer equitable. Neither theory carries Defendants' burden.

### I. Defendants Cannot Obtain Dissolution by Recasting a Consent-Decree Exit Inquiry as Jurisdictional.

Defendants approach the question of dissolution from the wrong procedural posture. They characterize Plaintiffs' opposition to dissolution as an effort to obtain new, forward-looking relief based on an alleged risk of future harm and argue that Article III does not permit federal courts to order relief for uninjured parties, whether in a class action or otherwise. But that is not the question before the Court. This case is not at the outset of litigation over whether Plaintiffs are entitled to prospective relief; the Court entered the 2nd MSA as a modified consent decree in 2018, and the Parties' negotiated agreement established the terms governing continued judicial oversight and the conditions under which that oversight will end. The question now

is whether Defendants have satisfied the conditions they agreed would permit dissolution of the decree, not whether Plaintiffs could obtain a new injunction based on some abstract risk of future harm. Indeed, even under Defendants' preferred framework, their argument fails because the "changed circumstances" they identify have neither cured the violations underlying the 2nd MSA nor eliminated the ongoing risk of harm that necessitated the decree in the first place. Defendants therefore cannot recast the Court's determination of whether the decree's negotiated exit conditions have been satisfied as a freestanding Article III inquiry divorced from the decree's terms and the record before the Court.

As a threshold matter, even Defendants' own authority does not support the relief they seek. Defendants rely heavily on *Chisom* for the proposition that where defendants have addressed the constitutional violations underlying a consent decree, "it is the courts' duty to bring federal control over the issue to its proper end." *Chisom v. Louisiana ex rel. Landry*, 116 F.4th 309, 316 (5th Cir. 2024). But Defendants cannot simply invoke that principle while ignoring what *Chisom* says about how courts are to determine whether that point has been reached. *Chisom* makes clear that consent decrees must be evaluated according to their terms. "Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms." *Id.* at 317 (quoting *Armour & Co. v. Worldwide Cosmetics, Inc.*, 402 U.S. 673, 681 (1971)). "Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *Id.* at 317-

18. Thus, "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Id.* at 318 (quoting *Armour & Co.*, 402 U.S. at 682). And "[b]ecause the defendant has, by the decree, waived his right to litigate the issues raised, . . . the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written." *Id.* (quoting *Armour & Co.*, 402 U.S. at 682); *see also Frew v. Hawkins*, 540 U.S. 431, 437 (2004) ("The whole point of negotiating and agreeing on a plethora of specific, highly detailed action plans was to establish a clearly defined roadmap for attempting to achieve the Decree's purpose.") "Thus, while consent decrees have elements of judicial decrees, they are, at their core, contracts." *Chisom*, 116 F.4th at 318. Accordingly, the question before the Court is not whether Defendants have made progress, but whether the relief they seek is consistent with the terms of the agreement they made, and under *Chisom*, that question must be answered by reference to the decree itself.

That is particularly relevant here because the 2nd MSA itself expressly contemplates its own exit. The agreement provides a mechanism for terminating the Court's oversight upon Defendants' satisfaction of the requirements and obligations set forth in the decree. *See* ECF No. 712 at § 11.2. Plaintiffs agree that the 2nd MSA was never intended to last forever. But it was intended to remain in effect until Defendants satisfied the conditions the parties agreed would permit federal court oversight to end**.** Defendants cannot disregard that negotiated exit mechanism and

substitute a different standard simply because they now prefer to end federal court oversight.

Defendants' selective reliance on *Chisom* is therefore misplaced. Their cases do not support terminating federal oversight simply because time has passed or because Defendants can point to some improvement. Indeed, *Chisom* itself recognizes that "[a]s the State argued both at the district court and on appeal, the appropriate standard in assessing the satisfaction of contractual terms is 'substantial compliance.'" 116 F.4th at 318. That inquiry requires assessing whether Defendants have substantially complied with the obligations they undertook in the consent decree itself in such a way as they have complied with the necessary elements to achieve termination, not whether the decree has been in place long enough, or whether conditions are better than they once were.

"Consent decrees are hybrid creatures, part contract and part judicial decree." *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 334 (5th Cir. 2018) (citing *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 519 (1986)); *Frew*, 540 U.S. 431 at 437. A consent decree "embodies an agreement of the parties" while also functioning as "a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992). That dual nature carries a dual consequence. The parties' agreement supplies the substantive obligations the decree enforces, and the court's entry of the decree as a final judgment supplies the legal force behind those obligations. *Smith*, 906 F.3d at 334 ("[I]t is the agreement of the parties, rather than the force of the law

upon which the complaint was originally based, that creates the obligations embodied in a consent decree.") (quoting *Firefighters*, 478 U.S. at 522). After entry, the controversy before the court is no longer whether the original federal-law predicate exists. The controversy is whether the decree's obligations are being met, and whether modification or termination is warranted under the framework Rule 60(b)(5) establishes.

Defendants cannot satisfy even that standard here. The Monitor's findings demonstrate that, notwithstanding improvements in some areas, Defendants remain far from substantial compliance with the 2nd MSA's requirements. Thus, even under the framework of the very case Defendants rely upon, the State has not reached the point at which federal court control must come "to its proper end." *Chisom*, 116 F.4th at 316. That framework forecloses Defendants' jurisdictional theory – the State cannot recast a Rule 60(b)(5) argument as a jurisdictional one. Binding Fifth Circuit precedent rejects that approach, and Supreme Court authority confirms.

The Fifth Circuit rejected Defendants' precise jurisdictional argument in *Borel ex rel. A.L. v. School Board of Saint Martin Parish*, 44 F.4th 307 (5th Cir. 2022). The school board there had voluntarily entered a consent decree resolving a desegregation suit, then later challenged the district court's jurisdiction on the ground that "vestiges of de jure segregation [had] been eliminated to the extent practicable" and that "[i]n the absence of vestiges flowing from the original constitutional violation, . . . the district court lack[ed] jurisdiction to order additional relief." *Id*. at 313. That is the

same tactic Defendants attempt here, claiming that the underlying constitutional violation has been cured, so the Court has lost jurisdiction.

In *Borel,* the Fifth Circuit gave two independent reasons for rejecting this argument, both of which apply directly in the present case. First, the school board's post-decree conduct—five years of discovery, repeated concessions, and the entry of additional consent orders—was "fatal to its jurisdictional challenge" because that conduct presupposed the existence of vestiges the board now disclaimed. *Id*. at 313. This mirrors Defendants' conduct here. Defendants entered the Mississippi Settlement Agreement and Reform Plan, ECF No. 459, which was then superseded by the Modified Mississippi Settlement Agreement and Reform Plan, ECF No. 571, and then the 2nd MSA, ECF No. 712. Defendants have engaged in years of monitoring, reporting, and remedial action. Defendants' recent assertion that the constitutional violation is gone is, as in *Borel*, undermined by everything they have done since 2008. *See* ECF No. 459.

Dispositively, the Fifth Circuit held that the defendant's "assumption of obligations under the superseding consent order confers remedial jurisdiction on the district court to enforce those obligations." *Id.* (citing *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 334 (5th Cir. 2018)). The jurisdictional predicate, in other words, is the decree itself—not the persistence of the original constitutional violation. The court in *Smith*, contemplating violations of a consent decree governing compliance with a desegregation order, announced that rule in language that mirrors this case nearly verbatim:

> [N]o finding of an independent constitutional violation was necessary. . . . [B]y entering into the consent decree, [the defendant] vested the district court with authority to ensure [the defendant's] compliance. . . . [T]he district court did not need to find that [the defendant] violated the Constitution, only that it violated the consent decree.

*Smith*, 906 F.3d at 335 (citing *United States v. Alcoa, Inc.*, 533 F.3d 278, 286 (5th Cir. 2008)).

Together, *Smith* and *Borel* establish a clear Fifth Circuit rule: when a defendant voluntarily assumes obligations under a consent decree, the decree itself becomes the jurisdictional predicate for the court's continuing authority. That rule controls here. The 2nd MSA is a consent decree this Court entered in 2018 after Defendants voluntarily assumed its obligations. And as the agreement expressly contemplates its own exit, providing a mechanism for terminating the Court's oversight upon a showing of sustained compliance with its requirements, Defendants' jurisdictional argument fails. Under *Smith* and *Borel*, that assumption conferred, and continues to confer, the Court's remedial jurisdiction over the 2nd MSA's enforcement, modification, and termination. Whether the underlying constitutional violation persists is precisely the question the Fifth Circuit has held courts need not, and should not, address as a jurisdictional matter. Once a final judgment is entered, the judgment itself defines the parties' legally enforceable rights and obligations. A consent decree therefore remains binding regardless of whether the predicate violation persists, and the court's continuing authority to enforce, modify, or terminate it derives from the decree itself and the obligations the parties voluntarily assumed and the court approved. *See Horne v. Flores*, 557 U.S. 433, 446 (2009).

## II. Defendants Have Not Carried Their Burden Under Rule 60(b)(5).

Rule 60(b)(5) provides that the court may relieve a party from a consent decree under three circumstances: (1) "if the judgment has been satisfied, released, or discharged"; (2) "it is based on an earlier judgment that has been reversed or vacated"; or (3) "applying it prospectively is no longer equitable." Defendants seek relief under the third prong, that applying the 2nd MSA prospectively is no longer equitable.[15]

Under the equity prong, the movant "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo,* 502 U.S. at 383; *Horne*, 557 U.S. at 447; *LULAC, Dist. 19 v. City of Boerne*, 659 F.3d 421, 438 (5th Cir. 2011) ("The burden is on the moving party to prove that modification is warranted, regardless of whether the party seeks to lessen its own responsibilities under the decree, impose a new and more effective remedy, or vacate the order entirely.").

Modification may be warranted when (1) "changed factual conditions make compliance with the decree substantially more onerous"; (2) "a decree proves to be unworkable because of unforeseen obstacles"; (3) "enforcement of the decree without modification would be detrimental to the public interest"; or (4) "the statutory or decisional law has changed to make legal what the decree was designed to prevent." *Rufo*, 502 U.S. at 384, 388. The 2nd MSA's modification provision codifies those

[15] Defendants explicitly disclaim satisfaction of their obligations under the 2nd MSA, which requires Defendants demonstrate "they have achieved and maintained substantial compliance of all of the provisions of this 2nd MSA based upon 12 continuous months of data that has been verified by the Monitor, prior to the application." ECF No. 712 at ¶11.3; ECF No. 978 at 40-41.

standards: the changed circumstances must be "significant," "beyond Defendants' control," and "not contemplated by the Parties at the time this 2nd MSA was entered into." ECF No. 712 at ¶ 11.2.a.

### A. The Changes Defendants Invoke Make Compliance Easier, Not More Onerous.

Defendants argue that continued enforcement is no longer equitable because circumstances have changed. But changes alone do not warrant relief. The changes must be significant, uncontrollable, and unanticipated, and must make compliance more onerous or make the decree unworkable. *Rufo*, 502 U.S. at 385. Defendants prove the opposite. The changed circumstances Defendants invoke—legislative reforms and programmatic changes[16]—do not make compliance more onerous; they make compliance easier and better situate the 2nd MSA into the larger regulatory framework. Under Rule 60(b)(5), modification is permitted when changed conditions render compliance "substantially more onerous." *Rufo,* 502 U.S. at 378. Defendants describe the opposite.

The initiatives Defendants catalogue in the affidavit of Andrea Sanders[17] are the conditions under which compliance with the 2nd MSA becomes more achievable, not less. Nor have Defendants suggested that any provision of the 2nd MSA is mutually exclusive of, or incompatible with, the initiatives undertaken during the

---

[16] Defendants identify various legislative and programmatic changes such as changed circumstances, including the Pathway to Permanency Act, which separated MDCPS from MDHS, the establishment of the Mississippi Task Force on Foster Care and Adoption; the Foster Parents' Bill of Rights; MDCPS's agreement with Youth Villages to provide Intercept Services, (ECF No. 978 at 43-450), changes which should make compliance easier not more onerous as Defendants argue.
[17] ECF No. 976-1.

tenure of the current MDCPS leadership. Plaintiffs likewise do not contend that these reforms cannot be sustained alongside continued compliance with the 2nd MSA; the question is whether Defendants have demonstrated that they can. Additionally, Defendants assert that the time required to comply with and report on the 2nd MSA prevented the agency from developing and implementing new, effective strategies. ECF 978 at 34. But they offer no evidence establishing how much time 2nd MSA compliance actually consumed, which personnel were responsible for that work, or how those obligations specifically impeded the agency's ability to develop or implement new strategies. Nor do Defendants explain how the 2nd MSA purportedly constrained their ability to make improvements between 2023 and 2025, when the agency was again responsible for complying with a significant number of the MSA's provisions.

**i. The suspension of the 2nd MSA was an absence of change circumstance, not a changed circumstance.**

Defendants' principal argument is that the four-year suspension of monitoring[18] and enforcement freed MDCPS to make improvements that would have been impossible under the decree, suggesting that resumption of 2nd MSA enforcement would impose the administrative burdens that previously prevented compliance.[19] ECF No. 978 at 49. This is not a changed circumstance warranting

[18] Although formal compliance monitoring was suspended during this period, the suspension was not complete. Defendants continued to report data and information concerning their performance and compliance with certain requirements. *See infra* Section II.B.

[19] The 2nd MSA resumed full effect on April 15, 2025. Defendants have submitted no evidence that performance has materially deteriorated as a result of its reinstatement 16 months ago.

modification. Defendants invoke the 2nd MSA's purported failure to achieve its purpose as the "changed circumstance" justifying termination, even though the violations it was designed to remedy persist. Moreover, the cases Defendants cite in support of their argument concerned requests for modification, not vacatur, and emphasized that modification requires a sufficient record of genuinely changed circumstances, which is not the case here.[20]

First, the factual premise is unsupported. Defendants provide no evidence of the resource displacement they invoke. They do not say how many caseworkers were diverted from front-line work to 2nd MSA compliance, how many hours were spent on 2nd MSA-specific reporting that could have been spent on casework, or how the reporting burdens of the 2nd MSA differed in kind from the reporting Defendants will continue to do under federal and state law. ECF No. 976-1 at ¶¶26–27. Nor do they control for other factors that likely contributed to purported improvements during the suspension period—for example, the appointment of a new Commissioner with greater will and competency than her predecessor. *See* ECF No. 978 at 33, n.25. Conclusory claims of administrative burden do not satisfy the State's burden of proof.

Second, the factual premise is empirically refuted by the decree's own history. Defendants have successfully moved eight provisions of the 2nd MSA to the "Maintenance Status" prior to the suspension period, on the ground that they had

[20] *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, *Police Ass'n of New Orleans Through Cannatella v. City of New Orleans*, 100 F.3d 1159, 1168 (5th Cir. 1996) and *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 252 (1968).

achieved and maintained compliance with those provisions.[21] *See* Progress of the Mississippi Department of Child Protection Services Monitoring Report 8 at 91-93, ECF No. 918, (the "Monitor's 2020 Report"); ECF No. 984 at 24. Provisions designated as "To Be Maintained" are not actively monitored. ECF No. 712 at §10.2. That earlier cessation of active monitoring forecloses the argument that compliance is impossible while the 2nd MSA is in effect. Compliance was possible then; the State's failure to achieve broader compliance is the consequence of its own inaction, not of the administrative burdens it now invokes.

Third, the monitoring, reporting, and validation requirements were not unforeseen byproducts of the 2nd MSA, they were core components of the carefully negotiated agreement and are essential to its enforcement. The State agreed to those obligations because the parties understood that durable institutional reform requires sustained oversight. The obligations voluntarily accepted by Defendants were, by definition, "anticipated at the time it entered into a decree." *Rufo*, 502 U.S. at 385.

Fourth, reinstatement of the 2nd MSA does not make compliance more onerous. The same administrative burdens that existed before the suspension period exist after enforcement resumed. Compliance will require no more of Defendants than it did before the suspension period. The only difference is that Defendants now believe it is "no longer convenient to live with the terms of a consent decree." *Rufo*, 502 U.S. at 383. That is not a basis for relief under Rule 60(b)(5).

---

[21] Section 10 of the 2nd MSA allows for movement of commitments to maintenance status when MDCPS has attained the highest designated performance standard(s) for a 12-month or 24-month reporting period. ECF No. 712 at §10.

### ii. New state laws reduce, rather than increase, the burden of compliance.

Defendants next point to legislative actions taken during the suspension period—new statutes addressing child-welfare practices, oversight mechanisms, and program structures. ECF No. 978 at 43–44. By Defendants' own account, these laws "help to ensure protection of Plaintiffs' substantive due process rights" and create "new requirements and oversight mechanisms that overlap with provisions of the 2nd MSA." *Id.* at 44. That is the opposite of a changed circumstance contemplated in *Rufo*.

Modification is permitted when changed circumstances "make compliance with the decree substantially more onerous." *Rufo,* 502 U.S. at 384. Changes that make compliance *easier* do not satisfy the test. If anything, the new statutes Defendants invoke reduce the marginal administrative burden of MSA compliance, because Defendants are now obligated to satisfy the new state requirements regardless of the federal decree. Provisions of the MSA that overlap with state law are no additional burden at all; the State must do that work either way. Provisions that go beyond state law are the only ones that remain incremental—and Defendants identify none.

### iii. Operational improvements at MDCPS were contemplated by the decree, not unforeseen changes beyond Defendants' control.

The remaining changes Defendants cite—programmatic reforms, additional staffing, technological upgrades, expanded placement options—are presented collectively as evidence that MDCPS has improved. *Id.* at 45–47. Plaintiffs welcome these developments. They are precisely what the 2nd MSA was designed to

encourage, and their occurrence is a testament to the decree's effectiveness, not an argument against its continued enforcement.

Such improvements are not changed circumstances for two related reasons. They were neither "beyond Defendants' control" nor "unforeseen by the parties," as both *Rufo* and the 2nd MSA's modification provision require. *Rufo,* 502 U.S. at 385; ECF No. 712 at ¶ 11.2.a. The parties expected MDCPS to take exactly these kinds of steps under the 2nd MSA; the decree's outcome metrics anticipated them even though many of those metrics have not yet been reached.

The question under *Rufo*'s changed-circumstances analysis is whether Defendants have identified a significant, exogenous, and unanticipated development that disturbs the bargain the parties struck. They have not.

**B. Continued Federal Oversight Serves the Public Interest Because the Underlying Violation Persists and No Durable Remedy Exists.**

Defendants' principal argument is that continued federal oversight of MDCPS is itself contrary to the public interest because the substantive due process violation underlying the 2nd MSA has been cured. ECF No. 978 at 18–34, 43–49 (advancing argument under changed circumstances theory). Plaintiffs agree that the Consent Decree was never intended to last forever. But it was intended to remain in effect until Defendants satisfied the requirements and obligations set forth in the Consent Decree and explicitly laid out a path for exit. ECF No. 712 at § ¶11.2. Defendants' authorities do not support terminating federal oversight simply because time has passed where, as here, the underlying violations persist. The argument is properly framed as a public-interest argument under *Rufo*'s third clause. It contends that

"enforcement of the decree without modification would be detrimental to the public interest" because continued federal oversight of a State no longer in need of oversight intrudes on state autonomy. Dissolution would not, however, cure the constitutional deficiencies that remain in Mississippi's foster-care system. It would merely terminate the existing mechanism for addressing them. If the State's practices continue to violate children's constitutional rights, those violations would remain actionable notwithstanding the dissolution of the 2nd MSA, and Plaintiffs would be entitled to seek appropriate relief in a new action. Defendants therefore cannot transform the question whether the existing Decree should remain in force into a determination that the State's constitutional obligations have been satisfied. The argument fails. Defendants have not produced the evidence that the substantive due process violation has been cured. And even if they had, they have not shown that the cure is durable.

Before reaching the constitutional standard or the durability inquiry, the threshold question is what Defendants must produce to obtain the relief they seek. The burden under Rule 60(b)(5) lies with the moving party, *Rufo*, 502 U.S. at 383, and it requires record evidence sufficient to support each element of the claim. That burden applies "regardless of whether the party seeks to lessen its own responsibilities under the decree, impose a new and more effective remedy, or vacate the order entirely." *LULAC, District 19 v. City of Boerne*, 659 F.3d 421, 438–39 (5th Cir. 2011). Defendants' position falls far short of what Rule 60(b)(5) requires.

The Fifth Circuit confronted this problem in *LULAC*. There, a district court modified a consent decree on a motion unaccompanied by supporting affidavits, a summary of facts, or an evidentiary hearing. The Fifth Circuit vacated. "[T]he paucity of the record," it explained, supplied "an insufficient basis . . . to determine that modification was warranted." 659 F.3d at 438–39.

The Fifth Circuit has denied Rule 60(b)(5) relief on records far more substantial than what Defendants have submitted here, which consists solely of an affidavit from a primary Defendant. In *Anderson v. City of New Orleans*, the Fifth Circuit affirmed denial of Rule 60(b) relief on a record developed through an eight-day magistrate hearing with "ample evidence, including testimony from independent monitors." 38 F.4th 472, 477, 480 (5th Cir. 2022). And where courts granted relief, those determinations rested on records built through independent fact-finding. In *John B. v. Emkes*, the district court conducted an 18-day evidentiary hearing involving 31 witnesses and 260 exhibits, received 345 pages of proposed findings, and issued a 38-page opinion before terminating the decree. 710 F.3d 394, 399 (6th Cir. 2013). In *Jackson v. Los Lunas Cmty. Program*, the district court held a five-day evidentiary hearing and issued 206 pages of findings. 880 F.3d 1176, 1185–86 (10th Cir. 2018).

These are the records on which Rule 60(b)(5) motions are decided. Defendants have offered the Affidavit of Andrea Sanders, a principal Defendant in this action. That is not enough.

**i. Defendants have not cured the constitutional violation.**

As a threshold matter, this case is not at the merits stage, and the Court therefore need not decide whether Defendants are presently acting with deliberate indifference. The relevant inquiry under the Consent Decree is whether Defendants have cured the underlying constitutional violations that warranted federal intervention in the first place. And they have not.

To know whether the public interest favors withdrawing federal court oversight, the Court must first know whether the violation the oversight was designed to remedy still exists.

To state a claim for a substantive due process violation under § 1983, plaintiffs must demonstrate: (1) they were deprived of a cognizable constitutional right, (2) the State acted with "deliberate indifference" to the protected right; and (3) the policies or practices complained of were the direct cause of the constitutional deprivation. *M.D. v. Abbott*, 907 F.3d 237, 248 (5th Cir. 2018). When the State takes a child into foster care, the Fourteenth Amendment imposes "a corresponding duty to assume some responsibility for his safety and general well-being" and "to provide for his basic human needs." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). Basic human needs include, at minimum, "food, clothing, shelter, medical care, and reasonable safety." *Id.* The Fifth Circuit "has defined the substantive due process right enjoyed by children in the custody of the State's foster care as a right to 'personal security and reasonably safe living conditions,'" which includes, at minimum, "protection from physical abuse and violations of bodily integrity" and "from *severe* psychological abuse and emotional trauma—both of which are often

inextricably related to some form of physical mistreatment or deprivation." *M.D.*, 907 F.3d at 250 (quoting *Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regul. Servs.*, 380 F.3d 872, 880 (5th Cir. 2004)). The State must also take actions necessary to secure these rights.[22] Foster children, for example, may not have an independent constitutional right to caseworkers with reasonable workloads, but caseworkers with reasonable workloads may be necessary to secure their right to personal security and reasonably safe living conditions. *M.D.*, 907 F.3d at 264–65.

To establish a deprivation in "a claim (like the one here) based on a failure to prevent harm," custodial plaintiffs must show that they are held "under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The constitutional violation is the risk itself, not the manifestation of that risk, the violation occurs before the risk ripens into actual tangible physical or psychological injury. *Farmer*, 511 U.S. at 845 ("'one does not have to await the consummation of threatened injury to obtain preventive relief.'") (citation omitted); *M.D.*, 907 F.3d at 253 ("plaintiffs may be protected against future harm not yet realized") (citing *Helling v. McKinney*, 509 U.S. 25, 33 (1993)).

To establish deliberate indifference, plaintiffs must show that state officials consciously disregarded a known or obvious safety risk. *M.D.*, 907 F.3d at 252; *Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Farmer*, 511 U.S. at 842; *Hernandez*, 380 F.3d at

[22] *See, e.g., Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (detainees may not have independent right to a blanket but it may be necessary during cold winter months to secure constitutional right); *Youngberg v. Romeo*, 457 U.S. 307, 318–319 (1982) (patients may not have independent right to staff training but it may be necessary to secure constitutional right).

881. Officials "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. But the court may still find deliberate indifference if the response was unreasonable or disproportionate to the substantial risk of serious harm. *See M.D.*, 907 F.3d at 261; *Gates v. Cook*, 376 F.3d 323, 340–41 (5th Cir. 2004) (affirming findings of deliberate indifference despite efforts to abate risks posed by high temperatures); *Ball v. LeBlanc*, 792 F.3d 584, 595–96 (5th Cir. 2015) (same); *Coleman v. Wilson*, 912 F. Supp. 1282, 1319 (E.D. Cal. 1995) ("patently ineffective gestures purportedly directed towards remedying objectively unconstitutional conditions do not prove a lack of deliberate indifference, they demonstrate it").

To establish causation, Plaintiffs need only show that the agency's policies or practices "played a part" in the deprivation, not that they were the exclusive cause of the deprivation. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Plaintiffs must identify each policy or practice alleged to have caused the constitutional deprivation, but they do not exist in a vacuum: when the policies and practices "have a mutually enforcing effect," courts must examine their "cumulative impact" and may find that they establish a Fourteenth Amendment violation "'in combination' when each would not do so alone." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991); *Rhodes v. Chapman*, 452 U.S. 337, 364 (1981); *id*. at 362–63 (Brennan J., concurring); *M.D.*, 907 F.3d at 255.

Defendants do not dispute that Plaintiffs have been deprived of cognizable constitutional rights. ECF No. 978 at 27–30. They instead advance a circular argument, denying that their challenged policies and practices are the moving force

behind the deprivation of Plaintiffs' constitutional rights, but identifying no alternative cause of those deprivations, while simultaneously asserting that those very same policies and practices are what they have spent the last four years working to remedy. *Id.* at 41. Defendants' remedial actions establish that Defendants are subjectively aware of the objectively serious risks posed by their systemic failures: caseload pressures, placement shortages, gaps in medical care, deficient data systems. *See Harris v. Angelina County*, 31 F.3d 331, 335–336 (5th Cir.1994) (a defendant's remedial response to known conditions establishes subjective awareness for deliberate indifference). Defendants' remedial actions also establish that MDCPS's policies and practices "play[] a part" in the Plaintiffs' conditions of confinement; a custodial agency cannot simultaneously claim credit for improvements while disclaiming responsibility for risks; its policies and practices govern the children's care, and its actions and inactions abate or aggravate the risk.[23]

What's left—and what Defendants stake their argument on—is the affirmative defense: whether Defendants "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844 (quoted in *M.D.*, 907 F.3d at 252); ECF No. 978 at 31 ("The key to analyzing deliberate indifference is not the existence of harm, but the actions of the State."). Defendants catalogue their various

[23] If there is no "causal link between Defendants' customary policies and Plaintiffs' alleged constitutional deprivation," then there can be no causal link between Defendants' policies and the alleged system improvements. ECF No. 978 at 34. MDCPS's policies and practices "play[] a part" in success or failure.

efforts and present them as evidence that the constitutional violation has been cured. The record does not support Defendants' theory.

Defendants repeatedly characterize their remedial actions as "purposeful" and "intentional." ECF No. 978 at 10, 18, 25–27, 30, 34–35, 37, 39–42, 56. These efforts, Defendants insist, prove that Defendants are not deliberately indifferent. But purposeful action is not, on its own, the constitutional metric. The metric is whether the Defendants' actions constitute a reasonable or adequate response to the risks—that is, are they proportionate to the substantial risks of harm. *See Webb v. Livingston*, 618 F. App'x 201, 209 n.7 (5th Cir. 2015) ("the mere presence of remedial measures would not end the inquiry, as such measures must be adequate."); *Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004) (upholding injunction because "conditions have persisted for years despite MDOC's purported efforts."); *Ball v. LeBlanc*, 792 F.3d 584, 595–96 (5th Cir. 2015) (affirming findings of deliberate indifference despite efforts to abate risks posed by high temperatures); *Laube v. Haley*, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002) ("the defendants in this case are dedicated public servants who have acted to address problems at Tutwiler. Nonetheless, the court must still find deliberate indifference because the defendants' efforts simply do not go far enough; the measures they have taken have had negligible impact on the massive danger posed to inmates.")

*M.D. v. Abbott* illustrates. To address high caseloads and caseworker turnover, the agency made appropriations requests "for additional caseworkers and salary increases," but it was "a standard, boilerplate request" unable to sufficiently

replenish its workforce to "accommodate the influx of more children." *M.D.*, 907 F.3d at 262. It "focuse[d]" on "high-volume hiring to fill the gaps left by the mass exodus of caseworkers every year" but "fail[ed] to address the internal management issues that motivate many caseworkers to leave," and without "internal standards" or "a target number," the agency did not "know how many caseworkers it *actually needs* to reduce the caseloads to safe levels." *Id.* (emphasis in original). It "use[d] secondary workers" to "alleviate the burden on caseworkers," but they were not an "adequate or 'reasonable' substitute for primary caseworkers." *Id.* at 262–63. It launched an "initiative" to address "excessive caseloads and caseworker burnout," but the initiative was "conveniently rolled out *six weeks* before trial," the agency "could offer no data whatsoever on actual or even expected impact," and it "fail[d] to address a fundamental problem plaguing caseload management: the lack of adequate data and standards." *Id.* at 263. It "revamped training programs for new caseworkers," but "'there was limited data and information available' regarding the program's efficacy" due to its recent rollout. *Id.* (citation omitted).

Despite all these efforts, the district court found, and the Fifth Circuit affirmed, that the agency's response was "inadequate" and that the defendants were deliberately indifferent. *Id.* at 265. The agency's "relative lack of responsiveness"—that is, relative to the serious risk of harm posed by overburdened caseworkers—suggested a "refus[al] to address a systemic deficiency in the way it manages its caseworkers." *Id.* at 264. The agency was aware that "merely adding more caseworkers won't treat the underlying issue," but "it want[ed] to be able to point to

a nominal fix." *Id*. Given the "numerous concerns regarding the quality of the state's self-assessment of its case practices and the accuracy of its case ratings," the Fifth Circuit found that the "district court's skepticism [of the agency's remedial efforts] was entirely warranted." *Id*. at 263–64.

**ii. MDCPS's own data shows the risk of harm remains unabated.**

This Court should be equally skeptical of Defendants' self-assessment of their remedial efforts. Defendants identify a series of new policies, committees, initiatives, and technological improvements and ask the Court to infer from their existence that the constitutional risks that gave rise to this litigation have been adequately addressed. ECF No. 976-1 at ¶¶ 32–103; ECF No. 978 at 17, 27–34. But the relevant question is not simply whether MDCPS has undertaken reform. It is whether those reforms, in operation and taken together, have adequately addressed the risks to children in their custody.

Moreover, it is improper to analyze the agency's policies and practices in a vacuum. Given the "mutually enforcing effect" of the state's policies and practices, the "cumulative impact" may establish a Fourteenth Amendment violation "'in combination' when each would not do so alone." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991); *Rhodes v. Chapman*, 452 U.S. 337, 364 (1981); *id*. at 362-63 (Brennan J., concurring). The Sanders Affidavit does the opposite. It catalogues remedial efforts policy-by-policy and program-by-program: a revised intake structure, a new Senior Safety Team, a MIC/Fatality Review Committee, a planned Structured Decision-Making tool, licensure reforms, caseload reduction initiatives, technology upgrades. ECF No. 976-1 at ¶¶ 32-103; ECF No. 978. at 17, 27-34. Each effort is described in

isolation. None is measured against the cumulative outcome it produces in combination with the others, nor are any improved metrics advanced to show that Defendants' efforts are achieving better outcomes.

The Monitor's 2025 Report supplies the missing analysis. It evaluates the State's performance at the point where *Wilson* and *Rhodes* require them to be evaluated—where they converge in risk of harm to actual children. The convergence point on the safety dimension of this case is the maltreatment-in-care rate. Section 2.9 of the 2nd MSA, drawn from the federal Child and Family Services Review Round Two outcome standard, fixes that rate at 0.33%. ECF No. 712 at § 2.9. It is the outcome of the entire system, intake, screening, investigation, licensing, caseworker supervision, placement quality, data reliability, exists to prevent.

**a. MDCPS still cannot reliably investigate maltreatment.**

At the most basic level, a safe child-welfare system must be able to identify when a child in its custody is being abused or neglected, investigate that allegation competently, and intervene before further harm occurs. The 2nd MSA's maltreatment provisions address precisely that function. Section 2.9, drawn from the federal Child and Family Services Review Round Two outcome standard, sets a maltreatment-in-care rate of 0.33%. *Id.* at § 2.9. That outcome reflects the combined effectiveness of the system's intake, screening, investigation, placement, licensing, supervision, and monitoring functions.

MDCPS remains far from that standard. The Monitor's 2025 Report found the maltreatment rate was 0.74%, more than twice the agreed 0.33% ceiling, and calculated that at least 27 additional children would have needed to be protected for

MDCPS to meet the agreed-upon standard. ECF No. 984 at 8, 53. That outcome is the cumulative product of the very reforms the State catalogues as evidence of compliance.

Nor do Defendants' investigation reforms establish that MDCPS can reliably detect maltreatment when it occurs. Of 108 maltreatment-in-care investigations the Monitor reviewed for 2024, MDCPS's findings could not even be evaluated in 25.9% of cases because investigative practice was too deficient—including missing perpetrator interviews, missing collateral contacts, failure to review medical records or forensic-interview results, and failure to address all disclosed allegations. ECF No. 979-2 at 22. Another 1.9% were unsubstantiated even though the Monitor, applying MDCPS's own criteria, would have substantiated them. *Id.* The newest data shows the same failure. Of the 314 maltreatment-in-care investigations due during the post-suspension period, April 1, 2025 – December 31st, 2025, only 49.7% were completed timely, when 90% are required under the standard; and the Monitor's independent case-record review yielded essentially the same result, with only 50.0% of the investigations completed timely. ECF No. 984 at 46. Timely investigations are essential to child safety. When investigations are of maltreatment are not timely investigated, critical evidence often disappears, and children are left in abusive situations.

The consequences of deficient investigations appear in individual cases. Three teenage foster children placed in the same non-relative home separately reported that the foster parent pitted them against one another, told one child that "nobody else is

going to want [her],” controlled another child’s bank account and paycheck, and attempted to discharge a suicidal child from acute care before losing the associated board payment. ECF No. 984 at 50. MDCPS found the allegations unsubstantiated for “insufficient evidence” without reviewing the bank records. *Id*. In another case, a foster parent was investigated for the fourth time in eighteen months, each complaint involving allegations of physical or emotional abuse and children describing fear or hair-pulling. MDCPS unsubstantiated each investigation. *Id.* at 50–51.

These are not merely failures to satisfy technical investigation requirements. Without reliable intake and thorough investigation, MDCPS cannot know which children are unsafe, which caregivers present a continuing danger, or when removal or other protective intervention is necessary. A new intake structure, committee, or decision-making tool does not eliminate that risk if the system still fails to investigate half of its maltreatment cases on time and cannot reliably support its own findings.

**b. Licensing and placement screening still fails to protect children.**

Preventing maltreatment also requires MDCPS to determine that a caregiver and home are safe before entrusting a child to them. The 2nd MSA’s licensing requirements therefore serve a basic protective function: background checks, home assessments, and other licensing requirements are mechanisms for identifying risks before a child is exposed to them.

Defendants point to licensure reforms, but the results do not establish a reliably functioning screening system. The Monitor identified lapses in completing initial MACWIS and child-abuse-registry checks for primary applicants and adult household members before children were placed in the home. ECF No. 979-2 at 7. Of

the non-relative foster homes MDCPS licensed in 2025, only 60% were licensed within the required 120 days, and only 55.6% of the files reviewed met both the timeliness and quality requirements of the approved licensure process. ECF No. 984 at 54. Put differently, 44.4% failed one or both requirements. *See* Ex. 2, Affidavit of Magdalena Holland, at ¶¶ 9-10 ("Holland Affidavit") (stating that MDCPS knowingly placed a child in her home for four months while she did not have an active foster license).

The problem is even more pronounced in relative placements. Of 63 relative homes reviewed, 45 lacked all required background checks before the child was placed there. ECF No. 984 at 56. The Monitor also identified licensing files missing basic safety-related information, including documentation of childcare arrangements while a caregiver worked overnight. *Id*. at 55. MDCPS has long struggled with adequate and timely licensure, and the Monitor identified these deficiencies as safety concerns both before and after the suspension period. *See* ECF No. 845, ECF No. 897, ECF No. 979-2. The distinction matters. The number of newly licensed homes says little about whether MDCPS is screening those homes sufficiently to protect children. Volume of licensing is not the quality of licensing. And a licensing reform that produces more available placements while leaving basic safety checks incomplete does not demonstrate that the underlying risk has been cured.

Placement safety also requires the State to provide children with settings appropriate to their ages and needs. Yet 49 children between six months and nine years old were placed in group settings during the post-suspension period, and 22 of those placements lacked either the required approval or a qualifying exception. ECF

No. 984 at 67. Three children spent more than 100 days cycling through multiple emergency shelters in 2025 without documentation establishing the required justification for those repeat placements. *Id.* at 68.

These placement requirements are another component of the same safety system. Children cannot be protected merely by investigating abuse after it occurs; MDCPS must also make safe placement decisions before harm occurs.

**c. Caseworkers still do not reliably monitor children after placement.**

Even a properly screened placement can become unsafe. Regular, meaningful caseworker contact therefore provides an essential second layer of protection: it gives MDCPS an opportunity to observe the child's condition, speak privately with the child, identify emerging safety concerns, and intervene before those concerns become serious harm.

Defendants' reforms have not produced reliable caseworker oversight. MDCPS did not satisfy the 2nd MSA's requirements governing either the frequency or quality of caseworker visits. ECF No. 984 at 9. Of 80 children sampled for ordinary monthly caseworker contact, only 35% received all required visits. *Id.* at 69–70. Every visitation commitment assessed under the 2nd MSA—caseworker visits with children, visits during trial home placements, contact with parents working toward reunification, and monthly visits to foster homes—was rated "No" for 2025. *Id.* at 16-17, 69–70. And the deficiency is not simply one of frequency. *See* Ex. 3, Cathy Tate Affidavit. ("Tate Affidavit.") ¶8-9 (describing caseworkers typically remaining for fewer than five minutes and failing to speak with children during visits). *See also* Holland Affidavit, ¶ 22 (stating one of her foster children who had come to her home

from a psychiatric hospital placement did not have a caseworker visit her in the two years she was placed with Ms. Holland). *See also* Ex. 4, Terri Rensch Affidavit ("Rensch Affidavit") ¶29 (describing caseworkers never meeting privately with her foster children).

The problem becomes especially serious after maltreatment has already been reported. For substantiated 2024 cases, only 70.3% of required follow-up worker visits occurred, and only 80.7% of those completed visits met the decree's quality standards. For children remaining in placements following unsubstantiated allegations, the figures were still lower: 64.8% of required visits occurred, and only 61.4% met quality standards. ECF No. 979-2 at 26. In the Monitor's most recent sample of children whose placements had just been substantiated for maltreatment, only one received the follow-up visits required by the 2nd MSA, and even those visits failed the applicable quality standards. ECF No. 984 at 48. *See* Holland Affidavit ¶ 16-19 (despite an open investigation in her home, MDCPS is still reaching out to place children with her). If MDCPS cannot reliably see children in their placements—and cannot reliably check on them even after maltreatment has been identified—it cannot credibly claim that reforms to its supervisory structure have eliminated the risk of undetected harm.

**d. Children are still warehoused in unlicensed settings incapable of meeting their individualized needs.**

MDCPS's continued reliance on hotel placements further illustrates why Defendants' description of their "placement array" reforms cannot substitute for evidence of their actual effect. During the April 1, 2025 – December 31st, 2025 post-

suspension period, at least 155 children were housed in hotels or motels—unlicensed, non-residential settings often staffed by contracted "sitters." ECF No. 984 at 8. More than one-third of those children experienced multiple hotel stays, and the average stay lasted 65 days. *Id.* Although that represents fewer children than the 181 identified in 2024—more than one-third of whom also experienced multiple hotel placements—the average duration increased from approximately 45 days in 2024 to 65 days during the 2025 post-suspension period. ECF No. 979-2 at 7; ECF No. 984 at 8.

The conditions documented in those hotels and motels expose significant safety consequences. For example, a sitter responsible for supervising two teenagers tested positive for amphetamines, cocaine, cannabis, and methamphetamine—one day after the sitter's own children entered MDCPS custody following a positive drug screen and prior substantiated neglect finding. ECF No. 984 at 60. In another instance, a 17-year-old left a hotel unsupervised for approximately eight hours before the assigned sitter reported the absence; the pattern continued for weeks and eventually resulted in a statewide runaway alert. *Id.* On another occasion, an 18-year-old and a 16-year-old, assigned separate sitters at the same hotel with instructions that they be kept apart, were nevertheless repeatedly permitted to leave together, resulting in one of the children sexually assaulting the other. *Id.* These examples are impossible to reconcile with Defendants' claim that they have "develop[ed] a continuum of care to help ensure that, when an out of home placement has been deemed in the best interest of the child, that child is provided with the appropriate level of quality

residential services that are safe, licensed, child and family centered, trauma focused, and time limited." ECF No. 978 at 25. Nor are these placements appropriately time limited. An 18-year-old with significant behavioral needs spent seven consecutive months in a hotel between October and May 2025. ECF. No. 984 at 60.

Defendants' claim to have "entered into new contracts developing a more robust continuum of care" does not establish that the risk created by the practice has been cured, especially when the evidence shows vulnerable children continue to languish for weeks or months in unlicensed settings without the safeguards, services, and supervision of an appropriate foster-care placement. *See* ECF No. 978 at 53.

**e. Medical and behavioral health needs still go undiagnosed and untreated.**

Physical safety is not limited to protection from caregiver-inflicted abuse and neglect. Children entering state custody often arrive with unmet medical, developmental, disability-related, and trauma-related needs. Timely health screening is therefore the gateway through which MDCPS identifies those needs and connects children to necessary treatment.

The 2nd MSA requires that 90% of children receive an Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") screening or other comprehensive exam within 30 days of entering foster care. ECF No. 712 at §8.1.b.3 MDCPS's own data for 2025 showed that only 54% of children entering foster care received timely screenings. The Monitor's independent review of a random sample produced an even lower figure: only 34.7% of children due for an EPSDT during the period received an EPSDT or comprehensive exam within their first 30 days in care. ECF No. 984 at 92.

That failure matters because EPSDTs and comprehensive exams are not merely extra paperwork requirements. They are critical mechanisms through which the State identifies medical conditions, developmental delays, disabilities, trauma-related needs, and other conditions requiring services or treatment.

MDCPS's failure to ensure that children entering foster care are timely and adequately evaluated also has a detrimental impact on placement and supervision deficiencies. MDCPS cannot select an appropriate placement for a child whose medical, developmental, or behavioral needs it has not identified; a caregiver cannot safely meet needs that MDCPS has not communicated; and a caseworker cannot meaningfully evaluate whether a placement is serving a child if the agency itself lacks an accurate understanding of what the child requires. The provisions of the 2nd MSA relating to physical and mental health care are not "litigants preferred policy outcomes" but rather critical components of the same cumulative risk.

**f. Communication breakdowns still prevent MDCPS from acting on known risks.**

A functioning child-protection system also depends on information moving between MDCPS and the hospitals, law-enforcement agencies, courts, schools, and other community institutions that encounter children at risk. Defendants' list of revised intake processes and decision-making structures does not ameliorate evidence that those channels continue to fail in practice.

Medical professionals describe persistent breakdowns in communication with MDCPS, including reports of suspected abuse and neglect being screened out without adequate investigation, difficulty obtaining responses or information from MDCPS,

and failures to communicate information necessary to make informed decisions about children's safety. Austin Richburg, a pediatric nurse practitioner at Singing River Hospital in Pascagoula, and Ocean Springs Hospital in Ocean Springs described repeated instances in which MDCPS failed to adequately respond to known safety risks, including parental substance use, serious mental-health concerns, and unstable housing, resulting in children remaining in or returning to unsafe homes and, in some cases, later presenting for medical care with further signs of harm. *See* Ex. 5, Austin Richburg Affidavit ("Richburg Affidavit") ¶¶ 14–20. A revised intake structure is not an adequate response if the information needed to protect a child still does not reach the people responsible for acting on it.

**g. MDCPS's own quality-control systems still cannot catch its failures.**

Finally, Defendants' reliance on their own assessment of their reforms is particularly problematic because the mechanisms MDCPS uses to assess its own performance remain unreliable.

MDCPS's Safety Review Unit ("SRU") is responsible for completing reviews of investigations of maltreatment of children in MDCPS custody. ECF No. 712 at §2.2. The Monitor reviewed SRU reports for 61 of the 267 investigative reviews completed by the SRU during the April 1, 2025- December 31st, 2025, post-suspension period in 2025. The SRU itself identified serious case practice deficiencies in 40 of the 61 maltreatment in care investigations, including: untimely and/or not thorough safety assessments, failure to interview individuals pertinent to the investigation, failure to assess physical home environments, and failure to timely initiate investigations. ECF

No. 984 at 52. The Monitor identified additional safety and/or case practice deficiencies that the SRU failed to identify in 15 of the same 61 investigations—including seven outright deficient investigations. *Id.* The record contained no documented corrective action even where SRU itself concluded that a thorough investigation had not been conducted. *Id.* Similarly, in 2024, the SRU identified a safety issue in only one of 103 investigations cross-checked by the Monitor. The Monitor identified case-practice or safety issues that the SRU had missed in 27 of those same investigations. ECF No. 979-2 at 25. Defendants' deficient maltreatment in care investigations *and* investigative reviews is especially concerning given that the rate of maltreatment in foster care in Mississippi is more than twice the agreed-upon rate set by the Parties. *See* ECF No. 984 at 53.

The underlying data is also unreliable. MDCPS's data systems understated the 2024 maltreatment population by approximately one-third. MDCPS reported 59 victims of caregiver-inflicted maltreatment, but the Monitor's review of every substantiated intake identified 30 perpetrator relationships that MDCPS had incorrectly coded, producing the corrected total of 89 victims. ECP No. 979-2 at 27, n.15.

The same defect recurred during the period Defendants now identify as evidence that their reforms are working. MDCPS initially told the Monitor that 30 children were substantiated victims but then provided underlying data reflecting 27 substantiated victims. The Monitor's independent review identified 48 substantiated victims. ECF No. at 984 53–54. Six years after the same coding problem required

manual correction in 2018, ECF No. 845 at 32–33, the agency's own safety data still cannot be relied upon without independent review.

These failures are particularly important to Defendants' present motion. Defendants ask the Court to rely on MDCPS's judgment that its reforms are sufficient while the agency's own quality-control process continues to miss deficient investigations and its own data continues to undercount the children harmed in its custody. Independent oversight remains necessary precisely because the State's internal systems have not demonstrated that they can reliably identify and correct their own failures.

**h. Taken together, these failures show a system that still cannot protect children.**

Taken in isolation, each deficiency can be characterized as a work in progress: a reform still maturing, a metric maybe trending in the right direction, a quality-control mechanism under development. Taken together, as *Wilson* and *Rhodes* require, they describe something different.

These are not merely breakdowns in communication or isolated implementation failures; they reflect MDCPS's continuing failure to carry out core responsibilities necessary to protect children in its care. Children continue to enter homes before basic safety checks are complete. Allegations of maltreatment are not reliably or timely investigated. Caseworkers do not consistently see children often enough, or meaningfully enough, to identify emerging danger. Children remain for months in hotels and other settings not designed or equipped to serve as foster placements. Required medical, developmental, disability-related, and trauma-related

screenings do not consistently occur, leaving critical needs unidentified and unaddressed. Hospitals and law-enforcement agencies continue to report failures on MDCPS's part in information-sharing necessary for MDCPS to respond effectively to risks to children. And MDCPS's own monitoring, review, and data systems continue to fail to identify or accurately capture these deficiencies. Taken together, these failures demonstrate that MDCPS has not yet established the reliable systems of oversight, case management, and child protection necessary to ensure the safety and well-being of children in its custody.

The outcome is consistent with those failures. The system produced a maltreatment-in-care rate more than twice the agreed standard during the very post-suspension period Defendants proffer as proof that continued oversight is unnecessary. ECF No. 984 at 53–54. And MDCPS's own data substantially understated even that harm until the Monitor independently reviewed the underlying files.

Continued enforcement of the 2nd MSA provides another objective measure against which the adequacy of Defendants' efforts can be tested. *See Shakman v. Pritzker*, 43 F.4th 723, 729 (7th Cir. 2022). The parties assigned independent compliance assessment to the court-appointed neutral Monitor, Public Catalyst. ECF 712 ¶ 9.3. That Monitor's most recent independent assessment does not depict a system approaching successful completion of reform. The Monitor found compliance with 37 of 113 metrics in 2018 and 39 of 126 metrics in 2019. ECF Nos. 845 at 5, 897 at 6. Those early reports establish the baseline against which Defendants claimed

years of independent reform can be evaluated. Yet in 2025, the Monitor found compliance with only 22 of 113 applicable measures. ECF No. 984 at 7.

Defendants' failures are not confined to peripheral administrative requirements. They concern the functions at the heart of a safe child-welfare system: whether caregivers are adequately screened, whether maltreatment is competently investigated, whether caseworkers maintain meaningful contact with children, whether children receive timely health and behavioral-health assessments, whether placements are safe and appropriate, and whether the agency can accurately identify and correct its own failures.

Plaintiffs do not deny that Defendants have attempted to undertake some reforms. The question is whether those efforts have produced a system that adequately protects the children whose safety the State has assumed responsibility for. The independent evidence demonstrates that they have not. Defendants' catalogue of steps taken and meetings held cannot establish that the constitutional risk has been remedied when the system those reforms has produced continues to expose children to the very harms the decree was designed to prevent.

**iii. Defendants have not shown that any improvement is durable.**

Even if Defendants could prove present compliance—which they cannot—that would be only half the inquiry. *Horne* requires a second showing—that the cure is durable. *Horne*, 557 U.S. at 450 ("If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper"); *John B.,* 710 F.3d at 412 (a State must demonstrate "first whether the state has achieved compliance with the federal-law provisions whose violation the decree sought to

remedy; and second, whether the State would continue that compliance in the absence of continued judicial supervision"); *Frew v. Janek*, 2015 WL 13357954, at *3 (E.D. Tex. Jan. 20, 2015) (citation omitted) ("A durable remedy is 'one that gives the court confidence that defendants will not resume their violations of plaintiffs' constitutional rights once judicial oversight ends'"); *Inmates of Suffolk Cnty. Jail v. Rufo*, 12 F.3d 286, 292 (1st Cir. 1993) ("Implicit in these requirements is the need for the district court, before terminating the decree entirely, to be satisfied that there is relatively little or no likelihood that the original constitutional violation will promptly be repeated when the decree is lifted"). "[F]leeting federal compliance is insufficient to warrant relief" because terminating oversight based on transient compliance produces cycling in and out of decrees that serves no one's interest. *Jackson*, 880 F.3d at 1202. The 2nd MSA's exit provision accounts for durable reform by requiring that Defendants achieve and maintain substantial compliance with all provisions for 12 continuous months, as verified by the Monitor. ECF No. 712 at §11.3.

Defendants have not produced the evidence durability requires—their durability showing fails on the evidence they have produced, on the statements they have made about their own compliance posture, and on the empirical record of this litigation. Defendants' most colorable arguments in support of durability are (1) the statutory separation of MDCPS from MDHS as a stand-alone agency, ECF No. 976-1 at ¶ 35.a.i, which gives MDCPS independent rule-making, budgeting, and personnel authority—capacities the original consent decree assumed but the prior administrative structure constrained; (2) the statutory authority to hire agency

counsel to represent MDCPS in youth court proceedings, ECF No. 976-1 at ¶ 38.a.iii, which is material to MDCPS's capacity to advance permanency plans; and (3) the legislative package of 2024, which codified procedural reforms governing termination of parental rights, parental representation, and the statutory definition of neglect. ECF No. 976-1 at ¶¶26–27¶ 35.b. These are the only changes in the Sanders Affidavit that a successor commissioner could not unilaterally reverse.

Every other reform Defendants describe—the service area model, caseload dashboard, salary realignment, workforce wellbeing initiatives, Title IV-E and FFPSA work, technology modernization, licensure revisions, intake restructuring, new investigation review committees, and the continuum-of-care contracts—is a policy, contract, internal unit, or administrative rule, revocable by the next administration or the next budget cycle.

The motion does not commit MDCPS to maintaining the caseload ratios, placement standards, training programs, or monitoring practices it describes. That distribution of reforms does not establish the durability required to terminate the 2nd MSA. The relevant question is not whether MDCPS can make progress while the decree is suspended; it is whether the State has demonstrated that it has actually achieved the 2nd MSA's objectives and institutionalized the reforms necessary to sustain that progress without judicial oversight. Defendants' showing falls short of that standard.

Defendants' own statements compound the deficiency. Defendants tell this Court that they "could have chosen inaction" during the suspension period and

instead chose to undertake the reforms they now invoke. ECF No. 978 at 57. The statement is offered as evidence of good faith, but it functions as something else. Constitutional duties owed to children in state custody are not elective. *See* U.S. Const. art. VI, cl. 3; *Cooper v. Aaron*, 358 U.S. 1, 18 (1958). MDCPS's obligation to provide reasonably safe conditions to children in its custody was the same during the suspension period as before it and as it is now. *M.D.*, 907 F.3d at 250. A State that describes its own constitutional compliance as a choice between action and inaction is a State whose voluntary compliance cannot supply the basis for a finding of durability.[24] *Horne*'s durability requirement asks whether the Court can have "confidence that defendants will not resume their violations of plaintiffs' constitutional rights once judicial oversight ends." *Frew*, 2015 WL 13357954, at *3 (citation omitted). Defendants' framing of compliance as elective is the opposite of the confidence the doctrine requires.

Upcoming changes in both Mississippi's statewide leadership further undermines any finding that Defendants' recent progress is durable. Mississippi will elect a new governor in 2027, and whether Commissioner Sanders—under whose tenure many of the alleged reforms were undertaken—remains at MDCPS

[24] Defendants imply that reinstatement of the 2nd MSA would itself cause backsliding detrimental to the public interest. ECF No. 978 at 49-50. The suggestion compounds rather than answers the durability concern. A State whose ability to maintain constitutional compliance depends on the absence of federal supervision is a State that has not implemented a durable remedy; it has demonstrated only what *Jackson* described as "fleeting federal compliance." 880 F.3d at 1202. The State's implication that reinstating the decree would cause backsliding is, in substance, an acknowledgment that without external pressure the State cannot be relied on to maintain compliance.

afterwards is not yet known. The administration will inherit responsibility for sustaining the reforms her predecessor began. The legacy MACWIS information system is in the midst of a long-planned transition to a federally compliant CCWIS system—a transition Defendants committed to beginning no later than October 15, 2016, and has not yet reached full deployment. ECF No. 713 at 3, ECF No. 976-1 at ¶79.

**C. Vacatur Is Not a Tailored Remedy.**

Even if Defendants had carried their burden of showing changed circumstances or public interest, the remedy they seek would still fail Rule 60(b)(5)'s requirements. A consent decree is "a final judgment that may be reopened only to the extent that equity requires." *Rufo*, 502 U.S. at 391. Modifications must be "tailored to resolve the problems created by the change in circumstances," and they must "do no more" than that. *Id*. In particular, modifications should not rewrite the agreement "so that it conforms to the constitutional floor." *Rufo*, 502 U.S. at 391-92.

Defendants have not requested any modifications. They have asked this Court to vacate the 2nd MSA in its entirety. *See* ECF Nos. 976, 987. The motion identifies no specific provision that has become substantially more onerous, no specific obligation that has been rendered unworkable, very few specific aspects of compliance that have been independently verified as complete. It lowers the bar to the constitutional floor and insists, on nothing more than the Commissioner's word, that that the constitutional minimum has been satisfied. On this thinnest of records, it seeks the most extreme remedy. Defendants invoke flexibility and ask the Court to impose the most inflexible solution available. They want flexibility, but only in one

direction. Rule 60(b)(5) prohibits this categorical approach. Rule 60(b)(5)'s tailoring requirement reflects a fundamental principle of equity that judicial intervention must be proportionate to the problem it addresses. *Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294, 300 (1955) ("Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs."). The Consent Decree itself establishes a clear path to termination; Defendants must achieve and demonstrate sustained compliance with its requirements. ECF No. 712 at §11.2. Defendants have made no such showing here.

The federalism principles Defendants invoke at length do not displace this proportionality requirement. Just the opposite, the "flexible approach" required under Rule 60(b)(5) embodies the proportionality requirement. Federalism is not, as Defendants characterize it, an independent categorical bar that extinguishes a consent decree's legal force after some unspecified period of time. Rather, it shapes how equity is exercised. Indeed, federalism infringements are not merely expected but tolerated. *Brown v. Plata*, 563 U.S. 493, 511 (2011) ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 28 (1971) ("The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to

eliminate the dual school systems."). The collateral effects of an equitable remedy do not invalidate "a narrow and otherwise proper remedy for a constitutional violation." *Plata*, 563 U.S. at 531. The objective, then, is to tailor equitable relief to address those federalism concerns without yielding to vital constitutional principles. *See Brown*, 349 U.S. at 300.

Defendants' claim that "[s]imilar cases demonstrate that continued enforcement is no longer equitable" (ECF No. 978 at 58) is negated by the very cases that they cite. In *U.S. v. Mississippi*, the Department of Justice (DOJ) brought an action alleging that the state was unnecessarily institutionalizing persons with mental illness in violation of the ADA. The "suit was not based on individual instances of discrimination," but rather expert studies and statistical surveys indicating that all persons with mental illness suffered a serious risk of institutionalization. 82 F.4th 387, 389 (5th Cir. 2023). After years of unsuccessful settlement negotiations, the district court appointed a special master and entered an injunction. *Id.* at 390–91. On appeal, the Fifth Circuit held that there is no "at risk" liability under the ADA; and because the suit was based entirely on the risk of institutionalization and did not identify any individual instances of discrimination, there was no evidence establishing a violation of the ADA. *Id.* at 398. In dicta, the court observed that the injunction was overly broad because it was not tailored to correct the alleged statutory violation. *Id.* at 398–401.

This lawsuit is different. It was brought by individual plaintiffs, not by the DOJ. The plaintiffs alleged individual instances in which their constitutional and

statutory rights were violated, not merely statistical data and expert forecasting. The lawsuit included claims under the ADA but centered around the Due Process Clause of the Fourteenth Amendment, which indisputably permits at-risk liability. The district court did not impose an overly-broad injunction; instead, to avoid trial, Defendants willingly agreed to, and meticulously negotiated, a settlement. Defendants' narrow selections from *U.S. v. Mississippi* might be appropriate for a district court considering the scope of an post-trial injunction, but it is wholly irrelevant to a district court assessing whether the agreed-upon settlement should be vacated in its entirety. To the extent it is relevant at all, it favors Plaintiffs' argument that the equitable remedy sought by Defendants—vacatur—is not tailored to the federalism burden that Defendants allege. The same tailoring principle that cautions a court against overly-broad injunctions is the same principle that cautions a court against premature release from unfulfilled consent decrees: the remedy must be tailored to redress the alleged harm and no more.

This principle is best demonstrated in *M.D. v. Abbott*, the other Fifth Circuit case cited by Defendants, and the one most analogous to this case. After a two-week bench trial, the district court held that Texas was deliberately indifferent to known and obvious risks in violation of the class members' substantive due process rights under the Fourteenth Amendment, and the Fifth Circuit affirmed a substantial portion of the district court's comprehensive injunction. 907 F.3d at 246. Defendants' quotation from *M.D. v. Abbott*, 119 F.4th 373, 395 (5th Cir. 2024) concerned the

propriety of contempt, not the validity of the injunction. Read in context, the entire *M.D.* litigation supports Plaintiffs' argument that vacatur is not a tailored remedy.

Finally, Defendants cite *Jonathan R. v. Morrisey*, 768 F. Supp. 3d 756, 763 (S.D. W. Va. 2025) for the proposition that federal courts are not authorized to issue injunctions of the kind requested here. But less than a month after Defendants filed this motion, the Fourth Circuit reversed the district court: "despite the district court's assertion that the 'Constitution does not permit federal courts to step in and govern' state programs, longstanding precedent firmly bestows federal courts with the power to mandate and oversee the reform of state institutions when they systematically deprive citizens of constitutional rights." *Jonathan R. v. Morrisey*, 178 F.4th 139, 151 (4th Cir. 2026) (Jonathan R. II). The court found that decades of precedent established the "unambiguous legal reality" that federal courts not only can but "must remedy systemic rights violations through comprehensive injunctive reform of state institutions." *Id*. at 155. Defendants' protestations to the contrary do not change the legal reality.

If Defendants believe particular provisions of the 2nd MSA have become unworkable or unnecessary, the doctrinally correct response is to identify them and propose tailored modifications. The 2nd MSA itself contemplates such modifications. *See* ECF No. 712 at §11.2.a. Plaintiffs have not foreclosed that path; nothing in this opposition asks the Court to do so. What Plaintiffs ask is that the Court hold Defendants to the burden the doctrine assigns them: produce the evidence, request

the relief proportionate to that evidence, and accept the corresponding scope of judicial intervention. That is the path *Rufo* requires. Defendants have not taken it.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' motion in its entirety.

Dated: August 31, 2026 *Respectfully submitted*,

By /s/ Marcia Robinson Lowry
Marcia Robinson Lowry

A BETTER CHILDHOOD
Marcia Robinson Lowry (*admitted pro hac vice*)
mlowry@abetterchildhood.org
Anastasia Benedetto (*admitted pro hac vice*)
abenedetto@abetterchildhood.org
420 Lexington Avenue, Room 2035
New York, NY 10170
Telephone: (646) 795-4456
Facsimile:(212) 692-0415

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically filed the foregoing *Response* with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel of record.

This 31st day of August, 2026.

By *_/s/ Marcia Robinson Lowry_*
Marcia Robinson Lowry