# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| OLIVIA Y., et al<br><br>Plaintiffs<br><br>v.<br><br>TATE REEVES, as Governor of the State of Mississippi, et al.<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 3:04-cv-251-HSO-ASH |

---

**AFFIDAVIT OF MAGDELENA HOLLAND**

---

I, Magdelena (Mag) Holland, declare under penalty of perjury, pursuant to 28 U.S.C. § 174 that the following is true and correct:

1. I am over 18 and competent to testify.

2. I have personal knowledge of the facts stated herein.

3. I, being duly sworn, hereby declare and state as follows:

4. I live in Long Beach, Mississippi, and have served as a foster parent for over twenty years. Over the approximately twenty years that I have been a foster parent; I have cared for hundreds of children.

5. I have also adopted several children who were previously in foster care or otherwise came into my care, including L. (7), K. (14), N. (16), D. (17), E. (23), and NR. (27).

6. At one point, I allowed my foster care license to lapse because L. was experiencing significant health issues and I needed to focus my attention on caring for L. After L.'s condition stabilized, I decided that I wanted to begin accepting foster children again.

7. In approximately July 2023, I began the process of becoming relicensed as a foster parent.

8. The relicensing process took an extraordinarily long time. I was repeatedly told that there were additional things I needed to provide or complete despite having provided all of the documents they initially requested. At one point, I was told that CPS was waiting for my fingerprints, a process that continued for approximately six months.

9. In December 2024, CPS placed N. in my home even though I did not have an active foster care license.

10. N. remained in my home for approximately four months before my licensing issues were resolved in approximately April 2025.During those months, CPS knew that I did not have an active foster care license.

11. CPS also failed to provide adequate financial support for N. during this period. N. arrived without adequate clothing, and I spent my own money purchasing clothing, necessities and providing for her medical needs. I was initially told that CPS would reimburse me for these expenses. CPS later told me that they could not reimburse me because I had not been licensed at the time I incurred them.

12. In other words, CPS placed N. in my home while knowing that I was not licensed and then relied on my lack of a license as the reason it could not reimburse me for the expenses I incurred caring for the child CPS had placed with me.

13. CPS brought N. and her two siblings to me on the same day that they witnessed their mother being murdered. She had experienced severe neglect, had been abused and trafficked and had never attended school.

14. N. had spent approximately two and a half years at Youth Villages in Tennessee and continued to struggle significantly with her mental health. Despite the severity of her trauma and a court order requiring therapy, CPS did not arrange ongoing therapy or provide me with other supports to help care for her.

15. I paid out of pocket for N.'s medications and other basic necessities, including new clothing, because she arrived in clothes she had outgrown to the point that she could not button her pants. I was not reimbursed for most of these expenses.

16. More recently, CPS investigated allegations involving me and members of my household in connection with my adopted daughter D. In approximately February 2026, D. was admitted to Oceans Behavioral Hospital for suicidal ideation and reported that I had abused her. D. and her biological mother also made allegations concerning L. and my ex-husband, Marty, including concerns about Marty caring for L. given Marty's minor dementia.

17. I later received a letter stating that the allegations concerning D. were unsubstantiated, but that an allegation of physical neglect concerning L. was substantiated because I had left L. in Marty's care. After CPS raised this concern, we stopped leaving L. in Marty's care. I have since received conflicting information from CPS about the investigation: CPS personnel have told me the allegations were unsubstantiated, while written correspondence states that at least one allegation was substantiated.

18. Despite these allegations and the investigation remaining open, CPS has continued contacting me approximately once a month to ask me to accept additional foster children. I find this deeply concerning. If CPS believed there was a potential safety issue in my home serious enough to warrant an investigation, I do not understand why it continued seeking to place vulnerable children in my home before resolving that investigation.

19. In my experience, CPS fails to arrange necessary medical, dental, psychological, and developmental services for children in its custody. I take it upon myself to organize these appointments for my foster children.

20. In my experience, CPS caseworkers generally have not been the people ensuring that children receive routine medical and dental care. I have had to arrange and advocate for that care myself.

21. I have experienced significant caseworker turnover throughout my years as a foster parent.

22. One example involved a foster child named A., who was approximately 13 years old when she came to my home from a mental health institution. During the approximately two years A. lived with me, she never received a home visit from her caseworker and, for a significant period, effectively had no caseworker involved in her case. When I contacted the State to express concern about the lack of caseworker involvement, I was essentially told that because A. was doing well in my home, there was no problem and she did not need visits.

23. I continuously had to pay out of pocket for children's basic necessities. At one point, CPS failed to reimburse me for approximately three years. During that period, I maxed out three credit cards paying expenses associated with caring for children. A judge ultimately had to order CPS to reimburse me.

24. CPS has stated that children are not being housed in hotels. Last year, a young girl who had been living in a hotel room for many months, and was a friend of one of my children called to ask if she could live with me. When I called to ask CPS about placement of her CPS told me there were no children staying in hotel rooms.

25. I also cared for a young girl who had experienced approximately forty-eight

different placements.

26. In my experience, CPS's treatment of foster parents makes it extraordinarily difficult to recruit and retain qualified foster homes.

27. Based on my approximately twenty years of experience caring for hundreds of children, I am deeply concerned that CPS is not adequately protecting or caring for the children for whom it is responsible.

28. The matters set forth herein are based on my personal knowledge.

29. I declare under penalty of perjury that the matters set forth herein are true and correct to the best of my knowledge information and belief.

Executed on this 20 day of August, in 2026.

Magdelena Holland (Aug 20, 2026 15:20:47 CDT)

MAGDELENA HOLLAND